Exhibit A

SALINA CITY COMMISSION MEETING

held on

November 13, 2023

Excerpt Transcribed by

AVANELLE L. SULLIVAN

for Dolginoff & Associates, a
Registered Professional Reporter
Certified in Kansas and Missouri.

## APPEARANCES

CITY MANAGER:
Mike Schrage

VICE MAYOR:
Bill Longbine

CITY ATTORNEY:
Greg Bengtson

CITY COMMISSIONERS:

Greg Lenkiewicz
Trent W. Davis, MD
Karl Ryan

DIRECTOR OF COMMUNITY AND DEVELOPMENT SERVICES:

Lauren Driscoll

(ph) indicates a phonetic spelling.

[sic] indicates the text is as stated.

Quoted text is as stated by the speaker.

(The excerpt of the proceedings commenced.)

VICE MAYOR LONGBINE: That brings us to Citizens Forum.

MR. SCHRAGE: If I may -- I need to make sure my microphone is on.

VICE MAYOR LONGBINE: Oh, you have other business?

MR. SCHRAGE: Right.

VICE MAYOR LONGBINE: I was going to skip that.

MR. SCHRAGE: So I have a -- I would like to give you some background on an issue that I'm sure you're aware of that became a topic of conversation over the last week. And that is the Cozy Inn artwork and mural/sign that's been initiated on the -- I guess it would be the north side of their building. So I have some background information for you.

I would tell you that I think staff made first contact with Mr. Howard, who's here on -- the owner and operator of Cozy's is here. Made first contact with him last week and then we met with Mr. Howard and his artist this morning and kind of walked through the

same information that I'm going so share with you at this point.

So -- and it started by acknowledging -- and I understand it's become an emotional issue for some and has been a hot topic of conversation in social media and the radio.

I want to give Mr. Howard credit. He's adamant that that wasn't his doing, that wasn't his initiation, that wasn't his intent. But it did start, you know, kind of a community conversation.

So I want to clarify a couple of things right off the top. The issue is not about the art. The issue is not about the artist. I think there were some comments made that the artist hadn't been approved or the art hadn't been approved. And that's really not what -- what's at play here.

I would tell you as well that there are examples of very similar issues as it relates to what constitutes art, what constitutes a sign, how does free speech get involved, how can signs and art be regulated.

That is a difficult issue that's

playing itself out coast to coast, so not necessarily unique to Salina. The important distinction here relates to commercial speech and our ability to regulate commercial speech or signs and then specifically how we do that by way of our -- the codes that we have in place.

I won't go into great detail, but there's a U.S. Supreme Court case that provided us clear direction, provided the nation clear direction, that sign regulation has to be content neutral. And I think some of you are on the planning commission, and the city commission as we worked our way through that a couple years ago trying to modify our code to be sure that we met that content neutral requirement. So.

And that's important in that we don't get to look at a sign and what it says and what it looks like. We just need to have codes that apply across the board, regardless of any specific content parameters. And so --

And there certainly is a misunderstanding between art and signs and commercial speech. And I would acknowledge

that signs can be artistic, some more artistic than others. This one in particular is very artistic in terms of kind of the theme and where it's headed with the image.

So despite all the emotion and kind of the confusion surrounding it, we do not regulate based on content, aesthetics, the particular business in question nor social media or a petition process. We just have to administer based on the codes that are in effect.

Our codes in this particular case have been in effect since 1966. It doesn't mean that they can't be changed, but the codes that we currently have, have been in effect since 1966 and we regulate based on size.

So by zoning category, that then dictates, kind of, the mathematical formula that gets applied that then determines the maximum size of signs in total, not just an individual sign, but kind of the aggregate size of those signs that's allowed.

And I am going to call on Lauren Driscoll to walk you through the specifics as it relates to Cozy's. And so that, then, kind

of sets size limits in proportion to the building or more specifically the building frontage.

So in this particular case, Cozy currently has three permitted signs, and they use up 84 percent of their allowable space by our current code. The proposed sign, in combination with those other three signs, would put them at about nine times the allowable size. So it really becomes a function of the size of that artwork and signage relative to our current code provisions.

In terms of possible next steps, we discussed these with Mr. Howard and his artist. First and foremost is submitting a sign application, so we have the specifics of what they intend and we can take a look at that relative to the code.

But we do know just from what's on the sign and the renderings that have been shared, it's going to be more than just submitting an application for approval. We do have a disconnect between what they intend and what our code currently allows.

A couple of other options that are just generally available in the zoning code are applying for a variance or proposing a code amendment. We discussed the variance process, and there is a statutory set of criteria that the board of zoning adjustment has to reach findings on all five of them, that they're met.

And that makes it a little -- makes it problematic in terms of this particular instance. It has to be unique and -- there has to be something unique in terms of an insurmountable challenge or something that the code might not have taken into account. There has to be an undue hardship -- some of those standards are pretty high bars.

And we told Mr. Howard, we are not saying you can't apply for a variance. We're not saying what the outcome might be. But knowing what we know about kind of that criteria and our history, it doesn't seem likely that a variance would be granted.

In fact, staff shared that our only knowledge of a sign variance that has been approved relates to a location where the

ground falls off so quickly from the roadway, that it had to be allowed to be taller than the code might have allowed just to get in a normal scale relative to the driving surface.

The other option, the code amendment, we have a process whereby someone can make application or request a code amendment. Looking at it in first blush, probably to accommodate what's being -- what Mr. Howard desires, we need to increase the allowable square footage nine to 10 times what our code currently says or we would need to come up with some allowance to cover an entire -- a wall pretty much in its entirety or possibly even all four sides of the building in its entirety.

And that starts to get very customized, very detailed. And the key factor there is, it has to be applicable across the board. We can't -- we're not in a position to create a carve-out specific to a particular business.

And so whatever we come up with would need to allow the proposed sign. It would need to apply equally to others in a similar

situation, again, regardless of its content, regardless of its aesthetics, regardless of the specific business.

And I would reiterate, it's all on the basis of a commercial message. So while we may have one sign that feels much more artistic than another, these size limits could just be pricing and a more typical business sign text than kind of an art -- artistic flair.

I don't -- I think it's lost on you; that's a pretty significant policy decision. It's going to take some work. We will -- we're prepared to staff that through in terms of code drafting, running it through the necessary committees for recommendation. But then it ultimately would end up back at the city commission level for consideration of an amendment to our code.

As I said, we're -- we're definitely willing to do that. It won't be quick. I think there is a lot that we might be able to learn from other communities, and if they've been able to find a creative way to come up with codes that kind of address the balance

that we're trying to strike here.

Part of the conversation will be while -- while it may be acceptable in this particular location, does it open it up for other locations. And so we would need to provide -- spend some time kind of looking at all the possible scenarios so that the planning commission and the city commission have a good understanding of what that code change might allow.

And so we have learned -- had some contacts and planning. And we'd already identified the need to take a look at this and had it on our plan of work for 2024. It wasn't necessarily on the plan of work for the coming week or before year end, but she is aware of some planners that specialize in this. Reached out to one of them last week to try to see if we can expedite some of that conversation.

We're hoping to have a proposal back in the next week or two. But the preliminary conversation -- Lauren can speak to this better than I can -- is their schedule is such that their -- even if we engaged them and can

get something in place, it's probably a couple months out before they're able to, you know, work on our specific project.

The last thing that I would say -- then I want to turn it over to Lauren, and then I know Mr. Howard is here as well -- is part of the conversation we had with the artist and Mr. Howard this morning was last week, staff's contact with him was not intended to be enforcement, per se, with a violation citation, but just agree to pause on proceeding with the project until we can sort through the codes, until we can have the conversation we had this morning.

I think that's still a possibility. The artist indicated this morning their preference was, they washed the building in preparation for painting. They don't necessarily want to leave it half finished. And if it's going to take into the spring before they have an answer, their preference is to paint it white and just prep it to start over again.

So. That's certainly probably the cleanest way from a code standpoint. But that

wasn't something that we said that they necessarily had to do.

With that, what I'd like to do is give Lauren an opportunity to walk you through the math and the code provision specific to the Cozy sign as a little bit of background.

MR. HOWARD: Can I just say --

MR. LONGBINE: Well, now, let Ms. Driscoll -- let Ms. Driscoll bring the code.

MS. DRISCOLL: Are you sure?

VICE MAYOR LONGBINE: Yeah. No, you don't need to leave, Mr. Howard. We just got procedure here.

MR. HOWARD: Okay.

VICE MAYOR LONGBINE: Go ahead, Lauren.

MS. DRISCOLL: Jacob, if you wouldn't mind popping that analysis up. Staff learned about the sign late on Sunday night, contacted Mr. Howard Monday morning and just asked if we could have -- if he could pause in -- in the creation of his sign so that we could get a chance to look at it.

Without an application, we had no measurements, things like that. Needed a

chance to look at it. And could already see on social media a lot of people had already seen it, loved it, wanted more of it.

So we also looked and needed a little time to research to see if there are any exceptions to -- somebody asked us if really, you know, institutional-type buildings get an exception to sign codes. How -- how do you give that kind of variance. Did some research -- that's why we asked for the pause so that we could meet with him this morning.

MR. SCHRAGE: Sorry to interrupt, but just to clarify. Sunday -- not yesterday --

MS. DRISCOLL: Correct.

MR. SCHRAGE: -- Sunday, the week prior.

MS. DRISCOLL: Right. Sunday before. But without a lot of details, staff needed just a little time to do some research, which is what we had asked him and he said that that was fine.

As part of some of that research, also quick -- did a side analysis. This is typically something we would do when we would get a new sign permit in the door. In this

case the question is, is it a sign.

If you look at our definition of a sign, a sign is anything in writing including letters, words and numbers -- there are letters involved in this application -- or in this particular sign -- pictoral representation. This includes illustrations or decorations; that is also part of this sign.

And these are calculated to attract the attention of the public or any figures, similar in character which, one, could include being painted on -- so they are painted on to the wall; two, used to announce, direct attention to or advertise something. It's welcoming you to come into the building -- that's part of the sign -- and is not located inside the building. It is of course on the exterior side wall of the structure.

So from that pure definition, this starts to tick all the boxes that make it a sign, before we even get into a discussion of commercial speech, noncommercial speech.

When we look at sign regulation, we go to the sign code, which is in the city

zoning code, Chapter 42. And then we look at what zone the property falls into.

So I've gotten quite a few calls over the last few days of people asking, well, what about that one? What about that sign? What about that sign?

Well, they're in different zoning districts. So the rules are going to be different for those.

This particular property is in C4, which is the central business district downtown. And beyond things that are typical to any zoning district, identifying functional types of signs, structural permits, numbers of signs, most notable by most people when it comes to signage is the maximum gross surface area. So how big can the sign be.

We also do a collective surface area. So you can have a couple smaller signs that could equal that full surface area amount of signage. So, for instance, in the downtown, you can have 3 square feet of signage for every foot of frontage.

Well, the Cozy building is a very little building. It only has 20.8 feet -- so

let's round it up to 21 -- even to 21 linear feet of frontage. So if we take 21 times 3, you get 63 square feet.

So by the time we take their north facing wall sign, which is 24 square feet, their 7th Street projecting sign, which is 24 square feet and then their 7th Street awning sign, which is another 4.88 square feet, you get 52.88 square feet, leaving us just over 10 square feet of remaining surface area of signage allowed for the building.

In Cozy'a situation, if you take the sign that's on the side of the building and you do the square footage analysis on that, it's approximately 528 square feet, which is significantly greater than the allotted amount in the C4 district. So that's really the challenge here.

And I would love to say from the staff perspective, if there was one line that I could change and make this simple, I really would. But one of the things that makes the downtown unique is there's kind of a domino effect; right? We have a lot of different shaped buildings. We have very limited or no

setbacks in many situations.

So how the buildings work together, the scale of messaging, of signage, really does matter in that environment. Plus the C4 is also very pedestrian focused.

Where, for instance, you know, driving down 9th Street, that's not a pedestrian environment. But everything in the C4 is scaled for both car and people. So that also has to do with some of our sign regulations and kind of how they came to be.

So we did have this conversation with Mr. Howard this morning. We kind of saw this coming, the excitement of all the art with Boom Festival has gotten people looking at blank walls differently. But that doesn't necessarily change the definition of a sign.

Even if we changed our definition, we still have to be mindful of kind of what the Supreme Court decisions have done to reflect that sign code and how murals and signs can exist cohesively in a community.

And it takes a bigger, broader conversation. So we had planned to start that this spring knowing we had a lot of creative

minds wanting to share, but also wanting to get everybody on the same page of what the outcome would look like.

In reaching out to specialists -- and I will say, if we could do this in-house right now, I would. But this is a very unique and specialized area of code. It also, in order to do it in a time efficient manner, you kind of need to -- this needs to be your -- your thing.

It's kind of like when you hire a specialist, a subject-matter expert to do something. They can do it quicker than other people. You know, that's -- that's their system or that's the tool that they always work on.

And we want this done in a timely manner. Clearly it's kind of come to a precipice where people are noticing this. And I do think bringing a subject matter expert in -- a couple of them that I've talked to said, you know, two, three months they could have a good public process that lets everybody have a chance to speak on this, to find code that will work in the community and get

something to bring forward to you all.

So I think that's pretty reasonable. I'm hoping they can start January, February at the latest. But I do think that this is a situation in which it would be reasonable to get somebody who could really kind of help us move this along in addition to everything else we got going on.

MR. SCHRAGE: And if I could add one thing to that. In addition to being the subject matter expert, I think this a really good example where it's going to take some creativity on our part. It's going to take some balancing of considerations.

And someone that's been in these similar conversations in multiple communities and facilitated, you know, kind of public discussions about that I think can add a lot of value versus us just kind of working in a vacuum trying to figure this out from scratch.

MS. DRISCOLL: Well, and they're going to have to turn visual materials around quickly. I mean, in amongst everything that's coming in and out of the office every day, somebody stopping, and every time we talk

about a scaling of something or, you know, how -- how a different change in rules would look, you're going to need to kind of create new visuals to go over with the group to say, okay, well, that's what it looks like here, that's what it looks like here and that's what it looks like here in the C4.

Is that what you were hoping this rule change would do? And so people are going to have to see those visuals. And somebody being able to produce those in a timely manner is also part of kind of what helps move this along, rather than staff in amongst phone calls and other day-to-day things, trying to produce those materials, plus research code, plus rewrite and do all of those others things.

MR. SCHRAGE: So we -- in what little time we have had, we brainstormed a little bit about, okay, what's unique about that location. Could it be acceptable.

And I think the conversation was not just absolute objection to it, but it then quickly becomes, well, how do we write something that that's acceptable but it

doesn't expand beyond what the community might have in mind for other building faces in the downtown.

I think we can get there. But I do think an outside subject matter expert could certainly help us.

COMMISSIONER RYAN: Well, I would agree you're taking the right approach to dive in, given the proliferation of mural art everywhere -- and it seems Salina is really interested in that, we're kind of ahead of things in trying to develop that.

But I'm -- yeah, I would be anxious to hear what the better brains are doing with that. Because I can understand the city's point of view of --

I mean, if this code is as old as 1966, it deserves to be reviewed in this modern concept. Because I can see dividing a signage like this -- I mean, look at any Apple ad in the world that -- it's very much art but still a portion of it communicates the commercial message.

I could see much of the mural part be considered art, and then focus on the actual

portion that's the message as the commercial aspect. So a fine line there between artistic minds and people that administer code, so.

MS. DRISCOLL: And I think representation is one thing also that you'll see when you read case law about this is, expressly related solely to the economic interest, to the speaker and the audience, or speech that possesses commercial transaction when the -- I'm going to use the coffee house for instance. This is actually from a Supreme Court case.

If the coffee house has a dove with an olive branch and it says the word "peace" on the side of it, that -- that's not a sign. Because even though the word "peace" is there, you're not selling peace inside. I mean, coffee may do that for some people.

But in general, the dove, the olive branch, the peace are not part of a commercial transaction that would take place in that building or draw you to that building for a commercial transaction.

Where if we had a steaming cup of coffee and a coffee pot on the side, those are

things that draw you in to the use of that building. Even without a word, that illustration can suggest that commercial transaction.

There's actually case law example of a mural, which is actually a sign, of a bunch of puppies playing in a field. It's across from a dog park. And the mural happens to be on a building that is a doggy day care. Never said a word. But it's dogs; they do doggy day care. That was deemed commercial signage.

VICE MAYOR LONGBINE: I think it's -- go ahead.

COMMISSIONER RYAN: I'm sorry. I was just kind of following up on my -- are there communities that have public boards or entities that decide what's an artistic aspect and what would be a commercial? I mean, that seems very hard to me to distinguish in given instances.

MS. DRISCOLL: I do. I think that is one of the biggest challenges. I think part of what we have to focus on is really location, size, and scale of signage and work from there, rather than what is the content or

does it look like art, does it feel like art. Because that's definitely where we get into the trouble zone. And that's definitely where, you know, cities that try to regulate to that messaging side of things typically end up getting sued.

MR. SCHRAGE: Yeah. You probably recall time, place, and manner is a typical refrain of, well, you can relate. And then Reed v Gilbert is another U.S. Supreme Court case that very clearly makes it known that you're not supposed to regulate based on content. So.

MS. DRISCOLL: But the other option is we may end up having to have a process for the murals. So it's like if you can't say this is one thing, do you identify the others? I mean, that's part of the conversation I think needs to be had.

Sometimes saying something isn't something -- maybe you need a process to identify what something is. So. I think there's some different things we have to look at.

COMMISSIONER DAVIS: Just from a

definition standpoint, if this same painting was, let's say, on the side of one of the grain elevators, downtown, away from where it is now, would it -- then be considered commercial -- commercial signage?

MR. SCHRAGE: And the reason I laugh, is now we're into off-premise signs. There are -- there is signage that's not on a -- at the actual business location that directs attention elsewhere.

COMMISSIONER DAVIS: Yeah, I kind of remember that discussion from --

MR. SCHRAGE: So --

COMMISSIONER DAVIS: Okay. I'll withdraw that question.

MR. SCHRAGE: But it -- you know, there's a lot of what-ifs. There certainly is a circumstance where a steaming cup of coffee on the side of a coffee house is a sign and a steaming cup of coffee on the other side of town unrelated to anything going on might not be a sign.

You know, as we -- as we looked at murals, we had some conversation about this very question. And the first reaction was,

well, if it includes lettering, or if it includes wording.

But it really -- if the wording's not commercial in any way or doesn't have an attachment to a commercial operation, that in and of itself isn't a disqualifier.

COMMISSIONER DAVIS: Case in point being the Target logo. You know, some of the buildings, they don't even put the word "Target" on it.

MR. SCHRAGE: Right.

COMMISSIONER DAVIS: They just have --

MR. SCHRAGE: Well, Lauren's made the example in prior conversations, the gas pump and the different icons that you see on directional signs on the side of the interstate. No words, but it's still conveying a message.

VICE MAYOR LONGBINE: Well, I think if this had been anything other than a 101-year old historic institution, it wouldn't be an issue.

And, you know, I'm sorry Mr. Howard wouldn't stay and join the conversation here.

But I really believe if he intended to get in on the whole mural trend -- and it is -- you pointed out well the distinction between art and murals and commercial sign.

So I guess my thoughts all along as I've studied this issue is what would it take for him to turn this into a mural rather than a sign.

MR. SCHRAGE: So as I prepared my overview, I shared it with legal counsel to just make sure I wasn't saying anything incorrectly. And as might be expected, they responded two to three levels deeper in terms of legal analysis and court cases.

And I say all that because we end -- that ends up being a legal question of, if there are no words but it's still, you know, related to the business activity of the building, I think there's case law out there that says that's still a commercial message and it's still a sign.

And then the added difficulty is -- and there's examples in court cases of this as well -- as soon as you start that treatment, whatever it might be, for one intended

location or purpose, then the expectation is, I'm the same as them. I deserve the same treatment.

And that's the precedent-setting nature that we have to really pay attention to as we revise the code.

COMMISSIONER DAVIS: Then I think the other flip side of that is, you know -- and I do -- I did drive by and it's a really nice drawing. But we don't spend our time regulating things that we like. Our codes make us be impartial when we have to deal with things that we don't like.

And if everybody in town liked it, we'd probably push it through and -- but the next time -- you know, this may be a poor example to use. But, you know, if a sexually explicit supply store wanted to come by and they had, you know, pictures of their paraphernalia on the side of the building, judging from comments during our last election, a lot of folks would be upset over that.

Or if we had same-sex couples, you know, with a rainbow picture on the side of

the building saying, you know, Salina, friendly to the LGBTQ community, folks -- you know, we'd have folks coming up on the other side saying, well, how can you allow that? I mean, that's clearly a sign.

So, you know, whatever we do, it's got to be something that will stand the test, no matter who's coming up to the podium. And it makes it more difficult -- I think it's a beautiful sign, but.

And I've said it before, we have rules for a reason. There are times -- you know, if a rule always has to be overridden or we give exceptions, then there's probably something wrong with the rule.

But we even need to look at finding a way to change the rule. But, again, you know, you have to understand that someone else that you don't like may come by and use that same -- same rule.

MR. SCHRAGE: All right. So building on that hypothetical just a little bit, without additional clarification, allowing one building to have 100 percent of the side wall as a sign, we -- you could do your frontage on

Santa Fe, a hundred percent a sign.

I don't think that's the intent. And that's -- those are the kind of things that when we make a code amendment, we need to parse out so that we don't have unintended consequences.

COMMISSIONER DAVIS: And, you know, if we wanted to have a sign frontage district, you know, where the front of every building had to be a sign, you know, so it looked like you weren't going into a store but you were going into a sign, we could do that. I mean, what is it -- which city in Texas is Weird -- Austin?

MR. SCHRAGE: Keep Austin Weird.

COMMISSIONER DAVIS: Austin and Portland would probably take objection to us stealing their fun. But, again, that just has to be the nature of that particular district.

MR. SCHRAGE: It's not lost on staff, this is a result of the enthusiasm and the energy that is the mural festival. And speaking with Mr. Howard, I'm confident that he viewed it as his mural and didn't make a distinction between it being a sign in our

estimation and it being a mural.

And I have vague knowledge to the artist, that -- his artwork is high energy. You know, it -- it pops. We just got to find a way to balance that with the sign code.

VICE MAYOR LONGBINE: Well, I think we should be able to work through this without bringing in outside consultants. It shouldn't be that complicated.

MR. SCHRAGE: I don't -- you might find us bringing a consultant in on this one.

VICE MAYOR LONGBINE: I do agree with Commissioner Davis' point, though, that, you know, we got these ordinances and regulations and we need to be consistent. You know, someone could put something very derogatory or offensive to society as a whole, and that's why we have these ordinances.

COMMISSIONER DAVIS: And I guess even then we can't prevent. All we can do is regulate the size of the sign.

COMMISSIONER LENKIEWICZ: It's a bit of a quandry. And I -- coming back to the subject matter, expert -- I mean, you mentioned -- I'm sorry. I did not mean to do

that to you. But it sounds like it will expedite the situation, which is what we want to see happen.

I mean, I can't speak for the other members of the Commission, but I'm getting a general sensibility of we want to work with this business owner. We want to figure out if there is any middle ground, which sounds very questionable at this point. We'd like to get there.

But, you know, for the general public, this sensibility that we're just up here, you know, thumbs up, thumbs down and, you know, this is art, this is not art, I mean, it's a lot more complicated than that.

And, unfortunately, we find ourselves in a situation where I think we all appreciate the art. But we are bound by -- by laws that we -- you know, we're a governing body and that we -- we're -- we can't just arbitrarily decide, yes, this rule we're not going to enforce, and, you know, this rule we're going to apply, and there's the sense of fairness and uniformity to how we do things.

And it's really not a good spot to be

right now, to be honest. I don't like this. And it reminds me a lot of my law enforcement years, a lot of similarities. But unfortunately, that's part of our job and it's going to take time. And hopefully we find some middle ground.

But the concept of private property rights and, hey, this is something I own and I want to do what I will with it. That's not lost on me either, as a -- as a business owner. I get it. It's just we are -- we're in a bit of a quandary, I'll say it again.

COMMISSIONER DAVIS: If we had a different set of rules for downtown or if we called it an arts district or whatever, we would not be able to have a separate board decide the artistic merits. It would still -- you'd still have to have a regulation -- not necessarily worded like this, but it would still be you either fit or you don't.

MR. SCHRAGE: We do have a design review board that applies some architectural and aesthetic standards within -- in that district. But that's about as far as I'm comfortable going without some legal advice

beyond that.

It certainly isn't -- as Commissioner Lenkiewicz pointed out, it's not thumbs up, thumb down on the particular art. It's --

COMMISSIONER DAVIS: Just the structure and appearance of the building.

MR. SCHRAGE: -- some broader guidance and is it within that guidance.

MS. DRISCOLL: Well, boards and commissions make their decisions based on the criteria that's outlined in code. So when they make a decision, you have to be able to tie findings back to that.

So the body finds that as per this section of code, it did not meet it. The body finds it did meet that section of code. So it's never really arbitrary, right, when the board reviews things. I mean, there is criteria which they make the decision to.

So when we say, like, can we have a board that decides if it's art or not art, that's a great example of can you really find that criteria. That's where we stick to time, place, and manner.

The board can decide, is that, you

know, the right size for that space. Is that the right material for that space.

When we get into downtowns, we start talking about, you know, historic materials, historic architecture. And that's kind of a unique line that we walk in our downtown. We're not a purist when it comes to historical integrity like some downtowns which is -- that's -- we have a lot of cool stuff going on, which means we can bring some other things in. But you still have to be mindful, of some of those components.

So those are things that can be part of that decision. But as far as kind of content or, you know, the flavor of the message, I mean, outside of outright profanity -- Mr. Bengtson?

MR. BENGTSON: Well, if I may, Vice Mayor and commissioners, to all the points being made, most of what a municipality or city regulates is subject to a relative -- relatively simple test of whether there is a nexus between the regulation and a legitimate public purpose. Most of the code is subject to that sort of test.

When you get into First Amendment regulation, anything that is protected by First Amendment, it gets more specific. The Supreme Court has told us now when you are evaluating anything in the commercial speech category, it undergoes what is called an intermediary -- intermediate scrutiny level.

It's higher than that just rational nexus. There has to be a specific public purpose. It has to be narrowly tailored to meet that. That's the type of analysis that under -- that -- or critique that anything that you do that regulates commercial speech would undergo if challenged.

Now, we know also, however, that when you're looking at art as a form of expression that has been determined to be protected under the First Amendment, that undergoes what is called a strict scrutiny. It's a higher level test. So that's the sort of distinctions that Ms. Driscoll is speaking of.

And I think the only other point I would make, to your point Vice Mayor, understand I'm not sure if your thought was related to cost or time or whatever it might

have been. But the only thing I would say, we are in an area where we, as your local general counsel recognize, particularly with both the speed and accuracy with which we would like to address this, that at least from the legal standpoint, I think there are efficiencies even in terms of cost of having the specialized expert handling those sorts of questions rather than you all having to wonder if we've figured that out or not.

So, you know, I think there are efficiencies. And I know from Ms. Driscoll's work at state and national levels, she has reason to be familiar with folks who are expert in these areas. And from our standpoint as legal counsel, we welcome that sort of expertise on such a -- such an important set of issues.

VICE MAYOR LONGBINE: What's the commission's thoughts on that? Bring a consultant in?

COMMISSIONER RYAN: No. I'm completely on board with a consultant, yeah. I think that there are people that have been following this law for periods of time and

that it's important that we have their wisdom and experience. And I'm sure it will be much cheaper than us, you know, plowing a new road.

I mean, I have a lot of confidence in our staff in figuring any kind of problem out and providing remedies. But it looks like we'll get much quicker answers if we buy some expertise.

COMMISSIONER DAVIS: I agree. And that doesn't mean that creative minds in town can't still work up some other solutions.

MS. DRISCOLL: Oh, definitely. And, I mean, one of the things that takes a little time vers, you know, me sitting in my office just going one line at a time, is that we need public process. I mean, there are definitely a group of stakeholders here. They're artists. They're downtown business owners. They're downtown building owners. There's nondowntown businesses and buildings.

So, I mean, this is -- this is something that we're seeing not just downtown but in the other areas. And I think to have time to have conversations with those folks and ask, you know, how are these rules feeling

and fitting as we've changed as a community over the last few years is an important part of that process. So definitely getting those creative minds to the table.

VICE MAYOR LONGBINE: Well, I did learn a lot from the PowerPoint presentation that was forwarded to us and things I hadn't thought of. So this is a learning experience for all of us, I think.

MS. DRISCOLL: And it's -- to Greg's point, it's also like an ever-changing field. I mean, every time somebody gets sued, a different city, that's a different interpretation of that case law.

So that's the other thing is having somebody who's doing this day in and day out, following and applying those things. And there's a -- I will say from 20-some years of experience, there's a difference between having read it and read somebody else's code, then trying to borrow pieces of that and put that into your own, vers somebody who has applied this in other places and can kind of come in and say, well, here's several different examples; how do they apply to your

place, which can -- can be very helpful.

And sometimes just a new set of eyes to see things differently than we have before.

VICE MAYOR LONGBINE: Well, I hope patience can prevail. This really did take off. And I want to remind people, this had nothing to do with the city collecting permit fees.

MS. DRISCOLL: No. And I have -- I will say we have not issued a violation notice. We simply called and asked for a brief pause so we could research and asked for a meeting. That is the sum total of it.

This morning we met with the business owner like we would any other business owner in town, wanted to talk through these things, and came in willing to talk about how the code could be different.

Still haven't issued a violation notice. Haven't -- haven't done any of those things. Had a normal conversation.

In fact, as I was coming down the stairs, Mr. Howard did drop off his permit along with his application fee. We'll use that to kind of be in the system, work through

it to see, you know, if he'd like to move forward with that. But at least that's on record.

And as we go forward with the ordinance changes, if he'd like to wait and see how that applies, we can do that as well.

VICE MAYOR LONGBINE: Well, I hope citizens realize that a lot has been put into this already. And we want to see it work out and be successful. I think I can speak for a lot of citizens that we'd just like it to be worked out. So.

UNIDENTIFIED SPEAKER: I think we're doing great things here in town. And I look forward to the collaborative aspect of this. Certainly, our value set here in Salina as midwesterners is different than Seattle or in Florida or D.C. So I think it's important we have this -- conversations and do what's right for our place here.

MS. DRISCOLL: Hm-hmm.

VICE MAYOR LONGBINE: Anything else?

MR. SCHRAGE: That was longer than I expected but good conversation.

VICE MAYOR LONGBINE: It was.

MR. SCHRAGE: So we'll keep moving forward.

VICE MAYOR LONGBINE: Yes, it was. Okay. That will bring us to Citizen's Forum.

Anything that's not on the agenda, welcome to come and share and keep your comments three minutes.

(The excerpt of the proceedings concluded.)

C E R T I F I C A T E

I, Avanelle L. Sullivan, a Certified Shorthand Reporter of the State of Kansas, do hereby certify that I appeared at the time and place first hereinbefore set forth, that I took down in shorthand the entire proceedings had at said time and place, and that the foregoing constitutes a true, correct, and complete transcript of my said shorthand notes.

Witness my hand and seal this 16th day of November, 2023.

Avanelle Sullivan
State of Kansas
Certified Shorthand Reporter

Avanelle L. Sullivan
Certified Shorthand Reporter
State of Kansas