IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

Civil Action Case No.  6:24-cv-01027-TC-ADM


Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard,

Plaintiffs,

v.

City of Salina, Kansas,
Defendant.


Expert Report of Charles R. Taylor, Ph.D.


September 20, 2024

**EXHIBIT D**

### Summary of Expert Opinions of Dr. Charles R. Taylor

I am the John A. Murphy Professor of Marketing at Villanova University. I am also Senior Research Fellow at the Center for Marketing and Consumer Insights at Villanova University. I am Past-President of the American Academy of Advertising and currently serve as the Editor in Chief of International Journal of Advertising, a leading journal in the area of consumer marketing. I also currently serve as Vice President of the Global Alliance of Marketing and Management Association. I received my Ph.D. in Marketing from Michigan State University. I am responsible for teaching marketing courses at both the undergraduate and graduate levels at Villanova and am expected to engage in ongoing academic research. I teach marketing courses regularly both in the classroom and in online formats. I am actively involved in several ongoing research projects and have published more than 100 articles in peer reviewed academic journals, in addition to several books and conference papers.

Since 1992, one of my primary research interests has been signage. I have conducted several research studies on this topic, including peer reviewed articles in leading journals including *Journal of Advertising, Journal of Advertising Research, Journal of Public Policy and Marketing* (3), *Journal of Consumer Marketing*, and *Journal of Macromarketing* as well as several peer reviewed conference papers. I have also served on the Executive Board of the Academic Advisory Council for Signage Research and Education, an organization for academics committed to the study of Signage and have held the office of Chairman of the Board (2021-2022) as well as Vice Chair and in other capacities.

I have given presentations on regulatory issues related to signage at conferences of the Transportation Research Board, the American Marketing Association, the Association of

1

Consumer Research (Transformative Consumer Research Conference), the European Advertising Association, the Outdoor Advertising Association of America, the International Sign Association, and the Signage Foundation.   I have also provided testimony based on my research on signage to the U.S. House of Representatives Small Business Committee, the Texas State Senate, the Missouri State Senate, the Philadelphia Zoning Board, and the San Clemente City Council.   Moreover, I was an expert informant for the Federal Highway Administration's Assessment/ Mediation of Outdoor Advertising issues in 2006 and was interviewed by the Federal Highway Administration in conjunction with fact finding on policy toward signage in 2010.

I am the lead-author of a book titled *On-Premise Signs as Storefront Marketing Devices and Systems* published by the U.S. Small Business Administration in conjunction with the Signage Foundation.  On multiple occasions I have given presentations to industry professionals pertaining to research on signage, including groups such as the International Sign Association, the Signage Foundation for Communication Excellence, the Transportation Research Board, and at the National Signage Research and Education Conference.  I have also served as an expert in several legal cases involving signage and issues related to aesthetics, traffic safety, and the value of signs (see Appendix).

I write a regular column for the Chief Marketing Officer (CMO) section of Forbes.com, focusing on consumer marketing issues.  I frequently serve as a media commentator on consumer marketing issues and have provided commentary in outlets such as  the Associated Press, the Wall Street Journal, the CBS Morning Show, Forbes.com, the New York Times, National Public Radio, CNBC, ESPN.com, Time Magazine, Fox, Reuters, Variety, and many others.

I was recently included in a list of the top 2% of scientists (rated in the top 1% of marketing

2

scholars) published by a group of researchers at Stanford University. I have received the Ivan

Preston Award for lifetime achievement in advertising research, awarded by the American

Academy of Advertising and the Flemming Hansen award for outstanding contribution to the field

from the European Advertising Association. My research has received the Hans B. Thorelli award

from the Journal of International Marketing, and the Charles Slater award for contribution to the

discipline of macromarketing from the Journal of Macromarketing. My work has also won best

paper awards at Journal of Advertising (2), the Journal of Consumer Affairs, and the Journal of

Global Fashion Management.

I have also served regularly as a marketing consultant or expert witness for many firms

and clients including General Motors, ADT Alarm Systems, Philip Morris USA, U.S. Smokeless

Tobacco, Samsung, Comcast, Viacom, Live Nation,    McCann Erickson, Clear Channel

Communications,  Star Storage, Lamar Outdoor, Magic Media, Inc., Walker Furniture, Eller

Media, the Outdoor Advertising Association of America, the International Sign Association, and

the Center for Information on Beverage Alcohol (United Kingdom), among others.

My extensive work and decades of experience in the field of signage places me in a unique

position to evaluate the issues in the current case. My full curriculum vitae is attached to this

report.

**Engagement:**

*Background*

I was retained to evaluate and render my expert opinions and observations concerning matters

relevant to the case Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard v. City of Salina,

Kansas (CASE NO. 6:24-cv-01027-TC-ADM). Plaintiffs' counsel has asked me to opine on issues

related to the amended sign ordinance adopted by Salina, Kansas. I am familiar with the facts in this case and have reviewed the relevant documents including the First Amended Complaint, the City of Salina's Sign Code, and Defendant's Response to Plaintiffs' First Set of Interrogatories.

At issue in the case is the City of Salina's action to stop Mr. Steve Howard, owner of Cozy Inn from allowing work on a mural painted by a local artist, Colin Benson, on the side of The Cozy Inn based on its Sign Code. The Cozy Inn is an institution in Salina that has been selling hamburgers for more than 100 years and has achieved an iconic status based on its longevity and winning multiple national awards for its burgers. It now serves more than 45,000 customers per year. The establishment itself is small, at 192 square feet.

Mr. Howard decided he wanted to present a whimsical mural on the side of the building that would include the phrase, "Don't fear the smell. The fun is inside!!" The mural depicts flying saucers that look like burgers and are shown "attacking" the Cozy Inn with a blast of ketchup and mustard. Mr. Benson began painting the mural on November 3. 2023, but a Salani representative ordered that the painting be stopped on November 6, stating that it was a regulated sign. Plaintiffs in the case argue that the Sign Code allows the city to arbitrarily choose which murals it allows and which it does not allow in a way that is unconstitutional based on the 1st and 14th Amendment.

I have specifically been asked to opine on assertions in the report of S. Mark White, AICP, a planner and attorney pertaining to his opinions that:

1. The Sign Code is supported by substantial and compelling interests in the area of urban planning and code administration. Specifically:

   - Comprehensive plan implementation
   - Traffic safety
   - Aesthetics
   - Urban design and travel behavior
   - Public Health and Safety; and

In responding to Mr. White's above assertions, I have formed the following opinions:

1. **Contrary to Mr. White's assertion, there is not support for the notion that City's Sign Code is supported by a compelling government interest based on:**

   i)    **Comprehensive plan implementation;**
   ii)   **Traffic safety;**
   iii)  **Aesthetics**
   iv)   **Urban design and travel behavior; or**
   v)    **Public health and safety.**

I rely on research, studies, surveys and other evidence for my opinions. Should additional facts arise, I reserve the right to modify my opinions accordingly. I also rely on my background and learning derived from my academic career.

A copy of my curriculum vitae is attached at the end of this report. I am being compensated at a flat rate of $350 per hour in this case and to date have worked 30 hours on this matter. In the previous four years I have been deposed or testified in the following cases:

In the Matter of Certain Soft Projectile Devices, Components Thereof, Ammunition and Products Containing Same. (2023), United States International Trade Commission. Inv. No. 337-TA-1325. Wrote expert report. Deposed.

Guantanemera Cigars Company v. SMCI Holding, et al., United States District Court for the Southern District of Florida. Case No. 1:21-cv-21714-MORENO/GOODMAN. (2023) Wrote expert report. Testified.

ADT LLC v. Safe Home Security Inc et al., United States District Court for the Southern District of Florida. Miami Division. Case No. 1:20-cv-23918 (2022) Wrote expert report. Deposed.

Peloton Interactive, Inc., v. Icon Health & Fitness, United States District Court for the District of Delaware, Case No. 20-1535 (RGA), (2021) Wrote expert report. Deposed.

## OPINIONS

**1) Contrary to Mr. White's assertion, there is not support for the notion that City's Sign Code is supported by a compelling government interest based on: i) Comprehensive plan implementation; ii) Traffic safety; iii) Aesthetics; iv) Urban design and travel behavior; or v) Public health and safety.**

### i) Comprehensive plan implementation

Mr. White cites from the Comprehensive plan itself that (p.5.), "(the comprehensive plan is the 'basis or guide for public action to insure a coordinated and harmonious development which will promote the health, safety, morals, order, convenience, prosperity, and general welfare." Yet, Mr. White does not provide evidence that the comprehensive plan is built on scientific evidence that these goals are actually achieved. Indeed, there is no compelling scientific evidence favoring the idea that regulating on-premise signs as prescribed in the plan promotes health and safety, and general welfare (see subsequent sections discussing aesthetics, traffic safety and public health and welfare). While it is true that a desire for shared community identity vs. the need to allow signage that differentiates businesses is often a point of tension in signage regulation, Mr. White's claims on these issues are not substantiated, and ignore important roles played by signage.

Mr. White states (p.4) that, "The Sign Code varies height, size, and design by zoning district. This is a state of the art, and generally accepted technique for controlling sign clutter…" He goes on to assert (pps. 4-5) that "Plaintiff's lawsuit would invite all businesses to completely ignore the Sign Code's area restrictions—at least if the sign is painted—and contribute to sign clutter." In referring to "sign clutter," Mr. White invokes a subjective term and fails to recognize the value of signage to businesses and to the community at large. Indeed, White's reference to "sign clutter" when referring to signs and in support of restrictive codes ignores the marketing

6

functions of signs—functions that are valuable both to businesses within the community and consumers alike.

In my book titled "On-Premise Signs as Storefront Marketing Devices" published by the U.S. Small Business Administration in cooperation with the Signage Foundation (Taylor, Claus and Claus 2005) four significant roles that on-premise signs play in the marketing program of firms are outlined.  These roles are:

- Communicating the location of the business
- Reinforcing advertisements and other marketing variables as part of Integrated Marketing Communications (IMC)
- Branding the site
- Enhancing store image

These functions represent the major roles signage plays for retail businesses and should be taken into account in developing sign codes that contribute to the success of local businesses. In general, signage should not be dismissed as clutter without evidence of it being broadly perceived that way, and Mr. White's casual reference to "sign clutter" are indicative of a willingness to inhibit businesses based on a subjective view of aesthetics (the reasons why aesthetics do not represent a substantial government interest in this case are discussed in section 1-b of this  report).

The aforementioned functions are now elaborated on as they collectively play a key role in the success or failure of a business and in informing consumers (Taylor, Sarkees, and Bang 2012).

### *Communicating the location of the business*

Signs serve as important navigational tools that offer information that is aimed to orient individuals in a physical space or in a built environment at a fundamental level (Jourdan, Strauss

and Hunter 2017). As observed by several scholars, (Auffrey and Hildebrandt 2017; Calori and Vanden-Eynden 2015) for many businesses, the most basic function of an on-premise sign is to communicate the location of the business to customers. To serve this purpose effectively, the sign must be both visible to the viewer and conspicuous, meaning that it stands out within the environment in which it exists (Bullough 2018). Taylor and Sarkees (2016) find that for many businesses, the sign is the primary way in which consumers learn where a business is located. Visibility is important for consumers passing directly by the business so that both information on the location and what is sold can be communicated (Berman, Evans, and Chatterjee 2018) and also to induce impulse stops from passersby (Taylor, Sarkees, and Bang 2012). As a result, it is important for planners to acknowledge that on-premise signs do not represent "clutter."

### Branding the Site

Signs play an important role in the differentiation of retail businesses. Academic studies that to identifying colors of business are positively perceived by consumers (Bellizzi and Hite 1992; Myers-Levy and Peracchio 1995), as are shapes (Veryzer and Hutchinson 1998), typefaces, and background design elements (Mandel and Johnson 2002) that often are a part of a store's signage and physical appearance. Exterior visual features interact and can affect consumer perceptions and positioning, and thereby brand to the site (Kopp and Langenderfer 2014). In this case, it is Mr. Howard's belief that the bare walls of the Cozy Inn did not reflect the establishment's brand personality and this was his motivation for wanting to have a mural painted. This rationale is consistent with marketing principles related to branding the site of a retailer.

8

As an example, gas stations are often owned by oil companies, superstores or convenience stores and the brand logo appears on pole signs and pumps.  In such cases, the sign's visual appearance links the brand to the business' place of business. In conjunction with these associations, such as a good customer experience, lower prices, or other attributes become affixed to that location. When the exterior appearance and signage for the business is distinctive and memorable, this site branding can help increase desire for a product, decrease price sensitivity, and enhance memory, awareness, loyalty, and brand equity (Keller 2013; Taylor, Claus, and Claus 2005).

### *Enhancing the Image of the Store or Business*

Academic research has long held that retailers need to work to develop and maintain a store image as part of their success (James, Durand, and Dreves 1976; Golden, Albaum, and Zimmer 1987; Bloch and Kamran-Disfani 2018).  Signage now only draws attention to a business, but also communicates aspects of the store's atmosphere and image to the consumer (Berman, Evans, and Chatterjee 2018).  For example, an elegant jewelry store may want to communicate a prestigious image via expensive and well-designed signage while having an elegant storefront. A convenience store, on the other hand, may want simpler signage that gets across a simple and more down to earth image.

### *Signage and Integrated Marketing Communications (IMC)*

Signage is part of integrated marketing communications (IMC), which views marketing communications holistically (Kitchen et al. 2004; Muñoz-Leiva, Porcu, and Barrio-García 2015). The IMC concept emphasizes that all points of contact a company has with the consumer have an impact on consumer perceptions of a brand and, in turn, affect its value. In this way, people

9

perceive a company's brand as a result of synthesizing the bundle of messages they receive along with their own experience with the business (Belch and Belch 2018). In this way, impressions of the company are formed by advertising, the store's environment, pricing, and other marketing variables as well as signage (Taylor. Claus and Claus 2005). Signs can play a particularly important role by displaying a logo, symbol or brief message that reinforces other aspects of IMC and, in turn, aids in increasing retail traffic and sales.

Signage plays an important role in informing consumers and performing marketing functions that enhance a business' chance of being profitable and thriving. It is important that sign codes are reflective of this and that signs are not simply dismissed based on a subjective claim that they represent "clutter." While some in a community may perceive signage and competition among retailers to contribute to a community environment that is dynamic and easy to maneuver through, others may see signs as unappealing or clutter causing. This depends on the beholder. The marketing functions of signage should not simply be dismissed and referring to signage as "clutter" is problematic.

**ii) The City of Salina's Sign Code does not advance an interest in traffic safety. Evidence from prior research and literature clearly demonstrates that properly constructed and positioned on-premise signs do not represent a traffic safety hazard.**

The argument that signs are distracting to motorists and constitute a traffic safety hazard is not supported by scientific evidence. While this claim is sometimes made by critics of signage and public officials engaged in zoning debates, there is a multitude of evidence that indicates that signs that are readable and sufficiently large do not pose a threat to traffic safety (e.g., Schwab 1998; Signage Sourcebook 2003; Taylor, Claus and Claus 2005). Continued research on measures that enhance readability and legibility of signage reinforces the notion that properly

10

regulated signage does not pose a threat to traffic safety (e.g., Garvey, et al., 2016; Garvey and Klena 2019; Garvey and Klena 2020).

As noted by Richard Schwab, former program manager of the Federal Highway Administration's (FHWA) research on highway visibility and night driving safety, it is only signs that are too small, poorly lit, or inappropriately placed (e.g., blocking a driver's view when making a turn) that might lead to traffic safety issues (c.f. Taylor, Claus and Claus, 2005). Moreover, in recent years, the Federal Highway Administration has gone on record stating that standardized billboards  are not distracting to drivers, and, thus, not a traffic safety hazard.  In general, the FHWA's reviews of signage and traffic safety have found no conclusive evidence of a link between signs and traffic accidents (Wachtel and Netherton 1980; FHWA 2001; Federal Register 2002; FHWA 2013).

Research evidence as well as common sense point out that signage that is readable and conspicuous avoids situations in which drivers strain to see signs, make quick lane changes across traffic to turn into a parking lot, or become frustrated because they missed a sign they did not see in time.  In fact, a large volume of scientific evidence demonstrates that properly constructed and placed signage, meaning signs that are clearly visible and legible and do not block a driver's vision while making a turn, are not a traffic safety hazard. A recent study by Saha, Dumbaugh and Merlin (2020) reviewed prior literature and examined factors of the built environment on traffic safety did not include signage among the analyzed factors, indicative of extant research not showing on-premise signs as being linked to traffic safety.

Several authoritative sources have gone on record stating that signs are not a traffic safety hazard.  In an independent study sponsored by the AAA Foundation for Traffic Safety Research,

11

researchers at the University of North Carolina Highway Safety Research Center explored the causes of approximately 284,000 automobile accidents occurring from 1995 to 1999 (Stutts et al., 2001). The study's goal was to identify sources of distractions for drivers and to determine their relative importance. The report concluded that signs are not significant distractions that lead to highway accidents (Stutts et al., 2001).

In addition, a monograph describing the results of a 100-Car naturalistic study conducted by the Virginia Polytechnic University's Transportation Institute and the National Highway Traffic Safety Administration in order to examine whether various aspects of the environment distracted drivers stated that the findings showed that "Short, brief glances away from the forward roadway for the purpose of scanning the driving environment are safe and actually decrease near-crash/crash risk." Consistent with this finding, the extant literature research suggests that when the difficulty of a driving task increases, drivers focus their attention on the driving task and ignore other stimuli, such as billboards and signs (Johnston and Cole 1976; Lee Olson and DeHart 2004). A University of Miami study on a large sample of individuals conducted in 1971 in which a driving task was simulated and subjects' eye movements were recorded demonstrated that the presence of signs did not have an adverse impact on traffic safety (Morrison and Dainoff 1971).

The Virginia Tech Transportation Institute also conducted a study specifically looking at the impact of billboards on driving behavior. The study found that under actual driving conditions driver performance, speed keeping, and lane maintenance were not measurably impaired by signage. This finding is consistent with earlier evidence that drivers remain attentive to the driving task when encountering signs and do not divert attention from the driving

12

task to the point where it might affect their safety (Schwab 1998). In a sense, when not directly relevant to the driver, signage becomes part of the background. When it is relevant, drivers have been shown to process the information while not being distracted from the driving function (Schwab 1998; Lee 2005).

A study by Hawkins et al. (2012) examined a large volume of sign and crash data in order to examine whether digital on-premise signs were linked to traffic accidents. The study used data from multiple states obtained from the Highway Safety Information System, which contains a comprehensive database of accident records. The authors concluded (p. viii) that, "The results of this study provide scientifically based data that indicate that the installation of digital on-premise signs does not lead to a statistically significant increase in crashes on major roads."

While a multitude of individual academic studies over the past sixty years have explicitly researched the issue of a possible link between signs and traffic accidents, no conclusive evidence has been found. Some classic studies of static billboards (e.g., Lauer and McGonigle 1955; Blanche 1965; Holahan 1977) show no correlation between billboards and traffic safety. Other studies that found a correlation did not control for numerous other factors that could be responsible for a correlation and, thus, cannot be used to infer a causal relationship (e.g., Rusch 1951; Faustman 1961; Madigan-Hyland 1963). Thus, reviews of academic research have concluded that no evidence exists that billboards cause traffic accidents. As on-premise signs that are properly placed and sized carry the same characteristics as billboards, the same conclusion can be safely applied.

Not only has research demonstrated that properly placed signs are not a safety hazard, but there is also considerable evidence that signs can actually enhance traffic safety (Signage

13

Sourcebook 2003). For example, well-designed and strategically placed finds can help to relieve boredom and "wake up" a driver or catch their attention when they are becoming tired or less alert (Taylor, Claus and Claus 2005). Additionally, a FHWA study showed that on-premise signs located at high traffic intersections increased traffic safety, provided they met FHWA standards for legibility, conspicuity, readability, and conspicuity (Cirillo et al. 1969). Collectively, these findings suggest that on-premise signs can actually enhance traffic safety by assisting in keeping drivers alert and in finding their way.

In addition to research from scientific academic studies not showing evidence of a link between signage and traffic safety, historic evidence from insurance companies and law enforcement agencies on causes of traffic accidents supports the notion that there is a lack of correlation between on-premise signs and traffic accidents. Indeed, a considerable number of studies from these types of agencies have found that an on-premise sign or billboard causing a traffic accident is an extremely rare event (Wachtel and Netherton 1980; FHWA 2001). Interestingly, there have been cases where signage deficiency has been an issue in tort cases, owing to traffic signs being too small. This is why the FHWA does not allow traffic signs below a certain size (Signage Sourcebook 2003).

In summary, years of research on the topic of traffic safety demonstrates that properly constructed signs not only are not a traffic safety hazard but may actually improve traffic safety in some instances. As such, the advancement of traffic safety is not a valid justification for the City of Salina's Sign Code.

14

**iii. The City of Salina's Sign Code does not advance a general interest in aesthetics. Aesthetics are inherently a matter of opinion, and prior research documents that public opinion toward signage is more positive than    negative.**

Part of the rationale for City of Salina's Sign Code is that it advances the City's interest in aesthetics.  In his report, Mr. White argues (p.7), "Sign clutter is considered unattractive by most planning professionals and the general public."  However, Mr. White offers no evidence that the City of Salina's Sign Code actually promotes an interest in aesthetics, and extant evidence from public opinion polls conducted on the aesthetics of billboards and on-premise signage refutes this claim. Additionally, because of the widespread understanding for the need for on-premise signs (even states and municipalities that ban billboards allow on-premise signs), it stands to reason that public opinion towards on-premise signs would be at least as favorable as to billboards.

While it is true that aesthetics can be a point of tension in signage regulation with some people holding different viewpoints on what is visually pleasing (Auffrey et al. 2024), available research evidence on signage consistently documents that the general public is not opposed to either on-premise signs or billboards aesthetic grounds. Contrary to the assertions of industry critics such as Scenic America and other similar groups, public opinion toward on-premise signs is quite positive, and public opinion is actually more favorable than negative towards off-premise signs (billboards).  An analysis of data collected by leading market firm Brand Spark for Better Homes and Gardens American Shopper study conducted by Dr. James Kellaris of the University of Cincinnati documents several aspects of public opinion toward on-premise signs (Kellaris 2013).  The 2013 sample analyzed was representative of the U.S. at large and included 880 respondents.

15

One of the key findings of the Kellaris study is that only a small proportion of the public agree that "Smaller signs are generally more attractive than larger signs." In response to this question, only 14.1% of respondents in the 2013 study agreed, while more than twice as many (34.7%) disagreed and many more indicated that they were neutral (Kellaris 2013). This finding is in opposition to the idea that limitations on the size of signs would serve an aesthetic interest as more people indicate that they prefer larger vs. smaller signs on aesthetic grounds.

Another major finding of the Kellaris' analysis is that consumers strongly prefer a variety of signs in business districts to uniformity. In response to the statement that "Variety of signage design within a business district is interesting and appealing," nearly seven in ten (69.5%) agreed, while 26.9% were neutral and just 3.6% disagreed.

A large volume of public opinion polls also reinforces the idea that a majority of the public does not object to signage on aesthetic grounds. A review of fifty major studies conducted over the years, including studies by renowned organizations such as the U.S. Travel Data Center, Louis Harris Polling, University of Michigan Survey Research Center, University of Alabama, Virginia Commonwealth University, Penn, Schoen and Berland, Inc., and Arbitron, among others. Collectively, these studies included more than 16,000 observations that measured public opinion on a variety of issues related to billboards. The Taylor and Franke (2011) study found that only a minority (21%) of the public supports banning billboards in general. Taylor and Franke also found that across polls, 85% of Americans believed that billboards are useful to travelers, 80% believed that billboards create jobs, and 82.2% agree that billboards help businesses attract customers. Additionally, on average, over 83% of those surveyed agreed that billboards are informative. And a majority of those polled (58.2%) agree that billboards are interesting. When asked specifically

16

about aesthetic issues, the public was evenly split on whether billboards can harm scenic beauty (50.1%), while a minority of respondents agreed that billboards are ugly (43.2%) and annoying (27.8%).

These findings of public opinion toward billboards are indicative of the public at large not having a distaste for signs. As U.S. retailers use the on-premise sign as the basic link to the consumer in 98% of cases, whether to promote impulse purchases, help consumers remember the store and what it sells at its location for future reference, it is clear that consumers value the information conveyed on-premise signs (Signage Sourcebook 2003) . Consumers use on-premise signs for a variety of functions including finding a business, developing an impression of the store and its image and recollecting information stored in memory about the business (Taylor, Sarkees and Bang 2012; Kellaris 2013). There is also broad recognition that signs help businesses build traffic, increase sales, employ people, and allow businesses to contribute to the tax base of a community (Signage Sourcebook 2003; Taylor, Claus and Claus 2005). Moreover, on-premise signs are particularly important to small businesses (see Taylor, Sarkees and Bang (2012)), and the U.S. public broadly supports the right to open a small business.

Overall, public opinion polls on billboards are not supportive of the sweeping claim that signs have a negative impact on the appearance of the community. By substantial majorities, the general public recognizes that billboards create jobs, help businesses, and help consumers. While the public is split to some extent, public opinion on the aesthetics of signs is not negative, and a majority of the public believe that the "pros" of billboards outweigh the "cons."

It should also be noted that there is no evidence that the public generally dislikes painted signs. Academic research does not support the notion that the public likes painted signs any less

17

than other types of signs.  Indeed, many urban communities, including Salina, have developed mural programs that include paintings on walls because they are viewed as aesthetically pleasing, evidence of a substantial segment of the public liking some forms of paintings on buildings (City of East Lansing 2015; City of Tacoma 2015; Prevention Institute 2015). Thus, the City of Salina's content based restriction on on-premise signs does not advance an aesthetic interest.

### iv) The City of Salina's Sign Code does not advance a general interest in urban design and travel behavior.

In his report, Mr. White argues (p.8), "While Salina's Downtown is a pedestrian oriented district, a proliferation of oversized painted wall signs along with other inappropriate intrusions into the district would encourage shifts in travel behavior internal to the district.  This would, in turn, create pressure for further intrusions, create demand for land consumptive uses such as parking, and discourage the use of public transit." This quote is a central part of Mr. White's contention that the City of Salina's Sign Code advances a general interest in urban design and travel behavior.  Yet, Mr. White offers no evidence that allowing painted murals or signs on the side of walls would have any impact on pedestrian vs. vehicular traffic, let alone create demand for land consumptive uses or decrease use of public transportation.

Indeed, it can be argued that the type of painting at issue in this case would be more likely to encourage viewing by pedestrians than motorists.  A study conducted by Ewing et al. (2016) found that street art, including the presence of murals, was a factor that was positively correlated with pedestrian traffic.  In general, it makes sense that wall paintings would be more likely to be closely viewed by pedestrians as they have time to take in the artwork, as opposed to motorists who are passing by, typically at significant rates of speed unless stopped at an intersection.

18

In terms of this case, claims that traffic patterns or land usage would be affected based on the content of a painting on the sides of building walls are unsubstantiated. Moreover, there is no scientific evidence that paintings on the side of buildings decrease traffic safety. There is no scientific support for, or reason to believe, that a painting on the side of a building depicting flying hamburgers vs. some other type of scene would make it less safe.

### v) The City of Salina's Sign Code does not advance a general interest in public health and safety.

In his report, Mr. White makes the remarkable claim that signs are damaging to public health. Rather than citing valid academic research focused directly on any impact of signs, Mr. White instead references studies broadly focused on "sprawl," "community design," and "urban sprawl." None of the studies cited directly examine the impact of on-premise signs on incidence of people walking or exercising. The proposition that painted walls would lead people to a more sedentary lifestyle would require a very complex research design that is controlled for numerous other factors. Moreover, Mr. White's assertion that "Large signs are one characteristic of sprawling, automobile corridors. In the planning profession, the protection of public health is considered a compelling public interest. Restricting the size and number of signs, including the control of painted wall signs is directly related to this interest," is wholly unsupported by the studies he cites as they did not investigate the impact of signs in general, let alone "large signs."

It is also notable that Mr. White cites a study stating that public murals have been found to have positive impacts on public health. The idea that a difference in the classification of a message contained in the exact same painting (on-premise sign vs. mural) would make a differential impact on public health is wholly unsupported. Again, there is no scientific evidence available supporting

the notion that a painted wall depicting a dove versus a cup of coffee would have any impact on individuals' health.

In terms of "public health," the economic vitality of a community should also be considered as a factor in regulation, but economic impact is ignored. As alluded to earlier, signs play a key role in facilitating the success of a wide variety of businesses by informing consumers and allowing businesses to communicate messages.  If inadequate commercial signage exists, this makes it difficult for a business to communicate with consumers, who in most cases are passing a business in an automobile, and the result is often underperformance of the business or even outright failure (U.S. Small Business Administration 2013). The retail sector accounts for sales of more than $7 trillion in 2022, according to new estimates from the U.S. Census Bureau's Annual Retail Trade Survey (U.S. Census Bureau 2024). Thus, it is clear that availability of signage to retail and service businesses is a key facilitating factor to the vitality success of the U.S. economy.

Managers of retail and service businesses are well aware of the sales impact of signage, as evidenced by a survey conducted by Taylor, Sarkees and Bang (2012).  In this study, 85% of respondents (which included some non-profit organizations and professional services such as doctors in addition to conventional retailers) indicated that they would lose sales if they did not have an on-premise sign and among those businesses indicating that sales would be lost, and the average sales loss was reported to be 34.6%. This is representative of a very substantial economic impact on a community.

In summary, there is no evidence to support the notion that the City of Salina's Sign Code promotes a substantial interest in public health and safety.


9/20/2024

Date                                        Charles R. Taylor, Ph.D.

# REFERENCES

Auffrey, Christopher and Henry Hildebrandt (2017), "Do Motorists See Business Signs? Maybe. Maybe Not. A Study of the Probability that Motorists View On-premise Signs," *Interdisciplinary Journal of Signage and Wayfinding*, 1(2), 100–115.

Auffrey, Christopher, Matthew Isaac, Steven Kopp, Hannah Marriott, Aparna Sundar, Charles Taylor, and Franklin Velasco (2024), "A Stakeholder Approach to the Regulation of On-Premise Signs." *Interdisciplinary Journal of Signage and Wayfinding* 8 (1), 5-22.

Belch, George E. and Michael A. Belch (2018). *Advertising and promotion: An integrated marketing communications perspective*. McGraw Hill.

Bellizzi, Joseph A. and Robert E. Hite (1992). Environmental Color, Consumer Feelings, and Purchase Likelihood," *Psychology & Marketing*, 9(5), 347–363.

Berman, Barry, Joel Evans, and Patrali Chaterjee (2018), *Retail Management: A Strategic Approach*. 13th ed. New York: MacMillan.

Blanche, Ernest E. (1965), "The Roadside Distraction," *Traffic Safety*, 65 (11), 24-25.

Bloch, Peter H. and O. Kamran-Disfani (2018). A Framework for Studying the Impact of Outdoor Atmospherics in Retailing," *AMS Review*, 8 (3/4), 195–213.

Bullough, John, (2017), Factors Affecting Sign Visibility, Conspicuity, and Legibility: Review and Annotated Bibliography. *Interdisciplinary Journal of Signage and Wayfinding*, 1(2), 2–25.

Calori, Chris and David Vanden-Eynden (2015), *Signage and Wayfinding Design: A Complete Guide to Creating Environmental Graphic Design systems*. John Wiley and Sons.

Cirillo J.A., S.K. Dietz and R.L. Beatty (1969), *Analysis and Modeling of Relationships between Accidents and the Geometric and Traffic Characteristics of the Interstate System*. Washington: U.S. Printing Office/ Federal Highway Administration.

City of East Lansing (2015), "Urban Mural Project (Crack Art)," https://www.cityof eastlansing.com/411/Urban-Mural-Project-Crack-Art (accessed April 16, 2015).

City of Tacoma (2015), "City of Tacoma, Washington: Murals Project," http://www.cityoftacoma.org/cms/one.aspx?objectId=2026 (accessed April 17, 2015).

Ewing, Reid, Amir Hajrasouliha, Kathryn M. Neckerman, Marnie Purciel-Hill, and William Greene (2016), "Streetscape Features Related to Pedestrian Activity," *Journal of Planning Education and Research* 36 (1), 5-15.

22

Faustman, D. Jackson (1961), "Study of Relationship between Advertising Signs and Traffic Accidents on U.S. 40 between Vallejo and Davis."

Federal Highway Administration (2001), "Potential Safety Effects of Electronic Billboards on Driver Attention and Distraction," Washington, D.C.: FHWA.

Federal Highway Administration (2013), "Driver Visual Behavior in the Presence of Commercial Electronic Variable Message Signs," available at http://www.fhwa.dot.gov/real_estate/oac/visual_behavior_report/review/cevms2.pdf (accessed April 2, 2015).

Federal Register (2002), U.S. DOT/FHWA Notice of Amended Federal/ State Agreement, 67 (63), 15661-15662.

Garvey, Philip M., and M. Jennifer Klena (2019), "Recommended Mounting Heights for Freestanding On-Premise Signs." *Interdisciplinary Journal of Signage and Wayfinding* 3 (1), 3-15.

Garvey, Philip M., and M. Jennifer Klena (2020), "Parallel-mounted On-premise Letter Height and Sign Size." *Interdisciplinary Journal of Signage and Wayfinding* 4, (1).

Golden, Linda L., Gerald Albaum and Mary Zimmer (1987), "The Numerical Comparative Scale: An Economical Format for Retail Image Measurement," *Journal of Retailing*, 63 (4), 393–410.

Hawkins Jr, H. Gene, P. Kuo, and D. J. Lord (2012), "Statistical Analysis of the Relationship Between On-premise Digital Signage and Traffic Safety," *Signage Foundation, Inc. & Texas Engineering Extension Service* (2012).

James, D. L., Richard Durand and Robert A. Dreves (1976), "Use of a Multi-attribute Attitude Model in a Store Image Study," *Journal of Retailing*, 52 (2), 23–32.

Johnston, A.W. and Barry L. Cole (1976), "Investigations of Distraction by Irrelevant Information," *Australian Road Research*, 6, 3-23.

Jourdan, Dawn, Eric Strauss and M. Hunter (2017), "Sign Code Development Process: Best Practices," *Interdisciplinary Journal of Signage and Wayfinding*, 3(1), 1–2.

Keller, Kevin Lane, (2013) "The Brand Report Card," *Harvard Business Review*, 78 (January/February), 3-10.

Kellaris, James J. (2013). Additional insights from the BrandSpark / Better Homes and Gardens American Shopper StudyTM: A three-year longitudinal update. In *Signage as Advertising: Proceedings of the National Signage Research and Education Conference*, October 9–10, 2013, Cincinnati. Signage Foundation.

23

Kitchen, Philip J., Joanne Brignell, Tao Ki and Graham S. Jones (2004), "The Emergence of IMC: A Theoretical Perspective. *Journal of Advertising Research*, *44*(1), 19–30.

Kopp, Steve W. and Jeff Langenderfer (2014), "Protecting Appearance and Atmospherics: Trade Dress as a Component of Retail Strategy," *Journal of Public Policy & Marketing*, 33 (1), 34–48.

Lauer, A. and J.C. McGonagle (1955), "Do Roadsigns Affect Traffic Accidents," *Traffic Quarterly*, 9 (3), 322-329.

Lee, S. E., E. Olsen, and M. DeHart (2004), "Driving Performance in the Presence and Absence of Billboards," Foundation for Outdoor Advertising Research and Education.

Madigan-Hyland, Incorporated (1963), *New York State Thruway: Relationship between Accidents and the Presence of Advertising Devices*. New York City, 1963.

Mandel, Naomi and Eric J. Johnson (2002), "When Web Pages Influence Choice: Effect of Visual Primes on Experts and Novices," *Journal of Consumer Research*, 29 (2), 235–245.

Meyers-Levy, Joan and Laura A. Peracchio (1995). How the Use of Color in Advertising Affects Attitudes: The Influence of Processing Motivation and Cognitive Demands. *Journal of Consumer Research*, 22(2), 121–138.

Morrison, Bruce J. and Marvin J. Dainoff (1971), "Eye Movement Characteristics in Recall of Incidentally Presented Stimuli When Attention is Divided," Oxford, OH: University of Miami. Prevention Institute (2015), "Philadelphia Mural Arts Program: Philadelphia, PA," http://www.preventioninstitute.org/component/sbxmapper/article/368.html (accessed April 17, 2015).

Muñoz-Leiva, Sergio, Lucia Porcu and Salvadore Barrio-García (2015), "Discovering Prominent Themes in Integrated Marketing Communication Research from 1991 to 2012: A Co-word analytic approach. *International Journal of Advertising*, 34 (4), 678–701.

Rusch, W. (1951), "Highway Accident Rates as Related to Roadside Business and Advertising," *Highway Research Board Bulletin*, 30.

Schwab, Richard N. (1998), *Safety and Human Factors: Design Considerations for On-Premise Commercial Signs*. Sherwood, OR and Alexandria, VA: The Signage Foundation for Communication Excellence Inc. and the International Sign Association.

Saha, Dibakar, Eric Dumbaugh, and Louis A. Merlin (2020), "A Conceptual Framework to Understand the Role of Built Environment on Traffic Safety," *Journal of Safety Research*, 75, 41-50.

24

Signage Sourcebook: A Signage Handbook (2003), Washington, DC: U.S. Small Business Administration.

Stutts, Jane C., Donald W. Reinfurt, Loren Staplin and Eric Rodgman (2001), "The Role of Driver Distraction in Traffic Accidents," Report prepared for AAA Foundation for Traffic Safety. Chapel Hill, NC: University of North Carolina Highway Research Center.

Taylor, Charles R., Susan Claus and Thomas Claus (2005), *On-Premise Signs as Storefront Marketing Devices and Systems*. Washington DC: U.S. Small Business Administration.

Taylor, Charles R. and George R. Franke (2011), "Public Opinion toward Digital Billboards in the United States: An Analysis of Recent Polls," in *Advances in Advertising Research* (Volume II): Breaking New Ground in Theory and Practice, (Shintaro Okazaki, Ed.). Heidelber, Germany: Gabler.

Taylor, Charles R., Matthew Sarkees and Hae-Kyong Bang (2012), "Understanding the Value of On-Premise Signs as Marketing Devices to Businesses for Legal and Public Policy Purposes," *Journal of Public Policy and Marketing*, 31 (2), 185-194.

Taylor, Charles R. and Matthew Sarkees (2016). Do Bans on Illuminated On-premise Signs Matter? Balancing Environmental Impact with the Impact on Businesses. *International Journal of Advertising*, 35(1), 61–73.

United States Census Bureau (2024), "U.S. Retail Sales Reach $7,040 Billion," (Jan 24), https://www.census.gov/newsroom/press-releases/2024/annual-retail-trade-survey.html#:~:text=JAN.,Retail%20Trade%20Survey%20(ARTS).

Veryzer, Robert W. and J. Wesley Hutchinson (1998), "The Influence of Unity and Prototypicality on Aesthetic Responses to New Product Designs,". *Journal of Consumer Research,* 24 (4), 374–394.

Wachtel, Jerry and Ross Netherton (1980), "Safety and Environmental Design Considerations in the Use of Commercial Electronic Variable-Message Signs," Report No. FHWA/RD-080/051. Washington: Federal Highway Administration.