IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| Cozy Inn, Incorporated, | :CIVIL ACTION |
| d/b/a The Cozy Inn; | :CASE NO. |
| Stephen Howard, | : |
| | :6:24-cv-01027-TC-ADM |
| Plaintiffs, | : |
| | : |
| -vs.- | : |
| | : |
| City of Salina, Kansas, | : |
| | : |
| Defendants. | : |

NOVEMBER 13, 2024

ZOOM VIDEOCONFERENCE DEPOSITION OF

CHARLES R. TAYLOR, Ph.D., held via remote teleconference

hosted by U.S. Legal Support, located at 1818 Market

Street, Suite 1400, Philadelphia, Pennsylvania, on

Wednesday, November 13, 2024, at 10:05 a.m., before

Michelle Keys, a Stenographer and Notary Public of the

Commonwealth of Pennsylvania.

**EXHIBIT E**

Charles R Taylor PhD
November 13, 2024

Page 66

1  BY MR. MESSENGER:
2  Q.    How many opinions do they need in order to
3  make that judgment as policymakers?
4                MR. SHAW:  Objection to scope.
5                THE WITNESS:  Yeah.  I don't -- I
6           mean, I don't regard myself as an expert
7           on -- on writing codes -- codes
8           themselves.  You know, in the planning
9           context, I -- I would certainly say they
10          should -- you know, they should get
11          opinions.  They should get opinions from
12          various stakeholders in the community.  I
13          can't say exactly how many.
14 BY MR. MESSENGER:
15 Q.    In your IJSW article you advocated for this
16 type of participatory framework; is that correct?
17                MR. SHAW:  Objection to form.
18                THE WITNESS:  In that article we do
19          talk about balancing the needs of
20          stakeholders.
21 BY MR. MESSENGER:
22 Q.    Did that article say how many stakeholders
23 that you should have as a local government in your
24 process?
25                MR. SHAW:  Objection to form.

Page 67

1  BY MR. MESSENGER:
2  Q.    In your sign code development process?
3  A.    It listed out the various different --
4  different stakeholders.  It didn't -- I mean, it
5  didn't give a specific number, but it certainly --
6  it certainly talked at length about -- about needing
7  to consider the different stakeholders.
8  Q.    And in different communities, would those
9  stakeholder groups be different?
10                MR. SHAW:  Objection to scope.
11                THE WITNESS:  I think -- to say -- it
12          should be the same general categories
13          of -- of stakeholders.
14 BY MR. MESSENGER:
15 Q.    Is it possible that within those stakeholder
16 groups that different representatives would have
17 different aesthetic judgments?
18 A.    Yes.  That's certainly possible.
19 Q.    And that in different communities they may
20 come the different conclusions?
21                MR. SHAW:  Objection.  Scope.
22                THE WITNESS:  Yeah, yeah.  I -- you
23          know, I'm not -- I'm not offering an
24          opinion specifically on that process of --
25          of how the code is determined.

Page 68

1  BY MR. MESSENGER:
2  Q.    Did you review how the City of Salina
3  developed its current sign regulations?
4  A.    No.
5  Q.    Do you know who was involved in those
6  determinations?
7  A.    No.
8  Q.    Have you reviewed sign codes in your
9  professional capacity over the last 25 years, other
10 than the City of Salina?
11 A.    Yeah.  I've read -- I've read some, yes.
12 Q.    Okay.  Is it common for a sign code to have
13 a -- an allocation of signage based on the frontage
14 of a lot or a building?
15                MR. SHAW:  Objection to scope.
16                THE WITNESS:  Again, you know, I'm
17          not an urban planning expert.  So I can --
18          you know, I can say I've seen codes that
19          do that.
20 BY MR. MESSENGER:
21 Q.    Okay.  And how is Salina's code different
22 from those codes?
23                MR. SHAW:  Objection to scope.
24                THE WITNESS:  Yeah, again, I'm -- I'm
25          not -- I'm not putting myself forward an

Page 69

1           urban planning expert.  The -- the codes
2           vary a lot from one -- you know, from one
3           municipality to another.
4  BY MR. MESSENGER:
5  Q.    Is Salina's code more or less permissive than
6  average in terms of the amount of area of wall sign
7  an owner can have based on the front footage of
8  their building?
9                MR. SHAW:  Objection to scope.
10                THE WITNESS:  I don't -- I'm not an
11          urban planning expert, and so I -- I can't
12          say for sure.
13 BY MR. MESSENGER:
14 Q.    Do you know why a municipality would tie the
15 amount in signage on a wall to the front footage of
16 the building?
17                MR. SHAW:  Objection to scope.
18                THE WITNESS:  Yeah, again, that's --
19          that's an urban planning question.  And
20          I'm not -- not testifying in that area.
21 BY MR. MESSENGER:
22 Q.    So Mark White talked about urban planning
23 issues, and your report is a rebuttal to
24 Mark White's report; is that correct?
25 A.    Yes, to the extent that Mr. White argued that

Page 90
1  A.     Yeah.  I mean, it depends on -- it depends on
2  whether you're asking about signs in general or
3  on-premise signs.  But on-premise signs, by
4  definition, are on the physical -- they're located
5  at the physical site of the business.
6  Q.     And what is their purpose?
7  A.     The -- again, there's four primary functions
8  that they serve.
9  Q.     Tell me what those functions are.
10 A.     One -- one is identifying the -- the
11 business.  The second one is branding the site.
12 They also interact with other forms of -- of
13 marketing communication and -- yeah, I'm trying to
14 remember the fourth one off the top of my head.
15 It'll come to me.
16 Q.     We'll wait.
17        Okay.  So as you sit here today, you
18 can't remember the four --
19        MR. SHAW:  Objection to form.
20 BY MR. MESSENGER:
21 Q.     -- functions of signs?
22 A.     Well, we can look at it in my report.  It's
23 in there.
24 Q.     Okay.  Now, with respect to, then, what signs
25 do, they serve those four functions; is that

Page 91
1  correct?
2  A.     Yes.
3  Q.     And signs are also -- you have a word for
4  this, but "displays," would that be a fair
5  characterization?
6        MR. SHAW:  Objection to form.
7        THE WITNESS:  Yeah.  "Display" can
8        mean many different things.
9  BY MR. MESSENGER:
10 Q.     So what is the physical make-up of a sign?
11 A.     Well, as -- as was defined in the book, it
12 should have the -- the -- we refer to the
13 terminology of having some structure as we define an
14 on-premise sign.
15 Q.     Have you ever authored an expert report in
16 the area of signs where you opine that traffic
17 safety was a legitimate government interest?
18 A.     No.
19 Q.     So traffic --
20 A.     That's -- I -- I apologize.
21        You know -- I mean, the government
22 generally has an interest in promoting traffic
23 safety.  I'm just saying that signage isn't a
24 traffic safety hazard.
25 Q.     Have you ever authored an expert report in

Page 92
1  the area of signs where you opined that aesthetics
2  was a legitimate government interest?
3  A.     It's -- I mean, my -- my point is that it
4  should be -- that it should be balanced.  And given
5  the specific facts of the case, the cases I've been
6  involved in, I haven't -- I don't think it's been --
7  it's been a legitimate interest.
8  Q.     Have you ever reviewed a sign code and
9  independently evaluated whether that sign code
10 advances aesthetics?
11 A.     No.
12 Q.     Have you ever turned away work on the basis
13 that the sign code actually advances traffic safety
14 or aesthetics?
15        MR. SHAW:  Objection to form.
16 BY MR. MESSENGER:
17 Q.     Let me -- let me ask that as two separate
18 questions.
19        Have you ever turned away a request
20 to be an expert witness in a sign case?
21 A.     I -- I think I have.
22 Q.     And what was the basis for doing that?
23 A.     I -- I really don't remember.  But, in
24 general, before I take any expert witness case, I
25 have to -- I have to agree with the side of the case

Page 93
1  that I'm on.
2  Q.     Okay.  So in that capacity, do you do an
3  independent review of the sign code to make sure
4  that it advances or does not advance aesthetic
5  interests?
6  A.     No.
7  Q.     Do you do a review of the legislative record
8  of the sign code to make sure that it reflects
9  public opinion of the stakeholders you've
10 identified?
11 A.     Given the scope of what I do, there wouldn't
12 be any reason to do that.
13 Q.     And why is that?
14 A.     Because I'm just saying it -- it's not a case
15 that the -- it's not a case that, you know,
16 communities, you know, don't have an interest in --
17 in promoting aesthetics.  What I'm questioning is
18 whether the code really does promote aesthetics.
19 And I think this is -- this is a good example where
20 this particular restriction, in my opinion, does not
21 do -- there's not evidence that it contributes to
22 aesthetics.
23 Q.     Which particular restriction are you talking
24 about?
25 A.     This -- the issue of -- of businesses --