In the United States District Court
for the
District of Kansas

| | |
|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard.**<br><br>Plaintiffs,<br><br>v.<br><br>**City of Salina, Kansas.**<br><br>Defendant. | Civil Action No. 6:24-cv-01027-TC-ADM<br><br>Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White; Index of Exhibits; Exhibits A-F; Certificate of Service. |

**Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White**

Steve Howard wants to finish painting a whimsical mural on the side of the iconic business he owns, The Cozy Inn, but can't. That's because Salina considers The Cozy's artwork a regulated sign instead of an unregulated mural. The difference between the two turns on the artwork's content: if it pertains to a business, contains a commercial message, or is part of a commercial transaction, Salina considers it a regulated sign subject to size limitations, permitting requirements, and certificate of compatibility process, not an unregulated mural which is exempt from these requirements. The distinction between regulated signs and unregulated murals isn't specified anywhere in the written code. A rendition of the mural is below, if completed:



1

Plaintiffs filed a civil rights lawsuit challenging Salina's mural-sign code regime on the grounds it's a content- and speaker-based restriction on speech, it's an unconstitutional prior restraint, and it's unconstitutionally vague. Doc. 16. Salina proffers attorney Mark White as an expert witness in support of its mural-sign code regime. *See* Ex. A, Expert Disclosure; Ex. B, White Report at 39 (curriculum vitae). Although he's described as an expert in urban planning and zoning, Mr. White renders seven *legal opinions* in his written report, all of which invade the province of this Court. Mr. White's legal opinions—all seven of them—are inadmissible expert testimony under Federal Rule of Evidence 702 and should be stricken or excluded.

But even if Mr. White's opinions aren't improper legal conclusions, they are not based on sufficient facts or data and are not the product of reliable principles and methods. Mr. White's opinions are devoid of *any* specific fact, study, or evidence directly related to the impact of Salina's mural-sign code regime in Salina. Furthermore, the opinions Mr. White expresses in *this case* are directly contradicted by the learned treatise he authored, titled *Content-Neutral Sign Codes After Reed and Austin*, Sign Research Foundation (Nov. 2022). Ex. D. Mr. White's own learned treatise demonstrates the unreliability of the principles and methods he utilized in this case.

In short, either Mr. White improperly renders legal opinions, or the opinions aren't based on sufficient facts or data, aren't based on reliable principles and methods, and aren't reliably applied to this case. Either way, they are inadmissible and should be stricken or excluded.

I.     **Legal Standard**

Rule 702 of the Federal Rules of Evidence establishes the standards for determining the admissibility of expert testimony. The proponent of the expert testimony bears the burden of establishing its admissibility. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009). The testimony must be relevant and reliable. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).

Under Rule 702, the expert's opinion testimony must "help the trier of fact to understand the evidence or to determine a fact in issue," it must be "based on sufficient facts or data," it must be "the product of reliable principles and methods," and it must "reflect a reliable application of

the principles and methods to the facts of the case." If the proponent can't satisfy each of the requirements, the testimony is unreliable, irrelevant, and inadmissible. *Nacchio*, 555 F.3d at 1241.

## II. Analysis

### A. White's opinions are inadmissible legal opinions.

Salina can't meet its burden of establishing the admissibility of its proffered expert's testimony. Mr. White's opinions are inadmissible because "expert testimony on legal matters is not admissible." *United States v. Bull*, 8 F.4th 762, 768 (8th Cir. 2021). Expert testimony is only admissible when it "will help the trier of *fact* to understand the *evidence* or to determine a *fact* in issue." Rule 702(a) (emphasis added). Experts are prohibited from providing "legal testimony, such as legal conclusions," because it doesn't aid the trier of fact. Instead, it "invades the province of the trial judge" to determine questions of law. *United States v. Boutte*, No. 22-2079, 2024 WL 3665536, at *10 (10th Cir. Aug. 6, 2024). "There is a significant difference" between proffering "an attorney" as an expert to offer opinions "touching upon nearly every element of plaintiffs' burden of proof under § 1983" and "any other expert witness." *Specht v. Jensen*, 853 F.2d 805, 80 (10th Cir. 1988).[1]

As in *Specht*, the opinions offered in Mr. White's report touches upon nearly every element of Plaintiffs' § 1983 claims and violates this long-standing prohibition. Each of Mr. White's opinions is a legal conclusion directly related to the elements of Plaintiffs' case. Ex. B, White Report at 3.

   a. Opinion 1: "The Sign Code establishes time, place and manner metrics that are not content-based."

In *Ward v. Rock Against Racism*, the Court held that "the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for

---

[1] *See also United States v. Vreeken*, 803 F.2d 1085, 1091 (10th Cir. 1986) ("questions of law" are "not the subject of expert testimony"); *Okland Oil Co. v. Conoco Inc.*, 144 F.3d 1308, 1328 (10th Cir. 1998) (testimony about "legal standards" and "legal conclusions" improper)

3

communication of the information." 491 U.S. 781, 791 (1989) (cleaned up). Mr. White's opinion is nothing more than a conclusory assertion that the mural-sign code regime fits the definition of a content-neutral time, place, and manner restriction as established in *Ward*. Indeed, he wrote in his report that the "the allegations by plaintiff are incorrect to the extent that they relate to content neutrality." Ex. B, White Report at 3; Ex. C, White Dep. 63:16-25—64:1-2. Tellingly, even Mr. White admits that whether a sign code is content-neutral is a question of law. Ex. C, White Dep. 61:9-15.

      b.      Opinion 2: "The Sign Code is supported by substantial and compelling interests in the area of urban planning and code administration."

Content-based restrictions on speech must "serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). Restrictions on commercial speech must serve a "substantial interest." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 564 (1980). Mr. White asserts that the mural-sign code regime "serves a number of compelling and substantial" interests such as "comprehensive plan implementation," "traffic safety," "aesthetics," "urban design and travel behavior," "public health and safety," and "compromise." Ex. B, White Report at 5 (cleaned up).

Whether an asserted government interest is considered "compelling" or "substantial" is a legal question for this Court to decide, without any need for expert testimony from a lawyer. Mr. White agrees. Ex. C, White Dep. 102:22-25—103:7. Mr. White's extensive citation to legal cases and authorities, as seen below, Ex. B, White Report at 5, demonstrates that his opinion is based on his legal expertise as an attorney:[2]

> *Concerned Citizens of Calaveras County*, 166 Cal. App. 3d 90, 212 Cal. Rptr. 273, 276-77 (Cal. App. 3 Dist. 1985) (citing *O'Loane v. O'Rourke*, 231 Cal. App. 2d 774, 42 Cal. Rptr. 283 (1965); *Machado v. Musgrove*, 519 So.2d 629, 632 (Fla.App. 1987), *rev. denied*, 529 So.2d 694 (Fla. 1988) (comprehensive plan is the constitution of land development regulation)); Kansas Statutes Annotated § 12-747(c) (the comprehensive plan is the "basis or guide for public action to insure a coordinated and harmonious development or redevelopment which will best promote the health, safety, morals, order, convenience, prosperity and general welfare"). Comprehensive plans constitute "the general outline of

---

[2] *See also* Ex. B, White Report at 7-8: stating "*Georgia Outdoor Advertising, Inc. v. City of Waynesville*, 833 F.2d 43, 47 (4th Cir. 1987)("It requires neither elaboration nor citation to say that an ordinance regulating billboards is likely to advance the objective of enhancing the beauty of a city, and that no less intrusive

        c.        Opinions 3 and 4: "The Sign Code directly and materially furthers its recited purposes" and "The Sign Code is reasonable in scope in that it targets issues related to wall signs, without unnecessarily expanding its reach to artistic murals."

When analyzing a regulation of commercial speech, the Court must ask "[1] whether the State's interests in proscribing it are substantial, [2] whether the challenged regulation advances these interests in a direct and material way, and [3] whether the extent of the restriction on protected speech is in reasonable proportion to the interests served." *Aptive Env't, LLC v. Town of Castle Rock, Colorado*, 959 F.3d 961, 987 (10th Cir. 2020) (quoting *Edenfield v. Fane*, 507 U.S. 761, 767 (1993)). Mr. White's third and fourth opinions are bald assertions that the challenged law satisfies the second and third elements of the *Aptive* test. Once again, Mr. White's report extensively cites legal cases[3] and authorities.[4] But, whether the evidence directly or materially furthers the government interests and is in reasonable proportion to the interests served are legal questions properly answered by the Court, not an attorney testifying as an expert witness. *See Aptive*, 959 F.3d at 989-999.

        d.        Opinion 5: "The Sign Code is not vague."

Plaintiffs have alleged that the mural-sign code regime is void for vagueness under the Fourteenth Amendment. *See* Doc. 16. Mr. White's fifth opinion is simply a denial of the Plaintiffs' vagueness claim.

Mr. White's opinion provides nothing more than legal argument that various words or phrases used in the mural-sign code regime are also used in the sign codes of other municipalities

---

method would adequately protect the city's interest."); *City of Belleville v. Kesler*, 428 N.E.2d 617, 101 Ill.App.3d 710, 57 Ill.Dec. 67 (1981)."

[3] *See* Ex. B, White Report at 10 (citing *State v. Sanchez*, 298 P.3d 1138 (Kan. App. 2013)); *see also* Ex. B, White Report at 13 n.9:

> [9] See description in *Vanguard Outdoor LLC v. City of Los Angeles*, 648 F.3d 737, 738 (9th Cir. 2011): "This case was one of many 'copycat' lawsuits filed after this Court in *World Wide Rush* enjoyed [sic] the City's enforcement of its ban on offsite and supergraphic signs as an invalid prior restraint on speech under the First Amendment and enjoined enforcement of the City's Freeway Facing Sign Ban as a fatally underinclusive restriction on commercial speech. See [*World Wide Rush, LLC v. City of Los Angeles*, 606 F.3d 676, 683–84 (9th Cir. 2010)]. After that decision, "well-travelled thoroughfares that contained any sort of sizable building were soon pockmarked with Supergraphic Signs." *World Wide Rush, LLC v. City of Los Angeles*, 605 F.Supp.2d 1088, 1092 (C.D.Cal.2009), *rev'd*, 606 F.3d at 689."

[4] *See* Ex. B, White Report at 15-16 citing Ithaca Zoning Ordinance § 270-5; Arlington County Zoning Ordinance Art. 13, § 13.2.3.D; Lake Placid Code § 154-5; Las Vegas Unified Development Code § 19.06.140.G.3.b.IV.

or are found in dictionaries. *See* Ex. B, White Report at 16-18. This type of legal analysis is the hallmark of legal advocacy, not expert testimony.

      e.      Opinion 6: "The restrictions established in the Sign Code are reasonable, generally accepted regulations of the size, shape, placement, and design of signs."

Whether something is "reasonable" is a quintessential question of law that is not the proper subject of expert opinion testimony. *Est. of Smart v. City of Wichita*, No. 14-2111-JPO, 2020 WL 3618850, at *4 (D. Kan. July 2, 2020) (whether an officer's use of force was "reasonable" is an improper legal conclusion); *see also Fetty v. City of Baton Rouge*, 518 F. Supp. 3d 923, 932 (M.D. La. 2021) (same); *see id*. at 930-31 (collecting cases about the impropriety of expert testimony on the "reasonableness of an officer's use of deadly force," "whether an estate executor had acted reasonably," and the "'reasonableness' of the police officer's actions in arresting the plaintiff."). Mr. White's opinion simply restates the restrictions created by the mural-sign code regime and concludes that these legal restrictions are "reasonable," "flexible," and "generous." Ex. B, White Report at 19. This opinion is an improper legal conclusion.

      f.      Opinion 7: "The Sign Code has numerous procedural safeguards."

In prior restraint cases, the government must provide "procedural safeguards designed to obviate the dangers" of the prior restraint of speech. *Freedman v. State of Md.*, 380 U.S. 51, 58 (1965). Whether the procedural safeguards of the mural-sign code regime are sufficient to obviate the dangers of Salina's prior restraint on speech is a question of law for the Court to determine. Mr. White's opinion simply points out that the written code allows property owners to seek a variance or appeal to the Board of Zoning Appeals, a task that Defense counsel is more than capable of undertaking without the aid of expert testimony from an attorney.

## Conclusion

All seven of Mr. White's opinions are legal arguments improperly framed as expert testimony that infringe on the role of the Court. Mr. White's report is little more than a "brief in support of" Salina's arguments. *Rural Water Dist. No. 4, Douglas Cnty., Kansas v. City of Eudora,*

*Kan.*, 604 F. Supp. 2d 1298, 1307 (D. Kan. 2009) *aff'd in part, rev'd in part on other grounds*, 659 F.3d 969 (10th Cir. 2011).

      **B.**      **Mr. White's opinions are not supported by sufficient facts or data and are not the product of reliable principles and methods.**

Expert testimony is only admissible if the opinions are based on sufficient facts or data and are the product of reliable principles and methods. *Nacchio*, 555 F.3d at 1241. Mr. White's opinions are not. Instead, Mr. White's opinions are based on inappropriate speculation and conjecture. *Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996). Throughout his report, Mr. White defines a "mural" as "an outdoor exhibit painted on a wall that does not fall with the Sign Code's parameters and that may include art, but does not announce, direct attention to, or advertise." Ex. B, White Report at 3 n.2. White's definition of a "mural" corresponds with his definition of a "sign", "[a]s defined by Salina's Zoning Code, 'signs' are outdoor displays that are 'used to announce direct attention to, or advertise' (Salina City Code § 42-764)," Ex. B, White Report at 15. But throughout his report, none of the reports or studies cited by Mr. White use these idiosyncratic definitions of murals and signs. Ex. C, White Dep. 59:7-21. Mr. White is, in effect, comparing apples to oranges throughout his opinions.

      a.      Opinion 1: "The Sign Code establishes time, place and manner metrics that are not content-based."

Mr. White's report doesn't contain any explanation of the basis for this opinion, unlike the other opinion sections. *See* Ex. B, White Report at 5-9 (section on Opinion 2); 9-14 (section on Opinion 3); 15-16 (section on Opinion 4); 16-19 (section on Opinion 5); 19 (section on Opinion 6); 19-20 (section on Opinion 7). Mr. White doesn't state in his report what facts, data, principles, or methods he utilized to reach this opinion. Without this information, Salina can't meet its burden of establishing this opinion is admissible.

Furthermore, Mr. White authored a learned treatise[5] on content-neutral signage. *See* Exhibit D, S. Mark White, *Content-Neutral Sign Codes After Reed and Austin*, Sign Research

---

[5] Ex. C, White Dep. 191:19-25—192:2: Q: "You agree that your publication is a reliable authority?" A: "Yes."; *see also* Federal Rule of Evidence 803(18).

Foundation (Nov. 2022). In his treatise, Mr. White points out that "sign codes that either exempt" or "regulate works of art or murals" based on criteria such as "commercial messages" or "advertising" are content based. Ex. D, *Content-Neutral Sign Codes* at 14-15; *see also* Ex. C, White Dep. 71:15-22.

Based on his learned treatise, Salina's mural-sign code regime is content based. For example, Mr. White defines, in his report, a "mural" as "an outdoor exhibit painted on a wall that does not fall with the Sign Code's parameters and that may include art, but does not announce, direct attention to, or advertise." Ex. B, White Report at 3 n.2. White also states, "[a]s defined by Salina's Zoning Code, 'signs' are outdoor displays that are 'used to announce direct attention to, or advertise' (Salina City Code § 42-764)," Ex. B, White Report at 15. Under the principles and methods articulated in the treatise, Salina's mural-sign code regime is content based. For example, based on his own principles articulated in his treatise, Salina's code which exempts a painted display which "does not announce, direct attention to, or advertise," but regulates a painted display which does "announce, direct attention to, or advertise," is content based.

Given the total lack of facts or data to support Opinion 1, and that the methodology utilized contradicts Mr. White's own learned treatise, it must be excluded.

      b.      Opinion 2: "The Sign Code is supported by substantial and compelling interests in the area of urban planning and code administration."

Mr. White's opinion does not contain any facts or data regarding Salina's stated government interests or Salina's mural-sign code regime. Ex. B, White Report at 5-9. The only data related to Salina contained in Mr. White's report is a reference to Salina's 2010 Comprehensive Plan.[6] Mr. White asserts that "[a]ppropriate sign restrictions are critical to implementing these policies." Ex. B, White Report at 7. Yet Mr. White buries in a footnote, Ex. B, White Report at 7 n.5, that the only discussion of sign restrictions in the 168 pages of the Comprehensive Plan is an unimplemented proposal to create an Urban Industrial Overlay District in a different part of Salina with "standards

---

[6] Available at https://www.salina-ks.gov/media/Community%20Development/Planning%20&%20Zoning/ComprehensivePlan_Adopted.pdf

that address site design, transition areas, connectivity and signage." This lack of facts and data specific to Salina and Salina's mural-sign code regime shows that there is no proper factual basis for Opinion 2.

Mr. White's opinion fails to identify the principle or method used to determine what government interests are substantial and compelling. When pressed, Mr. White testified that he used the legal term of art "substantial and compelling interests" "in a general sense in terms of how people would normally use those terms," Ex. C, White Dep. 107:4-6, and "the words compelling and the word substantial outside of their use in the case law I think have generally understood meanings. So if you went to the dictionary, for example, you'd probably find a definition of compelling and you'd probably find a definition of substantial." Ex. C, White Dep. 106:11-23. Mr. White considered the general sense of the term and the legal term of art to be like "a Venn diagram, there would be some – there would be some intersection between" the way he used the terms and the way the case law did. Ex. C, White Dep. 104:1-8. This confuses the issues in the case and does not provide any reliable methodology for determining what interests are compelling or substantial.

Indeed, the opinion does not even articulate which proffered government interests are compelling and which are substantial. Two of the "compelling and substantial interests" he identifies are traffic safety and aesthetics. Ex. B, White Report at 5. But his treatise states that "aesthetics and traffic safety – the traditional interests that support sign regulations – are not sufficiently 'compelling' to support content-based regulations. *See Clark v. City of Williamsburg*, 388 F.Supp. 1346 (D. Kan., 2019), *cert. denied*, 141 S.Ct. 2629, 209 L.Ed.2d 754 (2021) (citing *Quinly v. City of Prairie Village*, 446 F. Supp. 2d 1233, 1243-44 (D. Kan. 2006); *Outdoor Sys., Inc. v. City of Merriam*, 67 F. Supp. 2d 1258, 1269 (D. Kan. 1999); *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1268 (11th Cir. 2005)." Ex. D, *Content-Neutral Sign Codes* at 6; *see also* Ex. C, White Dep. 113:8-16.

Because Mr. White's own learned treatise reaches a different conclusion than his report, the opinion is not the product of reliable principles and methods.

9

        c.        Opinion 3: "The Sign Code directly and materially furthers its recited purposes."

In his learned treatise, Mr. White discussed how regulations of commercial speech must "directly and materially serve" the government's asserted interest and that "the local government has the burden of proof, and bans on speech that target truthful, non-misleading commercial messages are unlikely to survive intermediate scrutiny." Ex. D, *Content-Neutral Sign Codes* at 14; *see also* Ex. B, White Dep. 192:4-12. Mr. White's opinion, however, fails to meet this heavy burden with sufficient facts and data. The report has only generalized assertions that some regulation of signage may advance a government interest in theory. The report does not contain any data showing how *Salina's* mural-sign code regime has *actually* advanced traffic safety, pedestrian safety, aesthetics, or property values in *Salina*. The report does not contain a single fact showing that a traffic or pedestrian accident has been prevented by Salina's mural-sign code regime, or that property values have risen because of Salina's mural-sign code regime, or any quantifiable metric to prove that Salina's mural-sign code regime enhances aesthetics. The report simply lacks the facts and data needed to provide the basis for this opinion that *Salina's* mural-sign code regime directly and materially furthers *Salina's* recited purposes. Mr. White testified that he is not aware of the existence of these facts either. See Ex. C, White Dep. 46:25-47:1-5; 47:12-19; 47:21-48:4; 116:13-18; 120:10-17; 121:10-14; 123:7-14; 123:16-22; 124:13-19; 125:7-12.

Not only does Mr. White's opinion lack sufficient facts and data, the rebuttal report of Charles R. Taylor, Ph.D., conclusively shows that there is no evidence showing that the mural-sign code regime advances Salina's claimed interests. See. Ex. E, Taylor Report. The Federal Highway Administration's "reviews of signage and traffic safety have found no conclusive evidence of a link between signs and traffic accidents." Ex. E, Taylor Report at 12. "Not only has research demonstrated that properly placed signs are not a safety hazard, but there is also considerable evidence that signs can actually enhance traffic safety." Ex. E, Taylor Report at 13. "The argument that signs" "constitute a traffic safety hazard is not supported by scientific evidence." Ex. E, Taylor Report at 10. As Professor Taylor succinctly said, it is "pretty much settled science that on-premises signs don't cause traffic accidents." Ex. F, Taylor Dep. 119:12-13.

Similarly, Mr. White's opinion does not explain the principle and method utilized to reach a conclusion that his own treatise considers "unlikely." Mr. White lists several other municipal sign codes that he says, "demonstrate a range of approaches to regulating signs while accommodating the benefits of murals." Ex. B, White Report at 12-13. But in Mr. White's learned treatise, he instead recommends that municipalities "[r]emove restrictions that exempt or target artwork, along with limits on commercial advertising." Ex. D, *Content-Neutral Sign Codes* at 15. Nor does he explain what methodology he used to choose the twenty-one particular municipalities listed in the report, out of the thousands of possible municipalities in America. Instead, his report simply states, in general, that regulating signs while promoting art advances a city's interests, without any explanation of the methodology utilized to reach the opinion that *Salina's* mural-sign code regime directly and materially furthers *Salina's* recited purposes.

        d.      Opinion 4: "The Sign Code is reasonable in scope in that it targets issues related to wall signs, without unnecessarily expanding its reach to artistic murals."

The section of Mr. White's report addressing Opinion 4, Ex. B, White Report at 15-16, is based almost entirely on a comparison of Salina City Code § 42-764 to Ithaca Zoning Ordinance § 270-5, Arlington County Zoning Ordinance Art. 13, § 13.2.3.D, Lake Placid Code § 154-5, and Las Vegas Unified Development Code § 19.06.140.G.3.b.IV. The only other facts or data cited in this section are cited simply for the proposition that "public art (as do public spaces such as parks, or buildings with architectural significance) can <u>attract</u> people to a place (Cheng, 2023; Scholarly Community Encyclopedia, 2023)." Ex. B, White Report at 16 (emphasis in original). The opinion does not contain any facts or data showing that the sign codes in Ithaca, Arlington, Lake Placid, or Las Vegas have in fact advanced any government interest or that Salina's mural-sign code regime in fact advances any government interest. This does not provide a factual basis for the opinion that Salina's mural-sign code regime is reasonable in scope.

Mr. White's report does not describe any principle or methodology that he utilized to reach Opinion 4. Mr. White simply compares the Salina City Code to Ithaca, NY, Arlington County, VA, Lake Placid, NY, and Las Vegas, NV. But he does not explain how he chose these particular

municipal codes, or why, of the thousands of municipalities in America, these particular municipalities are an appropriate comparison to Salina. There is no explanation of what, if anything, Salina, KS, has in common with Ithaca, NY, Arlington County, VA, Lake Placid, NY, or Las Vegas, NV. Given the lack of any explanation, there is no way to know if this opinion is the product of reliable principles and methods, or simply cherry picking a handful of municipalities whose codes happened to be similar to Salina's. Nor does the report explain the principle or method used to compare these municipal ordinances to form Opinion 4.

      e.      Opinion 5: "The Sign Code is not vague."

The section of Mr. White's report dealing with Opinion 5, Ex. B, White Report at 16-19 is devoid of facts or data as contemplated by Rule 702(b). Instead, Mr. White simply cites various undefined terms in the Salina mural-sign code regime and compares them to other municipal codes or a dictionary. Ordinary dictionaries and municipal codes are not sufficient facts or data for an expert to formulate a reliable opinion. Nor does Mr. White's report describe any principle or methodology that he utilized to reach Opinion 5. Mr. White simply cites various undefined terms in the Salina mural-sign code regime and compares them to other municipal codes, but he does not explain how he chose these particular municipal codes or why, of the thousands of municipalities in America, these particular municipalities are an appropriate comparison to Salina. Given the lack of any explanation, there is no way to know if this opinion is the product of reliable principles and methods, or simply cherry picking a handful of municipalities whose codes happened to be similar to Salina's.

      f.      Opinion 6: "The restrictions established in the Sign Code are reasonable, generally accepted regulations of the size, shape, placement, and design of signs."

Opinion 6 is not based on any facts specific to Salina or data related to conditions in Salina. The opinion cites a handful of studies to argue that limiting the maximum number and size of signs is desirable, but, crucially, the studies Mr. White cites do not support the contention that painted murals should be treated differently than painted wall signs. Ex. B, White Report at 19. The opinion contains no facts that would indicate it is reasonable to restrict the size, shape, placement, and

design of signs painted on walls differently than the size, shape, placement, and design of murals painted on walls because of the content.

This opinion is not the product of reliable principles or methods. The report contends that it is reasonable to regulate the size, shape, placement, and design of painted wall signs while also exempting murals painted on walls from regulation. Yet Mr. White's own learned treatise recommends the exact opposite course of action: "Remove restrictions that exempt or target artwork, along with limits on commercial advertising." Ex. D, *Content-Neutral Sign Codes* at 15; *see also* Ex. C, White Dep. 77:11-20. Mr. White's report does not explain what method or principle was utilized to reach an opinion that is diametrically opposed to the recommendations he gives in his treatise. Defendant is not able to meet its burden of proving that this opinion is the product of reliable principles or methods.

g. Opinion 7: "The Sign Code has numerous procedural safeguards."

Mr. White's report does not contain facts or data to support this opinion. The report only describes the variance and appeal process in Salina City Code § 42-597. The Salina City Code is not fact or data that can be the basis of an expert opinion, it is simply a law. Defense counsel can easily cite, and the Court can easily understand and interpret, the provision of § 42-597.

Mr. White's report does not explain what reliable principles and methods he utilized to produce this opinion. All his opinion does is cite to the variance and appeal provisions of the Salina City Code to conclude that the mural-sign code regime contains procedural safeguards. Yet he fails to note other procedural safeguards written in the Salina City Code, such as time limits to issue or deny permits or certificates, §§ 42-502 & 2-209, or the requirement for a written statement of the reason for denial of a permit or certificate, §§ 42-596(c)(2) & 2-209. Mr. White didn't address these procedural safeguards precisely because Salina failed to comply with these safeguards and instead placed Plaintiffs' applications for a sign permit and certificate of compatibility "on-hold" indefinitely. It is difficult to imagine what reliable principle and method could produce the opinion

that the mural-sign code regime has numerous procedural safeguards while also ignoring the procedural safeguards that Salina violated.

## III. Conclusion

Mark White's expert report and testimony should be excluded because he provides legal conclusions and "invades the province of the trial judge" to determine questions of law. *United States v. Boutte*, No. 22-2079, 2024 WL 3665536, at *10 (10th Cir. Aug. 6, 2024). Additionally, his opinions are not based on sufficient facts and data or the product of reliable principles and methods. As a result, the Court should exclude Mr. White's report, opinions, and testimony entirely because they are neither relevant nor reliable. In the alternative, the Court should exclude any portions of Mr. White's report, opinions, and testimony that are legal conclusions or that are not based on sufficient facts and data or the product of reliable principles and methods.

Dated: December 20, 2024.                          Kansas Justice Institute

/s/ Jeffrey Shaw
Samuel G. MacRoberts, 22781
Jeffrey Shaw, 29767
12980 Metcalf Avenue, Suite 130
Overland Park, Kansas 66213
Sam@KansasJusticeInstitute.org
Jeff@KansasJusticeInstitute.org
(913) 213-5018
Attorneys for Plaintiffs

### Certificate of Service

The undersigned certifies that on December 20, 2024, the above document(s) were filed using the CM/ECF system, which will send notification of such filing to all participants, including to: Aaron O. Martin, Todd G. Messenger, and Amanda C. Jokerst.

/s/ Jeffrey Shaw
Jeffrey Shaw