# ANALYSIS OF SALINA SIGN CODE

---

## PREPARED BY:
## S. MARK WHITE, AICP

*Cozy Inn Incorporated v. City of Salina*, Case 6:24-cv-01027
(United States District Court, District of Kansas)

WHITE & SMITH, LLC
200 NE MISSOURI ROAD, SUITE 200
LEE'S SUMMIT, MO 64086
PHONE (816) 221-8700
MWHITE@PLANNINGANDLAW.COM
WWW.PLANNINGANDLAW.COM

Mark White

EXHIBIT NO. 2

APPINO & BIGGS

Exhibit B

**EXHIBIT A**

Contents

*Introduction* _____ *2*

*Basis of Opinions* _____ *3*

*Statement of Opinions* _____ *3*

*Compensation* _____ *20*

*Conclusions* _____ *21*

*Documents Reviewed* _____ *22*

*Exhibits* _____ *30*

*Resume and Qualifications* _____ *39*

---

### INTRODUCTION

The City of Salina has adopted a comprehensive set of regulations to control signs within its city limits (the "Sign Code").[1] Plaintiff wants to paint a wall sign on the side of its building that exceeds the size limits of the City's Sign Code. After plaintiff was informed that its proposed painted wall sign exceeded the Sign Code's maximum sign size limits, he challenged the Sign Code as a violation of the First and Fourteenth Amendments to the United States Constitution. The complaint states that the following claimed aspects of the city's Sign Code violate the United States Constitutions because, among other things:

1. The City regulates displays that announce, direct attention to or advertise, but does not regulate artistic displays (such as murals) that do not announce, direct attention to or advertise), under the Sign Code. The plaintiff claims that this is not narrowly tailored to, and does not directly or materially further, a substantial, important, or compelling government interest, in violation of plaintiff's free speech rights under the First Amendment, and

2. The Sign Code does not define various terms, such as "mural" or "commercial speech."

Plaintiff's Verified Amended Complaint for Declaratory Judgment and Injunctive Relief (April 10, 2024)("Complaint") would suggest that this case is about its proposed wall sign. It is not. If plaintiff prevails, Salina becomes exposed to proliferation of painted wall signs that exceeds the existing sign parameters its Sign Code. Those metrics are designed to ensure that the City and its Downtown – described in its Comprehensive Plan as the "heart of the community" – is attractive, safe, and economically strong. And the Sign Code stops where it needs to, by not sweeping decorative building elements such as murals that display public art into the same regulatory system that applies to signs. Instead of working with the community to determine a way forward for painted wall signs with some artistic features, the Plaintiff is seeking ad-hoc relief from a federal district

---

[1] For purposes of this report, the term "Sign Code" refers to Chapter 42, Article X of the Salina Code. These are shown in the Exhibits to this report beginning on page 14.

court. This not only exposes the City to a flurry of painted signs, but it also threatens to undermine the culture of creativity that has resulted in well-known murals[2] – which would now become subject to wall sign limitations.

It is my opinion as a professional urban planner that the allegations by plaintiff are incorrect to the extent that they relate to content neutrality and the purposes advanced by the Sign Code. It is my opinion that the Salina Sign Code furthers substantial, content neutral interests in urban planning, and that it provides legitimate and well-established tools to control the size, shape, and design of signs.

---

## BASIS OF OPINIONS

---

I have a Masters in Urban and Regional Planning and have practiced as a professional planner for thirty-four (34) years. I am a member of the American Institute of Certified Planners (AICP) with extensive planning experience throughout the nation. The conclusions set out under "Statement of Opinions," below, are based upon my professional experience and judgment, review of technical literature relating to the field of urban planning, review of technical literature relating to the field of signs, and review of the documents, pleadings and other materials for this lawsuit. I have reviewed the materials listed under "Documents Reviewed", page 22, below.

---

## STATEMENT OF OPINIONS

---

Based on my professional experience and judgment, and my review of the applicable documents and data below, it is my opinion and professional conclusion that:

1. The Sign Code establishes time, place and manner metrics that are not content-based.

2. The Sign Code is supported by substantial and compelling interests in the area of urban planning and code administration.

3. The Sign Code directly and materially furthers its recited purposes.

4. The Sign Code is reasonable in scope in that it targets issues related to wall signs, without unnecessarily expanding its reach to artistic murals.

5. The Sign Code is not vague.

6. The restrictions established in the Sign Code are reasonable, generally accepted regulations of the size, shape, placement, and design of signs.

7. The Sign Code has numerous procedural safeguards.

---

[2] For purposes of this report, a "mural" means an outdoor exhibit painted on a wall that does not fall with the Sign Code's parameters and that may include art, but does not announce, direct attention to, or advertise.

### DESCRIPTION OF SIGN CODE

The Sign Code is codified at Chapter 42, Article X of the City Code (see Sign Code and Zoning Definitions (Selected Provisions) beginning on page 30). The Sign Code is a conventional sign method for regulating signs, and has been in effect for more than 58 years with periodic amendments (see history notes to Sign Code). The Sign Code includes a comprehensive purpose statement (Salina Code § 42-500).[3]  A comprehensive set of definitions embraces virtually every sign category available on the market, and for which sign permit applications are requested in most cities (Salina Code Chapter 42, Article XIV, §§ 42-764 to -781).  The sign that is the subject of this lawsuit is a painted "wall sign" as defined by Salina Code § 42-781, as it is painted on and supported by a building wall, and does not project from the building's surface.[4]

Administrative provisions include permitting, fees and inspections, which are normally necessary to enforce the ordinance (Salina Code §§ 42-501 [sign permits], 42-502 [zoning certificate], 42-596 [enforcement and inspections], and 42-598 [fees]).  Exceptions from the regulations or permitting requirements relate to small scale signs, signs oriented to indoor locations (such as scoreboards), government signs needed for public safety (Salina Code § 42-504, -505).  These are typical exceptions in sign codes.

In addition to the Zoning Regulations, the Salina Code requires a certificate of compatibility approved by the Design Review Board (DRB) of the Salina Business Improvement District (BID) for changes to buildings (Salina Code § 2-207), in order to protect the architectural character of Salina's Downtown.  Full review by the DRB is required for wall signs that exceed two (2) square feet (such as Plaintiff's proposed wall sign) and exterior repainting of buildings (Salina Code § 2-209; Lee District Design Review Board, Design Guidelines for Downtown Salina (January 2, 2008)[Certificate of Compatibility Design Matrix]).

The Zoning Regulations also permit variances from sign standards (Salina Code § 42-597 [board of zoning appeals]; 42-597.1 [administrative variance]). Because it is impossible to write an ordinance that addresses every conceivable situation and site configuration, variances are a long-established technique to create flexibility in the administration of zoning and similar land use restrictions and ensuring equitable treatment of property owners (Morris, 2000, at 142-43).

The Sign Code varies sign height, size and design by zoning district.  This is a state of the art, and generally accepted, technique for controlling sign clutter (see Mandelker, 2015, at 52 [appropriate proportions for wall graphics]; Mandelker, 2004, and Mandelker, 1988; Weinstein, at 5).  Plaintiff's property lies within the C-4 (Central Business) zoning district.  Within the C-4 district, the Sign Code limits signs other than ground, pole or projecting signs to three (3) square feet of sign area for each lineal foot of building frontage (Sign Code § 42-521(4)).  Because the existing building frontage is 21 lineal feet, plaintiff is allowed 63 square feet in total sign area (Salina Community and Development Services Department, *The Cozy Inn Sign Analysis* (November 9, 2023)). Plaintiff's proposed sign is 528 square feet, or 8 times the total allowable sign area.  The total sign area is based on the location and structural characteristics of signs, and not their content. Plaintiff's lawsuit would invite all businesses

---

[3] The plaintiffs do not challenge the constitutionality of § 42-500.

[4] Section 42-781 (Sign, wall) reads: "Wall sign is a sign fastened to or <u>painted</u> on a <u>wall</u> of a <u>building</u> or structure in such a manner that the <u>wall becomes merely the supporting structure or forms the background surface</u>, and which does <u>not project more than twelve (12) inches</u> from such building."  (emphasis added)

to completely ignore the Sign Code's area restrictions – at least if the sign is painted – and contribute to sign clutter.

**SUBSTANTIAL AND COMPELLING INTERESTS UNDERLIE THE SIGN CODE**

The Sign Code serves a number of compelling and substantial urban planning purposes. These include the following, all of which are reflected in the Sign Code's statement of purpose (§ 42-500, page 30):

- Comprehensive Plan implementation (see page 5)

- Traffic safety (see page 7)

- Aesthetics (see page 7)

- Urban Design and travel behavior (see page 8)

- Public Health and Safety (see page 8), and

- Compromise (see page 9).

Each of these purposes are addressed in turn below.

COMPREHENSIVE PLAN IMPLEMENTATION

In 2010, the City adopted a Comprehensive Plan for development (Salina, Kansas *Comprehensive Plan*, adopted September 20, 2010). A comprehensive plan is a statement of the City's overall land use policies. The comprehensive plan is an extremely important document. It "is atop the hierarchy of local government law regulating land-use" and acts as a "constitution for all future development." *Concerned Citizens of Calaveras County*, 166 Cal. App. 3d 90, 212 Cal. Rptr. 273, 276-77 (Cal. App. 3 Dist. 1985) (citing *O'Loane v. O'Rourke*, 231 Cal. App. 2d 774, 42 Cal. Rptr. 283 (1965); *Machado v. Musgrove*, 519 So.2d 629, 632 (Fla.App. 1987), *rev. denied*, 529 So.2d 694 (Fla. 1988) (comprehensive plan is the constitution of land development regulation)); Kansas Statutes Annotated § 12-747(c) (the comprehensive plan is the "basis or guide for public action to insure a coordinated and harmonious development or redevelopment which will best promote the health, safety, morals, order, convenience, prosperity and general welfare"). Comprehensive plans constitute "the general outline of projected development," while zoning is a regulatory tool designed to implement the plan. Haar, "*In Accordance With A Comprehensive Plan*", 68 HARV. L. REV. 1154, 1156 (1955). As such, they are used for the following purposes:

ANALYSIS OF SALINA SIGN CODE | S. MARK WHITE, AICP

1. Establishing a vision for the community; and
2. Establishing policy guidelines; and
3. Providing sources of information; and
4. Enhancing the legal basis for zoning decisions.

The Salina Comprehensive Plan establishes a number of important policies relating to urban design, including specific policies that include Plaintiff's property. Downtown is the physical and social heart of Salina (Downtown Plan, at 2-77). The Downtown Future Land Use Category includes the C-4 zoning district, and Plaintiff's property is part of the downtown core (Comprehensive Plan, at 2-11, 2-77). This is the City's primary pedestrian district, and "requires higher levels of visual interest and amenities to attract residents and visitors" (Comprehensive Plan, at 2-64). In addition to redevelopment and infill, economic vitality and residential growth, the plan provides for arts and cultural institutions as an anchor for future growth (Comprehensive Plan, at 2-79), with Policy DT.4 providing to "[w]ork with the Community Art and Design Program to create a Downtown Arts Master Plan" (Comprehensive Plan, at 2-93). Downtown economic development



Figure 1 Downtown District Map (Salina Comprehensive Plan, at 2-79)

policies provide for public art – along with other arts and cultural uses – as a way to draw people there (Comprehensive Plan, at 2-99). Several implementation policies specifically reference public art (Comprehensive Plan, at 3-31):

- DT.5-1 Work with the Community Art and Design Program to plan for the incorporation of public art displays and street art downtown.

- DT.5-2 Incorporate performance art to enhance a sense of place. Identify public / private partnerships and programs to support the installation of art in Downtown.

- DT.5-3 Enhance the downtown arcades with installation of public art, including light and sound.

Appropriate sign restrictions are critical to implementing these policies.[5]    Downtown is pedestrian oriented, and is characterized by very unique urban design features.    Suburban style signage that is designed for highly trafficked roadway corridors is inappropriate for this location (see Weinstein, at 5).    Wall signs that are out of scale to the buildings to which they are applied are inappropriate for an urban, tourist-oriented location such as the Downtown.    The unregulated proliferation of this type of sign is harmful to aesthetics and detrimental to the character of the district.

By contrast, the BID's Downtown Design Guidelines (page 30) recognize public art as a tool to maintain a pedestrian friendly environment.    The policies relating to alterations and new construction establish a policy that "[t]he street level of a building should be pedestrian friendly," with the following (emphasis added):

"8. Develop the ground floor level to encourage pedestrian activity.

- A storefront should be used on the primary facade of a building.

- On a secondary facades, alternative methods of creating pedestrian interest should be utilized. Consider the following:

  ◊  A storefront

  ◊  Display case

  ◊  **Public art**

  ◊  Landscaping"


TRAFFIC SAFETY

Sign clutter contributes to a decline in traffic safety.    Scenic America, *Warning Signs: Billboards, Signs and Traffic Safety* (1996).    The proliferation of signs that could result from unregulated painted wall signs can distract motorists and contribute to traffic accidents.    Because traffic accidents can cause serious bodily harm and even death, traffic safety is a critical government interest.    In my experience and professional judgment, traffic safety is an important basis for sign regulations, and reasonable restrictions on the height, spacing, location, and size of signs promote traffic safety.

Public art does not create this type of distraction.    In fact, communities have used public art as a tool to provide wayfinding and markings that reduce traffic accidents and collisions with pedestrians. *Cf.* Schwartz, 2022 (asphalt art positively correlated with improved safety).

AESTHETICS

Sign clutter is considered unattractive by most planning professionals and the general public. The use of reasonable sign regulations to promote aesthetics is well-established and is accepted practice in the planning profession.    Mandelker, 2015, at 97-98; *Georgia Outdoor Advertising, Inc. v. City*

---

[5] The Comprehensive Plan also recognizes sign standards in other contexts, such as a proposed Urban Industrial Overlay District (page 2-101).

*of Waynesville*, 833 F.2d 43, 47 (4th Cir. 1987)("It requires neither elaboration nor citation to say that an ordinance regulating billboards is likely to advance the objective of enhancing the beauty of a city, and that no less intrusive method would adequately protect the city's interest."); *City of Belleville v. Kesler*, 428 N.E.2d 617, 101 Ill.App.3d 710, 57 Ill.Dec. 67 (1981).

In my professional experience, a proliferation of unregulated painted wall signs would generate many complaints from the general public with regard to their visual characteristics. These can compete with existing wall signs and other signs the compete for attention, and have a tendency to dominate the streetscape.[6]  The planning literature associates the cacophony of multiple signs along street frontages with a decline in community aesthetics. In the Downtown district in particular, a proliferation of large painted signs would be inconsistent with the existing built form of the district, the policies and objectives of the City's Comprehensive Plan, and the Downtown Design Guidelines.

By contrast, public art (including murals) – which the Sign Code does not regulate – is explicitly designed for beautification, fostering civic engagement, and improving quality of life (McMaster University, 2022).  Neuroscience studies have demonstrated positive amplitude from persons viewing artwork, as opposed to negative responses from viewing commercial symbols (Cheng, 2023; Scholarly Community Encyclopedia, 2023).

URBAN DESIGN AND TRAVEL BEHAVIOR

Building design has an impact on travel behavior.  The setback and building orientation of commercial structures, in a pedestrian-friendly context like Downtown Salina, encourages pedestrian travel and discourages vehicular trips by nearby residents.  Shallow setbacks with small, pedestrian oriented signs are characteristic of an urban environment.  Large front setbacks, along with automobile-oriented signs such as pole signs and roof signs, are more characteristic of a suburban environment.  While Salina's Downtown is a pedestrian oriented district, a proliferation of oversized painted wall signs along with other inappropriate intrusions into the district would encourage shifts in travel behavior internal to the district.  This would, in turn, create pressure for further intrusions, create demand for land consumptive uses such as parking, and discourage the use of public transit.

City policies strongly encourage walkability in the design of new development and structures in Salina.  See Salina Comprehensive Plan at 2-11 to -13 (downtown, community center and neighborhood center policies), 2-63 to -65 (pedestrian network and supporting land use policies), 3-6 Policy LU.2-3d, 3-10 Policy GD.1-2.  Adherence to these policies is critical in areas such as Downtown, which is already characterized by pedestrian supportive site design and building design. Allowing large painted signs and other forms of automobile-oriented signs in the district would pose a threat to the character of the district, and degrade public health and safety within the district.

PUBLIC HEALTH AND SAFETY

There is a growing body of evidence that urban sprawl, characterized by low density development, deep front setbacks, and automobile-oriented development patterns, has a real and substantial impact on public health.  See documents cited under "Sprawl and Public Health," page 28. This is manifested in several ways.  First, development design characteristics that are automobile oriented discourage non-vehicular travel modes such as walking. The result is a more sedentary

---

[6] The *Design Guidelines for Downtown Salina* defines "streetscape" as "[t]he distinguishing character of a particular street as created by its width, degree of curvature, paving materials, design of the street furniture, and forms of surrounding buildings.."

lifestyle, which creates health problems associated with the lack of exercise. Second, increases in traffic congestion resulting from more automobile-oriented development are associated with increases in traffic accidents. Large signs are one characteristic of sprawling, automobile-oriented corridors. In the planning profession, the protection of public health is considered a compelling interest. Restricting the size and number of signs, including the control of painted wall signs, is directly related to this interest.

By contrast, public art murals have significant positive impacts on placemaking, society, culture, economy, sustainability, wellbeing, and education (Cheung et al., 2021). In addition, evidence suggests that public murals are associated with a decrease in crime (Can More Art Equal Less Crime?, 2024).

COMPROMISE

Recognizing the impacts of signs does not require a community to eliminate them. Appropriately scaled signs are needed for all types of communication – from election messages to business identification. Therefore, it is important for communities to strike a balance that allows signs to communicate messages without generating clutter or safety issues. A feature of Salina's Sign Code that is not mentioned in the Complaint is the spirit of compromise. See Sign Code § 42-500(2)(a purpose of the Sign Code is to "[b]alance public and private objectives by allowing adequate avenues for both commercial and non-commercial messages"). As the foregoing discussion demonstrates, the city has strong public interest in imposing restrictions on signs, especially in the Downtown area. However, the Sign Code also recognizes the needs of businesses there. Accordingly, the Sign Code includes a number of flexible regulations, contains procedural alternatives, and permits a number of different sign categories throughout the Sign Code and in the C-4 (Central Business) district. In crafting any sign code, the City walks a tightrope between those who would completely ban signs or sign categories, and those who want to deregulate sign type, spacing and size. This Sign Code resolves this tension by coupling its height, size, spacing and locational restrictions with permission to construct an ample variety of signs throughout the city, including provisions for painted wall signs in many locations (including C-4).

**THE SIGN CODE FURTHERS ITS STATED INTERESTS**

WALL SIGN RESTRICTIONS

Sign codes, including the wall sign restrictions in Salina's Sign Code, directly further the interests listed above. The Sign Code limits, but does not completely eliminate, painted wall signs. This allows a person, business or property owner to install wall signs, so long as they fit the building's context. Limiting wall sign size keeps the sign from overwhelming a façade, and limiting the number of signs prohibits clutter (Bishop, 1989, at 7-8). Therefore, most sign codes (including model codes) limit the size and number of wall signs (Weinstein, 2000, at 32; Kelly, 1989, at 6-7).[7] By limiting clutter, the Sign Code avoids driver distractions, and keeps signs from competing for attention with other signs on the façade.

---

[7] The Salina Sign Code does not directly limit the number of wall signs. Instead, it limits all signs per business, which includes both wall and freestanding (ground or pole) signs in the C-4 district (§ 42-521(3)). Kelly recommends a limit on freestanding signs, but only a limit on wall sign area (not the number of wall signs) (Kelly, 1989, at 6-7). Salina's approach is flexible because it allows the business to choose how to allocate its signs within the total sign limit. In this case, Plaintiff's proposed sign does not increase the number of wall signs, but it exceeds the maximum sign area.

Limiting wall sign size also promotes aesthetics. While the Sign Code does not directly control the sign's design, it does limit sign size and the number of signs. This keeps the sign in scale with the building's context, which furthers aesthetics by avoiding unsightly clutter (McMahon, 2022). The proliferation of franchise design can degrade aesthetics and local character, while sign controls can simplify the display of information (improving traffic safety) and protect the unique design of pedestrian-friendly environments such as Salina's Downtown Core (Fleming, at 71-72). As with most sign regulations, including the recommendations in model codes, it is reasonable for the City to adjust its sign metrics by zoning districts in a way that protects the area's character (Weinstein, at 5).

Controlling painted wall signs promotes public health and safety. Painted wall signs can consist of text or drawings. Another type of outdoor display that is analogous to in design is graffiti (Understanding the First Amendment Limitations on Government Regulation of Artwork, 2017). Graffiti is a drawing or painting on a wall that is typically placed without the property owner's consent and is considered a public safety issue (Morgan & Louis, 2009; Zelinka, at 160). Graffiti can lead to urban disinvestment, is recognized as criminal behavior, and is often used by criminal gangs to communicate with each other (*State v. Sanchez*, 298 P.3d 1138 (Kan. App. 2013)). Graffiti creates clutter when it proliferates and can dramatically change the character of a neighborhood or district. Salina requires property owners to restore building surfaces that are defaced by graffiti in its Property Maintenance Code (Salina Code § 31-101.6).[8] Requiring a painted wall sign to comply with the number, size and permitting requirements of the Sign Code ensures that neither strangers nor the property owner can create painted signs without public oversight.

Controlling the number of signs, including wall signs, promotes the conspicuity or visibility of individual signs (Morris et al., at 9). As the number of signs increases, the readability of each sign diminishes (Garvey et al., 2004, at 10; McMahon, 2022). This can create traffic safety issues, because it then takes motorist vision off the road, lengthens the time it takes for them to scan information, and creates potential conflicts with cars and pedestrians (Morris et al. at 18). The visual complexity also competes with traffic control signs (Morris et al., at 10). One model sign code proposes a limit on items of information in signs (Morris et al., at 21-22; Mandelker, 2015, at 64). On Plaintiff's building wall, the proposed wall sign would add numerous items of information (including two lines of text and multiple images) to the items already displayed on the wall.

ACCOMODATING ARTISTIC MURALS

Promoting art – as distinct from signs that announce, direct attention to, or advertise – has a long history in government projects. From the 1850s through the New Deal, the federal government has sponsored art in new government buildings and projects (Federal Management Regulation: Art in Architecture. 87 Fed. Reg. 5711, 5712; 41 CFR Part 102-77). The New Deal's Section of Fine Arts developed a requirement that for allocating 1% of total building construction cost for the building's embellishment (87 Fed. Reg. at 5712), and the Works Progress Administration's program resulted in numerous murals throughout the United States and Kansas (New Deal Art During the Great Depression). General Services Administration (GSA) started the Fine Arts in New Federal Buildings

---

[8] Salina Code § 31-6 defines "graffiti" as "[a]ny letter, word, name, number, symbol, slogan, message, drawing, picture, writing or other mark of any kind visible to the public from a public place that is drawn, painted, chiseled, scratched, or etched on a commercial building or residential building, or any portion thereof, including fencing, that is not consented to by the owner of the commercial building or residential building. There shall be a rebuttable presumption that such letter, word, name, number, symbol, slogan, message, drawing, picture, writing or other mark of any kind is not consented to by the owner. Such presumption may be rebutted by the owner informing the city that the owner consents to the marking and intends that it remain on the building."

(now Art in Architecture) program, which has become a model for state and local governments (*id.*). There are over 350 local percent for art programs in the United States today (Jenkins, 2021). This has resulted in the following public benefits that also apply to local governments (87 Fed. Reg. at 5712):

- Enhancing the civic meaning of Federal architecture and showcasing the vibrancy of American visual arts.
- Creating a lasting cultural legacy.
- Improving the environment for conducting business in the buildings.
- Promoting equity by increasing access for artists of different backgrounds and art styles to participate in the design of buildings.

Artistic murals promote the public safety objectives listed above, therefore justifying their exclusion from the Sign Code. Murals and public art can replace and deter graffiti and are sometimes used (at least in part) for this purpose, consistent with Crime Prevention Through Environmental Design (CPTED) principles (Craw et al., 2006; Portland Police; Zelinka, at 119, 155, 162). Mural programs are actively used as a way promote public safety and deter disinvestment by:

- providing creative outlets and career opportunities for populations at risk for crime or displacement,

- promoting creative placemaking, which provides a sense of well-being and sense of place,

- promoting a sense of community through collective maintenance of outdoor public art,

- reversing the "broken windows" phenomenon by reducing vandalism, littering, robbery, and drug use,

- deterring crime and the perception of crime,

- reducing targets for graffiti and tagging,

- cultural development,

- youth development,

- public-private partnerships, such as collaborations with businesses improvement districts (BIDs),

- blight mitigation, and

- tourism.

Treskon et al., 2018; Benefits of Murals, accessed 2024; Abatement and Alternatives, accessed 2024; Treskon & Esthappan, 2018; Esthappan, 2018; Parolek, 2014; Sakip, 2016; Young, 2022). "Although public art can be aesthetically valuable, case studies and research have demonstrated that public art can offer <u>critical</u> benefits to residents, such as improved <u>public safety</u> and <u>well-being</u>" (Young,

ANALYSIS OF SALINA SIGN CODE | S. MARK WHITE, AICP

2022)(emphasis added). Public art (such as artistic murals) can also promote mental and physical health (Young, 2022; Tanguy & Kumar, 2019).

In addition to the public safety benefits listed above, murals are an effecting tool to prevent graffiti, because it discourages tagging (i.e., painting the surface in a way to achieve notoriety) (Project for Public Spaces, 2008). As is discussed above, graffiti is associated with crime. Not regulating murals through the Sign Code encourages their use in Downtown. Applying the stricter size and permitting standards of the Sign Code would not further the City's objectives to provide the public safety, placemaking, and beautification benefits of public art murals.

Salina's Sign Code is consistent, in practice, with the state of the art nationally for how sign regulations interact with decorative building features such as murals. The author examined sign and mural regulations for twenty-one (21) sign codes referenced in the literature, along with several in Kansas and Oklahoma where the author was the principal consultant on the sign regulation drafts (Oklahoma City, Olathe, Overland Park, Shawnee) and Manhattan, where the author was part of the consulting team for the Development Code update. These codes are cited in "Code Samples" on page 23 of this report.

*Table 1 Sample Sign Regulations*

| Community | State | Description |
|---|---|---|
| Arlington | VA | Works of art and murals not showing commercial business, product or service offered on the premises exempt from sign regulations |
| Beaverton | OR | Public art exempt from sign code, and requires City acquisition |
| Boise | ID | Sign permit not required for murals that do not contain advertising |
| Fort Collins | CO | Mural cannot depict commercial product brand name or symbolic logo |
| Ithaca | NY | No compensation for display of art murals, which are not considered signs. |
| Lake Placid | FL | Murals exempt from sign regulations if they are original artwork |
| Las Vegas | NV | Mural without advertising exempt from sign regulations |
| Los Angeles | CA | Mural without advertising exempt from sign regulations |
| Manhattan | KS | Art without advertising exempt from sign regulations |
| Marion County | IN | Art without advertising exempt from sign regulations |
| Minneapolis | MN | Murals (hand-painted, hand-tiled, or digitally printed work of visual art ) exempt from sign regulations |
| Oklahoma City | OK | Murals permitted in all districts, with words, text, logos, emblems, trademarks or numbers up to the wall sign limit |
| Olathe | KS | Murals not mentioned, but murals occur pursuant to a public arts plan |
| Overland Park | KS | Excludes artwork approved as part of design |
| Pasadena | CA | Sign regulations do not mention murals, but public art incentivized through bonuses. |
| Philadelphia | PA | Zoning Code silent about murals, outdoor advertising exempts non-commercial murals; mural program in effect |
| Portland | OR | Exempts public art (city improvements) and original mural art |
| Salem | OR | Public art exempt from sign code, and requires City acquisition |
| Shawnee | KS | Treats murals same as painted wall signs; not allowed in most districts |
| St. Petersburg | FL | Art without advertising exempt from sign regulations. Requires certificate of appropriateness on historic buildings or in historic districts. |
| Temecula | CA | Art without advertising exempt from sign regulations |

These codes demonstrate a range of approaches to regulating signs while accommodating the benefits of murals.  As the Ithaca Zoning Ordinance states: "[a]rt murals have different purposes and benefits than signs and are not signs" (§ 270-250).  Las Vegas exempts murals without commercial elements because they are "[w]orks of art or decorative architectural graphics." Overland Park exempts artwork approved as an integral building feature as part of the site plan review process.  Fifty-seven percent (57%) of the codes listed above explicitly provide that murals do not include commercial advertising.  In addition, several model sign codes have similar provisions (Montgomery County, § 5.L, at 77; League of Oregon Cities, at 15; Pocono Mountain Chamber of Commerce, at 1-21 [works of art that do not any commercial messages are permitted if they comply with general standards for signs]; Southeastern Wisconsin Regional Planning Commission, at 2; see Moeller, at 15 [treating advertising murals and building wraps as a specific sign category]; Bertucci, at 29 [exempting public art, including original art murals]).  This is because murals are integral to buildings, are not designed to direct attention to a place, and as such do not function as signs.

Several of the codes listed above – including two in Kansas (Olathe and Overland Park) – do not address murals as part of their sign regulations.  However, those communities accommodate murals through public arts plans and separate programs.  This is on point with Salina's approach, where murals are treated as integral to buildings and a decorative element of structures.

OVERSIZED WALL SIGN PROLIFERATION

The Complaint seeks a loophole for wall sign regulations that include painted images and text.  Controlling painted wall signs is an important way to control sign clutter.  When a sign is left unregulated, there is a significant risk – as shown by the experience in other communities – that the City would experience proliferation of large, painted wall signs (Hathaway, 2010).  In fact, the Sign Code would allow a smaller version of Plaintiff's sign if it adjusted the total, cumulative sign area on its building to fit the Sign Code's allowance for wall signs.  If plaintiff prevails, other businesses will have an individual economic incentive to install painted wall signs that exceed the Sign Code's maximum area standards, simply by painting images along with text.  The result could undermine the aesthetic, character, and traffic safety justifications that undergird the C-4 district sign restrictions.  This exposes the City to the unregulated proliferation of these signs, as occurred in Los Angeles following initial adverse court decisions overturning its supergraphics regulations which were later reversed on appeal (Hathaway, 2010) (see Figure 2, below).[9]

---

[9] See description in *Vanguard Outdoor LLC v. City of Los Angeles*, 648 F.3d 737, 738 (9th Cir. 2011): "This case was one of many 'copycat' lawsuits filed after this Court in *World Wide Rush* enjoined [sic] the City's enforcement of its ban on offsite and supergraphic signs as an invalid prior restraint on speech under the First Amendment and enjoined enforcement of the City's Freeway Facing Sign Ban as a fatally underinclusive restriction on commercial speech. See [*World Wide Rush, LLC v. City of Los Angeles*, 606 F.3d 676, 683–84 (9th Cir. 2010)]. After that decision, "well-travelled thoroughfares that contained any sort of sizable building were soon pockmarked with Supergraphic Signs." *World Wide Rush, LLC v. City of Los Angeles*, 605 F.Supp.2d 1088, 1092 (C.D.Cal.2009), *rev'd*, 606 F.3d at 689."

ANALYSIS OF SALINA SIGN CODE | S. MARK WHITE, AICP



*Figure 2 Supergraphics in Los Angeles*

ANALYSIS OF SALINA SIGN CODE | S. MARK WHITE, AICP

### THE SIGN CODE IS REASONABLE IN SCOPE

The Complaint alleges that the Sign Code is, among other things, vague because it does not define "mural."  However, the Sign Code does not regulate "murals" because artistic murals are not signs.  The Sign Code only regulates signs – not all forms of expression involving outdoor display such as license plates, T-shirts, handheld signs,[10] or public art.  It neither carves out public art for special treatment, nor does it regulate public art.



*Figure 3 Salina Art Center Mural*



*Figure 4 Painted Wall Sign*

As defined by Salina's Zoning Code, "signs" are outdoor displays that are "used to announce, direct attention to, or advertise" (Salina City Code § 42-764).  This definition plainly does not cover public art, such as artistic murals, statues, sculptures, or architecture.  For example, Ithaca, New York's Zoning Ordinance defines "art mural" as a "one-of-a-kind work of visual art that is hand-painted, hand-tiled or digitally printed directly on, or affixed directly to, an exterior wall of a building" (Ithaca Zoning Ordinance § 270-5).  In addition, public artwork – such as a mural – is a building embellishment and not a sign. This is why some sign codes simply exempt building embellishments and murals from sign regulation, or provide additional area for embellishments. See Arlington County Zoning Ordinance Art. 13, § 13.2.3.D (architectural embellishments not a sign); Lake Placid Code § 154-5 ("sign" not include building embellishments); Las Vegas Unified

---

[10] In addition, the Sign Code (§ 42-504(4)) exempts "onsite handheld signs," but makes no reference to "offsite" handheld signs.

15

ANALYSIS OF SALINA SIGN CODE | S. MARK WHITE, AICP

Development Code § 19.06.140.G.3.b.IV (embellishment may increase sign area up to 20%). While public art (as do public spaces such parks, or buildings with architectural significance) can <u>attract</u> people to a place (Cheng, 2023; Scholarly Community Encyclopedia, 2023), it does not <u>direct</u> people to a place.

The signs that Salina regulates are a specific medium of communication, and not a specific type of message. The Complaint would effectively subject all forms of outdoor display to the City's Sign Code. Home builders applying a change of materials to a wall plane would need to comply with the Sign Code. And, muralists creating original outdoor art would need to ensure that the display falls within the Sign Code's overall sign area restrictions. In fact, this would apply not only to displays created by artists, but also to decorative patterns (see Complaint, par. 90 [University of Kansas School of Medicine and School of Nursing wall patterns]; Complaint, par. 96 [Salina Art Center has a ceramic tile mural]).

### THE SIGN CODE IS NOT VAGUE

Plaintiff claims that the Sign Code is vague because it does not define "mural," "pictorial representation," "display," "calculated to attract the attention of the public," "figure or similar character," "announce," "direct attention to," "advertise," "pertains to," "goods or services sold," "art," "commercial speech," or "noncommercial speech." Many of these terms are simply not used in the Sign Code, and others relate to terms that simply do not appear in the Sign Code and are not needed.

Plaintiff points to several words and phrases embedded in the definition of "sign" that it claims are vague. Salina Code (§ 42-764) defines "sign" as:

".... any writing (including letters, words or numerals), <u>pictorial representation</u> (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or <u>display</u> <u>calculated to attract the attention of the public</u>, or any other <u>figure or similar character</u> which:

    (1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground;

    (2) Is used to <u>announce</u>, <u>direct attention to</u>, or <u>advertise</u>; and

    (3) Is not located inside a building."

The term "**pictorial representation**" has a well-understood dictionary meaning. Merriam-Webster Dictionary online defines "pictorial" as "of or relating to a painter, a painting, or the painting or drawing of pictures….of, relating to, or consisting of pictures… illustrated by pictures… consisting of or displaying the characteristics of pictographs….suggesting or conveying visual images" (Merriam-Webster online, https://www.merriam-webster.com/dictionary/pictorial). "Representation" means "one that represents: such as…an artistic likeness or image" (Merriam-Webster online, https://www.merriam-webster.com/dictionary/representation). Therefore, the images of hamburgers on Plaintiff's proposed wall sign are "pictorial representations" – i.e., they present a likeness of hamburgers and condiments served in its restaurant, which are painted pictures or visual images. In addition, the Sign Code buttresses this term by providing examples in a parenthetical. Other sign codes use similar language in their sign definitions. Lake Placid Code § 154-5.

16

Similarly, a "**display**" means "a setting or presentation of something in open view… an eye-catching arrangement by which something is exhibited…. type, composition, or printing designed to catch the eye" (Merriam-Webster online, https://www.merriam-webster.com/dictionary/display). The Los Angeles, Manhattan, Salem and Temecula codes listed below use the term "display" with no further definition.  Plaintiff's sign is a presentation or composition, consisting of both text and pictures.  With Plaintiff's wall sign exceeding its permitted allowance by 518 square feet (Cozy Inn Sign Analysis) – and nearly 10 times its existing sign area – it is clear that Plaintiff wants its sign to catch the eye.  In fact, the sign invites the reader inside the building, where the Plaintiff's products are sold.

"**Calculated to <u>attract the attention</u> of the <u>public</u>**" or its equivalent is a commonly used – but rarely defined – phrase in sign codes.  The sign codes discussed in "The Sign Code Furthers Its Stated Interests" above illustrate this, as do several model sign codes.  Sign codes commonly use "attract the attention" or similar language. Los Angeles Planning and Zoning Code § 14.4.20 ("sign" means "[a]ny whole or part of a display board, wall, screen or object, used to <u>announce</u>, declare, demonstrate, <u>display</u> or otherwise present a message and <u>attract the attention</u> of the <u>public</u>"); Manhattan Development Code ("sign" means any object, device, <u>display</u>, … used to <u>advertise</u>, identify, <u>display</u>, direct or <u>attract attention</u> to ….");  Beaverton Development Code Chapter 90 (sign defined as "[a]ny lettered or pictorial device designed to inform or <u>attract attention</u>"; "attract attention" is not defined); Minneapolis Code of Ordinances § 565.200 ("[a] structure, … announcement, …used for direction, information, identification, <u>attraction</u>, or to <u>advertise</u> or promote any business, product, activity, service, interest or entertainment."); Oklahoma City Municipal Code § 59-16119 ("sign" is "[a] structure or device…used or intended to be used to <u>attract attention</u>."); Olathe Unified Development Ordinance § 18.90 (a sign is "Any framed, bracketed, free-formed, or engraved surface … which is sufficiently visible to persons not located on the lot where such device is located to <u>attract the attention</u> of such persons or to communicate information to them."); Overland Park Municipal Code § 18.440.200 ("sign" means "[a]ny surface or object which is used to display or which is fabricated to create words, numerals, figures, devices, designs, trademarks or logos, and which is sufficiently visible to persons located outside of any building to <u>attract the attention</u> of such persons or to communicate information to them."); Pasadena Municipal Code § 17.48.170 ("sign" means "[a] device, fixture, surface, or structure of any kind… for the purpose of <u>advertising</u>, identifying or <u>calling visual attention</u> to…."); Philadelphia Zoning Code § 14-203 ("sign" is "[a] name, identification, description, emblem, device, or structure .. that <u>directs attention</u> to …."); Portland City Code § 32.20.020.YY ("sign" is "[m]aterials placed or constructed, or light projected, that …. is used to inform or <u>attract the attention</u> of the <u>public</u>."); Salem City Code § 900.005 ("sign" means "[a]ny structure, board, poster, placard, or device which contains or comprises a <u>display</u> designed, used, or intended to <u>attract the attention</u> of the <u>public</u>"); Shawnee Municipal Code Chapter 17.05 Appendix ("sign" is a "visual <u>display</u> of an object or device … that is intended to communicate, <u>advertise</u>, identify, <u>announce</u>, direct, inform, or <u>attract attention</u>"); St. Petersburg City Code § 16.40.120.4 ("sign" means "[a]ny device, fixture, placard, structure or representation that uses any color, form, graphic, illumination, or writing to <u>advertise</u>, <u>attract attention</u>, <u>announce</u> the existence of, or identify the purpose of a person, entity, product or service or to communicate information of any kind to the <u>public</u>"); Temecula Municipal Code § 17.34.010 ("sign" means "[a]ny object, device, <u>display</u> or structure, … used to identify, <u>display</u>, direct or <u>attract attention</u> …."). Similarly, sign codes often refer to attracting the attention of the "public," which is not defined. Arlington County Zoning Ordinance § 18.2 (sign defined as "[a]ny word, numeral, figure, … used to direct, identify, or inform the <u>public</u>…"); see also Portland City Code and St. Petersburg City Code,

above.  None of those codes define "attract attention" or "public."  And, "attract," "attention" and "public" all have defined dictionary meanings.[11]

"**Advertise**" also has a well-understood meaning, and is often embedded in sign regulations with no further definition.  Ithaca Zoning Ordinance § 270-5 (sign is "[a] device for visual communication publicly displayed to identify, <u>advertise</u>, and/or convey information"); Marion County Rev. Code § 744-902 (sign is "[a]ny structure, fixture, placard, announcement, declaration, device, demonstration or insignia used for direction, information, identification or to <u>advertise</u> or promote any business, product, goods, activity, services or any interests."); see also Lake Placid, Minneapolis, Pasadena, Shawnee and St. Petersburg codes cited above.  Merriam-Webster online defines "advertise" as "to make the public aware of (something or someone) especially by means of a published or broadcast notice" or "to present (something or oneself) to the public in a way that is intended to attract customers" (https://www.merriam-webster.com/dictionary/advertise).

The Las Vegas Unified Development Code (§ 19.18.020) uses three of the terms listed above, including "**announce**" ("sign" is "[a]ny device, fixture, placard, structure or other medium, including its structure and component parts, that uses any color, form, graphic, illumination, symbol or writing to <u>advertise</u>,[12] <u>announce</u> the purpose of, or identify the purpose of a person or entity, or to communicate information of any kind to the <u>public</u>").  The Lake Placid, Los Angeles, Shawnee, and St. Petersburg regulations listed above also use the term "announce."  Merriam-Webster online defines "announce" as "to make known publicly" (https://www.merriam-webster.com/dictionary/announce).

The terms "commercial speech" and "noncommercial speech" do not appear in the Sign Code.  The Sign Code does use the terms "commercial" and "noncommercial" in relation to "messages" or "copy," which have well-reviewed meanings.  Of the sign codes reviewed above, only Arlington County, Las Vegas and Oklahoma City define "commercial message" or "copy" and "noncommercial message" or "copy."  In addition, well-known model sign codes use these terms without a definition (Mandelker, 2015, at 71-72).  This is because the common law meaning of "commercial" refers to proposing a commercial transaction (i.e., selling items), while "noncommercial" refers to speech that is entitled to full protection under the free speech clauses of the federal and state constitutions (Mandelker, 2015, at 134-35 notes 2, 18).

As this discussion shows, the supposed vague terms and phrases are well understood and in common use in sign regulations throughout the nation and in Kansas.  In addition, these terms are defined – and in a free, online dictionary used in court decisions (including 10th Circuit Court of Appeals decisions).  See *United States v. Lesh*, 23-1074 (10th Cir. 2024) (citing to Merriam-Webster online dictionary).  If Plaintiff is really confused about these terms, there is a free and easily accessible resource to resolve that confusion.

---

[11] Merriam-Webster online has the following definitions: "Attract" means "to draw by appeal to natural or excited interest, emotion, or aesthetic sense (https://www.merriam-webster.com/dictionary/attract, using "attract attention" as an example).  "Attention" means "the act or state of applying the mind to something" (https://www.merriam-webster.com/dictionary/attention).  Public means "a place accessible or visible to the public —usually used in the phrase in public" or "the people as a whole" (https://www.merriam-webster.com/dictionary/public).

[12] The Las Vegas Code does define "advertising" as "[a]ny writing, painting, <u>display</u>, emblem, drawing, sign or other device designed, used, or intended for <u>display</u> or any type of publicity for the purpose of making anything known or <u>attracting attention</u> to a place, product, goods, services, idea or statement." This uses several of the undefined but generally accepted terms listed above, with no further definition.

ANALYSIS OF SALINA SIGN CODE | S. MARK WHITE, AICP

"Mural" and "art" are not used in the Sign Code. The Sign Code simply does not regulate these building features, so there is no need to use them. Similarly, the terms and phrases "pertains to" and "goods or services sold" appear nowhere in the Sign Code. It is pointless for the Sign Code to define terms not used in the body of the code, or in other definitions.

### SALINA'S SIGN RESTRICTIONS ARE REASONABLE

Plaintiff's building is located in the C-4 (Central Business) zoning district. Sign Code § 42-521 regulates signs in this district, allowing all of the functional categories listed in the Sign Code (§ 42-506) and 16 of the 18 structural categories (§ 42-507).

For the C-4 district, the Sign Code allows four (4) signs per business (§ 42-521(3)), and up to three (3) square feet of sign area per lineal foot of building frontage with up to 67 percent of the total sign area on any building wall or street frontage (§ 42-521(4)b). This is a very flexible system, giving the business the choice to allocate its sign across the building walls as it sees fit, subject to the cumulative sign area. A maximum number of signs prevents clutter, but does not necessarily prevent customers from locating a site (Mandelker 2015, at 100). With these flexible standards, Plaintiff still has room for an additional sign of up to 10 square feet (The Cozy Inn Sign Analysis, page 3). Therefore, Plaintiff has ample opportunity to provide additional advertising and messaging on its building, without overwhelming the scale of the building or site.

While the Plaintiff's proposed sign significantly exceeds allowable sign size, allowing 67 percent of the cumulative sign area on a wall protects aesthetics and architectural integrity. Typical problems with signs, including wall signs, including context and scale with surroundings, incompatibility with the architecture of buildings to which they are attached, and overwhelming building architecture through location, shape, and color (Morris et al., at 47). To ensure that the wall and signs attached to it are correctly proportioned, experts recommend a maximum display area of 40-60% of the signable area[13] of a wall, with the lower figure applicable to pedestrian-oriented districts such as Salina's Downtown Core (Mandelker, 2015, at 52; Jourdan et. al. at 38 [recommending a maximum of 50% wall coverage]). Salina's Sign Code is a more generous standard – allowing up to 67% of the total sign allowance on one wall. Unfortunately, Plaintiff's proposed wall sign exceeds even this allowance.

### THE SIGN CODE HAS NUMEROUS PROCEDURAL SAFEGUARDS

As is described in the Description of Sign Code (page 4), the Sign Code has an administrative permitting process, along with avenues such as variances and appeals to resolve issues with the City. And the Downtown BID's certificate of compatibility process includes a flexible, case-by-case review procedure to assess how signs fit into the City's historic, walkable downtown. This type of case-by-case review is a common process for reviewing changes to buildings for architectural compatibility, so that they become individually significant, fit into their historic context, and are properly maintained (Burns).

The zoning regulations also allow for a variance or an appeal to the Board of Zoning Appeals (Sign Code § 42-597). A variance allows the Board of Zoning Appeals to adjust the sign size, subject to the statutory variance criteria. This section allows the Board of Zoning Appeals to grant a variance if:

---

[13] "Signable area" is the "continuous portion of a building unbroken by doors or windows (Mandelker 2015, at 52).

- The request arises from a condition unique to the property in question and not ordinarily found in the C-4 district, and is not created by an action or actions of the property owner.

- The variance will not adversely affect the rights of adjacent property owners or residents.

- Strict application of the Sign Code will constitute an unnecessary hardship upon the property owner represented in the application.

- The variance will not adversely affect the public health, safety, morals, order, convenience, prosperity, or general welfare.

- The variance desired is not opposed to the general spirit and intent of the zoning regulations.

The zoning regulations prohibit variances that would increase the allowable number of signs on a zoning lot (Salina Code § 42-597(c)(4)g), but that is not the case here. City staff determined that Plaintiff may install an additional sign (The Cozy Inn Sign Analysis, page 3), so the Plaintiff would need to request additional sign area.[14]

Plaintiff could also appeal the City's decision to require a sign permit (Salina Code § 42-597(c)(1)). If Plaintiff believes that the City improperly determined that its proposed wall sign is subject to the Sign Code and not an unregulated wall decoration, it could make that case to the Board of Zoning Appeals. If the Board of Zoning Appeals finds that decision erroneous, it could reverse the decision or make any decision that the Zoning Administrator could have made pursuant to Sign Code § 42-502, including issuance of a zoning certificate (sign permit).

---

## COMPENSATION

Mr. White's compensation for preparing this report is $350 per hour.

---

[14] The zoning regulations also have a process for administrative variances by the Zoning Administrator if the sign does not exceed 15% of the City's requirements. This avenue is not available, unless the applicant reduced its sign size to 11.5 feet (15% over its remaining available sign area).

## CONCLUSIONS

For the foregoing reasons, Salina's Sign Code furthers compelling and substantial public purposes, and is calibrated to accomplishing those purposes. The Sign Code does not extend its reach to decorative and artistic building elements such as artistic murals, as that is not the Sign Code's mission. The City promotes the aesthetics and public safety benefits of murals – which are not shared by wall signs – through its regulatory program that achieves the design and character of its historic Downtown. The Sign Code presents a reasonable, workable system of regulation, and is also accompanied by procedural safeguards that protect both property owners and the general public.

Dated this 16th day of August, 2024.

Digitally signed by
Mark White
Date: 2024.08.16
14:38:29 -05'00'

S. Mark White

ANALYSIS OF SALINA SIGN CODE | S. MARK WHITE, AICP

---

### DOCUMENTS REVIEWED

---

American Planning Association.  *Commercial Design Guidelines*.  Planning Advisory Service Reference Packet, Compiled March 2000.

Bishop, Kirk.  *Designing Urban Corridors*.  American Planning Association, Planning Advisory Report No. 418, 1989.

Fleming, Ronald Lee. *Saving Face: How Corporate Franchise Design Can Respect Community Identity (revised edition)*.  American Planning Association, Planning Advisory Report No. 503/504, February 2002.

Hinshaw, Mark.  *Design Review*.  American Planning Association, Planning Advisory Report No. 454, 1995

Kelly, Eric and Rasco, Gary.  *Sign Regulation for Small and Midsize Communities: A Planners Guide and a Model Ordinance*.  American Planning Association, Planning Advisory Report No. 419, 1989.

Mandelker, Daniel.   *Street Graphics and the Law*. American Planning Association, Planning Advisory Report No. 580, 2015.

Mandelker, Daniel.   *Street Graphics and the Law*. American Planning Association, Planning Advisory Report No. 527, 2004.

Mandelker, Daniel and Ewald, William.   *Street Graphics and the Law*. American Planning Association, 1988.

McMahon, Ed.   *Main Spotlight: Sign Regulation*.   Main Street America: May 25, 2022. https://mainstreet.org/the-latest/news/main-spotlight-sign-regulation

Moeller, Wendy.  *Best Practices in Regulating Temporary Signs (Updated with Reed v. Town of Gilbert Supreme Court)*.   Sign Research Foundation, 2015.    https://signresearch.org/best-practices-in-regulating-temporary-signs/

Morris, Marya; Hinshaw, Mark L.; Mace, Douglas; and Weinstein, Alan.  *Context-Sensitive Sign Design*.  American Planning Association, 2000.

Salina Code, Chapter 2, Article VII (Salina Arts and Humanities Commission), and X (Salina Business Improvement District Design Review Board), online at municode.com.

Salina Code, Chapter 31 (Property Maintenance Code), online at municode.com.

Salina Code, Chapter 42 (Zoning Regulations), Article X (Sign Code), online at municode.com.

Salina Community and Development Services Department, *The Cozy Inn Sign Analysis* (November 9, 2023).  Bates No. CITY000001-CITY000003

Salina, Kansas *Comprehensive Plan*, adopted September 20, 2010

Sign Permit Application (November 13, 2023).  Bates No. CITY000020-CITY000024

Tunnard, Christopher and Puskarev, Boris.  *Man-Made America: Chaos or Control?*  New Haven, CT: Yale University, 1964.

U.S. Small Business Administration and Signage Foundation for Communication Excellence. *The Signage Sourcebook : A Signage Handbook*.  Washington, D.C., 2003.

Verified Amended Complaint for Declaratory Judgment and Injunctive Relief (April 10, 2024).

### CODE SAMPLES

Arlington, Virginia: Zoning Ordinance Art. 13, § 13.2.3.C
https://www.arlingtonva.us/files/sharedassets/public/v/1/building/documents/codes-and-ordinances/aczo_effective_5.21.2024.pdf

Beaverton, Oregon: Development Code § 60.40.10.4 (public art exempt from sign regulations), Beaverton Code § 2.03.245 (Public Art) - https://online.encodeplus.com/regs/beaverton-or/doc-viewer.aspx?secid=278#secid-278; https://beaverton.municipal.codes/BC/2.03.245

Boise, Idaho: Development Code 11-04-012 (Signs) and 11-06-03 (Definitions), at https://codelibrary.amlegal.com/codes/boise_id/latest/boise/0-0-0-68585 and https://codelibrary.amlegal.com/codes/boise_id/latest/boise/0-0-0-70319; Artist Designed Mural Guidelines  https://www.cityofboise.org/media/17663/mural-guidelines.pdf - Bates No. CITY000663 - CITY000669

Ithaca, New York: Ithaca Zoning Ordinance Art. XXX, § 270-264 et seq., -5 (definitions) https://ecode360.com/IT1944

Ithaca, New York: Town of Ithaca Zoning Ordinance (at https://ecode360.com/IT1944 on 2024-08-08), Article XXX (Art Murals).

Lake Placid, Florida: Lake Placide Code § 154-15 (Signs); ; 154-5 (Definitions and Word Usage) https://library.municode.com/fl/lake_placid/codes/code_of_ordinances?nodeId=CH154ZO_ARTIIISURE_S154-15SI;

Las Vegas, Nevada: Unified Development Code § 19.08.120.B.2.d (Commercial-Industrial District signs); 19.06.140.E.2.d (Residential District Signs)
   https://online.encodeplus.com/regs/lasvegas-nv/doc-viewer.aspx#secid-397;
https://online.encodeplus.com/regs/lasvegas-nv/doc-viewer.aspx#secid-383

Los Angeles, California: Planning and Zoning Code 14.4.20; Administrative Code 22.119
   https://codelibrary.amlegal.com/codes/los_angeles/latest/lapz/0-0-0-24134;
https://codelibrary.amlegal.com/codes/los_angeles/latest/laac/0-0-0-48276  - Bates No. CITY000731 - CITY000738

Manhattan, Kansas: Development Code § 26-7D-1.B.2.a (exempts art)
   https://online.encodeplus.com/regs/manhattan-udo/doc-viewer.aspx?secid=1480#secid-1480

Marion County, Indiana: Rev. Code § 744-902 (defining mural, art), -903.F.2
   https://library.municode.com/in/indianapolis_-

_marion_county/codes/code_of_ordinances?nodeId=TTTIIIPUHEWE_CH744DEST_ARTIX2018RESIRE

Minneapolis Minnesota: Code of Ordinances 560.60(a)(8)(exempting murals); 565.140 (defining murals)
https://library.municode.com/mn/minneapolis/codes/code_of_ordinances?nodeId=MICOOR_TIT20ZOCO_CH560SI_ARTIGEPR_560.60EXSI;
https://library.municode.com/mn/minneapolis/codes/code_of_ordinances?nodeId=MICOOR_TIT20ZOCO_CH565DE_565.140DEBEM

Oklahoma City, Oklahoma: Municipal Code § 59-16112 Murals
https://online.encodeplus.com/regs/oklahomacity-ok-sr/doc-viewer.aspx?secid=2211#secid-2211

Olathe, Kansas: 2020 Call for Street Mural Artists (https://www.olatheks.gov/home/showpublisheddocument/16903/637260979291600000); 2020 Downtown Olathe Street Mural (June 22, 2020)(https://www.olatheks.gov/Home/Components/News/News/2910/); Meridith McKinley, Via Partnership, and James Martin, Public Art Master Plan ()(https://www.olatheks.org/home/showdocument?id=12151).

Olathe, Kansas: Unified Development Ordinance § 18.50.190 (Signs)
https://olathe.municipal.codes/UDO/18.50.190

Overland Park, Kansas: Public Art Master Plan (2021)(https://drive.google.com/file/d/1A9-v1C8fj8M9ucRWybVnYoBYom2Jajn9/view?usp=sharing).

Overland Park, Kansas: Unified Development Ordinance § 18.440.030.H (Signs Not Requiring Permits) https://online.encodeplus.com/regs/overlandpark-ks/doc-viewer.aspx#secid-6159

Pasadena, California: Municipal Code Chapter 17.48 Signs
https://library.municode.com/ca/pasadena/codes/code_of_ordinances?nodeId=TIT17ZOCO_ART4SIPLGEDEST_CH17.48SI

Philadelphia, Pennsylvania: Zoning Code Chapter 14-900 (signs); 9-602 (outdoor advertising)
https://codelibrary.amlegal.com/codes/philadelphia/latest/philadelphia_pa/0-0-0-294054;
https://codelibrary.amlegal.com/codes/philadelphia/latest/philadelphia_pa/0-0-0-287568;
https://codelibrary.amlegal.com/codes/philadelphia/latest/philadelphia_pa/0-0-0-276624

Portland, Oregon: City Code § 32.12.020.I, -J (sign code exemptions); Chapter 5.74 (public art); Title 4 (original art murals)   https://www.portland.gov/code/32/12;
https://www.portland.gov/code/5/74; https://www.portland.gov/code/4

Shawnee, Kansas: Municipal Code 17.05.070.H Attached Signs
https://library.municode.com/ks/shawnee/codes/code_of_ordinances?nodeId=CD_TIT17ZO_CH17.05SICO

St. Petersburg, Florida: City Code § 16.40.120.19
https://library.municode.com/fl/st._petersburg/codes/code_of_ordinances?nodeId=PTIISTPECO_CH16LADERE_S16.40.120SICO

Temecula, California: Municipal Code § 17.28.050(U)
https://ecode360.com/42692992#42692992

### MODEL CODES

Montgomery County (Pennsylvania) Planning Commission. *Model Sign Ordinance*. 2014. https://planningpa.org/wp-content/uploads/Model-Sign-Plan.pdf

Bertucci, Andrew D. and Crawford, Richard B. *Model Code for Regulation of On-Premise Signs*. United States Sign Council, 2016. https://ussscfoundation.org/wp-content/uploads/2018/03/USSC-Model-On-Premise-Sign-Code-2018.pdf

Jourdan, Dawn, Esq., Ph.D.; Hawkins, Gene; Abrams, Robin; Winson-Geideman, Kimberly. *A Legal and Technical Exploration of On-Premise Sign Regulation: An Evidence Based Model Sign Code*. Urban Design Associates. https://signresearch.org/a-legal-and-technical-exploration-of-on-premise-sign-regulation-an-evidence-based-sign-code/

League of Oregon Cities. Model Sign Code. March 2018, Last reviewed by LOC attorneys January 2024.
https://www.orcities.org/application/files/9117/1398/0823/ModelSignOrdinance.pdf

Pocono Mountain Chamber of Commerce, Committee on Signage Improvement. *Model Sign Ordinance*. November 14, 2000.

Southeastern Wisconsin Regional Planning Commission. *SEWRPC Model Zoning Ordinance Regulations for Signs*. April 8, 2017.
https://www.sewrpc.org/SEWRPCFiles/CommunityAssistance/ModelOrdinances/ModelSignOrdinance.pdf

Weinstein, Alan C. *A Framework for On-Premise Sign Regulations*. The Signage Foundation, March 2009.

### RESOURCES RELATED TO PUBLIC ART

Abatement and Alternatives. CRP Bay Area, accessed August 10, 2024, at https://crpbayarea.org/policy/abatement/

*Art in Architecture*. 41 CFR Part 102-77 (up to date as of 8/09/2024), at https://www.ecfr.gov/current/title-41/subtitle-C/chapter-102/subchapter-C/part-102-77

*Benefits of Murals*. CRP Bay Area, accessed August 10, 2024, at http://crpbayarea.org/painting/benefits-of-murals/.

Burns, Leigh (Director, Fox Theatre Institute). *Historic Preservation Considerations for Murals* (2019), at https://gaarts.org/wp-content/uploads/2019/12/Historic-Preservation-Murals.pdf – Bates No. CITY000670 - CITY000671

Cheng Y, Chen J, Li J, Li L, Hou G, Xiao X. Research on the Preference of Public Art Design in Urban Landscapes: Evidence from an Event-Related Potential Study. *Land*. 2023; 12(10):1883. https://doi.org/10.3390/land12101883

Cheung, M., Smith, N., & Craven, O. (2021). The Impacts of Public Art on Cities, Places and People's Lives. *The Journal of Arts Management, Law, and Society*, 52(1), 37–50. https://doi.org/10.1080/10632921.2021.1942361

City Club of Portland (Portland, Or.), "City Club of Portland Report: Billboard Regulation in Portland" (1996). City Club of Portland, Paper 479. http://pdxscholar.library.pdx.edu/oscdl_cityclub/479

Esthappan, Sino. *Art Beyond Bars: A Case Study of the People's Paper Co-op in Philadelphia, Pennsylvania*. Urban Institute: September 2018. https://www.urban.org/research/publication/art-beyond-bars-case-study-peoples-paper-co-op-philadelphia-pennsylvania

*Federal Management Regulation; Art in Architecture*. 87 Fed. Reg. 5711 (February 2, 2022), at https://www.federalregister.gov/documents/2022/02/02/2022-02158/federal-management-regulation-art-in-architecture

Garvey, Philip M; Thompson-Kuhn, Beverly; and Pietrucha, Martin T. *Sign Visibility: Research And Traffic Safety Overview*. United States Sign Council, 2004.

Hathaway, Dennis. *Public Art Murals: Can Portland Model Solve Legal Dilemma in Los Angeles?* Banbillboardblight.org. June 7, 2010. Bates No. CITY000704 - CITY000706.

Jenkins, David. *Public Art and the Law: A Primer*. Center for Art Law, June 18, 2021. https://itsartlaw.org/2021/06/18/public-art-and-the-law-a-primer/

Kansas State Historic Preservation Office (SHPO) Guidance for the Installation of Downtown Murals – Bates No. CITY000756

McMaster University, *Public art and its impact on our lives* (June 15, 2022), at https://www.mcmasteroptimalaging.org/blog/detail/blog/2022/06/15/public-art-and-its-impact-on-our-lives.

Mural Creation Best Practices - CITY000739 - CITY000755

New Deal Art During the Great Depression, 2006, at http://www.wpamurals.org/.

O'Connor, De-"coding" the Visual Landscape: Municipal Sign Ordinances, Murals, and the First Amendment, 59 *Municipal Lawyer* No. 1, at 6 (January/February 2018). Bates No. CITY000708 - CITY000714

Orlando, *Art or Signage? The Regulation of Outdoor Murals and the First Amendment*, 35 Cardozo Law Rev. 867 (2013). Bates No. CITY000673 - CITY000702

Parolek, Dan. The Power of Public Art: How Murals Beautify Cities and Build Communities. Opticos Design, at https://opticosdesign.com/blog/the-power-of-public-art-murals/.

Public Art Design in Urban Landscapes, Scholarly Community Encyclopedia, at https://encyclopedia.pub/entry/50240 (updated October 15, 2023).

ANALYSIS OF SALINA SIGN CODE | S. MARK WHITE, AICP

Tanguy, M., and V. Kumar. 2019. "Measuring the Extent to Which Londoners Are Willing to Pay for PublicArt in Their City." *Technological Forecasting and Social Change* 142:301–11. https://www.sciencedirect.com/science/article/abs/pii/S0040162518318249?via%3Dihub .

Treskon, Mark; Esthappan Sino;  Okeke, Cameron; and Vásquez-Noriega, Carla.  *Creative Placemaking and Community Safety: Synthesizing Cross-Cutting Themes*.  Urban Institute: September 25, 2018.    https://www.urban.org/research/publication/creative-placemaking-and-community-safety-synthesizing-cross-cutting-themes

*Understanding the First Amendment Limitations on Government Regulation of Artwork*. American Bar Association (January 2, 2017) (https://www.americanbar.org/groups/state_local_government/publications/state_local_law_news/2016-17/winter/understanding_first_amendment_limitations_government_regulation_artwork/). Bates No. CITY000716 - CITY000730

Young, Caitlin.  *How Public Art Can Improve Quality of Life and Advance Equity*.  Urban Institute: November  16,  2022.    https://housingmatters.urban.org/articles/how-public-art-can-improve-quality-life-and-advance-equity

**RESOURCES RELATING TO PUBLIC AND TRAFFIC SAFETY**

Beijer, D. D., Smiley, A., and Eizenman, M. "Observed Driver Glance Behavior at Roadside Advertising." Transportation Research Record No. 1899 (2004).

Cairney, P., and Gunatillake, T. *Roadside Advertising Signs—A Review of the Literature and Recommendations for Policy*. ARRB Transport Research, Royal Automobile Club of Victoria, 2009.

Can  More  Art  Equal  Less  Crime?  *Omnia*.  April  11,  2024. https://omnia.sas.upenn.edu/story/graduate-student-maya-moritz-researching-link-mural-art-less-crime

Craw, P. J., Leland, L. S., Bussell, M. G., Munday, S. J., & Walsh, K. (2006). The Mural as Graffiti Deterrence. *Environment and Behavior*, 38(3), 422-434. https://doi.org/10.1177/0013916505281580

Morgan, Anthony & Louis, Erin. Key issues in graffiti. Research in Practice Summary Paper No. 06, December 2009. https://www.researchgate.net/publication/324895655_Key_issues_in_graffiti#fullTextFileContent

Portland  Police  [Maine],  *Graffiti  Prevention*,  at  https://www.portlandmaine.gov/474/Graffiti-Prevention.

Project  for  Public  Spaces.  *Graffiti  Primer*.  December  31,  2008. https://www.pps.org/article/graffitiprimer

Ross, Catherine.  *Exploring the Ways Arts and Culture Intersect with Public Safety: Identifying Current Practice  and  Opportunities  for  Further  Inquiry*.  Urban  Institute:  April  2016. https://www.urban.org/sites/default/files/publication/79271/2000725-Examining-the-Ways-Arts-and-Culture-Intersect-with-Public-Safety.pdf

Sakip, Siti & Bahaluddin, Azrul & Hassan, Khalilah. (2016). The Effect of Mural on Personal Crime and Fear of Crime. *Procedia - Social and Behavioral Sciences*. 234. 407-415. 10.1016/j.sbspro.2016.10.258. https://www.sciencedirect.com/science/article/pii/S1877042816315129

Scenic America. *Warning Signs: Billboards, Signs and Traffic Safety.* 1996.

Schwartz, Sam. *Asphalt Art Safety Study: Historical Crash Analysis and Observational Behavior Assessment at Asphalt Art Sites.* Bloomberg Philanthropies: April 2022.

Treskon, Mark & Esthappan, Sino. *Empowering Young People to Make Their Place: A Case Study of the Marcus Garvey Clubhouse in Brownsville, Brooklyn.* Urban Institute: September 25, 2018. https://www.urban.org/research/publication/empowering-young-people-make-their-place-case-study-marcus-garvey-clubhouse-brownsville-brooklyn

Weisel, Deborah Lamm. *Graffiti*. Center for Problem-Oriented Policing, Problem-Oriented Guides for Police, Problem-Specific Guides Series No. 9, Revised 2013. https://popcenter.asu.edu/sites/default/files/graffiti.pdf

Zelinka, Al and Brennan, Dean. *Safescape: Creating Safer, More Livable Communities Through Planning and Design.* American Planning Association, 2001.

### RESOURCES RELATING TO SPRAWL AND PUBLIC HEALTH

Barbara A. McCann and Reid Ewing. *Measuring the Health Effects of Sprawl: A National Analysis of Physical Activity, Obesity and Chronic Disease.* Smart Growth America and Surface Transportation Policy Project, September 2003.

Georgia Institute of Technology Research News, "Tipping The Scales For Smart Growth: SMARTRAQ Demonstrates How Community Design Affects Travel Behavior, Air Quality And Health" (May 31, 2004).

Reid Ewing, Tom Schmid, Richard Killingsworth, Amy Zlot, Stephen Raudenbush, "Relationship Between Urban Sprawl and Physical Activity, Obesity, and Morbidity," 18 American Journal of Health Promotion 47 (September/October 2003).

### RESOURCES RELATING TO DESIGN / TRAVEL BEHAVIOR

1000 Friends of Oregon, Making Land Use Transportation Air Quality Connections, The Pedestrian Environment, Vol. 4A (Dec. 1993)(at www.bts.gov/ntl/docs/tped.html)

Kulash, "Traditional Neighborhood Development-Will the Traffic Work?" American Society of Civil Engineers, (ASCE 1990);

Bookout, "Neotraditional Town Planning: Cars, Pedestrians & Transit," Urban Land (Feb. 1992), at 10, 15.

Cervero & Kockelman, "Travel Demand and the 3Ds: Density, Diversity, and Design, Transportation Resource-D, Vol. 2, No. 3 (1997)

Cervero, "Land-Use Mixing and Suburban Mobility," Transportation Quarterly (1988)

Colorado/Wyoming Section Technical Committee, "Trip Generation for Mixed Use Developments," ITE Journal 57, 2 (1987): 27-32)

Crane, "Cars and Drivers in the New Suburbs: Linking Access to Travel in Neo-traditional Planning," 62 APA Journal 51 (Winter 1996);

Friedman, Gordon & Peers, "Effect of Neo-traditional Neighborhood Design on Travel Characteristics," Transportation Research Record 1466: 63-70 (1993)

Holtzclaw, "Using Residential Patterns and Transit to Decrease Auto Dependence and Costs" (1994)

JHK & Associates. Transportation-Related Land Use. Strategies to Minimize Motor Vehicle Emissions: An Indirect Source Research Study, Final Report. Sacramento: California Air Resources Board, June 1995.

Kulash, Anglin, & Marks, Traditional Neighborhood Development: Will the Traffic Work?, Development 21 (July/Aug. ), 21-24

Moudon & Hess, et al., Effects Of Site Design On Pedestrian Travel In Mixed-Use, Medium-Density Environments (May 1997, Report No. WA-RD 432.1);

Kitamura, Mokhtarian, Laidet, "Micro Analysis of Land Use and Travel in Five Neighborhoods in San Francisco" (Institute of Transportation Studies, University of California at Davis, Nov. 1994).

Parsons, Brinckerhoff Quade and Douglas, Inc., Cambridge Systematics, Inc., and Calthorpe Associates. 1993. *Building Orientation: A Supplement to The Pedestrian Environment: Volume 4B*. Portland, OR: 1000 Friends of Oregon. (online at http://ntl.bts.gov/DOCS/bob.html)

Frank & Pivo, *Relationships between Land Use and Travel Behavior in the Puget Sound Region*. Washington State Transportation Center, 1994.

United States Environmental Protection Agency. *Our Built and Natural Environments*. EPA 231-R-01-002, January 2001.

ANALYSIS OF SALINA SIGN CODE | S. MARK WHITE, AICP

---

### EXHIBITS

---

**Sign Code and Zoning Definitions (Selected Provisions)**

## Chapter 42  Zoning Regulations

ARTICLE X. SIGNS

*DIVISION 1. GENERALLY*

**Sec. 42-500. Purpose.**

This article promotes the public health, safety and welfare of the community through a comprehensive system of reasonable, effective, consistent, content-neutral and nondiscriminatory sign standards and requirements, narrowly drawn to:

(1)  Ensure that all signs installed in the city are compatible with the character and visual environment of the community and promote the goals, objectives and policies of the comprehensive plan;

(2)  Balance public and private objectives by allowing adequate avenues for both commercial and non-commercial messages;

(3)  Improve pedestrian and traffic safety by promoting the free flow of traffic and the protection of pedestrians and motorists from injury and property damage caused by, or which may be fully or partially attributable to, unsecured, cluttered, distracting, and/or illegible signage;

(4)  Protect the aesthetic appearance of the city's natural and built environment for its citizens and visitors;

(5)  Prevent property damage, personal injury, and litter caused by signs that are improperly constructed or poorly maintained;

(6)  Protect property values, the local economy, and quality of life by preserving and enhancing the appearance of the streetscape; and

(7)  Provide for the placement of temporary signs in limited circumstances, without regard to the communicative content of the sign.

(8)  Provide consistent design standards that enable the fair and consistent enforcement of these sign regulations.

(9)  Enhance the city's ability to maintain its public rights-of-way.

(Ord. No. 17-10882 , § 1, 7-10-17)

### Sec. 42-501. Permits.

No sign, except for normal repair and for signs listed in sections 42-504 and 42-505, shall be painted, constructed, erected, remodeled, relocated or expanded until a zoning certificate (sign permit) for such sign has been obtained pursuant to the procedure set forth in this article.

(Code 1966, § 36-900)

### Sec. 42-502. Zoning certificate (sign permit) required.

(a)    The zoning certificate (sign permit) must be obtained from the office of the zoning administrator.

(b)    A zoning certificate (sign permit) shall be either issued or refused by the zoning administrator within ten (10) days after the receipt of an application therefore or within such further period as may be agreed to by the applicant. No zoning certificate for any sign shall be issued unless the sign complies with the regulations of this article.

(c)    A zoning certificate (sign permit) shall become null and void four (4) months after the date on which it is issued unless within such four-month period, construction, building, moving, remodeling or reconstruction of a structure or sign is commenced or a use is commenced.

(Code 1966, § 36-901)

### Sec. 42-503. Sign standards.

(a)    The gross surface area of a sign shall be the sum of all surface areas of all sign faces, except that for signs designed as double faced signs, with both faces parallel and the distance between the faces does not exceed two (2) feet, then only one (1) face of the sign shall be considered in determining the gross surface area. When two (2) or more signs are located on a zoning lot, the gross surface area of all signs on the lot shall not exceed the maximum allowable for the district regulations. For computing the area of any wall sign which consists of letters, numbers and symbols mounted or painted on a wall, the area shall be deemed to be the area of the smallest rectangular figure which can encompass all of the letters, numbers or symbols.

(b)    Sign height shall be measured from ground level at the base of or below the sign to the highest element of the sign.

(c)    All signs must conform to the regulations and design standards of the building code of the city and all wiring of all electrical signs must conform to the electrical code of the city.

(d)    Illuminated signs shall be shaded wherever necessary to avoid direct casting of light upon property located in any residential district or upon any public street or park. Any illuminated sign located on a lot adjacent to or across the street from any residential district, which sign is visible from such residential district, shall be illuminated only during business hours or between the hours of 7:00 a.m. and 10:00 p.m.

(e)    Electronic changeable copy signs.

(1)    Electronic changeable copy signs shall be permitted: (i) in residential districts subject to the limitations of Section 42-517(7); (ii) in U districts subject to the limitations of Section 42-518(9); (iii) in P districts subject to the limitations in Section 42-518.2(7); (iv) in H-M districts; (v) in the C-1, C-2, C-3, C-5, C-6 and C-7 commercial districts; and (vi) in the I-2 and I-3 industrial districts. No electronic changeable copy signs shall be permitted in the C-4 district, except on theatres listed on a historic register. Applications for electronic changeable copy signs for historic theatres shall be reviewed and approved by the Heritage Commission. Electronic changeable copy signs shall comprise only a portion of the overall theatre marquee or sign design package for the theatre.

(2)    All electronic changeable copy signs must be equipped with a photo cell dimmer or some other automatic dimmer control that automatically adjusts for day and night brightness. The sign owner or sign installer shall provide written certification from the equipment

manufacturer that the sign is so equipped. No electronic changeable copy sign shall exceed a brightness level of three-tenths (0.3) foot-candle above ambient light as measured using a foot candle meter at a preset distance depending on sign size. The measuring distance shall be determined using the following equation: the product of the square root of the sign copy area times one hundred (100). Text and moving pictorial images shall be permitted; however, blinking, flashing, rotating, revolving, spinning or fluttering lighting or graphic animation is not allowed. Transitions between messages must fade, scroll or reveal. No signs with moving parts, revolving beacons, strobe lights or signs which emit an audible sound, shall be permitted in any district.

(f)    No sign shall block any required accessway or window.

(g)    No sign shall be attached to a tree or utility pole whether on public or private property.

(h)    On corner and through lots, each lot line that abuts a street or highway shall be considered a separate street frontage.

(i)    No metal sign shall be located within eight (8) feet vertically and four (4) feet horizontally of electric wires or conductors in free air carrying more than forty-eight (48) volts, whether or not such wires or conductors are insulated or otherwise protected.

(j)    No sign shall be maintained at any location where by reason of its position, size, shape or color it may obstruct, impair, obscure, interfere with the view of, or be confused with any traffic-control sign, signal or device, or where it may interfere with, mislead or confuse traffic.

(k)    No sign shall be located in any vision triangle formed by the curb lines of any two (2) intersecting streets, except signs mounted ten (10) feet or more above the ground whose supports do not constitute an obstruction. See also section 42-81.

(l)    No sign shall be permitted to be located in the public-right-of-way in any zoning district, except for the following:

(1)    Signs placed or authorized by the city, county, state, or federal government for the protection of the public health, safety, and general welfare, including, but not limited to, the following:

a.    Emergency and warning signs necessary for public safety;

b.    Traffic and wayfinding signs;

c.    Signs showing the location of public facilities including public and private hospitals and emergency medical services; and

d.    Any sign, posting, notice, or similar sign placed by or required by a governmental agency in carrying out its responsibilities to protect the public health, safety, and general welfare.

(2)    Projecting signs within the C-4 (central business) zoning district, provided that no such sign may project over the public right-of-way more than half the width of the abutting public sidewalk or alley. Any sign so extending must be a minimum of ten (10) feet above grade.

(3)    Movable A-frame and sandwich board signs within the C-4 (central business) zoning district complying with section 35-40.2 of the Salina Code.

(4)    Neighborhood entry signs placed and displayed in any RS, R, R-1, R-2, R-2.5, R-3 or MH residential zoning district, if authorized by the city pursuant to a written license agreement

which shall specify the message content, size, placement, illumination, design, and material to be used.

(5) Vertical banners attached to light or utility poles in any zoning district, if authorized by the governing body pursuant to a banner program.

(6) Decorative flags within the Salina Business Improvement District No. 1, if authorized by the governing body pursuant to a decorative flag program.

(7) Temporary signs placed and displayed in the unpaved public right-of-way for a city street, in any zoning district, during the period prior to an election, in accordance with the requirements set forth in subsection 42-508(d).

(8) Signs authorized by the city to be permanently affixed on bus benches in the public right-of-way at bus stops located on arterial streets. Signs affixed to bus benches must face toward the adjacent public street. If signs are placed on bus benches by a private contractor pursuant to an agreement between the city and such contractor, the agreement shall be in writing and shall specify the allowable message content, size, placement, illumination, design, and material for each of the signs, so as to minimize the visual impacts of such signs on the general public and surrounding properties.

(m) All signs which are more than four (4) feet above grade shall be securely fastened so as to prevent movement.

(n) Any time a sign is removed from its structural support, except for the purposes of maintenance, repair, replacement, repainting or cleaning, or due to an act of God, the structural support shall be removed within twenty-four (24) hours, provided further, that if a sign removed for the purposes of maintenance, repair, replacement, repainting or cleaning, or due to an act of God, if not reinstalled within thirty (30) days of the removal, then the structural support shall be removed within twenty-four (24) hours.

(Code 1966, § 36-901; Ord. No. 80-8821, § 1, 11-24-80; Ord. No. 81-8857, § 1, 6-22-81; Ord. No. 90-9381, §§ 1, 9, 5-14-90; Ord. No. 06-10337, § 1, 7-10-06; Ord. No. 19-10990 , § 1, 1-14-19; Ord. No. 19-11020 , § 1, 12-2-19)

### Sec. 42-504. Exemptions generally.

The following signs shall be exempt from the requirements of this article:

(1) Noncommercial flags displayed on private property;

(2) Signs placed or authorized by the city, county, state, or federal government for the protection of the public health, safety, and general welfare, including, but not limited to, the following:

    a. Emergency and warning signs necessary for public safety;

    b. Traffic and wayfinding signs;

    c. Signs showing the location of public facilities including public and private hospitals and emergency medical services; and

    d. Any sign, posting, notice, or similar sign placed by or required by a governmental agency in carrying out its responsibilities to protect the public health, safety, and general welfare;

ANALYSIS OF SALINA SIGN CODE | S. MARK WHITE, AICP

(3) Signs placed in or attached to a motor vehicle, bus, or railroad car that is regularly used for purposes other than the display of signs;

(4) Onsite handheld signs;

(5) Memorial signs and tablets displayed on private property;

(6) Address numerals and other signs required to be maintained by law or governmental order, rule or regulation, provided that the content and size of the signs does not exceed the requirements of such law, order, rule or regulation;

(7) Small signs, not exceeding five (5) square feet in area, displayed on private property for the convenience of the public, including signs to identify entrance and exit drives, parking areas, one-way drives, restrooms, freight entrances, and the like;

(8) Scoreboards in athletic stadiums;

(9) Window signs affixed to the interior of a window that do not display an advertising message or cover more than thirty-three (33) percent of the total window area on a single wall.

(Code 1966, § 36-903; Ord. No. 90-9381, §§ 2, 9, 5-14-90; Ord. No. 04-10218, § 1, 10-11-04; Ord. No. 19-11020 , § 2, 12-2-19)

Editor's note(s)—Ord. No. 04-10218, adopted § 42-504, combining former §§ 42-504, 8-386, and 8-387.

….

### Sec. 42-506. Classification of signs—Functional types.

The following signs are classified by function:

(1) *Advertising sign.* A sign displaying a commercial message that directs attention to a business, commodity, service or entertainment conducted, sold, or offered at a location other than the premises on which the sign is located, or to which it is affixed (off-premise sign).

(2) *Bulletin board sign.* A sign that indicates the name of an institution or organization on whose premises it is located and which contains the name of the institution or organization, the name or names of persons connected with it, and announcements of persons, events or activities appearing or occurring at the institution. Such signs may also present a greeting or similar message.

(3) *Business sign.* A sign displaying a commercial message that directs attention to a business or profession conducted, or to a commodity or service sold, offered or manufactured, or an entertainment offered, on the premises where the sign is located or to which it is affixed.

(4) *Identification sign.* A sign having the name and address of a building, business, development or establishment. Such signs may be wholly or partly devoted to a readily recognized symbol.

(5) *Menu board sign.* An on-site sign designed and used for the display of menu items and pictures and/or prices of menu items.

(6) *Nameplate sign.* A sign giving the name and/or address of the owner or occupant of a building or premises on which it is located, and where applicable, a professional status.

(Code 1966, 36-905; Ord. No. 04-10218, § 1, 10-11-04; Ord. 07-10396, § 1, 7-9-07; Ord. No. 17-10882 , § 2, 7-10-17)

Editor's note(s)—Ord. No. 04-10218 adopted § 42-506, combining §§ 8-385 and former 42-506.

## Sec. 42-507. Same—Structural types.

The following signs are classified as types:

(1) *Awning, canopy and marquee sign.* A sign that is mounted or painted on, or attached to, an awning, canopy or marquee that is otherwise permitted by this chapter. No such sign shall project more than twenty-four (24) inches above, below, or twelve (12) inches beyond the physical dimensions of the awning, canopy or marquee, and a minimum of eight (8) feet of clearance shall be provided above grade.

(2) *Banner sign.* A temporary sign composed of cloth, canvas, plastic, fabric, or similar light-weight, non-rigid material that is mounted to a wall, canopy, or solid fence with cord, rope, cable, or a similar method.

(3) *Changeable copy sign.* Any sign on which message copy can be changed through the use of attachable letters and numerals or by electronic switching of lamps, light emitting devices, or illuminated tubes. This includes public message displays or any sign which features automatic switching such as time and temperature signs.

(4) *Electronic changeable copy sign/Computer-operated electronic message signs.* A sign containing a computer or digital software generated message or other automated or remote method of changing copy.

(5) *Feather flag.* A temporary, freestanding, vertical sign, also referred to as a teardrop flag, swooper flag or wind flag, consisting of a loose polyknit or other semi-rigid membrane sign face that flutters in the wind from a pole or staff attached to, anchored or placed into the ground.

(6) *Flashing sign.* A sign which contains an intermittent or flashing, pulsating, blinking or traveling light source which includes signs that give the illusion of intermittent or flashing light by means of animation, or an externally mounted intermittent light source.

(7) *Ground sign.* Any sign placed upon or supported by, and permanently affixed to, the ground independently of the principal building or any accessory structure on the property.

(8) *Illuminated sign.* Any sign which is directly lighted by any electrical light source, internal or external, regardless of technology.

(9) *Inflatable sign.* Any sign made of flexible material enlarged, activated or inflated by inserted air or gas, which floats, is tethered in the air, or is located on the ground or on a building.

(10) *Mobile sign.* A sign that is not permanently affixed to the ground or a building and is designed or constructed to be easily moved from one (1) location to another, including signs mounted upon or designed to be mounted on a trailer, even if the sign has had its wheels removed.

ANALYSIS OF SALINA SIGN CODE | S. MARK WHITE, AICP

(11) *Pole sign.* A sign that is mounted on a freestanding pole, the bottom edge of which sign is six (6) feet or more above ground level.

(12) *Projecting sign.* A sign that is wholly or partly dependent upon a building for support and which projects more than twelve (12) inches from such building.

(13) *Pylon sign.* A freestanding sign, other than a pole sign, permanently fixed to the ground by shafts, posts or other supports wrapped with an aesthetic veneer, but not having the appearance of a solid base.

(14) *Roof sign.* A sign erected, constructed and maintained wholly upon or projecting above any portion of the roof of a building or having the roof as the principal means of support. A mansard shall be considered part of the wall of the building.

(15) *Rotating sign.* Any sign or portion of a sign which moves in a revolving or similar manner.

(16) *Temporary sign.* A sign that is to be displayed for a short period of time and not designed or constructed for permanent display, including but not limited to yard signs, banners, flags, balloons, feather flags, and inflatable signs. Temporary signs shall not include mobile signs.

(17) *Wall sign.* A sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

(18) *Yard sign.* A temporary, freestanding sign made of lightweight or nondurable materials such as paper, cardboard, canvas, fabric, wood, metal, or vinyl that is supported by a frame, pole, or other support structure placed directly in the ground without foundation or other anchor. Yard signs shall not include banner signs.

(Ord. No. 88-9283, § 1, 11-14-88; Ord. No. 90-9381, §§ 3, 9, 5-14-90; Ord. No. 07-10396, § 1, 7-9-07; Ord. No. 17-10882 , § 3, 7-10-17)

….

### Sec. 42-509. Maintenance and safety.

All signs, including attendant braces, supports, guys and anchors, shall be kept in a safe and sound structural condition and maintained in a presentable state of appearance. Defective parts shall be repaired or replaced and display surfaces shall be kept neatly painted or posted and readable at all times. Every sign and its immediate surroundings shall be maintained in a clean and sanitary condition and free of all offensive substances, rubbish and weeds. All maintenance required is the responsibility of the owner of the sign. Where ownership cannot be determined, the property owner is responsible for the maintenance of the sign. If the zoning administrator shall find that any sign is unsafe, insecure, has been abandoned, or has been erected or is being maintained in violation of the article, he shall give written notice to the owner thereof to repair, alter or remove the sign so as to comply with the standards herein set forth.

(Ord. No. 90-9381, § 4, 5-14-90)

….

### Sec. 42-511. Sign substitution.

The owner of any sign which is otherwise allowed by this article may substitute noncommercial copy in lieu of any other commercial or noncommercial copy. This substitution of copy may be made without any additional approval or permitting. The purpose of this provision is to prevent any inadvertent favoring of any

particular commercial or noncommercial message over any other noncommercial message. This provision prevails over any more specific provision to the contrary.

(Ord. No. 17-10882 , § 5, 7-10-17)

…

## DIVISION 2. DISTRICT REGULATIONS

**Sec. 42-521. C-3 and C-4 commercial districts.**

 The following sign regulations shall apply in the C-3 shopping center and C-4 central business districts:

(1) *Functional types permitted.* Any type listed in section 42-506, except that advertising signs for other than special public events sponsored by governmental, philanthropic and nonprofit organizations shall be prohibited in the C-4 district and district and advertising signs other than computerized electronic message displays shall be prohibited in the C-3 district.

(2) *Structural types permitted.* Any type listed in section 42-507, except that mobile signs and roof signs shall be prohibited in the C-4 district.

(3) *Number of signs permitted.* No maximum limitation in the C-3 district. In the C-4 district, four (4) signs per business with a maximum of ten (10) signs per zoning lot; provided, however, the following additional restrictions shall apply:

 a. No more than one (1) projecting sign or ground/pole sign shall be allowed per street frontage.

 b. Ground/pole signs shall be allowed only on zoning lots without buildings or those with buildings having a front yard setback of ten (10) feet or more.

 c. Ground/pole signs and projecting signs shall not be allowed in combination along the same street frontage.

(4) *Maximum gross surface area:*

 a. In the C-3 district, four (4) square feet of sign area for each lineal foot of building frontage; where no building frontage exists, one (1) square foot of sign area for each lineal foot of street frontage.

 b. In the C-4 district, three (3) square feet of sign area for each lineal foot of building frontage for allowable signage other than a ground/pole sign or a projecting sign; where no building frontage exists, one (1) square foot of sign area for each lineal foot of street frontage. Irrespective of building or street frontage, no property or zoning lot shall be restricted to less than thirty-six (36) square feet of sign area. No more than sixty-seven (67) percent of allowable sign area may be displayed on any building wall or street frontage. In regards to projecting signs and ground/ pole signs, the following maximum area limitations shall apply:

| Building Frontage | Projecting Signs* | Ground/Pole Signs |
|---|---|---|
| 25 feet or less | 30 sq. ft. | 45 sq. ft. |
| 26—50 feet | 36 sq. ft. | 54 sq. ft. |

ANALYSIS OF SALINA SIGN CODE | S. MARK WHITE, AICP

| 51 feet or more | 48 sq. ft. | 72 sq. ft. |

> *The maximum area for a projecting sign on a building wall without street frontage shall be four (4) square feet.

(5) *Maximum height.* In the C-3 and C-4 districts, ground/pole signs may not exceed thirty (30) feet in height above grade. In the C-4 district, projecting or wall signs may not project above the lowest point of the roof of the structure to which it is attached.

(Ord. No. 90-9381, §§ 5, 9, 5-14-90; Ord. No. 07-10425, § 1, 12-03-07)

….

ARTICLE XIV. DEFINITIONS

….

### Sec. 42-764. Sign.
*Sign* is any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure of similar character which:

(1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground;

(2) Is used to announce, direct attention to, or advertise; and

(3) Is not located inside a building.

(Code 1966, § 36-1301(145))

### Sec. 42-765. Sign, advertising.
*Advertising sign* is a sign which directs attention to a business, commodity, service, or entertainment conducted, sold, or offered at a location other than the premises on which the sign is located, or to which it is affixed (off-premise sign).

(Code 1966, § 36-1301(146))

….

### Sec. 42-781. Sign, wall.
*Wall sign* is a sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

(Code 1966, § 36-1301(162))

ANALYSIS OF SALINA SIGN CODE | S. MARK WHITE, AICP

---

RESUME AND QUALIFICATIONS

---

# Curriculum Vitae
# S. Mark White

200 NE Missouri Road, Suite 200
Lee's Summit, Missouri 64081
Phone: 816-221-8700
Email: mwhite@planningandlaw.com

## BACKGROUND

S. Mark White is a planner and attorney recognized as an expert in zoning and subdivision law, form-based zoning and New Urbanism, land use and takings litigation, housing, development of comprehensive growth management plans, and implementation systems.  He has 30 years of experience representing clients at every level from city, state and local governments, as well as major private developers, many of whom are involved in environmental permitting proceedings and takings litigation.

Mr. White is a former partner of Freilich, Leitner & Carlisle.  He received his Bachelor of Arts degree, magna cum laude, in History and Political Science from Bethany College in Lindsborg, Kansas, and holds a Juris Doctor and Master of Regional Planning from the University of North Carolina at Chapel Hill.  While in law school, Mr. White was a Research Editor for the North Carolina Journal of International Law and Commercial Regulation, and worked at the Department of City and Regional Planning as a Research Assistant in the Center of Urban and Regional Studies.  He is a former President of the board of directors of the nonprofit community development group Westside Housing Organization, and is a member of the North Carolina and Missouri Bars, the American Institute of Certified Planners, and the American Planning Association.  Recently, Mr. White was a member of the leadership team for the City of Lee's Summit, Missouri's Livable Streets Committee.   This resulted in adoption of the Kansas City region's first Complete Streets resolution.

Mr. White's articles have appeared in a variety of notable publications, including the American Planning Association's *Planning Advisory Service*, the American Bar Association's *Urban Lawyer*, the International Municipal Attorneys Association's *Municipal Lawyer*, and the United Kingdom's *Transport Policy*.

Mr. White is a frequent speaker at the national meetings of the American Planning Association, the American Center for National and International Law, the Congress for the New Urbanism, the University of Wisconsin, and various other professional organizations.  He is an adjunct professor at the University of Kansas Department of Urban Planning.

**Education**

Bachelor of Arts, magna cum laude, History/Political Science (Bethany College, Lindsborg, Kansas)

Juris Doctor/Master of Regional Planning (University of North Carolina at Chapel Hill)

Member, Lee's Summit Land Clearance and Redevelopment Authority

**Work Experience**

Partner & Associate, Freilich, Leitner & Carlisle (Kansas City, MO) 1990-2005

Partner, White & Smith, LLC Planning & Law Group (Kansas City, MO & Charleston, SC), 2005-present

39

ANALYSIS OF SALINA SIGN CODE | S. MARK WHITE, AICP




*Mr. White is co-author and contributor to several recent national publications on new urbanism, sustainability, and zoning and development codes.*

## SELECTED HONORS, AWARDS AND PUBLICATIONS

*Content-Neutral Sign Codes after Reed and Austin* (Sign Research Foundation, November 2022)

Co-Author, *A Cross-Sector Approach to Removing Legal and Policy Barriers to Opioid Agonist Treatment.*, The Network for Public Health Law (December 2020)

"Coding to Avoid the Takings Trap," Zoning Practice (May 2019)

"Parking and Property Rights," Planning & Law (Spring 2019)

"The Takings Denominator in Zoning Lot Merger Cases: *Murr v. Wisconsin*," Planning & Law (Spring 2018)

"Legal Issues with Form Based Codes (Part 2)," The Commissioner (October 2016)

"Legal Issues with Form Based Codes (Part 1)," The Commissioner (August 2016)

"Planned Unit Developments and Master Planned Communities," The Commissioner (Feb. 2015)

"Aligning Development Codes with the Law," Zoning Practice (November 2014)

"Nonconformities (Part 2) – Dealing with Uses," PlannersWeb (October 4, 2013)

"Nonconformities (Part 1) – Dealing with Uses," PlannersWeb (October 4, 2013)

"The Consistency Doctrine," Quicknotes (April 2013)

"Public Notice and the Planning Commission," The Commissioner (Winter 2013)

Reviewer, Callies, Barclay, & Tappendorf, Development by Agreement: Tool Kit for Land Developers and Local Governments (American Bar Association, 2012)

"The Rise of Form-Based Codes," The Commissioner (Winter 2012)

ANALYSIS OF SALINA SIGN CODE | S. MARK WHITE, AICP

"Bringing Codes into the 21st Century," The Commissioner (Fall 2011)

Co-Author, A 21st Century Land Development Code (American Planning Association, 2008).

Contributor, A Legal Guide to Urban and Sustainable Development for Planners, Developers and Architects (Wiley, 2008)

Reviewer and Contributor, Planning and Urban Design Standards (American Planning Association, 2006).

"Writing Defensible Codes," The Commissioner (Winter 2006)

"Unified Development Codes," Municipal Lawyer (July/August 2006)

"Development Codes for Built Out Communities," Zoning Practice (Aug. 2006)

"Classifying and Defining Uses and Building Forms: Land-Use Coding for Zoning Regulations," Zoning Practice (September 2005)

Contributor, Codifying the New Urbanism (American Planning Association, Planning Advisory Service Report No. 526, 2004).

Contributor, Planning for Street Connectivity (American Planning Association, Planning Advisory Service Report No. 515, 2003).

"Regulation of Concentrated Animal Feeding Operations: The Legal Context," Land Use Law & Zoning Digest (February 2000)

The Zoning and Real Estate Implications of Transit-Oriented Development, Transit Cooperative Research Program (TCRP) Legal Research Digest, No. 12 (January 1999).

"Neotraditional Development: A Legal Analysis," 49 Land Use Law & Zoning Digest, No. 8 at 3 (August 1997).

Adequate Public Facilities Ordinances and Transportation Management (American Planning Association, Planning Advisory Service Report No. 465, August 1996).

State and Regional Roles in Transportation and Land Use (with Freilich), American Planning Association, Planning Advisory Service Report no. 462/463, March 1996).

"State and Federal Planning Legislation and Manufactured Housing: New Opportunities for Affordable, Single-Family Shelter," 28 The Urban Lawyer 263 (Spring 1996).

Contributing Researcher and Writer, Model Subdivision Regulations, by Freilich & Schultz (American Planning Association, 1995).

Co-Author, "The Interaction of Land Use Planning and Transportation Management: Lessons from the American Experience," Transport Policy (U.K.) (March 1994).

ANALYSIS OF SALINA SIGN CODE | S. MARK WHITE, AICP

Affordable Housing:  Decent Shelter Is a Fundamental Right (with Jim Hecimovich), in Planning and Community Equity (APA's Planners Press October 1994).

Affordable Housing: Proactive and Reactive Planning Strategies (American Planning Association, Planning Advisory Service Report No. 441, 1992).

"The Use of Zoning and Other Local Controls for Siting Solid and Hazardous Waste Facilities," Natural Resources and Environment, 7:3-45 (with Shortlidge, N.R.).

"Using Fees and Taxes to Promote Affordable Housing," Land Use Law & Zoning Digest (September 1991).

Co-Author, "Transportation Congestion and Growth Management: Comprehensive Approaches to Resolving America's Major Quality of Life Crisis," 24 Loyola Of Los Angeles Law Review 915 (June 1991).

"Development Fees and Exemptions For Affordable Housing: Tailoring Regulations To Achieve Multiple Public Objectives," 6 J. Land Use & Envtl. L. 25 (Winter 1990)

### SELECTED CITATIONS

Court decisions, books, agency publications, and other important resources that have cited publications authored by Mr. White include:

- *Town of Rhine v. Bizzell*, 311 Wis.2d 1, 751 N.W.2d 780 (2008)
- *Bahl v. City of Asbury*, 656 N.W.2d 336 (Ia. 2002)
- Danielle Arigoni. *Affordable Housing and Smart Growth: Making the Connection*.  National Neighborhood Coalition, 2001.
  http://www.smartgrowthamerica.org/affordable_housing.pdf.
- Tim Iglesias & Rochelle E. Lent.  *The Legal Guide to Affordable Housing Development*.  American Bar Association, 2006.

### SELECTED EXPERIENCE

| Client | Project | Year(s) |
|---|---|---|
| Albuquerque, New Mexico | Planned Growth Strategy - study and planning policies designed to encourage Smart Growth at a regional scale | 1998-2002 |
| | Mixed Use Zones – Form Based Code; Growth Management and Adequate Public Facilities Standards | 2005-2007 |
| | Volcano Heights Charrette and Planning Study | 2004-2005 |
| Aquila, Inc. | Expert witness testimony - siting of peaking and transmission facilities and testimony before Missouri Public Utility Commission | 2006 |
| Arlington, Texas | Zoning and Subdivision Regulations update (with Clarion Associates) | 2008-2011 |
| Aspen, Colorado | Land Use Code amendments | 2006-2008, 2016-2017 |
| Atlanta Regional Commission | Plan 2040 Implementation Study | 2010 |
| Boulder, Colorado | Housing excise tax | 1989 |
| Cabarrus County, North Carolina | Adequate Public Facilities Ordinance | 2005-2007 |

ANALYSIS OF SALINA SIGN CODE | S. MARK WHITE, AICP

| Client | Project | Year(s) |
|---|---|---|
| Carbondale / Roaring Fork Valley community coalition | Regional housing Mitigation study, with linkage and inclusionary zoning regulations. | 1999 |
| Catawba County, North Carolina | Unified Development Ordinance | 2004-2006 |
| Centennial, Colorado | Land Development Code rewrite (with Kendig Keast Collaborative) | 2008-2009 |
| Chapel Hill, North Carolina | Land Management Ordinance | 2000-2002 |
| | Inclusionary Zoning Ordinance | 2007 |
| Charlotte, North Carolina | Smart Growth audit | 1999-2000 |
| Charleston County, South Carolina | Land Development Code update | 2004-2006 |
| | Greenways Master Plan | 2005-2006 |
| Cincinnati, Ohio | Land Development Code | 2011-2014 |
| Cole County, Missouri | Zoning Regulations | 2011-2014 |
| Collier County, Florida | Impact fee deferral program for affordable housing | 2005 |
| | Land Development Regulations update | 2007-2013 |
| | Master Mobility Plan | |
| Concord / Cabarrus County, North Carolina | Unified Development Ordinance | 1996– 1999 |
| Cumberland Region Tomorrow (Nashville, Tennessee) | Regional Plan Implementation Toolbox including economic development, affordable housing, environmental protection, transportation/land use, and rebuilding urban core with model codes | 2005-2006 |
| Davidson, North Carolina | Adequate Public Facilities Ordinance designed for Smart Growth regulations | 1998-2000 |
| Douglas County, Colorado | Concurrency Management Regulations | 1995 |
| Dunedin, Florida | Land Development Regulations analysis (with HDR, Inc.) | 2006-2007 |
| Enid, Oklahoma | Comprehensive Plan and Zoning Ordinance updates | 2003-2004 |
| Frederick, Maryland | Carroll Creek Overlay District (form-based code for a riverwalk district) | 2004-2005 |
| Gainesville, Florida | Land Management Code | |
| | Update of the Comprehensive Plan and Land Development Code for mixed use and community design. | 2009-2010 |
| | Study of regulatory options for homeless shelters and social services, and Religious Land Use and Institutionalized Persons Act (RLUIPA) compliance. | 2010 |
| Galveston, Texas | Land Development Regulations (Subconsultant to Kendig-Keast Collaborative) | 2011-2013 |
| Gwinnett County, Georgia | Comprehensive Plan update (Subconsultant to PB Americas) | 2007-2008 |
| Hillsborough County (Tampa), Florida | Community Design Regulations including Traditional Neighborhood Development, Pedestrian and Transit-Oriented Development | 1999-2002 |
| Hilton Head, South Carolina | Wetlands Protection, Non-Residential Growth Management and Traffic Congestion Management Ordinances | 1992 |
| Huntersville, North Carolina | Adequate public facilities ordinance | 2006-2007 |
| Jacksonville, North Carolina | Growth Plan and plan implementation | 2005-2007 |
| Irving, Texas | Development Ordinances rewrite (with Clarion Associates) | 2008-2009 |
| Kansas City, Missouri | Study of development processes | 2010 |
| Lafayette, Louisiana | Comprehensive Plan & Unified Development Ordinance | 2012-present |

ANALYSIS OF SALINA SIGN CODE | S. MARK WHITE, AICP

| Client | Project | Year(s) |
|---|---|---|
| | (Subconsultant to Wallace, Roberts & Todd) (*PlanLafayette* adopted June 2014, UDO adopted May 2015) | |
| Lake Lotawana, Missouri | General Counsel, land use issues | 2005-2011 |
| Lebanon, Tennessee | Zoning Ordinance update (with Parsons Brinkerhoff) | 2007-2010 |
| Lee's Summit, Missouri | Sign Regulations | 2011-2012 |
| Linn County, Missouri | Health Ordinance for Concentrated Animal Feeding Operations and successfully legal defense in Missouri Western District Court of Appeals | 1994-1995 |
| Lincoln County, Nevada | Development agreement review and assistance with zoning regulations. | 2008-2010 |
| Livingston County, Missouri | Special counsel for land use issues, including various zoning updates, zoning ordinance rewrite, subdivision regulations, and legal defense | 1993-present |
| Los Angeles, California | Zoning Code update (recode:LA) (subconsultant to Code Studio) | 2013-2017 |
| Loudoun County, Virginia | Zoning regulations, including employment and mixed-used districts, for an airport and transit-oriented corridor north of Dulles International Airport. | 2012-2014 |
| Madison, Wisconsin | Zoning Regulations update (subconsultant to Cunningham Architects) | 2008-2009 |
| Marion County (Missouri) Health Department | Health ordinance regulating concentrated animal feeding operations (CAFOs) | 2006-2007 |
| Memphis, Tennessee | Downtown Memphis Sign Code and Design Guidelines (Subconsultant to Winter & Company) | 2011-2013 |
| Missouri Advisory Commission on Regulatory Barriers to Affordable Housing | General counsel to state agency on issues dealing with zoning and land development regulations and their effect on affordable housing. | 1996 |
| Monroe County, Florida | Concurrency Management Ordinance | 1992 |
| Nashua, New Hampshire | Land Development Code | 2002 - 2003 |
| New Castle County, Delaware | Unified Development Code updates and Guiding Principles for development | 2014-2019 |
| | Sewer impact fees | 2005 |
| Nodaway County (Missouri) Heath Department | Health ordinance regulating concentrated animal feeding operations (CAFOs) | 2006 |
| North Augusta, South Carolina | Development Code and transportation corridor regulations | 2001-2005 |
| Nye County, Nevada | Impact fee ordinance, land use consulting and development agreement negotiations | 2005-2011 |
| Olathe, Kansas | Unified Development Ordinance | 2011-2014 |
| Osage Beach, Missouri | Entertainment and Tavern Zoning Regulations | 1995 |
| Overland Park, Kansas | Unified Development Ordinance update | 2015-present |
| Panama City Beach, Florida | Form Based Code study (with Planning Works, LLC) Sign Regulations | 2008-2010 |
| Pickerington, Ohio | Impact fee regulations | 2005-2006 |
| Pierce County, Washington | Countywide Planning Policies and Urban Growth Areas | 1991-1993 |
| Platte County, Missouri | Health ordinance regulating concentrated animal feeding operations (CAFOs) | 1998-2001 |
| Ponce Inlet, Florida | Land Development Regulations update, including coastal waterfront urban design regulations. | 2010-2011 |
| Prince Georges County, | Zoning and Subdivision Regulations Comprehensive Amendment | 2014-2016, 2009-2010 |
| | Zoning Ordinance Study including: | 2004-2005 |

ANALYSIS OF SALINA SIGN CODE | S. MARK WHITE, AICP

| Client | Project | Year(s) |
|---|---|---|
| Maryland | Master plan amendment procedures | |
| | Rural Tier study and implementing regulations including transfer of development rights, conservation subdivisions, and right to farm ordinance | |
| | Permit streamlining study | 2006-2007 |
| Pulaski County (Little Rock), Arkansas | Watershed zoning regulations | 2009-2011 |
| Queen Creek, Arizona | Zoning Ordinance, Adequate Public Facilities Ordinance, and Impact Fee Ordinance / Manual | 1998-2000 |
| Raleigh, North Carolina | Comprehensive Plan Update (subconsultant to HNTB Corporation) | 2007-2009 |
| Roanoke, Virginia | Zoning Ordinance with urban design standards | 2002-2004 |
| San Antonio, Texas | Unified Development Code including Smart Growth principles, Use Patterns, infill development incentives, maximum parking ratios, transfer of development rights, and liveable street design | 1999-2001 *(winner of Texas American Planning Association award)* |
| | Expert witness testimony, Borden Park v. City of San Antonio (sign regulations) | 2005 |
| San Diego, California | General Plan Guidelines for Future Development and Growth Management Implementation | 1990 |
| Sparks, Nevada | Zoning Code update (scheduled for adoption August 2015) | 2013-present |
| St. Petersburg, Florida | Land Development Regulations | 2002 - 2004 |
| Spokane Regional Transportation Commission | Regional concurrency study | 2006-2007 |
| Suffolk, Virginia | Smart Growth Management/ Unified Development Ordinance | 1998-1999 |
| Summit County, Utah | Snyderville Basin Development Code Ordinance, Zoning Ordinance, and Administrative Regulations | 1992-1994 |
| | Housing Element to General Plan | |
| Sunnyvale, Texas | Assistance with expert witness testimony in Fair Housing Act litigation | 1993-1998 |
| Topeka, Kansas | Unified Development Code | 2006-2009 |
| Unified Government of Kansas City-Wyandotte County, Kansas | Narrow lot zoning regulations and traditional neighborhood development update (subconsultant to 180° Urban Design + Architecture) | 2007 |
| | Sign Code Update | 2015-2016 |
| | Zoning and Subdivision Regulations Update | 2017-2020 |
| Union County, North Carolina | Adequate public facilities ordinance | 2006-2010 |
| | Litigation defense | |
| Washington, DC | Zoning Regulations Reengineering Study (Office of Zoning) | 2007-2008 |
| | Zoning Best Practices Study (Office of Planning) | |
| Whiteside County, Illinois | Zoning Ordinance / Subdivision Regulations update (subconsultant to MSA) | 2013-2014 |
| Winchester, Virginia | Form-Based Code (subconsultant to PB PlaceMaking) | 2011 |

### EXPERT WITNESS TRIALS AND DEPOSITIONS

Mr. White has not testified as an expert witness in the past four (4) years.