# MARK WHITE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

COZY INN, INCORPORATED, d/b/a THE COZY INN; STEPHEN HOWARD,
Plaintiffs,

vs. Civil Action No. 6:24-cv-01027-TC-ADM

CITY OF SALINA, KANSAS,
Defendant.

DEPOSITION OF
MARK WHITE,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 9:07 a.m. on the 31st day of October, 2024, at Kansas Justice Institute, 12980 Metcalf Avenue, Suite 130, in the City of Overland Park, County of Johnson, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

APPEARANCES

ON BEHALF OF THE PLAINTIFFS:

Mr. Samuel G. MacRoberts
Mr. Jeffrey Shaw
Kansas Justice Institute
12980 Metcalf Avenue, Suite 130
Overland Park, KS 66213
913-213-5018
sam.macroberts@kansasjusticeinstitute.org
jeff@kansasjusticeinstitute.org

Exhibit C

ON BEHALF OF THE DEFENDANT:

Mr. Aaron O. Martin (via Zoom)
Clarke Mize & Linville
129 S. 8th Street
Salina, KS 67402
785-823-6325
aomartin@cml-law.com

Ms. Amanda C. Jokerst (via Zoom)
Fairfield and Woods
1801 California Street, Suite 2600
Denver, CO 80202
303-830-2400
ajokerst@fwlaw.com

ALSO PRESENT:

Mr. Tim Faulhaber, Zoom technician

INDEX

Certificate------------------------------ 204

WITNESS

| ON BEHALF OF THE PLAINTIFFS: | PAGE |
|---|---|
| MARK WHITE | |
| Direct-Examination by Mr. MacRoberts | 5 |
| Cross-Examination by Ms. Jokerst | 192 |
| Redirect-Examination by Mr. MacRoberts | 198 |

EXHIBITS

| WHITE DEPO EX. NO: | MARKED |
|---|---|
| No 1 Defendant's Expert Disclosure | 5 |
| No 2 Expert Report | 5 |
| No 3 Content-Neutral Sign Codes After Reed and Austin article by White | 5 |
| No 4 Sign Permit Application | 94 |
| No 5 Photo of Mural at the Mill | 94 |
| No 6 Conclusion/Next Steps Bloomberg article | 188 |

10/31/2024 Case 6:24-cv-01027-TC Document 97-4 Filed 12/20/24 Page 2 of 13 12 (45 - 48)
MARK WHITE

Page 45

A. Because I'm testifying as an urban planner and a zoning expert and not as an attorney. The legal principals I assume you will argue through with the counsel in this case.

**Q. Do you think a reasonable person could disagree with the opinions expressed in your report?**

MS. JOKERST: Object to form.

A. I believe it -- I believe in another expert could object to the opinions in this report.

BY MR. MACROBERTS:

**Q. But what about a reasonable person?**

MS. JOKERST: Object to form.

A. I'm not familiar with this reasonable person standard you're talking about.

BY MR. MACROBERTS:

**Q. Have you included references or materials that can undermine your opinions?**

MS. JOKERST: Object to form.

A. I believe there are things in the documents cited that somebody could cite in a way that disputes some of my conclusions and discussion in the report.

BY MR. MACROBERTS:

Page 46

**Q. What about legal cases? Did you cite legal cases that have the tendency to -- that could have the tendency to undermine your opinions?**

MS. JOKERST: Object to form.

A. Not that I'm aware of, but there could be statements in those cases that somebody could use as an argument against things that are in the report, I suppose.

BY MR. MACROBERTS:

**Q. Did you include any disputed facts or any facts that could undermine your opinion?**

MS. JOKERST: Object --

BY MR. MACROBERTS:

**Q. -- in your report?**

MS. JOKERST: Object to form.

A. Not that I recall.

MR. MACROBERTS: Can we take a five-minute break?

THE WITNESS: Yes. I was going to ask the same thing.

MR. MACROBERTS: Yeah.

(THEREUPON, a recess was taken.)

BY MR. MACROBERTS:

**Q. All right. Mark, do you know whether the**

Page 47

**City of Salina commissioned or conducted any studies before drafting any version of their sign code?**

MS. JOKERST: Object to form.

A. I am not aware of any.

BY MR. MACROBERTS:

**Q. Do you have any knowledge about why the sign code had been amended at any point?**

MS. JOKERST: Object to form.

A. No.

BY MR. MACROBERTS:

**Q. Are you aware of any peer reviewed studies that have analyzed the efficacy of Salina's sign code in promoting the goals, objectives and policies of the comprehensive plan?**

MS. JOKERST: Object to form.

A. I'm not aware of any peer reviewed studies specifically to -- specific to Salina's own sign code.

BY MR. MACROBERTS:

**Q. So then I was going go through each one. I appreciate you saying that. How about any studies at all. My previous question was peer reviewed studies. Are you aware of any studies that have analyzed the efficacy of Salina's sign**

Page 48

**code?**

MS. JOKERST: Object to form.

A. I am not aware that there were or were not studies specific to Salina's sign code.

BY MR. MACROBERTS:

**Q. So one way or the another, you're not aware?**

A. Correct.

MS. JOKERST: Object to form.

THE WITNESS: Sorry, Amanda. Go ahead. Amanda objected.

MR. MACROBERTS: It is noted. I am certain of that.

BY MR. MACROBERTS:

**Q. All right. So for purposes of your report, you used the word mural to mean, quote, an outdoor exhibit painted on a wall that does not fall with the sign code's parameters and that may include art but does not announce, direct attention to or advertise. You meant within. Is that right? Does not fall within the sign code's parameters?**

MS. JOKERST: Object to form.

BY MR. MACROBERTS:

**Q. And for reference --**

Appino
Biggs
Reporting
Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

10/31/2024 Case 6:24-cv-01027-TC Document 97-4 Filed 12/20/24 Page 3 of 13 15 (57 - 60)

# MARK WHITE

Page 57

BY MR. MACROBERTS:

**Q. For purposes of your report, you did not specifically define the term announce?**

MS. JOKERST: Object to form.

A. That's incorrect. I don't know whether to say no or yes.

BY MR. MACROBERTS:

**Q. Is that in the vagueness section of your report?**

A. Yes.

**Q. All right. Besides the vagueness section, you did not specifically define the term announce for purposes of your report?**

MS. JOKERST: Object to form.

A. I would say that's incorrect.

BY MR. MACROBERTS:

**Q. Why do you say that is incorrect?**

A. Because the way that's used in the -- I took the customary understood meaning of announce as it's defined in the dictionary and in best practices, and that's how I would have used that in the report.

**Q. So you did not put a footnote in your report defining announce the same way you did with the term mural. Is that fair to say?**

Page 58

A. It's fair to say that that was not in a footnote.

**Q. And outside of that vagueness section of your report, you didn't put in the report explaining to the reader how you are using the word announce?**

A. I didn't use that in the introduction to the report. But implicit in the discussion of vagueness, that's how that's generally understood by planners when they're not defined.

**Q. What is implicit? Maybe I misunderstood you.**

A. The definitions that I used in the vagueness section are how those terms are typically used and defined by persons administering the sign code, for example.

**Q. Starting at page 22 of your report and going through page 29, you cite a number of documents that you've reviewed?**

A. Um-hum.

**Q. Of those documents you reviewed, which ones use the same exact mural definition that you use in your report?**

MS. JOKERST: Object to form.

A. I don't recall the definition of mural

Page 59

use -- the specific word-for-word definition of mural used in those --

BY MR. MACROBERTS:

**Q. Of the studies you reviewed -- I'm sorry. Were you --**

A. In those documents.

**Q. Of the studies you've reviewed, which ones used the exact same definition of mural that you use in your report?**

MS. JOKERST: Object to form.

A. I do not recall the definition of mural used in those studies.

BY MR. MACROBERTS:

**Q. Of the documents that you've reviewed, which ones use the exact same sign definition as Salina's City Code?**

MS. JOKERST: Object to form.

A. I don't recall the documents that use the exact same definition, although the definition Salina uses is very consistent generally with other definitions of sign.

BY MR. MACROBERTS:

**Q. Of the legal cases that you've cited, are there any that use the same exact definition of mural that you use in your report?**

Page 60

MS. JOKERST: Object to form.

A. I don't recall how and if any of those cases defined mural.

BY MR. MACROBERTS:

**Q. How about legal cases on signs? Of the legal cases that you have cited, which ones use the same definition of sign that the Salina City Code uses?**

MS. JOKERST: Object to form.

A. I don't recall what specific definition of sign was used in those cases.

BY MR. MACROBERTS:

**Q. Going back to your report on page 3, and just to be transparent, what I'm going to try to do is go through your statement of opinions in order. So we're just going work our way through them. I may have to bounce around a little bit, but I'm going to do the best I can just so you have an idea of what we're doing. Hopefully, that will make things easier for you.**

**You have expressed an opinion that the sign code establishes time, place and manner metrics that are not content-based. Do you see that?**

A. Yes.

**Q. Do you agree that content neutrality is a**

Appino & Biggs Reporting Service, Inc. TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street Topeka, KS 66604 785-273-3063 www.appinobiggs.com
6420 W. 95th Street Suite 101 Overland Park, KS 66212 913-383-1131
800 E. 1st Street Suite 305 Wichita, KS 67202 316-201-1612

10/31/2024 Case 6:24-cv-01027-TC Document 97-4 Filed 12/20/24 Page 4 of 13 16 (61 - 64)

MARK WHITE

Page 61

**question of law?**

A. I believe that it's partially a question of law and partially a question of fact.

**Q. Why do you think that?**

A. Because the facts of the case are how the sign code is written, and so those facts will lead to whether the sign code is content-based or content neutral.

**Q. Do you agree the conclusion whether a code is content neutral is a question of law?**

MS. JOKERST: Object to form.

A. I believe in the courts it's a legal conclusion. It's also something planners need to consider when they draft and administer sign codes.

BY MR. MACROBERTS:

**Q. Why is it that planners need to consider content neutrality when writing sign codes?**

A. They need to consider that because those codes are subject to the constitution. You know, like policemen or police persons, law enforcement personnel, they have to understand the law when they administer, and in the case of planners more so than law enforcement personnel I believe when they actually draft regulations within the

Page 62

parameters of that legal structure.

**Q. In your report, on your opinion section, it seems to me like you list your Statement of Opinions 1 through 7, and then there's a corresponding section later in the report outlining more about your opinions. Is that a fair way of expressing the breakdown of your report?**

A. Yes.

**Q. So on Statement of Opinion 2, the sign code is supported by substantial and compelling interests in the area of urban planning and code administration, you later have a section explaining that opinion?**

A. Yes.

**Q. 2, 3, 4, 5, 6 and 7 opinions, or the opinions listed 2 through 7, have a corresponding section, right?**

A. Yes.

**Q. Why is it that you don't have a corresponding section for opinion 1, that the sign code establishes time, place and manner metrics that are not content-based?**

MS. JOKERST: Object to form.

A. I believe there's statements throughout

Page 63

the report that get to whether that is content-based or not.

BY MR. MACROBERTS:

**Q. But do you know why there wasn't a section explaining your opinion No. 1 like there was for opinions 2 through 7?**

A. I don't recall why that wasn't organized into a specific section of the report.

**Q. You I think just mentioned that there were some statements about content neutrality within the report. Is that how you said it?**

A. I believe so, yes.

**Q. I'm not trying to trick you. I'm just trying to remember.**

A. Okay.

**Q. It seems like you made three statements about content neutrality in your report, and we'll go through them. The first appears to be on page 3 of your report where it says it is my opinion as a professional urban planner that the allegations by plaintiff are incorrect to the extent that they relate to content neutrality and the purposes advanced by the sign code. Did I read that correctly?**

A. Is that on page 3?

Page 64

**Q. Yes.**

A. Oh, I see. It's up at the top. Yes.

**Q. The second time was also on page 3. The Salina sign code furthers substantial content neutral interests?**

A. Yes.

**Q. And the -- as I understand it, the last opinion or statement on content neutrality was I believe page 4, quote, the total sign area is based on the location and structural characteristics of signs and not their content. Do you see that on the bottom of page 4?**

A. Yes.

**Q. Other than those three statements, do you have any other statements about content neutrality that I have missed?**

MS. JOKERST: Object to form.

A. Not that I can recall off the top of my head.

BY MR. MACROBERTS:

**Q. Do you -- would you take a moment to review the report?**

A. Yes. I don't see anything specific other than what you mentioned.

**Q. You -- I want to go now to your**

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street Topeka, KS 66604 785-273-3063 www.appinobiggs.com
6420 W. 95th Street Suite 101 Overland Park, KS 66212 913-383-1131
800 E. 1st Street Suite 305 Wichita, KS 67202 316-201-1612

10/31/2024 Case 6:24-cv-01027-TC Document 97-4 Filed 12/20/24 Page 5 of 13 18 (69 - 72)
MARK WHITE

Page 69

**Q. Do you agree that few sign codes are free of content-based provisions under the court's content neutrality standard both for temporary signs and permanent signs?**
MS. JOKERST: Object to form.
A. Are you reading that from a section of the report?
BY MR. MACROBERTS:
**Q. Yes, sir.**
A. Awe.
**Q. I apologize. It's at the top of --**
A. Gotcha. Yes. At the time I wrote the report, I believe that to be true.
**Q. Do you agree that every local jurisdiction that regulates signs in their community should review their ordinance and revise it in light of Reed, if necessary?**
MS. JOKERST: Object to form.
A. Yes.
BY MR. MACROBERTS:
**Q. You agree that to comply with Reed, a code should establish three broad sign categories based upon their physical characteristics?**
MS. JOKERST: Object to form.
A. Yes.

Page 70

BY MR. MACROBERTS:
**Q. What are those three -- I'll just say it, freestanding signs --**
A. Yes.
**Q. -- attached signs and incidental signs?**
MS. JOKERST: Object to form.
A. Yes.
BY MR. MACROBERTS:
**Q. Do you agree that to ensure that a sign code is content neutral, a community should begin by removing all references to the content of sign types or sign messages that trigger permitting or related sign regulations?**
MS. JOKERST: Object to form.
A. Generally speaking, yes.
BY MR. MACROBERTS:
**Q. Do you agree --**
A. What page are we on now?
**Q. 10.**
A. Okay.
**Q. My apologize. Do you agree that a sign code that gives a zoning administrator unlimited discretion to deny or condition a sign permit can intrude on First Amendment rights even if the regulations are facially neutral?**

Page 71

MS. JOKERST: Object to form.
A. Yes.
BY MR. MACROBERTS:
**Q. In your publication, you wrote about artwork and murals. Is that right?**
A. I believe I wrote about murals. I don't recall if I specifically addressed -- actually, I think I did address art, yes.
**Q. Let's turn to page 14.**
A. Okay. Yes, I did.
**Q. In this publication, you pose the question can cities distinguish art and murals from commercial signs. Do you see that?**
A. Yes.
**Q. And you wrote several cases have ruled that sign codes that either exempt (Central Radio v. City of Norfolk, 4th Circuit, 2016) or regulate (Kersten v. City of Mandan, 389 F.Supp3d 640, District of North Dakota, 2019) works of art or murals that did not display commercial messages are content-based. Did I read that correctly?**
A. Yes. That's what I wrote.
**Q. And you wrote before Reed, courts applied intermediate scrutiny to the regulation of commercial speech based on whether the message**

Page 72

**conveyed is tied solely to economic benefit of the business and serves no purpose beyond the commercial motive. Did I read that correctly?**
A. Yes.
**Q. You went on to describe Kersten. In Kersten, quote, the court -- you wrote this.**
A. Um-hum.
**Q. The court ruled that design guidelines that prohibit murals with commercial messages but allow other murals that are not commercial is content-based and subject to strict scrutiny. Did I read that correctly?**
A. Yes.
**Q. You also referenced a case called Complete Angler vs. City of Clearwater, correct?**
A. Correct.
**Q. You describe complete Angler vs. City of Clearwater as, parens, but I'm quoting, bait and tackle shop displaying aquatic mural was non-commercial speech, and exemptions for non-commercial works of art and holiday decorations were content-based. Did I read that correctly?**
MS. JOKERST: Object to form.
A. Yes.
BY MR. MACROBERTS:

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street Topeka, KS 66604 785-273-3063 www.appinobiggs.com
6420 W. 95th Street Suite 101 Overland Park, KS 66212 913-383-1131
800 E. 1st Street Suite 305 Wichita, KS 67202 316-201-1612

10/31/2024 20 (77 - 80)
MARK WHITE

Page 77

MS. JOKERST: I'll object to form. I don't know what exhibit we're on.
BY MR. MACROBERTS:
**Q. Do you understand what exhibit we're on?**
A. Would you like to clarify it for the record?
**Q. Sure. Exhibit 3.**
A. Could you repeat the question?
**Q. Yes.**
A. Okay.
**Q. On page 15 of Exhibit 3, you wrote a community who wants to regulate murals can consider the following options: Remove restrictions that exempt or target artwork along with limits on commercial advertising. The regulations could consider a restriction on text if the message is not restricted, for example, limiting the text to the artist's signature. Did I read that -- did I read that correctly?**
A. Yes.
**Q. And you wrote consider mural subcategories based on their physical characteristics such as a wall sign or paint wall sign. An issue with this approach is that murals often occupy entire building walls which exceed**

Page 78

**typical wall sign limits. Did I read that correctly?**
A. Yes.
**Q. If the Salina zoning administrator looks at renditions of paintings that are to be displayed to determine whether or not that painted display is an unregulated mural or a regulated wall sign, the regulations are likely content-based, correct?**
MS. JOKERST: Object to form.
A. Not necessarily.
BY MR. MACROBERTS:
**Q. Why is that?**
A. Because the Salina planner that you mentioned is only applying the content neutral wall sign standards is Salina's sign regulations as written.
**Q. Why do you say that?**
A. I say that because as defined in the sign regulations, a painting that occupies any part of a wall that announces, directs attention to or advertises is considered a sign.
**Q. How do you know whether a painting advertises without looking at the content?**
MS. JOKERST: Object to form.

Page 79

A. You would know that because as with the City of Austin case, for example, the planner in this case is only reviewing and reading that presentation in terms of where that sign is directing people to. So it's a form of location restriction as was the off-premise sign in the City of Austin.
BY MR. MACROBERTS:
**Q. My question was not about directions or on or off-premises. My question was about advertising.**
MS. JOKERST: I'll state an objection. Object to form to the extent that's a question.
A. Yes. Could you repeat the question?
BY MR. MACROBERTS:
**Q. How would you know whether or not a painting advertises without looking at the painting?**
MS. JOKERST: Object to form.
A. Well, you would have to look at the painting to see what is being advertised and where that -- where that's located. Where that's located I think is bound up with advertising.
BY MR. MACROBERTS:
**Q. Why is that?**

Page 80

A. Well, I know in this case the painting points to something that's right on site. So that's how you know that this painting advertises something that's inside.
**Q. And given the lack of a definition of advertising, how is one to determine whether or not it, indeed, advertises?**
MS. JOKERST: Object to form.
A. Absent a definition, a planner or an applicant or anyone else can turn to a dictionary to determine how that's customarily defined.
BY MR. MACROBERTS:
**Q. You would agree that Mr. Howard does not sell UFOs, right?**
MS. JOKERST: Object to form.
BY MR. MACROBERTS:
**Q. I mean that would be absurd?**
THE WITNESS: Amanda, did you...
MS. JOKERST: Yeah, I am. Sorry.
THE WITNESS: You're about to talk.
MS. JOKERST: Keep my mouth shut while you finish your question. I apologize, Mr. MacRoberts.
MR. MACROBERTS: No, you're fine.
A. Did you want to repeat the question?

Appino & Biggs Reporting Service, Inc. TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street Topeka, KS 66604 785-273-3063 www.appinobiggs.com
6420 W. 95th Street Suite 101 Overland Park, KS 66212 913-383-1131
800 E. 1st Street Suite 305 Wichita, KS 67202 316-201-1612

10/31/2024 26 (101 - 104)
MARK WHITE

Page 101

Salina calls it. But, yeah, those regulations that administers -- that administer those long-term planning policies.

**Q. So when you reference urban planning and code administration, is that what's listed in page 5 of your report, the comprehensive plan implementation, the traffic safety, aesthetics, urban design and travel behavior, public health and safety and compromise?**

A. I'm sorry, are you asking whether those things are urban planning or what are you asking?

**Q. So on your Statement of Opinion 2, you say urban planning and code administration. It appears to me that then the urban planning and code administration is broken out on page 5 of those things, comprehensive planning implementation, traffic safety, aesthetics and so on. I just want to make sure I understand so I could ask you questions about it. So it's more foundational than anything.**

A. Okay.

**Q. So I'll rephrase it then.**

A. Okay.

**Q. When you reference urban planning and code administration on your Statement of Opinion on page 3, is that broken down on page 5?**

MS. JOKERST: Object to form.

A. Urban planning isn't broken down, but all of those interests listed on page 5 are interests that are related to urban planning.

BY MR. MACROBERTS:

**Q. So in your Statement of Opinion on page 3, the totality of that opinion is broken out on page 5?**

MS. JOKERST: Object to form.

BY MR. MACROBERTS:

**Q. In other words, are there any other urban planning and code administration interests that are not listed on page 5?**

A. There could be, but these are the ones that seemed germane to this, what's going on here, so that's why I listed. That's not to say I won't think of something else eight hours after we're done with our deposition, but those are the ones that were germane to what's going on in this case.

**Q. Do you agree that whether or not something qualifies as a compelling interest is a question of law?**

MS. JOKERST: Object to form.

Page 102

(see above)

Page 103

A. In a court of law it is.

BY MR. MACROBERTS:

**Q. And what about whether something qualifies as a substantial interest? That is also a question of law in a court?**

MS. JOKERST: Object to form.

A. It is a question of law in courts, yes.

BY MR. MACROBERTS:

**Q. So on page 5, is it your opinion that comprehensive plan implementation is both a substantial and compelling interest?**

A. I'm not speaking to the legal conclusion here but as a planner. To me, it is the most -- one of the most important interests in writing any -- any zoning or land development code, including a sign code.

**Q. So when you use the term substantial and compelling interest, you're not talking about the legal test that use the same phraseology?**

MS. JOKERST: Object to form.

A. I'm not making a legal conclusion.

BY MR. MACROBERTS:

**Q. You're using terms, though, that are in case law, right?**

A. Those terms do appear in case law.

Page 104

**Q. So when you use the term substantial and compelling interests, you're not using those terms the same way that case law does?**

MS. JOKERST: Object to form.

A. I'd say if you had a Venn diagram, there would be some -- there would be some intersection between the two, but that's -- I'm speaking to the importance of those interests to a sign code.

BY MR. MACROBERTS:

**Q. So as you drafted this report, what you may consider a substantial and compelling interest may not be the same thing as a substantial or compelling interest in a legal case?**

MS. JOKERST: Object to form.

A. It may end up being that and that's something that you all and the attorneys in the case will argue. I'm only speaking about how important they are to urban planners when they draft sign codes.

BY MR. MACROBERTS:

**Q. So what may be a substantial and compelling interest to a planner, you would agree may not be a substantial or compelling interest in a legal case?**

MS. JOKERST: Object to form.

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street Topeka, KS 66604 785-273-3063 www.appinobiggs.com
6420 W. 95th Street Suite 101 Overland Park, KS 66212 913-383-1131
800 E. 1st Street Suite 305 Wichita, KS 67202 316-201-1612

10/31/2024 27 (105 - 108)
MARK WHITE

Page 105

A. That could happen.
BY MR. MACROBERTS:
**Q. In a First Amendment free speech case involving signs or murals, has any federal court ever held that a comprehensive plan implementation is a compelling government interest?**
MS. JOKERST: Object to form.
A. I don't know. I didn't do legal research as part of this. So I wasn't writing a legal brief, so I didn't search my sources for that.
BY MR. MACROBERTS:
**Q. But you did do some legal research because you cited legal cases, right?**
MS. JOKERST: Object to form.
A. Those are cases that describe what planners typically consider to be the role of a comprehensive plan in cases I was already aware of. I didn't -- I didn't jump on Fastcase, for example, and find a case for the purposes of this report. These are things that planners typically consider when they write comprehensive plans and when they write regulations and implement them.
BY MR. MACROBERTS:
**Q. In a First Amendment free speech case involving signs and murals, has any federal court**

Page 106

**ever held that a comprehensive plan implementation is a substantial government interest?**
MS. JOKERST: Object to form.
A. Again, I didn't research that specifically, because I'm not expressing opinion about -- an opinion about what the legal conclusions are. I'm only expressing an opinion about the importance of a comprehensive plan to regulations like Salina's sign code.
BY MR. MACROBERTS:
**Q. How would the reader of the report know when you use terms like substantial interest or compelling interest that you are not talking about those terms in the same way the legal cases use those terms?**
MS. JOKERST: Object to form.
A. I be -- words -- the words compelling and the words substantial outside of their use in the case law I think have generally understood meanings. So if you went to the dictionary, for example, you'd probably find a definition of compelling and you'd probably find a definition of substantial.
BY MR. MACROBERTS:
**Q. So when you use the terms compelling and**

Page 107

**substantial interests, you're using the common dictionary definition version of those terms?**
MS. JOKERST: Object to form.
A. I'm using them in a general sense in terms of how people would normally use those terms. They're very important interests.
BY MR. MACROBERTS:
**Q. Do people normally use the term substantial interest underlying a sign code?**
MS. JOKERST: Object to form.
A. I know outside of my practice, I don't usually -- that doesn't come up in ordinary conversation because I usually don't talk to people outside of my office about sign codes specifically. But I do know that at a professional level, planners do talk about the relative importance of interests that underlay any regulation that they write.
BY MR. MACROBERTS:
**Q. And earlier, you had testified about making sure that planners understood the Reed case, for example. You remember that?**
A. Yes.
**Q. And the Reed case uses things like compelling interest, right?**

Page 108

MS. JOKERST: Object to form.
A. Yes.
BY MR. MACROBERTS:
**Q. So it's important that readers or planners know what compelling interest means, right?**
MS. JOKERST: Object to form.
A. Generally speaking, yes.
BY MR. MACROBERTS:
**Q. So a planner who wants to make sure they're not drafting an unconstitutional code needs to know what a compelling interest is, right?**
MS. JOKERST: Object to form.
A. Generally speaking, yes.
BY MR. MACROBERTS:
**Q. In your comprehensive plan implementation section, you cited concerned citizens of Calaveras County. Do you see that?**
A. Yes.
**Q. That was not a First Amendment case, correct?**
A. Not that I recall.
**Q. You also cited the Machado case?**
A. Yes.

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street Topeka, KS 66604 785-273-3063 www.appinobiggs.com
6420 W. 95th Street Suite 101 Overland Park, KS 66212 913-383-1131
800 E. 1st Street Suite 305 Wichita, KS 67202 316-201-1612

10/31/2024 Case 6:24-cv-01027-TC Document 97-4 Filed 12/20/24 Page 9 of 13 29 (113 - 116)

MARK WHITE

Page 113

A. I don't recall all of the cases that I cited in this publication but, you know, I could refresh my memory. I can be convinced that I cited it.

**Q. I don't want to belabor this, but page 6, if you would --**

A. Okay.

**Q. -- on your publication. I'll just read it so we can --**

A. Okay.

**Q. Courts have held that aesthetics and traffic safety, the traditional interests that support sign regulations, are not sufficiently compelling to support content-based regulations. Did I read that correctly?**

A. Yes.

**Q. On page 7 of your report, you testified the sign clutter contributes to decline and traffic safety and that public art does not create this type of distraction?**

A. I'm sorry.

**Q. Switching around here.**

A. Okay. Could you repeat the question? I was going back between documents.

**Q. Yes. Absolutely. You wrote that sign**

Page 114

**clutter contributes to decline and traffic safety and in the same paragraph write public art does not create this type of distraction. Do you see that?**

A. Yes.

**Q. You don't define what public art is in that, correct?**

MS. JOKERST: Object to form.

A. I do not have a footnote on that page that defines what public art is.

BY MR. MACROBERTS:

**Q. There's no citation in your report for the proposition that public art can't create clutter?**

MS. JOKERST: Object to form.

A. I don't think that there's any documents cited in the report that says that public art could never create clutter.

BY MR. MACROBERTS:

**Q. Are you aware of any evidence that establishes that private art is more dangerous than public art?**

MS. JOKERST: Object to form.

A. Well, I don't have a definition of those two, but that said, I'm not aware of a report that

Page 115

gets into the distinctions between those two and their impacts.

BY MR. MACROBERTS:

**Q. Are you aware of any studies that establish private art is more dangerous than public art?**

MS. JOKERST: Object to form.

A. Not off the top of my head, no.

BY MR. MACROBERTS:

**Q. Are there any cases that establish private art is more dangerous than public art?**

MS. JOKERST: Object to form.

BY MR. MACROBERTS:

**Q. That you're aware of?**

A. Not that I'm aware of.

MR. MACROBERTS: It's 12:10, do you want to take a break.

THE WITNESS: Certainly.

MR. MACROBERTS: All right.

(THEREUPON, a recess was taken.)

BY MR. MACROBERTS:

**Q. All right. Mark, are you -- are you aware of any evidence that establishes that commercial content painted on a wall is more dangerous than non-commercial content painted on a**

Page 116

**wall?**

MS. JOKERST: Object to form.

A. I'm not aware of anything that specific.

BY MR. MACROBERTS:

**Q. Are you aware of any study or case law that establishes that commercial content painted on a wall is more dangerous than non-commercial content painted on a wall?**

MS. JOKERST: Object to form.

A. Again, I can't think of anything that specific.

BY MR. MACROBERTS:

**Q. Okay. Are you aware of any evidence that would establish that a burger-esque UFO mural is more dangerous than a pizza-esque UFO mural?**

MS. JOKERST: Object to form.

A. Again, I can't think of anything that specific.

BY MR. MACROBERTS:

**Q. Same with studies and case law. There are no studies in cases that would say that?**

A. I --

MS. JOKERST: Object to form.

A. Oh, go ahead.

MS. JOKERST: Just object to form.

Appino & Biggs Reporting Service, Inc. TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street Topeka, KS 66604 785-273-3063 www.appinobiggs.com
6420 W. 95th Street Suite 101 Overland Park, KS 66212 913-383-1131
800 E. 1st Street Suite 305 Wichita, KS 67202 316-201-1612

10/31/2024 Case 6:24-cv-01027-TC Document 97-4 Filed 12/20/24 Page 10 of 13 30 (117 - 120)
MARK WHITE

Page 117

A. Okay. I certainly can't think of any cases that deal with burgers and UFOs, whether or not it deals -- whether they're more dangerous or not.

BY MR. MACROBERTS:

**Q. You cited an asphalt art -- it's hard to say, asphalt art report in your report. Do you recall that?**

A. Yes.

**Q. Is that the McMahon, 2022 report?**

A. I -- give me a second here. I can't recall off the top of my head, the name of the author, but I do recall the asphalt art report.

**Q. Okay.**

A. It's in here.

**Q. Maybe it's the Schwartz, 2022 report on page 7?**

A. Page 7?

**Q. Of your report?**

A. Awe, here we go. Yes.

**Q. That's the Asphalt Art Safety Study, Historical Crash Analysis and Observational Behavioral Assessment at Asphalt Art Sites?**

A. Yes.

**Q. Did you read the Asphalt Art Study that**

Page 118

**was conducted?**

A. Yes.

**Q. All right. And you would agree that that was an observational study?**

MS. JOKERST: Object to form.

A. I don't know what you mean by observational study.

BY MR. MACROBERTS:

**Q. In the report, it says it's an observational study, meaning people observed what was going on. Do you agree with that characterization?**

A. Yes, I do believe that they did observe what was going on.

**Q. Yeah. The Schwartz asphalt art report was not peer reviewed, correct?**

MS. JOKERST: Object to form.

A. That I can't recall.

BY MR. MACROBERTS:

**Q. It was published in Bloomberg Philanthropies, correct?**

A. Just a second to look up the citation because it would tell you where it was. Yes.

**Q. Do you agree that the asphalt art report did not have control groups to account for random**

Page 119

**variations in crash rates?**

MS. JOKERST: Object to form.

A. I don't remember that level of detail in the report.

BY MR. MACROBERTS:

**Q. Would it help if I printed out that -- or is it sufficient for me to -- we'll just print it out.**

A. Excuse me?

**Q. We'll just print it out.**

A. Okay.

**Q. So it will be just a moment. I've got it pulled up, so I will try to do that here in just a second.**

MS. JOKERST: While we're doing that, Sam, your voice is trailing just a little bit. It wasn't earlier, so I don't know if you're sitting someplace different in the room or if the mic got moved.

MR. MACROBERTS: No, I'm in the same spot, same mic.

MS. JOKERST: Okay. Well, right there you're very clear, so I'll keep you apprised if it goes back down again.

MR. MACROBERTS: Sounds good.

Page 120

BY MR. MACROBERTS:

**Q. I want to go back to Deposition Exhibit 5, the photograph of the Mural at the Mill. Do you agree that the Mural at the Mill is not dangerous?**

MS. JOKERST: Object to form.

A. I don't have any data about the Mural in the Mill and its impacts on traffic safety.

BY MR. MACROBERTS:

**Q. Do you have any reason to believe that the Mural at the Mill display is dangerous?**

A. No.

**Q. Would the exact same mural become dangerous if a daycare business had it painted on their wall?**

MS. JOKERST: Object to form.

A. Not that I know of.

BY MR. MACROBERTS:

**Q. What about if a daycare business started operating inside the mill? Would the mural become dangerous once a daycare started operating inside?**

MS. JOKERST: Object to form.

A. I would have to know more about the business itself to assess its own land use impacts.

Appino Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street Topeka, KS 66604 785-273-3063 www.appinobiggs.com
6420 W. 95th Street Suite 101 Overland Park, KS 66212 913-383-1131
800 E. 1st Street Suite 305 Wichita, KS 67202 316-201-1612

10/31/2024 Case 6:24-cv-01027-TC Document 97-4 Filed 12/20/24 Page 11 of 13 31 (121 - 124)

MARK WHITE

Page 121

BY MR. MACROBERTS:

**Q. Not talking about land use impacts.**

A. It's a very generic term, daycare business.

**Q. Sure. Let's say that this mural is still at the mill and let's say a daycare business started operating inside the mill, compliant with the code, the kids are inside, they're not running out in the streets, things like that. Okay. Does the mural become dangerous simply because a business was operating inside of that that pertained to the mural?**

MS. JOKERST: Object to form.

A. Not that I know of.

MS. JOKERST: Sorry. Did I miss a question? I heard like a cough and then what sounded like maybe someone said why.

MR. MACROBERTS: No. There was no question.

MS. JOKERST: Oh, okay.

BY MR. MACROBERTS:

**Q. You testified in your report that aesthetics is a substantial and compelling interest, correct?**

A. Yes. I testified that it's either one.

Page 122

**Q. What do you mean either one?**

A. You could characterize it either way.

**Q. I see. But you used the word compelling and substantial, right?**

A. I'm sorry, where is that?

**Q. At the -- the sign -- so page 5, the sign code serves a number of compelling and substantial. And then up above in the bold heading says substantial and compelling interest. And then the -- page 3 of your report, the sign code is supported by substantial and compelling interest?**

A. Right. That's all of those interests collectively. That doesn't mean they're all both substantial and compelling.

**Q. Do you agree that many courts have concluded that aesthetics is not a compelling government interest?**

MS. JOKERST: Object to form.

A. I'm aware that I believe some courts have held that in the context of the regulations that were under consideration in those cases.

BY MR. MACROBERTS:

**Q. I just didn't hear that last part.**

A. In the context of the regulations that

Page 123

were at issue in those cases.

**Q. Are you aware of any complaints made about the display at The Cozy other than from city workers?**

A. No, I'm not aware of any -- any complaints that were filed.

**Q. Are you aware of any academic research that either does or does not support the notion that the public likes painted signs less than other types of painted displays?**

MS. JOKERST: Object to form.

A. I'm not aware of any studies that distinguish painting on a wall versus painting somewhere else.

BY MR. MACROBERTS:

**Q. What about the different types of paintings on a wall? Are you aware of any research that says one type of painting on a wall is more aesthetically pleasing than another type of painting on a wall?**

MS. JOKERST: Object to form.

A. Not that I can recall.

BY MR. MACROBERTS:

**Q. Are you aware of any evidence that would establish that a burger-esque UFO is less**

Page 124

**aesthetically pleasing than a pizza-esque UFO mural?**

MS. JOKERST: Object to form.

A. Not that I can recall.

BY MR. MACROBERTS:

**Q. Are you aware of any study that would establish that a burger-esque UFO mural is less aesthetically pleasing than a pizza-esque UFO mural?**

MS. JOKERST: Object to form.

A. I can't recall anything that specific.

BY MR. MACROBERTS:

**Q. Are you aware of any evidence, study or case that establishes that commercial content painted on a wall is less aesthetically pleasing than non-commercial content painted on a wall?**

MS. JOKERST: Object to form.

A. In terms of painting on a wall specifically, not specifically, but there are tons of studies on the traffic distraction factor associated with commercial signs.

BY MR. MACROBERTS:

**Q. Well --**

A. So --

**Q. -- I appreciate that.**

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

A. Okay.

**Q. Do you believe that the Mural at the Mill on Exhibit 5 is aesthetically pleasing?**

MS. JOKERST: Object to form.

A. To me personally, it is.

BY MR. MACROBERTS:

**Q. Does that mural become less aesthetically pleasing if a daycare business were being operated inside the mill?**

MS. JOKERST: Object to form.

A. I don't have a basis for saying that it would.

BY MR. MACROBERTS:

**Q. On page 8 of your report, you wrote neuroscience studies have demonstrated positive amplitude from persons viewing artwork as opposed to negative responses from viewing commercial symbols. Do you see that?**

A. Yes.

**Q. Did you read the Cheng, 2023 study?**

A. Yes.

**Q. Is it your opinion that that is what the Cheng, 2023 study, in fact, said?**

A. There is a statement in the study to that effect that I believe cites another study.

**Q. Okay. So that's different than the study -- the Cheng, 2023 study did not say that, correct?**

MS. JOKERST: Object to form.

A. It's incorrect. It did state that.

BY MR. MACROBERTS:

**Q. That is -- so in the Cheng, 2023 study, they're citing a different study, right?**

A. That is my recollection.

**Q. So there's one sentence in the Cheng, 2023 study that could be even considered close to your statement on page 8 of your report?**

MS. JOKERST: Object to form.

A. Yeah. To my recollection, there is one statement that says that.

BY MR. MACROBERTS:

**Q. And that statement references a different report, right?**

MS. JOKERST: Object to form.

A. That is my recollection.

BY MR. MACROBERTS:

**Q. You would agree that the Cheng, 2023 study examined the preferences while viewing abstract and figurative public art, right?**

MS. JOKERST: Object to form.

A. Yes.

BY MR. MACROBERTS:

**Q. And that between abstract and figurative public art, people were supposed to respond with key presses according to their personal preferences?**

A. That is my recollection, yes.

**Q. So an individual, as I understand the report, an individual would look at either figurative or abstract public art and then they would press a button on which one they liked better?**

A. That is my recollection.

**Q. And so they weren't deciding whether or not they liked public art versus commercial logos, for example, correct?**

MS. JOKERST: Object to form.

A. That is my recollection.

BY MR. MACROBERTS:

**Q. Do you agree that the study, the Cheng, 2023 study, positive that there were limitations to it?**

MS. JOKERST: Object to form.

A. That I can't recall, but most studies do.

BY MR. MACROBERTS:

**Q. Do you -- do you recall that one of the limitations they said was that they only used 40 participants?**

A. I don't recall off the top of my head how many participants they used.

**Q. And that all 40 participants were at school in China?**

MS. JOKERST: Object to form.

A. I don't recall whether they -- it said they were at school in China.

BY MR. MACROBERTS:

**Q. Do you recall that all the participants were in China?**

A. That is my recollection.

**Q. And one of the limitations was that it did not consider the impact of cultural background on the aesthetic appreciation of public art?**

MS. JOKERST: Object to form.

A. I believe that statement was in the report.

BY MR. MACROBERTS:

**Q. The report or at least the reference, the one sentence reference within the Cheng, 2023 report, you did not cite that study in your report, correct?**

10/31/2024 Case 6:24-cv-01027-TC Document 97-4 Filed 12/20/24 Page 13 of 13 48 (189 - 192)

# MARK WHITE

Page 189

marked for identification by the reporter.)

BY MR. MACROBERTS:

**Q. Earlier, we talked about that asphalt study, and I mentioned I was going print off a copy for you.**

A. Yes.

**Q. I did do that during the break. And, Amanda, I've marked it now as Exhibit 6, and it's page 44 of the asphalt report. And I think we only printed off one copy, so do you mind if I come near you?**

A. Certainly.

**Q. Okay. Sorry. So, earlier, I was talking about some of the limitations and I asked you about control groups. So on page 44, the report says it will also be critical to have control groups to account for the random variation in crash rates over time. This would determine a crash modification factor for asphalt art projects and provide the research grounding that some transportation professionals have requested. Did I read that correctly?**

A. Yes.

**Q. All right. And then I just got one other. I think it's going to be quick.**

Page 190

MS. JOKERST: I do want to address I have an objection to entering Exhibit 6. It looks like he -- Mr. White only has one page. He hasn't had an opportunity to review it to determine that it is exactly the correct and complete copy of that draft. And so I recognize that the question is okay that he read it along with you, but I would object to admitting that into the record.

BY MR. MACROBERTS:

**Q. Do you need to -- do you need or want to see a copy of the full report?**

A. I -- if you want to print it out, you could.

**Q. Do you -- in order to answer the question about the control or the limitations to that report, do you need to see the whole report?**

A. I would think to answer -- I don't recall specifically what your question was, but I would think that this sentence by itself does not answer that.

**Q. Okay. My question is or was about the limitations to the asphalt art report that you mentioned in your report.**

A. Um-hum.

**Q. And my recollection is you weren't sure**

Page 191

**about the limitations. So my question to you is do you agree that there weren't control groups for this?**

MS. JOKERST: I'll object to form again. It's not a complete copy.

A. Yes. And I don't know because I don't know what the context of control groups is. They may have discussed that earlier. There may be different kinds of control groups. I just don't know.

BY MR. MACROBERTS:

**Q. So as you're sitting --**

A. Without reading the whole report, I would not know.

**Q. Got it. As you're sitting here right now, though, do you know whether that asphalt art report had control groups or not?**

A. Not off the top of my head.

**Q. We're going to go back to the report, and I think this is going to be fast. We're going to go back to your publication, not report, publication, Exhibit No. 3.**

A. Okay.

**Q. You agree that your publication is a reliable authority?**

Page 192

MS. JOKERST: Object to form.

A. Yes.

BY MR. MACROBERTS:

**Q. All right. On page 14, you wrote while this does not require a compelling interest, the local government has the burden of proof, and bans on speech that target truthful, non-misleading commercial messages are unlikely to survive immediate scrutiny. Do you see that?**

A. Yes.

**Q. Did I read that correctly?**

A. Yes.

MR. MACROBERTS: I have no other questions.

MS. JOKERST: I have some follow-up.

CROSS-EXAMINATION

BY MS. JOKERST:

**Q. All right. We'll actually just stay here, Mr. White, on Exhibit 3.**

A. Um-hum.

**Q. And you were asked a little bit about -- I'm looking here, the pointers. There was some pointers on this. I'm trying to find the page here. So page 15.**

A. Um-hum.

Appino Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street Topeka, KS 66604 785-273-3063 www.appinobiggs.com

6420 W. 95th Street Suite 101 Overland Park, KS 66212 913-383-1131

800 E. 1st Street Suite 305 Wichita, KS 67202 316-201-1612