

SIGN RESEARCH FOUNDATION™



Photo by Joe Ravi CC-BY-SA 3.0

# CONTENT-NEUTRAL SIGN CODES AFTER *REED* AND *AUSTIN*

Mark White

EXHIBIT NO. 3

APPINO & BIGGS

Exhibit D

Sign Research Foundation 2022 Analysis
Mark White, White & Smith, LLC

Published November 2022

# TABLE OF
# CONTENTS

| | |
|---|---|
| CONTENT-NEUTRAL SIGN CODES AFTER *REED* AND *AUSTIN* | 03 |
| WHAT ARE CONTENT-BASED REGULATIONS | 04 |
| WHAT LEGAL TEST APPLIES TO CONTENT-BASED | 06 |
| WHAT ARE CONTENT-NEUTRAL SIGN CODES? | 07 |
| TIPS TO COMPLY WITH *REED* | 09 |
| REGULATING SPECIFIC SIGN TYPES | 11 |
| TEMPORARY, INCIDENTAL AND YARD SIGNS | 11 |
| POLITICAL SIGNS | 12 |
| SPECIAL EVENT SIGNS | 13 |
| HUMAN SIGNS/SIGN WALKERS | 13 |
| COMMERCIAL SIGNS | 14 |
| ARTWORK AND MURALS | 14 |
| ON- VS. OFF-PREMISE SIGNS | 16 |
| PUBLIC FORUM | 19 |
| *REED*'S TOP 10 TAKEAWAYS | 20 |
| ABOUT THE AUTHOR | 21 |

# AFTER *REED* AND *AUSTIN*

Local governments throughout the United States regulate signs to promote aesthetics and traffic safety. These sign codes typically address the location, dimensions and physical design of signs. Sign regulations often classify signs based on what they say – i.e., their messages.

In 2015, the United States Supreme Court issued its seminal First Amendment decision in *Reed v. Town of Gilbert* that, for all practical purposes, rendered message categories unconstitutional. The *Reed* decision opens a number of grey areas in drafting sign regulations that lower courts have attempted to sort out. One questionable area was resolved nearly seven years after *Reed* to address the issue of on- versus off-premise signs, in *City of Austin vs. Reagan National Advertising.*

This article summarizes the state of the law, sorts through the practical issues in complying with content-neutrality, and offers pointers for local governments considering a sign code update.



# What are Content-Based Regulations?

To comply with *Reed*, sign regulations should be "content-neutral" – in other words, agnostic about the sign's message or who is expressing it. While content-neutrality is deceptively simple on its face, it raises practical issues in defining and implementing sign codes.

## Content-Neutral Sign Regulation: When a sign is regulated without regard to the message or the speaker.

Content-neutral sign codes regulate signs by their temporal (i.e., whether a sign is temporary or permanent), locational (for example, whether a sign is freestanding or attached, or is in a commercial or residential zoning district), or physical (for example, whether a sign is digital or static) characteristics.

While the First Amendment has permitting and language precision implications for sign codes, the *Reed* decision deals with the issue of message control. *Reed* holds that "content-based" regulations are subject to "strict scrutiny" in the courts. A "content-based" regulation controls the topic of communication, and in some instances the speaker. For, example, in *Reed* the Town of Gilbert, Arizona established a sign category known as a "Temporary Directional Signs Relating to a Qualifying Event," which were signs directing the public to a nonprofit group meeting (such as a church service at a school).

### *THE TEMPORARY DIRECTIONAL SIGN THAT STARTED IT ALL!*

When Pastor Clyde *Reed* wanted people to know where services for his Good News Community Church were located, he was relegated to using these kinds of small temporary directional signs to get the word out. The small church in Gilbert, Arizona, often rented different spaces in temporary locations, making visible and effective signage critical in directing the community. But the Town of Gilbert severely restricted the size, location, number and duration that temporary directional signs could be, especially compared to other signs with political and ideological messages. For example, political signs could be up to 32 square feet and displayed for up to 5 months, but Pastor *Reed*'s signs could only be up to 6 square feet and out for just 12 hours before the services, and taken down after 1 hour afterwards.

*Image Source: AZCentral.com*
*(https://www.azcentral.com/story/news/local/gilbert/2015/01/12/gilbert-church-signs-supreme-court-arguments/21636837/)*



A temporary directional sign was limited to 6 square feet in area, could stay up 12 hours before and one 1 hour after an event, and only 4 temporary directional signs were allowed on public or private property. By contrast, other temporary sign categories such as "political signs" – defined as temporary signs designed to influence the public elections – were allowed 16 square feet in residential and 32 square feet in commercial districts, could stay up 60 days before a primary and 15 after a general election. The only difference between temporary directional signs and political signs is the kind of message they display.



| Display Time Before | Event | Display Time After |
|---|---|---|
| UNLIMITED | Ideological Sign | UNLIMITED |
| 4 1/2 MONTHS | Election | 15 DAYS |
| 30 DAYS | HOA Event | 48 HOURS |
| 16 HOURS | Real Estate Sale | 36 HOURS |
| 12 HOURS | Religious Event | 1 HOUR |

CONTENT-NEUTRAL SIGN CODES AFTER *REED* AND *AUSTIN*

Therefore, the regulations are content-based, i.e., they turn on the sign's content (message), as opposed to its physical characteristics (such as whether it not it is erected on a freestanding pole or attached to a building). This is the case even if the regulations do not discriminate among viewpoints; simply controlling the type of message renders a regulation content-based even when it does not favor some viewpoints over others.

A sign regulation is content-based if the message displayed on a sign has a regulatory impact. Generally, if the zoning administrator has to read the sign to determine what regulations apply, the regulation is likely content-based – with the exception of the on-premise/off-premise distinction, as per *Austin*. Even if the regulation restricts or favors a category of speech for a benign reason (such as to allow churches to guide congregants to services in temporary locations), the regulation is still considered content-based. An innocuous justification cannot transform a content-based law into one that is content-neutral. In addition, the *Reed* decision intimated that content-neutral regulations that target or favor speakers is content-based if it impacts the message.

## What Legal Test Applies to Content-Based Regulations?

Content-based regulations are subject to "strict scrutiny" in the courts. This means several things: First, the regulation must serve a *compelling* government interest. A compelling interest is one that exceeds the substantial or legitimate interests supporting a conventional zoning regulation (such as a protecting property rights), and few interests are deemed compelling. Courts have held that aesthetics and traffic safety – the traditional interests that support sign regulations – are not sufficiently "compelling" to support content-based regulations. See *Clark v. City of Williamsburg,* 388 F.Supp. 1346 (D. Kan., 2019), *cert. denied,* 141 S.Ct. 2629, 209 L.Ed.2d 754 (2021) (citing *Quinly v. City of Prairie Village,* 446 F. Supp. 2d 1233, 1243-44 (D. Kan. 2006); *Outdoor Sys., Inc. v. City of Merriam*, 67 F. Supp. 2d 1258, 1269 (D. Kan. 1999); *Solantic, LLC v. City of Neptune Beach,* 410 F.3d 1250, 1268 (11th Cir. 2005). Second, the regulation must be narrowly tailored to that interest.

If other sign categories burden those interests more but are less restricted because of what they say, the restriction is not narrowly tailored. For example, in *Reed,* the Town limited the number and size of temporary directional signs to control clutter, but political signs were unlimited in number and had significantly larger sign allowances. Therefore, political signs were allowed to intrude on the Town's aesthetic interests to a greater extent than temporary directional signs based only on what they said. This was not narrowly tailored to the Town's aesthetic interests. Finally, the regulation is presumed unconstitutional, and the local government has the burden to prove that it meets the first two tests.



**Therefore, content-based regulations, or facially-content-neutral regulations justified in relation to content, rarely survive a constitutional challenge when subject to strict scrutiny.**

As noted in *Reed*, few sign codes are free of content-based provisions under the Court's content-neutrality standard, both for temporary signs and permanent signs. Every local jurisdiction that regulates signs in their community should review their ordinance and revise it in light of *Reed*, if necessary.

## What are Content-Neutral Sign Codes?

Content-neutral sign codes regulate signs by their temporal (i.e., whether a sign is temporary or permanent), locational (for example, whether a sign is freestanding or attached, or is in a commercial or residential zoning district), or physical (for example, whether a sign is digital or static) characteristics. In other words, a sign code that regulates only the "*time, place, and manner*" of signs is considered content-neutral. Content-neutral regulations are subject to intermediate, rather than strict, scrutiny. Courts also apply intermediate scrutiny to regulations that affect only commercial speech.



CONTENT-NEUTRAL SIGN CODES AFTER *REED* AND *AUSTIN*

Intermediate scrutiny requires that a sign regulation is narrowly tailored to serve a *substantial* governmental interest and leave ample alternative avenues of communication. Some lower courts have found that aesthetics and traffic safety are not "compelling" interests under the strict scrutiny standard. However, aesthetics and traffic safety typically meet the "substantial government interest" standard and courts are more deferential in assessing whether those regulations are tailored sufficiently to meet their stated objectives than they are when strict scrutiny applies.

**Both the majority and concurring opinions in *Reed* summarized the types of regulations that are considered content-neutral.**

**Content-Neutral Regulations Include:**

**1** MAXIMUM SIGN SIZE

**2** MATERIALS

**3** LIGHTING

**4** MOVING PARTS

**5** PORTABILITY

**6** BANNING OR REGULATING SIGNS IN THE PUBLIC RIGHT-OF-WAY

**7** LOCATIONS

**8** DISTINGUISHING FREESTANDING AND ATTACHED SIGNS

**9** DISTINGUISHING FIXED VERSUS CHANGEABLE ELECTRONIC SIGNS

**10** REGULATING SIGNS DIFFERENTLY BY ZONING DISTRICT

**11** TOTAL NUMBER OF SIGNS ALLOWED PER FRONTAGE OR AREA

**12** TIME RESTRICTIONS ON ADVERTISING A ONE-TIME EVENT

**13** GOVERNMENTAL SIGNS

Keep in mind that the regulatory matters listed here are content-neutral only if they are not triggered by the sign's message or user (a possible exception is government signs, which remains a grey area). For example, setting a maximum footcandle brightness for digital signs is, on its face, content-neutral. However, allowing digital signs only for gas prices or churches could be content-based.



Notably, the concurring opinion in *Reed* stated that regulating off-premise signs differently from on premise signs, a traditional element of local and state billboard regulation, is content-neutral. However, this did not preclude billboard operators from litigating against on-premise/off-premise distinctions in cities and states across the country over the next several years. The U.S. Supreme Court recently clarified that issue (see discussion of Off-Premise Sign Regulations, below).

## Tips to Comply with *Reed*

To comply with the principles announced in *Reed*, a sign code should establish three (3) broad sign categories based on their physical characteristics. These typically include freestanding signs, attached signs, and incidental signs.

## Three Sign Categories Based on Physical Characteristics



**FREESTANDING SIGNS**

Signs that are not attached to any other structure, ie. pole signs and monument signs.



**ATTACHED SIGNS**

Signs that are attached to a building or structure, ie. wall signs, window signs and murals.



**INCIDENTAL SIGNS**

Smaller signs that are physically subordinate to the principal freestanding or attached signs on the site, ie. directional signs, historic markers, temporary signs. (The sign code can break temporary signs into a separate category).

CONTENT-NEUTRAL SIGN CODES AFTER *REED* AND *AUSTIN*

To ensure that a sign code is content-neutral, a community should begin by removing all references to the content of sign types, or sign messages that trigger permitting or related sign regulations. For example, a community could replace project identification sign categories with regulations for a single monument or pole sign for properties in a commercial zoning district. This replaces a message trigger (i.e., whether the sign identifies the site) with the physical parameters of the monument or pole sign. A possible exception is sign categories that directly relate to public safety issues. The majority opinion in *Reed* stated that "[a] sign ordinance narrowly tailored to the challenges of protecting the safety of pedestrians, drivers, and passengers--such as warning signs marking hazards on private property, signs directing traffic, or street numbers associated with private houses-well might survive strict scrutiny."

By contrast, all provisions in a sign code that refer to number, area, structure, location and lighting of signs are content-neutral and unaffected by *Reed* if those categories do not relate to what the sign says. However, keep in mind that other First Amendment requirements apply. For example, a content-neutral regulation that inadvertently chokes off too much speech (see discussion of yard signs below), or that gives a zoning administrator unlimited discretion to deny or condition a sign permit, can intrude on First Amendment rights even if the regulations are facially neutral. Therefore, even if the regulations are content-neutral, a community should make sure that sign allowances are not overbroad and consider how sign permits are processed.

**Sign codes should also include severability and substitution clauses.**

A severability clause is common to most zoning and land development codes and simply provides that if any part of the code is invalidated in court, the rest of the code remains valid. This is important because there are many grey areas in sign regulations, and both the U.S. Supreme Court and lower courts are still fleshing out the parameters of content-neutrality. A substitution clause simply allows a sign to substitute a noncommercial message on any sign that permits a commercial or another noncommercial message. For a truly content-neutral code, this may seem superfluous. However, this simply clarifies that a sign code regulates only the physical characteristics of the sign and not its message.



# Regulating Specific Sign Types

While *Reed's* principles are deceptively simple, there are unsettled issues in its application to specific sign types. These range from traditional temporary placards (such as political yard signs) to lighted projections on buildings. This section explores how the lower courts have treated various, common sign categories and how to address them in your sign codes.

## Temporary, Incidental and Yard Signs

Temporary signs are difficult to codify as they are traditionally identified by their message or function. For example, real estate signs relate to the sale of property, and political signs relate to an election. However, a community can regulate the time, place and manner of temporary signs if they are not called out by their message. For example, a sign code can regulate signs based on temporary materials (such as cloth, canvas, vinyl, cardboard, wallboard, or other temporary materials), or temporary types such as feather signs. In addition, the sign code can fold temporary signs into an overall allocation of incidental signs for a site, remaining agnostic about how those signs are used.



For temporary signs, the community should consider a flat time allocation, rather than one tied to specific events. For example, a city amended its sign code after *Reed* to cap the number of temporary signs on any property, with an allocation of 5 additional signs 45 days before and 14 days after an election. This allocation did not restrict the message of the additional signs. In an unreported federal district court opinion, the court ruled that this was impermissibly user-based even though it did not regulate the additional sign's message (www.ricardopacheco.com *et al. v. City of Baldwin Park,* No. 16-CV-09167-CAS, 2017 WL 2962772 (C.D. CA. July 10, 2017)). The court suggested that the community could, for example, allow additional signs for a limited number of times per year not tied to specific events. "For example, the City could authorize five additional signs of up to 12 square feet for 60 days one time per year at the time of the speaker's choosing."

Instead of defining signs by message or function, the sign code should establish overall allocations for incidental or temporary signs. How those signs are used - whether to sell the property, advertise their favorite political candidate, or to express an opinion - is up to the property owner. For example, the City of Indianapolis established a set of standards for "noncommercial opinion signs." After that was found to violate content-neutrality principles, the city replaced that with an overall allocation for yard signs. This was found consistent with content-neutrality requirements (*Geft Outdoor LLC v. Consolidated City of Indianapolis* (S.D. Ind. 2016)). As is mentioned above, however, the overall allocation of yard signs must allow a sufficient amount of speech even if it is content-neutral. Several federal court decisions have invalidated sign codes allowing only one or two yard signs as restricting too much speech, even when those restrictions are content-neutral (*Willson v. City of Bel-Nor* (E.D. Mo. 2020); *Arlington County Republican Committee v. Arlington County* (4th Cir. 1993)).

To avoid administrative and enforcement issues with having to identify whether a sign as "temporary" and enforcing time limits, communities can also fold temporary signs into an overall sign number allocation for incidental signs. If the community believes regulation of temporary signs is needed, it can require stickers that identify when the sign was placed to document compliance with any time restrictions.

A common issue with sign regulations written before *Reed* is regulations that limit flags to those with government or institutional symbols. This is content-based (*Willson v. City of Bel-Nor* (E.D. Mo. 2020)), and any definition of flags should include only their physical description with no limitation to government or other symbols.

## Political Signs

Political signs fall into two major categories, including traditional handheld political message signs (picketing, panhandling, "save the turtles") and campaign election signs. Sign codes are traditionally limited to the latter. Political signs are not only a content-based category, but political speech enjoys the highest level of protection in First Amendment case law. Therefore, sign regulation should never target political signs, but rather fold them into incidental and temporary sign allowances. For yard signs, it is advisable to allow additional incidental or temporary signs for a given number of days per year to allow for occasions (such as elections, holidays, or similar times) where additional signs are needed to accommodate speech.



---

[1]The City later amended its sign regulations to a content-neutral allocation of the number and area of temporary signs, which was upheld on appeal. *Baldwin Park Free Speech Coal. v. City of Baldwin Park,* No. 20-55244 (9th Cir. 2021).

An emerging issue is state preemption of state preemption of political sign regulations. Several states, such as Arizona and Kansas, limit how local governments can regulate political signs during election season. This preemption does not extend to signs that display other forms of speech. How should a local government comply with state law without itself engaging in unconstitutional discrimination between types of speech? At least one federal court case has ruled that the exemption of government signs or signs exempt from state regulation is not content-based (*Signs for Jesus v. Town of Pembroke* (D.N.H. 2017)). Because local governments typically cannot supersede state law, that type of exemption is not itself content-based but rather a recognition that the local government is powerless to supersede state law. In the context of panhandling, a federal district court found that a local regulation that did not incorporate a content-based exemption for solicitations by municipal employees such as firefighters was not content-based even where the city announced an intention to enforce the regulations consistent with state law (*Watkins v. City of Arlington* (N.D. Tex. 2015)).

## Special Event Signs

Some sign codes include special regulations or allowances for signs at special events. If those regulations do not require the signs to advertise the special event or something occurring there, it is arguably content-neutral. However, it is unclear whether that would constitute a user preference. Under the current state of the law, it is likely not to constitute a user preference if a special event itself does not restrict expressive conduct. In *Act Now to Stop War & End Racism Coal. v. Dist. of Columbia* (D.C. Cir. 2017), the court upheld a regulation allowing signs posted a public lamppost to remain for up to 180 days, but requiring signs for special events to be removed within 30 days. The court held the regulation was content-neutral because it only regulated where some speech may occur and did not distinguish between events by topic, and was narrowly tailored to the government's interest in controlling clutter. Another court, however, found that an exemption for special and civic event signs (including grand openings) was content-based because one must assess the communicative content of the sign to determine whether the exemption applies (*International Outdoor v. City of Troy* (E.D. Mich. 2017)). More recently, the U.S. Supreme Court in City of *Austin* v. *Reagan National Advertising* (discussed below) distinguished regulations that regulated special event signs generally (which are content-neutral) and those that regulate specific kinds of special events (which are content-based).

## Human Signs/Sign Walkers

Some sign codes attempt to regulate signs carried by persons, i.e., the stereotypical costumed Statue of Liberty advertising a tax preparer. Regulating hand-held signs or costumes does not necessarily trigger content concerns, but raises difficulties in distinguishing things like costumes that advertise (e.g., the omnipresent Statue of Liberty) from those that do not (for example, a Statue of Liberty costume designed to send a political message). This also raises difficulties in defining costuming and hand-held signs in a way that meets First Amendment tests for language precision. A pre-*Reed* decision invalidated sign walker regulations based on the *Central Hudson* test (*Kitsap County v. Mattress Outlet* (Wash. 2005)), and at least one state statute (Arizona) addresses sign walkers. Many post-*Reed* cases address panhandling, which does not directly involve a sign display but could involve the same principles of content-neutrality.





© SIGN RESEARCH FOUNDATION | **13**

CONTENT-NEUTRAL SIGN CODES AFTER *REED* AND *AUSTIN*

# Commercial Signs

It remains unclear whether strict scrutiny applies to sign regulations that affect only commercial signs. Sign regulations cannot preference commercial over noncommercial speech (*Metromedia v. City of San Diego* (U.S. 1981)). For regulations that affect only commercial speech, courts have traditionally applied a test announced in *Central Hudson Gas & Electric Corp. v. Pub. Serv. Comm'n* (1980) that asks (1) whether the speech concerns a lawful activity and is not misleading, (2) whether the government's interest is substantial, (3) whether the restriction directly and materially serves the asserted interest, and (4) whether the restriction is no more extensive than necessary. While this does not require a compelling interest, the local government has the burden of proof, and bans on speech that target truthful, non-misleading commercial messages are unlikely to survive intermediate scrutiny. As is discussed below in the context of murals and billboards, communities are finding that limits on commercial signs may not survive judicial review if they wander beyond the sign's physical parameters.



# Artwork and Murals

Is artwork a sign? Can cities distinguish art and murals from commercial signs? Artwork (including murals) is expressive conduct protected by the First Amendment. Several cases have ruled that sign codes that either exempt (*Central Radio v. City of Norfolk* (4th Cir. 2016)) or regulate (*Kersten v. City of Mandan,* 389 F.Supp.3d 640 (D. N.D. 2019)) works of art or murals that did not display commercial messages are content-based. Before *Reed,* courts applied intermediate scrutiny to the regulation of commercial speech based on whether the message conveyed is tied solely to economic benefit of the business and serves no purpose beyond the commercial motive. In *Kersten,* the court ruled that design guidelines that prohibit murals with commercial messages but allow other murals that are not commercial is content-based and subject to strict scrutiny. See also *Complete Angler, LLC v. City of Clearwater* (M.D. Fla. 2009)(bait and tackle shop displaying aquatic mural was non-commercial speech, and exemptions for noncommercial works of art and holiday decorations were content-based). *In Morris v. City of New Orleans* (E.D. La. 2019), the city defined murals separately from signs and prohibited commercial advertising on them.

**A community who wants to regulate murals can consider the following options:**

- Remove restrictions that exempt or target artwork, along with limits on commercial advertising. The regulations could consider a restriction on text, if the message is not restricted (for example, limiting the text to the artists' signature).

- Consider mural subcategories based on their physical characteristics, such as a "wall sign" or "painted wall sign." An issue with this approach is that murals often occupy entire building walls, which exceed typical wall sign limits.

- Consider a review process for murals, such as an arts commission review, that examines the artistic quality of the mural. This approach should involve clear standards, time limits, and an express prohibition on considering the mural's content.

Applying intermediate scrutiny, the court invalidated the mural regulations, finding that "there is nothing in the record to suggest that commercial messages in artwork are more unsightly than non-commercial messages in artwork."

There is also an emerging issue as to whether artistic embellishments are protected. This could involve signs that are embedded in a building's architectural features, or regulating a sign's design elements (such as materials). *In Burns v. Town of Palm Beach* (11th Cir. 2021), the court rejected a First Amendment challenge to in architectural review commissions denial of a building permit to replace a traditional beachfront mansion with a much larger midcentury modern house. Over a strong dissent, the court declined to decide that architecture is expressive conduct. This leaves open common design controls for signs, such as requiring masonry or materials compatible with the principal building style for monument signs. However, if courts were to apply intermediate or strict scrutiny to those types of regulations, local governments would need to examine the basis and regulatory efficacy of sign design controls.



CONTENT-NEUTRAL SIGN CODES AFTER *REED* AND *AUSTIN*

# On- vs. Off-Premise Signs:

Off-premise signs advertise products not located on the same premise as the sign, or direct people to off-premise locations. It is common for local sign regulations and state billboard regulations to distinguish on- from off-premise signs. The federal Highway Beautification Act of 1965 (23 U. S. C. § 131) conditions highway funding on outdoor sign regulation, while exempting on-premise signs (i.e., "signs … advertising the sale or lease of property upon which they are located" and "signs, displays, and devices . . . advertising activities conducted on the property on which they are located"). At least two-thirds of state highway beautification regulations and tens of thousands of local sign codes either ban off-premise signs, or subject them to spacing, permitting, and size requirements. Those regulations do not apply to signs that advertise or communicate a business or activity that occurs on the same premise.[2] In *Reed,* a concurring opinion characterized this type of regulation as content-neutral. This is consistent with Supreme Court precedent upholding off-premise sign regulation (*Metromedia, Inc. v. City of San Diego* (1981)).

**Both these signs are digital and advertise the same company, but communities are allowed to regulate them differently based on where they are located, according to the U.S. Supreme Court in *Austin* v. Reagan (2022).**



*Many communities, such as in Austin, TX, prohibit these kinds of digital off-premise signs, or billboards.*



*Many communities, such as in Austin, TX, allow these kinds of digital on-premise signs, or electronic message centers (EMCs), in the parlance of the on-premises sign industry.*

Image Source: Daktronics

[2]In response to concerns that off-premise classifications were content-based, after *Reed* several states revised their outdoor advertising statutes or regulations to replace the premises category with a category for signs that are erected for compensation. See Colorado Rev. Stat. § 43-1-403(1)( "Advertising devices" include signs "for which compensation is directly or indirectly paid or earned in exchange for its erection or existence by any person or entity"); Kentucky Rev. Stat. § 177.830(5)("advertising device" means a sign "[o]perated or owned by a person or entity who is earning compensation directly or indirectly from a third party or parties for the placement of a message on the device"); Tennessee Code Ann. § 54-21-102(18)("[o]utdoor advertising device" is "a sign that is operated or owned by a person or entity that is earning compensation directly or indirectly from a third party or parties for the placement of a message on the sign"). A federal district court found the Colorado legislation content-neutral in *StreetMediaGroup, LLC v. Stockinger*, No. No. 1:20-cv-03602-RBJ (D. Colo. 2021), because the state transportation department "need not be aware of a sign's content to determine whether compensation was received for its erection."

The United State Supreme Court recently confirmed that off-premise sign regulations subject to intermediate, not strict, scrutiny. In *City of Austin v. Reagan National Advertising*, 142 S.Ct. 1464 (U.S. 2022), the court considered a sign code that prohibited the digitization of off-premise signs. Plaintiffs claimed that off-premise sign categories are content-based because persons (especially regulators) have to read the signs to determine whether the message related to things occurring on-or-off the site. The U.S. Supreme Court rejected this argument, ruling that the distinction relates to the location of signs and is not inherently directed at the sign's message. Essentially, the court held that the need to read the sign is directed to its location rather than its message. Therefore, off-premise sign regulations that do not preference commercial over non-commercial speech are subject to intermediate rather than strict scrutiny.

While off-premise sign regulations are not presumed unconstitutional, they remain subject to First Amendment challenge. In drafting off-premise sign restrictions, local governments should consider the following:

**1**  ***Reed's* "Need to Read" Test Does Not Apply to Off-Premise Sign Regulations.** *Austin* reasons that conventional off-premise sign categories require "examination of speech only in service of drawing neutral, location-based lines" rather than controlling the sign's communicative content. However, central to its holding is that the off-premise category did not trigger a specific or substantive category of speech, such as political messages, ideological messages, or directional messages concerning specific events (*Austin*, at 8). Therefore, off-premise sign categories that regulate specific types of off-premise messages or users could implicate higher scrutiny and jeopardize the regulations in court (see paragraphs 3 and 5, below) because they affect the sign's topic, idea or message.

**2**  **Billboards versus Off-Premise Signs. While many billboards are off-premise signs, the two concepts are distinct.** A billboard is a physical category – typically, a large, freestanding panel sign. By comparison, an off-premise sign can occur in any configuration – including a billboard, a wall sign, or on digital copy. Communities can choose to regulate billboards as physical entities regardless of their message, removing the need to justify distinctions between off-premise commercial messages under intermediate scrutiny. For example, a sign code could define a "billboard" as a panel-type sign mounted on posts or steel frames (see, for example, Westminster, Colorado Sign Code § 11-11-16(D)), or as a freestanding smaller than typical bulletin specifications (672 square feet in area or 14 feet in height).

**3**  **Off-Premise Distinctions that Regulate Non-Commercial Messages May Trigger Strict Scrutiny.** The *Austin* opinion assumed that the sign regulations at issue regulated only commercial speech. Because non-commercial speech receives a higher degree of protection under the First Amendment, regulations that implicate non-commercial messages (such as political campaign or religious messages) will trigger strict scrutiny. However, regulations that affect any off-premise message – whether or not those messages are commercial in nature – will trigger only intermediate scrutiny.

**4**  **Limiting Off-Premise Regulations to Commercial Messages is Subject to Intermediate Scrutiny.** Both the majority opinion and dissent in *Austin* recognized that regulations targeting only commercial speech (i.e., advertising or directing customers to a business) are subject to intermediate, not strict, scrutiny (*Austin* at 10 [majority opinion], Thomas, dissenting, at 2, note 1).

[3] *Austin*'s sign regulations, as described in the majority opinion, did not exempt noncommercial speech. *Austin* at 5, note 3.

CONTENT-NEUTRAL SIGN CODES AFTER *REED* AND *AUSTIN*

**5** **Off-Premise Regulations that Regulate Commercial Messages Differently may Fail Intermediate Scrutiny.** It is one thing to regulate off-premise advertisements, and another to carve out special treatment for specific businesses. For example, some sign regulations have special permissions for off-premise real estate signs, hospital, or farms. Car dealerships, hospitals, bookstores, or other businesses do not qualify for those exemptions. What government interest justifies not allowing a car dealership to display a sign at an off-premise location while allow that permission for a homebuilder? Why would a general regulation or allowance for off-premise signs – coupled with size, spacing and design restrictions – not promote those interests as effectively? A local government with those categories would need to show how those distinctions are narrowly tailored to serve a significant government interest.

**6** **Facially Content-Neutral Off-Premise Sign Regulations Trigger Strict Scrutiny if they have an Impermissible Purpose or Justification.** The majority opinion in *Austin* stated that an impermissible purpose could sink a content-neutral off-premise sign regulation, but gave no examples. One example could include, for example, a regulation that allows for billboards only during election season – where the regulation allows for any form of off-site message, but is designed to favor a particular form of speech (see www.ricardopacheco.com, *supra*).

In drafting off-premise sign regulations, the most conservative approach legally is to regulate only commercial speech (which triggers only intermediate scrutiny), and at least to ensure that the regulations do not explicitly or implicitly favor commercial over non-commercial speech. In addition, regulating only the billboard structure with no off-premise sign restriction is a viable approach legally, but also potentially exposes more locations to off-premise advertising. However, the *Austin* decision clarifies that none of these approaches (without more) will trigger strict scrutiny.

 

*Image Source: Watchfire*

# Public Forum

Local governments retain wider discretion over the display of their own signs and those on their own property than they do for private signs on private property. However, free speech protections apply when the government opens public property to private expression. In 2022, the U.S. Supreme Court addressed the issue of signs in the public forum. In *Shurtleff v. City of Boston,* No. 20–1800 (U.S., May 2, 2022), the City routinely allowed the display of flags on a flagpole at City Hall with no guidelines or control over who could display them or their content. The City denied the display of a religious flag based on concerns that it would violate the Establishment Clause by endorsing a set of religious beliefs. The City's lack of involvement in selecting flags for display at that location meant that the display was private (not public) speech. Therefore, denying permission to display the flag amounted to viewpoint discrimination in violation of the First Amendment. Local governments should exercise clear control over signs in public spaces where only government speech is allowed, and adopt content-neutral rules for permitted private displays (other than exempt government signs, such as traffic directional signs) in the public forum.





# *Reed's* Top 10 Takeaways

The *Reed* decision changed the way communities and courts look at sign regulations, and its impact is still being felt (and litigated) across the nation. Local jurisdictions applying the content-neutrality principles of *Reed* to their sign code should consider the following:

**1** While the facts in *Reed* involve temporary signs, content-neutrality is not limited to temporary signs. The First Amendment protections at issue in *Reed* apply to any form of communicative content - whether the sign is a cardboard election sign in a yard, a large monument sign at the entry to a shopping center, or a mural subject to design review.

**2** If a regulation affects the topic or message conveyed, the regulation is content-based and likely subject to strict scrutiny. This applies whether the regulation appears in a sign code, a zoning ordinance, design guidelines, or some other regulation.

**3** A sign code should identify all signs (permanent or temporary) by their structure or design (such as the sign's materials, configuration, and presentation – i.e., whether or not it has changeable or digital copy, lighting, and similar visual features), rather than what they say.

**4** Communities do not usually run into trouble simply because they regulate a sign's dimensional standards or design features. Instead, sign codes trigger strict scrutiny when they create either: (1) exemptions for preferred categories of speech, or (2) target categories of speech for regulation through their sign code.

**5** Communities who want to specifically regulate temporary signs can continue to do so, but should base their regulations on the signs structure type (such as feather signs, windblown signs, or cardboard placards mounted on a metal frame) and uniform event triggers (such as 5 to 10 temporary signs along a frontage for up to 30 days four times a year).

**6** Traditionally, courts have given more deference regulation of commercial content through intermediate scrutiny. However, some lower courts have started to apply strict scrutiny to commercial content categories and it is fair to say that the state of the law is unclear.

**7** *Reed* does not require signs to be bigger, cluttered, brighter, or otherwise an obstacle to a community's aesthetic or traffic safety objectives. It simply advises communities to focus carefully on the physical characteristics of signs that they truly need to regulate, and to avoid interfering with a sign's message.

**8**    To control clutter and driver distraction, sign codes can use allocation-based systems that allow persons and property owners to allocate messages as they see fit within the parameters established by the sign code's dimensional standards.

**9**    There are other First Amendment requirements and constitutional issues to consider, such as overbreadth, vagueness, and how long it takes to issue a sign permit. Those are beyond the purview of this article but remain important considerations.

**10**    Distinctions between on- and off-premise signs are sufficient under *Austin*, if they do not involve other content-based categories (for example, allowing off-premise signs for some messages but not others).

**Communities applying these content-neutral principles can develop and implement sign codes that promote community character, traffic safety, and economic development.**

## About the Author:

Mark White is a senior partner with White & Smith, LLC – a multi-disciplinary law firm based in Kansas City and Charleston that specializes in zoning and sign code updates. White & Smith, LLC has led or participated in over 150 zoning and sign code updates in 36 states. Mr. White is a nationally-recognized expert on planning and law presents frequently on sign law and regulations at planning and law conferences, and has spearheaded numerous zoning and sign code updates. Mr. White has over forty publications appearing in books, law journals, and planning literature.

**IS YOUR COMMUNITY EXPLORING SIGN CODE CHANGES?**

CONTACT
**signhelp@signs.org**

FOR COMPLIMENTARY ANSWERS

PUBLISHED BY:



WWW.SIGNRESEARCH.ORG

© Sign Research Foundation