In the United States District Court
for the
District of Kansas

| | |
|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard.**<br><br>Plaintiffs,<br><br>v.<br><br>**City of Salina, Kansas.**<br><br>Defendant. | Civil Action No. 6:24-cv-01027-TC-ADM<br><br>Plaintiffs' Response to Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert; Index of Exhibits; Exhibits A-I; Certificate of Service. |

### Plaintiffs' Response to Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert

In this case, Plaintiffs began painting a whimsical mural depicting hamburger-esque flying saucers piloted by aliens attacking The Cozy Inn, an iconic local restaurant, with blasts of ketchup and mustard. The City of Salina ordered Plaintiffs to stop work on the mural, insisting that the mural was in fact a sign because the content of the mural pertained to the business. Plaintiffs filed this suit, arguing that Salina's mural-sign code regime is an unconstitutional content- and speaker-based restriction on speech, a prior restraint on speech, and is void for vagueness. Salina retained an attorney, Mark White, to provide expert testimony defending Salina's mural-sign code regime. Plaintiffs retained Professor Charles Taylor, a noted expert on signage, to rebut the opinions of Mr. White. The report, opinions, and testimony of Professor Taylor are relevant, reliable, and proper under Federal Rule of Evidence 702. Salina argues that facts don't matter in First Amendment cases, and that because facts don't matter, Professor Taylor's expertise is irrelevant. That's fundamentally wrong under First Amendment case law and the Rules of Evidence.

Professor Taylor is a widely recognized expert in signage, his testimony will help the trier of fact, is based on sufficient facts or data, is the product of reliable principles, and reflects a reliable application of the principles and methods to the facts of the case. Professor Taylor satisfies the

1

requirements for expert witnesses under Rule 702 and Defendant's Motion to Exclude should be denied.

I. **Defendant improperly equates its merits argument with the standard for experts**

Salina devotes a significant amount of its brief to its peculiar understanding of the merits of First Amendment sign code cases. In short, Salina argues that if a municipality argues that a sign regulation advances an interest in traffic safety or aesthetics, then a court must, as a matter of pure law, find that the challenged regulation advances a substantial government interest and satisfies intermediate scrutiny. Doc. 98 at 2-3. Salina does not believe that "any evidence is necessary," because no matter what the evidence suggests, the Court must find Salina's mural-sign code regime advances the governments claimed interests "as a matter of law." Doc. 98 at 2-3.

This fact-free view of the merits of the case has shaded Salina's understanding of the standard for experts under Rule 702. Salina's own expert, attorney Mark White, offers little more than legal opinions that are not supported by sufficient facts or a reliable methodology, but Salina contends that this is acceptable because the expert was only proffered "in an abundance of caution and in the unlikely event that this Court determines evidence is necessary." Doc. 98 at 3. Conversely, here, where Plaintiffs' rebuttal expert testified that Mr. White's opinions are unsupported by evidence and contradicted by significant evidence, Salina argues that these facts are irrelevant and unhelpful to the trier of fact. In other words, Salina believes that the merits of a First Amendment challenge to a sign regulation create a sort of sliding scale for Rule 702 evidence, with the standards significantly reduced for experts proffered by the government, while experts testifying against the government face an almost insurmountable hurdle. Salina is wrong both about the merits of the First Amendment and the requirements for expert testimony under Rule 702.

Salina's fact-free understanding of First Amendment jurisprudence is more deferential to the government than even rational-basis review. While a law may pass rational-basis review even if "no empirical evidence supports the assumptions underlying," the law, *Powers v. Harris*, 379 F.3d 1208, 1217 (10th Cir. 2004), a plaintiff must at least be given the opportunity to create a factual record that would "negative every conceivable basis which might support" the challenged law. *Id*.

2

(upholding challenged law only after bench trial with evidence). Shockingly, Salina here argues not only that the government does not bear *any* burden to justify its speech restriction with evidence, but it also argues that *any* evidence presented by Plaintiffs undercutting the government's alleged interests are irrelevant and inadmissible, and Plaintiffs are not even allowed to attempt to use evidence to negative every conceivable basis which might support a sign regulation.

Salina insists that the case of *StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243 (10th Cir. 2023), mandates this outcome and holds that aesthetics and traffic safety are content neutral interests and are advanced as a matter of law under intermediate scrutiny without regard to any facts. But the Tenth Circuit in *StreetMedia* made clear that it was "skeptical" that the challenged sign regulation advanced the government's claimed interest in aesthetics and traffic safety. *Id*. at 1252. The Tenth Circuit upheld the district court's dismissal only because the StreetMedia plaintiffs failed to "allege with any specificity that the Act and rules fail to meet intermediate scrutiny." *Id*. at 1252. Far from holding that facts are simply unnecessary under intermediate scrutiny, the Tenth Circuit held that facts are necessary in determining the constitutionality of a sign regulation. Plaintiffs in this matter clearly alleged that Salina's mural-sign code regime would fail intermediate scrutiny. *See* Doc. 16 at ¶¶ 230-258; 309. This is in keeping with Tenth Circuit precedent placing the burden on government to justify restrictions on speech with factual evidence, even under intermediate scrutiny. *See Aptive Env't, LLC v. Town of Castle Rock, Colorado*, 959 F.3d 961, 989 (10th Cir. 2020); *McCraw v. City of Oklahoma City*, 973 F.3d 1057, 1071 (10th Cir. 2020); *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1221 (10th Cir. 2021).

Even if Salina were correct about the merits of the First Amendment claim, that would not change the standards for expert testimony under Rule 702. The rule only requires that a qualified expert's testimony "help the trier of fact to understand the evidence or to determine a fact in issue," be "based on sufficient facts or data," be "the product of reliable principles and methods," and "reflect a reliable application of the principles and methods to the facts of the case." There is no basis for the idea that the merits of a First Amendment claim, or any of the tiered scrutiny tests, demand a different standard than the one established in Rule 702.

3

## II.     Professor Taylor is Qualified to Provide Expert Testimony on Signage

Professor Taylor is a recognized signage expert, and Plaintiffs disclosed him as a rebuttal expert to provide testimony about the report and opinions of Defendant's expert, Mark White. Ex. A, Plaintiffs' Expert Disclosure. Salina argues that because Mr. White was designated as an expert in "urban and regional planning," only an expert in urban and regional planning can serve as a rebuttal expert. Doc. 98 at 6. But Professor Taylor was not retained to rebut Salina's Rule 26(a)(2) disclosure, he was retained to rebut the opinions provided by Mr. White's report and testimony, all of which are about signage. *See* Ex. E, White Report at 3. What matters is whether an expert is qualified to provide the substance of his opinions, not the language used by lawyers to disclose the expert.

Professor Taylor is the John A. Murphy Professor of Marketing at Villanova University and has spent more than three decades researching signage. Ex. B, Taylor Report at 2; Ex. C, Taylor CV at 1. He is the author of more than 100 peer reviewed academic articles. Ex. B, Taylor Report at 2; Ex. C, Taylor CV at 12-23. He served as Chairman of the Board of the Academic Advisory Council for Signage Research and Education. Ex. B, Taylor Report at 2; Ex. C, Taylor CV at 7. He has given presentations on the regulatory issues relating to signage at the Transportation Research Board, the American Marketing Association, the Association of Consumer Research, the European Advertising Association, the Outdoor Advertising Association of America, the International Sign Association, and the Sign Foundation. Ex. B, Taylor Report at 2-3; Ex. C, Taylor CV at 3, 39-42. He is also the lead-author of a book published by the U.S. Small Business Administration titled *On-Premise Signs as Storefront Marketing Devices* (2005). Ex. B, Taylor Report at 3.

He has testified regarding his signage research before the U.S. House of Representatives Small Business Committee, the Texas State Senate, the Missouri State Senate, the Philadelphia Zoning Board, and the San Clemente City Council. Ex. B, Taylor Report at 3; Ex. C, Taylor CV at 9. Professor Taylor was an expert informant for the Federal Highway Administration's Assessment / Mediation of Outdoor Advertising issues in 2006 and was interviewed by the Federal Highway

Administration in conjunction with fact finding on policy toward signage in 2010. Ex. B, Taylor Report at 3.

Professor Taylor has qualified as an expert witness in numerous cases involving signage regulation. Ex. F, Taylor Depo. 9:3-12; 37:24-38:13. Examples of federal cases in which Professor Taylor has provided expert testimony in the area of signage regulation include, *Peterson v. Village of Downers Grove*, Case No. 14-c-9851 (N.D. Ill., 2014), *Lamar OCI South Corp. v. City of Oxford*, Case No. 3-12-CV-002-A-A (N.D. Miss., 2012), and *Borden Park, L.P. v. City of San Antonio*, Case No. SA-03-CA-491-RF (W.D. Tex., 2005).

Salina attempts to limit Professor Taylor's expertise to "informing a business if their sign effectively advertises to increase profits," Doc. 98 at 7, but as is explained above, Professor Taylor's expertise on signage goes far beyond just "advertising to increase profits." He has testified to numerous government bodies regarding the impact (or lack thereof) of signage on traffic safety. Ex. B, Taylor Report at 3; Ex. C, Taylor CV at 9; *see also* Ex. F, Taylor Depo. 35:8-11 (explaining that his research and writing on signage go beyond marketing and advertising and include societal issues, planning issues, and traffic safety); 42:18-19 ("I have provided testimony on traffic safety and signage cases").

Salina attempts to equate this case to the case of *Taylor v. Cooker Tire & Rubber Co.*, 130 F.3d 1395 (10th Cir. 1997), where a proffered expert was not allowed to testify about the cause of a tire failure because he had not conducted any testing on the tire at issue. Apart from the fact that the cause of a tire failure has absolutely nothing to do with whether Salina's mural-sign code regime actually advances any compelling, substantial, or legitimate government interest, Salina ignores the fact that its own expert did not conduct any sort of testing or research on any actual impact of Salina's mural-sign code regime on aesthetics, traffic and pedestrian safety, or property values in Salina. It is disingenuous for Salina to insist that a rebuttal expert must be excluded because he did not conduct any testing to rebut Salina's proffered expert who also did not conduct any testing.

Professor Taylor is a widely recognized expert in signage. His expertise on the impact of signs on aesthetics, traffic and pedestrian safety, and property values has been utilized by multiple

5

federal courts and the Federal Highway Administration. He is qualified by training, experience, knowledge, skill, and education to provide expert opinions rebutting Mark White's opinions about signage.

### III. Professor Taylor's opinions are reliable

Professor Taylor's report and testimony show that he based his opinions on sound methodology and sufficient facts and data. Salina repeatedly attempts to read snippets of Professor Taylor's report in isolation, taking them out of context and ignoring the fact that Professor Taylor's opinions are provided in response to the opinions found in Mr. White's report.

Salina objects to Professor Taylor's statement that "the City of Salina's content based restriction on on-premises signs does not advance an aesthetic interest," Ex. B, Taylor Report at 19, and insists that it is a "conclusory opinion" and "devoid of any facts or data to support such an opinion." Doc 98 at 9. Salina leaves out that this supposedly objectionable sentence is simply the concluding sentence to a three and a quarter-page section rebutting Mr. White's opinion that Salina's mural-sign code regime advances the governmental interest in aesthetics. Ex. B, Taylor Report at 16-19.

In those three and a quarter-pages, Professor Taylor points out that Mr. White offers no empirical evidence to support his assertion that the mural-sign code regime advances aesthetics, that aesthetics is an inherently subjective matter, and that the only empirical evidence relating to the subjective view of the aesthetics of signage—opinion polling—shows that the public views signage positively. Ex. B, Taylor Report at 16. Professor Taylor then devotes three pages, Ex. B, Taylor Report at 16-19, to explaining the multiple studies of opinions on signage that contradict Mr. White's baseless assertion that "[s]ign clutter is considered unattractive by most planning professionals and the general public." Ex. E, White Report at 7.

Nor is it relevant that Professor Taylor's statement "does not even address what 'content based' means, let alone what constitutes a content-based regulation." Doc. 98 at 9. Professor Taylor's opinion in this section is not about whether Salina's mural-sign code regime is content based or content neutral (a purely legal question that is not the subject of expert testimony) but that

6

the mural-sign code regime "does not advance an aesthetic interest." Ex. B, Taylor Report at 19. It is Mr. White who offers the legal opinion that "[t]he Sign Code establishes time, place and manner metrics that are not content-based," Ex. D, White Report at 3, and then fails to provide any explanation, much less "address what 'content based' means, let alone what constitutes a content-based regulation." Doc. 98 at 9.

Salina argues that it is fatal to Professor Taylor's report that he "does not understand how the Sign Code was developed as he admits he did not review the legislative history of the Sign Code." Doc. 98 at 10. But Professor Taylor's report rebuts Mr. White's report, which includes no review of how Salina's mural-sign code regime was developed or any legislative history. Ex. E, White Report at 22-38 (documents reviewed includes no legislative history); Ex. G, White Depo at 46:25-48:4; 165:4-13; 185:23-186:15. Given that Mr. White did not undertake any review of the legislative history or discuss how Salina's mural-sign code regime was developed, it is unsurprising that Professor Taylor did not attempt to rebut hypothetical legislative history that Salina's expert did not address. Rebutting an opinion that has never been expressed is an impossible task. If the lack of legislative history is indeed fatal to an expert's testimony, then Mr. White's testimony is just as deficient as Professor Taylor's—more so given that Mr. White is being offered in Salina's case-in-chief, while Professor Taylor is simply rebutting Mr. White's opinions.

Salina argues that Professor Taylor's "opinion that the Sign Code does not advance the City's interest in community aesthetics, traffic safety, or pedestrian safety are also devoid of sufficient facts or data." Doc. 98 at 9 (citing Ex. B, Taylor Report at 10-20). Yet these ten pages of Professor Taylor's report consist of an extensive review of the academic literature and provide extensive factual support for Professor Taylor's opinions.

Professor Taylor reviews years of research on the impact of signage on traffic safety, including numerous studies from the Federal Highway Administration, and explains that the Federal Highway Administration's "reviews of signage and traffic safety have found no conclusive evidence of a link between signs and traffic accidents." Ex. B, Taylor Repot at 11. Salina mischaracterizes Professor Taylor's analysis of a study by Stutts, et al., *The Role of Driver*

7

*Distraction in Traffic Accidents* (2001), stating that Professor Taylor's opinion "directly contradicts the study's findings that signs are in 'one of the highest categories' of distractions." Doc. 98 at 11. Yet this "highest category" in the Stutts report is a generic category of "outside person, object, event," which includes everything in the world outside the vehicle, signs included. Ex. F, Taylor Depo. 105:9. Needless to say, this is "a very broad category," Ex. F, Taylor Depo. 102:3-5, and Professor Tayor explained that the academic consensus, including Professor Stutts herself, Ex. F, Taylor Depo. 99:12-15, is that signage is not a significant contributor to driver distraction, even if it happens to fall within the broad, generic category of "outside person, object, event." *See* Ex. F, Taylor Depo. 119:7-13 ("And I think the weight of the evidence in the academic literature, tons and tons of studies -- less so recently because it's, in my opinion, pretty much settled science that on-premise signs don't cause traffic accidents.").

Salina concedes that Professor Taylor's report extensively discuses "studies regarding signs and traffic safety," but the Defendant complains that Professor Taylor "does not reliably apply these principles and methods to the facts of this case" because he "does not analyze the metrics of the Sign Code." Doc 98 at 10. This once again ignores the fact that Professor Taylor's report is a rebuttal of Mr. White's report—a report that does not contain any Salina-specific evidence about how "the metrics" of Salina's mural-sign code regime advances traffic safety in Salina. Not only did Mr. White not conduct any studies about the efficacy of Salina's mural-sign code regime, he is also not aware of any studies by anyone about the efficacy of Salina's mural-sign code regime. *See* Ex. G, White Depo. 47:17-19; 48:3-4; 83:22-23. Neither is Salina itself aware of any studies by anyone about the metrics or efficacy of Salina's mural-sign code regime. *See* Ex. I, Herrs 30(b)(6) Depo. 73:13-21; 73:23-74:3; 74:5-15; 74:17-75:8; 76:19-23; 76:25-77:10; 77:23-78:3. Professor Taylor does not need a Salina-specific report analyzing the efficacy of the mural-sign code regime at promoting traffic safety in Salina to rebut Mr. White's fact-free assertion that the Salina sign code advances its interest in traffic safety in Salina. Ex. E, White Report at 7. It is enough to point out that Mr. White does not cite to any evidence to support his opinion and that based on "tons and

8

tons of studies," it is "pretty much settled science that on-premise signs don't cause traffic accidents." Ex. F, Taylor Depo. 119:7-13.

## IV.     Professor Taylor's opinions are relevant

Salina contends that portions of Professor Taylor's report are not relevant because "[m]arketing, advertising, and the value of signs to a particular business are not germane." Doc. 98 at 11. This mischaracterizes the nature of Professor Taylor's opinion and the context in which it was given. Throughout his report, Mr. White denigrates signs, and the messages they communicate, as "sign clutter," and insists that controlling "sign clutter" is the primary purpose for Salina's mural-sign code regime.[1] Salina itself has repeatedly insisted that controlling "sign clutter" is the primary purpose of the mural-sign code regime. *See* Ex. H, Def. Response to Second Set of Interrogatories, Rog. 1 ("By limiting sign clutter more effectively than it would be limited in the absence of regulation, the Sign Code maintains and enhances the character of the community and the visual environment, reduces the potential for obstructed views, helps keep rights-of-way clear, and reduces pedestrian and motorist distraction (improving both pedestrian and traffic safety, in part by avoiding vehicular-pedestrian collisions)"); *see also* Ex. I, Herrs 30(b)(6) Depo. 20:10-19; 26:13-17; 41:12-18; 45:7-10; 51:14-18; 62:1-8; 71:12-25; 72:19-73:9.

Neither Mr. White nor Salina ever defines "sign clutter" or identifies any empirical data substantiating the supposed evils of "sign clutter." Instead, the pejorative dismissal of signs—and the messages they communicate—as "clutter" that needs to be controlled reflects a subjective and

---

[1] *See* Ex E, White Report at 4 ("This is a state of the art, and generally accepted, technique for controlling sign clutter"); *id*. at 4-5 ("Plaintiff's [sic] lawsuit would invite all businesses to completely ignore the Sign Code's area restrictions – at least if the sign is painted – and contribute to sign clutter"); *id*. at 7 ("Sign clutter contributes to a decline in traffic safety"); *id*. at 7 ("Sign clutter is considered unattractive by most planning professionals and the general public"); *id*. at 9 ("it is important for communities to strike a balance that allows signs to communicate messages without generating clutter or safety issues."); *id*. at 9 ("Limiting wall sign size keeps the sign from overwhelming a façade, and limiting the number of signs prohibits clutter"); *id*. at 9 ("By limiting clutter, the Sign Code avoids driver distractions, and keeps signs from competing for attention with other signs on the façade"); *id*. at 10 ("This keeps the sign in scale with the building's context, which furthers aesthetics by avoiding unsightly clutter"); *id*. at 13 ("Controlling painted wall signs is an important way to control sign clutter."); *id*. at 19 ("A maximum number of signs prevents clutter, but does not necessarily prevent customers from locating a site").

hostile view that the messages communicated by signs are of no value to society. Professor Taylor's report responds to this hostility to the messages of signs by explaining the functions served by signs - "functions that are valuable both to businesses within the community and consumers alike." Ex. B, Taylor Report at 7. Because signs and their messages are valuable to "businesses and to the community at large," Ex. B, Taylor Report at 6, "signage should not be dismissed as clutter without evidence." Ex. B, Taylor Report at 7.

Both Mr. White and Salina have identified "sign clutter" as the chief evil that the mural-sign code regime seeks to control. Professor Taylor's report shows that "sign clutter" is an undefined, subjective concept, which is not supported by empirical data and ignores the important function performed by signs in communicating messages that are valuable to society. Professor Taylor's opinion is relevant to the issues of this case and helpful to the trier of fact.

## Conclusion

Professor Taylor is qualified as an expert in signage and his opinions are reliable and relevant to the issues in this case. Professor Taylor's opinions meet the requirements of Federal Rule of Evidence 702 and Defendant's Motion to Exclude should be denied.

Dated: January 10, 2025.	Kansas Justice Institute

/s/ Jeffrey Shaw
Samuel G. MacRoberts, 22781
Jeffrey Shaw, 29767
12980 Metcalf Avenue, Suite 130
Overland Park, Kansas 66213
Sam@KansasJusticeInstitute.org
Jeff@KansasJusticeInstitute.org
(913) 213-5018
Attorneys for Plaintiffs

**Certificate of Service**

The undersigned certifies that on January 10, 2025, the above document(s) were filed using the CM/ECF system, which will send notification of such filing to all participants, including to: Aaron O. Martin, Todd G. Messenger, and Amanda C. Jokerst.

<u>/s/ Jeffrey Shaw</u>
Samuel G. MacRoberts