IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

```
Cozy Inn, Incorporated,      :CIVIL ACTION
d/b/a The Cozy Inn;          :CASE NO.
Stephen Howard,              :
                             :6:24-cv-01027-TC-ADM
            Plaintiffs,      :
                             :
    -vs.-                    :
                             :
City of Salina, Kansas,      :
                             :
            Defendants.      :
```

NOVEMBER 13, 2024

ZOOM VIDEOCONFERENCE DEPOSITION OF

CHARLES R. TAYLOR, Ph.D., held via remote teleconference

hosted by U.S. Legal Support, located at 1818 Market

Street, Suite 1400, Philadelphia, Pennsylvania, on

Wednesday, November 13, 2024, at 10:05 a.m., before

Michelle Keys, a Stenographer and Notary Public of the

Commonwealth of Pennsylvania.

1  say maybe -- I think I've testified in court seven
2  or eight times.  Something like that.
3  Q.     And were these all sign cases?
4  A.     No.
5  Q.     How many of them were sign cases?
6  A.     Given my best estimate, I would say maybe
7  something like 12.
8  Q.     And of those, were some on premise and some
9  off premise?
10 A.     Yes.
11 Q.     How many were on premise?
12 A.     I think -- I think at least -- five or six.
13 Q.     Okay.  So before we get too much further, I'm
14 sure you're already familiar with this, but I don't
15 know how long it's been since the last time you were
16 deposed.  But we just want to point out a couple of
17 rules for the deposition going forward, and we're
18 doing great so far.
19            There is a court reporter taking down
20 everything that we say.  So in order to create a
21 clean record, we need to try to not talk over each
22 other.  And notwithstanding the coffee I've had this
23 morning, try not to talk too fast.  This way, the
24 court reporter can understand and record everything
25 that we say.  So consequently, if I ask you to wait

1  deep understanding of signage and its -- and its
2  functions.
3  Q.    What is the scope of that expertise?
4  A.    I mean, I -- I think if you looked at -- at
5  my -- at my book, which is probably the -- arguably
6  the most authoritative source on -- on functions of
7  signs, you'd see the scope of it.  It's -- it
8  certainly -- it covers marketing and advertising
9  issues, it covers societal issues.  It does get into
10 some -- some planning, some planning issues as well.
11 It covers traffic safety.
12 Q.    So with respect to that, did you write all of
13 that material yourself?
14 A.    My memory is I did the first draft of five of
15 the chapters.
16 Q.    Okay.  Do you endorse everything in that book
17 and stand by it?
18 A.    I -- I stand by it as of the time it was
19 written.  It was written in 2005, and it's possible
20 some conditions have changed since 2005.  But I
21 believe it to be accurate at the time it was
22 written.
23 Q.    Well, you cited in your report today for
24 certain propositions.
25            Do you stand by it with respect to

1  focused on -- and some of it is focused on the
2  marketing focus of signs.  And, like, with an IJSW
3  article I was involved with recently, we focused on
4  the impact of signage broadly on stakeholders.
5  Q.    Now, when you talk about regulatory issues,
6  what is the focus with respect to those regulatory
7  issues?  What -- what point does your research try
8  to make?
9  A.    You know, essentially with -- with the
10 outdoor studies, the -- the research looked at
11 whether outdoor advertising contains information
12 that provides value to consumers.  With some of the
13 on-premise work, we looked at the impact -- we
14 looked at the impact of signage on the businesses.
15 I did one study that had to do with whether lighting
16 signs makes a difference -- makes a difference in
17 the success of a business, like whether they would
18 lose sales or not.
19 Q.    Okay.  So the design of individual signs is a
20 component?
21 A.    Yeah.  We didn't really look specifically at
22 the design of individual signs in -- in the study I
23 was talking about.
24 Q.    Okay.  Have you ever been admitted in a court
25 as an expert in the field of signage?

1  A.     Multiple times, yes.
2  Q.     And did the court designate you as a signage
3  expert or something else?
4  A.     I don't remember for sure, but the cases
5  dealt squarely with signage.
6  Q.     Can you tell me which cases you may have been
7  admitted as an expert in signage?
8  A.     There was the Walker case in Las Vegas.
9  There's one called Borden Park in San Antonio.  Two
10 billboard cases in Mississippi.  The one billboard
11 case in Myrtle Beach.  A signage case in
12 Downers Grove, Illinois.  There's others I can't
13 remember right now.
14 Q.     Okay.  And in -- okay.  Turning back to your
15 expert report, let me just -- now we've got this on
16 a tab, so we're going back to Exhibit B, as I
17 recall.
18            I wanted to direct your attention to
19 page 5 here.  So it's actually page 6 of the PDF,
20 page 5 as they're marked.  You have four cases
21 listed here, right?  Sorry.
22            It's the lower -- these four cases.
23 These four cases listed here.
24 A.     Yes.
25 Q.     Okay.  And we've already gone over how many

Charles R Taylor PhD
November 13, 2024

1       MR. SHAW:  Objection to form.
2  BY MR. MESSENGER:
3  Q.    Is that how you understand this table?
4  A.    I -- to be honest, I'm not certain, based
5  on -- it could be described in a little bit more
6  detail.
7            Can we take a look at the footnote?
8  Q.    Certainly.
9  A.    Standard error column -- okay.  It is -- that
10 is the column percent.  So that's correct.
11 Q.    Okay.
12 A.    Although I will -- I will say I've seen
13 Professor Stutts present this work and say that
14 signage is not in that category of outside person,
15 object, or event based on the reports.
16 Q.    Okay.  Let's look at table 7.
17            So do you recall reading -- looking
18 at this table?
19 A.    It's -- it's been a long time, so I don't
20 recall it very well, but I can take a look at it.
21 Q.    So here we see "outside distraction," right?
22 A.    Yes.
23 Q.    And I can probably zoom out a little bit so
24 you can see this better.  Oh, sorry.
25            Can you see that okay?

```
 1  in terms of table 8; is that correct?
 2                  MR. SHAW:  Objection.
 3                  THE WITNESS:  It's a -- yeah.  It's a
 4          very broad category you're talking about
 5          there.
 6  BY MR. MESSENGER:
 7  Q.      Did you see Professor Stutts present this
 8  material prior to your first opinion --
 9                  MR. SHAW:  Objection to form.
10  BY MR. MESSENGER:
11  Q.      -- that is cited in this article?
12  A.      Prior to what?
13  Q.      Okay.  We'll skip that.
14                  Now, on page -- let's see.  Let's get
15  to your book.
16                  Hold on.  Let me stop sharing.
17  A.      Is it okay if we take a brief bathroom break?
18  Q.      Absolutely.
19                  Five minutes?  Ten minutes?
20  A.      Five minutes is plenty.
21  Q.      Okay.  We'll see you in five.
22                  MR. MESSENGER:  We'll go off record.
23                          - - -
24                  (Whereupon, a recess was taken from
25          12:26 p.m. to 12:36 p.m. Eastern, after
```

1   codes?
2           A.   No.
3   Q.   Now, I want to go back to the Stutts article
4   really quick.  Let's see.
5           So now I'm not really interested in
6   what Professor Stutts would say at a conference, as
7   that's not in your report.
8           Can you just tell me here, again,
9   that -- is outside person, object, and event a major
10  source of distraction compared to the other
11  distractions that Stutts studied in this report?
12  A.   It -- it's one of the highest categories,
13  yes.
14  Q.   And in that -- on the same page, it says that
15  such distractions include signs; is that right?
16  A.   It doesn't specify what type of sign, but it
17  says "signs."
18  Q.   It does say "signs," right?
19  A.   It does, yes.
20  Q.   Okay.
21          Okay.  I want to get into your --
22  your book a little bit here so we can understand the
23  citations to that in your expert report.  I'm going
24  to stop sharing this and I'm going to bring your
25  book up.

| | |
|---|---|
| 1 | traffic safety, the common citizens of Salina? |
| 2 | A.    I -- I don't think you need to be an expert |
| 3 | in traffic safety to know that that sign wouldn't |
| 4 | cause traffic accidents. |
| 5 | Q.    So as a layperson, you need no expertise in |
| 6 | traffic safety to evaluate traffic safety impacts? |
| 7 | A.    I -- I think laypeople can have an opinion as |
| 8 | to what would cause them to have an accident and |
| 9 | what would not.  And I think the weight of the |
| 10 | evidence in the academic literature, tons and tons |
| 11 | of studies -- less so recently because it's, in my |
| 12 | opinion, pretty much settled science that on-premise |
| 13 | signs don't cause traffic accidents. |
| 14 | Q.    If laypeople opinions on traffic safety are |
| 15 | adequate, why do we have all of this scientific |
| 16 | research on traffic safety? |
| 17 | A.    I never said they were adequate.  You're |
| 18 | putting words in my mouth. |
| 19 |                MR. MESSENGER:  Well, can -- |
| 20 |                Court Reporter, can you read back the |
| 21 |          testimony with respect to common citizens |
| 22 |          believing that the sign does not cause |
| 23 |          traffic safety problems. |
| 24 |                          - - - |
| 25 |                (Whereupon, the stenographer read |