**Page 1**

```
 1  
 2        IN THE UNITED STATES DISTRICT COURT
 3           FOR THE DISTRICT OF KANSAS
 4  
 5  
 6  COZY INN, INCORPORATED, d/b/a
 7  THE COZY INN; STEPHEN HOWARD,
 8       Plaintiffs,
 9  
10     vs.  Civil Action No.  6:24-cv-01027-TC-ADM
11  
12  CITY OF SALINA, KANSAS,
13       Defendant.
14  
15  
16            DEPOSITION OF
17         CORPORATE REPRESENTATIVE
18             DUSTIN HERRS,
19  taken on behalf of the Plaintiffs, pursuant to
20  Notice to Take Deposition, beginning at 9:27 a.m.
21  on the 30th day of October, 2024, at Clark, Mize &
22  Linville, 129 S. 8th Street, in the City of
23  Salina, County of Saline, and State of Kansas,
24  before Sandra S. Biggs, Kansas CCR No. 0716.
25  
```

**Page 2**

```
 1             APPEARANCES
 2  
 3  
 4  ON BEHALF OF THE PLAINTIFFS:
 5  
 6     Mr. Jeffrey Shaw
 7     Kansas Justice Institute
 8     12980 Metcalf Avenue, Suite 130
 9     Overland Park, KS  66213
10     913-213-5018
11     jeff@kansasjusticeinstitute.org
12  
13  
14  
15  
16  
17  
18  
19  
20  
21  
22  
23  
24  
25  
```

**Page 3**

```
 1  ON BEHALF OF THE DEFENDANT:
 2  
 3     Mr. Aaron O. Martin
 4     Clarke Mize & Linville
 5     129 S. 8th Street
 6     Salina, KS  67401
 7     785-823-6325
 8     aomartin@cml-law.com
 9  
10     Ms. Amanda C. Jokerst  (via Zoom)
11     Fairfield and Woods
12     1801 California Street, Suite 2600
13     Denver, CO  80202
14     303-830-2400
15     ajokerst@fwlaw.com
16  
17  
18  ALSO PRESENT:
19  
20     Mr. Tim Faulhaber, Zoom technician
21  
22  
23  
24  
25  
```

**Page 4**

```
 1              INDEX
 2  
 3  
 4  Certificate------------------------------ 133
 5  
 6  
 7             WITNESS
 8  ON BEHALF OF THE PLAINTIFFS:          PAGE
 9  DUSTIN HERRS
10  Direct-Examination by Mr. Shaw          7
11  Cross-Examination by Ms. Jokerst      126
12  
13  
14            EXHIBITS
15  30(b)(6) DEPOSITION EXHIBIT NO:       MARKED
16  No 1  Sign code                          7
17  No 2  Downtown Design Guidelines         7
18  No 3  E-mail, CITY219                    7
19  No 4  E-mail, CITY261-263                7
20  No 5  E-mail, CITY220                    7
21  No 6  E-mail, CITY221-222                7
22  No 7  Cozy Inn Sign Analysis             7
23  No 8  Sign Permit Application            7
24  No 9  Certificate of Compatibility
25         Application                       7
```

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street            6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604                  Suite 101                    Suite 305
785-273-3063              Overland Park, KS 66212        Wichita, KS 67202
www.appinobiggs.com           913-383-1131                  316-201-1612

Page 17

1  that nature, oriented towards interstate traffic
2  and commerce. And the characteristics of those
3  properties are you typically have taller signs,
4  like 50 foot signs, pole signs, maybe a little bit
5  larger signs. You're going to have larger parking
6  lots for off-street parking.
7       If you contrast that with the C-4 district
8  which is our downtown district, it's going to have
9  different characteristics, different requirements
10 for those characteristics. The downtown area is
11 going to be more pedestrian. It's going to have
12 wider sidewalks. The buildings are going to be
13 shoulder to shoulder where they have common walls
14 in between them that they share. The buildings
15 are going to take up the entire property. The
16 signage, you're not going to typically see pole
17 signs. You're going to see more pedestrian scale
18 pole -- or pedestrian scale signs where you have
19 projection signs and wall signs that are maybe a
20 little bit smaller because you have more of a
21 pedestrian environment.
22      Residential zoning districts, you may have
23 some institutional type uses. Most residential
24 neighborhoods are houses where people live and
25 dwell and have their families, but there are

Page 18

1  schools or churches that are not uncommon to have
2  those types of uses in those residential
3  districts. And signage for those properties is
4  going to be a smaller scale. You're going to have
5  shorter ground signs, monument signs that are 32
6  square feet or less, and the character of those
7  properties is going to be more in line with the
8  residential character that surrounds them versus
9  again like the C-7 where you have a lot of
10 commercial activity, a lot of automobile movement
11 or the downtown where you have a lot of pedestrian
12 activity in a dense urban fabric.
13      And in the downtown district, you'll also
14 have the requirements for DRB which is downtown
15 review board review, and there are additional
16 design requirements and standards that impact the
17 character and the visual environment of the
18 downtown area.
19      BY MR. SHAW:
20      Q. All right. Is there a way for the city
21 **to measure or quantify what is compatible with the**
22 **character and visual environment of the community?**
23      MS. JOKERST: Object to scope.
24      A. When you say quantify, what do you mean
25 in the sense? I'm not understanding the question.

Page 19

1  BY MR. SHAW:
2       Q. All right. **Is there a way to objectively**
3  **determine what is and is not compatible with the**
4  **character and visual environment of the community?**
5       A. Well, I think from an objective
6  standpoint in our role in administering the sign
7  code, it becomes an equation of does the proposed
8  signage meet the requirements of that zoning
9  district. Because the zoning district
10 requirements are designed to have the specific
11 character that's intended for that zoning
12 district.
13      Q. All right. I'll move on. So for
14 **subsection 2 where it says balance public and**
15 **private objectives by allowing adequate avenues**
16 **for both commercial and non-commercial messages,**
17 **did I read that correctly?**
18      A. I believe so. I was getting a drink so I
19 wasn't reading with you, but I think you did.
20      Q. All right. What are the public
21 **objectives that are referenced in this subsection?**
22      A. So I'm going to start with -- I will
23 answer that question, but I want to start with the
24 kind of the end of the sentence or end of the
25 statement there where it says allowing adequate

Page 20

1  avenues for both commercial and non-commercial
2  messages. So the City of Salina has what we would
3  call a content neutral sign code where we have a
4  substitution clause where if you have a commercial
5  sign or a non-commercial sign, commercial message
6  or non-commercial message, it doesn't matter.
7  Like you can literally just swap them out because
8  we don't -- we don't really concern ourselves with
9  the content of those signs.
10      Now, the objectives and the balance, when
11 we're talking about balance the public and the
12 private objectives, some of the public objectives
13 are making sure that we don't have signs that
14 create a lot of clutter that might be distracting
15 or a lot of clutter where it's difficult to
16 discern messages of the signage because there's so
17 much of it or clutter in the way that it blocks
18 or impairs visibility for motorists or pedestrians
19 along the street front. We also want to make sure
20 that we don't have distractive signs, signs that
21 are flashing or blinking or maybe are so large
22 that they draw our attention longer than they
23 should or they're illegible, you can't read them
24 and so it draws our attention longer than it
25 should and, therefore, creating potential traffic



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street    6420 W. 95th Street    800 E. 1st Street
Topeka, KS 66604       Suite 101              Suite 305
785-273-3063           Overland Park, KS 66212  Wichita, KS 67202
www.appinobiggs.com    913-383-1131           316-201-1612

Page 25

1  some examples.
2      Q.  Okay.
3      A.  Not all inclusive, but those are some of
4  the ideas.
5      Q.  Can a painted wall sign be unsecured?
6          MS. JOKERST:  Object to scope.
7      A.  Probably not.
8  BY MR. SHAW:
9      Q.  Does the city have any records of the
10 number of accidents caused by unsecured signs?
11         MS. JOKERST:  Object to scope.
12     A.  I don't know.
13 BY MR. SHAW:
14     Q.  Can a painted wall sign be less secure
15 than a painted mural?
16         MS. JOKERST:  I'll object to scope.
17     A.  No.
18 BY MR. SHAW:
19     Q.  Okay.  How does the city define the term
20 clutter as used in this subsection?
21         MS. JOKERST:  Object to scope.
22 BY MR. SHAW:
23     Q.  Let me rephrase it then.  What is a
24 cluttered sign?
25         MS. JOKERST:  I'll object to form of the

Page 26

1  question on that one.
2      A.  So the statement of this particular
3  provision is unsecured clutter distracting and/or
4  illegal -- or illegible signage.  And so clutter
5  typically is not a single sign.  Clutter is having
6  multiple signs and having many of them to the
7  point where it becomes distracting or blocks
8  vision.
9  BY MR. SHAW:
10     Q.  Is the city aware of any facts that
11 cluttered signs are a danger to motorist s,
12 pedestrians or property?
13     A.  I'm aware that traffic safety is a
14 concern when it comes to regulating signage and
15 that clutter can play into that because signs are
16 specifically by their nature and what they are
17 designed to pull your eye or attract your eye.
18 They wouldn't function if they didn't.  And by
19 having -- the more signs you have, the more your
20 eye is pulled away from either driving or walking
21 and potentially creating a safety hazard.
22     Q.  Is the city aware of any traffic
23 accidents that have been caused in the City of
24 Salina by cluttered signage?
25         MS. JOKERST:  Object to scope.

Page 27

1      A.  I don't know.
2  BY MR. SHAW:
3      Q.  How does the city determine the number of
4  signs that constitute clutter?
5      A.  So each zoning district has a requirement
6  on number of signs, how big the signs can be and
7  where they can be located.  And those requirements
8  are designed to limit clutter so we don't have
9  accidents.
10     Q.  Is the city aware of any published
11 studies on traffic safety that support the numbers
12 that are in the code of what constitutes clutter?
13         MS. JOKERST:  Object to scope.
14     A.  I don't know.  Sorry.  I was prepared to
15 answer the questions that were in the topics.
16 BY MR. SHAW:
17     Q.  Okay.  I'm just trying to understand what
18 the city's purpose as laid out in the code is.
19         Does the -- how does the city determine what
20 constitutes a distracting sign?
21     A.  So what we do is we apply the code from
22 each zoning district.  So each zoning district has
23 a number of signs that are allowed, the size of
24 signs that are allowed, the location of any
25 freestanding signs, what limitation there might be

Page 28

1  on location as well as height.  And those district
2  regulations are designed to reduce any kind of
3  distraction that there might be.  There's also
4  prohibitions on flashing signs or blinking signs
5  or strobing, things of that nature, that might be
6  distracting.  So the code itself is designed to
7  reduce distraction as much as possible.
8      Q.  Does the city have -- is the city aware
9  of any facts showing that distracting signs are a
10 danger to motorist, pedestrians or property?
11         MS. JOKERST:  Object to scope.
12     A.  I don't know.
13 BY MR. SHAW:
14     Q.  Is the city aware of any accidents that
15 have been caused by distracting signs in the City
16 of Salina?
17         MS. JOKERST:  Object to scope.
18     A.  I don't know.
19 BY MR. SHAW:
20     Q.  How does the city determine what is an
21 illegible sign?
22     A.  So if a sign is faded where it requires
23 additional staring at it, looking at it to discern
24 the sign or if it's like ripped or tattered or if
25 it's -- if it's written in a way where -- it's

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

Page 41

1 establishes a new precedent, it could establish a
2 new precedent that causes injuries in other
3 locations just by virtue of changing laws if it
4 set a precedent.
5     BY MR. SHAW:
6     Q.  I'm not sure I'm following you.  How does
7 it setting a precedent cause property damage
8 elsewhere?
9     A.  Sure.  So we -- we regulate sign codes in
10 the aggregate.  So we don't just regulate Cozy
11 Inn.  Like that's not the only -- our only
12 concern.  And if we were to say that -- change
13 the regulations to where additional signage,
14 additional clutter, larger signage is allowed,
15 then perhaps that could create a situation where
16 there's other distractions, other clutter, other
17 accidents in other locations by virtue of treating
18 Cozy different and setting a different precedent.
19     Q.  Can murals that do not meet the
20 definition of sign also cause distraction?
21        MS. JOKERST:  Object to scope.
22     A.  I don't know.  The reason I don't know is
23 because if they don't meet the definition of a
24 sign, they're not announcing or proclaiming or
25 making any kind of statements or declarations.

Page 42

1 They're not directing your attention to anything
2 or pointing towards other things.  They're not
3 advertising businesses, products, encouraging
4 commerce, so they don't have the same function
5 and, therefore, they don't -- they don't behave
6 the same way.
7     BY MR. SHAW:
8     Q.  I understand that they -- the city
9 believes they are different from a painted wall
10 sign.  I guess what I'm asking, though, is why is
11 a painted wall sign considered more distracting
12 than a mural by the city?
13     A.  Because by virtue of their nature, they
14 have writings, pictorial references, emblems and
15 symbols that are designed to announce, direct
16 attention to and advertise.  And so their nature
17 is different.
18     Q.  Why is that nature more distracting?
19     A.  I mean signs are designed to catch your
20 attention, they're designed to catch your eye.
21 They don't function if they don't.
22     Q.  Are murals designed to attract attention?
23        MS. JOKERST:  Object to form and to
24 scope.
25     A.  Are they designed to do what, direct --

Page 43

1     BY MR. SHAW:
2     Q.  Attract attention?
3     A.  Attract attention?  I can't tell you the
4 intention of each individual artist and what they
5 intend.
6     Q.  Can the city determine the intention of
7 any business that wants to put up a sign?
8        MS. JOKERST:  Object to scope.
9     A.  We can determine that a sign is a sign by
10 its character and elements.
11     BY MR. SHAW:
12     Q.  What do you mean by its character and
13 elements?
14     A.  Does it have writings or pictorial
15 images, representations, emblems, symbols that
16 announce, direct attention to or advertise.
17     Q.  So by reviewing the potential sign for
18 those elements being contained within it, that is
19 how the city can determine if it is a sign?
20     A.  Yes.
21        MS. JOKERST:  Object to form.  Sorry.
22 I'm trying to follow your question and I'm not
23 trying to interrupt.
24     BY MR. SHAW:
25     Q.  All right.  I'll try to rephrase this.

Page 44

1 Does the city determine that a sign or a potential
2 sign is, in fact, a sign by reviewing its content
3 for elements that announce, direct attention to or
4 advertise?
5        MS. JOKERST:  Object to form.
6     A.  We determine whether or not a display is
7 a sign by looking at the writings, the pictorial
8 representations, the emblem, symbols and whether
9 or not those work together to announce anything or
10 make any proclamations, if they are identifying
11 anything, if they're pointing towards anything or
12 directing to anything or if they're advertising
13 any products or services or highlight any brands
14 or encouraging commerce of some kind.
15     BY MR. SHAW:
16     Q.  Okay.  So in subsection 5 here, apart
17 from the potential for distraction or for setting
18 a city-wide precedent, is there any other way that
19 a painted wall sign can cause property damage?
20     A.  Well, I think it could impact the
21 aesthetic appearance.  So if you had -- for
22 instance, if you're in a residential district and
23 you had somebody that wanted to put up a giant
24 billboard that's a painted sign in between House A
25 and House B, it could impact the aesthetic and the

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

Page 45

1  character of that neighborhood.  It could also
2  impact property values.  So there are examples of
3  painted signs that could have negative impacts.
4      Q.  Okay.  But so section 5 here, subsection
5  5 here, does the property damage that is discussed
6  include aesthetic harms?
7      A.  Okay.  Okay.  I understand your question
8  better now.  You could also have multiple signs, I
9  guess, that could create litter and clutter if you
10 had a lot of painted signs.  So I think -- I
11 think it's -- I don't know that whether it's a
12 painted sign or a non-painted sign it makes much
13 of a difference according to our sign code.  It's
14 about the time, place and manner, where the signs,
15 how many signs are there, how large are the signs,
16 how tall are the signs.
17     Q.  Okay.  But subsection 5 here, is that
18 dealing with the aesthetics of signs?
19     A.  No.  This is property damage, personal
20 injury.
21     Q.  Okay.  I guess at least I'll explain what
22 I'm thinking when I read this.
23     A.  Okay.
24     Q.  When I think, okay, an improperly
25 constructed sign that could cause property damage

Page 46

1  or personal injury or litter, I'm thinking like a
2  pole sign falls down on someone or something like
3  that.  Is -- and maybe I'm just reading this
4  wrong.
5      A.  No, no, that would be correct.
6      Q.  Okay.  So I guess what I'm getting at is
7  can a painted wall sign cause that kind of
8  property damage?
9      A.  Probably not.
10     Q.  Okay.  And could it cause that kind of
11 personal injury?
12     A.  I doubt it.
13     Q.  Okay.  And could it cause litter?
14     A.  If it's not well-maintained and starts
15 flacking off.
16     Q.  It's like paint chips you mean?
17     A.  Um-hum.
18     Q.  Would that be true just of any paint?  If
19 you just had a white wall, if it's not maintained
20 well, it could start flaking?
21     A.  Sure.
22     Q.  Okay.
23         MS. JOKERST:  Hey, Jeff, can we take a
24 brief break for restroom?
25         MR. SHAW:  Yeah.  Five minutes?

Page 47

1         MS. JOKERST:  Yep, that works.
2         MR. SHAW:  So back at 10:30?
3         MS. JOKERST:  Yes.  10:31?
4         MR. SHAW:  Sure.
5         (THEREUPON, a recess was taken.)
6  BY MR. SHAW:
7      Q.  Is the city aware of any facts showing
8  that the painting on the side of The Cozy Inn was
9  improperly constructed?
10     A.  No.
11     Q.  Is the city aware of any facts that the
12 -- that would show the painting on the side of The
13 Cozy Inn is poorly maintained?
14     A.  No.
15     Q.  Okay.  So in subsection 6, you see where
16 it says protect property values, the local economy
17 and quality of life by preserving and enhancing
18 the appearance of the streetscape?
19     A.  Yes.
20     Q.  Is the city aware of any facts that the
21 sign code has enhanced property values?
22     A.  I think it protects property values.  And
23 an example of that would be one I've already kind
24 of presented where if you had a residential
25 neighborhood and there was a empty lot between two

Page 48

1  houses and somebody came in and put a giant
2  billboard might impact the property values or the
3  desire for people to want to live in that
4  neighborhood.
5      In the downtown district where we have
6  specific design guidelines for signs, there is a
7  higher standard of development.  And there has
8  been in the last ten years transformative
9  investment that's taken place in the millions if
10 not hundreds of millions, kind of transformative
11 investment.  And part of those improvements,
12 certainly anything that's on the exterior, front
13 facade or signage gets reviewed by the DRB to make
14 sure that the design fits within the design
15 guidelines of the DRB and is of a certain
16 character and quality that ensures that the
17 property values in the downtown are kept up and
18 that the economy in the downtown is strong because
19 it becomes a desirable area with a perceived
20 quality of life that people enjoy and it has an
21 attractive streetscape appearance because of that.
22     Q.  Has the city done any sort of studies of
23 property values within the city and how the sign
24 code has impacted those property values?
25         MS. JOKERST:  Object to scope.

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street      6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604         Suite 101                 Suite 305
785-273-3063             Overland Park, KS 66212   Wichita, KS 67202
www.appinobiggs.com      913-383-1131              316-201-1612

Page 49

1  A. I don't know.
2  BY MR. SHAW:
3  Q. Okay. And is the city aware of any facts
4  showing that the sign code has protected the local
5  economy?
6  A. Have there been any studies that show
7  that the sign code protects the local economy? Is
8  that what you said? Did I understand that?
9  Q. I think what I said was is the city aware
10 of any facts that show that the sign code has
11 protect the local economy. So a study would be an
12 example of that.
13 A. Okay.
14    MS. JOKERST: Well, I'll object to form
15 on that. If we're talking about facts, that's
16 within scope. If we're talking about studies,
17 then I'll object out of scope. So can we get a
18 question on?
19 BY MR. SHAW:
20 Q. My question was is the city aware of
21 facts showing that the sign code protects the
22 local economy?
23 A. Okay. If I'm understanding the question
24 correctly, I think this is an example, that the
25 downtown within the last, you know, five, ten

Page 50

1  years has had substantial growth and that the
2  property values in the downtown area have gone up
3  substantially because of it.
4  Q. Is the city aware of any facts that that
5  show that that growth in the downtown was caused
6  by the sign code?
7     MS. JOKERST: Object to scope.
8  A. It's probably a contributing factor. I
9  don't know if it's directly a cause and --
10 causation or cause and effect.
11 BY MR. SHAW:
12 Q. Subsection 6 talks about protecting the
13 quality of life. How does the city measure
14 quality of life?
15    MS. JOKERST: Object to scope.
16 A. Well, I think if you look at the
17 overarching theme of the comprehensive plan, the
18 overarching theme is to improve the quality of
19 life. That is the No. 1 public goal I would say
20 that encompasses everything that's in there,
21 because we want to improve the quality of our
22 community for its citizens and for its visitors.
23 And so I think you drill down from there where the
24 comprehensive plan sets out the ideals of having
25 an aesthetic community, of having a safe

Page 51

1  community. And so then you have policies such as
2  these that are in this purpose statement that
3  promote the public health, safety and welfare, and
4  that includes having an attractive and enhanced
5  visual streetscape which is what we're talking
6  about in No. 6 here.
7  BY MR. SHAW:
8  Q. So you see where it says both preserving
9  and enhancing the appearance of the streetscape?
10 A. I do.
11 Q. What is the difference between preserving
12 the streetscape and enhancing the streetscape?
13    MS. JOKERST: Object to scope.
14 A. So preserving the appearance of the
15 streetscape is not endangering the current visual
16 aesthetic by cluttering it up with excessive
17 signage or signage that maybe is too large or out
18 of character for the property. And enhancing the
19 appearance of the streetscape is making sure that
20 all new proposed signage meets the requirements of
21 the zoning district in which the sign is being
22 proposed.
23 BY MR. SHAW:
24 Q. Apart from the city's belief that the
25 painting on the side of the Cozy isn't in

Page 52

1  compliance with the code, is the city aware of any
2  facts showing that the painting at The Cozy has
3  harmed property values?
4  A. No. Neither have we done that research.
5  Q. Apart from the city's belief that the
6  painting at The Cozy is not in compliance with the
7  code, is the city aware of any facts showing that
8  the painting at The Cozy has harmed the local
9  economy?
10    MS. JOKERST: I'll object to scope there.
11 A. No, and we have not researched that,
12 either.
13 BY MR. SHAW:
14 Q. Okay. And same question. Is the city
15 aware of any facts apart from the fact that the
16 painting at The Cozy the city doesn't believe is
17 in compliance with the code that that painting has
18 harmed the quality of life in the city?
19    MS. JOKERST: I'll object to scope.
20 A. I would say that it potentially does harm
21 the quality of life by virtue of the fact that
22 it's not adhering to the requirements of the
23 downtown area. So the C-4 district and the BID --
24 BY MR. SHAW:
25 Q. Okay. But apart from the city's position

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

Page 61

1  of the interests of Section 42-500 and one of the
2  purpose is to protect the aesthetic appearance of
3  the city, both natural and built-in environment
4  for it's citizens and visitors. One of the ways
5  we do that is each zoning district has its own
6  sign code requirements that limit the number of
7  signs, the size of signs, the location of signs,
8  how tall the signs can be to establish a certain
9  visual character within that zoning district and
10 protect the aesthetic appearance of that district
11 through those regulations.
12     Q.  But what facts show that regulating signs
13 like The Cozy sign enhances aesthetics?
14     A.  It's one of the desires of the community
15 set forth in the comprehensive plan.
16     Q.  So are there any facts that the city
17 relies on in stating that regulating these signs
18 enhances aesthetics apart from the comprehensive
19 plan?
20     A.  Are you asking if there are other reasons
21 other than the comprehensive plan that having
22 aesthetic standards is a good thing or --
23     Q.  I'm asking what facts the city contends
24 show that regulating signs like The Cozy sign
25 enhances aesthetics?

Page 62

1     A.  So we regulate signs in the aggregate
2  across the entire community. And if we didn't,
3  there would be a potential that you could have a
4  lot more signs producing sign clutter which could
5  enhance the aesthetic of the community. You can
6  have signs that are very large and possibly
7  distracting which could impact the aesthetics of
8  the community.
9     Q.  Sorry. Let me stop you. I'm not asking
10 about the sign code as a whole right now --
11    A.  Sure.
12    Q.  -- and how that may or may not enhances
13 aesthetics. What I'm getting at is this.
14 Interrogatory 4 here --
15    A.  Yes.
16    Q.  -- specifically claims that the interests
17 served by regulating the specific types of signs
18 like The Cozy sign include aesthetics. And so I'm
19 asking what facts support that contention that
20 regulating signs like The Cozy sign enhances
21 aesthetics?
22    A.  Well, it says the sign code regulates all
23 signs, and so that's what I was answering to. I
24 guess I'm still not -- I'm sorry.
25    Q.  Right now, I'm focusing here on the last

Page 63

1  sentence --
2     A.  Okay.
3     Q.  -- that says the government interests
4  served by regulating signs like The Cozy sign --
5     A.  Yeah.
6     Q.  -- include aesthetics, pedestrian and
7  traffic safety and property values?
8     A.  Right.
9     Q.  So I'm asking not about the code as a
10 whole but about that very specific claim by the
11 city that its interests are served in regulating
12 signs like The Cozy sign because it enhances
13 aesthetics?
14    A.  Okay.
15    Q.  Are there any facts that you're aware of
16 that support that contention?
17        MS. JOKERST:  Object to form and scope.
18 Mr. Shaw, if you'd like, I think that you
19 misstated what's in there.
20        BY MR. SHAW:
21    Q.  All right.  Does this read, the last
22 sentence there --
23    A.  Okay.
24    Q.  -- the government interests served by
25 regulating signs like The Cozy sign include

Page 64

1  aesthetics?
2     A.  Yes.
3     Q.  What facts is the city contending show
4  that regulating signs like The Cozy sign enhances
5  aesthetics?
6     A.  Well, if you don't regulate the number of
7  signs and you don't regulate the size of signs and
8  you don't regulate where they're located, it could
9  change the aesthetic of any zoning category, any
10 zoning district.
11    Q.  The code doesn't prevent changing
12 aesthetics.  Is that correct?
13        MS. JOKERST:  Object to scope.
14    A.  I don't know what you mean by changing
15 aesthetic.
16        BY MR. SHAW:
17    Q.  I guess my question was about facts
18 showing that regulating signs like The Cozy sign
19 enhances aesthetics.
20    A.  Okay.
21    Q.  But you answered about changing
22 aesthetics, and that's not the same thing as
23 enhances aesthetics.  So my question is what facts
24 does the government contend supports its
25 allegation here that regulating signs like The

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street    6420 W. 95th Street    800 E. 1st Street
Topeka, KS 66604       Suite 101              Suite 305
785-273-3063           Overland Park, KS 66212  Wichita, KS 67202
www.appinobiggs.com    913-383-1131           316-201-1612

Page 69

1 designed to bring out the aesthetic that is
2 considered to be an enhanced aesthetic.
3   BY MR. SHAW:
4   Q. But if they disagree with the assessment
5 in that zoning district of what is the desired
6 aesthetic --
7   A. Sure.
8   Q. -- is there any factual basis to say they
9 are wrong?
10   MS. JOKERST: Object to scope.
11   A. I mean they could change the aesthetic --
12 or what is considered to be the appropriate
13 aesthetic and character for the zoning district by
14 -- through a text amendment with the city
15 commission if they disagreed and could change what
16 the aesthetic standard is.
17   BY MR. SHAW:
18   Q. I mean I understand if what you're saying
19 is they could go to the city commission and ask
20 for a change?
21   A. Right. And it's always possible to just
22 change the requirements or the desired aesthetic.
23 But the code is designed to bring out the acquired
24 aesthetic.
25   Q. All right. I guess what I'm getting at

Page 70

1 is there any objective right answer of what the
2 correct aesthetic for any given district should
3 be?
4   MS. JOKERST: Object to scope.
5   A. Like are you asking if the governing body
6 that adopted the regulations that are bringing out
7 the aesthetic that they desired if they were right
8 objectively?
9   BY MR. SHAW:
10   Q. I guess what I'm saying is, is there any
11 reason to believe that a member of the public
12 would be factually incorrect to disagree with the
13 assessment of the governing body in what the
14 governing body determines to be the appropriate
15 aesthetic for a district?
16   MS. JOKERST: Object to form and scope.
17   A. They could -- I mean if they disagreed
18 with the city commission's idea of what an
19 enhanced aesthetic was and wanted to change the
20 regulations, they can make their case certainly,
21 and it could be changed if they were found to be
22 more objectively correct than the city commission.
23   BY MR. SHAW:
24   Q. So if the city commission changed its
25 mind on what is aesthetically pleasing in a given

Page 71

1 district, is there any reason to believe that that
2 change would be factually incorrect?
3   MS. JOKERST: Object to form and scope.
4   A. That's very similar to earlier when you
5 asked me if I think what is -- well, I don't
6 remember the exact question. But I think it's --
7 yeah, that's something I couldn't answer.
8   BY MR. SHAW:
9   Q. Okay. What facts does the government
10 contend show that regulating signs like The Cozy
11 sign enhances pedestrian safety?
12   A. So if you have -- the idea is that the
13 sign regulations are designed to, again, for each
14 district limit the size of signs, the number of
15 signs, the height of signs, the location of signs
16 in order to reduce clutter. We don't want a lot
17 of sign clutter because that can become
18 distracting. It could impair the visual sight
19 lines for motor vehicles as well as pedestrians.
20 Sign sizes, we want to limit them so they don't
21 become a distraction. We don't want signs that
22 hold the eye longer than they should. We want to
23 make sure that signs are effective. Again, that
24 comes down to clutter where if you have too many
25 signs, it becomes --

Page 72

1   Q. I don't want to interrupt you, but is the
2 city aware of any factual data showing its
3 regulating the specific type of signs that The
4 Cozy Inn has enhances pedestrian safety?
5   MS. JOKERST: Object to scope.
6   A. You're asking if The Cozy Inn enhances
7 traffic safety? Is that what you said?
8   BY MR. SHAW:
9   Q. No. I'm asking is the city aware of any
10 like factual data showing that regulating this
11 type of sign enhances pedestrian safety?
12   MS. JOKERST: Object to scope.
13   A. I don't know.
14   BY MR. SHAW:
15   Q. Is the city aware of any -- let me
16 rephrase. What facts does the city contend
17 support the allegation that regulating signs like
18 The Cozy sign enhances traffic safety?
19   A. So our regulations, again, are designed
20 to limit the number of signs, the location of
21 signs, the size of signs so that businesses have
22 opportunities or property owners, if they are not
23 even businesses, have opportunities to have signs
24 that give them opportunities to display and post
25 those while at the same time limiting the number

Page 73

1  of signs so that you don't have sign clutter that
2  can become distracting. It doesn't make it hard
3  to read the signs because the more signs you have,
4  the more information there is, sometimes the
5  harder it is to really soak in information that
6  you're trying to and it can become distracting
7  when you're focusing on signs rather than driving
8  or walking. And by limiting the number of signs,
9  you reduce clutter. By limiting the size of
10 signs, you limit signs that might be a
11 distraction. By limiting or prohibiting, rather,
12 like blinking, flashing, strobing kind of signs --
13     Q.  Hold on. Let me stop you. Is the city
14 aware of any facts showing that the sign code, in
15 fact, enhances traffic safety, has succeeded in
16 its objective?
17        MS. JOKERST: Object to scope.
18     A.  I don't know how you would even do a
19 study like that if you have these design
20 standards, because you wouldn't have a before and
21 after picture to evaluate.
22        BY MR. SHAW:
23     Q.  Is the city aware of any other
24 municipality that has conducted any sort of before
25 and after of its sign code to show if it has, in

Page 74

1  fact, enhanced traffic safety?
2        MS. JOKERST: Object to scope.
3     A.  Yeah, I don't -- I don't know.
4        BY MR. SHAW:
5     Q.  Okay. And in a similar vein, is the
6  government aware of any facts that would show that
7  the sign code has, in fact, succeeded in enhancing
8  pedestrian safety?
9        MS. JOKERST: Object to scope.
10    A.  I think just like with the traffic safety
11 question, you'd have to have a before and after.
12 So you'd have to have -- and since we have the
13 sign code that we've consistently administered,
14 you don't really have a before and after picture.
15 You just have what we have.
16       BY MR. SHAW:
17    Q.  Okay. And does the government or is the
18 government aware of any facts showing that the
19 sign code has succeeded in promoting property
20 values?
21       MS. JOKERST: Object to scope.
22    A.  Since the sign code regulations have been
23 administered consistently since their inception
24 which has been a very long time, I don't -- again,
25 you won't -- there's no way to have a before and

Page 75

1  after picture, like this is what the property
2  values used to be. Here's what they are. I can
3  tell you in the downtown area where we have had a
4  lot of redevelopment that property values have
5  gone up. We can certainly -- we could do a study
6  as to what property values were five, ten years
7  ago and what they are now. That exercise has not
8  been completed but we could do that.
9        BY MR. SHAW:
10    Q.  Okay.
11    A.  And I'm sure it would show property
12 values have gone up.
13    Q.  But the sign code in the business -- or
14 in the downtown area, that was in effect before
15 this increase in property value, correct?
16       MS. JOKERST: Object to scope.
17    A.  So the sign code in the downtown business
18 -- or downtown Business Improvement District,
19 you're asking if they predate the downtown or --
20       BY MR. SHAW:
21    Q.  You mentioned how in the past I think you
22 said ten years or so the downtown has seen a lot
23 of development, correct?
24    A.  Yes. Absolutely, yes.
25    Q.  And so what I'm asking is the sign code,

Page 76

1  though, long predates that boom in development.
2  Is that correct?
3        MS. JOKERST: Object to scope.
4     A.  It does. And it predate -- the BID is
5  not as old as the sign code, but it also predates
6  the recent reinvestment, but I do think it
7  contributes to it.
8        BY MR. SHAW:
9     Q.  Okay. Section 42-500, when was that
10 enacted?
11       MS. JOKERST: Object to scope.
12    A.  2017.
13       BY MR. SHAW:
14    Q.  Was there a different purpose section in
15 effect before 2017?
16       MS. JOKERST: Object to scope.
17    A.  I don't know. I didn't research that.
18       BY MR. SHAW:
19    Q.  Okay. Is the city aware of any facts
20 showing that painted wall signs are more harmful
21 to aesthetics than painted murals?
22       MS. JOKERST: Object to scope.
23    A.  No.
24       BY MR. SHAW:
25    Q.  Is the city aware of any facts that would

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street      6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604         Suite 101                  Suite 305
785-273-3063             Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com      913-383-1131               316-201-1612

Page 77

1  show that painted wall signs are more detrimental
2  to pedestrian safety than painted murals?
3       MS. JOKERST: Object to scope.
4    A. Any specific studies or like...
5       BY MR. SHAW:
6    Q. Any facts that would show that a painted
7  wall sign is more detrimental to traffic -- to
8  pedestrian safety than painted murals?
9       MS. JOKERST: Object to scope.
10   A. No.
11      BY MR. SHAW:
12   Q. Is the government aware of any facts that
13 would show that painted wall signs are more
14 detrimental to traffic safety than painted murals?
15      MS. JOKERST: Object to scope.
16   A. I think the fact that signs by their
17 definition attract your eye in a way to announce,
18 direct attention to or advertise does change the
19 character of a sign in relationship to or
20 contrasted to a mural, a painted mural and that
21 that could have impacts on traffic safety.
22      BY MR. SHAW:
23   Q. So you say it could have impacts on
24 traffic safety. Is the city aware of any facts
25 showing that it, in fact, does have impacts on

Page 78

1  traffic safety?
2       MS. JOKERST: Object to scope.
3    A. I didn't research that in preparation.
4       BY MR. SHAW:
5    Q. Okay. And same question there for is the
6  government aware of any facts showing that painted
7  wall signs have a more detrimental affect on
8  property values than paint murals?
9       MS. JOKERST: Object to scope.
10   A. Yeah, I wasn't aware to research that
11 particular topic, so I haven't prepared for that.
12      BY MR. SHAW:
13   Q. All right. So we're mainly talking about
14 the sign code here, Section 42-500 and subsequent
15 sections here. I want to pivot now to the
16 Business Improvement District regulations, so
17 that's Section 2 -- I think like 201 of the city
18 code?
19   A. I don't have that one.
20   Q. You don't have it?
21   A. No, I don't.
22   Q. Oh, okay. So --
23   A. Which -- I guess where are we at because
24 like I'm trying to figure out --
25   Q. I'm talking about the BID code section

Page 79

1  now.
2    A. Yeah.
3    Q. So that would be in Exhibit 1 --
4    A. We're still on 40, on Exhibit 40 or no.
5    Q. Well, I'm pivoting now.
6    A. Okay. I'll just listen. I'm just not
7  following you yet.
8    Q. So the BID code process, you're familiar
9  with that, right?
10   A. The process?
11   Q. Yes.
12   A. Yes.
13   Q. What is the purpose of the Business
14 Improvement District's review process?
15      MS. JOKERST: Object to scope.
16   A. Do you have like an exhibit for that that
17 I can --
18      BY MR. SHAW:
19   Q. So if you go to Exhibit 1 at the very
20 front --
21   A. Put this -- put this one away then?
22   Q. Yeah. That way it's just in order.
23   A. Okay. You said it was Exhibit 1, Jeff?
24   Q. Yeah, so the very front. So the Business
25 Improvement District's review process, is that

Page 80

1  created by city code Section 2-200 through 2-211?
2       MS. JOKERST: Object to scope.
3    A. Which topic are we on on the list?
4       BY MR. SHAW:
5    Q. This would be falling under -- let me
6  bring up my topics list. It's Topic 1, second
7  bullet point, the facts supporting the
8  government's contention that the application of
9  the mural side code regime promotes the following
10 claimed government interests. Do you see that?
11   A. Yeah.
12   Q. And do you see in the definition section
13 up above where it says mural sign code regime
14 means Salina's written code, Salina's unwritten
15 policies and practices, Salina's sign permit
16 requirement, Salina's downtown Salina's Business
17 Improvement District review process, the
18 Certificate of Compatibility requirement and its
19 concomitant enforcement penalties?
20   A. Okay.
21   Q. So --
22      MR. SHAW: Yes.
23      MS. JOKERST: Jeff, can we take a break
24 and we'll go off the record? Dustin can leave,
25 but we can have a conference here.

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street   6420 W. 95th Street   800 E. 1st Street
Topeka, KS 66604      Suite 101             Suite 305
785-273-3063          Overland Park, KS 66212   Wichita, KS 67202
www.appinobiggs.com   913-383-1131          316-201-1612