**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **Cozy Inn, Incorporated,** <br> **d/b/a The Cozy Inn; Stephen Howard,** <br><br> Plaintiffs, <br><br> v. <br><br> **City of Salina, Kansas,** <br><br> Defendant. | ) <br> ) <br> ) <br> ) CIVIL ACTION <br> ) CASE NO.  6:24-cv-01027-TC-ADM <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION TO STRIKE OR EXCLUDE
OPINIONS OF ATTORNEY MARK WHITE**

Defendant City of Salina, Kansas ("City"), by and through its attorneys Fairfield and Woods, P.C. and Clark, Mize & Linville, Chartered, hereby submits its Response to Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White and states as follows:

**I.   Introduction**

The crux of this case is (1) whether the text of Salina Code Chapter 42 Article X ("Sign Code") is content-neutral, specifically as it relates to the definition of "sign" (codified at Salina Code § 42-764) upon which the applicability of the Sign Code relies, and (2) whether the Sign Code passes intermediate scrutiny. As Plaintiffs argue in their Motion to Strike or Exclude Opinions of Attorney Mark White [Dkt. No. 97] ("Plaintiffs' Motion"), whether the Sign Code is content-neutral is a legal matter for the Court to decide. *Austin v. Reagan*, 596 U.S. 61, 64, 76 (2022); Pls.' Mot. at 3-4. Indeed, the United States Supreme Court determined—without evidence

1

other than its text–that a substantially similar sign regulation was content-neutral in the case of *Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 66 (2022).  Like Salina Code § 42-764, which subjects a display used to "announce, direct attention to, or advertise" to regulation as a "sign," the City of Austin's regulation also triggered regulation as a "sign" based on whether the display was used to "advertis[e]" or "direct[] persons to." *Austin*, 596 U.S. at 1469. While it is technically a legal determination, the phrase "content-neutral" is also shorthand for the existence of a specific set of facts—that is, whether the regulation is justified without reference to the regulated speech. That factual justification is what Mr. White's expert opinion addresses.

The Court also decides as a matter of law whether the content-neutral Sign Code passes intermediate scrutiny. *Harmon v. Norman*, 981 F.3d 1141, 1148-49 (10th Cir. 2020). The intermediate scrutiny test requires a regulation be "narrowly tailored to serve a significant governmental interest" and "leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quotation omitted). Whether a governmental interest is substantial "is a legal question for this Court to decide . . . ." *Harmon*, 981 F.3d at 1148-49. The United States Supreme Court and Tenth Circuit precedent direct that as a matter of law the governmental interests provided by the City in regulating signs–community aesthetics, traffic safety and property values–are substantial government interests. *Members of the City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 795, 805-06 (1984); *StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243, 1251 (10th Cir. 2023).

Whether a regulation is "narrowly tailored to serve a significant governmental interest" is also a matter of law determined by the Court and is satisfied "so long as the . . . regulation promotes

a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799-800. To satisfy the intermediate standard of review, the Supreme Court and Tenth Circuit do not require the City to set forth evidence supporting a finding that the Sign Code serves its stated, substantial government interests. *See Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 508-10 (1981) (Court did not weigh evidence and deferred to the city's "sufficient basis for believing that billboards are traffic hazards and are unattractive"); *Taxpayers for Vincent,* 466 U.S. at 805-808; *StreetMediaGroup, LLC v. Stockinger*, 1:20-CV-03602-RBJ, 2021 WL 5770231, at *5 (D. Colo. Dec. 6, 2021), aff'd, 79 F.4th 1243 (10th Cir. 2023) (Without hearing evidence held "the general assembly finds and declares the act 'necessary to further . . . substantial state interests," and "[p]reventing crashes caused by distracted drivers is a substantial state interest, and the state would less effectively prevent these crashes if it took down signs after they caused motor accidents instead of establishing a prophylactic permitting scheme.").

The Court does not need any evidence to find that the Sign Code is content-neutral and that it passes the intermediate scrutiny test by, among other things, advancing the City's substantial government interests in community aesthetics, traffic and pedestrian safety, and property values. That is, *per force*, these substantial interests would be "achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799. Plaintiffs have alleged that under a commercial speech case related to oral speech (door-to-door solicitation), *Aptive Envtl., LLC v. Town of Castle Rock*, 959 F.3d 961 (10th Cir. 2020), the City is required to set forth evidence that its Sign Code advances its substantial government purposes. *Aptive* does not control here. It was decided before a more recent Tenth Circuit sign case, *StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243, 1251 (10th

Cir. 2023). *Aptive*, 959 F.3d at 966. Notably, *Stockinger* did not cite to or address *Aptive*. Further, the United States Supreme Court has found that signs "pose distinctive problems" compared to oral speech, because they "take up space and may obstruct views . . . and pose other problems . . . ." *Ladue v. Gilleo*, 512 U.S. 43, 48 (1994).

Even though it is not required to submit such evidence, the City can support such a finding with evidence. In the unlikely event that this Court determines evidence is necessary, the City wanted to reserve its right to make such a showing. Accordingly, in addition to producing record evidence showing the Sign Code serves its stated evidence, the City disclosed Mark White, an urban planning expert, who will provide opinion testimony analyzing how the Sign Code serves the City's substantial interests. If the presentation of evidence regarding the advancement of governmental interests is required, then Mr. White's expert opinion does not usurp the Court's determinations as a matter of law. Rather, Mr. White's testimony would assist the trier of fact in evaluating whether the Sign Code does advance its stated interests, utilizing urban planning and zoning industry standards and metrics.

Moreover, Mr. White's opinions are admissible and satisfy the requirements of F.R.E. 702 because they are helpful, reliable, and are not improper legal conclusions.  Mr. White's report addresses the "state of the art" national practice respecting regulation of signs and "decorative building features such as murals," and conducts a comparison of model and sample codes. Pls.' Mot. Ex. B at 12. Precedent establishes that such references aid the trier of fact. Indeed, the *Austin* court looked to information not unlike that provided by Mr. White in this case, and found that the definition at issue in *Austin* "was materially analogous to the one used in the Federal Highway

4

Beautification Act and many other state and local codes . . . ." *Austin*, 596 U.S. at 66. Further, the *Austin* Court recognized sign regulation approvingly as a "tradition" dating back more than 150 years and observed that for the past century-and-a-half, such regulations have addressed "signs . . . that promote ideas, products, or services . . . [or] promote or identify things located onsite." *Id*. at 65. Finally, Mr. White's opinions expressed in his promotional article are not germane to evaluating the reliability of his testimony. Pls.' Mot. Ex. D. There, he merely offered "pointers for local governments considering a sign code update." *Id*. at 3. Mr. White testified that these pointers are not the exclusive way that a local government can bring its sign code within constitutional limits. Ex. 1 at 193:16-21.

## II.    Argument

### A. *Mark White's Opinions are Helpful and Within the Proper Scope of Expert Testimony*

While Mr. White is an urban planner and an attorney, the City proffers Mr. White only as an urban planning and zoning expert. Ex. 1 at 44:24-25; 45:1-4 ("Q: Why is [ ] that you were more interested in the facts? A: Because I'm testifying as an urban planner and a zoning expert and not as an attorney."). Mr. White's testimony is helpful to the trier of fact to understand the technical terms, methodology, and metrics of the Sign Code, the "industry standard" as it relates to sign regulations, how the Sign Code functions in general and as applied to the Cozy Sign, and how the Sign Code serves the governmental interests that are articulated in its purpose statement. Indeed, if the Court finds that evidence must be considered to determine whether the City can satisfy intermediate scrutiny, this is exactly the type of evidence a fact finder must evaluate and weigh to determine whether the Sign Code serves the City's stated governmental interests.

Expert testimony is admissible when the expert's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).  An expert witness can "testify in the form of an opinion or inference even if that opinion or inference embraces an ultimate issue to be determined by the trier of fact." *U.S. v. Bedford*, 536 F.3d 1148, 1158 (10th Cir. 2008) (quotations omitted). An expert can "refer to the law in expressing his or her opinion." *Id*. (quotations omitted). Indeed, courts "do not exclude all testimony regarding legal issues." *Specht v. Jenson*, 853 F.2d 805, 809 (10th Cir. 1988).

The narrow line drawn in *Specht* recognized expert testimony is within the proper scope of F.R.E. 702 "if the expert does not attempt to define the legal parameters within which the jury must exercise its fact-finding function." *MCC Management of Naples, Inc. v. International Bancshares Corp.*, 468 Fed.Appx. 816, 821 (10th Cir. 2012). In *MCC Management*, the Tenth Circuit held that a tax attorney "did not overstep this line" when he "discussed the 'common methodology' that tax lawyers use interpreting phrases like the one at issue–'net of any related tax benefits, in respect of the FDIC counterclaim'–and suggested three possible readings: 'narrow,' 'intermediate,' or 'broad.'" *Id*. at 821-822. Certainly, the court recognized that this testimony was helpful where "intricate arrangements and technical tax jargon" was "illuminated" by the expert's "knowledge of industry custom, tax law, and authorities in the field." *Id*. at 822. Even though the expert opined "it was 'reasonable to conclude' that the agreement was drafted in a 'very broad manner' . . . a conclusion touching the heart of [the] dispute," the opinion was "not objectionable because it embraces an ultimate issue to be decided by the trier of fact." *Id*.

6

Here, Mr. White's opinions focus on the methodology and metrics of the Sign Code, and how the Sign Code functions in general and in this case. Urban planners are concerned with the design and development of cities and communities, by way of comprehensive plans and local land use regulations, including zoning codes and sign regulations. Mr. White's testimony explains from an urban planning perspective, how and why the Sign Code regulates the size, number, shape, and placement of signs in each zoning district, and how those regulations advance the City's substantial interests. Pls.' Mot. Ex. B. Mr. White's report cites case law because urban planners need to know about certain legal principles "when they write and administer sign codes." Ex. 1 at 44:10-23.

> i. *Opinion 1. The Sign Code establishes time, place and manner metrics that are not content-based.*

This opinion relates to the methodology and metrics of the Sign Code. Mr. White addresses the "height, size and design" regulations of the Sign Code, explains how such metrics are "state of the art, and generally accepted" in the industry for "controlling sign clutter." Pls.' Mot. Ex. B at 4. He goes on to specifically address proportionality metrics, detailing how the "total sign area is based on the location and structural characteristics of signs, and not their content." *Id.* Mr. White's opinions address how the methodology and metrics of the Sign Code advance its stated purposes using specific data from the Sign Code and facts of this case in the context of urban planning and zoning industry standards. Pls.' Mot. Ex. B at 4, 12-13 ("These codes demonstrate a range of approaches to regulating signs while accommodating the benefits of murals . . . This is because murals are integral to buildings, are not designed to direct attention to a place, and as such do not function as signs.").

> ii. *Opinion 2. The Sign Code is supported by substantial and compelling interests in the area of urban planning and code administration.*

Mr. White properly supports this opinion on his expertise in urban planning; it is not a legal conclusion. The case citation in this section does not incorporate legal analysis regarding what constitutes a substantial or compelling interests for First Amendment purposes, it provides case law finding the importance of a comprehensive plan to urban planning and development. Pls.' Mot. Ex. B at 5. As Mr. White testified, when he used the term "substantial and compelling interests" he was "not making a legal conclusion," he was "speaking about how important they are to urban planners when they draft sign codes." Ex. 1 at 103:9-25; 104:1-19.

> iii.  *Opinion 3 and 4. The Sign Code directly and materially furthers its recited purposes, and the Sign Code is reasonable in scope in that it targets issues related to wall signs, without unnecessarily expanding its reach to artistic murals.*

Again, Mr. White opines, among other things, that "restrictions on the height, spacing, location, and size of signs" reduces sign clutter and promotes traffic safety and aesthetics. Pls.' Mot. Ex. B at 7. Citing to supportive publications, he opines regarding the importance of proportionality, namely that: (1) "[l]imiting wall sign size keeps the sign form overwhelming a facade and limiting the number of signs prohibits clutter," and (2) proportionality keeps a sign in scale with a building's context. Pls.' Mot. Ex. B at 9-10. This proportionality, derived from the metrics from the Sign Code ("67 percent of the cumulative sign area on a wall") and supporting literature, "protects aesthetics and architectural integrity." *Id*. at 19. He opines that "[s]ign clutter contributes to a decline in traffic safety" (at 7) and "[c]ontrolling the number of signs, including wall signs, promotes the conspicuity or visibility of individual signs," which in turn promotes traffic safety. *Id*. at 10. He bases this opinion on his extensive planning experience and professional judgment (at 3), the literature he cites in his report, and the "experience in other communities" (at

8

13-14). This specialized knowledge leads him to conclude that "[a]s the number of signs increased . . . [t]his can create traffic safety issues, because it then takes motorist vision off the road, [and] lengthens the time it takes for them to scan information . . . ." *Id*. at 10.

      iv.      *Opinion 5. The Sign Code is not vague.*

Mr. White's opinion regarding the robustness of the Sign Code language is not a legal conclusion. Mr. White's opinion evaluates the Sign Code and its definitions within the context of the urban planning and zoning industry standard to opine that urban planners need not define every single word of a Sign Code to understand its meaning and methodology. In using his urban planning and zoning expertise, he compares the language of the Sign Code to sample codes to show that that the terms and phrases used in the Sign Code are commonplace in urban planning. Pls.' Mot. Ex. B at 16-18.

      v.      *Opinion 6. The restrictions established in the Sign Code are reasonable, generally accepted regulations of the size, shape, placement, and design of signs.*

Opinion testimony is not objectionable because it touches on the ultimate issue and reasonableness. *See MCC Management*, 468 Fed.Appx. at 822 (tax attorney opined "it was 'reasonable to conclude.'"). Here, Mr. White utilizes his urban planning expertise to assess the applicable metrics where the Cozy Sign is located, opine that the Sign Code permits a generous wall sign allowance "without overwhelming the scale of the building or site" and on that basis opines that such regulations are generally accepted and reasonable. Pls.' Mot. Ex. B at 19.

      vi.      *Opinion 7. The Sign Code has numerous procedural safeguards.*

Mr. White's opinion addresses the administrative procedures and safeguards utilized by urban planners such as permitting processes, variances, and appeals. Based on his professional

9

experience, Mr. White opines that flexible case-by-case review, as found in the Sign Code, is a common process. Pls.' Mot. Ex. B at 19. Accordingly, Mr. White's opinions are within the permissible scope of expert witness testimony under F.R.E. 702.

### B. Mr. White's Opinions are Reliable

F.R.E. 702 requires the expert's opinions to be reliable. *Roe v. FCA US LLC*, 42 F.4th 1175, 1180-81 (10th Cir. 2022). Under the reliability inquiry, courts assess whether the expert testimony is "based on sufficient data, sound methods, and the facts of the case." *Id*. at 1181. Here, Mr. White reviews and evaluates the specific text and metrics of the Sign Code, the methodology regarding how the Sign Code functions in general and as applied to the Cozy Sign, comparable sign regulations, and industry-specific publications related to sign regulations and governmental interests.

    i.    *Opinion 1. The Sign Code establishes time, place and manner metrics that are not content-based.*

Though this opinion was organized differently than the others, as Mr. White pointed out during his deposition, he addressed the opinion throughout the report. Ex. 1 at 62:20-25; 63:1-8. Mr. White opines, based on the specific data from the Sign Code, the "total sign area is based on the location and structural characteristics of signs, and not their content." Pls.' Mot. Ex. B at 4. Mr. White evaluated the metrics of the Sign Code for the C-4 district, noted that the Code "limits signs other than ground, pole or projecting signs to three (3) square feet of sign area for each lineal foot of building frontage" and applied this methodology to the Cozy Sign to conclude the Cozy Sign was too big and didn't qualify for a permit based on its physical characteristics, not its content. *Id*. He further opined that it is common industry standard to adjust metrics "by zoning districts in

a way that protects the area's character." *Id*. at 10. In acknowledging why the metric adjustments are common in the industry, Mr. White opined that "[s]uburban style signage that is designed for highly trafficked roadway corridors is inappropriate for" the downtown district. *Id*. at 7.

    ii.    *Opinion 2 and 3. The Sign Code is supported by substantial and compelling interests in the area of urban planning and code administration, and the Sign Code directly and materially furthers its recited purposes.*

Mr. White's opinions address the "comprehensive purpose statement" set forth in Salina Code § 42-500 (where the City identifies its interests). He specifically identifies substantial and compelling interests from an urban planning and code administration perspective, including Comprehensive Plan implementation, traffic safety, aesthetics, urban design and travel behavior, public health and safety, and compromise. Pls.' Mot. Ex. B at 4 (all of which are reflected in the Sign Code's purpose statement). Mr. White need not identify for the Court which interests are substantial or compelling from a First Amendment perspective. Mr. White's opinion utilizes the metrics of the sign code, compares those to industry specific publications regarding signs and traffic safety and aesthetics, and concludes that the Sign Code does advance the City's stated interests. *Id*. 7-8. *See* discussion *supra* Section II(A)(iii) and *infra* Section II(B)(v).

    iii.    *Opinion 4. The Sign Code is reasonable in scope in that it targets issues related to wall signs, without unnecessarily expanding its reach to artistic murals.*

Evaluating and opining on industry custom is within the proper scope of expert testimony. *MCC Management*, 468 Fed.Appx. at 821-22. Here, Mr. White utilizes his specialized knowledge to opine that "Salina's Sign Code is consistent, in practice, with the state of the art nationally for how sign regulations interact with decorative building features such as murals." Pls.' Mot. Ex. B at 12. He evaluates the industry custom of wall sign regulations, cites to industry specific

11

publications, and compares other jurisdictions' sign codes to explain that how the Sign Code regulates signs and not other displays, such as public art (which can "attract people to a place," but "does not direct people to a place") is a common and acceptable urban planning practice. *Id*. at 12, 15-16. This is important from an urban planning perspective because "most sign codes (including model codes) limit the size and number of walls signs" and the City's Sign Code offers flexible regulations that allow wall signs while ensuring the signs do not overwhelm a façade or contribute to sign clutter. *Id*. at 9. The Sign Code does this within a limited scope that does not overextend into the regulation of building embellishment (which includes public art and murals). *Id*. at 15-16. As Mr. White opines, this method effectively regulates "a specific medium of communication, and not a specific type of message." *Id*. at 16.

  iv. *Opinion 5. The Sign Code is not vague.*

 Here, Mr. White uses the specific facts of the Sign Code (terms and phrases from the actual text), data from dictionary references and sample sign codes (terms and phrases from the text of other sign codes), to support his conclusion that the "terms and phrases are well understood and in common use in sign regulations through the nation and in Kansas." *Id*. at 18. Mr. White then demonstrates how the specific facts of this case fall square within the "well-understood" meaning of such terms and phrases. Pls.' Mot. Ex. B at 16-19. Mr. White then utilizes his specialized knowledge and data from several other sample codes to show how other "sign codes use similar language in their sign definitions" and demonstrates how Salina's Sign Code can be generally understood and applied. *Id*. at 16-19.

  v. *Opinion 6. The restrictions established in the Sign Code are reasonable, generally accepted regulations of the size, shape, placement, and design of signs.*

While this section may provide a truncated summary of that data and Mr. White's conclusions, the facts and data are discussed in detail throughout the report. Specifically, Mr. White's opinions address wall sign regulations. Pls' Mot. Ex. B at 9 (citing to "Weinstein, 2000, at 32 and Kelly, 1989, at 6-7."). He analyzes the data in detail, comparing the recommendations in the Kelly publication (a numerical limit on "freestanding signs" and a limit on wall sign area versus the number of wall signs) to the City's metrics (which limit "all signs per business"). *Id.* at 9, n. 7. He opines that the City's approach is flexible and effective because it "allows the business to choose how to allocate its signs within the total sign limit." *Id.* This method not only prevents sign clutter and "protects aesthetics and architectural integrity," but also allows a business to "allocate its signs across the building wall as it sees fit." *Id.* at 19.

Mr. White's report details how it is generally acceptable to regulate signs and not regulate decorative embellishments like murals. *Id.* at 9-14. He cites to publications that support his opinion that "[a]rtist murals," which are "distinct from signs that announce, direct attention to, or advertise," actually "promote public safety objectives." *Id.* at 10-11. He further cites to publications that support his opinion that the Sign Code advances traffic safety as "public art does not create" the same type of "distraction" as signs and that public art can "reduce traffic accidents and collisions with pedestrians." *Id.* at 7.

In fact, Mr. White's opinions regarding "how sign regulations interact with decorative building features such as murals" is based on an examination of "sign and mural regulations for twenty-one (21) sign codes referenced in the literature, along with several in Kansas and Oklahoma where [Mr. White] was the principal consultant on the sign regulations drafts . . . [or] was part of

13

the consulting team for the Development Code update." *Id*. at 12. Plaintiffs' focus on Mr. White's single promotional article that provided some generalized "pointers" is irrelevant. Pls.' Mot. Ex. D. That is particularly the case as Mr. White referred to several sign codes wherein he was the principal consultant or part of the consulting team to support the expert opinion that Salina's Sign Code "is consistent, in practice, with the state of the art nationally for how sign regulations interact with decorative building features such as murals." *Id*. at 12-13.

    vi.    *Opinion 7. The Sign Code has numerous procedural safeguards.*

Mr. White's opinion specifically details the provisions of the Sign Code that constitute the "procedural safeguards" utilized by urban planners. Pls. Mot. Ex. B at 19-20. He does not specifically address the time limits to issue a permit as he is not attempting to provide a legal conclusion regarding Plaintiffs' prior restraint claim. Rather, his opinion focuses on the "common process" utilized by urban planners in sign code administration that provide flexible and "case-by-case review" in instances where an applicant cannot satisfy the Sign Code requirements or does not agree with how the City administered the Sign Code. *Id*. at 20.

### III.    Conclusion

Although the City maintains that its definition of "sign" is rooted in more than 150 years of regulatory tradition and common understanding and that the Sign Code passes intermediate scrutiny as a matter of law–in the event that this Court requires fact-finding with regard to any of the elements of the intermediate scrutiny test, then Mr. White brings the requisite expertise, and his expert opinion with regard to the operation of the Sign Code in the context of sign regulation nationally is reliable, relevant, admissible, and helpful to the trier of fact. The City has met its

burden of establishing the admissibility of Mark White's expert testimony. As such, the City respectfully requests that Plaintiffs' Motion be denied.

Respectfully submitted this 10th day of January 2025.

| s/ Aaron O. Martin | s/ Todd G. Messenger | s/ Amanda C. Jokerst |
|---|---|---|
| Aaron O. Martin | Todd G. Messenger, | Amanda C. Jokerst |
| Bar Number 24170 | CO Bar Number 38783 | CO Bar Number 47241 |
| Attorney for Defendant City of Salina, Kansas | Pro Hac Vice Attorney for Defendant City of Salina, Kansas | Pro Hac Vice Attorney for Defendant City of Salina, Kansas |
| CLARK, MIZE & LINVILLE, CHARTERED | Fairfield and Woods, P.C. | Fairfield and Woods, P.C. |
| P.O. Box 380 | 1801 California St., Ste. 2600 | 1801 California St., Ste. 2600 |
| Salina, KS 67402-0380 | Denver, CO 80202 | Denver, CO 80202 |
| Tel. (785) 823-6325 | Tel. (303) 830-2400 | Tel. (303) 830-2400 |
| Fax: (785) 823-1868 | Fax: (303) 830-1033 | Fax: (303) 830-1033 |
| Email: aomartin@cml-law.com | Email: tmessenger@fwlaw.com | Email: ajokerst@fwlaw.com |

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of January, 2025, I caused the foregoing **DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION TO STRIKE OR EXCLUDE OPINIONS OF ATTORNEY MARK WHITE** to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record as follows:
Jeffrey Shaw.
Samuel G. MacRoberts
Kansas Justice Institute
12980 Metcalf Avenue, Suite 130
Overland Park, KS 66213
Telephone: 913-213-5121; 913-213-5018
E-mail: jeff@kansasjusticeinstitute.org; sam.macroberts@kansasjusticeinstitute.org

*Attorneys for Plaintiffs*

                                                */s/ Aaron O. Martin*
                                                Aaron O. Martin