IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| Cozy Inn, Incorporated, | :CIVIL ACTION |
| d/b/a The Cozy Inn; | :CASE NO. |
| Stephen Howard, | : |
| | :6:24-cv-01027-TC-ADM |
| Plaintiffs, | : |
| | : |
| -vs.- | : |
| | : |
| City of Salina, Kansas, | : |
| | : |
| Defendants. | : |

NOVEMBER 13, 2024

ZOOM VIDEOCONFERENCE DEPOSITION OF

CHARLES R. TAYLOR, Ph.D., held via remote teleconference

hosted by U.S. Legal Support, located at 1818 Market

Street, Suite 1400, Philadelphia, Pennsylvania, on

Wednesday, November 13, 2024, at 10:05 a.m., before

Michelle Keys, a Stenographer and Notary Public of the

Commonwealth of Pennsylvania.

**EXHIBIT A**

| | |
|---|---|
| Page 10<br>1  until I finish my question before you answer, I'm<br>2  not being rude.  I'm just trying to get a clean<br>3  transcript.<br>4           Does that make sense?<br>5  A.    Yes.<br>6  Q.    Okay.  So I will ask that you wait until I<br>7  finish my questions, and I'll wait until you're done<br>8  answering them before I ask another one.<br>9           We also need answers to be audible.<br>10 So in conversation, one might say "uh-huh" or, you<br>11 know, shake their head or give a thumbs up or<br>12 something like that.  But here we have to say "yes"<br>13 or "no" so that the transcript can reflect that.<br>14 Sometimes I might ask you to clarify your response<br>15 if we get to that level of conversation.  And if I<br>16 do, again, I'm not being rude.  I just want to make<br>17 sure that our transcript is clear.<br>18          We can take breaks as needed, and I<br>19 understand from the heads-up that we got about your<br>20 hospitalization that you may need those.  Just let<br>21 us know.  But before we do, if there is a question<br>22 pending, we're going to need you to answer it.  And<br>23 then we can take a break.<br>24          Other than that, from time to time,<br>25 Mr. Shaw may object to one of our questions.  If you | Page 11<br>1  hear an objection, you can still answer the question<br>2  after the objection.  And you're actually required<br>3  to do so unless you're directed not to.<br>4           Okay?<br>5  A.    Yes.<br>6  Q.    Great.<br>7           So that was the head shake, but you<br>8  said "yes," so we're on a great start.  Appreciate<br>9  that.<br>10          So what is your educational<br>11 background?<br>12 A.    I did my undergraduate degree at the<br>13 University of Michigan.  It's a general studies<br>14 degree.  And then I did an MBA at<br>15 Michigan State University, and a Ph.D. in marketing<br>16 at Michigan State University.<br>17 Q.    So tell me about the undergraduate degree.<br>18          What is a general studies degree?<br>19 A.    It -- it's a liberal arts degree.<br>20 Essentially I -- I'd started out in engineering, but<br>21 changed my mind partway through and ended up<br>22 wanting -- you know, wanting to finish in four years<br>23 and -- and go on to do -- you know, go on to do an<br>24 MBA.<br>25 Q.    Great. |
| Page 12<br>1           What sort of engineering were you<br>2  doing?<br>3  A.    Nuclear engineering.<br>4  Q.    Nuclear engineering?  Okay.<br>5           Okay.  What was your course of study<br>6  to obtain that general degree?<br>7  A.    It's -- it's through the College of Liberal<br>8  Arts.  So as I was taking the engineering courses,<br>9  you know, early on, I got to take some electives and<br>10 took business courses, and especially a marketing<br>11 course that I really liked.  So I realized that --<br>12 that I wanted to go on and -- and do a business<br>13 degree, but by the time I made that decision, it was<br>14 a little bit late in the game to try to switch over<br>15 to the business school.<br>16 Q.    Okay.  So the coursework you took was mostly<br>17 related to business, then?<br>18 A.    I would say it was -- it was a real mix<br>19 because of starting in engineering, and then --<br>20 ultimately it was liberal arts degree and so a<br>21 majority of them weren't business.  I think I had<br>22 five business courses as an undergrad.<br>23 Q.    Okay.  Did you ever take a course in urban<br>24 planning?<br>25 A.    No. | Page 13<br>1  Q.    In regional planning?<br>2  A.    No.<br>3  Q.    Urban design?<br>4  A.    No.<br>5  Q.    Landscape architecture?<br>6  A.    No.<br>7  Q.    Traffic engineering?<br>8  A.    No.<br>9  Q.    Transportation planning?<br>10 A.    In my Ph.D. program, I had multiple logistics<br>11 courses.<br>12 Q.    But in your undergrad, no courses in<br>13 transportation planning?<br>14 A.    No.<br>15 Q.    Land use?<br>16 A.    No.<br>17 Q.    Zoning?<br>18 A.    No courses in it, no.<br>19 Q.    Architecture?<br>20 A.    No.<br>21 Q.    Okay.  You said that you have a master's<br>22 degree as well?<br>23 A.    Yeah.  It's an MBA.<br>24 Q.    MBA?<br>25 A.    Yeah. |

Page 14

1  Q.   Okay.  And what was the focus of that degree?
2  A.   It's -- I had a marketing concentration.
3  It's a general management and business degree.
4  Q.   Okay.
5       Okay.  And what was the course of
6  study during that program?
7  A.   Business, including finance, accounting,
8  management, marketing, economics.
9  Q.   And what classes did you take?
10 A.   Well, courses in those areas, the -- you
11 know, that I -- that I just mentioned.  Just a
12 variety of different -- a variety of different
13 business courses.
14 Q.   Okay.  Any classes in urban planning?
15 A.   No.
16 Q.   Regional planning?
17 A.   No.
18 Q.   Urban design?
19 A.   No.
20 Q.   Landscape architecture?
21 A.   No.
22 Q.   Traffic engineering?
23 A.   No.
24 Q.   Transportation planning?
25 A.   No.

Page 15

1  Q.   Land use?
2  A.   No.
3  Q.   Zoning?
4  A.   No.
5  Q.   Architecture?
6  A.   No.
7  Q.   Okay.  Do you have a Ph.D. as well, sir?
8  A.   Yes.
9  Q.   And what was your course of study to obtain
10 that degree?
11 A.   My Ph.D. is in marketing.
12 Q.   Okay.  And what was your Ph.D. thesis?
13      Actually, let me go back really quick
14 to your master' degree.
15      Did you have a thesis program?
16 A.   No.
17 Q.   The Capstone Project?
18 A.   No.  The -- like a lot of MBA programs,
19 Michigan State's wasn't structured that way.
20 Q.   Okay.  What about your Ph.D.?  What was your
21 Ph.D. thesis?
22 A.   It was -- it was on techniques to
23 differentiate advertising effectively.
24 Q.   Tell me more.
25      MR. SHAW:  Objection to form.

Page 16

1       THE WITNESS:  We looked at the impact
2       of brand differentiating messages in --
3       in -- in advertising effectiveness and
4       tested different types, different types of
5       brand differentiating messages in terms of
6       their impact on independent variables like
7       attitude towards the ad and towards the
8       brand and purchase intention.
9  BY MR. MESSENGER:
10 Q.   Was that across different media?
11 A.   My dissertation focused on television
12 advertising.
13 Q.   So only television advertising?
14 A.   Yeah.  This was 1992, the -- so advertising
15 over the internet didn't exist at the time.
16 Q.   We did have out-of-home advertising, though,
17 yes?
18 A.   Yes.
19 Q.   You didn't try -- approach home advertising?
20 A.   I was doing other work on outdoor advertising
21 and published a few papers in peer-reviewed academic
22 journals at the time, but it wasn't the focus of my
23 dissertation.
24 Q.   Okay.  What classes did you take in your
25 Ph.D. program?

Page 17

1  A.   I minored in advertising and communication.
2  So I had multiple courses in -- in both of those
3  areas.  Also, there was a core -- there was a core
4  group of courses, so, like one economics course, one
5  finance course, one accounting course.  And then a
6  variety of other marketing courses, statistics
7  courses, methods courses.
8  Q.   Okay.  Did you take any classes in urban
9  planning in your Ph.D. program?
10 A.   No.
11 Q.   Regional planning?
12 A.   No.
13 Q.   Urban design?
14 A.   No.
15 Q.   Landscape architecture?
16 A.   No.
17 Q.   Traffic engineering?
18 A.   No.
19 Q.   Transportation planning?
20 A.   No.
21 Q.   And by this, I mean, yeah, roads.  Like the
22 design of roads and multi-modal networks, if that
23 makes sense.
24 A.   Yeah.
25 Q.   Not things like trucking logistics and

Page 18

1  whatnot.
2  A.    Well, logistic classes certainly covered like
3  multi-modal forms of transportation, but I didn't --
4  you had asked about transportation planning, and I
5  would say the answer to that is no.
6  Q.    Okay.  And land use?
7  A.    No.
8  Q.    Zoning?
9  A.    No.
10 Q.    Architecture?
11 A.    No.
12 Q.    Do you have any professional experience
13 outside of academia?
14 A.    Yes.
15 Q.    And what would that be?
16 A.    I -- I worked for General Motors, you know,
17 between degrees and -- and, from time to time, I've
18 done consulting.
19 Q.    So in -- at General Motors, what did you do?
20 A.    Worked in market analysis.
21 Q.    Tell me more.
22           MR. SHAW:  Objection.
23           THE WITNESS:  We -- we used advanced
24      statistical techniques to analyze buyer
25      behavior.  We worked on projects like

Page 19

1       engine choice modeling, customer
2       satisfaction studies.
3  BY MR. MESSENGER:
4  Q.    Okay.  And as a consultant, what kind of
5  consulting do you do?
6  A.    We consulted ad agencies and companies about
7  advertising, and in some -- in some cases, signage.
8  Q.    And what's the nature of the signage
9  consulting?
10 A.    I've done work for the outdoor advertising
11 companies helping them understand what the -- what's
12 effective with -- with billboard advertising.
13 Q.    Okay.  Have you -- do you have any other
14 professional work outside of being an expert
15 witness, being a consultant, working at GM?
16 A.    Yeah.  I edit a leading academic journal, and
17 I get a stipend from doing that.
18 Q.    And tell me about that journal.
19 A.    It's -- it's called The International Journal
20 of Advertising.  And it's a social science citation
21 listed academic journal.  And I'm in charge of the
22 review -- review process.  It's basically a
23 peer-reviewed academic journal.
24 Q.    Okay.  Have you published in any planning
25 journal like the Journal of the American Planning

Page 20

1  Association or any other publication?
2  A.    No.
3  Q.    Okay.  What journals have you published in?
4  A.    I think I've published something on the order
5  of 120 or more peer-reviewed articles.  So -- so the
6  Journal of Advertising, the -- The International
7  [sic] Journal of Signage and Wayfinding.  Got
8  published in the Journal of Public Policy and
9  Marketing, Journal of Advertising Research, Journal
10 of Current Issues in Research and Advertising, and
11 there is a lot more listed on my vitae.
12 Q.    Okay.  I looked at your articles in the
13 Journal of Signage and Wayfinding, and it seemed
14 like they were advocating for bringing stakeholders
15 to the table to discuss sign regulation.
16           Is that accurate?
17 A.    No, I wouldn't characterize it that way.
18 Q.    How would you characterize it?
19 A.    I -- I -- I think it's -- it's important
20 to -- to balance various factors in signage
21 regulation.  I also think it's very important to
22 look at the impact of signage on businesses and the
23 economic vitality of the community.  And I think
24 that's a particularly important factor.
25 Q.    Does that factor relate to safety,

Page 21

1  aesthetics, or property values?
2  A.    I would think the economic vitality of the
3  community would relate to property values.
4  Q.    But does it relate to safety or aesthetics?
5  A.    I think it relates to aesthetics in the sense
6  that sometimes some planners and organizations like
7  Scenic America put aesthetics above economics in --
8  in drafting the codes, in my opinion.
9  Q.    Okay.  Let's see.
10          Have you ever published an article on
11 urban design?
12 A.    No, although my -- my -- the book that I
13 coauthored in 2005 certainly goes -- covers some
14 aspects of urban design.
15 Q.    Okay.  Have you ever published a -- an
16 article on transportation systems?
17 A.    No.
18 Q.    Traffic safety?
19 A.    Again, the -- you know, the book has a whole
20 chapter on traffic safety.
21 Q.    Okay.
22           MR. MESSENGER:  So to the court
23      reporter, Michelle, I -- I have a bunch of
24      exhibits that I think probably the best
25      way to do it would be to -- to upload them

**EXHIBIT A**

Page 30

1 record.
2  And if the court reporter could mark
3 this as Exhibit B, I will upload it to the
4 chat here.
5  - - -
6  (Whereupon, Exhibit B was marked for
7 identification.)
8  - - -
9  MR. MESSENGER: And let me know when
10 that's confirmed and marked.
11  MR. SHAW: It's downloading now, so
12 I'll let you know when it's here.
13  MR. MESSENGER: Thank you, sir.
14  And does the court reporter have it?
15 Is it marked?
16  THE STENOGRAPHER: I have it.
17  Thank you.
18  MR. MESSENGER: Thank you.
19 BY MR. MESSENGER:
20 Q. Okay. Let's go back up to the beginning
21 here. So I just want to take a few minutes to go
22 through your report to make sure that I understand,
23 you know, where you're coming from. And I need to
24 resize some windows here to effectively do that.
25  Okay. So on page 2 here in your

Page 31

1 report says that you're responsible for teaching
2 marketing courses right here, I guess, at both the
3 undergraduate and graduate levels; is that correct?
4 A. Yes.
5 Q. And did we go over the full range of courses
6 that you taught in the questioning that we just did?
7 A. In terms of courses I've taught in
8 recent years, yes.
9 Q. And that's at both the undergraduate and the
10 graduate levels?
11 A. Yes.
12 Q. Do you teach any classes in urban planning?
13 A. No.
14 Q. Do you teach any classes in regional
15 planning?
16 A. No.
17 Q. Do you teach any classes in urban design?
18 A. No.
19 Q. Do you teach any classes in landscape
20 architecture?
21 A. No.
22 Q. Do you teach any classes in traffic
23 engineering?
24 A. No.
25 Q. Do you teach any classes in transportation

Page 32

1 planning?
2 A. No.
3 Q. Do you teach any classes in land use?
4 A. No.
5 Q. Do you teach any classes in land use
6 planning?
7 A. No.
8 Q. Do you teach any classes in zoning?
9 A. No.
10 Q. Do you teach any classes in architecture?
11 A. No.
12 Q. Have you ever taught any classes in urban
13 planning?
14 A. No.
15 Q. Have you ever taught any classes in land use
16 planning?
17 A. No.
18 Q. Regional planning?
19 A. No.
20 Q. Urban design?
21 A. No.
22 Q. Landscape architecture?
23 A. No.
24 Q. Traffic engineering?
25 A. No.

Page 33

1 Q. Transportation planning?
2 A. No.
3 Q. Land use?
4 A. No.
5 Q. Zoning?
6 A. Haven't -- haven't taught a whole class in
7 it, but we do -- in the advertising course, we -- I
8 cover some zoning issues related to outdoor
9 advertising.
10 Q. Which issues?
11 A. Basically differences in regulation based on
12 whether under Highway Beautification Act whether an
13 area is zoned residential versus commercial.
14 Q. So cotton areas and Bonus areas and that?
15 Other areas?
16 A. Well, the -- you know, essentially under the
17 Highway Beautification Act, the zoning of -- the
18 zoning effects -- effects the regulation at -- at
19 the federal level, and then, you know, local
20 communities have additional authority.
21 Q. Do you know what a cotton area is under the
22 Outdoor Advertising Act?
23 A. What is the term?
24 Q. The cotton area.
25 A. No.

```
                                                   Page 42                                                    Page 43
 1  Q.    Have you ever been excluded as an expert            1  Q.    Did you prepare an expert report in the case
 2  witness in a case?                                        2  of Guantanamerica [sic] Cigars Company versus
 3  A.    No.                                                 3  SMCI Holdings?
 4  Q.    Have you ever had your report excluded or           4  A.    Yes.
 5  parts of it stricken?                                     5  Q.    Okay.  Let me-- let me stop this share.  Give
 6  A.    The -- in the Guantanamera case, I think            6  me just a minute here to --
 7  there was -- there was one paragraph that I wasn't        7        Do you recognize this document?
 8  allowed to testify on out of a 25-page report.            8  A.    I don't know that I actually saw it before,
 9  Q.    Okay.  Have you ever been proffered or              9  but it looks like the expert designation from
10  tendered as an expert witness, but failed to be          10  that -- from the Guantanamera case.
11  admitted as an expert witness?                           11  Q.    So I'll represent to you that this is
12  A.    No.                                                12  plaintiff's reply in support of its Daubert motion
13  Q.    Have you ever been admitted as an expert           13  to exclude expert report, testimony, and declaration
14  witness in urban planning?                               14  of Charles Taylor as same, as reprinted by Westlaw.
15  A.    No.                                                15        Do you have any reason to dispute the
16  Q.    Traffic safety?                                    16  accuracy or authenticity of this document?
17  A.    I don't think I've been formally designated        17  A.    No.
18  that way, but I have -- I have provided testimony on     18  Q.    Okay.
19  traffic safety and signage cases.                        19        MR. MESSENGER:  I move to formally
20  Q.    But never formally designated as a traffic         20        enter this document into the deposition
21  safety expert, correct?                                  21        record.  I will upload it and ask that the
22  A.    I don't think so, no.                              22        court reporter mark it as Exhibit C.
23  Q.    Have you ever testified in defense of a            23                  - - -
24  municipal sign code?                                     24        (Whereupon, Exhibit C was marked for
25  A.    No.                                                25        identification.)

                                                   Page 44                                                    Page 45
 1                  - - -                                     1  A.    Could you repeat the question, please?
 2        MR. MESSENGER:  And we will pause, I                2  Q.    Sure.
 3        guess, while we do that.  Hang on.                  3        In this report -- I'm sorry.
 4        If everybody could confirm that they                4        Could you read the text that I
 5        got it, and if the court reporter can               5  highlighted here?
 6        confirm that it's marked.                           6  A.    Yeah.
 7        THE STENOGRAPHER:  I got it and it's                7        "Dr. Taylor was tasked with
 8        marked.                                             8  evaluating the market realities of premium cigars,
 9        MR. MESSENGER:  Mr. Shaw?                           9  (plaintiff's products) as compared to mass-market
10        MR. SHAW:  It is downloading now.                  10  cigars (defendants' products) based on established
11        Okay.  I have it.                                  11  marketing principles which Dr. Taylor has learned,
12  BY MR. MESSENGER:                                        12  developed, and applied over his 30 years of
13  Q.    Okay.  So here it says:                            13  experience with a particular focus on branding and
14        "Dr. Taylor was tasked with                        14  legal issues associated with the tobacco industry."
15  evaluating the market realities of premium cigars as    15  Q.    Is that accurate?
16  compared to mass-market cigars based on established     16        MR. SHAW:  Objection to form.
17  marketing principles, which Dr. Taylor has learned,     17  BY MR. MESSENGER:
18  developed, and applied over his 30 years of             18  Q.    Is this statement in this -- in this document
19  experience with a particular focus on branding and      19  accurate as to your experience?
20  legal issues associated with the tobacco industry."     20  A.    Yeah, I -- I think what it says as applies to
21        Is that right?                                    21  this case is true, yes.
22        MR. SHAW:  Objection to form.                     22  Q.    So you have 30 years of experience on
23  BY MR. MESSENGER:                                       23  branding and legal issues associated with the
24  Q.    Is that an accurate statement of what it says     24  tobacco industry?
25  here?                                                   25  A.    I -- I -- yeah.  Over that time period, I've
```

Charles R Taylor PhD
November 13, 2024

Page 58

1  conspicuity."
2  Q.   Okay.  And I would imagine in signage -- so
3  in -- in real estate, there's a saying that there
4  are three factors that influence the value of real
5  estate.
6         Are you familiar with those three
7  factors?
8  A.   No.
9  Q.   Location, location, and location.
10        Now, in signage, it seems like
11 conspicuity might be that, right?  Because it's
12 conspicuity and readability and conspicuity; is that
13 right?
14 A.   Yes.
15 Q.   Conspicuity being a very important factor?
16 A.   All three; legibility, conspicuity, and
17 readability are important.
18 Q.   "Conspicuity" is listed twice here in this
19 report and in your current report; is that true?
20 A.   Yeah.  That's -- that's a mistake, a typo on
21 my part.
22 Q.   Now, what is it about conspicuity that's so
23 important?
24        MR. SHAW:  Objection to form.
25        You can answer.

Page 59

1         THE WITNESS:  Well, conspicuity
2     refers to the sign's ability to stand out
3     from -- from the rest of the environment
4     that it's in.
5  BY MR. MESSENGER:
6  Q.   And why is that important?
7  A.   You want people to be able to see the sign.
8  Q.   And everyone wants that, correct?  Every sign
9  owner?
10        MR. SHAW:  Objection to form.
11 BY MR. MESSENGER:
12 Q.   And every sign owner wants people to be able
13 to see their sign?
14        MR. SHAW:  Objection to form.
15 BY MR. MESSENGER:
16 Q.   Is that correct?
17 A.   Well, it's -- to -- business owners, you
18 know, that get on-premise signs should want them to
19 be conspicuous, yes.
20 Q.   Okay.  And even municipalities would want
21 their traffic signs to be visible, yes?
22        MR. SHAW:  Objection to form.
23        THE WITNESS:  That -- are we talking
24     about traffic signs here?
25 ///

Page 60

1  BY MR. MESSENGER:
2  Q.   Yes.
3         In terms of traffic control signs, a
4  municipality would want their traffic control signs
5  to be legible, conspicuous, and readable; is that
6  correct?
7  A.   Yes.
8  Q.   And why is that?
9  A.   You want -- you want the sign to be noticed
10 and -- and the person to be able to process the
11 information that's in it.
12 Q.   Okay.  And is there a -- a competition for
13 attention between on-premise signs, off-premise
14 signs, and municipal traffic control signs?
15 A.   I wouldn't call it a competition for
16 attention, no.
17 Q.   Okay.  On page 7 of this report, you opine
18 that:
19        "There is no evidence supporting a
20 claim that signs painted on walls along the railway
21 and properties and signs of a certain number and
22 size are aesthetic harms."
23        Is that right?
24 A.   Yes.
25 Q.   Did you also give an opinion in this case

Page 61

1  that the city sign code doesn't prevent aesthetic
2  harms in the instant case?
3  A.   That the city's -- my -- my -- yeah.  My
4  opinion was a rebuttal to Mr. White's report that
5  argued -- argued in favor of aesthetics, in favor of
6  the sign code.  And -- and my opinion is there's not
7  evidence that aesthetics -- there is not -- there is
8  not evidence that aesthetics support the sign code.
9  Q.   So I guess the question is:  Is it your
10 opinion that the city sign code does not advance the
11 city's interest in community aesthetics?
12 A.   I -- I don't think there's evidence that the
13 general public or business owners believe that.
14 Q.   Is it your expert opinion that the City of
15 Salina sign code does not advance the governmental
16 interest in community aesthetics?
17 A.   Aesthetics are subjective, and it -- it is
18 my -- it's my opinion that they don't have evidence
19 that -- that aesthetics are -- are being advanced by
20 that code.
21 Q.   How many years of experience do you have in
22 municipal sign regulation?
23 A.   I -- I have testified in some local
24 municipalities considering sign codes.
25 Q.   How many years?

Page 66

1  BY MR. MESSENGER:
2  Q.  How many opinions do they need in order to
3  make that judgment as policymakers?
4         MR. SHAW:  Objection to scope.
5         THE WITNESS:  Yeah.  I don't -- I
6     mean, I don't regard myself as an expert
7     on -- on writing codes -- codes
8     themselves.  You know, in the planning
9     context, I -- I would certainly say they
10    should -- you know, they should get
11    opinions.  They should get opinions from
12    various stakeholders in the community.  I
13    can't say exactly how many.
14 BY MR. MESSENGER:
15 Q.  In your IJSW article you advocated for this
16 type of participatory framework; is that correct?
17        MR. SHAW:  Objection to form.
18        THE WITNESS:  In that article we do
19    talk about balancing the needs of
20    stakeholders.
21 BY MR. MESSENGER:
22 Q.  Did that article say how many stakeholders
23 that you should have as a local government in your
24 process?
25        MR. SHAW:  Objection to form.

Page 67

1  BY MR. MESSENGER:
2  Q.  In your sign code development process?
3  A.  It listed out the various different --
4  different stakeholders.  It didn't -- I mean, it
5  didn't give a specific number, but it certainly --
6  it certainly talked at length about -- about needing
7  to consider the different stakeholders.
8  Q.  And in different communities, would those
9  stakeholder groups be different?
10        MR. SHAW:  Objection to scope.
11        THE WITNESS:  I think -- to say -- it
12    should be the same general categories
13    of -- of stakeholders.
14 BY MR. MESSENGER:
15 Q.  Is it possible that within those stakeholder
16 groups that different representatives would have
17 different aesthetic judgments?
18 A.  Yes.  That's certainly possible.
19 Q.  And that in different communities they may
20 come the different conclusions?
21        MR. SHAW:  Objection.  Scope.
22        THE WITNESS:  Yeah, yeah.  I -- you
23    know, I'm not -- I'm not offering an
24    opinion specifically on that process of --
25    of how the code is determined.

Page 68

1  BY MR. MESSENGER:
2  Q.  Did you review how the City of Salina
3  developed its current sign regulations?
4  A.  No.
5  Q.  Do you know who was involved in those
6  determinations?
7  A.  No.
8  Q.  Have you reviewed sign codes in your
9  professional capacity over the last 25 years, other
10 than the City of Salina?
11 A.  Yeah.  I've read -- I've read some, yes.
12 Q.  Okay.  Is it common for a sign code to have
13 a -- an allocation of signage based on the frontage
14 of a lot or a building?
15        MR. SHAW:  Objection to scope.
16        THE WITNESS:  Again, you know, I'm
17    not an urban planning expert.  So I can --
18    you know, I can say I've seen codes that
19    do that.
20 BY MR. MESSENGER:
21 Q.  Okay.  And how is Salina's code different
22 from those codes?
23        MR. SHAW:  Objection to scope.
24        THE WITNESS:  Yeah, again, I'm -- I'm
25    not -- I'm not putting myself forward an

Page 69

1     urban planning expert.  The -- the codes
2     vary a lot from one -- you know, from one
3     municipality to another.
4  BY MR. MESSENGER:
5  Q.  Is Salina's code more or less permissive than
6  average in terms of the amount of area of wall sign
7  an owner can have based on the front footage of
8  their building?
9         MR. SHAW:  Objection to scope.
10        THE WITNESS:  I don't -- I'm not an
11    urban planning expert, and so I -- I can't
12    say for sure.
13 BY MR. MESSENGER:
14 Q.  Do you know why a municipality would tie the
15 amount in signage on a wall to the front footage of
16 the building?
17        MR. SHAW:  Objection to scope.
18        THE WITNESS:  Yeah, again, that's --
19    that's an urban planning question.  And
20    I'm not -- not testifying in that area.
21 BY MR. MESSENGER:
22 Q.  So Mark White talked about urban planning
23 issues, and your report is a rebuttal to
24 Mark White's report; is that correct?
25 A.  Yes, to the extent that Mr. White argued that

Charles R Taylor PhD
November 13, 2024

Page 78

1  an aside before you answer, Dr. Taylor,
2  the scope objections would be for a
3  30(b)(6) deposition as I understand it,
4  and there -- we're just trying to delve
5  into Dr. Taylor's expertise and
6  understanding of his own report, and so I
7  think a scope objection and the prior ones
8  would be inappropriate.
9  BY MR. MESSENGER:
10 Q.    Dr. Taylor, are you familiar with how this
11 case turned out?
12 A.    My understanding is that the court ruled in
13 favor of Downers Grove.
14 Q.    And the district court dismissed that case;
15 is that correct?
16         MR. SHAW:  Objection to form and
17     scope.
18         THE WITNESS:  Yeah, I --
19 BY MR. MESSENGER:
20 Q.    You can -- I'm sorry, Dr. Taylor.  If we
21 could --
22         MR. MESSENGER:  Again, scope
23     objections would be improper.
24 BY MR. MESSENGER:
25 Q.    Dr. Taylor, you may continue.

Page 79

1  A.    Yeah.  I don't think -- I don't know that I
2  knew that the district court dismissed it, but...
3  Q.    Okay.  Would you read for me the highlighted
4  text?
5  A.    "It need not try to prove that aesthetic
6  judgments are right."
7  Q.    Okay.  And here, would you go ahead and read
8  that highlighted text for me?
9  A.    "Likewise, with size, many people view signs
10 as a necessary evil and believe that smaller equals
11 less evil.  Unless the government has engaged in
12 content or viewpoint discrimination, the aesthetic
13 judgment supports legislation."
14 Q.    Were you familiar with this case when you
15 prepared your report?
16 A.    I didn't -- I hadn't read that decision.  No.
17 Q.    Okay.  Now, you -- you opine that there's no
18 evidence that the City considered aesthetics in
19 terms of drafting its sign code; is that right?
20 A.    I don't know that I said that exactly.  Main
21 point is that aesthetics -- aesthetics are
22 subjective.
23 Q.    Okay.  Now, with respect to the documents
24 that you reviewed in preparation of your rebuttal
25 report, did you review the legislative history of

Page 80

1  the City's sign code?
2  A.    No.
3  Q.    Okay.  And yet you concluded that the City
4  didn't reflect proper opinions when determining
5  whether to regulate signs in the way that it does?
6  A.    My memory of what I said is that -- is that
7  aesthetics -- aesthetics are a matter of opinion
8  and -- and are subjective in terms of -- in terms of
9  how important they are.
10 Q.    But you have no idea what opinions went into
11 the formulation of the City sign code; is that
12 correct?
13         MR. SHAW:  Objection to form.
14 BY MR. MESSENGER:
15 Q.    Do you understand the question, Dr. Taylor?
16 A.    I didn't review the whole history of how they
17 developed the sign code, no.  I did read -- I did
18 read a little bit -- saw a hearing, read a hearing
19 that -- that got into it just a little bit.
20 Q.    About how the sign code was adopted?  You
21 read the adoption ordinance hearing?
22 A.    I don't remember if it was the adoption
23 ordinance hearing.
24 Q.    Did you read a hearing from November of 2023?
25 A.    It might have been.  It's been a while.

Page 81

1  Q.    At which the Cozy sign was discussed,
2  correct?
3  A.    I -- I think so.  I don't remember for sure.
4  Q.    And at the end of that hearing, there was no
5  motion to adopt a sign code; is that correct?
6  A.    I don't remember.
7  Q.    Okay.  So you don't recall any of the
8  legislative history of the sign code?
9         MR. SHAW:  Objection to form.
10 BY MR. MESSENGER:
11 Q.    Do you understand the question, Dr. Taylor?
12 A.    I wasn't -- yeah.  I wasn't asked to study
13 that in...
14 Q.    But you did opine that the opinions that went
15 into that were insufficient to make a determination
16 that the sign code advances community aesthetics; is
17 that correct?
18         MR. SHAW:  Objection to form.
19         THE WITNESS:  I don't think that's
20     what my opinion says.  I mean, I'd have to
21     go to my report for the exact wording.
22 BY MR. MESSENGER:
23 Q.    Okay.  Let's -- let's do that.
24         We're going to go back to the expert
25 report, which I believe is Exhibit B.  And please

Charles R Taylor PhD
November 13, 2024

Page 82

1 correct me if I'm wrong about the exhibit lettering
2 on this. I believe this is Exhibit B.
3                So in Exhibit B, you say "While
4 some" -- this is your expert opinion here in the
5 highlighted text; is that correct?
6 A.    Yeah. I think the opinion would be on -- on
7 the top of this section. The --
8 Q.    Wait. Let's find the opinion, and then we
9 can work through it.
10               And, again, sir, we just want to
11 understand. "Comprehensive Plan Implementation,
12 Aesthetics" in sub 3. Okay. So let's find sub 3.
13               Is that where it is?
14               Here. So when you're ready, sir.
15 A.    Can you ask the question again?
16 Q.    Yeah. Well, let me start with another
17 question.
18               Have you ever worked in a
19 municipality?
20 A.    I've never been employed by a municipality,
21 no.
22 Q.    Have you ever been employed by a county or a
23 township?
24 A.    No.
25 Q.    Have you ever been employed by a state

Page 83

1 department of transportation --
2 A.    No.
3 Q.    -- as an employee?
4 A.    No.
5 Q.    Have you ever administered a sign code?
6 A.    No.
7 Q.    Do you understand the mechanics of how the
8 Salina sign code works on a particular site?
9               MR. SHAW: Objection to form.
10              THE WITNESS: I wouldn't have any
11     detailed knowledge of that, no.
12 BY MR. MESSENGER:
13 Q.    If you were to buy a building in Salina,
14 would you be able to read the sign code and
15 independently figure out how much signage could go
16 on that --
17              Actually, let me ask you a different
18 question.
19              Did you evaluate how much signage the
20 Cozy Inn could have independently?
21 A.    Didn't do any holistic analysis. I think
22 I -- I think I read something that -- that said how
23 much space could be allocated to a painting.
24 Q.    All right. And can you tell me how much
25 income you make doing expert witness reports?

Page 84

1 A.    This -- it -- it would vary, you know, from
2 year to year. But over the last five years, I
3 probably average making about 50,000 a year,
4 something on that order.
5 Q.    And how much of that is on sign cases over
6 the last five or ten years?
7               MR. SHAW: Objection to form.
8               THE WITNESS: Probably -- probably --
9     over the last ten years, probably
10    something like 15 percent --
11 BY MR. MESSENGER:
12 Q.    Okay. So can you tell me --
13 A.    -- of my -- of my consulting income, which is
14 probably less than 5 percent of my overall income.
15 Q.    Can you tell me how the City of Salina's code
16 compares to the local codes in the cities where you
17 have offered expert testimony against the on-premise
18 sign regulations?
19 A.    I -- I'm not offering an opinion on that.
20 Q.    Because you're not qualified as an urban
21 planner?
22              MR. SHAW: Objection to form.
23              THE WITNESS: I'm just -- I wasn't
24    asked to offer an opinion on that.
25 ///

Page 85

1 BY MR. MESSENGER:
2 Q.    Okay. Now, is it your opinion that the
3 City of Salina sign code does not advance a
4 community interest in aesthetics?
5 A.    A general interest, yes.
6 Q.    So there's a governmental interest in
7 aesthetics; is that correct?
8               MR. SHAW: Objection to scope.
9               THE WITNESS: Yeah, that's -- that's
10    a legal question.
11 BY MR. MESSENGER:
12 Q.    Okay. If Salina asserts an interest in
13 aesthetics as a basis for its sign code, does the
14 sign code further that interest in aesthetics? Yes
15 or no?
16              MR. SHAW: Objection to form.
17              THE WITNESS: In this case, I think
18    it generally doesn't. In -- what's at
19    issue here is whether -- whether
20    businesses can have paintings on -- on
21    walls. And I think there are -- there are
22    people in the public there that wouldn't
23    find that objectionable.
24 BY MR. MESSENGER:
25 Q.    Now, does that -- so, again, you're saying

Charles R Taylor PhD
November 13, 2024

Page 94
1  murals versus -- versus on-premise signs that's the
2  fundamental issue in this case.
3  Q.   What's the -- okay.
4       So did you review any other documents
5  in this case other than the -- the -- let me move to
6  your report here.
7       This says that you -- can you read
8  this right here?
9  A.   "I am familiar with the facts in this case
10 and have reviewed the relevant documents, including
11 the first amended complaint, the City of Salina sign
12 code, and defendant's response to plaintiffs' first
13 set of interrogatories."
14 Q.   Did you review any other documents in this
15 case?
16 A.   There's a reference list at the end that
17 shows documents that I reviewed. And I also relied
18 on my years of experience studying signage.
19 Q.   Did you review the motion to dismiss or the
20 response or the reply?
21 A.   I don't believe so, no.
22 Q.   Now, let me go back to page 13 here.
23      MR. SHAW:  Did you say "13"?
24      MR. MESSENGER:  Yeah.  So this is up
25   on screen now.

Page 95
1  BY MR. MESSENGER:
2  Q.   Now, here you say -- can you read this to me?
3  The blue highlighted text.
4  A.   "The study's goal was to identify sources of
5  distraction for drivers and to determine their
6  relative importance.  The report concluded that
7  signs are not significant distractions that lead to
8  highway accidents."
9  Q.   Now, you've repeatedly cited the Stutts
10 article for this proposition, correct, in different
11 expert reports?
12 A.   A few, yes.
13 Q.   So I want to bring that up really quick.  If
14 you'll forgive me for the -- again, the Zoom
15 business that we have to do.
16      Okay.  Can you see that?
17 A.   Yes.
18 Q.   Okay.  Do you recognize that document?
19 A.   Yes.  It looks like the article we're talking
20 about, yes.
21 Q.   Okay.  I'll represent to you that this is an
22 article called "The Role of Driver Distraction in
23 Traffic Crashes" from January 2001 by Stutts and
24 Rothman.
25      Do you have any reason to dispute the

Page 96
1  authenticity of this document?
2  A.   No.
3  Q.   Okay.  Do you have any reason to dispute the
4  accuracy of this document?
5  A.   No.
6  Q.   Okay.
7       MR. MESSENGER:  I move to formally
8    enter this exhibit into the deposition
9    record.
10      I think we're on G; is that correct?
11      Exhibit G?
12      THE STENOGRAPHER:  I think it was F.
13      MR. SHAW:  F was the Seventh Circuit
14   opinion, at least on my notes.
15      THE STENOGRAPHER:  You can count them
16   in the chat too, if that helps.
17      MR. MESSENGER:  Yeah.  I think we're
18   on G now.  F was the -- was the --
19      THE STENOGRAPHER:  I got it.  I got
20   it.  Okay.  Yeah.  We're on G.
21      - - -
22      (Whereupon, Exhibit G was marked for
23   identification.)
24      - - -
25      MR. MESSENGER:  Okay.  I'm going to

Page 97
1    go ahead and upload this to the chat.
2       And if you can do the same
3    confirmation.
4  BY MR. MESSENGER:
5  Q.   So, Dr. Taylor, this is the same article that
6  you referred to?
7  A.   Yes.  I've also seen Stutts present her work.
8  Q.   Okay.  So on page 16 here, are you familiar
9  with this table 6?
10 A.   It's been a while since I read this, but I --
11 I see it.
12 Q.   Okay.  Can you tell me what this table 6
13 means?
14 A.   It says it's the distribution of specific
15 driver distractions within categories of driver age
16 based on 1995 to 1999 data.
17 Q.   Do you have any reason to believe that in
18 2024, this may be different?
19 A.   Probably not really substantially.  It
20 could -- it could be a little bit different.
21 Q.   Okay.  And this shows that people age 65 and
22 up -- what does this 42.8 mean?
23 A.   It's distribution of specific driver --
24 driver distractions.
25 Q.   Distribution in what way?  Events?

Page 98

1  Percentages?
2           MR. SHAW:  Objection to form.
3  BY MR. MESSENGER:
4  Q.    What does that number measure?
5  A.    I'm not sure without looking at the text --
6  Q.    Okay.  That --
7  A.    -- that's associated with --
8  Q.    Okay.
9  A.    That does help.
10 Q.    Okay.  What does that number measure?
11 A.    It appears to be the percentage, the
12 percentage of times people are in each of those age
13 categories report that they've been distracted.
14 Q.    And in -- in this case, by an outside person,
15 object, or event?
16 A.    Yes.
17 Q.    Will you read this first part of the table
18 here that's highlighted?
19 A.    Okay.
20           "Outside person, object, or event,
21 less than 20 to 27 percent.  20 to 29, 29.0.  30 to
22 49, 27.5.  50 to 64, 33.3.  65 plus 42.8."
23 Q.    So one-third of the time, somebody who is 50
24 to 64 could be distracted by an outside person,
25 object, or event?

Page 99

1           MR. SHAW:  Objection to form.
2  BY MR. MESSENGER:
3  Q.    Is that how you understand this table?
4  A.    I -- to be honest, I'm not certain, based
5  on -- it could be described in a little bit more
6  detail.
7           Can we take a look at the footnote?
8  Q.    Certainly.
9  A.    Standard error column -- okay.  It is -- that
10 is the column percent.  So that's correct.
11 Q.    Okay.
12 A.    Although I will -- I will say I've seen
13 Professor Stutts present this work and say that
14 signage is not in that category of outside person,
15 object, or event based on the reports.
16 Q.    Okay.  Let's look at table 7.
17          So do you recall reading -- looking
18 at this table?
19 A.    It's -- it's been a long time, so I don't
20 recall it very well, but I can take a look at it.
21 Q.    So here we see "outside distraction," right?
22 A.    Yes.
23 Q.    And I can probably zoom out a little bit so
24 you can see this better.  Oh, sorry.
25          Can you see that okay?

Page 100

1  A.    Yes.
2  Q.    So outside distractions are frequent, is that
3  right, based on this table, compared to even cell
4  phone use?
5           MR. SHAW:  Objection to form.
6           THE WITNESS:  Yeah.  This -- this
7      table is showing outside distractions
8      higher than cell phone use.
9  BY MR. MESSENGER:
10 Q.    It says cell phone use is less than
11 5 percent, and outside distractions are more than 25
12 and -- and north of 30 in the terms of animals?
13          MR. SHAW:  Objection to form.
14          THE WITNESS:  This is what the chart
15     says, but it doesn't say anything about
16     signage.
17 BY MR. MESSENGER:
18 Q.    We'll get to that.
19          Okay.  So here, outside person, this
20 talks about -- table 8 basically reflects figure 5.
21          Is that how that looks to you?
22 A.    It looks like the same categories, yes.
23 Q.    Okay.  Now, moving on to -- hold on one
24 second -- 26.  Table 6 -- page 16.
25          Okay.  So, here, this says:

Page 101

1           "Drivers age 50 to 64 were
2  overrepresented with respect to eating and drinking
3  distractions.  Below 65 and older were more likely
4  to have been distracted by objects and events
5  outside the vehicle."
6           Is that correct?
7  A.    Yes.
8  Q.    And here, it says:
9           "Other vehicles, signs, animals, et
10 cetera."
11          Is that not true?
12 A.    It says that, yes.
13 Q.    It does.
14          And this is the report that you cite
15 for the proposition that signs aren't distracting;
16 is that correct?
17 A.    It gives no -- it gives no breakdown of the
18 percentage of signs there.  It doesn't say anything
19 about the type of sign either.  And I've seen the
20 author say that on-premise signs aren't a
21 significant factor.
22 Q.    But what we see here is outside person,
23 object, and event, which includes signs, is a
24 material and significant factor based on the tables
25 shown in terms of table 6, in terms of figure 5, and

**Page 102**

1  in terms of table 8; is that correct?
2          MR. SHAW:  Objection.
3          THE WITNESS:  It's a -- yeah.  It's a
4      very broad category you're talking about
5      there.
6  BY MR. MESSENGER:
7  Q.   Did you see Professor Stutts present this
8  material prior to your first opinion --
9          MR. SHAW:  Objection to form.
10 BY MR. MESSENGER:
11 Q.   -- that is cited in this article?
12 A.   Prior to what?
13 Q.   Okay.  We'll skip that.
14         Now, on page -- let's see.  Let's get
15 to your book.
16         Hold on.  Let me stop sharing.
17 A.   Is it okay if we take a brief bathroom break?
18 Q.   Absolutely.
19         Five minutes?  Ten minutes?
20 A.   Five minutes is plenty.
21 Q.   Okay.  We'll see you in five.
22         MR. MESSENGER:  We'll go off record.
23         - - -
24         (Whereupon, a recess was taken from
25     12:26 p.m. to 12:36 p.m. Eastern, after

**Page 103**

1  which time the deposition resumed.)
2          - - -
3  BY MR. MESSENGER:
4  Q.   Okay.  Dr. Taylor, I want to go back to this
5  question about turning down cases for expert witness
6  reports.
7          Have you ever turned down a case
8  based on reviewing it and figuring out that the sign
9  code advanced a governmental interest in traffic
10 safety?
11 A.   I don't think I've turned down a case on that
12 basis, no.
13 Q.   Have you ever turned down a case because you
14 reviewed the materials and opined that -- that the
15 code actually advanced in interest and aesthetics?
16 A.   I -- I don't remember such a case, no.
17 Q.   So are you saying you've never turned down a
18 case because you opined that you couldn't agree with
19 the plaintiffs with respect to whether the code
20 advanced in interest and aesthetics?
21         MR. SHAW:  Objection to form.
22 BY MR. MESSENGER:
23 Q.   You can answer.
24 A.   I -- I don't remember turning down a case for
25 that reason.

**Page 104**

1  Q.   Have you ever turned down a case in terms of
2  writing an expert report on the basis that you
3  reviewed the code and the supporting materials and
4  made a determination that it actually does advance
5  the governmental interest and property values?
6  A.   I don't think I've turned down a case on that
7  basis, no.
8  Q.   Have you ever been in a municipality where
9  businesses are thriving?
10 A.   I -- yes.
11 Q.   Have you ever looked at that municipality's
12 sign code to determine why those businesses are
13 thriving?
14         MR. SHAW:  Objection to form.
15         THE WITNESS:  It -- haven't --
16     haven't, you know, explicitly, you know,
17     reviewed a sign code for -- word for word
18     for that purpose, no.
19 BY MR. MESSENGER:
20 Q.   Have you reviewed a sign code at all in a
21 community where businesses are thriving?
22 A.   There have been some, yes.
23 Q.   Have you ever done a study of sign codes in
24 communities where businesses are thriving?
25 A.   A -- the formal study of like multiple sign

**Page 105**

1  codes?
2          No.
3  Q.   Now, I want to go back to the Stutts article
4  really quick.  Let's see.
5          So now I'm not really interested in
6  what Professor Stutts would say at a conference, as
7  that's not in your report.
8          Can you just tell me here, again,
9  that -- is outside person, object, and event a major
10 source of distraction compared to the other
11 distractions that Stutts studied in this report?
12 A.   It -- it's one of the highest categories,
13 yes.
14 Q.   And in that -- on the same page, it says that
15 such distractions include signs; is that right?
16 A.   It doesn't specify what type of sign, but it
17 says "signs."
18 Q.   It does say "signs," right?
19 A.   It does, yes.
20 Q.   Okay.
21         Okay.  I want to get into your --
22 your book a little bit here so we can understand the
23 citations to that in your expert report.  I'm going
24 to stop sharing this and I'm going to bring your
25 book up.

Page 118

1  that competes for a driver's attention wants more
2  than two seconds of that time; is that correct?
3  A.    That assumes that -- that assumes that the
4  driver would just -- you know, would just read every
5  single sign that they pass, which is not a
6  reasonable assumption whatsoever.
7  Q.    If a driver read the sign at the Cozy and
8  spent two seconds or more reading the sign at the
9  Cozy because it has eight words, would that
10 single-glance duration exceed two seconds?
11           MR. SHAW:  Objection to form.
12           THE WITNESS:  That -- I don't
13       think -- I don't think drivers would do
14       that if they were driving past it quickly.
15           I think in the formula you showed in
16       my book, you also -- you need -- part of
17       that formula involves the size of the
18       lettering of the sign.  And -- and I think
19       if you ask common citizens of Salina,
20       Kansas, whether that sign would cause
21       traffic accidents, they would -- they
22       would say that it wouldn't -- it wouldn't
23       cause them to get into a traffic accident.
24 BY MR. MESSENGER:
25 Q.    And is that because they're experts in

Page 119

1  traffic safety, the common citizens of Salina?
2  A.    I -- I don't think you need to be an expert
3  in traffic safety to know that that sign wouldn't
4  cause traffic accidents.
5  Q.    So as a layperson, you need no expertise in
6  traffic safety to evaluate traffic safety impacts?
7  A.    I -- I think laypeople can have an opinion as
8  to what would cause them to have an accident and
9  what would not.  And I think the weight of the
10 evidence in the academic literature, tons and tons
11 of studies -- less so recently because it's, in my
12 opinion, pretty much settled science that on-premise
13 signs don't cause traffic accidents.
14 Q.    If laypeople opinions on traffic safety are
15 adequate, why do we have all of this scientific
16 research on traffic safety?
17 A.    I never said they were adequate.  You're
18 putting words in my mouth.
19           MR. MESSENGER:  Well, can --
20           Court Reporter, can you read back the
21       testimony with respect to common citizens
22       believing that the sign does not cause
23       traffic safety problems.
24                   - - -
25           (Whereupon, the stenographer read

Page 120

1       back the record as requested.)
2                   - - -
3  BY MR. MESSENGER:
4  Q.    So the Cozy sign has eight words on it,
5  correct?
6  A.    Yes.
7  Q.    And we have previously established that your
8  authoritative work on the topic suggests that a sign
9  that captured a driver's attention to read six words
10 would take the driver approximately six seconds to
11 read at 30 miles an hour; is that correct?
12 A.    It is, but you're conflating real-world
13 conditions with how long it would take to read the
14 sign.  A driver driving past it at speed wouldn't
15 just take their eyes off the road to read every word
16 of the sign.
17 Q.    But that's what you say in your book, that a
18 driver that's going 30 miles an hour requires
19 approximately two seconds to read six words; is that
20 not correct?
21 A.    That's how -- that's how long it would take,
22 yes.
23 Q.    Yes.
24           And you also make the case that a
25 sign needs to capture its viewer in order to

Page 121

1  effectively deliver its message; is that correct?
2           MR. SHAW:  Objection to form.
3           THE WITNESS:  It does, but that
4       doesn't mean that the driver is going to
5       take that time to -- to read it.
6  BY MR. MESSENGER:
7  Q.    But the business owner benefits if the driver
8  does, correct?
9           MR. SHAW:  Objection to form and
10      scope.
11          THE WITNESS:  You know, it depends on
12      whether the driver has any interest in --
13      in that business.
14          But the key point is that drivers are
15      not going to allow themselves to be
16      distracted to the point where it
17      compromises traffic safety.
18 BY MR. MESSENGER:
19 Q.    But your authoritative work on this topic
20 suggests that a sign with six words on it at
21 30 miles an hour takes approximately two seconds to
22 read; is that correct?
23 A.    Well, it -- what it -- what it's saying is
24 that's how long it would take to read it.
25 Q.    Did you study how tall the letters were on

Charles R Taylor PhD
November 13, 2024

Page 126
1       THE WITNESS: They -- I mean, the
2       business owner tries to make the sign
3       conspicuous so -- so it can be seen.
4  BY MR. MESSENGER:
5  Q.   So they try to make the sign more conspicuous
6  if it has become essentially invisible?
7       MR. SHAW: Objection to form.
8       THE WITNESS: Yeah, I don't
9       understand -- I don't understand the
10      question.
11 BY MR. MESSENGER:
12 Q.   If a sign has become essentially invisible
13 because of the competition for other visual elements
14 of the landscape, what does the sign owner do to
15 make it visible again?
16      MR. SHAW: Objection to form.
17      THE WITNESS: I mean, the sign owner
18      might not have many other options if there
19      is a lot of other things -- a lot of other
20      things going on. Because the point of
21      conspicuity is that it stands out from the
22      environment. So a lot of times the issue
23      is when you consider a place of -- of
24      business, you want adequate -- you want
25      adequate signage.

Page 127
1  BY MR. MESSENGER:
2  Q.   What would you recommend to a business owner
3  who needs to post a sign in a place with a lot of
4  visual clutter?
5       MR. SHAW: Objection to form and
6       scope.
7       THE WITNESS: I'd have to know -- I'd
8       have to know the specifics of the
9       situation. You know, it's possible that
10      that might not be the best place to do
11      business if -- if the sign can't be
12      noticed.
13      MR. MESSENGER: Okay.
14      Wow, I'm having a little trouble with
15      my screen here. Hold on.
16 BY MR. MESSENGER:
17 Q.   Would you advise the sign owner to make their
18 sign more conspicuous if they can if their sign has
19 become essentially invisible?
20      MR. SHAW: Objection to form and
21      scope.
22      THE WITNESS: I'd need to more --
23      know more details. And it's a
24      hypothetical as to something becoming
25      in- -- invisible. I'd need more detail

Page 128
1       on -- on the specific area and -- and also
2       what specific -- what signs they have.
3  BY MR. MESSENGER:
4  Q.   Does it matter how many other signs they
5  have?
6       MR. SHAW: Objection to form and
7       scope.
8       THE WITNESS: It's -- you know, I'm
9       not -- it's -- you know, in my report, I'm
10      not offering an opinion on the conspicuity
11      of -- you know, of Cozy's -- of Cozy's
12      signs.
13 BY MR. MESSENGER:
14 Q.   But you are offering an opinion that
15 conspicuity is important, correct?
16 A.   It's -- the -- the signage is important.
17 Q.   The conspicuity of signage is important?
18      MR. SHAW: Objection to form.
19      THE WITNESS: The -- the opinion is
20      that the signage plays important marketing
21      functions that should be taken into
22      account in -- in formulating sign codes
23      and specific aspects of sign codes.
24 BY MR. MESSENGER:
25 Q.   Can you say that again?

Page 129
1  A.   Can the -- can we get it from the court
2  reporter?
3       MR. MESSENGER: Certainly.
4            - - -
5       (Whereupon, the stenographer read
6       back the record as requested.)
7            - - -
8  BY MR. MESSENGER:
9  Q.   Okay. So the opinion doesn't relate to the
10 fact that the sign code should or should not address
11 conspicuity?
12      MR. SHAW: Objection to form.
13      THE WITNESS: Well, I mean,
14      conspicuity comes into play in terms --
15      you know, in terms of the sign being able
16      to play its marketing function. And to
17      that extent, it's part of my opinion.
18 BY MR. MESSENGER:
19 Q.   Because in -- if a sign is conspicuous, it's
20 more readily identified and perceived, correct?
21 A.   That's correct. Yes.
22 Q.   Okay. So if somebody wanted a sign to be
23 conspicuous, what would they do?
24      MR. SHAW: Objection to form and
25      scope.

**EXHIBIT A**

Page 162
1  representation of the graphic that we used in that
2  discussion when we were talking about conspicuity?
3  A.   Yeah.  It's -- I mean, it's modified from the
4  book and I would note that I -- in the report, I
5  don't offer any opinion on the conspicuity of the
6  Cozy Inn sign.  But that is a mod- -- that is a
7  modified version of the picture from the book.
8  Q.   And you agree that you the watched me draw
9  this red rectangle with the white filling in
10 realtime as we were discussing whether that sign
11 would become more conspicuous if it got larger; is
12 that correct?
13 A.   Yes.
14 Q.   All right.  I think that objection is
15 resolved as well, so we can move on.
16              MR. SHAW:  I mean, I'll renew the
17         objection to Exhibit H in that it is not
18         the complete article and it contains
19         highlights that have changed the pages
20         that are included.
21              MR. MESSENGER:  Okay.
22 BY MR. MESSENGER:
23 Q.   Let me see here.  Let's -- let's stop this
24 share.
25              I want to talk about -- hang on a

Page 163
1  second.  I want to talk about your experience in
2  terms of how signs are used in marketing.
3              The core of your signage expertise is
4  about how signs assist marketing; is that right?
5              MR. SHAW:  Objection to form.
6              THE WITNESS:  I mean, I think, you
7         know, I wrote a -- I wrote a book on this
8         topic that I do think is the first place a
9         lot of people go.  That it encompasses
10        marketing and a lot of -- a lot of related
11        issues.
12 BY MR. MESSENGER:
13 Q.   But marketing is the center piece of the
14 book, would you agree?
15             MR. SHAW:  Objection to form.
16             THE WITNESS:  That's -- I'd say it's
17        the core of it, but there's other
18        important topics as well.
19 BY MR. MESSENGER:
20 Q.   How are signs useful in terms of marketing?
21 A.   Again, I'd go back to the four functions.
22 And it's come back to me.
23             The -- the enhancing store image
24 is -- is the function I didn't recall earlier.
25             But they -- they can help identify

Page 164
1  the location of the -- of the business, they can
2  serve as a promo- -- as a form of promotion in
3  conjunction with other forms of integrated marketing
4  communication.  They can help brand the site, and
5  they can help enhance the store image.
6  Q.   Can they tell you what's available in the
7  store for sale?  Do signs do that?
8              MR. SHAW:  Objection to form.
9              THE WITNESS:  Yeah.  Some -- some
10        signs do identify what's available for
11        sale in the store.
12 BY MR. MESSENGER:
13 Q.   Which of the four functions that you just
14 articulated would that one be?
15 A.   The most -- most directly, ident- -- most
16 directly related to -- to, like, the -- the
17 promoting integrated marketing communications
18 function is communicating what they sell.
19 Q.   Okay.  So I -- I -- I'm not trying to get
20 free legal advice, sir, I'm not -- or not legal
21 advice, but free marketing advice here.  I am
22 definitively not going to do this.
23             But if I wanted to open a -- a taco
24 shop, what methodology would you suggest I do to
25 identify that brand?

Page 165
1              MR. SHAW:  Objection to form and
2         scope.
3              THE WITNESS:  I mean, depends on the
4         taco shop and whether -- whether it's
5         already well-known or whether it's a small
6         business, where it's located.  There's
7         really lot of factors in -- that would be
8         involved.
9  BY MR. MESSENGER:
10 Q.   It's a brand-new family business and we
11 specialized in Colorado Pueblo Green Chile sauce,
12 and we use soft taco shells.
13             MR. SHAW:  Objection to form and
14        scope.
15             MR. MESSENGER:  Wrong kind of
16        peppers, Jeff?
17             MR. SHAW:  Oh, I'm a big fan of
18        Chipotle peppers, but...
19             MR. MESSENGER:  Oh, you're missing
20        out.
21 BY MR. MESSENGER:
22 Q.   Go ahead, Dr. Taylor.
23             You can answer.
24 A.   Yeah.
25             Okay.  Well, I -- you know, I think

Page 174
1  to the -- to the interior of the -- of the
2  restaurant, the -- you know, branding the site goes
3  beyond just traditional, you know, on-premise signs.
4  It's the building has something to do with it as
5  well.
6  Q.   Okay.
7  A.   Other -- other elements that are re- -- you
8  know, related to signage as well, like, if you
9  have -- if you have banners, you know, internal
10 de- -- interior displays and stuff play into it as
11 well.
12 Q.   You want that stuff to be consistent, yeah?
13           MR. SHAW:  Objection to form.
14           THE WITNESS:  Consistent with --
15 BY MR. MESSENGER:
16 Q.   Complementary --
17 A.   Yeah, consistent with the brand.
18 Q.   Okay.  So my taco and my green chili and my
19 Kansas' Best Tacos, if I put the name of the company
20 and the logo for the company on that sign as well,
21 then have I done a better job of branding the site?
22           MR. SHAW:  Objection to form.
23           THE WITNESS:  I don't think -- I
24      don't think it goes a real long way to
25      branding the site.  It's better -- it's

Page 175
1      better than nothing.  If the -- a lot of
2      the best branding of the site goes on
3      directly on the exterior of the -- of the
4      building or inside the building.
5  BY MR. MESSENGER:
6  Q.   So if I were to paint that taco and that
7  Pueblo Green Chile and that tagline and then hang a
8  sign over it that said, you know "Messenger Taco
9  Stand.  The best tacos in Kansas," like is that --
10 on the building, is that better for branding the
11 site?
12 A.   It would be part of -- it would be part of
13 branding the site and it would supplement the
14 signage in that regard.
15 Q.   And the festive interior that suggests the
16 irony of a white guy with an English decent-selling
17 Mexican food would be --
18           MR. SHAW:  Objection to form.
19           THE WITNESS:  You know, I -- I think
20      generally it's a good idea, you know,
21      to -- to use the tools at -- at the
22      company's disposal to brand the site.
23 BY MR. MESSENGER:
24 Q.   Okay.  Now, does that sign that I just
25 mentioned, which would include my company name, a

Page 176
1  tag line that says "The best tacos in Kansas," and
2  then a picture of a taco on a Pueblo Green Chile,
3  does that give a visual cue to my customer what they
4  might expect when they come and visit me?
5           MR. SHAW:  Objection to form.
6           THE WITNESS:  Well, I mean, if they
7      read the sign, it's showing, you know --
8      it's showing an image of a taco, so they
9      would get -- you know, they would get an
10     idea the -- the -- that a taco was being
11     sold there.
12 BY MR. MESSENGER:
13 Q.   Okay.  Okay.  I want to bring up another
14 exhibit really quick.  Give me a second.
15           Sorry.  Apologies.
16           Okay.  I'd like to go back to
17 exhibit -- if anybody can help me with this.
18 Exhibit I?
19           MR. SHAW:  I have it as "I" as well.
20           MR. MESSENGER:  Thank you.
21 BY MR. MESSENGER:
22 Q.   So this is Exhibit I.
23           Have you seen this exhibit before?
24 A.   Yes.
25 Q.   Okay.  Now, I want to focus in on the -- the

Page 177
1  image that is under the text that says "Don't fear
2  the smell" and over the text that says "The fun is
3  i-n-s" -- because the rest of that word "inside" is
4  to the right of that image.
5           Do you see that image?
6  A.   Yes.
7  Q.   Can you describe to me what that image is?
8  A.   Well, I mean, I read in the complaint that
9  the -- it's -- the artist intended it to be an image
10 of, you know, a burger in the form of a flying
11 saucer squirting ketchup and mustard, and the owner
12 says it's designed to get across a whimsical and fun
13 atmosphere of Cozy Inn.
14 Q.   Did it brand the site?
15 A.   You know, in the sense of communicating that
16 there's, you know, a fun and whimsical atmosphere, I
17 do think that it helps to brand the site.  And I --
18 from -- from the quote I read from the owner, that's
19 exactly what he wants to do with this.
20           Honestly, his -- his signs are
21 conspicuous enough before this.  So there's not much
22 incentive to increase cons- -- conspicuity.  I think
23 it certainly meets the threshold.  So what he's
24 saying makes a lot of sense to me, that he's trying
25 to communicate something about the store atmosphere.