In the United States District Court
for the
District of Kansas

| | |
|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard.** | Civil Action No. 6:24-cv-01027-TC-ADM |
| Plaintiffs, | Plaintiffs' Memorandum in Support of their Motion for Summary Judgment; Exhibits A-LL. |
| v. | Oral Argument Requested. |
| **City of Salina, Kansas.** | |
| Defendant. | |

### Plaintiffs' Memorandum in Support of their Motion for Summary Judgment

Steve Howard wants to finish painting a whimsical mural on the side of the iconic business he owns, The Cozy Inn, but can't. That's because Salina considers it a regulated sign instead of an unregulated mural. The difference between the two turns on the artwork's content: if the display relates to the entity putting it up, Salina considers it a regulated sign subject to size limitations and permitting requirements. But if the artwork isn't related to the entity, Salina treats it as a completely unregulated mural. The distinction between regulated signs and unregulated murals isn't specified anywhere in the written code. Since The Cozy sells sliders, Mr. Howard can't finish the painting because it depicts burger-esque UFOs blasting the wall with ketchup and mustard. Salina deems that a regulated sign. But if Mr. Howard changed the content to depict pizza-esque UFOs shooting the wall with pizza sauce, he could. In Salina, that's an unregulated mural.

Under Salina's idiosyncratic mural-sign code regime, Mr. Howard could paint an exact, wall-sized replica of Andy Warhol's *Campbell's Soup Cans* (1962), unless he started selling soup, a church can display a cross, but not a wall-sized "Turn to Jesus" painting, a coffee shop could paint a wall-sized olive tree mural, but not one depicting a coffee tree, and a taco shop can paint a wall-sized mural of a dove, unless it started selling "dove tacos."

Salina doesn't have *any* evidence justifying its peculiar restrictions on speech. It's not as though a painted display is more likely to fall off a wall because it pertains to a business, for instance.

Indeed, The Cozy's UFO-themed mural doesn't become less pleasing, cause car wrecks, hurt pedestrians, or destroy property values because The Cozy sells sliders on the inside.

The Plaintiffs filed a civil rights lawsuit challenging Salina's mural-sign code regime on the grounds it's a content- and speaker-based restriction on speech, it's an unconstitutional prior restraint, and it's unconstitutionally vague. Doc. 16. The record proves what the Plaintiffs have alleged all along: Mr. Howard can't finish painting his one-of-a-kind UFO-themed mural because of its content and because of who he is. Salina has no *actual evidence* justifying *any* of its First Amendment restrictions either, including its permitting requirements and size restrictions. Salina's mural-sign code regime is plainly unconstitutional under *any level* of First Amendment scrutiny, there are no genuine disputes about the material facts, and therefore, this Court should grant Mr. Howard and The Cozy summary judgment. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-325 (1986); *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir. 1991); *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008).

### Statement of Facts

**A.     The Cozy Inn and its whimsical UFO-themed mural.**

1.     The Cozy Inn is a downtown Salina "institution" and "landmark" that's served sliders for more than 100 years. Doc. 16 ¶¶ 15, 16;[1] Ex. C, Cozy Proclamation at CITY000026.

2.     The Cozy has about 40 sq. ft. for diners. ¶ 22; Ex. D, Howard Dep. 44:11-16.

3.     Inside, The Cozy displays historical pictures and articles, including underneath the countertop where customers sit. Ex. B, Cozy Photos at 0065; Ex. A, Howard Dec. ¶ 2.

4.     After spending nearly 14 years as a maintenance worker at the local school district, Steve Howard bought The Cozy in 2007. Ex. D, Howard Dep. 9:16-18, 10:17.19.

5.     The Cozy is a family business. Ex. D, Howard Dep. 13:8-9, 12; Doc. 101 at 2.a.i-iii.

6.     In Salina, murals are prolific. ¶ 68; Ex. E, Comm. Tran. 18:13-16, 22:7-12 (City Commissioner acknowledging "proliferation of mural art everywhere"); Ex. KK, Photos.

---

[1] Except where noted, paragraph citations refer to Doc. 16, the Verified Amended Complaint.

7.    Salina hosts and supports "Boom!," an annual mural festival, as well as the "Salina Kanvas Project," which funds murals. Ex. G, Anderson Dep. 21:18-23; 22:16-19; 26:2-11.

8.    Plaintiffs are proud of the murals in Salina. ¶ 116; Ex. A, Howard Dec. ¶ 3.

9.    In 2023, Mr. Howard decided The Cozy's plain-white wall didn't reflect his or The Cozy's personality. *See* ¶ 21; Ex. D, Howard Dep. 91:19-23; 128:11-13; Ex. B, Cozy Photos at 0049.

10.   Plaintiffs wanted to participate in this "part of Salina culture," ¶ 118, and "paint a mural." Ex. D, Howard Dep. 96:10; *see* Ex. H, Windholz Dep. 57:25—58:1-2 ("just wanted to be part of" the murals scene); Ex. I, Schrage Email 11/9/23 at CITY000221 (Mr. Howard "views it as a mural and feels he was just joining in on the mural activity taking place in the downtown."); Ex. E, Comm. Tran. 31:20-24 ("this is a result of the enthusiasm and the energy that is the mural festival. And speaking with Mr. Howard, I'm confident that he viewed it as his mural").

11.   Mr. Howard's "vision" and "dream" for The Cozy's artwork came from the "art all over town." Ex. G, Anderson Dep. 47:18-25—48:1-4; Ex. A, Howard Dec. ¶¶ 5-6.

12.   Mr. Howard hired Colin Benson to "paint a story" showing Plaintiffs' personality. Ex. D, Howard Dep. 93:17-18; ¶¶ 20-21; Ex. J, Benson Dep. 60:24-25, 63:24-25—64:1-6.

13.   Mr. Howard is a "Sci-Fi" fan and liked the idea of having a science fiction themed mural at The Cozy. Ex. D, Howard Dep. 252:19-23; 253:1-5.

14.   Once completed, the UFO-themed mural will include whimsical hamburger-esque flying saucers piloted by aliens attacking The Cozy with blasts of ketchup and mustard and will read "Don't Fear the Smell!! The Fun is Inside!!" ¶¶ 23-24, 28; Ex. A, Howard Dec. ¶ 9; Ex. J, Benson Dep. 25:12; 135:3-5; 137:6-7; 139:15-21 ("spaceship burgers" with "see through" cockpits and a "big burger" "mothership"); Ex. D, Howard Dep. 145:24; Ex. K, Blase Dep. 14:2-4.

15.   This is what the finished mural will look like. ¶ 28; Ex. D, Howard Dep. 253:20-24; Howard Dec. ¶ 10.

16.     The mural tells a "story" about travelers, both alien and human: "I have a map inside the store that people write in -- they pin where they're from or they have -- they write in marker what country they're from. And they're excited. They've traveled sometimes hundreds of miles, sometimes thousands of miles. They're excited. They're finally here. Well, guess what, even aliens like Cozy's. They traveled light years to get here." Ex. D, Howard Dep. 105:9, 253:10-18.

17.     The painting was partially inspired by a Sci-Fi video Mr. Howard thought was "cool," is "artwork," "express[ive]," and conveys Mr. Howard and The Cozy's "character." ¶¶ 2, 21-24, 27-29; Ex. A, Howard Dec. ¶ 12; Ex. D, Howard Dep. 252:22-25—253:1-5.

18.     The UFO-themed mural is Mr. Howard's "vision" and "dream for The Cozy Inn," and part of Mr. Howard's "heart and soul." Ex. D, Howard Dep. 105:4-7; Ex. G, Anderson Dep. 47:21-23; Ex. A, Howard Dec. ¶ 6, 8, 12, 13.

19.     Mr. Howard didn't paint the mural to maximize profits. Ex. A, Howard Dec. ¶ 14.

20.     The Cozy has a walk-up window for customers. During the summer, about half of The Cozy's customers use it. Ex. D, Howard Dep. 42:1-3.

21.     For Mr. Howard, the walk-up window is "not as personal because you don't get the feel of – our entertaining is inside. You know, all of us talk with everybody." If "you use the walk-up window, you're just kind of missing the whole point." Ex. D, Howard Dep. 41:6-12.

22.     Inside, customers can "see the history within Salina. Like we are one of Salina's oldest running businesses, of Salina's oldest restaurants. We want people to come in and see our history. And then, also, we encourage them to shop downtown. We tell them all the time like we have an amazing ice cream shop right around the corner. We have really cute boutiques. We tell people all the time about our local brewery right around the corner from us. So we just – we really want them to just come stop in and see what Salina has to offer." Ex. H, Windholz Dep. 33:3-16.

23.     If people come inside to look around, The Cozy will sometimes offer free burgers so they can "see what we're all about, see what people talk about. We don't encourage them to purchase, no. We like – we will give a burger to them." Ex. H, Windholz Dep. 33:23-25—34:1-3.

24.     Since The Cozy only has 6 stools inside, and unlimited space outside, The Cozy is no better off, fiscally, if people come inside. Ex. A, Howard Dec. ¶ 16; Ex. B, Cozy Photos at 0065.

25.     Having people come inside is more personal, more fun, more enjoyable for Mr. Howard, the people who come inside, and is better for Salina's reputation. Ex. A, Howard Dec. ¶¶ 15, 17.

**B.     Salina orders The Cozy to stop painting its whimsical UFO-themed mural.**

26.     Colin Benson started painting The Cozy's mural on Friday, November 3, 2023. ¶ 25; *see* Ex. D, Howard Dep. 248:14; Ex. B, Cozy Photos at 0054.

27.     On Sunday, November 5, 2023, Mr. Benson posted a photo of the incomplete mural on social media, and "a lot of people had already seen it, loved it, and wanted more of it." Ex. J, Benson Dep. 115:4-9. Ex. E, Comm. Tran. 14:1-3; Ex. L, Schrage Dep. 26:19-25—27:1-6; 68:16-18.

28.     On Sunday, after seeing a picture of the mural on social media, Salina officials began texting each other, and City Manager Mike Schrage was informed that night. Ex. G, Anderson Dep. 31:13-16,43:14—19; Ex. M, Driscoll Dep. 28:6-8; Ex. L, Schrage Dep. 25:7-8, 13-14.

29.     The next day, Monday, November 6, 2023, Salina officials had "collective[ly]" decided The Cozy's painting was a regulated sign. Ex. N, Herrs 30(b)(6) Dep. 86:3-5, 85:7-10, 20-25; Ex. O, Herrs Dep. 31:19-23; Ex. M, Driscoll Dep. 70:6-13 (describing collective process).

30.     This "collective" "viewed [the unfinished mural] and [determined] it had met the definition of a sign." Ex. N, Herrs 30(b)(6) Dep. 86:4-5, 13-18; *see* Ex. M, Driscoll Dep. 67:22-25.

31.     For displays that Salina considers regulated signs, Salina's written sign code imposes size limits, *see* §§ 42-516–524; and permit requirements, *see* §§42-501, 502. Doc. 16-3.

32.     Because Salina considers The Cozy's mural a regulated sign, it claims the display is "about nine times the allowable size." Ex. E, Comm. Tran. 7:9-10.

33.     City Planner Dustin Herrs told Mr. Howard he couldn't finish the display even though there had been no public complaints about it and only city officials took issue with the mural at The Cozy. ¶ 26, Ex. L, Schrage Dep. 127:24-25; Ex. M, Driscoll Dep. 151:20-25—152:1-4; Ex. N, Herrs 30(b)(6) Dep. 85:7-25; Ex. G, Anderson Dep. 43:14-19.

**C.    Salina's mural-sign code regime:[2] an overview.**

34.    Under the text of Salina's written sign code, "any writing," "pictorial representation," "emblem," "flag," "banner," "streamer," "pennant," "string of lights," or "display that is calculated to attract the attention of the public" is considered a regulated "sign." Salina City Code § 42-764; Doc. 16-3 at 28.

35.    Under the text of Salina's written sign code, a "sign" also includes "any other figure of similar character" to the above types of signs "which (1) is a part of or attached to a structure, (2) is used to announce, direct attention to, or advertise, and (3) is not located inside a building." Salina City Code § 42-764; Doc. 16-3 at 28.

36.    Under the text of the written code, all murals are signs, and every sign is supposed to be subjected to the same size restrictions since they are a "writing," "pictorial representation," "emblem," "flag," "banner," "streamer," "pennant," "string of lights," or "display that is calculated to attract the attention of the public." Salina City Code § 42-764; Doc. 16-3 at 28.

37.    Notwithstanding the sign code's written text, Salina officials say murals aren't regulated. Ex. P, Andrew Dep. 91:3 ("we don't regulate murals"); Ex. M, Driscoll Dep. 93:12-14 ("[i]f you want to talk about murals, then that's a whole another thing[.]")

38.    In practice, Salina's Zoning Administrator Dean Andrew ignores the written sign code's definition of a "sign" which is a "display that is calculated to attract the attention of the public." Ex. Q, Andrew 30(b)(6) Dep. 13:17-20 ("Q. When determining if a display is a sign, does the city determine if the display is calculated to attract the attention of the public? A. No."); *see also* Ex. P, Andrew Dep. 64:14-15, 18-20 ("Q. Is a mural calculated to attract the attention of the public?" "A. I think the word calculated goes to intent, and it's not my job to interpret someone's intent."); 69:23-24—70:1 ("Q: How do you know if something is "calculated to attract the attention?" "A: I don't look at that."); 46:13-19 (admitting that even though the Mural at the Mill "attracts your attention," it's not considered a sign).

---

[2] The mural-sign code regime includes the written sign code, the unwritten policies and practices, the permit requirement, the size restrictions, and the concomitant enforcement penalties. Doc. 16 ¶¶ 12, 31-32, 312; Doc. 101 at 3.a. at 4-5, 4.a.i. at 16.

39.    Zoning Administrator Andrew says the difference between the undefined terms "attracting attention" and "directing attention" is that "[a]ttracting attention might briefly pull your eyes off the road or off the sidewalk to see what it is. Directing attention is for something that someone wants you to read or look at for an extended period." Ex. P, Andrew Dep. 46:6-12.

40.    Zoning Administrator Andrew has been a Salina City Planner for 37 years and has been the Zoning Administrator since 2009. Ex. P, Andrew Dep. 9:15-16, 18-19.

41.    The written code does not distinguish between murals and signs. *See* Doc. 16-3.

42.    The distinction between murals and signs is based on the display's content and the identity of the speaker. Ex. X, Def. Ans. to First Set of Interrog., Rog 5, 11; Ex. N, Herrs 30(b)(6) Dep. 88:21-24; Ex. E, Comm Tran. 10:4-5; Ex. L, Schrage Dep. 80:24-81:10.

**D.    Salina orders The Cozy to stop painting the mural because of its content.**

43.    City Manager Schrage wrote a memo to the City Commissioners about The Cozy's mural. Ex. R, Schrage Email 11/8/23; *see also* Ex. L, Schrage Dep. 35:23-25—36:1-10.

44.    City Manager Schrage is the CEO of Salina, oversees city personnel, and has spent 18 years either as the Deputy City Manager or City Manager. Ex. L, Schrage Dep. 12:3-6, 15-25.

45.    City Manager Schrage told City Commissioners that although The Cozy's mural "aesthetically might look similar to murals in the downtown elsewhere, it contains a commercial message promoting a business and its product which makes it a wall sign subject to the applicable zoning codes." Ex. R, Schrage Email 11/8/23; *see also* Ex. L, Schrage Dep. 35:23-25—36:1-10.

46.    City Manager Schrage said that Salina officials had "coordinate[d] closely with Boom Salina to confirm that none of their murals would intentionally or unintentionally include commercial speech subject to our sign codes." Ex. R, Schrage Email 11/8/23.

47.    By November 9, Salina's decision to regulate The Cozy's mural as a sign generated intense media coverage and public commentary. Ex. Z, News Articles at 0223-0227, 0217-0222;[3]

---

[3]Roman Campa, *Art or Ad?: City of Salina pauses project at historic Cozy Inn Restaurant*, KWCH (Nov. 9, 2023); Jeff Garretson, *Art or Advertising*, KSAL (Nov. 9, 2023).

Ex. M, Driscoll Dep. 39:1-7 (Salina was "getting kind of a lot of political and external communication both on social media").

48.    City Manager Schrage sent a "Cozy Inn Talking Points" memo saying "[a] distinction is commonly made between murals and art when compared to commercial speech," and "[w]e regulate the size of commercial signs through a permit process." Ex. S, Talking Points.

49.    City Manager Schrage called Mr. Howard to "calm things down," avoid a "social media fire storm," and "have the conversation to be at our level." Ex. L, Schrage Dep. 58:15-25.

50.    After City Manager Schrage called Mr. Howard, he wrote another memo to the City Commissioners on November 9, 2023, where he explained that Salina "regulate[s] the size of commercial signs through a permit process." Ex. I, Schrage Email 11/9/23 at CITY000221.

51.    City Manager Schrage continued, "I recently spoke with Mr. Howard. As expected, he views it as a mural and feels he was just joining in on the mural activity taking place in the downtown. He also indicated he does not do any kind of social media and he is trying to 'go soft' in his interviews with the media suggesting he thinks we will be pleased with his comments." Ex. I, Schrage Email 11/9/23 at CITY000221.

52.    On the morning of November 13, 2023, Salina officials held a meeting with Mr. Howard and Mr. Benson. Ex. J, Benson Dep. 79:8-13; Ex. D, Howard Dep. 176:9-12; Ex. L, Schrage Dep. 69:4-7; Ex. M, Driscoll Dep. 37:18-25.

53.    Mr. Benson told the officials that his work was art and that he didn't "believe it was a signage being put up," but he "was shut down pretty quick." Ex. J, Benson Dep. 82:4-7.

54.    Salina's officials told Mr. Benson the art was a sign because "the hamburgers are basically the same thing he sells, and therefore, it would be signage." Ex. J, Benson Dep. 82:9-17.

55.    That afternoon, City Manager Schrage "brought forward discussion on a mural being painted on the side of Cozy's Inn" at a City Commission meeting where he explained that "[t]here had been misunderstandings surrounding the mural as its content falls under sign provisions in the City Code rather than art[.]" Ex. T, City Commission Minutes at CITY000173.

56.    At the Commission meeting, City Manager Schrage explained to the Commissioners that "[t]he important distinction here, relates to commercial speech and our ability to regulate commercial speech or signs." Ex. E, Comm. Tran. 5:2-5.

57.    City Manager Schrage explained that "there is certainly is a misunderstanding between art and signs and commercial speech." Ex. E, Comm. Tran. 5:23-25.

58.    City Manager Schrage explained that the distinction between an unregulated mural and a regulated sign is based on whether the display contains a commercial or non-commercial message. Ex. E, Comm. Tran. 27:3-6 ("if the wording's not commercial in any way or doesn't have an attachment to a commercial operation, that in and of itself isn't a disqualifier."); *id.* at 28:16-21 ("if there are no words but it's still, you know, related to the business activity of the building, I think there's case law out there that says that's still a commercial message and it's still a sign.").

59.    City Manager Schrage explained to the Commissioners that "I would reiterate, it's all on the basis of a commercial message." Ex. E, Comm Tran. 10:4-5; Ex. L, Schrage Dep. 80:24-81:10.

60.    Salina's Director of Community Development Services, Lauren Driscoll, also told the City Commissioners that Mr. Howard couldn't finish the mural under Salina's mural-sign code regime. *See* Ex. E, Comm. Tran. 17:17-18; Ex. M, Driscoll Dep. 78:15-79:11.

61.    Director Driscoll oversees code compliance, zoning, and permitting, including sign permits, Ex. M, Driscoll Dep. 13:9-15, is a certified planner who has "worked in the profession for about 20 years," *id.* 18:12-13, and supervises the zoning administrator and planners, *id.* 16:18-23.

62.    Director Driscoll was part of the "collective" who decided The Cozy's mural was a regulated sign, not an unregulated mural. Ex. N, Herrs 30(b)(6) Dep. 86:3-5, 85:7-25; Ex. O, Herrs Dep. 31:19-23; Ex. M, Driscoll Dep. 70:6-13.

63.    At the City Commission meeting, Director Driscoll "walk[ed] [the Commissioners] through the specifics as it relates to Cozy's." *See* Ex. E, Comm. Tran. 6:23-25.

64.     Director Driscoll explained, through a hypothetical, that "[i]f a coffee house has a dove with an olive branch and it says the word 'peace' on the side of it, that – that's not a sign." Ex. E, Comm. Tran. 23:13-16.

65.     Director Driscoll continued, "in general, the dove, the olive branch, the peace are not part of a commercial transaction that would take place in that building or draw you to that building for a commercial transaction." Ex. E, Comm. Tran. 23:19-23.

66.     But, Director Driscoll continued, "if we had a steaming cup of coffee and a coffee pot on the side," Salina would consider it a regulated sign because "[e]ven without a word, that illustration can suggest that commercial transaction." Ex. E, Comm. Tran. 23:19-24:4.

67.     City Manager Schrage built upon the hypothetical, explaining that if the same "steaming cup of coffee" was painted "on the other side of town unrelated to anything," it would not be a regulated sign. Ex. E, Comm. Tran. 26:17-22; *see also* Ex. L, Schrage Dep. 81:12-82:8.

68.     Ms. Driscoll explained the difference between a regulated sign and an unregulated mural is whether the display is "expressly related solely to the economic interest, to the speaker and the audience, or speech that possesses commercial transaction[.]" Ex. E, Comm. Tran. 23:4-12.

69.     At the City Commission meeting, a Commissioner said, "I could see much of the mural part be considered art, and then focus on the actual portion that's the message as the commercial aspect." Ex. E, Comm. Tran. 22:24-23:2.

70.     Another Commissioner said, "if [Mr. Howard] intended to get in on the whole mural trend – and it is – you pointed out well the distinction between art and murals and commercial sign," "what would it take for him to turn this into a mural rather than a sign." Ex. E, Comm. Tran. 28:1-8.

71.    News outlets covered the November 13, 2023, City Commission meeting. *See, e.g.*, Ex. Z, News Articles at 0285-0295, Bates 0250-271.[4]

72.    City Manager Schrage publicly told reporters that if a display "includes a message that pertains to the goods or services for sale," "that makes it a sign and makes it subject to the sign code." Ex. L, Schrage Dep. 61:1-3, 18-23, 62:1-5; Ex. Z, News Articles at 0285-0295.

73.    In an email to the organizer of the Boom! Festival, City Manager Schrage said that his "intended response" to The Cozy's lawsuit "is to stress that we have been very mindful of the Reed v Gilbert case as well as applicable case law regarding what constitutes commercial speech subject to sign code regulation." Ex. U, Schrage Email 2/20/24; Ex. L, Schrage Dep. 85:20-87:19.

74.    Salina doesn't regulate displays it considers "art." Ex. V, Art Center DRB Packet at 7; Ex. S, Talking Points; Ex. T, City Commission Minutes at CITY000173; Ex. E, Comm. Tran. 5:23-25; Ex. E, Comm. Tran. 22:24-23:2; Ex. E, Comm. Tran. 28:1-8.

75.    Salina's mural-sign code regime demonstrates its antipathy toward content related to business and commercial speech and its preference for content unrelated to business and noncommercial speech. Ex. JJ, Plts.' First Amend. Resp. to First Set of Interrog., Rog. 6.

**E.    Salina's officials admit the mural-sign code regime is content based.**

76.    Salina's 30(b)(6) Representative testified it has to "look at the character and elements" of the display to determine it's a regulated sign. Ex. N, Herrs 30(b)(6) Dep. 88:21-24.

77.    Salina's 30(b)(6) Representative testified The Cozy's mural is a sign because "it proclaims or declares to not fear the smell," and "I mean, The Fun is inside is make a proclamation of sort[.]" Ex. N, Herrs 30(b)(6) Dep. 89:5-10.

78.    Salina's 30(b)(6) Representative testified The Cozy's mural is a sign because it contained an "arrow that points towards the pickup window and the entry door," which Salina considers as "directing attention." Ex. N, Herrs 30(b)(6) Dep. 89:18-22.

---

[4] Asia Cymone Smith, *City puts pause on Salina mural, restaurant owner says, "I believe we'll work through this"*, KSN (Nov. 13, 2023); Nate King, *Cozy Inn Hamburgers 'sign' put on hold pending city approval*, Salina Post (Nov. 19, 2023)

79.     Salina's 30(b)(6) Representative testified The Cozy's mural is a sign because it contained "pictorial representations of burgers," which it considers advertisements. Ex. N, Herrs 30(b)(6) Dep. 90:7-13.

80.     Zoning Administrator Andrew testified that that if customers didn't go inside The Cozy, and it only delivered food, a display that had the phrase "don't fear the smell" is a regulated sign because "it's not a non-commercial message." Ex. P, Andrew Dep. 170:7-25—171:1-20.

81.     Salina officials must review a display's contents before determining whether it is a regulated sign. Ex. L, Schrage Dep. 71:11-15; Ex. M, Driscoll Dep. 67:19-25, 68:13-18, 88:4-12; Ex. P, Andrew Dep. 86:11-23; 88:20-24—89:1-9, 89:11-18; 176:22-25—177:1-3; 176:14-20

82.     When asked whether a mural depicting little green men piloting traditional science fiction, non-burger flying saucers would still be considered a sign, if placed on The Cozy's wall, Zoning Administrator Andrew testified, "I'd have to see a rendering of what it looked like to make that determination." Ex. P, Andrew Dep. 176:22-177:3.

83.     When asked whether a mural depicting a pasture with cows and mustard plants, tomatoes, and onions growing in the field would be considered a sign, if placed on The Cozy's wall, Zoning Administrator Andrew said, "I'd have to see a rendering." Ex. P, Andrew Dep. 178:16-22.

84.     When asked if officials must "be able to look at the potential sign to determine if it's a sign," Salina's 30(b)(6) Representative said, "Yes." Ex. N, Herrs 30(b)(6) Dep. 88:21-23.

85.     In its permitting process, Salina requires the submission of a "shop drawing" and the display's "proposed copy." Ex. W, Sign Permit Submittal Procedure at CITY000661; *see* Ex. Q, Andrew 30(b)(6) Dep. 27:7-20.

86.     Salina officials testified that Mr. Howard would be allowed to paint a wall-sized mural of a silver airplane on the side of The Cozy—unless he sold airplanes or travel services. Then it would be considered a regulated sign, not an unregulated mural. *See* Ex. L, Schrage Dep. 121:24-25—122:1-23; Ex. M, Driscoll Dep. 106:6-11; Ex. P, Andrew Dep. 177:5-17, 24-25—178:1-3.

87.     Zoning Administrator Andrew testified that a mural of "a blank white wall with a pizza symbol" on The Cozy would be unregulated. *See* Ex. P, Andrew Dep. 172:11-25—173:1-20.

88.     The same display on a pizza shop would be a sign. *See* Ex. P, Andrew Dep. 175:2-6.

89.     Salina officials testified that Mr. Howard could paint a wall-sized mural replicating Andy Warhol's famous Campbell's soup can on The Cozy—unless he started selling Campbell's soup. *See* Ex. L, Schrage Dep. 124:9-11, 14; *see* Ex. P, Andrew Dep. 179:20-25—180:1-10.

90.     Conversely, Warhol's Campbell's soup can on a grocery store would be considered a regulated sign, not an unregulated mural. *See* Ex. L, Schrage Dep. 124:20-24; 125:1-8.

91.     City Manager Schrage testified that if a coffee shop painted a dove and an olive branch on its wall, that would be an unregulated mural, but if the display contained a dove and *a coffee branch*, that would be considered a regulated sign. Ex. L, Schrage Dep. 122:25—123:1-8.

92.     Director Driscoll testified that if a taco shop painted a dove, that would be unregulated—unless it sold dove tacos or sold doves. *See* Ex. M, Driscoll Dep. 155:6-24—156:12.

93.     Director Driscoll would need legal counsel to determine if a mural on The Cozy depicting a coffee pot, a dove, and the word peace is a sign. Ex. M, Driscoll Dep. 98:20-100:11-13.

94.     Director Driscoll would need legal counsel to determine if the Stiefel theatre mural depicting a woman with instruments would be a regulated sign. Ex. M, Driscoll Dep. 112:15-116:4, Ex. F, Mural Photos at 0119.

95.     Salina contends The Cozy's mural is a regulated sign, but if the display were painted on a different business that didn't sell hamburgers or have any connection to The Cozy, then it would not be considered a regulated sign. Ex. E, Comm. Tran. 26:16-22.

96.     Salina contends a mural is a regulated sign if the content of the display "is used to 'announce, direct attention to, or advertise.'" Ex. X, Def. Ans. to First Set of Interrog., Rog 5.

97.     Zoning Administrator Andrew testified that the "function" of a regulated sign is to announce, direct attention to, or advertise. Ex. P., Andrew Dep. 285:1-4.

98.     Salina says it decides whether a mural "is used to 'announce' by evaluating whether the display makes a declaration about a fact, occurrence, or intention or proclaims or gives notice of, or identifies, a business, product, or event." Ex. X, Def. Ans. to First Set of Interrog., Rog 5.

99.    Salina says it determines whether a mural "is used to 'direct attention to' by evaluating whether the display indicates, points to, points out, or specifies a location (in general, like a particular property, or specifically, like a building entrance or pickup window)." Ex. X, Def. Ans. to First Set of Interrog., Rog 5.

100.    Salina says it determines whether a mural "is used to 'advertise' by evaluating whether the display is meant to attract customers, encourage a commercial transaction, offer products or services in exchange for consideration (e.g., a display that says, 'sliders, 5 for $5.00'); call attention to a brand, products, or services in order to encourage the purchase of products or services, in that it pertains to or references the goods or services for sale (e.g., the depiction of hamburger on the Cozy building wall." Ex. X, Def. Ans. to First Set of Interrog., Rog 5.

101.    Salina says that the mural at The Cozy Inn is a sign is because it "contains a tag line announcing the infamous smells of the Cozy, it has an arrow directing attention to the building entrance and ordering window, and it advertises the hamburgers and toppings available for sale at the Cozy by depicting representations of them." Ex. X, Def. Ans. to First Set of Interrog., Rog 11.

**F.    Salina places Mr. Howard's sign permit application on-hold, indefinitely.**

102.    When Mr. Howard arrived at the November 13, 2023, meeting with Salina officials, "there were sign permits put in front of us before I even got into the room or put on the table, and [the meeting] was about why we didn't get a sign permit." Ex. J, Benson Dep. 80:10-13.

103.    Salina told Mr. Howard to submit a sign permit application. Ex. N, Herrs 30(b)(6) Dep., 111:1-3; ¶ 155; see also Ex. E, Comm. Tran. 7:17-23.

104.    Mr. Howard submitted the application on November 13, 2023. Ex. E. Comm. Tran. 41:22-24; Ex. M, Driscoll Dep. 63:9-10; Ex. Y, Sign Permit Application.

105.    Salina did not respond within the written code's 10-day deadline. Ex. A, Howard Dec. ¶ 23; Ex. N, Herrs 30(b)(6) Dep. 109:24-110:2; Ex. AA, On-Hold Letter at CITY000031; Salina City Code § 42-502(b) at Doc. 16-3 at 6.

106.    Salina's 30(b)(6) Representative testified that Mr. Howard's permit application was neither granted nor denied. Ex. N, Herrs 30(b)(6) Dep. 109:24-110:2.

107.    As such, Salina did not provide a written notice or statement of reasons for denial. Ex. N, Herrs 30(b)(6) Dep. 116:2-15; Ex. A, Howard Dec. ¶ 24; *see* §§ 42-596(c)(2), 42-597(d).

108.    In a letter dated February 8, 2024, Salina put the application "requesting approval of an existing painted wall sign/mural" "on-hold until our review of the sign regulations is complete." Ex. AA, On-Hold Letter at CITY000031.

109.    City Planner Dustin Michelson says Director Driscoll instructed him to write the letter and told him what it was supposed to say. Ex. BB, Michelson Dep. 15:2-23.

110.    Planner Michelson says that *he* did not place the application "on-hold," but simply that he was instructed by Director Driscoll to inform Mr. Howard that the application was "on-hold." Ex. BB, Michelson Dep. 17:8-20.

111.    Director Driscoll says she "didn't draft it" and "did not" have any input on the February 8, 2024, letter. Ex. M, Driscoll Dep. 64:11-24.

112.    Zoning Administrator Andrew says Director Driscoll instructed Planner Michelson to write the letter, and she told Zoning Administrator Andrew to work with Planner Michelson on it. Ex. P, Andrew Dep. 269:2-8, 273:8-10, 13.

113.    Zoning Administrator Andrew says both that the application was placed "on-hold" on November 6, 2023, (seven days before it was submitted), Ex. P, Andrew Dep. 271:3-8, and that it was placed "on-hold" on November 13, 2023, (right after it was submitted), Ex. P, Andrew Dep. 229: 4-8, 267:21-25.

114.    The Salina 30(b)(6) Representative says that the application was placed on hold "when it came in," on November 13, 2023. Ex. N, Herrs 30(b)(6) Dep. 112:25-113:1, 107:19-25.

115.    Salina has placed other applications "on-hold." Ex. BB, Michelson Dep. 18:14-25.

116.    Mr. Howard never consented to Salina placing his application on-hold. Ex. A, Howard Dec. ¶ 26; Ex. P, Andrew Dep. 233:2-6.

**G.    Salina's content-based discrimination is plainly evident throughout the city.**

117.    Salina has a firefighter mural at Fire Station #2. Ex. G, Anderson Dep. 69:8-21; Ex. F, Mural Photos at 0099.

118.    Even though the firefighter mural pertains to and identifies the activities of the fire station, Salina officials are unsure if the firefighter mural is a sign. Ex. L, Schrage Dep. 110:8-13

119.    Director Driscoll said that "it's one that I don't think is cut and dry, and I think it would be worth a discussion with legal counsel." Ex. M, Driscoll Dep. 121:3-5.

120.    Salina's 30(b)(6) Representative testified that the firefighter mural is not a regulated sign. Ex. Q, Andrew 30(b)(6) Dep. 58:24-59:6.

121.    The Salina Art Center installed a ceramic tile mural, which city staff determined was "similar in function to a sign" and "will direct the public to the gallery," but was deemed exempt from regulation because Salina determined that the content was art, and "as a general rule, an art installation" is not a regulated. Ex. V, Art Center DRB Packet at 7; Ex. F, Mural Photos at 0098.

122.    In Salina, the iconic Mural at the Mill depicts children playing ring-around-the-rosie on an abandoned grain elevator. Ex. G, Anderson Dep. 76:16-24; Ex. F, Mural Photos at 0082, 0088.

123.    The Mural at the Mill "bolster[s] business opportunities and support[s] the amazing institutions we already have here in Salina." Ex. Z, News Articles at 0279.

124.    Salina does not consider the Mural at the Mill to be a regulated sign, because of its content. Ex. M, Driscoll Dep. 126:19-128:7; Ex. L, Schrage Dep. 108:1-13.

125.    If Mr. Howard painted a replica of the Mural at the Mill on The Cozy's wall, Salina would not consider it a sign. Ex. P, Andrew Dep. 210:17-211:6.

126.    But if an indoor playground or daycare began operating on the property where the Mural at the Mill is located, it would change Salina's analysis. Ex. M, Driscoll Dep. 129:2-20.

127.    City Manager Schrage would need to "seek legal counsel to answer" whether a playground would transform the Mural at the Mill into a sign. Ex. L, Schrage Dep. 109:1-14.

128.    Salina does not consider the murals from the Boom! Festival to be signs because Salina confirmed that their content did not "intentionally or unintentionally include commercial speech subject to our sign codes." Ex. R, Schrage Email 11/8/23 at CITY000261.

129.    Around Salina, there are dozens of murals that have been exempted from regulation because of their content. See Ex. KK, Photos.

130.    Salina considers other murals to be "signs" but deems them compliant with the mural-sign code regime based on its unwritten policies and practices. Ex. Q, Andrew 30(b)(6) Dep. 69:1-6; 88:16-24; 91:10-24; Ex. O, Herrs Dep. 84:12-13; 84:16-22; 101:14-21; Ex. M, Driscoll Dep. 124:8-125:5; Ex. P, Andrew Dep. 311:13-20; 322:25-323:4; Ex. L, Schrage Dep. 98:25-99:9.

131.    Salina City Code § 42-503(a) states that the area of a wall sign is calculated as "the area of the smallest rectangular figure which can encompass all of the letters, numbers or symbols."

132.    Salina has created an unwritten policy of measuring the area by drawing multiple rectangles around each individual element and adding the area up, while excluding the area of the background, but only "[w]here it's practical." Ex. Q, Andrew 30(b)(6) Dep. 91:10-24.

133.    Salina utilized this alternative method of measuring a wall sign for the front mural at The Yard. Ex. Q, Andrew 30(b)(6) Dep. 88:16-24; Ex. F, Mural Photos at 0095.

134.    Salina utilized this alternative method of measuring a wall sign for the mural at Sharp Performance. Ex. O, Herrs Dep. 101:14-21; Ex. F, Mural Photos at 0103.

135.    Salina utilized this alternative method of measuring a wall sign for the mural at the KU School of Medicine. Ex. M, Driscoll Dep. 124:8-125:1; Ex. F, Mural Photos at 0083.

136.    Salina refused to use this alternative method of measuring a wall sign for the mural at The Cozy. Ex. Q, Andrew 30(b)(6) Dep. 100:10-22; Ex. O, Herrs Dep. 101:25-102:12.

137.    Schlotzsky's sandwich shop has a sandwich mural on a side façade that Salina considers a sign. Ex. Q, Andrew 30(b)(6) Dep. 69:1-6; Ex. F, Mural Photos at 0100.

138.    Since the side façade of Schlotzsky's faces a large parking lot that cars drive through, Salina created an unwritten policy of considering the parking lot to be a private road, and the side lot line that faces the parking lot to be a part of the building's frontage for purposes of calculating the total sign area allowed. Ex. P, Andrew Dep. 311:13-20.

139.    The side façade of The Cozy also faces a large parking lot that cars drive through, but Salina refused to consider this a road for calculating sign area. Ex. O, Herrs Dep. 33:12-15.

140.    The Yard is a baseball facility with a baseball mural on the side of one of its buildings. Ex. O, Herrs Dep. 68:6-11; 81:11-16; Ex. F, Mural Photos at 0091, 0123, 0124, 0301.

141.    When it was first built, city staff wrote that The Yard would consist of three buildings. Ex. CC, Yard DRB Packet at 0166, 183.

142.    Building A is described as "[t]he brick building on the north that would house indoor batting cages." Ex. CC, Yard DRB Packet at 0166, 183.

143.    Building B is described as "[t]he outdoor structure and turf infield." Ex. CC, Yard DRB Packet at 0166, 183. Building B is described as "a new metal structure between [Buildings A and C] that would cover a turf practice infield."

144.    The baseball mural at The Yard is painted on the exterior wall of Building A, facing the "adjacent building," Building B, the covered practice field. Ex. O, Herrs Dep. 86:1-3.

145.    Salina created an unwritten policy of considering this mural at The Yard to be inside a building because it was "oriented" towards the covered practice field and thus was not considered a regulated sign. Ex. O, Herrs Dep. 84:12-13; 84:16-22; Ex. P, Andrew Dep. 322:25-323:4; Ex. L, Schrage Dep. 98:25-99:9.

146.    The orientation of a sign is not anywhere in the code. Ex. P, Andrew Dep. 323:1-4.

147.    A bike shop, Bike Tek, hired Mr. Benson to paint two bike themed murals: "Pedals on one side and cranks on the other." Ex. J, Benson Dep. 69:9-16; Ex. F, Mural Photos at 300.

148.    Salina has not enforced the mural-sign code regime against Bike Tek. Ex. DD, Def. Amend. Ans. to First Set of Interrog., Rog 8.

149.    A music studio next to the Salina Symphony rehearsal hall has a music themed mural, titled Symphony of Sunflowers. Ex. G, Anderson Dep. 62:13-64:3, Ex. F, Mural Photos at 0120.

150.    Salina has not enforced the mural-sign code regime involving the Symphony of Sunflowers. Ex. DD, Def. Amend. Ans. to First Set of Interrog., Rog 8.

151.    The mural at Salina Art Center was exempt from the mural-sign code regime even though Salina believes it is "similar in function to a sign" and "will direct the public," because

Salina considers it an "art installation." Ex. V, Art Center DRB Packet at 7; Ex. F, Mural Photos at 0098.

152.    Salina has not enforced the mural-sign code regime against the Salina Art Center. Ex. DD, Def. Amend. Ans. to First Set of Interrog., Rog 8.

153.    The Salina City Code does not define "art installation," and the Zoning Administrator would need "to see a rendering of what they would like to do" to determine if a proposed mural qualified as an exempt "art installation." Ex. P, Andrew Dep. 280:6-16.

154.    When asked to explain how Salina identifies "art" that is exempt from the mural-sign code regime, Salina claimed that "'art' may be used from time to time as an imprecise short-hand for 'not sign'." Ex. X, Def. Ans. to First Set of Interrog., Rog 6.

155.    Across the parking lot from The Cozy is a mural, owned by a current City Commissioner who was then the Mayor, advertising Bull Durham Tobacco. Ex. P, Andrew Dep. 303:11-20; Ex. F, Mural Photos at 0093.

156.    Salina City Code § 42-510 says that any sign "which no longer advertises a bona fide business conducted, product sold or service provided shall be deemed abandoned and shall be removed at the expense of the owner."

157.    Bull Durham is no longer a bona fide business, but Salina does not consider this mural to be an abandoned sign. Ex. Q, Andrew 30(b)(6) Dep. 53:7-9.

158.    Instead, Salina created an unwritten policy that the Bull Durham mural was exempt from the mural-sign code regime "[b]ecause it was originally an internal sign on the wall of an enclosed building that it was exposed to daylight in 1986 when the building that occupied that site was torn down turning the interior wall into an exterior wall." Ex. P, Andrew Dep. 301:21-25.

159.    Salina owns a water tower with a large mural stating "Visit Salina.org, Right Place, Right Reason, Right Now." Ex. Q, Andrew 30(b)(6) Dep. 73:6-21.

160.    VisitSalina.org is the website of a private organization, the Salina Chamber of Commerce. Ex Q Andrew 30(b)(6) Dep. 76:18-20.

161.    Salina City Code § 42-504(2) exempts government signs placed "for the protection of the public health, safety, and general welfare" such as "a. Emergency and warning signs necessary for public safety; b. Traffic and wayfinding signs; c. Signs showing the location of public facilities including public and private hospitals and emergency medical services; and d. Any sign, posting, notice, or similar sign placed by or required by a governmental agency in carrying out its responsibilities to protect the public health, safety, and general welfare."

162.    Salina determined that the Chamber of Commerce website qualifies for this government public safety exemption because "attracting visitors and tourists to the city is their mission, and attracting visitors to the City of Salina protects the public health, safety and general welfare of the public." Ex. Q, Andrew 30(b)(6) Dep. 77:12-15.

163.    Salina determined that one side of the Kansas Wesleyan University scoreboard was an exempt scoreboard and not a regulated billboard, even if it contains advertisements, because it conveys information "directed at people that in the stadium." Ex. P, Andrew Dep. 105:6-23

164.    The opposite side of the scoreboard was determined to be a regulated billboard because it is "oriented towards Cloud Street and not the stadium." Ex. P, Andrew Dep. 104:9-14.

165.    The orientation of a sign is not anywhere in the code. Ex. P, Andrew Dep. 323:1-4.

166.    Zoning Administrator Andrew testified that if a church put up a cross this "would be considered a symbol, not a sign." Ex. P, Andrew Dep. 22:21-23:4.

167.    Even though Salina City Code § 42-764 includes "symbols" in the definition of a sign, Mr. Andrew testified that "[i]t has been the longstanding interpretation for the City of Salina that those are symbols just as flags don't count towards a sign allocation for a property." Ex. P, Andrew Dep. 24:12-15.

168.    If the same church, however, painted a mural saying, "Turn to Jesus," Salina would consider that a regulated sign because "[t]hey would be advertising their desire for the public to turn to Jesus." Ex. P, Andrew Dep. 54:18-22, 55:7-8.

169.    If a property owner flew a Kansas City Chiefs flag, Zoning Administrator Andrew would not consider this to be a sign, because "they are just expressing that property owner's support for their team." Ex. P, Andrew Dep. 33:22-34:6.

170.    Zoning Administrator Andrew believed this even though flags are expressly considered a sign under § 42-764, and a Chiefs flag "could be interpreted as announcing the Kansas City Chiefs." Ex. P, Andrew Dep. 35:4-5.

171.    If a business painted a mural of the Chief's Arrowhead logo and the phrase "Let's Go Chiefs!" Zoning Administrator Andrew would "interpret that to say that it is announcing that that property owner supports the Kansas City Chiefs." Ex. P, Andrew Dep. 89:11-24.

172.    But if the Kansas City Chiefs themselves had a training facility in Salina and wanted to paint the exact same mural, Zoning Administrator Andrew testified that he now considers the mural to be "advertising and directing attention." Ex. P, Andrew Dep. 89:25-90:3.

173.    If a property owner painted "I Like Ike," or "Vote Eisenhower 1952," Zoning Administrator Andrew would not consider this a regulated election sign, but "simply an expression of whoever the sign holder is that they like Ike." Ex. P, Andrew Dep. 114:19-20, 115:7-13.

174.    Conversely, a display saying "Mitt Romney 2012" must be removed because it's "an election sign that was up seven days after the election." Ex. P, Andrew Dep. 113:9-15.

175.    Zoning Administrator Andrew distinguishes the two because Eisenhower is dead, Ex. P, Andrew Dep. 114:17-19, even though the written code says nothing about a candidate being alive when requiring election signs be removed after the election. Salina City Code § 42-508(d).

176.    Zoning Administrator Andrew testified that "[a]ccording to the rules of construction of our city code, or and and are interchangeable." Ex. P, Andrew Dep. 72:2-3.

177.    Zoning Administrator Andrew testified that to know if "or" means "and" or vice versa "[y]ou have to look at the context in which its used." Ex. P, Andrew Dep. 72:18-19.

178.    If a member of the public wanted to know whether "or" means "and" or vice versa in the code "then they could contact the city to see how the city has historically interpreted it." Ex. P, Andrew Dep. 81:23-24.

**H.    Salina can't explain how its mural-sign code regime advances its interests.**

179.    Salina said the "interests served by regulating signs" are traffic safety, pedestrian safety, aesthetics, and property values. Doc. 101 at 4(b)(iii); Ex. X, Def. Ans. to Interrog. No. 4,

180.    When asked for the factual basis supporting its purported interests in aesthetics, pedestrian and traffic safety, and property values, Salina responded that "[a]s a matter of law, sign regulations, like the Sign Code, advance government interests in traffic safety, pedestrian safety, property values, and aesthetics." Ex. DD, Def. Ans. To Second Set. Interrog. 1.

181.    Salina continued by referencing an expert report, but ultimately, didn't provide any factual basis for any of its purported interests. *See* Ex. DD, Def. Ans. To Second Set. Interrog. 1.

182.    Salina's 30(b)(6) Representative isn't aware of any facts showing that its sign code enhances traffic safety or has succeeded in its objectives. Ex. N, Herrs 30(b)(6) Dep. 73:13-21.

183.    Salina's 30(b)(6) Representative isn't aware of any municipality that has conducted a before-and-after study to show its sign code has, in fact, enhanced traffic safety. Ex. N, Herrs 30(b)(6) Dep. 73:23—74:3.

184.    Salina's 30(b)(6) Representative isn't aware of any facts showing that its sign code enhances pedestrian safety. Ex. N, Herrs 30(b)(6) Dep. 74:5-15.

185.    Salina's 30(b)(6) Representative isn't aware of any facts showing that its sign code has succeeded in promoting property values. Ex. N, Herrs 30(b)(6) Dep. 74:17-25—75:1-8.

186.    Salina's 30(b)(6) Representative isn't aware of any facts showing that painted wall signs are more harmful to aesthetics than painted murals. Ex. N, Herrs 30(b)(6) Dep. 76:19-23.

187.    Salina's 30(b)(6) Representative isn't aware of any facts showing that painted wall signs are more detrimental to pedestrian safety than painted murals. Ex. N, Herrs 30(b)(6) Dep. 76:25-77:1-10; 25:14-17 (admitting a painted wall sign can't be less secure than a painted mural)

188.    Salina's 30(b)(6) Representative isn't aware of any facts showing that painted wall signs are more detrimental to traffic safety than painted murals. Ex. N, Herrs 30(b)(6) Dep. 77:23-25—78:1-10; 25:14-17 (admitting a painted wall sign can't be less secure than a painted mural)

189.    City Manager Schrage believes Colin Benson's artwork is "high energy" and The Cozy's mural "pops." Ex. E, Comm. Tran. 32:2-5.

190.    City Manager Schrage is not aware of any traffic accidents that have resulted from The Cozy's display. Ex. L, Schrage Dep. 126:15-20.

191.    City Manager Schrage is not aware of any pedestrian accidents that have resulted from The Cozy's display. Ex. L, Schrage Dep. 126:22-25.

192.    City Manager Schrage is not aware of property values decreasing as a result of The Cozy's display. Ex. L, Schrage Dep. 127:8-11.

193.    Director Driscoll is not aware of any traffic or pedestrian accidents that have resulted from The Cozy's display. Ex. M, Driscoll Dep. 167:16-22.

194.    Director Driscoll is not aware of facts showing that property values have decreased as a result of The Cozy's display. Ex M Driscoll Dep. 167:23-25.

195.    Director Driscoll is not aware of facts showing that the local economy has gotten worse because of The Cozy's display. Ex. M, Driscoll Dep. 168:1-3.

196.    Director Driscoll received several emails suggesting The Cozy's display was aesthetically pleasing. Ex. M, Driscoll Dep. 168:9-25; Ex. EE, Emails from Public.

197.    Salina retained attorney Mark White as an expert. Ex. FF, White Dep. 18:2-14.

198.    Mr. White isn't aware of any studies commissioned or conducted before Salina drafted any version of its sign code. Ex. FF, White Dep. 46:25-47:1-5.

199.    Mr. White doesn't have any knowledge about why the sign code had been amended. Ex. FF, White Dep. 47: 7-10;

200.    Mr. White is not aware of any peer reviewed study that has analyzed the efficacy of the sign code in promoting the goals, objectives, and policies of Salina's comprehensive plan. Ex. FF, White Dep. 47:12-19.

201.    Mr. White is not aware of any studies at all that have analyzed the efficacy of Salina's code. Ex. FF, White Dep. 47:21-48:4.

202. Mr. White is not aware of any evidence or studies that establish that private art is more dangerous than public art. Ex. FF, White Dep. 114:20-25—115:1-8.

203. Mr. White is unaware of any evidence showing that commercial content painted on a wall is more dangerous than non-commercial content. Ex. FF, White Dep. 115:22-25—116:5-11.

204. Mr. White is not aware of any evidence or studies that establishes that burger-esque UFOs are more dangerous than pizza-esque UFOs. Ex. FF, White Dep. 116:13-18.

205. According to Mr. White, the Mural at the Mill is not dangerous. Ex. FF, White Dep. 120:10-12.

206. The Mural at the Mill would not become dangerous, according to Mr. White, if a daycare business started operating inside the building. Ex. FF, White Dep. 121:10-14.

207. Likewise, the exact same painting at the Mural at the Mill would not become dangerous if it were painted on a daycare wall. Ex. FF, White Dep. 120:13-17.

208. Mr. White is not aware of any research or studies showing that the public would find painted signs less pleasing than other painted displays. *See* Ex. FF, White Dep. 123:7-14.

209. Mr. White is not aware of any research or studies showing that one type of wall painting is more aesthetically pleasing than another type. Ex. FF, White Dep. 123: 16-22.

210. Mr. White is unaware of any evidence proving that commercial content painted on a wall is less aesthetically pleasing than non-commercial content. Ex. FF, White Dep. 124:13-19.

211. Mr. White admits the Mural at the Mill is aesthetically pleasing and concedes the mural would not become less aesthetically pleasing at a daycare. Ex. FF, White Dep. 125:7-12.

212. Mr. White is the author of a learned treatise, "*Content-Neutral Sign Codes After Reed And Austin*, (Sign Research Foundation 2022). Ex. FF, White Dep. 191:19-192:2; Ex. GG, *Content Neutral Sign Codes After Reed and Austin*.

213. Mr. Howard hired Charles Taylor as a rebuttal expert. Ex. II, Taylor Dep. 34:16-23.

214. The Federal Highway Administration's "reviews of signage and traffic safety have found no conclusive evidence of a link between signs and traffic accidents." Ex. HH, Taylor Dec., Rpt. at 12.

215.    Properly constructed and positioned signs are not a safety hazard. Ex. HH, Taylor Dec., Rpt. at 10-14; *id.* at 13 (The "research [has] demonstrated that properly placed signs are not a safety hazard"); *id.* at 10 ("[t]he argument that signs" "constitute a traffic safety hazard is not supported by scientific evidence.")

216.    There is "no evidence" Salina's sign code "promotes an interest in aesthetics[.]" Ex. HH, Taylor Dec., Rpt. at 15-18.

217.    There is no scientific or evidentiary support undergirding any of Salina's stated interests. Ex. HH, Taylor Dec., Rpt., 1-25.

**I.    Mr. Howard wants to finish painting the mural.**

218.    Mr. Howard is "very passionate" about his whimsical UFO-themed mural. Ex. G, Anderson Dep. 48:1-2; Ex. A, Howard Dec. ¶ 6, 7, 8, 12, 13, 27, 31, 32.

219.    Mr. Howard was "moved to tears" because Salina wouldn't let him finish his mural. Ex. L, Schrage Dep. 59:9-12, 20-25; Ex. A, Howard Dec. ¶ 28.

220.    Mr. Howard left another meeting "crying" because he couldn't finish his mural. Ex. L, Schrage Dep. 59:9-25.

221.    Not being able to finish the mural made Mr. Howard feel "that [he] didn't have a voice." Ex. D, Howard Dep. 252:14-16; Ex. A, Howard Dec. ¶ 30.

222.    Mr. Howard doesn't want to alter the mural's content as shown in the rendition shown above. ¶ 29; Ex. D, Howard Dep. 253:20-24; Ex. M, Driscoll Dep. 49:16-18; Ex. A, Howard Dec. ¶ 31.

223.    Mr. Howard wants to finish what he started. ¶¶ 118, 151, 170, 190. "I didn't get to finish my story." Ex. D, Howard Dep. 146:4. "I want to paint my wall." ¶¶ 29, 151-153, 155-156, 158-160, 165-173, 278-281, 298-305; Ex. A, Howard Dec. ¶ 32.

224.    There is "no basis to doubt" that Mr. Howard will finish the mural as shown in the rendition above, if allowed. Ex. P, Andrew Dep. 356:21-357:2; Ex. A, Howard Dec. ¶ 31-32.

225.    Nobody has told Mr. Howard they dislike the mural. Many people have told Mr. Howard they like it. Ex. A., Howard Dec. ¶ 29.

## Argument

I.     **Salina's mural-sign code regime violates the First Amendment.**

A.     **The mural-sign code regime is content- and speaker-based.**

Salina's idiosyncratic mural-sign code regime regulates speech based on content. It "target[s] speech based on its communicative content," it "applies to particular speech because of the topic discussed or the idea or message expressed," and it targets "specific subject matter." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163, 169 (2015). The regime also "draws distinctions based on the message," "cannot be justified without reference to the content of the regulated speech," "defin[es] regulated speech by its function or purpose," and because Salina "disagree[s] with [certain] message[s]." *Id.* at 163, 164 (cleaned up).

Under the text of the sign code—largely unchanged since 1966—*all* outdoor murals are regulated wall signs, and every wall sign is supposed to be subjected to the same size restrictions and permit requirements. *Statement of Facts* (*SOF*) ¶¶ 34-36. A mural is a "pictorial representation" or a "display that is calculated to attract the attention of the public," after all.[5] *SOF* ¶¶ 34-36. But for decades, that's not how it's worked in practice. Salina doesn't apply its size and permitting requirements to displays it considers murals. *SOF* ¶ 37; *see also SOF* ¶¶ 31-32, 46, 48, 50, 72, 86-92, 95, 102-104, 120, 121, 124, 128, 129, 151, 154.  In practice, the difference between an unregulated mural and a regulated sign turns on the display's content. If it relates to the entity putting it up, is "part of a commercial transaction," contains a "commercial message," or if it "includes a message that pertains to the goods or services for sale," Salina considers it a regulated sign subject to size limitations and permitting requirements. *SOF* ¶¶ 42, 45, 48, 54, 55, 56-59, 63-68, 71-73, 80, 100, 168-172; *see also*, *SOF* ¶ 48 (a "distinction is commonly made between murals and art when compared to commercial speech").

Salina's preoccupation and disagreement with that content explains why Mr. Howard could paint an exact, wall-sized replica of Andy Warhol's *Campbell's Soup Cans* (1962), unless he started selling soup, *SOF* ¶¶ 89-90; why he could paint a wall-sized airplane mural, unless he

_____

[5] Alternatively, every mural "directs attention" to the mural or the building on which it is located.

offered travel services (or sold airplanes), *SOF* ¶ 86; why he could paint wall-sized pizza slices, since he doesn't sell pizza, *SOF* ¶ 87; why a city commissioner wanted to know "what it would take for him to turn this into a mural," *SOF* ¶ 70, and explains why he can't paint his burger-esque, UFO-themed mural, *SOF* ¶¶ 45, 48, 50, 54, 55, 56-59, 63-68, 71-73, 75, 80, 100, 168-172; *see also SOF* ¶ 95 (Cozy's display wouldn't be a regulated sign if it were painted on a business that didn't sell hamburgers). Under the mural-sign code regime, moreover, a church can display a cross, but not a wall-sized "Turn to Jesus" painting, *SOF* ¶¶ 167-168; a coffee shop could paint a wall-sized olive branch mural, but not one depicting a coffee branch, *see SOF* ¶¶ 63-66, 68, 91; and a taco shop can paint a wall-sized mural of a dove, unless it started selling "dove tacos," *SOF* ¶ 92. *See also*, *SOF* ¶¶ 7, 46, 73, 228 (coordinating with festival on content), *SOF* ¶¶ 120, 121, 122-124, 128, 129, 130, 169-172, 173-175 (more content-based examples).

Indeed, Salina admits it regulated The Cozy's display because of its content, saying it was "all on the basis of a commercial message." *SOF* ¶¶ 57-59; *see also SOF* ¶ 55 (Cozy's "content falls under sign provisions in the City Code rather than art"); *SOF* ¶ 54 (Cozy's artwork is a regulated sign because "the hamburgers are basically the same thing [Mr. Howard] sells, and therefore, it would be signage"); *see also SOF* ¶¶ 75, 77, 79, 95, 100, 101. That's plainly content based under *Reed*; and under *Aptive Envtl., LLC v. Town of Castle Rock, Colorado* too, where the Tenth Circuit rejected the argument that a commercial door-to-door solicitors' curfew was content neutral. 959 F.3d 961, 966, 970, 999 (10th Cir. 2020). The curfew "*is* content-based," the Tenth Circuit held, because it "applies by distinguishing between the commercial and noncommercial content of the solicitors' speech," a conclusion "dictated by the Supreme Court's decision in *Discovery Network*. There, the Court struck down a law that banned commercial but not noncommercial newsracks. In so doing, the Court concluded that the regulation was not content-neutral because the very basis for the regulation is the difference in content between ordinary newspapers and commercial speech." *Id*. at 982 (internal quotes cleaned up, italics in original); *see also SOF* ¶ 212; Ex. GG at 6 (regulation is "content-based if the message displayed" "has a regulatory impact").

Separately, the regime is content based because, as Salina officials have also repeatedly admitted, Salina has to "read the sign," or in this case, look at the mural's content to determine whether its restrictions apply. *SOF* ¶¶ 28-30, 45-46, 54, 56-59, 68-70, 72, 76-79, 81-85, 86-92, 96-101; *Reed*, 576 U.S. at 162; *Clark v. City of Williamsburg, Kan.*, 388 F. Supp. 3d 1346, 1358 (D. Kan. 2019), *aff'd,* 844 F. App'x 4 (10th Cir. 2021); *Quinly v. City of Prairie Vill., Kan.*, 446 F. Supp. 2d 1233, 1239 (D. Kan. 2006); *Norton v. City of Springfield, Ill.*, 806 F.3d 411, 412 (7th Cir. 2015); *Neighborhood Enterprises, Inc. v. City of St. Louis*, 644 F.3d 728, 736 (8th Cir. 2011).[6]

Three analogous mural cases further demonstrate the regime is content based. In *Complete Angler, LLC v. City of Clearwater, Fla.*, the owners of a bait and tackle shop painted a fish mural. 607 F. Supp. 2d 1326, 1329 (M.D. Fla. 2009). The city argued that murals displayed "in conjunction with" a business were not "art work," but commercial signage subject to size regulations. *Id.* at 1331. But murals showing "first responders" or "kids playing in the park" were unregulated art. *Id.* at 1333-34. The court held that was content based. The city "necessarily examined [the mural's] content" to determine whether it was "subject to the permit requirement or spatial constraints." *Id.* at 1333. Further, the city's "statements by its own representatives" and its "condoning of" the other murals showed the regime was "not content-neutral." *Id.* at 1334.

In *Kerston v. City of Mandan,* owners of a western bar painted a mural depicting mountains, cowboys, and the bar's name, which the city claimed was a regulated sign, not an unregulated mural. 389 F. Supp. 3d 640, 642, 644 (D.N.D. 2019). "Clearly," the court wrote, the "regulation is based on the content of the speech," and "is not content neutral," *Id.* at 646.

In *Morris v. City of New Orleans*, a painting with "a non-commercial message," was considered a mural; but if it had "a commercial message," it was considered a "sign," and subjected to different regulations. 399 F. Supp. 3d 624, 635 (E.D. La. 2019). That was

---

[6] The longstanding "read the sign" analysis wasn't obviated in *City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 73-74 (2022). Besides, *Austin* was limited to off-premises, "location-based and content-agnostic" regulations for billboards that didn't "single out any topic or subject matter for differential treatment." *Id.* at 76. What's more, billboards have always been treated differently by courts because of their unique characteristics. *See, e.g., Cafe Erotica of Fla., Inc. v. St. Johns Cnty.*, 360 F.3d 1274, 1285 (11th Cir. 2004) (the "law of billboards" is "a law unto itself").

"undeniably" "content-based" because it "separates out commercial and non-commercial speech." *Id.* at 636.

The results of Salina's content-based decisions are plainly evident. *SOF* ¶¶ 6, 19, 117, 121, 122, 129, 133, 147, 149, 155. And just like the city in *Complete Angler*, because Salina considers displays showing fire fighters (at the fire station) and kids playing (Mural at the Mill), as unregulated artwork, rather than regulated signs, proves the regime is content based. 607 F. Supp. 2d at 1331; *SOF* ¶¶ 122-124, 117, 120.

Salina can't credibly explain *why* the mural at The Cozy is a regulated sign, but the Mural at the Mill isn't, even under its preferred reading of the code. *SOF* ¶ 38-39, 122-127, 205-207, 211. The latter covers an entire grain elevator, it's a "pictorial representation," it "attract[s] the attention of the public," it "direct[s] attention to" itself, and it "direct[s] attention to" downtown Salina. Even though it's a "sign" as the code defines it, *SOF* ¶¶ 34-36, Salina considers it an unregulated mural, *SOF* ¶ 124. Besides, whether something is "used to announce, direct attention to, or advertise" is still content based because it "defin[es] regulated speech by particular subject matter," and "defin[es] regulated speech by its function or purpose," *Reed*, 576 U.S. at 163, *SOF* ¶ 97, or "turn[s] on whether the speech is commercial or not." *Aptive*, 959 F.3d at 982; *see also id.* at 983.

Under *Reed*, *Aptive*, *Discovery Network*, *Kerston*, *Complete Angler*, and *Morris*, Salina's mural-sign code regime is content based.[7] Because Salina applies the mural-sign code regime to artwork that "reference[s] a product or service," but "exempt[s] works of art" from its code "which in no way identify or specifically relate to a product or service," it's a content-based regulation. *Cent. Radio Co. Inc. v. City of Norfolk, Va.*, 811 F.3d 625, 633 (4th Cir. 2016) (cleaned up).[8] It's a speaker-based regulation too. For instance, a pizza shop could paint an exact replica of

---

[7] Even if Salina treats all murals pertaining to businesses the same, it's still a "content-based" regulation because it's a "regulation targeted at specific subject matter" "even if it does not discriminate among viewpoints within that subject matter." *Reed*, 576 U.S. at 169.

[8] *See also Ficker v. Talbot Cnty., Maryland*, 553 F. Supp. 3d 278, 285 (D. Md. 2021) (size limit based on subject is content based); *Morris*, 399 F. Supp. 3d at 636 (code that turns on message is "undeniably"

The Cozy's mural, but The Cozy can't. *SOF* ¶ 95; *see also SOF* ¶¶ 87-90, 92. That "favor[s] some speakers over others" and "reflects a content preference." *Reed*, 567 U.S. at 170.

"Both on its face and in its practical operation," Salina's mural-sign code regime "imposes a burden based on the content of speech and the identity of the speaker," *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011), and is "a paradigmatic example of content-based discrimination," *Reed*, 576 U.S. at 169.

### B.    Strict scrutiny applies, which Salina can't satisfy.

Content-based regulations "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* at 163. That requires Salina to prove, *with evidence*, its restrictions actually advance its stated interests, that its restrictions are not over- or under-inclusive, and that it used the least restrictive means possible. *See generally id.* at 171–72 (underinclusive); *United States v. Williams*, 553 U.S. 285, 292-97 (2008) (overbroad); *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 827 (2000) (least restrictive means required to address a real problem).

Salina can't clear its initial First Amendment hurdle. None of its stated interests, "traffic safety, pedestrian safety, aesthetics, and property values," Doc. 101 at 4.b.iii., are compelling ones. *Clark*, 388 F. Supp. 3d at 1361 (aesthetics and traffic safety not compelling interest); *Ficker*, 553 F.Supp.3d 278, 283 (D. Md. 2021) (aesthetics not a compelling interest); *Int'l Outdoor, Inc. v. City of Troy*, No. 17-10335, 2021 WL 2275977, at *3 (E.D. Mich. Apr. 6, 2021) (maintaining property values not a compelling interest). But even if they are compelling, that Salina can't satisfy less rigorous tests, *see* Section I.C. below, necessarily means it can't satisfy the heavier one.

#### 1.    Even if the mural is considered commercial speech, strict scrutiny applies.

Salina officials have repeatedly claimed The Cozy's mural is commercial speech, *SOF* ¶¶ 44, 48, 50, 56-59, 65-68, 73, 80, 100, 128, and Salina itself argues the mural-sign code regime "passes the commercial speech test" under *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm' of*

---

content based); *Neighborhood Enterprises*, 644 F.3d at 736; *Clark*, 388 F.Supp. 3d at 1359; *Quinly*, 446 F.Supp. 2d at 1239.

*New York*, 447 U.S. 557 (1980). Doc. 27 at 13 (cleaned up); *see also* Doc. 27 at 14 ("display is commercial speech"). "Commercial speech" is "usually defined as speech that does no more than propose a commercial transaction." *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001). Because The Cozy's mural is "not limited to merely proposing commercial transactions," it isn't commercial speech, even *if* it "may occasionally inspire" commercial transactions. *Complete Angler*, 607 F. Supp. 2d at 1332. The Cozy's mural doesn't say, for example, "five burgers for a dollar." The mural is "artwork," "express[ive]," conveys Mr. Howard and The Cozy's "character," and tells a story about alien travelers visiting The Cozy by burger-esque UFOs. *SOF* ¶¶ 9-13, 15-18. Mr. Howard wants people to come inside, even though there's an outside walk-up window and unlimited outside space, because it's more personal, more fun, better for Salina's reputation, and because people get to "see the history within Salina," not to maximize profits. *SOF* ¶¶ 2, 3, 19-22, 24-25. Inside, employees encourage people to explore downtown, spend their money *elsewhere*, and sometimes even give away free burgers so people can "see what [The Cozy's] all about, see what people talk about." *SOF* ¶¶ 22, 23.

Salina has "impermissibly treated Plaintiffs' noncommercial speech as commercial speech," but the "City may not skirt First Amendment protections by applying a definition of commercial speech that better suits its tastes." *Complete Angler*, 607 F. Supp. 2d at 1332. There's no *reason* to apply the commercial speech doctrine either. It contradicts the First Amendment's original public meaning, is prone to arbitrary application, is unfounded,[9] its underlying policy justification—consumer protection—doesn't exist here, and Salina can't prove the mural is, in fact, commercial speech.

Even *if* the mural is commercial speech,[10] the "regulation of commercial speech that is not content-neutral is still subject to strict scrutiny under *Reed*." *Int'l Outdoor, Inc. v. City of Troy,*

---

[9] *See* Alex Kozinski and Stuart Banner, *Who's Afraid of Commercial Speech?*, 76 Va. L. Rev. 627 (1990), *see also 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 518 (1996) (Thomas, J., concurring), *id.* at 517 (Scalia, J., concurring), Deborah J. La Fetra, *Kick It Up A Notch: First Amendment Protection for Commercial Speech*, 54 Case W. Res. L. Rev. 1205 (2004).

[10] If the doctrine applies, Plaintiffs reserve the right to challenge it. Doc. 16 ¶ 258; Doc. 101 at 4.a.i.

*Michigan*, 974 F.3d 690, 703 (6th Cir. 2020); *see also*, *Norton*, 806 F.3d at 412 (After *Reed*, a "law distinguishing one kind of speech from another by reference to its meaning now requires a compelling justification"); *cf. City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429-31 (1993) (applying strict scrutiny); *cf. Sorrell*, 564 U.S. at 565-66 (applying heightened scrutiny to commercial speech regulation).[11]

Based upon a collective reading of *Reed*, *Discovery Network, Sorrell, Int'l Outdoor*, and *Norton*, content-based restrictions on commercial speech trigger strict scrutiny. That Salina can't satisfy less rigorous tests, *see* Section I.C. below, necessarily means it can't satisfy the heavier one.

### C.      Salina's restrictions can't survive *any* form of heightened scrutiny.

The Plaintiffs are still entitled to summary judgment even if strict scrutiny doesn't apply. Salina doesn't have any evidence that its restrictions on speech advance its stated, theoretical interests. A painted wall display isn't more likely to fall off a wall, or block views, because it pertains to a business, for instance. The Cozy's burger-esque UFO-themed mural doesn't become an eyesore, cause car wrecks, hurt pedestrians, or destroy property values because The Cozy sells sliders on the inside either. Andy Warhol's *Campbell's Soup Cans* (1962) don't suddenly become less beautiful because someone sells soup on the inside, and there's no reason a church can display a cross, but not a "Turn to Jesus" painting.

### 1.      Even under *Central Hudson*, the mural-sign code regime is unconstitutional.

The Plaintiffs are entitled to summary judgment even if *Central Hudson*'s test applies. Salina can't prove that its stated interests are "substantial," that its restrictions advance its interests "in a direct and material way," and that its restrictions are "narrowly tailored." *Aptive*, 959 F.3d at 987–88, 982 (cleaned up); *see also Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1072 (10th Cir. 2001). All of that requires *actual evidence*, which Salina doesn't have. *Aptive*, 959 F.3d at 996 ("[c]onjectural harms and suppositions" are insufficient); *id.* at 995 ("asserted

---

[11] In *Aptive*, the Tenth Circuit only applied *Central Hudson*'s test because the plaintiffs requested it. *See, Brief of Appellee*, 18-1166 at page 26; *Aptive*, 1:17-cv-01545-MSK-MJW (D. Colo.), Doc. 23 at 11-12, Doc. 93 at 1, Doc. 105 at 2. Not so here. Doc. 16 ¶ 257.

interests" in "the abstract" not enough); *id*. at 999 ("harms" must be "real and that its restriction will in fact alleviate them to a material degree") (cleaned up); *id*. at 990 (record requires "a concrete, nonspeculative harm"); *Morris*, 399 F. Supp. 3d at 637 ("blindly intoning" theoretical civic interests not enough); *Complete Angler*, 607 F. Supp. 2d at 1334 ("abstract notions will not suffice").

In the Tenth Circuit, the commercial speech test isn't a fact-free, government deferential inquiry. In *Aptive*, for example, the Tenth Circuit independently reviewed the evidentiary record after a bench trial. 959 F.3d at 966. The Town of Castle Rock produced complaints involving registered and unregistered solicitors, solicitors visiting homes after the curfew time, testimonial evidence from council members, town employees, the police chief and its former mayor, statistical evidence, and much more. *Id*. at 990-992. That was not enough to satisfy the government's First Amendment burdens, the court held. *Id*. at 996 (The town "has failed to demonstrate that the Curfew directly advances in a material way its substantial interest").

Salina doesn't have anything close to the evidence that Castle Rock did, which still wasn't enough. For *each* of Salina's asserted interests—even assuming they're substantial in the *abstract*—it "fails to carry its burden of demonstrating that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Id*. at 989 (cleaned up).

Starting with its theoretical interest in "traffic" and "pedestrian" safety, *SOF* ¶ 179, Salina's doesn't have *any* evidence, let alone "studies," "supportive evidence-based findings," "survey results," statistics, or other credible evidence, justifying its First Amendment restrictions on safety grounds. *Id*. at 993; *SOF* ¶¶ 180-184, 187, 188, 190-191, 193, 197-207, 214-215. There is no evidence that the sign code has actually succeeded in those objectives, *SOF* ¶¶ 180-184, 187, 188, 190-191, 193, 197-207, 214-215; that a mural pertaining to a business is unsafe, *SOF* ¶¶ 180-181, 187, 203-207; that it would cause a traffic accident, *SOF* ¶¶ 180-183, 188, 190, 193; or a pedestrian accident, *SOF* ¶¶ 180-181, 184, 187, 193. There is no evidence that a painted mural will fall off the wall, *see SOF* ¶¶ 187-188; that burger-esque UFOs are more dangerous than flying pizza slices, *SOF* ¶ 204; that commercial art is more dangerous than non-commercial art, *SOF* ¶ 203; or

that private art is more dangerous than public art, *SOF* ¶ 202. There is no evidence The Cozy's mural has caused any safety issues at all. *SOF* ¶ 190-191, 193. That Salina doesn't have any credible, real-world evidence supporting its theoretical safety interests isn't surprising: "[t]he argument that signs" "constitute a traffic safety hazard is not supported by scientific evidence." *SOF* ¶¶ 213-215. Just like the Town of Castle Rock, Salina doesn't have the evidence to support any of its safety arguments. *Aptive*, 959 F.3d at 993.

Salina's theoretical interest in "aesthetics" is not supported by any studies, statistics, or credible evidence either. *SOF* ¶¶ 180-181, 186, 196, 197-201. There is *no evidence* that a mural pertaining to a business is not aesthetically pleasing. *SOF* ¶ 208-211. In fact, the opposite is true. The public enjoys The Cozy's mural. *SOF* ¶¶ 196, 225; *see also*, *SOF* ¶ 189 (The Cozy's mural "pops."). That Salina doesn't have any credible evidence supporting its theoretical interests in aesthetics isn't altogether surprising either, the scientific evidence doesn't support it. *SOF* ¶ 216. Because there "is nothing in the record" to credibly "suggest that commercial messages in artwork are more unsightly than non-commercial messages in artwork," Salina's mural-sign code regime is "unconstitutional insofar as it distinguishes between commercial and non-commercial artwork." *Morris*, 399 F. Supp. 3d at 637; *see also*, *Discovery Network*, 507 U.S. at 425 (commercial newsracks "no greater an eyesore" than noncommercial newsracks); *Neighborhood Enterprises*, 644 F.3d at 737-38 (aesthetics not narrowly tailored when exemptions are content-based); *Dimmitt v. City of Clearwater*, 985 F.2d 1565, 1570 (11th Cir. 1993) (city may not "promot[e] aesthetics" "by restricting speech depending upon the message expressed"); *Ficker* 553 F. Supp. 3d at 284-85 (sign code not narrowly tailored); *Reed,* 576 U.S. at 172 (same); *Bee's Auto, Inc. v. City of Clermont,* 8 F. Supp. 3d 1369, 1380 (M.D. Fla 2014).

Salina doesn't have any evidence for its claimed interest in "property values," that the code actually succeeds in advancing property values, or that The Cozy's mural impacts property values. *SOF* ¶¶ 180-181, 185, 192, 194, 195, 196-201. To the extent Salina claims other interests, they're either not "substantial," or they're irrelevant. *SOF* ¶¶ 179. Besides, they're still not supported by actual evidence. *SOF* ¶ 217.

Salina retained attorney Mark White to help supply the evidence it doesn't have.[12] *See SOF* 180. But just like Salina, Mr. White doesn't have *any* evidence that Salina's alleged "harms" are "real and that its restriction will in fact alleviate them to a material degree" either. *Aptive,* 959 F.3d at 999; *SOF* ¶¶ 197-217. If anything, Mr. White's learned treatise demonstrates the regime is content based and doesn't pass *any* level of scrutiny. *SOF* ¶ 212; *see* Ex. GG at 9-10, 20-21 (regime violates "Tips to Comply with *Reed*" and "*Reed*'s Top 10 Takeaways"). Salina's argument that it doesn't need evidence, *SOF* ¶ 180, is plainly wrong. *Aptive*, 959 F.3d at 987-988; *id*. at 996 ("talismanic invocation" of interest not enough); *id*. at 988 (substantial interests "in the abstract" not enough); *see id*. 988-999.

Salina can't credibly explain why it treats murals differently from signs, why flying pizza slices are safe and aesthetically pleasing but burger-esque UFOs aren't, and all the other content-based exemptions from the size and permitting regulations either. Because Salina doesn't have *any* evidence of real-life, tangible harms, or evidence justifying its restrictions, or that the restrictions directly and materially advance its alleged interests, or evidence that its restrictions are not over- or under-inclusive, and that it considered less restrictive alternatives, this Court should grant the Plaintiffs summary judgment.

### 2. Even if it's content neutral, the mural-sign code regime is unconstitutional.

Even *if* the regime is content neutral, the Tenth Circuit's fact-intensive content-neutral test proves too much for Salina as well. *See, e.g., McCraw v. City of Oklahoma City*, 973 F.3d 1057, 1071-1072 (10th Cir. 2020) (describing and applying content-neutral test). In *Brewer v. City of Albuquerque*, for example, the city restricted certain pedestrian activities on the theory it "was necessary to address persistent and troubling pedestrian safety concerns stemming from high rates of vehicular accidents[.]" 18 F.4th 1205, 1209 (10th Cir. 2021). The district court entered summary judgment against the city, which appealed. *Id*. at 1214. The Tenth Circuit explained that even under a content neutral analysis, "the burden falls on the City to show that its recited harms,

---

[12] Plaintiffs have filed a motion to strike and/or exclude. *See* Docs. 97, 103.

specifically defined, are real and that the Ordinance will in fact alleviate them in a direct and material way—and if the City is unable to demonstrate that the Ordinance provides more than ineffective or remote support for the City's stated purpose, or sufficiently serves those public interests in a direct and effective i.e., material way, then we are constrained to conclude that the Ordinance is not narrowly tailored and, consequently, contravenes the First Amendment." *Brewer*, 18 F.4th at 1227 (cleaned up); *id*. at 1221 (government required to consider less restrictive means); *id*. at 1220 (government must leave open ample alternative channels of communication).

The Tenth Circuit independently reviewed the evidentiary record, *id*. at 1227, which included the city's production of 900 accident and police reports, statistical information from the ordinance's preamble describing injury and fatality numbers, anecdotes from city councilors, police officers, and constituents, and much more. *Id*. at 1232, 1227. That was not enough, the Tenth Circuit held, because "as the record evidence reflects, the Ordinance neither alleviates any real, non-speculative harms in a direct and material (i.e., effective) way, nor otherwise advances the City's more abstract safety rationales." *Id*. at 1226. The Tenth Circuit repeatedly emphasized that even under a content neutral framework, the government *needs concrete evidence* justifying its First Amendment restrictions. *E.g., id*. at 1226 (First Amendment violation "unmistakable" when "juxtaposed against the paltry record evidence of real, non-speculative harms"); *id*. at 1238 (describing "paucity of evidence proffered by the City"); *id*. at 1243 (government "required" to have "evidence demonstrating" the ordinance "ameliorates real, not speculative, harms"); *id*. at 1245 (City's "largely evidence-free approach" to establishing the ordinance's constitutionality "an approach that is unavailing—is emblematic of its efforts, more broadly, to demonstrate the Ordinance's constitutionality—efforts that are also unavailing").

As shown in Section I.C.1. above, Salina doesn't have *any* evidence, let alone anything close to the evidence that Albuquerque did, which *still* wasn't enough. Again, Salina's argument that it doesn't need evidence, *SOF* ¶ 180, is plainly wrong under *McCraw* and *Brewer;* and any suggestion that *StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243 (10th Cir. 2023), turned the Tenth Circuit's First Amendment analysis into a fact-free, government-deferential inquiry where the

government gets to restrict speech because it says so, is terribly mistaken. *See* Doc. 101. In *StreetMedia*, the plaintiffs argued that treating billboards "differently depending on whether the message was paid for or not" was unconstitutional. 79 F.4th at 1247. Although the Tenth Circuit was "skeptical" the regulatory regime could survive *Brewer*'s rigorous evidentiary requirements, the billboard plaintiffs did "not allege with any specificity that the Act and rules fail to meet intermediate scrutiny," and "[t]hus conclude[d] that the district court properly dismissed" the claim. *Id.* at 1252. Unlike the billboard companies, the Plaintiffs have consistently, and with specificity, alleged that Salina's regime fails under *any* level of First Amendment scrutiny.

Salina doesn't have any credible evidence of any real-life harms it's trying to address, that its speech restrictions alleviate even its theoretical interests in a direct and material way, that its speech restrictions are narrowly tailored to serve real-life, content-neutral interests, that it has left open ample alternative channels of communication, or that it considered less-restrictive means. Salina can't prove any of the Tenth Circuit's content-neutral requirements from *McCraw* and *Brewer*. This Court should therefore award the Plaintiffs summary judgment.

## II.     Salina's mural-sign code regime is an unconstitutional prior restraint.

Salina's mural-sign code regime is an unconstitutional prior restraint. In addition to being content based, it lacks "narrow, objective, and definite standards," it requires the "appraisal of facts, the exercise of judgment, and the formation of an opinion," *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 131 (1992) (cleaned up),[13] it gives "unbridled discretion" to its officials, including its Zoning Administrator, and because its unwritten policies and practices authorize sign permit applications to be placed "on hold" indefinitely, *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225-26 (1990) (plurality opinion).

Salina says signs require permits, murals don't. Salina's *preferred* definition of a "sign" is a display that is "used to announce, direct attention to, or advertise." By not clearly defining those

---

[13] *See also Saia v. New York*, 334 U.S. 558, 560 (1948); *Lovell v. City of Griffin*, 303 U.S. 444, 450–51 (1938); *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 769–70 (1988).

terms, or the term "mural," Salina fails to give clear guidelines to both the permit applicant and the Zoning Administrator tasked with making the permitting decision. Deciding whether a display is a regulated sign, or an unregulated mural, plainly requires the exercise of judgment and the formation of an opinion. For instance, Zoning Administrator Andew has thirty-seven years of experience in Salina's planning department, and he couldn't answer whether a more traditional looking UFO mural would be considered a regulated sign without first looking at a rendering of it; and couldn't answer whether cows grazing in fields of mustard plants, tomatoes, and onions would be a regulated sign without first seeing a rendering of it as well. *SOF* ¶¶ 82, 83. Salina officials don't agree whether its firefighter display is a mural or a sign, *SOF* ¶¶ 117-120, and can't determine whether other displays are signs or murals without seeking legal advice, *SOF* ¶¶ 93, 94, 118-119, 127. All of that demonstrates that judgment must be exercised, and opinions must be formed, the hallmarks of an unconstitutional prior restraint.

Salina doesn't regulate things it considers "art." *SOF* ¶¶ 55, 69, 74, 121, 151-154; *see also SOF* ¶ 57 ("signs and commercial speech" can't be considered "art"). But the question, "What is art?" has been described as "one of the most elusive of the traditional problems of human culture," Richard Wollheim, *Art and Its Objects* 1 (1980), and courts have found the term "works of art" inherently vague. *E.g., Household Goods Carriers' Bureau v. ICC*, 584 F.2d 437, 440 (D.C. Cir. 1978).

Zoning Administrator Andrew's unbridled discretion can be seen in the decades of uneven application of the regime. *SOF* ¶¶ 6, 19, 117, 121, 122, 129, 133, 147, 149, 155. He alone gets to decide whether the words "and" and "or" can be substituted for one another. *SOF* ¶¶ 176-178. The Zoning Administrator is empowered by Salina's unwritten policies and practices to ignore the code's text, *SOF* ¶ 38-39; and invent code exemptions. *SOF* ¶ 163-164 (inward "oriented" displays not regulated); *SOF* ¶ 140-146 (exterior wall painting deemed inside because it faced an adjacent, outdoor structure); *SOF* ¶¶ 160-162 (Chamber of Commerce website unregulated because it's necessary to protect public safety); *SOF* ¶¶ 131-136 (unwritten policy of measuring displays differently when he thinks it's "practical"); *SOF* ¶ 158 (displays that used to be inside

still considered "inside" even when they've been outside for decades); *SOF* ¶¶ 169-172 (flag with Chiefs emblem not a sign, but wall with painted Chiefs emblem is); *SOF* ¶¶ 173-175 (Eisenhower display unregulated, Romney display regulated); *SOF* ¶¶ 166-168 (cross on a church wall is deemed an unregulated symbol—despite the code's text—but a display that says "turn to Jesus" is a regulated sign). Salina can even exempt from regulation the displays it prefers if it thinks they're good for tourism. *SOF* ¶¶ 159-162. By that logic, Salina can exempt *any* display it likes. What's more, Salina considers The Cozy's burger-esque display a regulated sign but considers The Yard's baseball themed display an unregulated mural, *SOF* ¶¶ 140-146, the Fire Station's display an unregulated mural, *SOF* ¶ 120, apparently considers BikeTek's bike-themed display a mural, *SOF* ¶ 148, and the Art Center's art display a mural, *SOF* ¶ 121.

The written code requires permitting decisions to be made within 10 days. If denied, Salina is required to provide written notice of the reasons for the denial and inform the applicant about a right to appeal. But Salina's unwritten policies and practices have replaced the written code, because now planners are authorized to put applications on hold, indefinitely. *SOF* ¶¶ 102-116.

Salina's ever-shifting positions on when and how it applies its mural-sign code regime demonstrates the extent of its unbridled, unconstitutional discretion. The regime's subjectivity strikes at the very core of the freedom of speech, which, as the Supreme Court has held for decades, "has a firmer foundation than the whims or personal opinions of a local governing body." *Niemotko v. Maryland*, 340 U.S. 268, 272 (1951).

## III.    Salina's mural-sign code regime is unconstitutionally void for vagueness.

Salina's mural-sign code regime is unconstitutionally vague. It "authorizes or encourages seriously discriminatory enforcement," *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012), *see also Welch v. United States*, 578 U.S. 120, 124 (2016), "regulated parties [can't] know what is required of them," and it fails to provide the "precision and guidance" required to guarantee "that those enforcing the law do not act in an arbitrary or discriminatory way," *Fox Television*, 567 U.S. at 253–54 (cleaned up).

The regime is so vague, officials invented code exemptions, *see above*, placed applications on hold indefinitely, *see above*, and invented definitions for "attracts attention," and "directs attention," *SOF* ¶ 38-39. The Zoning Administrator can unilaterally decide whether "or" means "and" and vice versa, and the only way for the public to know what the law means is to "contact the city to see how the city has historically interpreted it." *SOF* ¶¶ 176-178. It's so vague, Salina officials don't agree whether its firefighter display is a mural or a sign, *SOF* ¶¶ 117-120, and can't determine whether certain displays are signs or murals without seeking legal advice, *SOF* ¶¶ 93, 94, 118-119, 127. Key terms like "mural," "art," "pertains to," "commercial speech," "advertise," and most other key terms of the mural-sign code regime are undefined—and manipulated by Salina to prohibit displays it doesn't like—proves the regime doesn't provide constitutionally adequate guidance as well. And again, that code hasn't been uniformly applied *for decades* is evident throughout Salina. *SOF* ¶¶ 6, 19, 117, 121, 122, 129, 133, 147, 149, 155.

### Conclusion



In Salina, the mural on top is regulated, the murals on bottom aren't. The only difference between them is the content. But The Cozy's mural is not more likely to fall off the wall, block views, cause car wrecks, destroy Salina's tax base, or harm passersby, because it sells sliders on the inside. There is no legitimate, non-content-based reason why Salina applied its size and permitting restrictions to The Cozy's mural.

Salina's mural-sign code regime is plainly unconstitutional under *any form* of heightened First Amendment scrutiny, it's an unconstitutional prior restraint, and it's unconstitutionally vague. Because there are no genuine disputes about the material facts, Mr. Howard and The Cozy ask this Court to grant them summary judgment.

Dated: February 7, 2025.

Kansas Justice Institute

/s/ Samuel G. MacRoberts

Samuel G. MacRoberts, 22781
Jeffrey Shaw, 29767
12980 Metcalf Avenue, Suite 130
Overland Park, Kansas 66213
sam@kansasjusticeinstitute.org
jeff@kansasjusticeinstitute.org
(913) 213-5018
Attorneys for Plaintiffs