# Exhibit CC
# Yard DRB Packet



**BUSINESS IMPROVEMENT DISTRICT NO. 1**

**DESIGN REVIEW BOARD**

---

Design Review Board meetings will take place via Zoom until further notice. You can view the meetings at the City of Salina YouTube channel, https://www.youtube.com/cityofSalinaKansas

To participate in the meetings, citizens will need to use the Zoom link – https://us02web.zoom.us/j/82053180567

If citizens wish to speak, either during the public forum or when the Chair requests public comment on an item, citizens must raise their hand so that the meeting host can allow them to speak.

Citizens can also send written comments or questions to Design Review Board Members vie email at plangroup@salina.org

In order for the Board Members to have an opportunity to review comments in advance of the meeting, please email your comments or questions by 12:00 p.m. Thursday, prior to the 4:00 p.m. meeting.

---

Herrs

EXHIBIT NO. **25**

APPINO & BIGGS





# MEETING AGENDA

**DESIGN REVIEW BOARD**
MEETING VIA ZOOM
Thursday, January 14, 2021
4:00 P.M.

## 1. CALL TO ORDER / ROLL CALL / KOMA CONFIRMATION
(1.1)  Call to Order
(1.2)  Roll Call
(1.3)  Chair requests staff confirmation that Kansas Open Meeting Act required notice has been properly provided.

## 2. APPROVAL OF MINUTES
(2.1)  Approval of the minutes of the regular meeting held on November 12, 2020.

## 3. NEW BUSINESS

### Public Hearing Items

(3.1)  Application #CC20-14, filed by Jacob Wilson on behalf of Restore Construction, LLC requesting the approval of a Certificate of Compatibility to allow the demolition and renovation of the existing buildings located at the northwest corner of Fourth Street and Walnut Street. The subject property is legally described as Lot 130, 132, 134, 136 and 138 on Fourth Street in the Original Town (now City) of Salina, Saline County, Kansas and addressed as 211 E. Walnut Street / 138 S. Fourth Street.

### Administrative Items
None

### Preliminary Discussion Items
None

## 4. UNFINISHED OR OTHER BUSINESS
None

## 5. PUBLIC FORUM

## 6. ADJOURNMENT

### Record of this Meeting
This public meeting will be recorded by Salina Media Connection and available to view online free of charge at http://www.salinatv.org/index.php/city-of-salina. To receive meeting packets by email, subscribe to *Email Notifications* at http://www.salina-ks.gov/content/18160/23455/23473/default.aspx. Meeting DVDs and paper copies of meeting packets are available upon request (retrieval and/or duplication fees may apply). Please contact the Community and Development Services Department at building.services@salina.org or by phone at 785.309.5715 to request these open public records.



## ADDRESSING THE DESIGN REVIEW BOARD

The public is invited to speak to the Design Review Board during the public hearing portion of any item under discussion and during the Public Forum. Please raise your hand and after receiving recognition from the Chairman, approach the front, state your name, address and purpose for speaking.

Generally, the order of presentation after introduction of an item by the Chairman will be:

1.   Determination if the applicant or his/her representative is present.

2.   Brief presentation by the staff.

3.   Comments by the applicant.

4.   Comments by interested citizens.

5.   Additional comments by the applicant and/or citizens, as appropriate.

6.   Closing of public comment portion of hearing by Chairman.

7.   Design Review Board discussion and action.

If an application is approved by the Design Review Board, a Certificate of Compatibility will be forwarded to the City Building Services Division and will allow a building/sign or demolition permit to be issued for that work. Any applicant may appeal a decision of the Board to the Salina City Commission. A protest or appeal must be filed with the City Clerk no later than fourteen (14) days following the Board's decision. Should you wish to file a protest or appeal on any application, forms may be obtained from the City Clerk's Office, Room 206, City-County Building, 309-5735. If you have any questions or concerns, please contact the Community and Development Services Department, Room 205 of the City-County Building, 309-5720.





## MEETING MINUTES

**DESIGN REVIEW BOARD**
CITY-COUNTY BUILDING, ROOM 107
THURSDAY, NOVEMBER 12, 2020
4:00 P.M.

## 1. CALL TO ORDER / ROLL CALL / KOMA CONFIRMATION

(1.1)   Call to Order

Chair Martens called the meeting to order at 4:00 p.m.

(1.2)   Roll Call

**Board Members Present:**
Gary Martens (Chair), Katherine Kitchen, Jennifer Noonan

**Board Members Absent:**
Haley Helzer

**City Staff Present:**
Dean Andrew, Zoning Administrator; Dustin Herrs, Assistant Planner

Mr. Andrew informed the Board that Vice-Chair Mukesh Patel has resigned from the Board.

(1.3)   Chair requests staff confirmation that Kansas Open Meeting Act required notice has been properly provided.

Mr. Andrew confirmed that the packet was posted and the required notice of today's meeting was provided.

## 2. APPROVAL OF MINUTES

(2.1)   Approval of the Minutes of the October 29, 2020 special meeting.

A motion was made to approve the minutes of the October 29, 2020 special meeting by Board Member Kitchen, seconded by Board Member Noonan and carried by vote.

## 3. NEW BUSINESS

### Public Hearing Items

(3.1)   Application #CC20-13, filed by Guy Walker on behalf of Blue Beacon International, Inc. requesting the approval of a Certificate of Compatibility to allow the construction of two new metal canopies and the installation of a new projecting sign

on the National Bank of America Building at the southwest corner of Santa Fe and Iron. The subject property is legally described as Lot 110 on Santa Fe Avenue in the Original Town (now City) of Salina, Saline County, Kansas and is addressed as 100 S. Santa Fe Avenue.

Mr. Andrew presented the staff report with visual graphics which are contained in today's meeting packet.

Chair Martens asked the Board if there were questions for staff.

Chair Martens asked for Mr. Andrew to clarify that the 52 sq. ft. sign exceeds the size limitations in C-4.

Mr. Andrew stated that because the sign exceeds 48 sq. ft., staff would not be able to issue a sign permit even with the Board's approval of the location and design. He continued that the applicant will need to reduce the size of the sign to the allowable size.

Chair Martens clarified that if the applicant wants the sign to be 52 sq. ft. they would have to go before the Board of Zoning Appeals or apply for a text amendment which Mr. Andrew confirmed.

Board Member Kitchen asked what staff's concern was for the wrapping of the pillars.

Mr. Andrew stated that in staff's experience with National Register properties and the Secretary of Interior's Standards for Rehabilitation, applicants are discouraged from covering up original materials. He continued that staff could have misinterpreted the application but the concern is that the Downtown Guidelines and the Secretary of Interior's Standards for Rehabilitation discourage covering up or obscuring original façade materials. He continued that if it was limestone today and then wrapped in metal cladding, it would be covering original materials. He stated that if it was already covered, then it would not be covering just replacing.

Chair Martens invited the applicant to address the Commission.

Guy Walker, 500 Graves Boulevard, stated that the building was built in the 1920's and did not have the glass storefront, but a stone facade. He stated that it was renovated in the 1960's which changed the building. He stated that the two columns have metal on them now and because they are exposed now with this construction, they are visible.

Ben Moore, architect for the representative, stated that the existing metal of the canopies matches those wrapped columns. He stated that they have looked at replacing the deteriorated metal in a complimentary fashion with a prefabricated color of charcoal gray.

Mr. Walker returned to the microphone and stated that the sign square footage can be reduced to 48 sq. ft. to conform with the size limitation.

Mr. Andrew asked for the applicant to provide an update on National and State Historic Tax Credits.

Mr. Walker stated that the review is still pending. He stated that they submitted this project as an amendment to their application. He stated that they will not be doing anything that would impact their tax credits because they need those to reimburse some of the costs from interior renovations.

Mr. Moore returned to the microphone and stated that their preservation consultant is working with the state on the review now.

Mr. Walker returned to the microphone and stated that the preservation consultant is well versed in what the State will accept. He stated that she gave them advice on what the State will agree with or decline. He stated that this is not a major change and the color change is just to update the storefront.

Mr. Walker stated that the renderings show a blue colored text for the UMB sign on the north canopy and asked Mr. Andrew if they would have to come back before the Board to change that text color to white.

Mr. Andrew stated that staff could approve that administratively through the sign permit application and it would not have to go back before the Board.

Mr. Andrew stated historically staff refers to this building as the National Bank of America Building although it is now occupied by UMB Bank.

Mr. Walker stated that the reason they are trying to name the building the Hoffman Building is to give the building a full identity instead of just for one specific tenant and the Hoffman family was one of the families connected to the National Bank of America building.

Chair Martens asked the Board if there were other questions for the applicant's representative. There were none.

Mr. Andrew stated that staff just wanted to call attention to the different aspects impacting historic properties because there is a higher level of scrutiny when National and State Register buildings are being looked at. He stated that if the applicant is using a preservation consultant then they are in good hands.

Chair Martens confirmed there were no comments or questions from members of the public, closed the public hearing and brought the item to the Board for discussion and action.

| MOTION: | Board Member Kitchen made a motion to approve Application #CC20-13 with the conditions listed in the staff report and that the projected sign be reduced to 48 sq. ft. and that if any major changes were made that the application be brought back before the Board for review. |
|---|---|
| SECOND: | Board Member Noonan |
| VOTE: | Motion passed 3-0. |

Mr. Andrew stated that they will provide the applicant with a letter describing the actions taken by the Board today and what the next steps to take are.

**Administrative Items**
None

**Preliminary Discussion Items**
None

## 4. UNFINISHED OR OTHER BUSINESS

The next regularly scheduled meeting of the Design Review Board is on December 10, 2020. Mr. Andrew stated that there are no applications filed at this time and that staff will notify the Board if the meeting will be held.

Mr. Andrew stated that staff will work with Salina Downtown Inc. and Penny Bettles to get interested citizens to submit an EOI if they are interested in joining the Design Review Board.

Board Member Kitchen asked if there are any specific openings on the Board or if the positions were for Community At Large members.

Mr. Andrew stated there is one spot available for a Design Professional, filling the spot of Maggie Gillam's whose term expired in August. He continued that there is another opening for a property owner but believes that Board Member Helzer may qualify for that position. He stated that they will work with Salina Downtown Inc.to help find interested citizens.

## 5. PUBLIC FORUM
None

## 6. ADJOURNMENT

A motion was made to adjourn the meeting by Board Member Noonan, seconded by Board Member Kitchen and carried by vote.

The meeting adjourned at 4:32 p.m.

_____
Gary Martens, Chair


ATTEST:


_____
Dean Andrew, Secretary

**Record of this Meeting**
This public meeting was recorded by Salina Media Connection and available to view online free of charge at http://www.salinatv.org/index.php/city-of-salina. To receive future meeting packets by email, subscribe to *Email Notifications* at: http://www.salina-ks.gov/content/18160/23455/23473/default.aspx. Meeting DVDs and paper copies of meeting packets are available upon request (retrieval and/or duplication fees may apply). Please contact the Community and Development Services Department at building.services@salina.org or by phone at 785.309.5715 to request these open public records.

 

# Application for a Certificate of Compatibility
# Business Improvement District - Design Review Board

PLF-039    Certificate of Compatibility

| | |
|---|---|
| *Please return the completed application to:*<br>**Development Services Department**<br>300 W. Ash, City-County Building, Room #205<br>Salina, KS 67402-0736<br>785-309-5720    FAX 785-309-5713<br>Email: john.burger@salina.org | *The City Planning Division:*<br>• *Provides technical assistance to the applicant*<br>• *Receives the completed application*<br>• *Provides a copy of the application to the SDI Office for input*<br>• *Schedules the Design Review Board hearing*<br>• *Presents the application to Design Review Board*<br>• *Provides notice of approval to applicant* |

***Please see the Schedule for Design Review Board hearings for the deadline for submissions. An applicant or his representative must attend the review hearing in order for the item to be considered at that meeting.***

## Applicant Please Complete the Following:

1. Property Address  _211 E. Walnut & 138 S. 4th_
2. Name of Business  _The Yard_
3. Applicant's Name  _Jacob Wilson_ 4. Applicant Ph. _785-342-7545_
5. Applicant's Address  _210 E. Walnut_ 6. Email _jacob@restorebuildr.com_
7. Property Owner Name (if different)  _Restore Construction_
8. Property Owner Address  _210 E. Walnut_ 9. Owner Ph. _785-342-7545_
9. Contractor/Architect  _Restore Construction_ 10. Phone
11. Contractor/Architect Address  12. Email _jacob@restore.buildr.com_

13. What kind of work is proposed? (please check all that apply)
☒ Renovation or repair  ☒ Demolition  ☒ Sign or Canopy  ☐ New Construction  ☐ Paint
☐ Other, please describe
14. Approximate cost of project (including labor and material) $  _250,000.00_

## Please attach the following materials to the application:

1. *Please include **Certificate of Compatibility Application Fee of $35.00 payable to the "City of Salina".***
2. Representative color photographs showing existing structure(s) and the location for the proposed work.
3. Small-scale projects must include a floor plan that shows the existing structure and location of the proposed work.
4. For larger or complex projects, provide architectural drawings such as site plan, floor plans, elevations, wall sections and/or detail drawings.
5. Material samples or product specifications indicating color, form, profile and texture.

**Briefly describe the nature of the proposed work, the condition of existing materials, the replacement/new materials and/or the method of rehabilitation (attach additional sheets if necessary):**

_Renovation of 138 S. 4th for new business "The Yard". It will be a baseball & softball academy for youth kids. Demolition of metal building and construction of a new outdoor turf covered field. New siding & roof to corner building. New metal signage on 138 S. 4th._

Applicant Signature:                    Property Owner Signature (if different):

_____  Date  _12/4/20_     _____  Date _____

| | |
|---|---|
| **For Staff Use:** | **Application No. #CC** _20-14_ |
| Legal Description of Property _Lot 130, Lot 132, Lot 134, Lot 136 and Lot 138 on Fourth Street in the Original Town of Salina_ | |
| Current Zoning _C-4_ | Current Use _Vacant contractor's office_ |
| Date Filed _December 7, 2020_ | Accepted by _DA_ |
| Date of Publication _N/A_ | Building/Sign Permit No. |
| Property Owner Notice Sent _January 6, 2021_ | Heritage Commission Review (y/n) |
| Date of Hearing _January 14, 2021_ | Approval Notification Sent |

0165

**STAFF REPORT**
**BUSINESS IMPROVEMENT DISTRICT**
**DESIGN REVIEW BOARD**

Application: **#CC20-14**                    Hearing Date: **January 14, 2021**

**ITEM 3.1**

Application #CC20-14, filed by Jacob Wilson on behalf of Restore Construction, LLC requesting the approval of a Certificate of Compatibility to allow the demolition and renovation of the existing buildings located at the northwest corner of Fourth Street and Walnut Street. The subject property is legally described as Lot 130, 132, 134, 136 and 138 on Fourth Street in the Original Town (now City) of Salina, Saline County, Kansas and addressed as 211 E. Walnut Street / 138 S. Fourth Street.

**BACKGROUND**

The existing buildings at the northwest corner of Fourth and Walnut Streets in downtown Salina addressed as 211 East Walnut Street were constructed in 1929 for a lumber yard operation. In the 1960s the buildings were occupied by a heating and air contractor and later briefly as a solar energy product facility. From 1987 to the present this property was used as a construction warehouse for Bill Medina Construction.

There is a separate brick building on the property that is part of a 3 bay building facing South Fourth Street. The north two bays of this building are being incorporated into the Car Museum. The southernmost bay was leased by Medina Construction to Images Recycling and later to Prairieland Market. Prairieland Market has relocated to the building at the northeast corner of Fourth and Walnut Streets. This building is separately addressed as 138 S. Fourth Street.

**PROJECT PROPOSAL**

Fourth and Walnut, LLC (Guy and Katie Gross and Jacob Wilson and Bob Moeller) has purchased the former Medina Construction property at the northwest corner of Fourth and Walnut with plans to convert the property into a baseball training facility to be known as "The Yard". They plan to demolish the one large, white Morton building in the center of the lot to allow room for a turf infield area with a steel structure above it with netting inside the complex. In the brick building on the far north end they plan to have indoor batting cages (five to seven cages), restrooms, a pro shop, and a storage room. The building on the southeast corner of the lot is proposed to be dedicated for indoor pitching with five (5) lanes. Their hope for this facility is to allow Salina and surrounding area youth baseball / softball teams to use this facility and practice year-round. The facility is proposed to be set up as membership-based with a foundation being created to assist youth that might not be able to afford the use of the facility.

Fourth and Walnut, LLC plans to do the work and open the facility in phases. The brick building on the north (Building A) that would house indoor batting cages, would be completed first. The pitching building on the southeast corner of the Lot (Building C)

Application #CC20-14
Page 2

would be completed second. The outdoor structure (Building B) and turf infield would be completed last.

This proposed project involves three (3) elements that require review and approval by the Design Review Board:

    (1) Demolition of an existing warehouse building
    (2) Modifications to the exterior of two existing buildings
    (3) New infill construction between two buildings facing Fourth Street.

The applicant has submitted a site plan, floor plan, black and white elevation drawings and some color renderings but the elevation drawings are lacking detail about exterior façade materials and colors.

The project developers and their architect met with the City's Development Review Team (DRT) on **September 30, 2020** to go over their conceptual plans for the baseball training facility. Planning staff informed the owners and their architect that an indoor/outdoor recreational facility is not listed as a permitted use in the Central Business District and requested that they submit a detailed narrative explaining how the use would operate to allow the Zoning Administrator to make an Administrative Interpretation as to whether the operating characteristics of this facility would be sufficiently similar to a YMCA so as to make it a permitted use in the C-4 district. Planning staff also informed the project representatives that a Certificate of Compatibility would have to be applied for and approved by the Downtown Design Review Board prior to the demolition of any buildings and prior to the issuance of a building permit for work involving exterior modifications or new construction.

Work is underway on the site but no Certificates of Compatibility or building permits have been approved or issued by the City. A demolition permit was issued in error by Building Services staff in October without approval of a Certificate of Compatibility and the center warehouse building has been removed from the site. This error was made by staff and not the applicant or their contractor.

## DESIGN GUIDELINES

The Design Review Board is authorized to grant a Certificate of Compatibility if, upon a vote of a majority of its members, the project is found to comply with the Policies and Guidelines contained in the Design Guidelines for Downtown Salina, 2008.

**The Design Guidelines make the following recommendations in regard to Demolition:**

    6.2    Demolition should be considered if a building, object, or structure:

        a) Does not contribute to the historical or architectural character of the District, and

Application #CC20-14
Page 3

  b) Detracts from and does not have the potential to contribute to the importance of the District, and

  c) Its removal and the proposed site restoration plan, including any plans for new construction on the site, will result in a more positive, appropriate visual effect on the District

**The Design Guidelines make the following recommendations in regard to Alterations and New Construction.**

In regard to Building Mass, Scale and Form: A building should appear similar in scale to traditional commercial facades.

  A.1 Develop a primary façade that is in scale and aligns with surrounding traditional buildings.

  A.4 A building should maintain the alignment of horizontal elements along the block.

  Window sills, moldings, and cornices are among those elements that may be seen to align.

  A.6 Rectangular forms should be dominant on commercial facades.

  The façade should appear as predominantly flat, with any decorative elements and projecting or setback "articulations" appearing to be subordinate to the dominant form.

  A.7 Use flat roof lines as the dominant roof form.

In regard to Architectural Character: New materials should be appropriate to the scale, durability, color and texture of the predominate materials in the area.

  B.1 Building materials should be visually compatible with the predominate materials of the downtown area.

  Buildings should be compatible with the surrounding traditional commercial context, however new buildings should not imitate older building styles.

  B.2 Consider using storefronts, decorative surfaces or other features that provide visual interest to pedestrians. Avoid large expanses of featureless wall surface at the street level.

Application #CC20-14
Page 4

> Express the traditional distinction in floor heights between street levels through detailing, material, and fenestrations. The presence of a belt course is an important feature.

B.4 Orient the primary entrance of a building toward the street.

> A building should have a clearly defined primary entrance. For most buildings, this should be a recessed entryway.

**The Design Guidelines make the following recommendations in regard to building additions:** Minimize the visual aspects of an addition.

E.1 An addition should be compatible in scale, material and character with the main building.

> An addition should relate to the building in mass, scale and form. It should be designed to remain subordinate to the main structure.

**The Design Guidelines make the following recommendations in regard to color:** Use colors to create a coordinated color scheme for a building.

C.1 Use color schemes that are simple.

> The use of contrasting colors to highlight architectural details and upper facades is encouraged.

## STAFF ANALYSIS

In September, a demolition permit for the white metal building in the center of the site was applied for by Diehl Enterprises on behalf of Restore Construction but no Certificate of Compatibility application was submitted for the demolition request. City staff erroneously issued a demolition permit to Diehl Enterprises on October 26, 2020 without DRB approval and the building has been removed from the site.

Section 2-207 of the Salina Business Improvement District Design Review Board reads as follows:

Sec. 2-207. – Certificate of compatibility.

a) No person shall perform or cause to be performed any work to:

(1) Construct; demolish; or change the existing exterior design, material, color, texture, finish, or appearance of **any building or any other improvement to real property in the Salina Business Improvement District Number 1;** or

0169

Application #CC20-14
Page 5

  (2) Introduce, change, substitute, or remove any physical feature affecting the appearance of real property in the Salina Business Improvement District Number 1;

  **without first applying for and obtaining a certificate of compatibility,** subject only to the exclusions outlined in subsection (b).

 b) A certificate of compatibility shall not be required:

  (1) If the work includes only routine maintenance and results in no change to the existing design, material, color, texture, finish, or appearance of a building or other improvement to real property; or

  (2) If circumstances warrant authorization of emergency repairs of a pre-approved nature and scope, in the sole discretion of the building official.

 c) If the work requiring a certificate of compatibility requires any other type of permit, the permit shall not be issued unless a certificate of compatibility has been issued for the work.

Because no Certificate of Compatibility was approved, the October 26, 2020 demolition permit was not valid and the DRB needs to take action on this Certificate of Compatibility request to retroactively validate the permit.

In staff's opinion, this metal building met the criteria for demolition in the Downtown Design Guidelines. It was not a historically or architecturally significant building and its presence interfered with the owner's plans for redeveloping the project. However, it is ultimately up to the Board to decide whether the request to demolish this building was justified in this case and findings can be made to support its removal.

Proposed Replacement Construction

Fourth and Walnut, LLC is proposing to renovate the north building (Building A) and the south building (Building C) and to build a new metal structure between them (Building B) that would cover a turf practice infield. A building permit application and plans (site plan, floor plan and building elevations) have been submitted but the elevation drawings are lacking in detail.

Different drawings show different window sizes and styles and different exterior colors. None of the drawings clearly indicate what the exterior building material and roof materials would be, particularly on the south building which is already being renovated. The Board is supposed to review the applicant's plans to determine whether the proposed building design and materials will be compatible with the Fourth Street streetscape and the predominate building materials in the downtown area. In staff's view additional information is needed to make that determination.

Application #CC20-14
Page 6

Staff would request that the applicant and/or their architect provide additional information at the meeting about:

Building A – The proposed exterior building and roof material and whether the exterior color will be changed or continue to match the exterior masonry of the Car Museum to the north.

Building B – The proposed color of the metal roof and fencing.

Building C – The proposed exterior building and roof materials and the proposed exterior color of the building.

Some of the work that has occurred on this property has gotten ahead of the City's review processes. It is staff's hope that all proposed exterior improvements on this property that require review and action by the DRB can be addressed at the January 14, 2021 meeting.

Zoning Issues

The proposed baseball training facility is an indoor / outdoor recreation facility and is located on property that is part of the C-4 (Central Business) district. Neither indoor or outdoor recreation facilities are specifically listed as permitted uses in the C-4 district however, YMCA-type facilities are.

Section 42-302(79) of the C-4 district regulations lists YMCA, YWCA, and other similar organizations as a permitted use in the C-4 zoning district. Section 42-302(80) of the C-4 district regulations permits any use not specifically listed as a permitted use, if the Zoning Administrator determines under Section 42-596(a) that the characteristics or specific attributes of the use are sufficiently in common with a permitted use.

Like the Salina Fieldhouse project the Zoning Administrator has determined that the characteristics and attributes of this proposed baseball training facility are sufficiently in common with a YMCA, which would be a permitted use of the subject property. There fore this facility is permitted in the C-4 district.

Section 42-306(2) of the C-4 district use limitations states that *"All business, service, storage and display of goods shall be conducted within a completely enclosed building."* The Zoning Administrator has determined that the covered infield area is sufficiently enclosed by roof and fencing to conform with this requirement.

Addressing

The tax parcel / zoning lot at the northwest corner of Fourth and Walnut Street is currently addressed as 211 East Walnut Street. The brick building at the north edge of the property has had a separate address of 138 South Fourth Street. Because the proposed baseball training facility would have its main entrance facing Fourth Street,

Application #CC20-14
Page 7

the City's Fire Marshal is recommending that the current owners request an address assignment change from 211 East Walnut Street to a Fourth Street address.

Signage

Staff has identified only one proposed wall sign on the elevation drawings submitted with this Certificate of Compatibility application. If the Board wishes to approve the painted "THE YARD" wall sign as part of this application it needs to make sure it makes reference to the wall sign in any motion approving a Certificate of Compatibility.

**SUGGESTED FINDINGS**

Staff believes that the following potential findings may be incorporated to support the approval of the following project components:

Demolition Request

1. The existing metal warehouse structure because of its physical condition and location detracts from and does not contribute to the architectural character of the downtown area.

2. The removal of the existing structure and the proposed baseball training facility and associated parking lot will result in a more positive, appropriate visual effect on the Fourth Street corridor.

Proposed Exterior Modifications / New Construction

1. The building design and materials will be compatible with the predominate materials along Fourth Street of the downtown area.

2. The design of the building exterior will be compatible with the traditional commercial context while retaining a contemporary appearance that does not imitate an older building style.

3. The building will have a clearly defined primary entrance and street level entrances and features that will be pedestrian friendly.

4. Construction of a curb line and sidewalk would enhance the Fourth Street streetscape.

5. The satellite parking lot will contain landscape plantings and buffers that will reduce the impact of the lot on neighboring residential properties.

Application #CC20-14
Page 8

## ALTERNATIVES – DEMOLITION REQUEST

Following any additional information presented at the meeting and discussion, the Design Review Board would appear to have the following options in consideration of this application:

Option 1    Retroactively approve a Certificate of Compatibility for the demolition of the metal structure based upon staff's suggested findings that the demolition conforms with the Design Guidelines for Downtown Salina.

Option 2    Approve the proposed demolition of the requested structure based upon staff's suggested findings subject to any conditions identified and approved by a majority of Design Review Board members.

Option 3    Postpone consideration of the application, in order to obtain additional information concerning the proposal. The date of the future meeting must be included in the motion.

Option 4    Deny the demolition request as presented, upon making findings that would support the denial of the request and provide further direction to the applicant and staff.

   If the Design Review Board should deny the application or attach conditions not agreeable to the applicant, an appeal of that decision to the Salina City Commission may be filed with the Office of City Clerk within fourteen (14) days following the Design Review Board's decision.

## STAFF RECOMMENDATION

Staff would recommend Option No. 1. Under this option, the Board would be authorizing the post-demolition issuance of the demolition permit for the identified metal structure.

## ALTERNATIVES – EXTERIOR MODIFICATIONS

Following any additional information presented at the meeting and discussion, the Design Review Board would appear to have the following options in consideration of this application:

Option 1    Approve the Certificate of Compatibility for the proposed baseball training facility and accessory parking lot, including or excluding the proposed wall sign, based upon staff's suggested findings that the proposed new construction will conform to the Design Guidelines for Downtown Salina.

Option 2    Approve the Certificate of Compatibility for the proposed baseball training facility and accessory parking lot, based upon staff's suggested findings,

Application #CC20-14
Page 9

subject to any conditions or revisions to the plans identified and approved by a majority of Design Review Board members.

Option 3     Postpone consideration of the application in order to obtain additional design details and information about the proposed exterior changes. The date of the future meeting must be included in the motion.

Option 4     Deny the application as presented, upon making findings that would support the denial of the proposed project.

If the Design Review Board should deny the application or attach conditions not agreeable to the applicant, an appeal of that decision to the Salina City Commission may be filed with the Development Services Department within fourteen (14) days following the Design Review Board's decision.

**STAFF RECOMMENDATION**

If the applicant and their architect provide the additional requested information to the satisfaction of the Board, staff would recommend Option No. 2. If no additional information is provided about exterior materials and colors, staff would recommend Option No. 3.

If the Board wishes to approve the proposed exterior improvements, staff would recommend that the Design Review Board attach the following conditions to their approval of the requested Certificate of Compatibility under Option No. 2.

1. Development of the site shall substantially conform to the site plan, floor plans and exterior elevation drawings presented to and reviewed by the Board.

2. That if there are any significant changes to the project as approved, Development Services staff will be notified to determine whether additional staff or DRB review will be required.



**Application #CC20-14**
**Filed by Restore Construction, LLC**

1 inch = 200 feet

# 211 E. Walnut Street



Existing building was demolished in October of 2020

Business Improvement District Boundaries

City of Salina

HOSPITAL / MILL DISTRICT

SANTA FE DISTRICT

EMPLOYMENT DISTRICT

HOSPITAL / MILL DISTRICT



# Attachment

Project Site Plan



REMOVE FENCE

EXISTING BUILDING TO REMAIN

REMOVE LEAN-TO STRUCTURE

REMOVE WOOD STAIR/LANDING

REMOVE STRUCTURE

REMOVE RETAINING WALL AND FENCE

REMOVE FENCE

REMOVE CONC. PAVING

EXISTING BUILDING TO REMAIN

0180

ARCHITECTURAL DEMOLITION SITE PLAN

1" = 20'-0"



# Attachment

Floor Plan



BUILDING A

BUILDING B

BUILDING C

Salina Baseball Academy

138 S 4th St.
Salina, KS 67401

ANDERSON KNIGHT ARCHITECTS

G2.01
CODE FOOTPRINT

# Attachment

Proposed

Building Elevations







BUILDING C





# Attachment

Street Views







0193



0194

# Attachment

Demolition

Design Guidelines

# Chapter 6.  Guidelines for Demolition

## Essential Principles

Demolition is defined as the complete or partial tearing down or removal of a building, object, or structure from the Lee District.

**Generally, the demolition of a building, which contributes historically or architecturally to the character and significance of the district is unsuitable and should be avoided.**

Should the Design Review Board deem a proposed demolition appropriate, such demolition should proceed only when an immediate reuse is planned for the property, unless it has been considered a safety hazard. The proposed design of new construction should be submitted to, and reviewed by, the DRB in conjunction with the submission and review of the proposed demolition.

## Guidelines for Proposed Demolition

Demolition should only be considered under any of the following conditions:

1. If the City Building Official has ordered demolition for the public safety because of an unsafe or dangerous condition which constitutes an emergency;

2. If a building, object, or structure: a) does not contribute to the historical or architectural character and b) detracts from and does not have the potential to contribute to the importance of the District and c) its removal and the proposed new construction will result in a more positive, appropriate visual effect on the District.

Demolition should not be considered under any of the following conditions:

1. If a building, object, or structure is of such architectural or historical significance that its removal would be detrimental to the public interest and the objectives of the District;

2. If a building, object, or structure is of such architectural or historic character that it could not be reproduced without great difficulty and expense

3. If its proposed reuse, or new construction would make a less positive visual contribution to the District, would disrupt the character of the District, or would be visually incompatible; or

4. If the demolition of a building, object, or structure would negatively impact the character, streetscape, or other buildings, objects, or structures in the District.

# Attachment

Façade

Design Guidelines

# Chapter 4. Alterations and New Construction

While the Lee District has historic character, it is also a dynamic neighborhood in which existing buildings are altered and new buildings are constructed. Infill construction is encouraged on open lots in the District.

The design of a new building should not necessarily imitate historic buildings, but should be compatible with them. Creativity in design is especially encouraged when it also is compatible with the design objectives of the downtown.

New buildings should reinforce the basic character-defining features of the district. Such features include the way in which a building is located on its site, the manner in which it faces the street, its materials and the general alignment of architectural elements and details along a block. Arranging these design variables to be similar to those in the area creates visual compatibility.

The principal façade (front) and street related elevations of proposed new buildings will be more carefully reviewed than other facades. New construction facades should be consistent with the existing District buildings in terms of height, scale, rhythm, and other design characteristics.

New construction should not appear old. The intent of Lee district is not to "freeze" an area in time, but rather to encourage new buildings which fit contextually within the district. New construction should not attempt to replicate the old or to introduce a false "historic" appearance. For most new construction projects, the best approach is to **HARMONIZE** with and reinforce the context of existing buildings. The purpose of the design guidelines is to encourage new buildings that complement the best of the existing environment.

The dominant character should be pedestrian-friendly with an active street edge. New buildings should include the following key design aspects to help maintain that established District character:

- Buildings aligned at the sidewalk edge;
- Two-story traditional commercial buildings (some buildings reach greater heights);
- Masonry construction dominates;
- Transparent ground floor with smaller windows into predominantly solid upper floors;
- Flat-roof (low slope) buildings;
- Additions are compatible in size, form, materials, and design;
- Maintain traditional mass, size, form, and building materials;
- To design commercial buildings with storefront elements similar to those seen traditionally (e.g., recessed entry, display windows, bulkhead, transom windows, storefront cornices, upper cornices, and vertically oriented upper-story windows)
- To promote friendly, walkable streets.



Building materials should be compatible with materials of exiting buildings.

**Policy:** **A building should appear similar in scale to traditional commercial buildings**

## A. Building Mass, Scale and Form

Building heights generally vary in the Lee District from one to four stories, yet there is a strong sense of similarity in scale. A variety in building heights is appropriate; however, the dominant scale of two stories should be maintained. New construction should blend in the streetscape and not stand out. Buildings used as infill should be similar in height to adjacent buildings, and of a height of no more than 15 feet higher than the tallest adjacent building, and should not overpower the character of the District. The infill buildings should line up with existing setbacks, reinforce the established horizontal lines of the elevations, and maintain the rhythm in the single lot widths of new buildings.

**1. Maintain the established building scale in height.**

- Develop a primary façade that is in scale and aligns with surrounding traditional buildings.
- Consider stepping the mass of a tall building down to a lower height as it approaches surrounding buildings.

**2. Buildings should appear similar in width to those historically in the block.**

- Facades of large buildings should reflect the 25 ft. storefront bays to be in scale to traditional buildings.
- When a larger building is divided into bays, these should be expressed three-dimensionally throughout the entire building façade.

**3. Floor-to-floor heights should appear to be similar to those seen in adjacent buildings.**

- In particular, those windows in a building should appear similar in height to those seen in adjacent buildings.

**4. A building should maintain the alignment of horizontal elements along the block.**

- This alignment occurs because many of the buildings are similar in height.
- Window sills, moldings, and cornices are among those elements that may be seen to align.

**5. Where appropriate, consider dividing larger buildings into bays that are similar in scale to buildings seen historically.**

- If a larger building is divided into bays these should be expressed three dimensionally, throughout the entire building.
- When considering a tall structure, the alignment of building elements is particularly important. Although a new building may tower above the surrounding buildings, the first stories should visually relate to the surrounding historic context.

One of the most prominent unifying elements of a downtown district is the similarity in building form. Commercial buildings are simple rectangular solids, deeper than they are wide. This characteristic is important and should be continued.

**6. Rectangular forms should be dominant on commercial facades.**

- Rectangular forms should be vertically oriented.
- The façade should appear as predominantly flat, with any decorative elements and projecting or setback "articulations" appearing to be subordinate to the dominant form.

**7. Use flat roof lines as the dominant roof form.**

- Parapets of side facades should step down towards the rear of the building.

0199

## Policy:    Building materials should be visually compatible with the predominate materials of the downtown area

## B. Architectural Character

New materials should be appropriate to the scale, durability, color, and texture of the predominate materials in the area.

### 1. Material should appear similar to those used traditionally.

- Brick was the traditional material and is preferred.
- Wood and metal were used for windows, door and storefront surrounds and should be continued.
- New materials will be considered on a case-by-case basis. If used, they should appear similar to those used traditionally and should be detailed to provide human scale.
- New materials should have a demonstrated durability. Some new materials are susceptible to weather and do not last as long as brick.
- Existing metal should be maintained. If it needs to be stripped, use a chemical paint designed for that purpose, not dry grit blasting.
- Preserve cast iron by maintaining and restoring original cast iron columns and pilasters. Do not conceal or obscure original cast iron columns or pilasters.
- When it is necessary to replace brick, it should match in color and size to the original, if at all possible.
- Unless necessary to protect the surface, masonry should be left unpainted.
- Previously painted surfaces should be repainted rather than chemically cleaned. Repoint mortar, if necessary, before painting brick.
- Sometimes missing details and appropriate materials can be recreated with a one-dimensional paint scheme.
- Brick and other masonry should not be coated with silicone-based water sealants. Water sealants or water repellents generally have the effect of

keeping interior moisture from evaporating through the walls and thereby damaging the brick and mortar.
- Masonry should not be covered with stucco, wood siding, aluminum or other artificial materials.

It is important that buildings be compatible with the surrounding traditional commercial context, however new buildings should not imitate older building styles.

### 2. Maintain the distinction between the street level and upper floors.

- The first floor of the primary façade should be predominantly transparent glass, not tinted.
- A minimum of sixty-five percent of a street level façade of all buildings (except civic and institutional) should be windows, doors, display areas, or similar architectural features.
- Consider using storefronts, decorative surfaces or other features that provide visual interest to pedestrians. Avoid large expanses of featureless wall surface at the street level. These will discourage pedestrian activity in the District.
- Upper floors should be perceived as more opaque than the lower floors.
- Express the traditional distinction in floor heights between street levels through detailing, material, and fenestrations. The presence of a belt course is an important feature.

### 3. Upper-story windows with vertical emphasis are encouraged.

- A typical, upper-story window is twice as tall as it is wide. Upper story windows should relate to historic window proportions.
- Windows, lintels, and their trim elements should align with those on adjacent historic buildings.

Page 27

**Policy:    Building materials should be visually compatible with the predominate materials of the downtown area (continued)**

4. **Orient the primary entrance of a building toward the street.**

- A building should have a clearly defined primary entrance. For most commercial buildings, this should be a recessed entryway.
- Original entrances should be maintained, restored, or replaced (do not enclose, cover, or alter) including the design, material, depth, and placement.
- Aluminum replacement doors and storefronts should be made compatible by painting a dark color.
- Do not use doors decorated with molding, cross bucks, or window grills. Do not use solid wood doors in storefronts, unless original.
- If original design of a door is unknown, replace with a plain wood door with plain glazing (glass area), as opposed to solid wood doors, decorative doors, or any kind of period reproduction door.
- New entrance openings should not be added to storefronts. If an additional entrance is required by codes, place it on the rear or side façade and not on the main façade.
- Doors added to storefronts should be replaced with doors to match the original in design and materials.

5. **Maintain all aspects of the storefront (including doors, windows, and details) when possible.**

- Preserve existing original storefronts elements (windows, transoms, lintels, sills, hoods, bulkheads, cornices, and parapets) by maintaining or restoring, do not remove or alter. It is better to repair than replace deteriorated storefront features. Covering or removing significant elements such as transoms, panels below store windows, or original doors results in a substantial loss of historic character.

- Use a traditional storefront arrangement with features, materials, and proportions typical of similar structures of the same (not earlier or later) architectural style or period when the original design and features can not be determined. Storefront material should be simple.
- Do not allow storefront design to stray out of its natural place within the façade. Generally, there should be more glass and fewer walls at the storefront level, balanced by more walls and less glass on the upper façade.
- Display windows which are new, should match the original in location, design, size, configuration, and materials.
- Display windows which are missing and the original design is unknown, should be replaced with traditionally scaled windows. Traditionally scaled windows have large glass lights and few structural divisions to maintain a traditional transparent storefront appearance. If aluminum frame windows are used, utilize dark anodized or baked enamel finishes.
- When replacing missing or damaged features and based on historic evidence such as photographs or "ghosts" marking or cornice locations or through newspaper or photographic research, base new building features from a similar building of the same design, use simple (but to scale) decoration.
- Windows which are not original should not be added.
- Windows should be repaired rather than replaced, but if replacement is necessary the replacement windows should fill the entire original opening and duplicate the original pattern, including dimensions, number and arrangements of lights in each sash, materials, and detailing. If aluminum framed windows are used, use dark anodized or baked enamel finishes.

**Policy:    Building materials should be visually compatible with the predominate materials of the downtown area (continued)**

- Storm windows should be painted to match the color of the window sash and window shape should be duplicated. It may be desirable, on the front of building, to install storm windows inside where they will not be seen. Storm windows use full view or sash proportionate, blind stop type of wood or aluminum with anodized or baked-on enamel finish.
- New display windows should match the original in location, design, size, configuration and materials.
- New windows should not have snapon or flush muntins. True divided muntins are preferred over these types of muntins. Properly sized muntins permanently attached to windows are acceptable.
- Decorative glass windows which are original should be preserved in their original location, size, and design and with their original materials and glass pattern.
- On the interior, should the building's ceiling interfere with the transom space, recess ceiling space slightly away from the transom, or paint rear (interior) of the transom black.
- Windows can not be blocked or filled in.

**6.    Roofs, Cornices, & Gutters**

Roofs should be retained in their original shape and pitch, with original features, and, if possible, with original roof materials.

- New roofs covered with modern rolled composition, asphalt materials, or rubber membrane are appropriate. The installation of a higher pitched roof to improve water runoff is acceptable as long as the new roof is not visible on the primary elevation and is constructed below the roof parapet wall.
- Do not use mansard roof with wooden shingles.

- Metal flashing should be used with new roof materials extending along the brick walls to protect against leaks.
- Buildings with flat roofs should have cornices or decorative bands to "cap" the façade.
- Replacement gutters and downspouts should not result in the removal of significant architectural features on the building.
- Gutters and downspouts either of boxed or built-in type should be repaired rather than replaced if possible.

**7.    Foundations**

- Preserve (maintain or restore, not enclose or alter) original foundation materials and design -- whether solid or pier, brick, stucco or stone, etc.
- Foundations should not be concealed with concrete block, plywood panels, corrugated metal, or other non-original materials.

## Policy:    The street level of a building should be pedestrian friendly.

The Lee District should continue to develop as a pedestrian-oriented environment. Streets, sidewalks, and alleys should encourage walking, sitting and other outdoor activities. Buildings also should be visually interesting to invite exploration by pedestrians.

Existing pedestrian routes should be enhanced. A building should express human scale through material and forms that were used traditionally. This is important because buildings are experienced at close proximity by the pedestrian.

8.  **Develop the ground floor level to encourage pedestrian activity.**

*   A storefront should be used on the primary façade of a building.
*   On a secondary facades, alternative methods of creating pedestrian interest should be utilized. Consider the following:

    ◊A storefront
    ◊Display case
    ◊Public art
    ◊Landscaping
    ◊Decorative wall surfaces.

*   Include traditional elements such as display windows, bulkheads and transoms on commercial storefront.
*   Avoid a blank wall or vacant lot appearance.



Storefront has been redeveloped and is pedestrian friendly.

## Policy:    Minimize the visual impact of balconies and roof decks as seen from the street.

Roof gardens, decks, and accessory structures can visually impact the design integrity of the building on which they are located, their visual impacts should be minimized.

9.  **Set activities back such that they are not visible from the sidewalk across the street.**

*   This includes potted plants, umbrellas, and tables.
*   Roof terrace railings and furniture should be placed well behind the parapet.

10. **Avoid clutter on roofs that will be visible from the public's view.**

*   Mechanical equipment shall not be visible from the public's view.

11. **A roof garden, deck, or accessory structure should be compatible with the building on which it is located.**

*   This includes design, materials, scale, proportion, and color.
*   A roof garden, deck, or accessory structure should not damage, destroy, or overshadow the character-defining features of the building on which it is located.

## Policy: Use colors to create a coordinated color scheme for a building.

### C. Color

Downtown buildings contain a variety of colors in elements such as upper facades, storefronts, sign, and awnings. The introduction and use of colors should not restricted but it is encouraged that colors complement each building and its neighbors. There is **not** a specific color pallet for the Lee District.

**A. The façade should "read" as a single composition.**

- Paint colors on storefronts, trim, and upper-story openings should be related to the overall color of the building as should

added elements such as signs and awnings.

- In many cases these will be colors that complement or harmonize with the overall brick colors found on upper facades.

**B. Use color schemes that are simple.**

- Using one base color for the building is preferred.
- Using only one or two accent colors is also encouraged, although precedent does exist for using more than two colors in some situations.
- The use of contrasting colors to highlight architectural details or storefronts and upper facades is encouraged.

## Policy: Maintain the line of building fronts in the block.

### D. Site Planning

Structures in the Lee District should contribute to a "strong wall" along the street. A new building should align at the front lot line and be built out to the full width of the parcel, to the side lot lines.

**1. Maintain or enhance the alignment of buildings at the sidewalk edge.**

- Locate the front building wall at the sidewalk line when feasible.
- Where a building does set back from the sidewalk, use landscape elements to define the sidewalk edge.

**2. Orient the primary entrance of a building toward the street.**

- A building should have a clearly defined primary entrance. For most commercial buildings, this should be recessed entryway.
- A secondary public entrance to commercial spaces is also encouraged on a large building.

**3. Rear entrances and side elevations.**

- Preserve original windows, doors, and architectural detailing on rear and side elevations.
- Rear and side entrances can be enhanced by adding simple signage, awnings, and lighting that is related to those of the front elevation.
- New windows and doors may be added when needed if in keeping with the size, design, materials, proportions, and location of the originals. Follow guidelines for windows and doors for new openings on the rear and side elevations.
- Locate any necessary exterior staircases, balconies, elevator shafts, and additions on rear elevations, whenever possible.



Maintain the alignment of buildings at the sidewalk edge.

Page 31

**Policy:    Minimize the visual aspects of an addition.**

## E. Additions

There are three different types of additions that may be constructed. The ground-level addition is the first way to do an addition that involves expanding the footprint of the structure. This addition should be to the rear or side of a building where it will have the least impact on the character of a building.

The next option of constructing an addition is to the roof that can be simple and set back from the front of the building. Materials, window sizes, and alignment of trim elements on the addition should be compatible to those of the existing structure.

The third option is to design an addition within the wall plane of the existing building, which should be considered on a case-by-case basis. This is difficult and requires care to respect the relationship of the building to the street. Such an addition should provide a visual distinction between the existing building and its addition which can be done with the use of a storefront cornice element or a subtle change in building materials.

1. **An addition should be compatible in scale, material, and character with t h e main building.**

- An addition should relate to the building in mass, scale, and form. It should be designed to remain subordinate to the main structure.
- An addition to the front of a building is inappropriate.

2. **An addition may be made to the roof of a building if it does the following:**

- An addition should be set back from the primary façade, to preserve the perception of the historic scale of the building.
- Its design should be modest in character, so it will not attract attention from the historic façade.
- The addition should be distinguished as new, albeit in a subtle way.

3. **In limited circumstances, an addition may be made to the roof of a building and not be set back from character-defining facades, if it does the following:**

- An addition should be distinguished from the existing building. A change in material or a decorative band can be considered to accomplish this.
- An addition should maintain the alignment of storefront elements, molding, cornices, and upper-story windows that exist on the main part of the building.
- The addition should also be compatible in scale, texture, and materials with the original.

4. **An addition should not damage or obscure architecturally important features.**

- Loss or alteration of a cornice line should be avoided, for example.
- Additions should respond architecturally to adjacent buildings in general and to the building they are a part of in particular. They should blend in by using similar materials, shape, and rhythm and proportion of openings.
- If the original building is architecturally significant, the addition should take a respectful "back seat". The addition should not overpower the original. An addition may be taller than the original building if site consideration and design still allow the old building to remain dominant.
- In general, additions should follow the basic guidelines for new construction. They should appear contemporary but in context with the original. They addition should be sympathetic but not imitative in design.

# Attachment

Newspaper

Article

# SALINA JOURNAL

## Holm Auto Good News: Championships are won at practice

**By Randy Mathews, Special to The Salina Journal**
Posted Nov 24, 2020 at 11:01 AM

For Salina dentist Guy Gross, the creation of a baseball and softball training facility has become a personal mission, as well as one more exciting project in the ongoing transformation of downtown Salina.

"This is something that I've seen as a need in our community for a long time," Gross said. "I've been coaching baseball and raising kids and seeing that there is just not a great place to go practice, especially in the winter."

Gross said The Salina Fieldhouse, a multipurpose recreational center that opened at 140 N. Fifth in 2017, is a great facility, but it isn't always set up for baseball or softball, as it is sometimes configured for basketball or volleyball courts instead.

Other area coaches share his concern about the need for a dedicated training facility. They believe not having one available puts local and area baseball and softball players at a distinct disadvantage, not only in developing their individual skills, but also when trying to compete in tournaments in other cities where teams have better access to such facilities.

"We'd go around the state or to other parts of the country and we'd compete against these teams from communities where they already have academies and facilities where kids are able to prepare and compete year-round, and we found that we have some awesome players from Salina but we weren't able to keep developing them as much as these other academies were," Gross said. "Sometimes we could see that we were falling behind because our kids may not be getting as much exposure or opportunities for scholarships."

So Gross and his wife and fellow dentist Kate Gross decided to build The Yard, a state-of-the-art, 20,000-square-foot baseball and softball training complex currently under construction at 158 S. Fourth, just south of where the American Classics Auto Museum will be located.

"We wanted to create a top-notch place for baseball and softball training that could happen year-round," Gross said. "If there are kids in our community who want to become great ballplayers and potentially have a shot at going on to college or beyond to play, we wanted them to have all the resources around them to be able to do so."

Under the umbrella of the Salina Baseball Academy, the concept for The Yard quickly took shape. Encompassing three separate but interconnected facilities, the complex will provide a wide range of training opportunities utilizing the latest in sports technology.

Two existing brick buildings — one at the northwest corner of Fourth and Walnut and the other about mid-block to the north — are being extensively renovated and will house a regulation pitching "bull pen" and batting cages, respectively. In between, in a space formerly occupied by an office building/warehouse and parking lot, a 115-foot by 120-foot outdoor turf infield will meet both high school and collegiate specifications. The covered infield will feature a tall roof structure and will be sloped and netted. Lighting will make it possible to use the infield after dark and portable heaters will allow for limited wintertime use.

Gross expects the two indoor facilities to be opened by the end of December. The outdoor infield should follow later in the winter or early spring. Architectural and engineering work is nearly completed, and groundbreaking is set to begin soon. The Salina Baseball Academy and Restore Properties are partners on the property acquisition and Restore's Jake Wilson and Gross are co-managing the project. Restore is handling most of the contracting work.

Meanwhile work is already well underway on the buildings housing the pitching and batting facilities. The Yard's head coach and director of operations Brian Guyett provided an overview of the planned set-up during a recent tour. Guyett, a native of Anaheim, Calif., came to Kansas by way of the Seattle area to play baseball at Bethany College, where he was a starting pitcher. He said for him, The Yard is like a dream that is coming true. He will oversee a team of local and area baseball and softball youth to manage The Yard, staff its operation and maintain the facility.

Guyett said the pitching "bullpen" in the south building will feature five lanes of pitching mounds set up across the north side. Pitching will be from north to south. Pitchers can bring their own catchers but that isn't necessary for bullpen sessions, as there will be targets to aim at. Windows will provide natural light and the space will be turfed, so the pitching mounds can be lifted to allow for ground ball practice. Nets will be installed but will not extend all the way around, so batting practice is not permitted in that building.

Batting will be the focus of the second building further north. Guyett said the space can be configured for up to eight batting cages, in a variety of sizes. Nets are mounted to tracks in the ceiling, allowing them to be opened to create a 50-foot by 50-foot square for ground ball practice.

Both Gross and Guyett are excited about the high-tech amenities that the pitching and batting facilities will offer.

In the pitching bullpen, a camera and sensor-based system called Rapsodo will provide pitchers with a variety of metrics, including spin ratio and miles per hour. A screen at the opposite end will display ball movement, showing where a pitch starts its trajectory and where it ends.

In the batting cage building, a similar system called HitTrax can be custom-set to match the layout of any stadium, even those that are home to Major League Baseball teams. Two HitTrax systems will be available for use.

Four batting cages will also have a Hack Attack pitching machine that can be set to accurately throw curveballs, sliders, knuckleballs or fastballs so batters can become more adept at hitting different kinds of pitches. Guyett said many professional and Division One college baseball teams use the Hack Attack system.

"What it allows us to do is have competitive hitting leagues in the wintertime, so that the players can not only practice in the winter, they can compete. Normally in Kansas, that's not possible," Gross said.

The Yard will also offer other services to help baseball and softball players improve. Guyett is developing training programs and will offer individual pitching and batting lessons, and he and Gross intend to schedule camps designed to enhance specific skill sets.

"Camps are a big part of it," Guyett said. "We are planning on doing full groups but also specialized camps, including some that are just for infielders, or just for outfielders. We'd like to have a catching camp and a pitching camp; maybe take an entire day and just work with middle infielders — second basemen and short stops."

"We'll have camps for kids of all ages and we'll have different specific track or training programs for kids that are a little older," Gross said.

The Yard won't just focus on players. Gross and Guyett both intend to offer help to baseball and softball coaches as well.

"We want to coach the coaches so their teams are well prepared to play ball," Gross said.

Guyett is developing a website, theyardsalina.com, where players and coaches can sign up for lessons, book practice times or purchase memberships. The site also details the facility's wide variety of services and programs.

"We already have a lot of coaches interested in having a membership to it," Gross said. "In addition to supporting the coaches at Kansas Wesleyan University, we've talked to the local and area high school coaches. We want to make it so that they have the resources available to develop their athletes."

Gross said he and Kate believe The Yard will not only be a great thing for the community, it will also provide an additional piece to the ongoing rebuilding of downtown Salina.

"We loved the idea of putting it right down there where there's already families going for other sports, for dance, for twirling, for yoga, for shopping and restaurants," he said.

Guyett said hearing from former players he has coached or trained is what he most enjoys, and what excites him about this new opportunity.

"The kids are great," he said. "It's fun to see them succeed. Every year I'll get a text message, 'Hey, I hit my first home run,' or 'Thank you for all you've done. I just pitched a heck of a ball game.' So that's what keeps me going is seeing the success these kids can have if they put their mind to it and work hard."