Exhibit JJ Plaintiffs' First Amended Response to First Set of Interrogatories

In the United States District Court
for the
District of Kansas

| | |
|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard**, <br><br> Plaintiffs, <br><br> v. <br><br> **City of Salina, Kansas**, <br><br> Defendant. | Case No. No. 6:24-cv-01027 <br><br><br> Plaintiffs' First Amended Response to Defendant's First Set of Interrogatories; Verification |

**Plaintiffs' First Amended Response to Defendant's First Set of Interrogatories**

Instructions

1. Pursuant to Fed.R.Civ.P. 26 and 33, Plaintiffs are required to answer the following discovery requests within thirty (30) days after service hereof.

2. In your answer or response, please restate each numbered Interrogatory prior to your response to that request.

3. Plaintiffs are required to make a reasonable and good faith effort to obtain the information requested by each interrogatory. If you are unable to answer or respond fully to any request, answer or respond to the extent possible and explain why you cannot answer or respond in full.

4. If you do not have enough personal knowledge to fully answer a request, say so, but make a reasonable and good faith effort to get the information by making inquiry within your organization.

5. In case of doubt as to the scope of a clause including "and," "or," "any," "all,"

"each" or "every," the intended meaning is inclusive rather than exclusive.

6. If you find the meaning of any term in these discovery requests to be unclear, then you should either request clarification or assume a reasonable meaning, state what that assumed meaning is, and answer the request on the basis of that assumed meaning.

7. These discovery requests are continuing in nature and you are requested to furnish amended or supplemental responses and additional documents in accordance with Fed.R.Civ.P. 26(e).

8. Pursuant to Fed.R.Civ.P. 26(e), you are under a duty to promptly amend a prior response to a request if you learn that the prior response is in some material respect incomplete or incorrect and the additional or corrective information has not otherwise been made known to the defendant during the discovery process.

9. If you assert a privilege (*e.g.*, attorney-client privilege) as the reason for refusing to answer or respond or as the basis of an objection to any discovery request, state the specific grounds therefor, separately and specifically identify each individual discovery request as to which such privilege is claimed, and describe the facts upon which you base the assertion of privilege. If the claim of privilege involves a **Communication**, please identify each person present at that **Communication**. Please produce a privilege log identifying each document withheld or redacted pursuant to any alleged privilege.

10. Your answers to the Interrogatories must be verified, dated and signed.

1. **DEFINITIONS**

1. **"Communication"** or **"Communications"** refers to all means of exchanging information, whether verbal, on paper, or via any electronic means, including but not limited to all

inquiries, discussions, conferences, conversations, negotiations, agreements, interviews, telephone conversations, letters, correspondence, e-mail, text messages, SMS texts, iMessages, private electronic messaging apps, file sharing, and notes.

2. **"Document"** or **"Documents"** shall be defined in their broadest sense under Fed.R.Civ.P. 34, and they mean the original and all copies any writing and each original, or a copy in the absence of the original, and every copy bearing notes or markings not present on the original or copy of the following items, however produced or reproduced, including without limitation: writings, books, invoices, shipping forms, accounting records of any nature whatsoever, agreements, correspondence, SMS texts, iMessages, emails, memoranda, recordings, summaries or records of telephone conversations, summaries of records of personal conversations or interviews, diaries, calendars, day-timers, time sheets and other time records, letters, forecasts, graphs, notebooks, charts, plans, sketches, drawings, video and audio tapes, films, slides, photographs, photo-records, microfilms, tape recordings, minutes or records of meetings or conferences, expressions or statements of policy, lists of persons attending meetings or conferences, summaries of investigations, opinions or reports of consultants, reprints and drafts of any documents, working papers, indices, original or preliminary notes, computer printouts, and other data compilations, including those stored on computer drives, tapes, smartphones, smart watches, tablets, solid-state devices (whether fixed or removable), or internet-based file sharing, file storage, or backup services, from which information can be obtained or translated, if necessary, through detection devices into reasonably usable form. The term **"Document"** shall include all drafts, as well as final versions of any **Document**.

3. **"Sign Code"** means the following provisions of the Salina Code of Ordinances:

(a) Chapter 42, Article X; (b) the definitions found in Chapter 42, Article XIV for words and phrases that are used in Chapter 42, Article X; (c) Section 42-581; (d) Section 42-596 to Section 42-597.1, inclusive; (e) Section 42-598 to Section 42-600, inclusive.

    4.    "**BID Code**" means Chapter 2, Article X of the Salina Code of Ordinances.

    5.    "**Cozy Sign**" or "**Plaintiffs' Sign**" means the sign that is the subject matter of this lawsuit, also identified as the display painted on the exterior wall of the Cozy Inn as shown in paragraphs 27 and 28 (the "completed rendition") of Plaintiffs' Amended Complaint.

    6.    "**Plaintiffs**," "**You**," or "**Your**" means the Plaintiffs identified in Civil Action No. 6:24-cv-01027-TC-ADM collectively, and individually, including Plaintiffs' representatives, attorneys, officers, directors, employees, agents, affiliates, and persons or entities acting or purporting to act on Plaintiffs' behalf.

    7.    "**Sign**" means a sign as defined in Salina Code of Ordinances § 42-764.

    8.    "**Person**" or "**Persons**" mean, where contextually appropriate, any individual, corporation, partnership, association, group or entity of any kind.

    9.    "**Related**" or "**Relating**" means supports, proves, evidences, describes, is associated with, provides background for, explains, concerns or regards.

    10.    The term "**Identify**" shall mean, where contextually appropriate:

        A.  With respect to a Person, the name, current or last known address and telephone number for such Person; or

        B.  With respect to a Document, the title, type (letter, memorandum, etc.), author, recipient and current or last known location of such Document.

    11.    Any reference to the singular shall include the plural, and references to the plural

shall include the singular.

2.    **INTERROGATORIES**

6. In Plaintiffs' Amended Complaint [Dkt. No. 16], Plaintiffs allege at ¶ 210 that "This demonstrates Salina's antipathy toward content related to a business and commercial speech. This also demonstrates Salina's preference for content unrelated to a business and noncommercial speech." Please describe in detail the basis for this allegation including specific standards of the **Sign Code** or **BID Code** imposed by City staff and the factual basis supporting the allegation in ¶ 210 of the Amended Complaint.

ANSWER: As described in the Amended Complaint, Salina exempts murals from regulation under the mural-sign code regime if Salina considers the mural's content to be noncommercial or "art." Conversely, if Salina perceives the content of the mural to be commercial or to pertain to goods or services sold, then Salina regulates the mural as a sign under the mural-sign code regime. In short, Salina encourages and promotes murals with a noncommercial message while strictly regulating murals it believes have a commercial message. This reflects a preference for noncommercial speech and a hostility toward commercial speech. Examples of this preference for noncommercial speech include:

- The City Manager's statement that "It includes a message that pertains to the goods or services for sale, and that makes it a sign and makes it subject to the sign code." Bates 0285-295.

- A City Commissioner's statement that "I could see much of the mural part be considered art, and then focus on the actual portion that's the message as the commercial aspect." Doc. 16-2 at pg. 22, ln. 24 – pg. 23, ln. 2.

- Ms. Driscoll's hypothetical comparing a mural of a dove to a mural of a coffee pot at a coffee house: "But in general, the dove, the olive branch, the peace are not part of a commercial transaction that would take place in that building or draw you to that building for a commercial transaction. Where if we had a steaming cup of coffee and a coffee pot on the side, those are things that draw you in to the use of that building. Even without a word, that illustration can suggest that commercial transaction." Doc. 16-2 pg. 23, ln. 19 – pg. 24, ln. 4.

- The City Manager's statement that "You know, as we -- as we looked at murals, we had some conversation about this very question.· And the first reaction was, well, if it includes lettering, or if it includes wording. But it really -- if the wording's not commercial in any way or doesn't have an·attachment to a commercial operation, that in·and of itself isn't a disqualifier." Doc. 16-2 pg. 26, ln. 23 – pg. 27, ln. 6.

- The City Manager's statement that "And I say all that because we end -- that ends up being a legal question of, if there are no words but it's still, you know, related to the business activity of the building, I think there's case law out there that says that's still a commercial message and it's still a sign." Doc. 16-2 pg. 28, ln. 15-21.

- The City Manager's statement that "The important distinction here relates to commercial speech and our ability to regulate commercial speech or signs and then specifically how we do that by way of our -- the codes that we have in place." Doc. 16-2 pg. 5, ln. 2-7.

- The City Manager's statement that "And there certainly is a misunderstanding between art and signs and commercial speech." Doc. 16-2 pg. 5, ln. 23-25.

- The City Manager's statement that "And I would reiterate, it's all on the basis of a commercial message." Doc. 16-2 pg. 10, ln. 4-5.

- The City Manager's email to the City Commission stating that "While it might look similar to murals in the downtown and elsewhere, it contains a commercial message promoting a business and its product which makes it a wall sign subject to the applicable zoning codes which includes size limitations among other things." Bates CITY000261-262.  The email later states "You may recall that similar questions came up last year related to attempts to classify signs as murals and trying to leverage the various murals installed or proposed to be installed in the downtown.  Our immediate solution was to coordinate closely with Boom Salina to confirm that none of their murals would intentionally or unintentionally include commercial speech subject to our sign codes."

- The City Manager's email to the City Commission stating that "We regulate the size of commercial signs through a permit process." Bates CITY000221-222.

- The City Manager's email to a City Commissioner listing the City's talking points on the Cozy's mural which states "A distinction is commonly made between murals and art when compared to commercial speech," and "We regulate the size of commercial signs through a permit process." Bates CITY000220.

- The email of Mr. Anderson explaining that "Work is done to ensure that the Boom mural content does not contain content that could be interpreted as a sign.  This is done through SDI, the building owner, the artist, Boom representatives, and city of Salina Development Services." Bates CITY000352.

- The City Manager's email stating that "My intended response is to stress that we have

been very mindful of the Reed v Gilbert case as well as applicable case law regarding what constitutes commercial speech subject to sign code regulation." Bates CITY000218.

- Salina City Code § 42-504(1) exempts noncommercial flags from regulation, but not commercial flags.

- Salina City Code § 42-504(5) exempts memorial signs and tablets from regulation, but not commercial signs or tablets.

- Salina City Code § 42-504(9) exempts window signs that do not display an advertising message, but not window signs that display an advertising message.

- Salina City Code § 42-511 authorizes the substitution of any noncommercial copy in lieu of any other copy, but it does not authorize the substitution of commercial copy in lieu of any other copy.

- Salina City Code § 42-521(1) authorizes advertising signs in the C-4 zoning district if the signs advertise "special public events sponsored by governmental, philanthropic and nonprofit organizations," while prohibiting advertising signs that convey a commercial message.

- Salina City Code § 45-506(1) classifies an advertising sign, which is more heavily restricted than other signs, as "A sign displaying a commercial message that directs attention to" an off-premises business, while a sign that displays a noncommercial message that advertises a off-premises non-commercial entity is not considered an advertising sign.

9. **Identify** any **Sign**, display, mural or art on the Cozy Inn property which was erected, constructed or displayed in the past 10 years for the purpose of noncommercial speech.

ANSWER: The only displays on the exterior of The Cozy that communicated noncommercial content in the past five years that Plaintiffs are aware of are: 1) the mural on the wall of The Cozy that is the subject of this lawsuit; and 2) a display celebrating the anniversary of The Cozy which has been updated regularly throughout the years to reflect The Cozy's age.

17. Do **You** contend the **Sign Code** does not advance the City's interest in traffic safety? If so, please state all material facts supporting **Your** contention.

ANSWER: The burden of proof is on the Government to show that a restriction on speech satisfies the strict demands of the First Amendment. To date Defendant has not produced evidence as to how the sign code advances its claimed interests in traffic safety, and Plaintiffs are not aware of any such evidence.

Nevertheless, Plaintiffs believe that portions of the sign code may conceivably advance the City's claimed interest in traffic safety. For instance, Plaintiffs could imagine how regulating the construction standards of pole signs might lessen the likelihood of a poorly constructed sign falling in the road. However, Plaintiffs are not aware of any factual evidence that would support this possibility.

Other aspects of the sign code may harm traffic safety. When signs are restricted in size, this makes it more difficult for pedestrians and motorists to find their destination, resulting in drivers and pedestrians who are distracted and more likely to get in an accident that harms themselves or others. Large, distinctive signs, on the other hand, will enhance traffic safety by making it easy for pedestrians and motorists to identify their destination, allowing them to fully focus on traffic safety.

Plaintiffs contend that there is no factual reason to believe that regulating the size and content of murals painted on private property will enhance traffic safety. Plaintiffs contend that there is no factual reason to believe that murals containing a commercial message, or that pertain to goods or services for sale, or with content that "announces," "directs attention to," or "advertises" (however the government choses to define those terms) will decrease traffic safety any more than murals which contain a different message would. Indeed, it seems likely that some non-commercial murals containing a controversial political, religious, or social message (a swastika mural, a gay pride mural, a "defund the police" mural, a Satanists mural, etc.) would be far more likely to upset and distract pedestrians and motorists and decrease safety than a mural of burger-esque flying saucers.

Dated: October 4, 2024.                         Kansas Justice Institute

                                                By: Jeffrey Shaw, 29767

                                                /s/ Jeffrey Shaw

                                                Jeffrey Shaw, 29767
                                                12980 Metcalf Avenue, Suite 130
                                                Overland Park, Kansas 66213
                                                Jeff@KansasJusticeInstitute.org
                                                (913) 213-5121
                                                Attorney for Plaintiffs

In the United States District Court
for the
District of Kansas

| | |
|---|---|
| Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard.<br><br>  Plaintiffs,<br><br>  v.<br><br>City of Salina, Kansas.<br><br>  Defendant. | Civil Action No. 6:24-cv-01027-TC-ADM<br><br>Verification |

**Verification**

I, Stephen Howard, have personal knowledge of myself, my activities, and my intentions, including those set out in Plaintiffs First Amended Answers to Defendant's First Set of Interrogatories. I verify under penalty of perjury under the laws of the United States of America that the factual statements in the Answers to Interrogatories are true to the best of my current knowledge, information, and belief.

Dated: 11-5, 2024.

_____
Stephen Howard, individually and
On behalf of Cozy Inn, Incorporated,
d/b/a The Cozy Inn