## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| Cozy Inn, Incorporated, | ) |
| d/b/a The Cozy Inn; Stephen Howard, | ) |
| | ) |
|        Plaintiffs, | ) CIVIL ACTION |
| | ) CASE NO.  6:24-cv-01027-TC-ADM |
| v. | ) |
| | ) |
| City of Salina, Kansas, | ) |
| | ) |
|        Defendant. | ) |

## BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, City of Salina, Kansas ("City"), by and through its attorneys Fairfield and Woods, P.C. and Clark, Mize & Linville, Chartered, respectfully requests judgment in favor of the City on all claims pursuant to F.R.C.P. 56, and in support thereof states as follows:

### I.      INTRODUCTION

Recently, the Supreme Court approvingly described sign regulation as a "tradition" dating back more than 150 years—and observed that during that time, such regulations have addressed "signs . . . that promote ideas, products, or services . . . [or] promote or identify things located onsite." *City of Austin v. Reagan Nat'l Advert.*, 596 U.S. 61, 65 (2022).  K.S.A. § 12-101 empowers the City to regulate its local affairs, and the City has specifically regulated signs for about 58 years. This First Amendment challenge stems from Plaintiffs painting of a sign on the North wall of the Cozy Inn ("Cozy Sign") that is more than 50 times larger than the Plaintiffs' available sign allowance under the City's sign regulations.

There are no material facts in dispute regarding the central issues of this First Amendment case: (1) whether the text of Salina Code of Ordinances ("Salina Code") Chapter 42 Article X (along

with related definitions in Chapter 42 Article XIV, "Sign Code") is content-neutral, specifically as it relates to the definition of "sign" (Salina Code § 42-764) upon which the applicability of the Sign Code relies; and (2) whether the Sign Code passes intermediate scrutiny, which involves the questions of whether: (a) the City's articulated interests in aesthetics, traffic and pedestrian safety, and property values are substantial (b) the Sign Code advances at least one of those interests in a manner that "would be achieved less effectively absent the regulation"; and (c) the Sign Code leaves open "ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 799 (1989).

The Court decides whether the face of the Sign Code is content neutral as a matter of law. *Austin*, 596 U.S. at 64, 76; *Harmon v. Norman*, 981 F.3d 1141, 1148 (10th Cir. 2020). The Court also decides as a matter of law whether the content-neutral Sign Code passes intermediate scrutiny. *Harmon*, 981 F.3d at 1148-49. To that end, the definition of "sign" that is the central issue of this case is agnostic as to content. It turns on whether a display is used to "announce, direct attention to, or advertise" and is "not located inside a building." Salina Code § 42-764. The Sign Code is not concerned with what is announced, to what attention is directed, or what is advertised. The City submits that the Sign Code, and specifically the definition of "sign"--a definition that is substantially similar to the definition of sign in the *Austin* case--is content-neutral. Like Salina Code § 42-764, which subjects a display used to "announce, direct attention to, or advertise" to regulation as a "sign," the City of Austin's regulation also triggered regulation as a "sign" based on whether the display was used to "advertis[e]" or "direct[] persons to." *Austin*, 596 U.S. at 1469.

The face of the Sign Code is content-neutral because it neither regulates based on the "topic discussed" or the "idea or message expressed," nor targets speech "based on its communicative

content" or "viewpoint." *Austin*, 596 U.S. at 69 (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)); *Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984); (Salina Code §§ 42-764, 42-781). The text of the challenged definition of "sign" does not refer to content at all. It simply defines "sign" in a way that is consistent with common understandings, recognizing that unlike architectural features, gazebos, trellises, statuary, and other decorative displays that provide visual interest, signs are "used to announce, direct attention to, or advertise." Salina Code § 42-764.

Salina Code § 42-500 enumerates the City's government interests, which include aesthetics, traffic and pedestrian safety, and property values. As a matter of law, these interests are both substantial and justified without reference to the content of the regulated speech (content-neutral). *Taxpayers for Vincent*, 466 U.S. at 795, 805-06 (property values and community aesthetics); *StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243, 1251 (10th Cir. 2023) (aesthetics and traffic safety). Therefore, the Sign Code satisfies the first prong of the three-prong intermediate scrutiny test.

As a matter of law, the Sign Code advances the City's substantial government interests in community aesthetics, traffic and pedestrian safety, and property values because it includes limitations upon the size, number, and placement of signs. *See Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 508 (1981); *Outdoor Sys., Inc. v. City of Lenexa*, 67 F. Supp. 2d 1231, 1238 (D. Kan. 1999); *see also Contest Promotions, LLC v. City and County of San Francisco*, 874 F.3d 597, 603 (9th Cir. 2017); *Wag More Dogs, Ltd. v. Cozart*, 680 F.3d 359, 369 (4th Cir. 2012); *CBS Outdoor, Inc. v. Village of Plainfield*, 959 F. Supp. 2d 1054, 1064 (E.D. Ill. 2013); *Signs for Jesus v. Town of Pembroke*, 977 F.3d 93, 106 (1st Cir. 2020); *Naser Jewelers, Inc. v. City of Concord*,

513 F.3d 27, 35 (1st Cir. 2008). As the Court observed in *Metromedia*, it is not "speculative" that the substantial, content-neutral objectives of sign regulations would be achieved less effectively absent the regulations. *Id*. at 510-11. Therefore, the Sign Code satisfies the second prong of the three-prong intermediate scrutiny test.

It is clear that Plaintiffs have "ample alternative channels for communication of the information." First, Plaintiffs could have painted the exact same display, scaled to about 10 square feet, or if other signs were removed, about 63 square feet. Second, deposition testimony reveals that Plaintiffs communicate in many ways, including Facebook, branded merchandise worn or used by their customers, community events, radio advertising, interviews, banner advertising at indoor football events, billboards, bumper stickers, and a sign located at Jenni's Liquors in a nearby town. Therefore, the Sign Code satisfies the third prong of the three-prong intermediate scrutiny test.

There is no genuine dispute of material fact as to the content-neutrality of the Sign Code or three-pronged intermediate scrutiny test that the First Amendment requires for such regulations. Summary judgment for Defendant on the First Amendment claims is proper.

Further, the Sign Code is not a prior restraint. The Sign Code provides for a brief, specified period of time within which the City must issue or deny a sign permit. Salina Code § 42-502(b). Work on the Cozy Sign started on November 3, 2023, without a required permit. Three days later, the City asked Plaintiff, Mr. Howard, to stop the work, advising him that the display was a sign and that it was too large to qualify for a sign permit, and Mr. Howard thereafter submitted an application for the sign fully understanding that it could not be approved. The City's determination to ask Mr. Howard to stop the work was not "arbitrary enforcement." It was an application of the letter of the Sign Code, the plain language of which provides constitutionally sufficient standards to limit the

discretion of City officials.

Similarly, the Sign Code is not unconstitutionally vague because it provides people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Vagueness is not about "the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved." *U.S. v. Williams*, 553 U.S. 285, 306 (2008). Instead, it is about "the indeterminacy of precisely what that fact is." *Id.* The Sign Code is only concerned with outdoor displays that "announce," "direct attention to," or "advertise." These are uncomplicated words and phrases that ordinary people understand. The Sign Code is not concerned with whether a sign may also be artistic. The bottom line is that whether it is artistic or not, Plaintiffs' display is a sign because it "announces," "directs attention to," or "advertises," and the City's determination of that question is conclusive due to issue preclusion, and by Plaintiffs' own admission. *See B & B Hardware, Inc. v. Hargis Ind., Inc.*, 575 U.S. 138, 148 (2015).

Neither Mr. Howard nor Ms. Windholz (the Cozy Inn owners) have read or even tried to read the Sign Code, let alone make any effort to comply with it. In fact, the record of this case shows that they have no regard for the City's reasonable, content-neutral regulations. Upset about the Sign Code being applied to them, Plaintiffs ask this Court to second guess the City's administrative decision to stop the installation of the Cozy Sign. In the constitutional dimensions of this case, Plaintiffs' insistence that pictures of "burgers" are actually "burger-esque flying saucers," and that their sign is just "art" and not "advertisement" is immaterial. That is the stuff of ordinary disputes about code application. This Court should "decline to sit as '[a] zoning board[ ] of appeals'" where, as here, "'presented with claims which, although couched in constitutional language, at bottom amount only to the run of the mill dispute'" between the City and a business

5

owner. *Gunkel v. City of Emporia, Kan.*, 835 F.2d 1302, 1305 (10th Cir. 1987) (citations omitted).

There are no material facts in dispute. The constitutional claims presented are without merit.

Summary judgment in the City's favor is appropriate.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      The City regulates signs pursuant to Chapter 42 Article X of Salina Code of Ordinances along with related definitions in Chapter 42 Article XIV (collectively, "Sign Code"). **Ex. A** (Dean Andrew Aff'd) at ¶ 3.

2.      The City applies the Sign Code as written. **Ex. B** at 6, Resp. to Int. No. 5. (City's Response to Plaintiffs' First Set of Interrogatories).

3.      Sign is defined by Salina Code § 42-764 as:

> *Sign* is any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure of similar character which:

> (1)    Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground;

> (2)    Is used to announce, direct attention to, or advertise; and

> (3)    Is not located inside a building.

The City requests that pursuant to Federal Rule of Evidence 201, the Court take judicial notice of the municipal ordinance provisions cited herein. *See* Fed. R. Evid. 201; *North Mill Street, LLC v. City of Aspen*, 6 F.4th 1216, 1221 n.3 (10th Cir. 2021) ("Federal Rule of Evidence 201 authorizes federal courts to take judicial notice of adjudicative facts, including provisions in municipal ordinances, at any stage of the proceedings."). The relevant citations to Salina Code are attached hereto as **Ex. C**. The Salina Code may be accessed at https://library.municode.com/ks/salina/codes/code_of_ordinances.

4.      The purposes of the Sign Code, codified at Salina Code § 42-500, set forth

the City's governmental interests in regulating signs:

> This article promotes the public health, safety and welfare of the community through a comprehensive system of reasonable, effective, consistent, content-neutral and nondiscrimatory sign standards and requirements, narrowly drawn to:
>
> (1)   Ensure that all signs installed in the city are compatible with the character and visual environment of the community and promote the goals, objectives and policies of the comprehensive plan;
>
> (2)   Balance public and private objectives by allowing adequate avenues for both commercial and non-commercial messages;
>
> (3)   Improve pedestrian and traffic safety by promoting the free flow of traffic and the protection of pedestrians and motorists from injury and property damage caused by, or which may be fully or partially attributable to, unsecured, cluttered, distracting, and/or illegible signage;
>
> (4)   Protect the aesthetic appearance of the city's natural and built environment for its citizens and visitors;
>
> (5)   Prevent property damage, personal injury, and litter caused by signs that are improperly constructed or poorly maintained;
>
> (6)   Protect property values, the local economy, and quality of life by preserving and enhancing the appearance of the streetscape; and
>
> (7)   Provide for the placement of temporary signs in limited circumstances, without regard to the communicative content of the sign.
>
> (8)   Provide consistent design standards that enable the fair and consistent enforcement of these sign regulations.
>
> (9)   Enhance the city's ability to maintain its public rights-of-way.

**Ex. C**; **Ex. B** at 4, Resp. to Int. 4.

5.    Wall sign is defined in Salina Code § 42-781 as:

7

> *Wall sign* is a sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

**Ex. C**.

6.      Salina Code § 42-501 requires a sign permit to be obtained before a sign is constructed or painted. It provides:

> No sign, except for normal repair and for signs listed in sections 42-504 and 42-505, shall be painted, constructed, erected, remodeled, relocated or expanded until a zoning certificate (sign permit) for such sign has been obtained pursuant to the procedure set forth in this article.

**Ex. C**.

7.      Salina Code § 42-502(b) provides:

> A zoning certificate (sign permit) shall be either issued or refused by the zoning administrator within ten (10) days after the receipt of an application therefore or within such further period as may be agreed to by the applicant. No zoning certificate for any sign shall be issued unless the sign complies with the regulations of this article.

**Ex. C**.

8.  Building is defined in Salina Code § 42-637 as:

> *Building* is any covered structure built for the support, shelter or enclosure of persons, animals, chattels or moveable property of any kind, and which is permanently affixed to the land.

**Ex. C**.

9.      The applicable size limitations of the Sign Code are set forth in § 42-521(4)(b). They provide:

> (1)     *Maximum gross surface area:* * * *
>
> b.  In the C-4 district, three (3) square feet of sign area for each lineal foot of building frontage for allowable signage other than a ground/pole sign or a

> projecting sign; where no building frontage exists, one (1) square foot of sign area for each lineal foot of street frontage. Irrespective of building or street frontage, no property or zoning lot shall be restricted to less than thirty-six (36) square feet of sign area. No more than sixty-seven (67) percent of allowable sign area may be displayed on any building wall or street frontage.

**Ex. C**.

10.    Salina Code § 1-11 articulates that intent: "If for any reason any chapter, article, section, subsection, sentence, clause or phrase of this Code or the application thereof to any person or circumstances, is declared to be unconstitutional or invalid or unenforceable, such decision shall not affect the validity of the remaining portions of this Code." **Ex. C**.

11.    Dean Andrew is the City's Zoning Administrator and has been in that position since 2009. He has a Bachelor's and Master's degree from Kansas State University in urban geography and planning and a Juris Doctorate degree from the University of Iowa. He has been employed as a planner for 37 years. **Ex. D** (Dean Andrew Depo.) at 9:14-25, 10:1-8.

12.    Dustin Herrs is a City Planner and has held that position since April 2006. Dustin Herrs is certified by the American Institute of Certified Planners. As part of that certification he has taken continuing education credits in planning law, which included sign regulations. Dustin Herrs studied Regional and Community Planning at Kansas State University. **Ex. E** (Dustin Herrs Depo.) at 8:15-21, 8:24-25, 9:1-6; **Ex. F** (Dustin Herrs Aff'd).

13.    The Cozy Inn is owned by Steve Howard and his daughter, Andrea Windholz. **Ex. G** at 2, Stipulated Fact ii (Amended Pretrial Order, ECF 101)

14.    On November 3, 2023, Plaintiffs started painting the Cozy Sign. **Ex. G** at 2, Stipulated Fact v.

15.    Plaintiffs did not seek a sign permit before constructing the Cozy Sign. **Ex. H**

(Stephen Howard Depo.) at 91:11-17, 140:12-15, 19-21.

16.     Plaintiffs knew the City regulated signs, but did not review the sign regulations. **Ex. H** at 82:2-25, 83:1-3, 87:2-25, 88:1-25, 89:1-5, 240:15-17; 241:4-15; **Ex. I** (Andrea Windholz Depo.) at 71:7-12.

17.     Plaintiffs have no intent to read the sign regulations. **Ex. H** at 240:15-17; 241:4-15.

18.     Plaintiffs have no regard for the City's reasonable, content-neutral regulations. **Ex H** at 190:24-25; 191:1-25; 192:1-9; 233:1-25; **Ex. J** (Colin Benson Depo.) at 57:23-25; 58:1-24.

19.     On November 6, 2023, the City reviewed the Cozy Sign, which at the time was fully outlined and partially painted on the North wall of the Cozy Inn. **Ex. K** (Dustin Herrs 30(b)(6) Depo.) at 82:1-20, 85:7-21; **Ex. L** (Photo of Cozy Sign Plaintiffs' Bates 58); **Ex. G** at 2, Stipulated Fact No. vi (stipulating to Plaintiffs' Bates 58).

20.     On November 6, 2023, the City informed Plaintiff, Mr. Howard, that the Cozy Sign was too large to qualify for a sign permit and asked him to pause the Cozy Sign. **Ex. K** at 110:2-22, 85:7-21; **Ex. H** at 138:11-25, 139:4-18; **Ex. J** at 78:20-25, 79:1; 80:14-24.

21.     On February 19, 2024, Plaintiffs filed suit against the City. *See* (ECF 1).

22.     Before Mr. Howard even submitted a Sign Permit application, he knew the Cozy Sign, as proposed, was too large to qualify for a sign permit. **Ex. H** at 137:22-25, 138:1-25,139:1-18, 140:2-21, 180:3-14, 181:4-12, 182:7-25, 183:1-13; **Ex. M** (Cozy Sign Permit Application); **Ex. J** at 78:20-25, 79:1; 80:14-24.

23.     Not only did the City inform Mr. Howard that the Cozy Sign would not qualify for a sign permit within the 10-day period of § 42-502(b), but the City also understood that Mr. Howard agreed that his sign permit application (submitted on November 13, 2023) would be placed on hold.

**Ex. D** at 229:4-24, 230:1-24, 231:1-25, 232:1-24.

24.     The City determined the Cozy Sign was a sign as defined by Salina Code § 42-764 and, more specifically, as "wall sign" as defined by Salina Code § 42-781. **Ex. K** at 82:10-20; **Ex. B** at 10, Resp. to Int. No. 11; **Ex. D** at 63:18-24, 64:1-3, 159:1-25, 160:1-10, 234:13-21, 346:10-16.

25.     The City interprets and applies Salina Code § 42-764 to require that subparagraphs (1), (2), and (3) therein be met for any display to be considered a "sign" that is subject to the regulations of the Sign Code. The City has interpreted Salina Code § 42-764 consistently for decades. **Ex. D** at 48:8-16, 50:5-11, 51:6-11, 55:10-24; 62:16-24. **Ex. N** (Dean Andrew 30(b)(6) Depo.) at 11:14-25, 12:1.

26.     Applying Salina Code § 42-764, the City determined that the Cozy Sign is a "writing" "pictorial representation" "emblem" "flag, banner, streamer pennant, string of lights, or display calculated to attract the attention of the public" or "any other figure of similar character" that is "a structure or any part therefor, or a portable display, or is attached to, painted on, or in any manner represented on a building or other structure or on the ground," that "is used to announce, direct attention to, or advertise, and is not located inside a building." **Ex. B** at 9, Resp. to Int. 11.

27.     The Cozy Sign is used to announce, direct attention to, or advertise, and it is not located inside of a building. Specifically, the Cozy Sign contains a tag line announcing the infamous smells of the Cozy, it has an arrow directing attention to the building entrance and ordering window, and it advertises the hamburgers and toppings available for sale at the Cozy by depicting representations of them. **Ex. B** at 9, Resp. to Int. 11.

28.     The City applies the plain language and ordinary use of the words and phrases

"announce," "direct attention to," and "advertise." The City determines whether a display is used to "announce" by evaluating whether the display makes a declaration about a fact, occurrence, or intention or proclaims or gives notice of, or identifies, a business, product, or event. The City determines whether a display is used to "direct attention to" by evaluating whether the display indicates, points to, points out, or specifies a location (in general, like a particular property, or specifically, like a building entrance or pickup window). The City determines whether display is used to "advertise" by evaluating whether the display is meant to attract customers, encourage a commercial transaction, offer products or services in exchange for consideration (e.g., a display that says, "sliders, 5 for $5.00"); call attention to a brand, products, or services in order to encourage the purchase of products or services, in that it pertains to or references the goods or services for sale. **Ex. B** at 6, Resp. to Int. 5.

29.    The City prepared The Cozy Inn Sign Analysis.  During the November 13, 2023 meeting with Mr. Howard at the Smoky Hill museum, the City provided The Cozy Inn Sign Analysis to Mr. Howard. **Ex. E** at 112:6-9; Ex. J at 81:4-24; **Ex. O** (Cozy Inn Sign Analysis); **Ex. P (**Michael Schrage Depo.) at 128:6-19.

30.    The Cozy Inn occupies a property that is 20.8 feet in width and 44.4 feet in depth facing North Seventh Street.  The building frontage occupies the entire property line.  Thus, the building frontage of the Cozy Inn is 20.8 feet.  The City rounded up, calculating the building frontage as 21 feet.  Under Salina Code § 42-521(4)(b) the Cozy Inn had 63 square feet of allowable sign area. The City advised Mr. Howard if he wanted to erect the Cozy Sign he could reduce the size of the Cozy Sign down to the remaining 10 square feet, or remove existing signs to try to fit the sign within the allowable 63 square feet. **Ex. K** at 92:15-24, 93:1-16. 94:11-25, 96:3-25, 97:1-

8, 98:1-13, 116:16-25, 117:1-2; **Ex. E** at 117:1-25, 118:19-25, 119:1-9.

31.    The Cozy Sign occupies the entirety of the North wall of the Cozy Inn. **Ex. E** at 27:25, 28:1-4; **Ex. Q** (Photo of Cozy Sign at Plaintiffs' Bates 51); **Ex. G** at 2, Stipulated Fact vii (stipulating to Plaintiffs' Bates 51); **Ex. J** at 121:1 and 130:6-8.

32.    Prior to constructing the Cozy Sign, the Cozy Inn had three other signs, with a total sign area of 52.88 square feet.  At the time of constructing the Cozy Sign, the Cozy Inn had 10.12 square feet of allowable sign area remaining. **Ex. E** at 117:19-25, 118:25, 119:1-9.

33.    Using the dimensions of the North wall of the Cozy Inn, the City determined the Cozy Sign was approximately 528 square feet in area.  **Ex. K** at 96:3-25, 97:1-8, 98:1-13.

34.    Plaintiffs did not administratively appeal the City's determination that the Cozy Sign was a sign and therefore subject to the requirements of the Sign Code. **Ex D** at 234:11-21; **Ex. C** (Salina Code § 42-597).

35.    The Cozy Inn sells hamburgers with chopped onions, pickles, ketchup, and mustard, but does not offer any other toppings or condiments. **Ex. H** at 36:9-15, 37:10-25, 38:1-9.

36.    The smell of onions is distinct to the Cozy Inn. **Ex. H** at 42:23-25, 43:1-15.

37.    The smell of onions at the Cozy Inn "tags" anyone who enters. **Ex. H** at 42:23-25, 43:1-15.

38.    According to Mr. Howard the arrow on the Cozy Sign directs people to the entrance of the Cozy Inn. **Ex. H** at 136:2-11.

39.    Mr. Howard admitted he could "upsell" better to customers who came inside of the Cozy Inn. **Ex. H** at 41:13-15; 43:22-25, 44:1-4; 48:2-9.

40.    The Cozy Sign advertises hamburger, chopped onions, pickles, ketchup, and

mustard. The Cozy Sign directs attention to the front door of the Cozy Inn by way of an arrow that points to the front door of the Cozy Inn.  The Cozy Sign announces the infamous onion smell by announcing, "Don't Fear the Small, the Fun is Inside." **Ex. H** at 76:1-14, 136:5-11, 142:20-25, 143:1-25, 144:1-25; **Ex. E** at 82:23-25, 83:1,115:3-10.

41.     The City also reviewed the rendering of the Cozy Sign Mr. Howard submitted with the sign permit application, which Mr. Howard alleged was intended to be the final rendering of the Cozy Sign.  The City confirmed the display that Mr. Howard intended to be the final rendering of the Cozy Sign was a sign under the Sign Code. **Ex. K** at 108:4-13, 127:22-25, 128:1-22; **Ex. D** at 246:10-16; **Ex. M**; **Ex. Q**.

42.     The City, via its Zoning Administrator, reviewed industry specific publications in anticipation of the City of Salina's 2017 amendment to the Sign Code. The 2017 amendment, Ordinance Number 17-108882, was prompted by *Reed v. Town of Gilbert* (the City's Governing Body amended the Sign Code in order to ensure compliance with the First Amendment). The industry specific publications reviewed by the City addressed how signs are a significant driver distraction and how sign regulations promote traffic safety and aesthetics. **Ex. A**.

43.     The City regulates signs in the aggregate. **Ex. K** at 62:1-2.

44.     The City regulates the time, place, and manner of the display of signs. **Ex. D** at 127:1-2; **Ex. K** at 45:10-16.

45.     These time, place, and manner regulations limit the size, number, height and location of signs pursuant to the specific zoning district wherein the sign is located. **Ex. K** at 45:10-16, 71:12-16, 72:19-21; **Ex. D** at 127:1-2; **Ex. R** (Mark White Aff'd) at ¶ 6.

46.     Regulating the size, number, height, and location of signs helps to reduce clutter,

thereby reducing distractions, keeping visual sight lines for vehicles and pedestrians clear, and ensuring signs remain effective while not holding the eye of viewer for too long. **Ex. K** at 71:12-23.

47.    The Sign Code seeks to protect the aesthetics of the community and quality of life, while reducing safety hazards that can result from sign clutter. **Ex. E** at 64:10-18.

48.    Eliminating the risk of sign wars--where in order to have more prominent signage businesses compete by erecting additional signs and signs that are larger than the surrounding signs cluttering the area--also protects the aesthetics and safety of the community. **Ex. E** at 60:6-24, 61:2-25, 62:1-18.

49.    Excessive amounts of "signage, both in terms of number of signs and size of signs" can become distracting and cause safety problems.  **Ex. E** at 121:10-25.

50.    The Sign Code seeks a balance by allowing "ample amount of signage for each property" allowing "effective and attractive" signs "without becoming a safety concern." **Ex. E** at 121:23-25, 122:1-2.

51.    The Cozy Inn is located in the C-4 district. **Ex. G** at 3, Stipulated Fact viii.

52.    In the C-4 District, the number of signs is limited to "four (4) signs per business." **Ex. C** (§ 42-521(4)(b)); **Ex. D** at 131:20-24.

53.    In the C-4 District, the size and number limitations are designed to prevent safety problems. **Ex. E** at 62:16-19.

54.    The C-4 district is a more pedestrian-oriented area where the buildings are shoulder to shoulder and share common walls. **Ex. E** at 17:7-21.

55.    The Sign Code serves compelling and substantial urban planning purposes including

traffic safety and aesthetics. The Sign Code directly and materially furthers its recited purposes, set forth in Salina Code § 42-500. The Sign Code is consistent in practice with the state of the art nationally for how sign regulations interact with decorative building features such as murals. To that end, it is consistent with twenty-one sign and mural regulations in Kansas and Oklahoma, which demonstrate a range of approaches to regulating signs while accommodating the benefits of murals.  This is because murals are integral to buildings, are not designed to direct attention to a place, and as such do not function as signs. **Ex. R** at ¶ 6.

56.    The restrictions in the Sign Code are reasonable, generally accepted regulations of the size, number, placement and design of signs. The Sign Code varies sign height, size and design by zoning district.  This is a state of the art, and generally accepted technique for controlling sign clutter. The Sign Code keeps signs in scale with the building's context which furthers the City's aesthetic interests.  This is especially important in the historic downtown C-4 district, where the 67% limitation on the total sign area on any building wall or street frontage protects aesthetics and architectural integrity. **Ex. R** at ¶ 6.

57.    The terms and phrases used in the definition of sign in the Sign Code, such as advertise and announce, are well understood and in common use in sign regulations throughout the nation and in Kansas. **Ex. R** at ¶ 6(g).

58.    The Cozy Inn communicates via Facebook, branded merchandise worn or used by their customers, community events, radio advertising, banner advertising at indoor football events, billboards, bumper stickers, and a sign similar to the Cozy Sign on the wall of Jenni's Liquors in a nearby town. **Ex. I** at 19:5-25, 20:1-25, 21:1-25, 22:1-2, 23:8-25, 24:1-25, 26:7-25, 27:1-2, 29:12-25, 30:1-25, 59:2-25, 60:1-19; **Ex. H** at 89:11-24, 150:8-24; 213:3-13, 221:25, 222:1-12; **Ex. S**

(Photo from Stephen Howard Deposition Ex. Y).

59.    Charles Taylor admitted that prior to construction of the Cozy Sign, the Cozy Inn signs that were already in place were "conspicuous enough," and did in fact "brand the site." **Ex. T** at 177:20-23; 180:1-2 (Charles Taylor Depo.).

60.    Mr. Howard was upset about the City's determination that his display was a sign and that it was too large to qualify for a permit. **Ex. I** at 48:4-17.

61.    Plaintiffs allege that they do not want to "remove or otherwise restrict" other murals in Salina. *See* (ECF 16 at ¶¶ 50, 72).

62.    Plaintiffs contend that "The mural is not an advertisement. Instead, it is an artistic expression intended to tell a story about travel. 'It's not a billboard; it's artwork,' Howard said. 'It's my expression. It's my character going on my wall. I want to paint my wall.'" **Ex. G** at 5.

63.    Plaintiffs contend that "The written sign code treats all outdoor murals as wall signs and purports to subject every wall sign to the same size restrictions because all murals are 'displays calculated to attract the attention of the public.'" **Ex. G** at 6

64.    Plaintiffs contend that the Cozy Sign depicts, among other things, "burger-esque flying saucers attacking The Cozy Inn with blasts of ketchup and mustard." **Ex. G** at 4.

65.    Plaintiffs contend that there is no "factual basis" to support the City's argument that the Sign Code advances its stated interests **Ex. G** at 9.

### III.    <u>STANDARD OF REVIEW</u>

"Summary judgment is appropriate only if 'there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.'" *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008) (quoting Fed. R. Civ. P. 56(c)). "A

fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. *Id.* (quotations omitted). The moving party bears the burden of proof. *Id.*

## IV.    ARGUMENT

### A.    The Complaint Must be Dismissed Because Plaintiffs Lack Standing.

"Article III of the Constitution confines the federal judicial power to 'Cases' and 'Controversies.' Under Article III, a case or controversy can exist only if a plaintiff has standing to sue . . . ." *United States v. Texas*, 599 U.S. 670, 675 (2023). Standing is "a bedrock constitutional requirement . . . ." *Id.* "To establish standing, a plaintiff must show an injury in fact caused by the defendant and redressable by a court order." *Id.* at 676. The element of redressability requires more than a "'merely speculative' showing that the court can grant relief to redress the plaintiff's injury." *Advantage Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793, 801 (8th Cir. 2006); *Friends of the Earth, Inc. v Laidlaw Env. Services (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). "[S]tanding concerns the court's subject-matter jurisdiction and may be raised at any time." *Bertels v. Farm Bureau Property & Casualty Ins. Co.*, 123 F.4th 1068, 1074 (10th Cir. 2024).

Plaintiffs insist that the City's definition of "sign" includes all "murals" in the City.[1] Statement of Undisputed Material Fact ("SUMF") No. 63. Yet Plaintiffs specifically (and repeatedly) allege that (although they are challenging the City's regulations on their face), they do not want to "remove or otherwise restrict" those murals. SUMF No. 61.

This Court has held that "Severability will be assumed 'if the unconstitutional part can be severed without doing violence to legislative intent.'" *Clark v. City of Williamsburg, Kansas*, 388

---

[1] The term "murals" here refers to artistic displays that are located on exterior building walls, but that do not "announce," "direct attention to," or "advertise."

F. Supp. 3d 1346, 1362 (D. Kan. 2019). Salina Code § 1-11 articulates that intent: "If for any reason any chapter, article, section, subsection, sentence, clause or phrase of this Code or the application thereof to any person or circumstances, is declared to be unconstitutional or invalid or unenforceable, such decision shall not affect the validity of the remaining portions of this Code." SUMF No. 10. In Kansas, a severability clause "creates a presumption of severability." *City of Wichita v. Griffie*, 544 P.3d 776, 791 (Kan. 2024). However, even if the intentions stated in Salina Code § 1-11 are disregarded, severing any part of the definition of "sign" would simply mean that the sign code would not only continue to apply to Plaintiffs' sign, but also to additional displays that are not currently subject to its provisions. Such a situation would not be ideal, but it certainly would not do "violence to legislative intent." Severability therefore applies as a matter of law.

Consequently, even if Plaintiffs' argument is successful, they are without a remedy. If this Court finds any part of the challenged definition of sign unconstitutional, it is severable, and the resulting scope of what is regulated under the Sign Code would expand due to the severance of limiting language. What remains will be unchallenged, objective numerical size limits that are clearly constitutional. SUMF Nos. 2, 9, 61, 63. Those limitations will continue to preclude the Cozy Sign. *See Advantage Media*, 456 F.3d at 801 (Finding lack of standing to challenge sign regulations because in light of severability principles, "a favorable decision . . . even with respect to those sign code provisions which were factors in the denial of its permit applications would not allow it to build its proposed signs, for these would still violate other unchallenged provisions of the sign code like the restrictions on size, height, location, and setback."); *see also Get Outdoors II, LLC v. City of San Diego*, 506 F.3d 886, 893 (9th Cir. 2007); *Harp Adv. Ill., Inc. v. Village of Chicago Ridge*, 9 F.3d 1290, 1292 (7th Cir. 1993). In sum, if Plaintiffs are to be taken at their word

19

as expressed in the Amended Complaint and Pretrial Order, they will actually be worse off if they prevail than they were when they filed suit. SUMF Nos. 2, 9, 61, 63

Plaintiffs also lack standing to challenge the timing provisions of the Sign Code as an impermissible prior restraint. The Sign Code articulates a brief, specified time for decision-making. SUMF No. 7. Plaintiffs started painting the Cozy Sign without a permit. SUMF No. 15. By the time the permit application was submitted, Plaintiffs were well-aware that the Cozy Sign could not qualify for a sign permit. SUMF Nos. 20, 22, 23. Indeed, their permit application was submitted hours after discussing this issue with City Staff (a discussion supported by The Cozy Inn Sign Analysis), at which time they agreed to have their permit application held in abeyance. SUMF Nos. 20, 22, 23, 29. Because Plaintiffs knew the permit could not presently be issued, and agreed to delayed processing of their sign permit application, Plaintiffs have no cognizable injury-in-fact.

On this record, Plaintiffs have not made the required showing for standing. Consequently, the Complaint should be dismissed in its entirety for want of subject-matter jurisdiction.

### B.    The Sign Code is Content-Neutral

1.    *The Sign Code is Content-Neutral on its Face.*

On its face, the Sign Code and definition of "sign" upon which the application of the Sign Code turns, are content-neutral.  The City applies the Sign Code as written. SUMF No. 2. Courts look to the text of challenged provisions to determine if they are content-neutral on their face. *See Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163-64 (2015) (looking to the text of the challenged code to determine if its content-neutral) *Harmon v. City of Norman, Okla.*, 981 F.3d 1141, 1148 (10th Cir. 2020) (looking to the text of the challenged code to determine if its content-neutral).  "To find a provision facially unconstitutional, [courts] must conclude that any attempt to enforce such

legislation would create an unacceptable risk of the suppression of ideas*." Am. Target Advert., Inc. v. Giani*, 199 F.3d 1241, 1246–47 (10th Cir. 2000) (quotations omitted). Under *Reed*, a regulation is content based if: (1) its text draws distinctions among signs based on "the topic discussed or the idea or message expressed"; or (2) if the regulations "cannot be 'justified without reference to the content of the regulated speech,' or . . . were adopted by the government 'because of disagreement with the message [the speech] conveys.'" 576 U.S. 155, 163-64 (2015) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). If these two factors are not present, the government may "place restrictions on expression so long as it do[es] not regulate *what* is said, but merely [regulates] such matters as *when, where,* and *how loud*." *Ward v. Utah*, 398 F.3d 1239, 1254 (10th Cir. 2005) (quotations omitted).

A regulation is not content based and subject to heightened scrutiny merely because it requires a reading of the sign to determine who is speaking and what they are saying in order to apply the regulation. *Austin*, 596 U.S. at 69. Rather, a regulation remains "agnostic as to content" when a "reading of the sign" is incidental to the application of a content neutral regulation. *Id*. Indeed, the Supreme Court outright rejected the argument that a sign regulation is unconstitutional because a person must read a display to determine whether the regulation applies--characterizing that approach as "too extreme." *Austin*, 596 U.S. at 69.

Looking to the text of the Sign Code, there is no reference to topics, ideas, messages, or viewpoints regarding what is announced, the objects or locations to which attention may be directed, or the contents of any advertisement. *See Austin*, 596 U.S. at 71; SUMF Nos. 3, 4, 5, 9. The Sign Code is agnostic as to content, and contains only "time, place and manner" restrictions. SUMF No. 3, 4, 5, 9, 44, 45, 53, 56. The definition of sign turns on whether a display is located

21

outside of a building and is used to "announce, direct attention to, or advertise." SUMF Nos. 3, 24, 25. That limitation, which constrains the application of the Sign Code by ruling out certain architectural embellishments that do not serve these functions, is in keeping with long-established common understandings regarding what signs are. SUMF No. 55. It does not involve content in a constitutional sense (that is, ideas, messages, topics, or viewpoints). Displays that fall within the definition are a "sign" and subject to the Sign Code's size, number, and placement limitations (time, place and manner provisions). Displays that fall outside of the definition of sign" are not signs and are therefore not regulated as such.

The United States Supreme Court determined that a substantially similar sign regulation was content-neutral in the case of *Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 66 (2022). Like Salina Code § 42-764, which subjects a display used to "announce, direct attention to, or advertise" to regulation as a "sign," the City of Austin's regulation also triggered regulation as a "sign" based on whether the display was used to "advertis[e]" or "direct[] persons to." *Austin*, 596 U.S. at 66; SUMF No. 3.

Just like the city officials in *Austin*, who had to read the display to determine if the applicable regulation applied (first, to determine whether a display is a "sign," and second, to determine whether it was an on-premise or off-premise sign), in some circumstances Salina City officials may have to look at a display to determine if it is a Sign. *Austin*, 596 U.S. at 71. But, like in *Austin*, a mere reading of the sign to determine if a regulation applies to it does not make the Sign Code content-based. *Austin*, 596 U.S. at 69. And like the noise regulation upheld as content-neutral by the Tenth Circuit Court of Appeals in *Harmon* (prohibiting "'loud or unusual sounds,' *without reference to the content* of the noise,") the Sign Code merely regulates the time, place, and manner

of the display of signs, but does not concern itself with what a sign *says*. *Harmon*, 981 F.3d at 1148 (quotations omitted) (emphasis added).

The government's purpose in the regulation is also used to assess its content-neutrality. *Harmon*, 981 F.3d at 1148 ("Whether a legislative enactment is content-neutral or instead content-based turns on 'the government's purpose.'"). "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Harmon*, 981 F.3d at 1148 (quotations omitted). Aesthetic and traffic safety purposes are unrelated to the content of the regulated speech. *Stockinger*, 79 F.4th at 1251 (recognizing aesthetic and traffic safety justification as unrelated to content).

Salina Code § 42-500 (purpose statement) enumerates the City's government interests, which include aesthetics, traffic and pedestrian safety, and property values. SUMF No. 4. The purpose statement does not reference content at all. Instead, it seeks to "promote the public health, safety and welfare of the community through a comprehensive system of reasonable, effective, consistent, *content-neutral* and nondiscriminatory sign standards and requirements . . . ." SUMF No. 4. Since the Sign Code addresses only the "time, place, and manner" of speech, and because the Sign Code does not cross any threshold into content based territory, it is content neutral. *See Ward*, 491 U.S. at 791.

2.    *The Sign Code is Content-Neutral As-Applied.*

The City applied the facially content neutral Sign Code, as written, to the Cozy Sign. It is "an uncontroversial principle . . . that a plaintiff generally cannot prevail on an *as-applied* challenge without showing that the law has in fact been (or is sufficiently likely to be) unconstitutionally *applied* to him." *McCullen v. Coakley*, 573 U.S. 464, 485 n.4 (2014). An "as-applied challenge

tests the application" of the regulation "to the facts of a plaintiff's concrete case." *Stockinger*, 79

F.4th at 1248-49.  Thus, no other display is germane to the Plaintiffs' as-applied challenge.  *Id.*

With regard to the Plaintiffs' "concrete case," the City applied the applicable, content-neutral provisions of the Sign Code to their letter when it determined that the Cozy Sign was a "sign" that was too big to qualify for a sign permit. SUMF Nos. 24-27, 29- 33, 35-41. Painting of the Cozy Sign commenced without a sign permit on November 3, 2023. SUMF Nos. 14-15. Three days later, the City reviewed the Cozy Sign that was fully outlined and partially painted on the North wall of the Cozy Inn, determined the Cozy Sign was a sign as defined by Sign Code § 42-764 and, more specifically, as "wall sign" as defined by Salina Code § 42-781 (the characterization of "wall sign" refers to its physical characteristics). SUMF No. 19. It then evaluated the size of the Cozy Sign against objective, numerical size limits of Salina Code § 42-521(4)(b). SUMF Nos. 20, 29-33.

The City determined that the Cozy Sign is a "writing" "pictorial representation" "emblem" "or display calculated to attract the attention of the public" or "any other figure of similar character" that is "a structure or any part therefor, or a portable display, or is attached to, painted on, or in any manner represented on a building or other structure or on the ground," that "is used to announce, direct attention to, or advertise, and is not located inside a building," and therefore qualified as a "sign" under the Sign Code. SUMF Nos. 24-27. Specifically, the Cozy Sign announces the Cozy's infamous smells, directions attention to the building entrance and ordering window, it advertises the hamburgers and toppings available for sale at the Cozy, and it is painted on the outside wall of the building. SUMF Nos. 24-27.

The City was transparent about how it applied the Sign Code to the Cozy Sign, preparing

"The Cozy Inn Sign Analysis" and providing it to Mr. Howard on November 13, 2023. SUMF No. 29. Using the same approach, the City also reviewed the rendering Mr. Howard submitted with Plaintiffs' *post-hoc* sign permit application (submitted after receipt of "The Cozy Inn Sign Analysis"), which included a rendering that Mr. Howard alleged was the final rendering of the Cozy Sign. SUMF. No. 41. The City confirmed the final rendering of the Cozy Sign also depicted a sign that would be regulated by the Sign Code. *Id.*

The City's determination that the Cozy Sign is too big to qualify for a permit was based on objective content neutral standards.  In the C-4 District where the Cozy Inn is located, the total allowable sign area is limited to three square feet for each linear foot of building frontage. SUMF. Nos. 9, 51, 52. The Cozy Inn has 21 feet of building frontage, so it is limited to 63 square feet of sign area in the aggregate. SUMF No. 30. Of that, three signs totaling 52.88 square feet of sign area were already in place, leaving 10.12 square feet of available sign area for additional signage. SUMF No. 32. The Cozy Sign takes up the entire North wall of the Cozy Inn, so the City estimated the size of the Cozy Sign by taking the height of the building (obtained from software available to the City) and the length of the North wall, concluding that the sign is approximately 528 square feet in area--more than 52 times the area that remained for additional signage. SUMF No. 30-33.

As such, on November 6, 2023, the City contacted Mr. Howard and asked him to pause the Cozy Sign, advising him that the Cozy Sign was a sign under the Sign Code, it needed a sign permit, and it was too big to qualify for a sign permit as proposed. SUMF No. 20. The City met with Mr. Howard again on November 13, 2023. SUMF No. 29. At that meeting, the City provided him with The Cozy Inn Sign Analysis. *Id.* Plaintiffs did not administratively appeal these determinations. SUMF No. 34.

The undisputed material facts show that Sign Code was applied as written to Plaintiffs. Thus, the Sign Code on its face, and as applied to Plaintiffs, is a content-neutral regulation.

### 3.    *Plaintiffs Misconstrue the Definition of Sign.*

Plaintiffs allege a different interpretation of the City's definition of "Sign." Under Plaintiffs' interpretation of § 42-764, a sign is *anything* that is "calculated to attract the attention of the public." SUMF No.63. That interpretation is absurd, ignores the plain language of § 42-764, is not how the City interprets § 42-764, and is not how the City applied § 42-764 to the Cozy Sign. Statutory construction begins with "the plain language of the law." *United States v. Morgan*, 922 F.2d 1495, 1496 (10th Cir. 1991). Indeed, "absent ambiguity or irrational result, the literal language of a statute controls." *Edwards v. Valdez*, 789 F.2d 1477, 1481 (10th Cir.1986). Words must be construed in their "ordinary, everyday sense." *Crane v. Commissioner*, 331 U.S. 1, 6 (1947). "In ascertaining the plain meaning," the court "must look to the particular . . . language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988). The Court must "choose the reasonable result over the 'absurd' one." *Robbins v. Chronister*, 435 F.3d 1238, 1241 (10th Cir. 2006).

Here, the plain language of the definition of sign is limited in application to only those displays (and "any other figure[s] of similar character") that are "a structure or any part thereof, or a portable display, or [are] attached to, painted on, or in any other manner represented on a building or other structure or on the ground," are "used to announce, direct attention to, or advertise," and are "not located inside a building." SUMF No. 3. The City interprets and applies Salina Code § 42-764 to displays and requires that subparagraphs (1), (2), and (3) be met to be a sign pursuant to the Sign Code. SUMF No. 25. The City's consistent and reasonable construction of the definition of

the term "sign," which was applied to Plaintiffs' sign in a content neutral way, is both constitutionally sound and supported by common understandings and long experience.[2] *Id.*

Plaintiffs' argument that the three subparagraphs of § 42-764(1)-(3) apply only to "any other figure of similar character" is a fundamentally incorrect take on the plain text, and one that robs it of common sense. For example, Plaintiffs' construction of the definition of sign would result in sign permit requirements for displays *inside of buildings*. Yet Plaintiffs' interpretation does not alter the content-neutrality analysis. The text of the Sign Code remains content neutral. Even if Plaintiffs have the correct interpretation, they are without relief that would address their alleged injury. See IV.A. and IV.B., *supra*. If all displays are "signs," the legal status of Plaintiffs' display would not change--it would still be a sign that is too large to qualify for a permit.

### C.    The Sign Code Passes Intermediate Scrutiny

Because the Sign Code is content neutral, the applicable test is "intermediate scrutiny." *Ward,* 491 U.S. at 797. The Court decides as a matter of law whether the content-neutral Sign Code passes intermediate scrutiny. *Harmon*, 981 F.3d at 1148-49. The intermediate scrutiny test consists of three prongs: (1) the governmental interests must be substantial (2) the regulation must advance those interests in a manner that "would be achieved less effectively absent the regulation"; and (3) the regulation must leave open "ample alternative channels for communication of the information." *Ward*, 491 U.S. at 791, 799 (quotation omitted).

As to the first prong, like thousands of other local governments, Salina's City Commission has determined that its Sign Code advances its substantial content-neutral interests of aesthetics, traffic and pedestrian safety, and property values. SUMF Nos. 3, 4, 42. Salina Code § 42-500

---

[2] *Sign*, MERRIAM-WEBSTER DICTIONARY (https://www.merriam-webster.com/dictionary/signs)

enumerates the City's governmental interests. SUMF No. 4. The City's interests in aesthetics and traffic safety are substantial government interests that are content neutral as a matter of law. *StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243, 1251 The City's interests in property values (and, again, aesthetics) are "substantial" and "legitimate." *Taxpayers for Vincent*, 466 U.S. at 795. Sign clutter is akin to a "visual assault," and is therefore a "significant substantive evil within the City's power to prohibit." *Taxpayers for Vincent*, 466 U.S. at 807-08.

As to the second prong, the narrowly tailored requirement is satisfied "so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799. Put another way, although the City submits that the Sign Code advances all its stated interests, the City need only show that the Sign Code advances one of its substantial government interests in order to pass intermediate scrutiny review. Additionally, the narrowly tailored requirement does not require the regulation be "the least restrictive or least intrusive means" of regulation. *Id*. at 798.

"Unlike oral speech, signs take up space and may obstruct views, distract motorists, displace alternative uses for land, and pose other problems that legitimately call for regulation." *City of Ladue v. Gilleo*, 512 U.S. 43 (1994). In addressing these concerns, the City regulates the time, place and manner of the display of signs by limiting their size, number, height, and location based on the specific zoning district wherein individual signs are located. SUMF Nos. 44-46, 52-56. Time, place, and manner restrictions like these *per force* address the "distinct safety and esthetic challenges" posed by signs. *Austin*, 596 U.S. at 64, 71, 75. The United States Supreme Court defers to "common-sense judgments of local lawmakers" in determining such things as the traffic safety "hazards" presented by signs. *Metromedia*, 453 U.S. 508-509. It is axiomatic that regulating the

time, place and manner of the display of signs is more effective at advancing traffic safety, aesthetics, and property values than not regulating them.

As to the third prong, "ample alternatives," "[t]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981). An alternative mode of communication is constitutionally adequate if the speaker's ability to "communicate effectively" is not "threatened." *Members of the City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 812 (1984).

Plaintiffs have ample alternative channels to communicate the information. First, the Sign Code regulates signs, but it does not prohibit them. Indeed, The Cozy Inn currently has three other signs installed on the building that are not at issue in this case. SUMF No. 32. These signs announce the Cozy Inn and advertise the hamburgers it sells.  SUMF Nos. 32, 58. Plaintiffs' proffered expert admitted that they were "conspicuous enough" and served to "brand the site." SUMF No. 59. Since there is room for just over 10 square feet of additional signage under the Sign Code, Plaintiffs could simply reduce the size of the Cozy Sign to an allowable size so that the City could legally issue a sign permit for it. SUMF No. 30. Second, in addition to signage on its building, the Cozy Inn also uses a number of other alternative channels to communicate information, including Facebook, branded merchandise worn or used by their customers, community events, radio advertising, banner advertising at indoor football events, billboards, bumper stickers, and a sign similar to the Cozy Sign located at Jenni's Liquors in a nearby town. SUMF No. 58. The Sign Code, therefore, satisfies the third prong of intermediate scrutiny.

In sign cases it is common for courts at all levels to not require evidence beyond the text of

the regulation itself to determine if intermediate scrutiny is satisfied. *See Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 508 (1981) ("If the city has a sufficient basis for believing that billboards are traffic hazards and are unattractive, then obviously the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them."); *StreetMediaGroup, LLC v. Stockinger, 1:20-CV-03602-RBJ, 2021 WL 5770231, at *5 (D. Colo. Dec. 6, 2021), aff'd, 79 F.4th 1243 (10th Cir. 2023)* ("state's interest in promoting safe driving alone satisfies the narrow-tailoring requirement . . . the state would less effectively prevent these crashes if it took down signs after they caused motor accidents instead of establishing a prophylactic permitting scheme."); *StreetMediaGroup, LLC v. Bd. Of Cnty. Comm'rs*, No. 21-CV-1232-RMR-KLM, 2023 WL 5613018 (D. Colo. Mar. 30, 2023) ("Plaintiffs argue that the County should be required to produce specific evidence that the Regulations actually relate to and advance the County's aesthetic and traffic goals. But the question before the Court is whether the Regulations directly advance the County's interests in traffic safety and aesthetics, not whether each provision of the Regulations is absolutely necessary to do so."). Despite this legal precedent, Plaintiffs contend the City must present evidence to support the City's arguments with regard to how the Sign Code advances its stated interests, and that there is no "factual basis" for such support. SUMF No. 65.

Yet even if this Court determines that additional evidence is necessary to support a holding that the Sign Code survives intermediate scrutiny, the summary judgment record demonstrates that the Sign Code advances aesthetics, traffic and pedestrian safety, and property values. To that end, the summary judgment record includes the following evidence: (1) industry specific publications the City considered; (2) testimony of City staff (who have extensive education and experience in

planning and sign regulations) (SUMF Nos. 11-12); and (3) expert testimony of Mark White.

The City, via its Zoning Administrator, reviewed industry specific publications in anticipation of the City of Salina's 2017 amendment of its Sign Code. SUMF No. 42. The 2017 amendment, Ordinance Number 17-108882, was prompted by *Reed v. Town of Gilbert*. *Id*. In response to *Reed*, the City's Governing Body amended the Sign Code to ensure compliance with First Amendment requirements. *Id*. The industry specific publications reviewed by the City at that time included material about how signs are a significant driver distraction and how sign regulations promote traffic safety and aesthetics. *Id*.

The Sign Code seeks to protect the aesthetics of the community and quality of life, while reducing safety hazards that can result from sign clutter. SUMF No. 47. Eliminating the risk of "sign wars"--where in order to have more prominent signage businesses compete by erecting additional signs and signs that are larger than the surrounding signs, cluttering the area--also protects the aesthetics of the community and the safety of motorists and pedestrians. SUMF No. 48. Excessive amounts of "signage, both in terms of number of signs and size of signs" can become distracting and cause safety problems.  SUMF No. 49. The Sign Code seeks a balance by allowing "ample amount of signage for each property" allowing "effective and attractive" signs "without becoming a safety concern." SUMF No. 50. In the C-4 District, where the Cozy Sign is located, the size and number limitations are designed to prevent safety problems. SUMF Nos. 52, 54. Regulating the size, number, height, and location of signs helps to reduce clutter, thereby reducing distractions, keeping visual sight lines for vehicles and pedestrians clear, and ensuring signs remain effective while not holding the eye of viewer for too long. SUMF No. 46.

The Sign Code is consistent in practice with the state of the art nationally for how sign

regulations interact with decorative building features such as murals. SUMF No. 55. To that end, it is consistent with twenty-one sign and mural regulations in Kansas and Oklahoma, which demonstrate a range of approaches to regulating signs while accommodating the benefits of murals. *Id*. This is because murals are integral to buildings, are not designed to direct attention to a place, and as such do not function as signs. *Id*. The Sign Code directly and materially furthers its recited purposes in Salina Code § 42-500. *Id*. The Sign Code keeps signs in scale with the building's context, which furthers the City's aesthetic interests. SUMF No. 56. This is especially important in the historic downtown C-4 district, where the 67 percent limitation on the total sign area on any building wall or street frontage protects aesthetics and architectural integrity. *Id*.

Although the Court need not rely on evidence outside the text of the Sign Code to determine if the Sign Code passes intermediate scrutiny, the summary judgment record is replete with evidence justifying how the Sign Code advances the City's substantial government interests in aesthetics, traffic and pedestrian safety, and property values. Thus, summary judgment in the City's favor on Plaintiffs' content-based claims is appropriate.

### D.      The Sign Code Does Not Constitute an Impermissible Prior Restraint

Prior restraints "are not unconstitutional per se." *Se. Promotions, LTD v. Conrad*, 420 U.S. 546, 558 (1975). They are permissible if the permitting system includes "procedural safeguards that reduce the danger of suppressing constitutionally protected speech." *Id*. at 559. Prior restraints consist of two procedural safeguards: (1) timing and (2) limitations upon discretion. The general rules is that a brief, specified time period for decision-making that allows for prompt judicial review is required. *Am. Target Advert., Inc. v. Giani*, 199 F.3d 1241, 1253 (10th Cir. 2000). However, persuasive case law from the Ninth Circuit has found that procedural safeguards regarding timing

"are not required for content-neutral time, place, and manner" regulations. *Epona v. Ventura*, 876 F.3d 1214, 1225 (9th Cir. 2017) (citing *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 322-23 (2002)). The prior restraint doctrine also requires "standards limiting the licensor's discretion." *Lakewood v. Plain Dealer Publ'g Co*., 486 U.S. 750, 758 (1988).

Respecting the timing procedural safeguard (if applicable to the City's content-neutral time, place, and manner regulations), Salina Code § 42-502(b) provides a sign permit must be issued or refused within 10 days after receipt of an application, or within such further period as may be agreed to by the applicant. SUMF No. 7. That is both "brief" and "specified," so it meets constitutional requirements on its face.

As-applied, the City asked Plaintiffs to pause the painting of the Cozy Sign within three days after Plaintiffs started the work. SUMF No. 14, 15, 19, 20. At that time, Plaintiffs had not even sought a permit. SUMF No. 15. The City promptly told Plaintiffs that the Cozy Sign would not qualify for a permit because: (1) it was a sign; and (2) it was too big. SUMF No. 20. Consequently, before Mr. Howard even submitted a Sign Permit application, he already knew that the Cozy Sign, as proposed in his application, was too big to qualify for a sign permit. SUMF No. 22.

Not only did the City inform Mr. Howard that the Cozy Sign would not qualify for a sign permit within the 10-day period of Salina Code § 42-502(b), but the City also understood and Mr. Howard agreed that his sign permit application, which he submitted on November 13, 2023, would be held in abeyance. SUMF No. 23. That is an "agreement by the applicant" under Salnia Code § 42-502(b). SUMF No. 7.

But even if Mr. Howard had not agreed to hold the application in abeyance, the sign permit application was submitted seven days after he was asked to pause the Cozy Sign, and just hours

after he received The Cozy Inn Sign Analysis. SUMF Nos. 19-20, 22-23. The City did not need to again inform Mr. Howard about what he already knew--the sign he had painted (and subsequently applied for a permit) was too big, and the City could not legally issue a sign permit for it. SUMF No. 20. Holding the application was a courtesy, not a violation of his First Amendment rights. Moreover, approximately three months later, Mr. Howard filed this lawsuit. SUMF No. 21. On its face and as-applied, the Sign Code includes the proper procedural safeguard with regard to timing of decision-making.

Respecting the safeguard of limiting the "licensor's discretion," one standard in the Sign Code is whether the display (among other possible things) "advertises." SUMF No. 3. That standard is ubiquitous in sign regulations. *See Austin,* 596 U.S. at 64-65. It is also constitutionally sufficient. It is particularly clear when the advertisements pertain to "goods or services for sale." Consider the strikingly similar case of *Wag More Dogs, Ltd. Liab. Corp. v. Cozart*, 680 F.3d 359 (4th Cir. 2012). In *Wag More Dogs*, a doggy day care facility painted a "mural" on an exterior wall that faced a municipally owned dog park. *Id*. at 363. The "mural" depicted "happy cartoon dogs, bones, and paw prints," and incorporated some of the cartoon dogs from the logo. *Id*. Wag More Dogs argued, *inter alia*, that the display was not an "advertisement," but instead "noncommercial speech." *Id*. at 369. The Fourth Circuit was not persuaded. It held that the display was commercial speech because it "was meant to attract customers," it included dogs from the company's logo (which, it held, was "analogous to referencing a specific product"), and it sought to create goodwill with potential customers. *Id*. at 370 (emphasis added).

With respect to Plaintiffs' prior-restraint claim, the Sign Code, on its face, does not promote arbitrary enforcement because it provides sufficient standards to limit the City and its officials'

discretion. The Sign Code has numerous procedural safeguards including avenues for variances and appeals to resolve issues with the City. SUMF No. 34. Further, the standard in the Sign Code is whether the display:

> (1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground; (2) Is used to announce, direct attention to, or advertise; and (3) Is not located inside a building.

SUMF No. 3. City staff under the supervision of the Zoning Administrator are capable of determining whether the structure or display is attached to, painted on, or represented on a building or other structure or on the ground. SUMF No. 28. City staff under the supervision of the Zoning Administrator are capable of determining whether a display announces, directs attention to, or advertises. *Id*. The City has been interpreting the definition of sign consistently for decades. SUMF No. 25.

As applied, on this record it is clear that the City applied the plain language and ordinary use of the words and phrases "announce, direct attention to, or advertise." The word "advertise" is widely used in defining "sign" for regulatory purposes. The Cozy Sign plainly "advertises." SUMF Nos. 31, 35-41. That is particularly clear since the advertisement pertains to or references goods or services for sale. *Id*. "Building" is also a defined term in the Salina Code, and City staff under the supervision of the zoning administrator are capable of determining when a display is "not located inside of a building." SUMF Nos. 8, 28. On their face and as-applied, the criteria of the Sign Code constrain the discretion of the decision-maker and therefore do not constitute an impermissible prior restraint. Summary judgment in favor of the City is proper.

### E. The Sign Code Also Passes the Commercial Speech Test.

Assuming *arguendo* this Court finds the Sign Code distinguishes between "signs" and

displays that are not signs based on whether the display is commercial speech or noncommercial speech, the commercial-noncommercial distinction is not a content-based distinction. If the regulation is of commercial speech, then the commercial speech test set out in *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of NY*, 447 U.S. 557, 564-67 (1980) applies.[3]

Commercial speech is an advertisement that refers to a particular product, whose speaker has an economic motivation. *See Bolger v. Youngs Drug Prod. Corp*., 463 U.S. 60, 66-67 (1983); *Wag More Dogs*, 680 F.3d at 363, 370. Commercial speech enjoys "a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values." *Bd. of Tr. of State Univ. of New York v. Fox*, 492 U.S. 469, 477 (1989). Regulations that differentiate between commercial and noncommercial speech, without more, are not content based. *See Metromedia v. San Diego,* 453 U.S. 490, 504-06 (1981). Under the commercial speech test, regulations "need only be tailored in a reasonable manner to serve a substantial state interest in order to survive First Amendment scrutiny." *Edenfield v. Fane*, 507 U.S. 761, 767 (1993) (citing *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557 (1980)). The test is strikingly similar to the intermediate scrutiny applied to content neutral regulations. *See Brewer v. Albuquerque*, 18 F.4th 1205, 1252 (10th Cir. 2021). However, unlike the intermediate scrutiny test examined in Section IV.C., *supra*, as-applied commercial speech challenges are not justiciable. *See U.S. v. Edge Broad. Co*., 509 U.S. 418, 431 (1993).

Nothing in *Reed* (which dealt only with content based classifications of noncommercial speech) or *Austin* prohibits the City from regulating commercial speech differently from

---

[3] This test is also referred to as "intermediate scrutiny," but for clarity, this brief will refer to it as the "commercial speech test."

noncommercial speech. The constitutional command is simply that commercial speech cannot be favored over noncommercial speech. *See Metromedia*, 453 U.S. at 504-06.

The Cozy Sign displays commercial speech. SUMF Nos. 31, 35-40. While Plaintiffs seek to have the commercial speech doctrine overturned, Supreme Court precedent controls that question, and such precedent has outright rejected overturning the commercial speech doctrine. *Edenfield v. Fane*, 507 U.S. 761, 767 (1993); *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557 (1980); *Brewer v. Albuquerque*, 18 F.4th 1205, 1252 (10th Cir. 2021). Here again, Plaintiffs do not consider the consequences of their demands. The "commercial speech doctrine" what the Supreme Court had previously determined was unprotected speech, and is therefore arguably the only First Amendment protection that commercial speech has. *See generally, Valentine v. Chrestensen*, 316 U.S. 52 (1942).

For lawful, non-misleading speech, the commercial speech test requires substantial governmental interests, direct advancement of those interests, and narrow tailoring. The City's asserted aesthetic, traffic safety, and property values interests are substantial as a matter of law. *Metromedia*, 453 U.S. at 508; *Taxpayers for Vincent*, 466 U.S. at 807; *StreetMediaGroup, LLC v. Stockinger*, 79 F.4th at 1251. The City's interests are directly advanced and narrowly tailored. SUMF Nos. 42-56; IV.C., *supra*; *See Metromedia*, 453 U.S. at 508 ("we reject appellants' claim that the ordinance is broader than necessary and, therefore, fails the fourth part of the *Central Hudson* test. If the city has a sufficient basis for believing that billboards are traffic hazards and are unattractive, then obviously the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them. The city has gone no further than necessary in seeking to meet its ends. Indeed, it has stopped short of fully accomplishing its ends: It has not prohibited all

billboards, but allows onsite advertising and some other specifically exempted signs."). Consequently, the Sign Code passes the commercial speech test.

Indeed, the Sign Code allows for a generous amount of commercial signage. By way of illustration (since as-applied commercial speech challenges are not justiciable), prior to Plaintiffs' decision to paint the Cozy Sign, the Cozy had not fully utilized its sign allowance. SUMF No. 32. According to Plaintiffs' proffered expert, at that time the Cozy Inn already had "enough" signs in place to be conspicuous and "brand the site and enhance the store image." SUMF No. 59. If this Court determines that the commercial speech test is appropriate and applicable, summary judgment in favor of the City is appropriate.

    **F.**    <u>**The Sign Code is Not Unconstitutionally Vague.**</u>

An ordinance is "unconstitutionally vague for one of two reasons:  it either 'fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits'; or it 'authorizes or even encourages arbitrary and discriminatory enforcement.'" *Dr. John's, Inc. v. Roy*, 465 F.3d 1150, 1158 (10th Cir. 2006) (quotation omitted). The task of identifying business advertising, is a "very basic test" that is "not unconstitutionally standardless or vague . . . ." *Wag More Dogs, LLC*, 795 F. Supp. 2d at 390.  The vagueness doctrine is not based on "the mere fact that close cases can be envisioned."  *United States v. Williams*, 533 U.S. 285, 305-06 (2008). "[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward*, 491 U.S. at 794. "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *Williams*, 553 U.S. at 306.

Ordinarily, "'[a] plaintiff who engages in some conduct that is clearly proscribed cannot

complain of the vagueness of the law as applied to the conduct of others.'" *U.S. v. Williams*, 553 U.S. 285, 304 (2008) (quoting *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494–495, n. 6 and 7 (1982)). However, the Supreme Court has "relaxed that requirement in the First Amendment context, permitting plaintiffs to argue that a statute is overbroad because it is unclear whether it regulates a substantial amount of protected speech." *Id*. As a matter of law, Plaintiffs cannot avail themselves to that relaxed standard because their display is commercial speech, and "the overbreadth doctrine does not apply to commercial speech." *Hoffman Estates*, 455 U.S. at 497.

Yet even if this challenge is available to Plaintiffs, the Sign Code provides people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Its text provides clear standards that ordinary people can understand, and therefore does not encourage arbitrary and discriminatory enforcement. SUMF Nos. 28, 57.

During depositions, both Howard and Windholz testified that they had not read the Sign Code and did not attempt to read the Sign Code. SUMF Nos. 16-18. The Sign Code does not regulate "murals." It regulates signs. As such, the Sign Code is not vague simply because it does not define mural or any number of other terms and phrases enumerated by Plaintiffs that are not used, and are simply not pertinent to the City's objective, content-neutral approach to identifying and regulating signs. Urban planning and zoning industry standards do not require a definition to be codified for every single word in a Sign Code to ensure understanding of its meaning and methodology. SUMF No. 57.

As Plaintiffs' commercial speech is clearly within the scope of the City's regulation, Plaintiffs cannot be heard on their vagueness claim against the Sign Code. But even if they could, the Sign Code provides clear standards that ordinary people can understand and, therefore, does not

encourage arbitrary enforcement. Consequently, the Sign Code is not impermissibly vague, and summary judgment in favor of the City on the Plaintiffs' vagueness claim is proper.

## V.    CONCLUSION

For the above stated reasons, the Court should enter judgment in the City's favor on all claims, declare the Sign Code constitutional, and enter final judgment against Plaintiffs. Alternatively, this Court should dismiss Plaintiffs' Amended Complaint because Plaintiffs lack standing and the Court is therefore without subject-matter jurisdiction.

Dated this 7th day of February, 2025.

| s/ Aaron O. Martin | s/ Todd G. Messenger | s/ Amanda C. Jokerst |
|---|---|---|
| Aaron O. Martin | Todd G. Messenger, | Amanda C. Jokerst |
| Bar Number 24170 | CO Bar Number 38783 | CO Bar Number 47241 |
| Attorney for Defendant City | Pro Hac Vice Attorney for | Pro Hac Vice Attorney for |
| of Salina, Kansas | Defendant City of Salina, | Defendant City of Salina, |
| CLARK, MIZE & | Kansas | Kansas |
| LINVILLE, CHARTERED | Fairfield and Woods, P.C. | Fairfield and Woods, P.C. |
| P.O. Box 380 | 1801 California St., | 1801 California St., |
| Salina, KS 67402-0380 | Ste. 2600 | Ste. 2600 |
| Tel. (785) 823-6325 | Denver, CO 80202 | Denver, CO 80202 |
| Fax: (785) 823-1868 | Tel. (303) 830-2400 | Tel. (303) 830-2400 |
| Email: | Fax: (303) 830-1033 | Fax: (303) 830-1033 |
| aomartin@cml-law.com | Email: | Email: |
| | tmessenger@fwlaw.com | ajokerst@fwlaw.com |

### CERTIFICATE OF SERVICE

I hereby certify that on February 7, 2025, I caused the foregoing **BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record including: Jeffrey Shaw and Samuel G. MacRoberts

s/ Aaron O. Martin
Aaron O. Martin