## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **Cozy Inn, Incorporated,** | ) |
| **d/b/a The Cozy Inn; Stephen Howard,** | ) |
| | ) |
| **Plaintiffs,** | ) **CIVIL ACTION** |
| | ) **CASE NO.  6:24-cv-01027-TC-ADM** |
| | ) |
| **v.** | ) |
| | ) |
| **City of Salina, Kansas,** | ) |
| | ) |
| **Defendant.** | ) |

### AFFIDAVIT OF DEAN ANDREW

I, Dean Andrew, Zoning Administrator for the City of Salina, Kansas, being first duly sworn, declare under penalty of perjury as follows:

1.  I am over 18 years of age and have personal knowledge of the following facts set forth in this Affidavit, and, if called as a witness, I could testify competently to them.

2.  I am the City of Salina Zoning Administrator.  I have held this position since 2009.

3.  The City regulates signs pursuant to Chapter 42 Article X of the Salina Code of Ordinance, along with related definitions in Chapter 42 Article XIV.

4.  The documents attached hereto as Affidavit Exhibit 1 are in my file as the Zoning Administrator and were considered by me in anticipation of the City of Salina's 2017 amendment to the sign code, set forth in Ordinance Number 17-10882.

5.  Ordinance Number 17-10882 is attached hereto as Affidavit Exhibit 2.

6.  Affidavit Exhibit 1 documents include:

**EXHIBIT A**

i.  The Cardozo Law Review article entitled "Art or Signage?: The Regulation of Outdoor Murals and the First Amendment" [bates stamped CITY000673-702].

ii.  Rocky Mountain Sign Law Blog article entitled "San Diego's Motion for Summary Judgment Granted in Mural Case" [bates stamped CITY001510-511].

iii.  Relevant pages of the APA National Planning Conference presentation on "Regulating Digital Signs and Billboards" [bates stamped CITY001585, 1600-01, 1615-17

7.  As stated in Ordinance Number 17-10882, the *Reed v. Town of Gilbert* decision prompted the Governing Body of the City of Salina to amend Article X, Chapter 42 of the Salina Code (referred to as the "Sign Code") in order to ensure compliance with the First Amendment and to update and clarify sign regulation and enforcement generally within the City.

Signed: _Dean Andrew_
Dean Andrew

STATE OF Kansas       )
                      ) ss.
COUNTY OF Saline      )

Subscribed and sworn to before me by Dean Andrew on the 7th day of February, 2025.

Witness my hand and official seal.    My commission expires: __4|29|2028__

(Seal)

SHANDI L. WICKS
Notary Public - State of Kansas
My Appt. Expires 4|29|2028

_Shandi l Wicks_
Notary Public

# Regulating Digital Signs and Billboards (S606)

Sponsored by *Zoning Practice*

APA National Planning Conference
Tuesday, April 28, 2009

**ANDREW AFFIDAVIT EX. 1**

CITY001585

# Driver Distraction #1 Cause of Crashes

| Causal Category | Percentage of Drivers Contributing to Causation |
|---|---|
| Driver Distraction | 22.7 |
| Vehicle Speed | 18.7 |
| Alcohol Impairment | 18.2 |
| Perceptual Errors | 15.1 |
| Decision Errors | 10.1 |
| Incapacitation | 6.4 |
| Other | 8.8 |

Source: National Highway Traffic Safety Administration, 2001; 2006.

**Regulating Digital Signs and Billboards (S606)     APA National Conference, April 28, 2009**

CITY001600

# Specific Distraction: % of Drivers

| | |
|---|---|
| Outside person, object or event | 29.4 |
| Adjusting radio, cassette | 11.4 |
| Other occupant in vehicle | 10.9 |
| Moving object in vehicle | 4.4 |
| Other device in vehicle | 2.9 |
| Adjusting vehicle/temp | 2.8 |
| Eating or drinking | 1.7 |
| Dialing/using cell phone | 1.5 |
| Smoking | 0.9 |
| Other distraction | 25.9 |
| Unknown distraction | 8.6 |

**Regulating Digital Signs and Billboards (S606)    APA National Conference, April 28, 2009**

CITY001601

# Goals and Purpose

- The statement of purpose includes promoting traffic safety and community aesthetics. We look to the legislative body's statement of intent.

CITY001615

# Narrow Tailoring

- Concord's interests in traffic safety and community aesthetics would be achieved less effectively without the prohibition.

CITY001616

# Need for Studies

- NJI argues that Concord must perform studies to uphold the ban. Concord was under no obligation to do such studies or put them into evidence.

**Regulating Digital Signs and Billboards (S606)    APA National Conference, April 28, 2009**

CITY001617

# Rocky Mountain Sign Law Blog

Regulatory, Best Practices and Other First Amendment News from Colorado's Leading Land Use Law Firm

## San Diego's Motion for Summary Judgment Granted in Mural Case

By Brian J. Connolly on May 1, 2017

In a **case that we reported on last year**, a federal district court in California granted summary judgment in favor of the City of San Diego in a case involving art murals.

Some of the facts of the case are reported in our prior post. The San Diego sign code exempts from permitting "[p]ainted graphics that are murals, mosaics, or any type of graphic arts that are painted on a wall or fence and do not contain copy, advertising symbols, lettering, trademarks, or other references to the premises, products or services that are provided on the premises where the graphics are located or any other premises." Otherwise, all signs visible from the right of way are required to obtain a permit, and signs on city-controlled property must obtain a permit as well. Messages on city-controlled property are limited to on-premises speech and "public interest" messages. As we previously noted, the plaintiff, a mural company, was granted approval to place two wall murals in San Diego, but

CITY001510

received a violation for the placement of a third mural.  The plaintiff believes that the annual Comic-Con event was given special treatment by the city, because certain signs posted around the city during the event were not issued citations.

On the city's motion for summary judgment, the court treated the signs in question as commercial speech and analzyed the regulations under the *Central Hudson* test, finding that the regulations easily passed constitutional muster.  In the court's view, the city had established that its interests in optimizing communication and aesthetics were substantial, and that the restrictions directly advanced these interests without going further than necessary.  The court did not provide any analysis to support its conclusion that the speech in question was commercial.  In response to the plaintiff's arguments that the mural exception undermined the city's asserted interests, the court disagreed.  And consistent with other lower courts' recent holdings, the court rejected the plaintiff's argument that *Reed v. Town of Gilbert* had invalidated the on-premises/off-premises distinction.

Furthermore, responding to the plaintiff's claims that the San Diego sign code was unconstitutionally vague, the court, while noting that "the sign ordinance at issue is far from a paragon of clarity," found that the mural exception, public interest exception, and on-premises/off-premises distinction were sufficiently clear.  The court also rejected the plaintiff's prior restraint, selective enforcement, due process, and intentional interference with prospective business advantage claims.

**ArchitectureArt, LLC v. City of San Diego, ___ F. Supp. 3d __, 2017 WL 1226913 (S.D. Cal. Jan. 6, 2017)**.



# ART OR SIGNAGE?: THE REGULATION OF OUTDOOR MURALS AND THE FIRST AMENDMENT

*Christina Chloe Orlando*†

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................868

I.  BACKGROUND....................................................................................871
    A.  *Sign Regulation*......................................................................871
        1.  Community Aesthetics and Traffic Safety .....................872
        2.  Content Neutrality.........................................................872
    B.  Metromedia, Inc. v. City of San Diego ....................................874
    C.  Post-Metromedia *Developments in Free Speech Law* ..............876

II. OUTDOOR MURAL REGULATION: REEXAMINING THE
    COMMERCIAL/NONCOMMERCIAL SPEECH DISTINCTION ...................879
    A.  *Sources of Inconsistency in Mural Case Law* ..........................881
        1.  Defining Commercial Speech ........................................881
        2.  Analyzing Content Neutrality........................................882
    B.  *Eliminating the Commercial/Noncommercial Speech Distinction*..........885
        1.  Constitutional Flaws......................................................885
        2.  Classifying Mural Speech................................................889
        3.  Classifying Mural Art.....................................................890
        4.  Murals as Art .................................................................892

III. A MODEL FOR REGULATING OUTDOOR MURALS................................893

CONCLUSION.............................................................................................896

† Senior Articles Editor, *Cardozo Law Review*. J.D. Candidate (May 2014), Benjamin N. Cardozo School of Law; A.B., Harvard University, 2011. Many thanks to Professor Stewart Sterk for suggesting this topic and providing invaluable guidance throughout the research and writing process.

CITY000673

*CARDOZO LAW REVIEW* [Vol. 35:867

### INTRODUCTION

Sally Business Owner runs a successful flower and gift shop in a vibrant suburban town. She sells a wide variety of flowers and related items, including vases and balloons. One day, after deciding that she wants to give her shop a makeover, Sally commissions a local artist to paint a tasteful mural of colorful flowers on the exterior wall of her building. The mural covers the entire wall. Sally believes the mural to be a beautiful piece of art[1] that the community will greatly enjoy. The following week, Sally receives a notice from Wanda Zoning Administrator. According to the notice, Sally's flower mural is in violation of the town sign ordinance that prohibits any outdoor "sign" from exceeding sixty square feet. Because Sally's mural contains flowers and the mural is painted on a commercial shop that sells flowers, the mural qualifies as "advertising" and falls under the ordinance's definition of "sign."[2] Wanda notes that if the mural contained anything other than flowers, such as panda bears or palm trees, it would be deemed art rather than signage. Wanda orders Sally to remove the mural, or else face a hefty fine. Sally is perplexed, and believes that the zoning board has intruded upon her right to free speech.

---

[1] The word "art," as used in this Note, indicates concrete works of visual art, such as paintings or sculptures. It does not include other art forms, such as films or productions of the performing arts.

[2] This hypothetical is based on an earlier version of Arlington County's zoning ordinance at issue in *Wag More Dogs, Ltd. Liab. Corp. v. Cozart*, 680 F.3d 359 (4th Cir. 2012), discussed *infra*. That version of the ordinance defined a "business sign" as a sign "identifying the products or services available on the premises or advertising a use conducted thereon." *See id.* at 362 (internal quotation marks omitted) (citing ARLINGTON COUNTY, VA., ZONING ORDINANCE § 34(G)). Arlington County's current zoning ordinance exempts certain works of visual art (including murals) from regulation as signage; to be exempted, artwork cannot include a "picture, symbol or device of any kind that relates to a commercial business, product or service offered on the premises where the wall is located." ARLINGTON COUNTY, VA., ZONING ORDINANCE § 13.2.3(C)(2)(e) (2013). In other words, the artwork cannot contain "commercial speech." Many municipalities throughout the country have substantially similar language in their sign ordinances. *See, e.g.*, TEMECULA, CAL., MUNICIPAL CODE § 17.28.050(U) (2013) (exempting works of art from sign regulations only if they do not convey a commercial message); ST. PETERSBURG, FLA., CITY CODE § 16.40.120.19 (2013) (defining artwork as "drawings, pictures, symbols, paintings . . . or sculpture, which does not in any way identify a product, service or business sold or available on the premises"); MARION COUNTY, IND., REV. CODE § 734-501(b) (2012) (defining a mural as "[a] design or representation painted, drawn or similarly applied on the exterior surface of a structure and which does not advertise a business, product, service, or activity"); MINNEAPOLIS, MINN., ZONING CODE § 520.160 (2013) (defining a mural as "[a] work of graphic art painted on a building wall, which contains no commercial advertising or logos, and which does not serve to advertise or promote any business, product, activity, service, interest or entertainment"); LAS VEGAS, NEV., ZONING CODE § 19.14.030(B)(4) (2010) (exempting works of art "that do not include a commercial message and are not symbolic of . . . commercial activities taking place on the premises on which the graphic is located").

CITY000674

Sally's belief is not unfounded. The First Amendment to the U.S. Constitution provides that "Congress shall make no law . . . abridging the freedom of speech . . . ."[3] This restriction extends to state and local government through the Due Process Clause of the Fourteenth Amendment[4] and plays a fundamental role in a municipality's regulation of outdoor signage.[5] While a municipality may place general time, place, and manner restrictions[6] on outdoor signage in order to preserve community aesthetics and ensure traffic safety, it may not discriminate against signage that promotes a certain viewpoint or contains certain content.[7]

The regulation of outdoor art murals[8] as signage is a recent phenomenon.[9] To date, only four courts have expressly analyzed the constitutionality of regulating mural art pursuant to the terms of a municipal sign ordinance.[10] Although mural law is still in its infancy, the convoluted status of the limited case law has led to "a war . . . a real

---

3 U.S. CONST. amend. I.

4 U.S. CONST. amend. XIV, § 1; *see* Gitlow v. New York, 268 U.S. 652, 666 (1925) ("[F]reedom of speech and of the press—which are protected by the First Amendment from abridgement by Congress—are among the fundamental personal rights and 'liberties' protected by the due process clause of the Fourteenth Amendment from impairment by the States."); Lovell v. City of Griffin, Ga., 303 U.S. 444, 450 (1938) ("It is also well settled that municipal ordinances adopted under state authority constitute state action and are within the prohibition of the [Fourteenth] amendment.").

5 For a general overview of the relationship between free speech law and outdoor signage, see DANIEL R. MANDELKER, FREE SPEECH LAW FOR ON PREMISE SIGNS (2012).

6 *See generally* 16B C.J.S. *Constitutional Law* § 828 (2012) (defining this term and providing case examples illustrating its application).

7 *See infra* Part I.A.

8 This Note focuses solely on murals that are independently commissioned. Cities throughout the United States have programs that allow for, and encourage, the public display of outdoor murals. *See, e.g.,* CITY PHILA. MURAL ARTS PROGRAM, http://www.muralarts.org (last visited Oct. 27, 2013); *Mural Program,* BEAVERTON ARTS COMMISSION, http://www.beavertonarts.org/index.aspx?NID=122 (last visited Oct. 27, 2013); *Public Art Murals Program,* REGIONAL ARTS & CULTURE COUNCIL, http://www.racc.org/public-art/mural-program (last visited Oct. 27, 2013); *Public Art Program,* CITY PASADENA, http://www.ci.pasadena.ca.us/arts/public_art_program (last visited Oct. 27, 2013). These public art mural programs are designed, in part, to enhance local aesthetics and foster community appreciation of the arts. Because municipalities implement and control these programs, issuing mural design guidelines to ensure adherence to local zoning requirements, zoning violations are rarely a concern.

9 *See* MANDELKER, *supra* note 5, at 69 ("Sign ordinances regulate a wide variety of [outdoor] signs, and some of the unique and/or specialized types of signs include digital signs, portable signs, . . . murals," and sculptures). For a brief overview of a dispute involving regulation of a "unique" type of sign, see Frederick Melo, *St. Paul City Council: Creative Kidstuff Wins Zoning Appeal for Sculptural Signs,* TWINCITIES.COM (Aug. 1, 2012, 12:01 AM), http://www.twincities.com/stpaul/ci_21213086/st-paul-city-council-creative-kidstuff-wins-zoning (discussing a dispute between a toy company and the city of St. Paul, Minnesota over whether two eighteen-foot-tall cat images were "sculptural art" or "signs").

10 *See infra* Part II. The four cases were decided in 2009, 2010, 2011, and 2012.

CITY000675

fight around the country."[11] Indeed, disputes between zoning administrators and mural owners over whether a particular mural is "art" or "signage" have become increasingly common.[12] These disputes are complicated, in part, because a legitimate work of art may also serve signage functions, oftentimes unintentionally.[13] In these cases, should the fact that an art mural contains "commercial speech" subject it to a lesser degree of constitutional protection?

This Note attempts to fit outdoor mural regulation into the broader scheme of constitutional law generally, and billboard and signage law specifically. In doing so, this Note argues that a municipality, in enacting a sign ordinance, may not distinguish between murals containing commercial speech and those containing noncommercial speech. The application of this distinction not only constitutes impermissible content-based regulation, but it also stands in stark contrast to the current state of free speech law. As an alternative, this Note proposes that all murals, regardless of their content, be regulated pursuant to the same set of restrictions.

Part I of this Note provides background on the purposes and mechanics of outdoor sign regulation. It then explores the landmark Supreme Court case addressing constitutional issues inherent in such regulation, *Metromedia Inc. v. City of San Diego*,[14] and surveys modern, post-*Metromedia* developments within free speech law. Part II of this Note turns to a narrow area of sign regulation: the regulation of outdoor murals. It discusses sources of inconsistency in current mural case law, and sets forth various legal and policy-based arguments for why the

---

[11] Tom Jackman, *Arlington's Wag More Dogs Mural Is No More*, WASH. POST (Sept. 25, 2012, 8:18 PM), http://www.washingtonpost.com/blogs/the-state-of-nova/post/arlingtons-wag-more-dogs-mural-is-no-more/2012/09/25/ed180e82-074c-11e2-a10c-fa5a255a9258_blog.html ("There's a war going on, . . . a real fight around the country about these sign laws . . . We don't usually require people to consult government bureaucrats before they express themselves." (second ellipsis in original) (internal quotation marks omitted)).

[12] *See, e.g., id.*; Karen Boros, *Tough Mural 'Advertising' Rules? Minneapolis Council Member Gary Schiff Wants to Loosen Them*, MINNPOST (July 20, 2012), http://www.minnpost.com/two-cities/2012/07/tough-mural-%E2%80%98advertising%E2%80%99-rules-minneapolis-council-member-gary-schiff-wants-loos; Melo, *supra* note 9; *see also infra* Part II and the cases discussed therein.

[13] Context is critical in determining whether a particular display is a work of art or signage. *See* Russ VerSteeg, *Iguanas, Toads and Toothbrushes: Land-Use Regulation of Art as Signage*, 25 GA. L. REV. 437, 469 (1991) ("The physical location of art can cause it to function as signage. A sculpture of Pegasus . . . is almost certainly a work of art when exhibited in an art museum. . . . [T]he same sculpture would function as a sign when placed in close proximity to a Mobil Oil gasoline station or perhaps Mobil's corporate offices. It functions as a sign because a reasonable person looking at the sculpture would recognize the connection between the image of a winged horse with the products and services of the Mobil Oil Corporation."); *see also* Shawn G. Rice, Comment, *Zoning Law: Architectural Appearance Ordinances and the First Amendment*, 76 MARQ. L. REV. 439, 453 (1993) ("The effect of the art on the viewing public is probably more important than the intent of the Presenter." (internal quotation marks omitted)).

[14] 453 U.S. 490 (1981).

distinction between commercial and noncommercial speech should be eliminated in the context of outdoor mural regulation. Finally, Part III of this Note proposes a model for regulating outdoor murals whereby all murals, regardless of their content, are treated in the same manner. Such a model, Part III argues, best balances government regulatory interests with individual free speech interests, while offering a realistic solution for reducing mural disputes, mending interstate judicial conflict, and preserving judicial and municipal resources.

## I.  BACKGROUND

### A.  *Sign Regulation*

Outdoor signs come in different forms, shapes, and sizes.[15] They can be on-premise or off-premise, situated on private property or public property, and attached or detached to a building.[16] As a tangible medium of communication, outdoor signs contain both physical and constitutional dimensions.[17] Physical characteristics of signs include their size, height, shape, spacing, number, distance, and location.[18] The communicative features of signs, namely their content and messages, implicate their constitutional dimension.[19] The speech contained in signs is protected by the First and Fourteenth Amendments from unwarranted government regulation.[20]

---

[15] *See generally* MANDELKER, *supra* note 5, at 69–88 (discussing a broad range of "specialized" on-premise signs, including digital signs, flags, freestanding signs, murals, portable signs, and time and temperature signs); Patricia E. Salkin, *Sign Regulation-Introduction*, 3 AM. LAW. ZONING § 26:1 (5th ed. 2013) (discussing the different types of signs and their functions).

[16] Salkin, *supra* note 15.

[17] *See* City of Ladue v. Gilleo, 512 U.S. 43, 48 (1994) ("While signs are a form of expression protected by the Free Speech Clause, they pose distinctive problems that are subject to municipalities' police powers. Unlike oral speech, signs take up space and may obstruct views, distract motorists, displace alternative uses for land, and pose other problems that legitimately call for regulation. It is common ground that governments may regulate the physical characteristics of signs—just as they can, within reasonable bounds and absent censorial purpose, regulate audible expression in its capacity as noise. However, because regulation of a medium inevitably affects communication itself, it is not surprising that we have had occasion to review the constitutionality of municipal ordinances prohibiting the display of certain outdoor signs." (citations omitted)); *see also* DEP'T OF STATE, N.Y. STATE, MUNICIPAL CONTROL OF SIGNS 2 (2006), *available at* http://www.dos.ny.gov/lg/publications/Municipal_Control_of_Signs.pdf.

[18] DEP'T OF STATE, N.Y. STATE, *supra* note 17; MANDELKER, *supra* note 5, at 89.

[19] DEP'T OF STATE, N.Y. STATE, *supra* note 17.

[20] Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 502 (1981) (plurality opinion) (noting that "the First and Fourteenth Amendments foreclose [an] interest in controlling the communicative aspects [of signs]"); DEP'T OF STATE, N.Y. STATE, *supra* note 17.

CITY000677

1.    Community Aesthetics and Traffic Safety

Sign regulation, an exercise of a local government's police power, is warranted on the basis of two public purposes: community aesthetics and traffic safety.[21] In recent years, aesthetics has become the more common justification. In fact, the majority of courts today recognize that aesthetics alone is sufficient to justify constitutionally permissible sign control.[22] This stems, in part, from settled Supreme Court authority dictating that local government has the power to determine that a community is "beautiful."[23] In addition to aesthetics, municipalities enact sign ordinances to eliminate hazards to pedestrians and motorists brought about by distracting sign displays and to ensure clear visibility of traffic signs and signals.[24]

2.    Content Neutrality

Regulations within a sign ordinance are characterized as either content-neutral or content-based.[25] This characterization is the single most crucial issue in evaluating the constitutionality of a sign ordinance.[26] Content-neutral regulations are those that restrict signage

---

[21] *See generally* AM. PLANNING ASS'N, PLANNING AND URBAN DESIGN STANDARDS 359 (2006); Alan Weinstein, *Legal Issues in the Regulation of On-Premise Signs, in* CONTEXT-SENSITIVE SIGNAGE DESIGN 119, 119–20 (Marya Morris et al. eds., 2001). Together, community aesthetics and traffic safety are often referred to as the "twin goals" of sign regulation. *See, e.g.*, *Metromedia*, 453 U.S. at 507; Interstate Outdoor Adver., L.P. v. Zoning Bd. of Mount Laurel, 706 F.3d 527, 529 (3rd Cir. 2013); Clear Channel Outdoor, Inc. v. City of New York, 594 F.3d 94, 103 (2d Cir. 2010); Outdoor Sys., Inc. v. City of Mesa, 997 F.2d 604, 611 (9th Cir. 1993).

[22] Stephanie L. Bunting, Note, *Unsightly Politics: Aesthetics, Sign Ordinances, and Homeowners' Speech in* City of Ladue v. Gilleo, 20 HARV. ENVTL. L. REV. 473, 480 (1996).

[23] Berman v. Parker, 348 U.S. 26, 33 (1954) ("The concept of the public welfare is broad and inclusive. The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled." (citation omitted)).

[24] *See* AM. PLANNING ASS'N, *supra* note 21. Although little empirical data exists to confirm that sign control actually increases traffic safety, courts readily accept the justification. *See, e.g.*, *Metromedia*, 453 U.S. at 507–09. This is especially true in cases involving billboards, which "by their very nature . . . are designed to distract drivers." Major Media of Se., Inc. v. City of Raleigh, 621 F. Supp. 1446, 1451 (E.D.N.C. 1985).

[25] *See* MANDELKER, *supra* note 5, at 5, 12–14.

[26] *See* Erwin Chemerinsky, *Content Neutrality as a Central Problem of Freedom of Speech: Problems in the Supreme Court's Application*, 74 S. CAL. L. REV. 49, 53 (2000) ("Today, virtually every free speech case turns on the application of the distinction between content-based and content-neutral laws."); Mark Tushnet, *The Supreme Court and Its First Amendment Constituency*, 44 HASTINGS L.J. 881, 882 (1993) ("Today the central organizing concept of First Amendment doctrine is the distinction between content-based regulations and content-neutral ones.").

CITY000678

without regard to the content of the speech contained in the signage.[27] The clearest examples of content-neutral regulations are general time, place, and manner restrictions.[28] For example, a sign ordinance may prohibit temporary signs from being posted for more than two months (time restriction); it may prohibit signs from being placed within fifteen feet of a road (place restriction); and it may require that all signs be limited in size to 200 square feet (manner restriction).[29] Content-neutral regulations, if challenged, are almost always upheld as constitutional.[30] These regulations are subject to a lenient, intermediate level of judicial scrutiny.[31] Under this standard, a municipality must demonstrate that the restrictions on speech further a substantial government interest, that the interest is unrelated to the suppression of speech, and that the restrictions are not significantly broader than necessary to further the interest or that ample alternative methods of communicating the message have been left open.[32] Courts routinely qualify community aesthetics and traffic safety as "substantial" government interests.[33]

By contrast, content-based regulations are those that restrict signage based on the message conveyed by the signage or the identity of the speaker displaying the signage.[34] An example of a content-based regulation is a sign ordinance that requires political signs to obtain a permit before being erected, but that exempts time and temperature signs from this permit requirement.[35] Content-based regulations are less favorable than content-neutral regulations, and are presumptively invalid.[36] While some content-based regulations of speech are permissible, the vast majority of these regulations, if challenged, are

---

27 *See* DEP'T OF STATE, N.Y. STATE, *supra* note 17.

28 *Id.* at 2–3.

29 *Id.*

30 Tushnet, *supra* note 26 ("Content-neutral regulations come to the Court with a strong presumption in their favor[.]").

31 *See* Weinstein, *supra* note 21, at 123.

32 *See* Ward v. Rock Against Racism, 491 U.S. 781, 798–99 (1989). However, to satisfy intermediate scrutiny, municipal sign regulation "need not be the least restrictive or least intrusive means of doing so." *Id.* at 798.

33 *See, e.g.*, Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 507–08 (1981) (plurality opinion); Ballen v. City of Redmond, 466 F.3d 736, 742 (9th Cir. 2006).

34 *See* DEP'T OF STATE, N.Y. STATE, *supra* note 17, at 3. Restrictions based on the identity of the speaker invoke the principle of "viewpoint neutrality." *See* Ridley v. Mass. Bay Transp. Auth., 390 F.3d 65, 82 (1st Cir. 2004). This principle demands that the municipality not suppress speech "where the real rationale for the restriction is disagreement with the underlying ideology or perspective that the speech expresses." *Id.*

35 *See* DEP'T OF STATE, N.Y. STATE, *supra* note 17, at 3. This regulation is content-based because the municipality is subjecting one type of speech (that contained in political signs) to greater restrictions than another type of speech (that contained in time and temperature signs) based solely on the content of the message within the sign.

36 Tushnet, *supra* note 26 ("Virtually all content-based regulations will be invalidated [by the Supreme Court.]").

CITY000679

declared unconstitutional.[37] Content-based regulations are subject to the strictest level of constitutional scrutiny and will be sustained only if a municipality meets its burden of proving that the restrictions on speech advance a compelling state interest and are narrowly tailored to serve that interest.[38] Courts have routinely held that traffic safety and community aesthetics do not qualify as "compelling" state interests.[39]

B.    Metromedia, Inc. v. City of San Diego

Although municipalities have been regulating outdoor signage since the early twentieth century, it was not until 1981 that the Supreme Court first grappled with the free speech issues raised by sign regulations.[40] The sign ordinance at issue in *Metromedia, Inc. v. City of San Diego* imposed substantial limitations on the display of outdoor billboards.[41] Specifically, the ordinance permitted on-premise commercial advertising, but prohibited most other forms of commercial advertising and most noncommercial communications.[42] Noncommercial messages were permitted only if they fell into one of twelve specified exemptions, which included signs with religious symbols and signs depicting time and temperature.[43] Metromedia, a leader in the outdoor advertising business, sued the city, arguing that the ordinance violated the First Amendment and that the ordinance's threatened destruction of the outdoor billboard industry was constitutionally prohibited.[44]

In an opinion delivered by Justice White and joined by Justices Stewart, Marshall, and Powell, a plurality of the Court found that the San Diego ordinance unconstitutionally discriminated among types of speech based on content.[45] First, the plurality held that by allowing on-premise commercial signs but not on-premise noncommercial signs, the ordinance impermissibly privileged commercial speech over

---

[37] *Id.* at 882 & n.4 (citing *Burson v. Freeman*, 504 U.S. 191 (1992), as a rare example of a decision upholding a content-based regulation); *see also* Weinstein, *supra* note 21, at 122.

[38] *Boos v. Barry*, 485 U.S. 312, 321 (1988); *see* Weinstein, *supra* note 21, at 123.

[39] *See, e.g.*, Members of City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 822–23 (1984); Solantic, LLC v. City of Neptune Beach, 410 F.3d 1250, 1267–68 (11th Cir. 2005); Gilleo v. City of Ladue, 986 F.2d 1180, 1183–84 (8th Cir. 1993), *aff'd*, 512 U.S. 43 (1994).

[40] Sign regulation cases in the early twentieth century did not involve the free speech concerns of modern sign cases. Instead, these earlier cases primarily involved due process and equal protection challenges. *See, e.g.*, Packer Corp. v. Utah, 285 U.S. 105 (1932); St. Louis Poster Adver. Co. v. St. Louis, 249 U.S. 269 (1919); Thomas Cusack Co. v. City of Chi., 242 U.S. 526 (1917).

[41] Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 493 (1981) (plurality opinion).

[42] *Id.* at 494–96.

[43] *Id.* at 494–95.

[44] *Id.* at 496–98.

[45] *See id.* at 513–16, 521.

CITY000680

noncommercial speech.[46] The plurality noted that this approach was incompatible with then-recent First Amendment case law, which consistently afforded commercial speech less protection than noncommercial speech.[47] Second, the plurality held that by exempting only select categories of noncommercial signage, including religious and historical signs, from regulation, the ordinance impermissibly distinguished between various categories of noncommercial speech.[48] However, the plurality concluded that the ordinance's content-based distinctions within the category of commercial speech were permissible, because they directly advanced San Diego's aesthetic and safety interests.[49] In sum, the *Metromedia* plurality indicated that content-based distinctions within the category of commercial speech were permissible, but similar distinctions favoring commercial speech over noncommercial speech or favoring certain speech within the category of noncommercial speech were impermissible.

In a concurring opinion joined by Justice Blackman, Justice Brennan agreed with the plurality's conclusion that the San Diego ordinance was unconstitutional, but for a different reason.[50] Justice Brennan believed the ordinance to be in violation of the First Amendment because it had the practical effect of eliminating the billboard as a medium of communication within the city, and San Diego lacked a substantial government interest for the ban.[51] Perhaps most notable from Justice Brennan's opinion was his explicit rejection of the first basis for the plurality's holding—that is, that it was impermissible for a sign ordinance to favor commercial over noncommercial speech.[52] Justice Brennan seemed to suggest that content-based distinctions favoring noncommercial speech over commercial speech were the same as content-based distinctions within the category of noncommercial

---

[46] *Id.* at 513.

[47] *Id.* ("San Diego effectively inverts this judgment, by affording a greater degree of protection to commercial than to noncommercial speech. . . . [T]he city may not conclude that the communication of commercial information concerning goods and services connected with a particular site is of greater value than the communication of noncommercial messages.").

[48] *See id.* at 514–15 ("With respect to noncommercial speech, the city may not choose the appropriate subjects for public discourse . . . . Because some noncommercial messages may be conveyed on billboards throughout the commercial and industrial zones, San Diego must similarly allow billboards conveying other noncommercial messages throughout those zones.").

[49] *Id.* at 507–12. The plurality's decision as to the regulation of commercial speech was expressly joined by Justice Stevens. *See id.* at 541 (Stevens, J., dissenting in part).

[50] *See id.* at 521–40 (Brennan, J., concurring in the judgment).

[51] *Id.* at 525–34 ("[T]he city has failed to show that its asserted interest in aesthetics is sufficiently substantial in the commercial and industrial areas of San Diego.").

[52] *Id.* at 536 ("I cannot agree with the plurality's view that an ordinance totally banning commercial billboards but allowing noncommercial billboards would be constitutional. For me, such an ordinance raises First Amendment problems at least as serious as those raised by a total ban, for it gives city officials the right—before approving a billboard—to determine whether the proposed message is 'commercial' or 'noncommercial.'" (footnote omitted)).

speech or within the category of commercial speech.[53] This was especially true, Justice Brennan noted, because the distinction between the two forms of speech was usually "anything but clear."[54]

The three dissenting opinions—authored individually by Justice Stevens, Chief Justice Burger, and Justice Rehnquist—all rejected the plurality's views that the San Diego ordinance was content-based and that it resulted in an unconstitutional ban of an entire medium of communication.[55] Justice Stevens believed the prohibition of billboards to be a constitutionally permissible use of San Diego's police power.[56] Chief Justice Burger thought that the subject matter at hand, including protecting the safety and enhancing the environment of a city, was best left to local government.[57] Finally, Justice Rehnquist felt that a total prohibition on billboards within a community was justifiable on aesthetic grounds alone.[58]

*Metromedia* was a severely fractured decision, described by Justice Rehnquist as a "virtual Tower of Babel, from which no definitive principles can be clearly drawn."[59] Nonetheless, the case remains the Supreme Court's leading authority on First Amendment issues in billboard and sign regulation. By approving a bifurcated approach to sign regulation based on whether the message of a sign is commercial or noncommercial in nature, the *Metromedia* plurality endorsed the distinction between commercial and noncommercial speech.[60] At the opposite end of the spectrum, Justice Brennan's concurrence strongly critiqued the distinction as content-based.[61] It is the latter view which has gained increasing popularity in Supreme Court case law.

## C.    *Post-*Metromedia *Developments in Free Speech Law*

Modern Supreme Court cases indicate a trend in favor of elevating commercial speech to a similar constitutional status as noncommercial speech. Underlying this trend is the Court's demand for a stricter content-neutrality standard. In *City of Cincinnati v. Discovery Network,*

---

[53]  *Id.* at 534–40.

[54]  *Id.* at 536.

[55]  *See id.* at 540–55 (Stevens, J., dissenting in part); *id.* at 555–69 (Burger, C.J., dissenting); *id.* at 569–70 (Rehnquist, J., dissenting).

[56]  *Id.* at 542 (Stevens, J., dissenting in part) (answering affirmatively the plurality's question of "whether a city may entirely ban one medium of communication").

[57]  *Id.* at 569 (Burger, C.J., dissenting) ("The Court today leaves the modern metropolis with a series of Hobson's choices and rejects basic concepts of federalism by denying to every community the important powers reserved to the people and the States by the Constitution.").

[58]  *Id.* at 570 (Rehnquist, J., dissenting).

[59]  *Id.* at 569.

[60]  *See supra* text accompanying notes 45–49.

[61]  *See supra* notes 52–54 and accompanying text.

CITY000682

*Inc.*, the Court went as far as to hold that commercial speech must be regulated on par with noncommercial speech.[62] At issue in the case was a city ordinance which banned the dissemination of commercial handbills while allowing the dissemination of noncommercial handbills.[63] After commercial newsrack companies brought suit against the city on First Amendment grounds, the Court concluded that Cincinnati's categorical ban on commercial handbills attached too much importance to the distinction between commercial and noncommercial speech.[64] The Court observed that the city's noncommercial newsracks were just as damaging to community aesthetics as its commercial newsracks, and thus the ban on commercial handbills did not directly advance the city's purported aesthetic and safety interests.[65] For this reason, the Court held, in cases where neither commercial speech nor noncommercial speech is intrinsically more harmful to the public, the distinction between the two speech forms is impermissible.[66]

Three years later, the Court in *44 Liquormart, Inc. v. Rhode Island* invalidated a state law that banned the advertising of retail liquor prices.[67] The Court found that a complete prohibition on such commercial signage would not advance the substantial state interest in temperance.[68] Rather, Rhode Island's goal of promoting temperance would more likely be achieved by alternative forms of regulation that

---

[62] City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 430–31 (1993).

[63] *Id.* at 413 n.3 ("No person shall throw or deposit any commercial or non-commercial handbill in or upon any sidewalk, street or other public place within the city. Nor shall any person hand out or distribute or sell any commercial handbill in any public place." (quoting CINCINNATI, OHIO MUNICIPAL CODE § 714-23 (1992)) (internal quotation marks omitted)).

[64] *Id.* at 419 ("[T]he city's argument [regarding its aesthetic and safety interests] attaches more importance to the distinction between commercial and noncommercial speech than our cases warrant and seriously underestimates the value of commercial speech.").

[65] *Id.* at 418 ("We accept the validity of the city's proposition, but consider [safety and community aesthetics] an insufficient justification for the discrimination against respondents' use of [commercial] newsracks that are no more harmful than the permitted [noncommercial] newsracks, and have only a minimal impact on the overall number of newsracks on the city's sidewalks.").

[66] *Id.* at 424 ("Not only does Cincinnati's categorical ban on commercial newsracks place too much importance on the distinction between commercial and noncommercial speech, but in this case, the distinction bears no relationship *whatsoever* to the particular interests that the city has asserted. It is therefore an impermissible means of responding to the city's admittedly legitimate interests [in community aesthetics and safety]."); *see also id.* at 437 (Blackmun, J., concurring) (noting that the valuable handbills at issue highlighted the "absurdity of treating all commercial speech as less valuable than all noncommercial speech," as it is "highly unlikely that according truthful, noncoercive commercial speech the full protection of the First Amendment will erode the level of that protection").

[67] 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 516 (1996).

[68] *Id.* at 507 ("Thus, the State's own showing reveals that any connection between the ban and a significant change in alcohol consumption would be purely fortuitous. As is evident, any conclusion that elimination of the ban would significantly increase alcohol consumption would require us to engage in the sort of 'speculation or conjecture' that is an unacceptable means of demonstrating that a restriction on commercial speech directly advances the State's asserted interest.").

did not involve any restrictions on speech.[69] Critical to the Court's analysis was its view that commercial speech regulations are not all subject to a similar form of constitutional review simply because they target a similar category of expression.[70] The Court held that if a state regulates commercial speech to protect consumers from misleading or deceptive sales practices, then the traditional intermediate-scrutiny standard of review for regulations on commercial speech should apply.[71] However, if a state prohibits the dissemination of "truthful, nonmisleading commercial messages" for reasons unrelated to the preservation of a fair bargaining process, then a "special care" standard of review should apply.[72] The Court noted that the "typical reason" why commercial speech can be subject to greater government regulation than noncommercial speech is that a state has an interest in protecting its citizen consumers from harms that may result from commercial advertising.[73] Bans on speech that target truthful, nonmisleading commercial messages fail to advance this goal.[74]

*44 Liquormart* was the first case to question the soundness of the supposed "commonsense differences" used to justify affording less First Amendment protection to commercial speech than to noncommercial speech.[75] It announced "a standard reasonably close to strict scrutiny" that "would nearly equate the First Amendment status of commercial speech with that of noncommercial speech in cases involving . . . a content-based prohibition on communication."[76] Justice Thomas was perhaps the most overt when he opined that he did not see any "philosophical or historical basis" for affording less value to commercial speech than to noncommercial speech.[77] Echoing these sentiments, the Court most recently held in *Sorrell v. IMS Health Inc.* that content- and speaker-based restrictions on commercial speech should be subject to heightened scrutiny—a more stringent standard than the typical intermediate-scrutiny level of review for commercial speech.[78]

---

[69] *See id.* (discussing alternative forms of regulation including higher prices by means of direct regulation or increased taxation and educational campaigns focused on the problems of drinking).

[70] *Id.* at 501 ("The mere fact that messages propose commercial transactions does not in and of itself dictate the constitutional analysis that should apply to decisions to suppress them.").

[71] *See id.*

[72] *Id.* at 503–04; *see also id.* at 501 (noting that in these cases, "there is far less reason to depart from the rigorous review that the First Amendment generally demands").

[73] *Id.* at 502 (citing Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 426 (1993)).

[74] *Id.* at 502–03.

[75] *Id.* at 498–99; *see supra* text accompanying note 73.

[76] Weinstein, *supra* note 21, at 128.

[77] *44 Liquormart*, 517 U.S. at 522 (Thomas, J., concurring in part and concurring in the judgment).

[78] 131 S. Ct. 2653, 2664 (2011) (relying on *Discovery Network*, 507 U.S. 410, to support a heightened scrutiny standard).

CITY000684

In light of the continued elevation of commercial speech in modern Supreme Court case law, it is unclear whether the line between commercial and noncommercial speech remains an important or necessary distinction in sign regulation today. Modern commercial speech cases stand in stark contrast to the views espoused by the *Metromedia* plurality over three decades ago.[79] Although the *Metromedia* plurality endorsed the distinction between the two speech forms, it had done so relying on free speech cases from the 1970s, which supported a lower constitutional status for commercial speech.[80] The *Metromedia* Justices did not have *Discovery Network*, *44 Liquormart*, and *Sorrell* at their disposal in 1981. Moreover, in endorsing the different treatment of commercial and noncommercial speech, the *Metromedia* plurality emphasized the "common-sense" nature of the distinction between the two speech forms.[81] But in actuality, as Justice Brennan succinctly noted, the distinction was "anything but clear."[82] This statement holds even more true today, where modern advertising has further convoluted the status of the two speech forms.[83]

Part II of this Note argues that the distinction between commercial and noncommercial speech should be eliminated in at least one context: the regulation of outdoor murals.

## II.  OUTDOOR MURAL REGULATION: REEXAMINING THE COMMERCIAL/NONCOMMERCIAL SPEECH DISTINCTION

Outdoor murals—"painting[s] or other work[s] of art executed directly on a wall"[84]—are unique in that they can be classified as

---

[79] *See supra* text accompanying notes 45–49.

[80] *See* Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 505–06 (1981) (plurality opinion) (citing, for example, *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976)) (citing, for the proposition that "commercial and noncommercial speech [are not equated] for First Amendment purposes"). At the time of the *Metromedia* decision, the commercial speech doctrine had been in existence for only six years.

[81] *Id.* at 506 ("[W]e again recognize[] the common-sense and legal distinction between speech proposing a commercial transaction and other varieties of speech.").

[82] *Id.* at 536 (Brennan, J., concurring in the judgment). In fact, the Supreme Court recognized the difficulty with distinguishing between the two speech forms at the moment the commercial speech doctrine was born. *See Va. State Bd. of Pharmacy*, 425 U.S. at 787 (Rehnquist, J., dissenting) ("There are undoubted difficulties with an effort to draw a bright line between 'commercial speech' on the one hand and 'protected speech' on the other . . . .").

[83] *See, e.g.*, Darrel Menthe, *Writing on the Wall: The Impending Demise of Modern Sign Regulation Under the First Amendment and State Constitutions*, 18 GEO. MASON U. C.R. L.J. 1, 26 (2007) (noting that "there is, arguably, a complete lack of a standard by which to evaluate [the] distinction" between these two forms of speech).

[84] *Mural Definition*, OXFORD DICTIONARIES, http://oxforddictionaries.com/definition/english/mural?q=mural (last visited Oct. 27, 2013). This Note is limited in scope to outdoor murals located on private property. Murals located on government property face unique issues and are governed by different case law.

artwork, signage, or both, depending on their content and the municipality in which they reside. Most commonly, a municipality's sign ordinance will classify a mural as signage only when the mural contains "commercial speech."[85] For example, Arlington County's sign ordinance mandates that outdoor murals include "no picture, symbol or device of any kind that relates to a commercial business, product or service offered on the premises where the [mural] is located."[86] If a mural does include this prohibited commercial content, the county classifies the mural as signage and subjects it to all of the restrictions and requirements of the sign ordinance.[87] Conversely, if the mural contains solely "noncommercial speech," the county classifies the mural as a "work of visual art" and exempts the mural from the specifications of the sign ordinance.[88]

Disputes between mural owners and local zoning authorities over whether a particular outdoor mural qualifies as artwork or signage have become increasingly common in recent years.[89] Four of these disputes have made their way to court: *Complete Angler, LLC v. City of Clearwater, Florida;*[90] *City of Tipp City v. Dakin;*[91] *Neighborhood Enterprises, Inc. v. City of St. Louis;*[92] and *Wag More Dogs, Ltd. Liability Corp. v. Cozart.*[93] Decided respectively in 2009, 2010, 2011, and 2012, the four cases involve similar fact patterns; yet, the courts embarked on varied analyses and arrived at different holdings. Though the murals at issue in the first three cases were ultimately permitted to remain in place, the mural in the last of the four cases, *Wag More Dogs,* was ordered removed by the county.[94] The various inconsistencies among these four mural cases are predominantly attributable to two factors, neither of which is unique to mural case law, and both of which stem in

---

[85] *See supra* note 2.

[86] ARLINGTON, VA., ZONING ORDINANCE art. 13, § 13.2.3.C (2013), *available at* http://buildingarlington.s3.amazonaws.com/wp-content/uploads/2013/06/ACZO_Adopted-05-18-2013_op.pdf.

[87] *See id.*

[88] *See id.* Assuming, of course, that the other requirements for exemption are met. *Id.*

[89] *See, e.g., supra* notes 11–12. These disputes follow a typical pattern, reflected in the Sally/Wanda dispute from this Note's Introduction: The owner of a commercial shop commissions an artist to paint a mural on the exterior wall of her building. The owner believes the mural to be a work of art. "Artwork" is categorically exempted in the local sign ordinance from some or all of the stringent size and other restrictions placed on outdoor signage. A local zoning official believes the shop owner's mural falls outside the definition of "artwork," and is thus signage. Because the mural violates one or more of the restrictions in the sign ordinance, the zoning official orders its removal.

[90] 607 F. Supp. 2d 1326 (M.D. Fla. 2009).

[91] 186 Ohio App. 3d 558, 2010-Ohio-1013, 929 N.E.2d 484.

[92] 644 F.3d 728 (8th Cir. 2011).

[93] 680 F.3d 359 (4th Cir. 2012).

[94] For a discussion of the facts and holdings of these cases, see discussion *infra* Part II.A–B.

CITY000686

part from the divisive *Metromedia* decision, as well as post-*Metromedia* developments in free speech law.[95]

A.   *Sources of Inconsistency in Mural Case Law*

1.   Defining Commercial Speech

The first factor contributing to the inconsistency in mural case law is the manner in which courts define "commercial speech." Some courts have adopted very narrow definitions of commercial speech, such as "speech that does no more than propose a commercial transaction"[96] and "expression related solely to the economic interests of the speaker and its audience."[97] Other courts, by contrast, have recognized a broader definition of commercial speech as encompassing speech that "cannot be characterized merely as proposals to engage in commercial transactions."[98]

The two narrow definitions were used by the court in *Complete Angler* in holding that a marine-themed mural on the wall of a bait and tackle shop qualified as artwork rather than signage because the mural contained noncommercial speech.[99] The court reasoned that although the mural might occasionally inspire commercial activity, namely the purchase of bait and tackle from the mural owner's shop, the mural's function was not limited to this pursuit.[100] Rather, the mural also depicted a reflection of a local artist's impression of the environment

---

[95] For a discussion of the five opinions in the *Metromedia* decision, see *supra* Part I.B. For a discussion of post-*Metromedia* developments in free speech law, namely the commercial speech and content neutrality doctrines, see *supra* Part I.C.

[96] *See, e.g.*, United States v. United Foods, Inc., 533 U.S. 405, 409 (2001); *see also* Dex Media W., Inc. v. City of Seattle, 696 F.3d 952, 958 (9th Cir. 2012) (providing same definition).

[97] *See, e.g.*, El Día, Inc. v. P.R. Dep't of Consumer Affairs, 413 F.3d 110, 115 (1st Cir. 2005) (quoting Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n, 447 U.S. 557, 561 (1980)); Hoover v. Morales, 164 F.3d 221, 225 (5th Cir. 1998) (same).

[98] *See, e.g.*, Spirit Airlines, Inc. v. U.S. Dep't of Transp., 687 F.3d 403, 412–13 (D.C. Cir. 2012) (quoting another source) (internal quotation marks omitted); *Wag More Dogs*, 680 F.3d at 369–70 (quoting another source) (internal quotation marks omitted); *see also* IMS Health Inc. v. Sorrell, 630 F.3d 263, 274 (2d Cir. 2010), *aff'd*, 131 S. Ct. 2653 (2011); United States v. Wenger, 427 F.3d 840, 846–47 (10th Cir. 2005). All of these cases rely on *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66–67 (1983) (adopting a more liberal and comprehensive approach to defining commercial speech that looks to a combination of factors).

[99] Complete Angler, LLC v. City of Clearwater, Fla., 607 F. Supp. 2d 1326, 1332 (M.D. Fla. 2009).

[100] *Id.*

CITY000687

surrounding the bait and tackle shop.[101] In this sense, the speech within the mural did "more than propose a commercial transaction."[102]

The Fourth Circuit in *Wag More Dogs* rejected this reasoning in favor of a broader definition of commercial speech.[103] The court easily could have found, similar to the court's finding in *Complete Angler*, that a dog-themed mural on the wall of a canine daycare center situated near a local dog park depicted an artist's reflection of the community's appreciation for dogs, and thus did more than simply propose a commercial transaction. Instead, the court stretched the definition of commercial speech to include speech beyond "the core notion of commercial speech."[104] The court held that the dog-themed imagery on the mural constituted commercial speech because the mural, which included cartoon dogs resembling the business's logo, was meant to attract potential customers from the nearby dog park, thus potentially economically benefiting the mural owner.[105]

## 2.    Analyzing Content Neutrality

The second factor contributing to the inconsistency in mural case law is that courts are divided over the manner in which to analyze the content neutrality of a sign ordinance. While some courts have adopted a strict approach that looks solely at the language of the sign ordinance,[106] other courts have adopted a more liberal approach that looks to a municipality's asserted purpose for enacting a given regulation.[107]

---

[101] *Id.*

[102] Thus, it did not satisfy one of the narrow definitions of commercial speech: "speech that does no more than propose a commercial transaction." United States v. United Foods, Inc., 533 U.S. 405, 409 (2001).

[103] *See Wag More Dogs*, 680 F.3d at 369–70 ("*Bolger* recognized a broader definition of commercial speech, encompassing speech that 'cannot be characterized merely as proposals to engage in commercial transactions.'... The three factors relied on by the Court in *Bolger* similarly counsel classifying Wag More Dogs' painting as commercial speech.").

[104] *Id.* at 370.

[105] *See id.*

[106] *See, e.g.*, Neighborhood Enters., Inc. v. City of St. Louis, 644 F.3d 728, 736–37 (8th Cir. 2011); Serv. Emps. Int'l Union, Local 5 v. City of Houston, 595 F.3d 588, 596 (5th Cir. 2010); Ballen v. City of Redmond, 466 F.3d 736, 742–44 (9th Cir. 2006); Solantic, LLC v. City of Neptune Beach, 410 F.3d 1250, 1259–62 (11th Cir. 2005); Rappa v. New Castle Cnty., 18 F.3d 1043, 1053–54 (3d Cir. 1994); Nat'l Adver. Co. v. Town of Babylon, 900 F.2d 551, 556–57 (2d Cir. 1990).

[107] *See, e.g.*, Asgeirsson v. Abbott, 696 F.3d 454, 460 n.6 (5th Cir. 2012); *Wag More Dogs*, 680 F.3d at 366–69; H.D.V.–Greektown, LLC v. City of Detroit, 568 F.3d 609, 621–23 (6th Cir. 2009); Globe Newspaper Co. v. Beacon Hill Architectural Comm'n, 100 F.3d 175, 183 (1st Cir. 1996); Scadron v. City of Des Plaines, 734 F. Supp. 1437, 1445–46 (N.D. Ill. 1990), *aff'd*, 989 F.2d 502 (7th Cir. 1993).

CITY000688

The strict approach to content neutrality is the majority approach in existing mural case law. Consider again the case of *Complete Angler*. At issue in the case was a marine-themed mural on the exterior wall of a bait and tackle shop.[108] The mural depicted sailfish, dolphins, and waterways.[109] Clearwater, a resort community, had a sign ordinance that prohibited various types of signs, required a permit and development review process for others, and exempted twenty-six categories of signs from review altogether.[110] One such exemption was made for artwork.[111] Believing the marine-themed mural to be commercial signage, the city issued plaintiffs a notice citing various violations of the sign ordinance and ordering the mural's removal.[112] The *Complete Angler* court held that Clearwater's application of its sign ordinance was content-based because a zoning official had to examine the content of the marine-themed mural in order to determine whether it was a sign or artwork.[113] After determining that the mural was a sign because it contained "commercial speech," the city then declined to extend protections that would have been extended to a mural containing alternative content, such as imagery of kids playing in a park.[114]

Following similar logic, the court in *Neighborhood Enterprises* held that the exemptions in St. Louis's sign ordinance were content-based because they made impermissible distinctions based solely on the content or message conveyed by a given sign.[115] St. Louis's sign ordinance exempted from regulation, among other things, "[w]orks of art which in no way identify a product."[116] Plaintiff, a critic of St. Louis's eminent domain practices, commissioned a mural on the wall of a building containing the words "End Eminent Domain Abuse" inside a red circle with a slash.[117] The city declared the mural an "illegal sign."[118]

---

108 Complete Angler, LLC v. City of Clearwater, Fla., 607 F. Supp. 2d 1326, 1329 (M.D. Fla. 2009).

109 *Id.* at 1328–29.

110 *Id.* at 1330–31.

111 *See id.* at 1331. The exemption defined artwork as "drawings, pictures, symbols, paintings or sculpture which do not identify a product or business and which are not displayed in conjunction with a commercial, for profit or nonprofit enterprise." *Id.* (citation omitted).

112 The city argued that the marine-themed mural was displayed "in conjunction with" plaintiffs' place of business, and thus was commercial speech, not artwork. *See id.* at 1332.

113 *Id.* at 1333 ("Yet in concluding that the [mural was] subject to the permit requirement or spatial constraints, [the city] necessarily examined [its] content and determined that [it was not] art work, a holiday decoration, or any other sign exempted under the Code.").

114 *See id.* at 1332–33.

115 Neighborhood Enters., Inc. v. City of St. Louis, 644 F.3d 728, 736 (8th Cir. 2011) ("[T]he zoning code's definition of 'sign' is impermissibly content-based because . . . . to determine whether a particular object qualifies as a 'sign' . . . and is therefore subject to the regulations, or is instead a 'non-sign' . . . or [is otherwise] exempt from the sign regulations . . . one must look at the *content* of the object." (citations omitted)).

116 *Id.* at 739.

117 *Id.* at 731 (internal quotation marks omitted).

118 *Id.* (internal quotation marks omitted). The design of the mural was similar to the design

CITY000689

In holding that the ordinance's exemptions to the definition of "sign" were content-based, the Eighth Circuit noted that a mural in the same location and with the same size and dimensions as plaintiff's mural would not be subject to regulation if it contained alternative content, such as a religious subject.[119] The court reasoned that treating one mural as signage and another as artwork based solely on the content of the murals was a clear example of a content-based regulation on speech.[120]

In contrast to the strict approach to content neutrality seen in *Complete Angler* and *Neighborhood Enterprises* is the more liberal approach reflected in *Wag More Dogs*. This latter approach is the minority approach in existing mural case law. At issue in *Wag More Dogs* was Arlington County's sign ordinance, which, similar to St. Louis's, included various exemptions from the definition of "sign."[121] One such exemption was made for "decorative art," which was left wholly unregulated.[122] After determining that plaintiff's dog-themed mural qualified as signage rather than an exempt work of decorative art because it contained "commercial speech," the county zoning administrator subjected the mural to restrictions placed on signage that the mural would not have been subjected to had it contained alternative content.[123] Nonetheless, the Fourth Circuit held that the sign ordinance was content-neutral, both facially and as applied.[124] The court gave significant weight to the government's purpose in enacting the regulations, observing that Arlington County adopted the sign ordinance to regulate land use, not to prohibit a particular disfavored message.[125]

---

that the Missouri Eminent Domain Abuse Coalition, an organization with whom the plaintiff co-missioned the mural, used in its advertising and marketing materials. *See id.*

[119] *See id.* at 736–37.

[120] *Id.* at 737. The court refused to accept St. Louis's justification for enacting these content-based regulations on speech. *See id.* This disregard for government intent is one of the defining features of the "strict" approach to content neutrality. *See* cases cited *supra* note 106 and accompanying text.

[121] *See* Brief of Appellant at 2, Wag More Dogs, Ltd. Liab. Corp. v. Cozart, 680 F.3d 359 (4th Cir. 2012) (No. 11-1226), 2011 WL 2534178, at *2.

[122] *Id.* (internal quotation marks omitted).

[123] *See Wag More Dogs*, 680 F.3d at 369–70 (noting that plaintiff's mural would have been allowed to remain had it contained "noncommercial messages" but holding that the mural contained commercial speech).

[124] *Id.* ("Deeming the Sign Ordinance content neutral, we now readily conclude that it satisfies intermediate scrutiny.... As applied to Wag More Dogs, the Sign Ordinance's regulation of commercial speech satisfies intermediate scrutiny.").

[125] *Id.* at 368 ("On this score, then, the Sign Ordinance's content neutrality is incandescent.").

CITY000690

B.    *Eliminating the Commercial/Noncommercial Speech Distinction*

The aforementioned inconsistencies in mural case law can be significantly reduced by eliminating the distinction between commercial and noncommercial speech in the context of outdoor mural regulation. Regulating all murals, regardless of their content, in the same manner would render moot the first source of inconsistency (that is, the definition of commercial speech) while appealing to the majority, and better, judicial approach for the second source of inconsistency (that is, how to analyze the content neutrality of a sign ordinance). Moreover, it would reflect a more modern regulatory regime that appeals to recent advances in the commercial speech and content neutrality doctrines. This section elaborates on these points and sets forth additional legal and policy-based arguments for regulating all murals, regardless of the speech they contain, in an equal fashion.

1.    Constitutional Flaws

The principal reason why the distinction between commercial and noncommercial speech should be eliminated in the context of outdoor mural regulation is that the distinction, when applied, constitutes a content-based regulation of speech. Explained simply, if a zoning official subjects one mural to stringent outdoor signage restrictions because the mural contains commercial speech, but exempts another mural from these restrictions because the latter mural contains noncommercial speech, this difference in treatment is a content-based regulation of speech.

The courts in three of the four mural cases—*Complete Angler, Neighborhood Enterprises,* and *Tipp City*—would support this view. Each of these courts embraced the stricter approach to evaluating the content neutrality of a sign ordinance.[126] This approach is the better approach in that it is more in line with modern Supreme Court case law, which indicates a desire for a stricter content-neutrality standard.[127] In *Discovery Network,* for instance, the Court embraced a strict approach to content neutrality in holding that Cincinnati's sign ordinance was content-based because a government official had to look at the content of the papers in a given newsrack in order to determine whether the

---

[126]  *See supra* Part II.A.2.

[127]  Brian J. Connolly, Note, *Environmental Aesthetics and Free Speech: Toward a Consistent Content Neutrality Standard for Outdoor Sign Regulation,* 2 MICH. J. ENVTL. & ADMIN. L. 185, 209 (2012) ("[S]ince *Metromedia,* there has been a gradual increase in the degree of content neutrality required of governmental regulations of speech. This gradual increase suggests that, to comply with the Supreme Court's recent statements on content neutrality, the content neutrality requirement in sign regulation should be more stringent . . . .").

CITY000691

newsrack was subject to the ordinance's ban.[128] The Court specifically rejected a content-neutrality analysis that looks to a government's justification for a given regulation, especially when that justification is the "naked assertion" that commercial speech has low value.[129] Similarly, the Court in *Sorrell* found that because the statute in question would require a government enforcement authority to examine the content of marketing materials before determining whether the protected information was being used for marketing or for some other purpose, the regulation of commercial speech was content-based.[130]

Not only does the strict approach to content neutrality embrace modern, post-*Metromedia* Supreme Court precedent, but this approach also avoids the reliance on community aesthetics and traffic safety as justifications for distinguishing between commercial and noncommercial speech. These justifications are successfully utilized only in those cases where a more liberal content-neutrality standard is applied (and thus, where sign ordinances are more likely to be upheld as content-neutral), because content-neutral ordinances need only satisfy a test of intermediate scrutiny where community aesthetics and traffic safety qualify as substantial government interests.[131] The problem with relying on community aesthetics and traffic safety, the so-called "twin goals" of sign regulation,[132] to justify the commercial/noncommercial speech distinction as applied to outdoor murals is that maintaining the distinction fails to advance either goal. At best, the distinction has a neutral effect on these goals. At worst, the distinction may be detrimental to these goals.

Consider *Wag More Dogs,* the sole mural case to embrace the more liberal content-neutrality standard.[133] After Arlington County's zoning administrator ordered plaintiff business owner to remove the dog-themed mural on the wall of her canine daycare shop because its

---

[128] City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 429 (1993) ("Under the city's newsrack policy, whether any particular newsrack falls within the ban is determined by the content of the publication resting inside that newsrack. Thus, by any commonsense understanding of the term, the ban in this case is 'content based.'"). For a more detailed discussion of *Discovery Network,* see *supra* Part I.C.

[129] *See Discovery Network,* 507 U.S. at 429–30.

[130] Sorrell v. IMS Health Inc., 131 S. Ct. 2653, 2663–64 (2011) ("Given the legislature's expressed statement of purpose, it is apparent that [the statute] imposes burdens that are based on the content of speech and that are aimed at a particular viewpoint."). In embracing a strict approach to content neutrality, the *Sorrell* Court relied on *Discovery Network. See id.* at 2664 (citing *Discovery Network,* 507 U.S. at 418, to support the proposition that heightened judicial scrutiny is warranted when content-based restrictions are placed on commercial speech).

[131] Ward v. Rock Against Racism, 491 U.S. 781, 798–99 (1989); *see also supra* Part I.A.2 (explaining the differences between content-based and content-neutral regulations within sign ordinances).

[132] Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 507 (1981) (plurality opinion); *see also supra* Part I.A.1 (discussing these two justifications for sign regulation).

[133] *See supra* notes 121–25 and accompanying text.

imagery allegedly constituted commercial speech,[134] plaintiff commissioned two artists to paint a new mural in its place.[135] The replacement mural depicted large bird-like creatures nesting in tires hanging from a tree.[136] While the community adored the "attractive," original mural, deeming it a welcome and fitting addition to the nearby dog park,[137] many local residents expressed their dislike of the replacement mural.[138]

Perhaps most concerning with this case is that the Fourth Circuit relied entirely on the twin goals of sign regulation in holding that Arlington County's sign ordinance satisfied intermediate scrutiny.[139] Focusing heavily on the intent of Arlington County in enacting the ordinance, the court held that the ordinance was content-neutral because it "serve[d] purposes unrelated to the content of expression," "even if it ha[d] an incidental effect on some speakers or messages but not others."[140] Because the content-neutral ordinance advanced substantial government interests—the furtherance of traffic safety and the enhancement of aesthetics within the county—the court found that it satisfied intermediate scrutiny.[141] The failure of the ordinance to actually further either of these interests highlights a flaw in this minority approach to evaluating the content neutrality of a sign ordinance. Under the stricter, majority approach, Arlington County's ordinance would have been deemed content-based and subject to a strict scrutiny

---

[134] *See supra* notes 103–05 and accompanying text. Arlington County's zoning administrator provided plaintiff with the following instructions:

> For the mural to NOT be considered a sign, it may depict anything you like EXCEPT something to do with dogs, bones, paw prints, pets, people walking their dogs, etc. In other [words], the mural [cannot] show anything that has any relationship with your business. If it does, then it becomes a sign.

Wag More Dogs, Ltd. Liab. Corp. v. Cozart, 680 F.3d 359, 363 (4th Cir. 2012).

[135] *See* Arin Greenwood, *Wag More Dogs Gets New Mural From Itinerant Artists Rob Fogle And Zack Weaver (PHOTOS)*, HUFFINGTON POST (Oct. 16 2012, 1:55 PM), http://www.huffingtonpost.com/2012/10/16/wag-more-dogs-mural-rob-fogle-zack-weaver_n_1962184.html.

[136] For photos of the replacement mural, see *id.*

[137] Wag More Dogs, LLC v. Artman, 795 F. Supp. 2d 377, 392 (E.D. Va. 2011) ("As murals go, Wag More Dogs' is a relatively attractive one, and . . . many patrons of the nearby local dog park quite enjoy it."), *aff'd*, 680 F.3d 359 (4th Cir. 2012).

[138] *See, e.g.*, *New Dog Park Mural . . . Improved??*, TWO DOG TALES (Oct. 15, 2012), http://twodogtales.wordpress.com/2012/10/15/new-dog-park-mural-improved ("[I]t's a shame the cute dogs had to go. They were much more appropriate for the space, and didn't elicit the comments overheard the past few days at the park, which generally [began] with, "What the heck ARE those things?").

[139] *See Wag More Dogs*, 680 F.3d at 368–69.

[140] *Id.* at 368 (acknowledging that Arlington had differentiated between different types of speech).

[141] *Id.* at 369 ("[W]e now readily conclude that [the sign ordinance] satisfies intermediate scrutiny. . . . Arlington enacted the . . . [o]rdinance to, in part, promote traffic safety and enhance the County's aesthetics. Both are substantial government interests.").

analysis, under which traffic safety and community aesthetics are not compelling justifications.[142]

In a similar case from Arlington County (which did not make its way to court), the owner of a head shop that sold various paraphernalia, including pipes, hookahs, and cigars, commissioned an artist to paint a mural on the side of his building to beautify the block.[143] The finished artwork depicted a man holding a smoke-exuding cigar.[144] Upon investigating the mural, the county zoning administrator noted: "[T]he cigar must go; then the mural can stay. Without the cigar, it is not a sign . . . ."[145] Smokey Shope's owner decided to paint over the cigar, converting it into a blue whale.[146] The new mural was identical in all respects to the original mural, except that it contained a whale instead of a cigar.[147] Yet, replacing the "commercial speech" with "noncommercial speech" did absolutely nothing to enhance Arlington County's aesthetics or traffic safety. Rather, it seemed only to enforce the meaninglessness of distinguishing between the two speech forms.[148]

Outside of Arlington County, at least one court has commented on the failure of the distinction between commercial and noncommercial speech to enhance the twin goals of sign regulation. In *North Olmstead Chamber of Commerce v. City of North Olmsted*, the court addressed a sign ordinance which permitted noncommercial art murals, but banned murals with commercial messages, such as corporate products or logos.[149] The court held that these restrictions on commercial speech were content-based and unconstitutional.[150] The sign ordinance lacked "rationality" because the city failed to provide evidence that the restrictions directly and materially contributed to traffic safety and

---

[142] *See, e.g.*, Members of City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 823 (1984) ("But a governmental interest in aesthetics cannot be regarded as sufficiently compelling to justify a restriction of speech based on an assertion that the content of the speech is, in itself, aesthetically displeasing."); Gilleo v. City of Ladue, 986 F.2d 1180, 1183–84 (8th Cir. 1993) (holding that the city's interest in eliminating aesthetic, safety, and property value problems associated with signs was not sufficiently compelling), *aff'd*, 512 U.S. 43 (1994).

[143] *See County to Head Shop: Cigar Mural Has Got to Go*, ARLNOW (Aug. 21, 2012, 1:50 PM), http://www.arlnow.com/2012/08/21/county-to-head-shop-cigar-mural-has-to-go.

[144] For a photo of the mural, see *id.*

[145] *Id.* According to the logic of the zoning administrator, if a mural painted on a cigar shop contains a cigar, the mural is a sign. If the cigar is converted into a whale, the mural transforms into a work of art. *See* Taylor Holland, *When a Cigar Becomes a Whale, a Sign Becomes Art*, WASH. EXAMINER (Sept. 26, 2012, 4:30 PM), http://washingtonexaminer.com/when-a-cigar-becomes-a-whale-a-sign-becomes-art/article/2509136#.UORv1InjkoZ.

[146] Holland, *supra* note 145.

[147] For photos of the original and replacement murals, see *id.*

[148] As the Smokey Shope store manager observed, "It doesn't make a lot of sense, but the county made us do it." *Id.*

[149] 86 F. Supp. 2d 755, 767 & n.7 (N.D. Ohio 2000).

[150] *Id.* at 773 ("The City's content-based regulations on commercial speech are unconstitutional.").

CITY000694

community aesthetics.[151] Murals housing commercial content, the court reasoned, were no more distracting or less aesthetically pleasing than noncommercial murals.[152] As such, it was senseless to distinguish between the two speech forms.[153]

### 2.    Classifying Mural Speech

Perhaps one of the reasons why maintaining the distinction between commercial and noncommercial speech in the context of outdoor mural regulation seems futile is that classifying mural speech is a transitory determination that has the potential to change overnight.

Consider the following hypothetical: The exterior wall of a local mom-and-pop cupcake shop features a lively mural with large cups of coffee in honor of the shop owner's favorite morning beverage. The mural has been on the building for five years, and is accepted and relished by the community as a lovely work of art. One day, the owner decides to start selling coffee at her cupcake shop. Although this decision converts the mural's coffee imagery from noncommercial to commercial speech, it would hardly seem necessary, fair, or prudent for the town to demand its removal after years of community enjoyment. Moreover, in light of the frequent product turnover within commercial establishments, a municipality would have to constantly reevaluate the products sold inside every building upon which is displayed an outdoor mural. This would be a foolish and wasteful use of government time and resources.

Further complications arise in cases where a given business sells a wide variety of products or services. The process of classifying mural speech is more conducive to businesses that sell only one key product or provide only one key service. Businesses such as gift shops or grocery stores, which may sell thousands of products, are placed at an unfair disadvantage if the distinction between commercial and noncommercial speech remains in place. Does a flower mural on the side of a gift shop, where fresh flowers comprise less than one percent of the store's total

---

[151] *See id.* at 772–73 ("In fact, many of the City's content-based restrictions *completely fail* to contribute to safety and aesthetics and seem to be *unrelated to these goals*." (emphasis added)).

[152] *Id.* at 768, 772 ("It is also not evident why a mural may contain content that may be very distracting (such as sexually explicit but not obscene art) or aesthetically displeasing, but may not contain words, corporate products, or corporate images. Surely a mural containing the 'golden arches' of McDonalds is not more distracting than Botticelli's 'Venus' or more aesthetically displeasing than some modern works of art that may be reproduced on the side of a wall. . . . Signs with content other than identifying a business are not somehow safer. Nor is the content . . . more aesthetically pleasing.").

[153] *See id.* at 771 (noting that making content-based distinctions among signs, including distinctions based on whether they contained commercial or noncommercial speech, did not further North Olmsted's goals "in any meaningful way").

inventory, contain commercial speech? Should a mural featuring fruits and vegetables on the wall of a Whole Foods Market—which also sells dairy, meat, grains, beverages, and even body care products and eating utensils—be considered signage, when the same mural outside of a butcher shop would be considered art? What if that same mural has been intact for fifteen years and has become a neighborhood landmark, as it has in the city of St. Paul, Minneapolis?[154] Eliminating the distinction between commercial and noncommercial speech in the context of outdoor mural regulation avoids these inevitable difficulties that arise when classifying mural speech.

### 3.    Classifying Mural Art

Similar to the difficulties with classifying mural speech, it is likewise difficult to classify mural art. Maintaining the distinction between commercial and noncommercial speech only further complicates this matter. The current framework leaves unbridled discretion in government enforcement authorities to arbitrarily decide when, in their subjective opinions, a mural qualifies as a work of art or signage.[155] It is this broad discretion that Justice Brennan feared in his *Metromedia* concurrence when he noted the danger of permitting a government unit to decide whether a given outdoor display contains commercial or noncommercial speech.[156] This concern is especially strong in the context of regulating outdoor murals. The definition of art and the determination of whether something qualifies as art have long been the subject of vigorous debate, even among artists themselves.[157]

Courts too have certainly struggled with the determination of whether a given mural is art or signage. The court in *Tipp City*, for

---

[154] For a photo of the Whole Foods mural, see Curtis Gilbert, *Cities Debate Art vs. Advertising*, MPRNEWS (Aug. 1, 2012), http://minnesota.publicradio.org/display/web/2012/08/01/business/art-versus-advertising-in-twin-cities.

[155] *See* Alex Kozinski & Stuart Banner, *Who's Afraid of Commercial Speech?*, 76 VA. L. REV. 627, 653 (1990) ("[T]he commercial speech doctrine . . . . gives government a powerful weapon to suppress or control speech by classifying it as merely commercial. If you think carefully enough, you can find a commercial aspect to almost any[thing] . . . .").

[156] *See* Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 536–37 (1981) (Brennan, J., concurring in the judgment) ("Because making such determinations would entail a substantial exercise of discretion by a city's officials, it presents a real danger of curtailing noncommercial speech in the guise of regulating commercial speech.").

[157] David Leichtman & Avani Bhatt, *Federal Courts and the Communicative Value of Visual Art: Is an Intended Message Required for Strong Protection of Rights Under the First Amendment?*, FED. LAW., Sept. 2011, at 25, 25 ("Federal courts addressing the question of the appropriate level of First Amendment protection for art have sometimes agreed that the key to protection is the communicative value of the work at issue. Others—in both law and other disciplines—have argued, however, that to qualify as art, the work must carry some component that is aesthetically pleasing, lest a mere circle painted on a canvas be considered art.").

CITY000696

example, was vocal in its discomfort with classifying the mad scientist mural at issue as commercial signage.[158] The court emphasized that the "inherent difficulty" with the classification was due, in part, to the lack of a clear distinction between commercial and noncommercial speech.[159] Stressing that the issue was "a close one," the *Tipp City* court avoided making a determination of its own.[160] Instead, it adopted the reasoning of the trial court, which had concluded that the mural was a sign, not art.[161] The hesitation scattered throughout the *Tipp City* court's discussion of classifying the mad scientist mural—a classification that hinged entirely on the distinction between commercial and noncommercial speech—is evidence of the arbitrariness of this distinction as it pertains to outdoor mural regulation.[162]

A related issue arises when multiple murals within a given municipality are regulated under the same terms of a local sign ordinance but are subjected to different treatment. The court in *Complete Angler* critiqued this discriminatory practice within the city of Clearwater. Although the city had declared plaintiffs' marine-themed mural an illegal sign, it had allowed other businesses in the city to display murals that contained similar degrees of relatedness to their business.[163] For instance, it had permitted a mural on a daycare center depicting children running through a field and a mural on a seafood restaurant containing various images of marine life.[164]

Of course, zoning officials are not entirely to blame for this disparate treatment. Murals painted on commercial buildings contain varying degrees of relatedness to the business inside, and thus, when a municipality must determine whether a mural is art or signage, the process of line-drawing becomes unbearably difficult—and consequently, quite haphazard.[165] Treating all outdoor murals the same,

---

[158] City of Tipp City v. Dakin, 186 Ohio App. 3d 558, 2010-Ohio-1013, 929 N.E.2d 484, at ¶ 31 ("Despite the straightforward nature of the issue, determining whether the appellants' mural constitutes commercial speech is not without difficulty.").

[159] *Id.* ¶ 32 ("'The distinction between commercial and non-commercial speech was never obvious, and sophisticated advertising techniques can blur the lines even more.'" (quoting Menthe, *supra* note 83, at 6)).

[160] *Id.* ¶ 33.

[161] *See id.* This was likely a showing of deference to the trial court.

[162] *See, e.g., id.* n.3 ("Assuming, arguendo, that we are wrong and that the appellants' mural is noncommercial speech, we note that the outcome in this case would remain the same. Our ultimate conclusion . . . is that Tipp City's sign ordinance cannot be enforced against the appellants' mural."); *supra* notes 158–59.

[163] *See* Complete Angler, LLC v. City of Clearwater, Fla., 607 F. Supp. 2d 1326, 1334 (M.D. Fla. 2009).

[164] *Id.*

[165] How close does the relationship have to be between the imagery contained in a mural and the business on whose wall the mural resides? Consider another case arising out of the city of Clearwater, Florida: An Egyptian-themed restaurant commissioned an artist to paint a mural depicting a repeating pattern of hieroglyphics over the entire front exterior wall of the building. The finished artwork was "eye-catching and appealing." But Clearwater, whose sign code

regardless of whether they contain commercial or noncommercial speech, would eliminate this inconsistency within a single municipality.

### 4.   Murals as Art

Lastly, eliminating the distinction between commercial and noncommercial speech in the context of outdoor mural regulation would restore all murals to their traditional status as artwork. Since its origination more than 30,000 years ago, mural art throughout history has been employed as a means of conveying artistic expression.[166] Mural art is a unique form of communication that is distinct from (and serves purposes different than) billboards, the prototype of commercial signage. Municipalities have used outdoor art murals, but not billboards, as a means of revitalizing urban communities.[167] Murals offer strong aesthetic pleasure in place of, or at least amongst, community blight, and they contribute to the cultural identity of a neighborhood.[168] By contrast, billboards generally clutter communities and elicit negative emotions from residents and tourists alike.[169] Treating murals housing commercial speech the same as those containing noncommercial speech would embrace the notion that all murals, no matter what their content,

---

forbids murals on commercial buildings if the mural relates to what the business is selling, declared the mural an illegal sign. Although the restaurant owner ultimately won the dispute on appeal, this case illustrates the danger of making broad determinations that jeopardize free speech interests. *See* Diane Steinle, *Murals Rules Create A Muddled Sign Code*, ST. PETERSBURG TIMES, Jan. 25, 2009, at 2.

[166] For a discussion of the historical and artistic importance of public mural art, see Christian Ehret, *Mural Rights: Establishing Standing for Communities Under American Moral Rights Laws*, 10 U. PITT. J. TECH. L. & POL'Y 3 (2010).

[167] *See id.* (noting that art allows "communities [to] take[] advantage of low cost, unused property and [attract] positive attention from outsiders"); Dana Cole, *Mural Project Gets Council's Green Light*, BENSONNEWS-SUN.COM (July 9, 2013, 6:00 PM), http://www.bensonnews-sun.com/news/article_d579d91c-e8e8-11e2-853d-001a4bcf887a.html (noting the success of mural projects in revitalizing communities, and indicating the intent of Benson, Arizona to launch a community-wide mural project to "make Benson a destination town for all tourists rather than a pass-through for travelers").

[168] For example, Lake Placid, a small Florida town with a population of 2,000, is now known as the "Town of Murals." The community had a business district that was on the verge of collapse until the mid-1990s, when the town decided to paint murals on dilapidated buildings. Mural artists have since painted historical scenes, landscapes, and pictures of Lake Placid people and wildlife. Tourists travel from all over the world to see the beautiful paintings. *See* Steinle, *supra* note 165 (observing that "[e]ven the trash receptacles have been transformed by murals").

[169] *See, e.g.*, Ballen v. City of Redmond, 466 F.3d 736, 744 (9th Cir. 2006) (defining billboards as "fixed, permanent structures that are . . . intrusive to community aesthetics"); Armin P. Langheinrich, *Letter: Ugly Highway Billboards Damage State's Image, Beauty*, DESERET NEWS (May 9, 2012, 12:00 AM), http://www.deseretnews.com/article/765574661/Ugly-highway-billboards-damage-states-image-beauty.html ("Because of [the abundance of ugly billboards all over the state of Utah], some labeled us as a third-world-country state. . . . This is . . . a big, ugly mess that distracts from the beauty of the state . . . .").

can contribute to society in a way that billboards and other commercial signage cannot.[170]

## III.   A MODEL FOR REGULATING OUTDOOR MURALS

In light of the legal and policy-based reasons for eliminating the distinction between commercial and noncommercial speech in the context of outdoor mural regulation,[171] this Note proposes a model whereby all murals, regardless of their content, are regulated in the same manner. Under this model, municipalities would be able to regulate murals as they please in a content-neutral manner. Business owners interested in painting a mural on the exterior wall of their building would have sufficient notice of any time, place, and manner restrictions by which they must abide. If implemented correctly, this model would eliminate the number of disputes between mural owners and zoning administrators over whether a particular mural is artwork or signage.

The method of defining what exactly constitutes a "mural" is a process that would need to be undertaken by each individual municipality. For example, a mural could be defined as "[a] hand-produced work of visual art which is tiled or painted by hand directly upon, or affixed directly to an exterior wall of a building."[172] Notably absent from this definition is any mention of commercial or noncommercial speech. Once a definition is established, a municipality would then need to decide how it would like to regulate all outdoor

---

[170] Moreover, it would embrace the Supreme Court's oft-repeated view that "[e]ach method of communicating ideas is a law unto itself and that law must reflect the differing natures, values, abuses and dangers of each method." Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 501 (1981) (plurality opinion) (internal quotation marks omitted); *see also* Se. Promotions, Ltd. v. Conrad, 420 U.S. 546, 557 (1975) ("Each medium of expression, of course, must be assessed for First Amendment purposes by standards suited to it, for each may present its own problems.").

[171] *See infra* Part II.B.

[172] This is the definition currently being used by the city of Portland, Oregon. *See* PORTLAND, OR., CITY CODE & CHARTER tit. 4, ch. 4.12.020(J) (2013), *available at* http://www.portlandonline.com/auditor/index.cfm?c=50808&a=257808; *see also id.* at ch. 4.10.010 ("The purpose of this Title and the policy of the City of Portland is to permit and encourage original art murals on a content-neutral basis on certain terms and conditions. Original art murals comprise a unique medium of expression which serves the public interest. Original art murals have purposes distinct from signs and confer different benefits. Such purposes and benefits include: improved aesthetics; avenues for original artistic expression; public access to original works of art; community participation in the creation of original works of art; community building through the presence of and identification with original works of art; and a reduction in the incidence of graffiti and other crime. Murals can increase community identity and foster a sense of place and enclosure if they are located at heights and scales visible to pedestrians, are retained for longer periods of time and include a neighborhood process for discussion.").

CITY000699

murals within its jurisdiction. Again, this process should be individualized to reflect the unique identity of each municipality.

Some municipalities may choose to exempt all murals from all forms of regulation. More likely, municipalities will choose to impose at least some restrictions on outdoor art. Bearing in mind aesthetic and traffic safety goals, as well as general community demands, each municipality should strive to create content-neutral time, place, and manner restrictions that are equally applicable to all outdoor murals. For instance, a municipality could require that all murals be less than 200 square feet (manner restriction), contain less than three percent text (manner restriction), be located on a commercial building at least fifty feet from a main highway (place restriction), and remain intact for a minimum of two years (time restriction). These restrictions would apply to all murals—those containing noncommercial speech, commercial speech, or a hybrid of both.

One potential concern with implementing such a regulatory model is that muralists would be inhibited in their artistic pursuits, at least in those municipalities which impose more stringent time, place, and manner restrictions on outdoor signage. A muralist who is otherwise accustomed to painting 600-square-foot murals may feel frustrated that he is now limited to painting murals one-third the size. Although one may be sympathetic to a muralist's concern, it is an insufficient basis for maintaining the content-based distinction between commercial and noncommercial murals. If an artist desires to paint large-scale murals, he can do so in a municipality that welcomes such murals. Just like most other facets of government regulation, every municipality will differ in the value it places on art. Fortunately, many, if not most, municipalities appreciate the value of outdoor murals. This appreciation is reflected in sign ordinances which "exempt" murals and similar works of art from the more stringent requirements placed on other forms of signage.[173] Of course, many of these ordinances maintain the distinction between commercial and noncommercial murals that this Note argues should be eliminated.[174] However, at least two cities are on the cusp of eliminating this distinction.

Minneapolis and St. Paul, Minnesota's two largest cities, are considering revisions to their sign ordinances that would relax the definition of "mural" to allow for imagery of products sold within the building on which a mural resides. In Minneapolis, council member Gary Schiff has been vocal in his desire to subject all murals, regardless of their content, to the same regulations.[175] Minneapolis's current sign ordinance bans all murals that "advertise or promote any business,

---

[173] *See supra* note 2.
[174] *See id.*
[175] *See* Boros, *supra* note 12; Gilbert, *supra* note 154.

product, activity, service, interest or entertainment" (that is, murals that contain "commercial speech").[176] Calling the distinction between commercial and noncommercial speech as contained in murals "silly," Schiff has called for a more reasonable definition that better responds to community needs and wishes.[177] Similar considerations for change are being voiced in St. Paul, a city that has long encouraged the creation of murals and other forms of artwork to "enliven" the city and "improve visual interest."[178]

Another possible concern with implementing a model that regulates all outdoor murals in the same manner is that municipalities risk corporate entities transferring their advertising campaigns from billboards to murals, which would now be permitted to house even the most overt commercial speech.[179] This concern is strongest in those jurisdictions that ban billboards, such as Los Angeles.[180] This concern, however, can be eliminated by carefully constructing content-neutral time, place, and manner restrictions that would make traditional forms of corporate advertising impossible.

---

176 Gilbert, *supra* note 154 (internal quotation marks omitted).

177 *See id.* ("I think ever since Andy Warhol painted a Campbell's Soup can, there's been a blurring between American iconography and advertising, and we need a change . . . . If you can't even paint some grapes on the side of a wine store, then we've gone to the land of silly and this needs to be fixed." (internal quotation marks omitted)); Boros, *supra* note 12 ("You are not allowed to show any products that you sell in your mural, or your mural is deemed advertising . . . It's really gotten silly, and the enforcement and destruction of murals has got to stop." (internal quotation marks omitted)).

178 *See* CITY SAINT PAUL, CENTRAL CORRIDOR DEVELOPMENT STRATEGY 66 (2007), *available at* http://www.stpaul.gov/DocumentCenter/Home/View/4772 ("Blank walls create harsh pedestrian environments by limiting activity, removing a sense of connection between the building and the street and limiting 'eyes on the street.' Where the reconfiguration and reopening of blank walls is not possible, an opportunity exists to enliven the street and improve visual interest through the creation of a mural or other form of artwork."); *see also* Melo, *supra* note 9.

179 Various mural advertising companies are already in existence, so businesses would have no shortage of artists willing to paint their commercial murals. *See, e.g.,* ALT TERRAIN, http://www.altterrain.com/graffiti_advertising.htm (last visited Oct. 27, 2013) (noting that they work with street artists to "assist agencies in creating unique art-advertising outdoor painted billboard murals"); COLOSSAL, http://colossalmedia.com/about (last visited Oct. 27, 2013) (touting themselves as "the largest hand paint mural and outdoor advertising company in the world"); *see also* Kim Bhasin, *17 Awesome Graffiti Ads From Around the World*, BUS. INSIDER (Oct. 20, 2011, 10:54 AM), http://www.businessinsider.com/graffiti-mural-guerrilla-advertising-2011-10?op=1 (describing how brands are increasingly using graffiti and murals in urban areas to "amp up their marketing").

180 An earlier version of Los Angeles's sign ordinance exempted artwork from sign regulation. Specifically, it made all signs viewed mainly from a freeway illegal, with the exception of artwork. In an attempt to draw the line between art and advertising, murals with less than three percent text were allowed so long as they were first approved by the city. Patrick Media Group (PMG), one of Los Angeles's largest billboard companies at the time, painted a fifty-foot-tall mural in defiance of the sign ordinance. PMG insisted the mural was art. The city ultimately rejected PMG's argument, ordering it to remove the mural or face six months in jail or a $1,000 fine. *See* Kelly David, *Art or Advertising?: Controversy Over Oversize L.A. Murals Looms Large*, L.A. TIMES, Sept. 2, 1995, at D1.

CONCLUSION

Sign ordinances throughout the nation continue to jeopardize the artistic expression of property owners who commission murals to be painted on their buildings. The continued reliance of municipalities on the outdated and content-based distinction between commercial and noncommercial speech has led to arbitrary enforcement of sign ordinances. Moreover, the inconsistent approaches taken by courts in their judicial review of these sign ordinances has resulted in art murals being subjected to different treatment based solely on the legal jurisdiction in which they reside. Even more concerning, the free speech rights of mural owners are being exposed to this same disparate treatment.

This Note argued in favor of a regulatory model whereby outdoor murals are divorced from the commercial/noncommercial speech distinction. Eliminating this distinction in the context of mural regulation renders moot the issue of how to define commercial speech. Moreover, it significantly diminishes the splitting effect of the contrasting judicial approaches to content neutrality. Altogether, such a model strikes the best balance between maintaining government regulatory power, preserving judicial resources, and safeguarding individual free speech.

CITY000702

Case 6:24-cv-01027-TC    Document 107-2    Filed 02/07/25    Page 41 of 47
(Summary published in *The Salina Journal* on July __14__, 2017.)
(Published on the City of Salina's website for a minimum of one week from July __11__ to July __25__, 2017.)

Consolidated-Salina  EPN111155

## ORDINANCE NUMBER 17-10882

**AN ORDINANCE ADDING NEW SECTIONS 42-500 AND 42-511 TO THE SALINA CODE PERTAINING TO THE PURPOSE OF THE CITY OF SALINA'S SIGN REGULATIONS AND ALLOWING THE SUBSTITUTION OF NONCOMMERCIAL MESSAGES ON ANY PERMITTED SIGN; AND AMENDING SALINA CODE SECTIONS 42-506, 42-507, AND 42-508 PERTAINING TO THE REGULATION OF SIGNS WITHIN THE CITY OF SALINA, AND REPEALING THE EXISTING SECTIONS.**

**WHEREAS,** Article X, Chapter 42 of the Salina Code regulates the placement of signs within the City of Salina ("City");

**WHEREAS,** the Governing Body finds that the number, size, height, lighting, design, location, portability, changing frequency, and other physical characteristics of temporary signs within the City directly affect the public health, safety, and welfare;

**WHEREAS,** the City, pursuant to its police power, has the authority to take appropriate action to address concerns regarding traffic safety and aesthetics, as they relate to temporary signs;

**WHEREAS,** the Governing Body recognizes that signs constitute speech protected by the First Amendment to the United States Constitution and that its regulation of temporary signs must be consistent with those protections; and

**WHEREAS,** on June 18, 2015, the United States Supreme Court issued its decision in the case of *Reed v. Town of Gilbert*, which imposed new standards under the First Amendment to the United States Constitution with respect to determining the content-neutrality of municipal sign regulations;

**WHEREAS,** the *Reed v. Town of Gilbert* decision prompts the Governing Body to amend Article X, Chapter 42 of the Salina Code in order to ensure compliance with the First Amendment and to update and clarify sign regulation and enforcement generally within the City;

**WHEREAS,** the City has a substantial interest in regulating temporary signs in the manner set forth in this ordinance, and the regulations adopted and amended in this ordinance further the City's substantial interests in traffic safety and aesthetics, as well as those additional substantial interests set forth in the purpose statement adopted by this ordinance; and

**WHEREAS,** this ordinance adds a message substitution provision to the Salina Code, allowing any sign permitted under the provisions of Article X, Chapter 42 of the Salina Code to display, or be substituted with, any noncommercial message, so that the City's regulations satisfy the constitutional mandate that it not restrict noncommercial signage to a greater degree than commercial signage;

**WHEREAS,** the Governing Body finds that a proliferation of temporary signs in the public right-of-way detracts from the aesthetic quality of the streets and sidewalks, interferes with traffic safety and pedestrian access to public sidewalks and streets, and obstructs the entrance to businesses and residences; therefore warranting the prohibition of all forms of temporary signage within the public right-of-way;

## ANDREW AFFIDAVIT EX. 2

**WHEREAS,** the Governing Body finds and determines that following amendments to Article X, Chapter 42 of the Salina Code are necessary and desirable to protect the public health, safety, and welfare and to comply with and satisfy the protections afforded speech by the First Amendment to the United States Constitution, **SO NOW THEREFORE,**
BE IT ORDAINED by the Governing Body of the City of Salina, Kansas:

**Section 1.   New Section.**  The Salina Code is amended by adding a section to be numbered 42-500 which section reads as follows:

> **Sec. 42-500.    Purpose.**
> This Article promotes the public health, safety and welfare of the community through a comprehensive system of reasonable, effective, consistent, content-neutral and nondiscriminatory sign standards and requirements, narrowly drawn to:
>
> 1. Ensure that all signs installed in the city are compatible with the character and visual environment of the community and promote the goals, objectives and policies of the Comprehensive Plan;
>
> 2. Balance public and private objectives by allowing adequate avenues for both commercial and non-commercial messages;
>
> 3. Improve pedestrian and traffic safety by promoting the free flow of traffic and the protection of pedestrians and motorists from injury and property damage caused by, or which may be fully or partially attributable to, unsecured, cluttered, distracting, and/or illegible signage;
>
> 4. Protect the aesthetic appearance of the city's natural and built environment for its citizens and visitors;
>
> 5. Prevent property damage, personal injury, and litter caused by signs that are improperly constructed or poorly maintained;
>
> 6. Protect property values, the local economy, and quality of life by preserving and enhancing the appearance of the streetscape; and
>
> 7. Provide for the placement of temporary signs in limited circumstances, without regard to the communicative content of the sign.
>
> 8. Provide consistent design standards that enable the fair and consistent enforcement of these sign regulations.
>
> 9. Enhance the city's ability to maintain its public rights-of-way.

**Section 2.   Amendment.**  Section 42-506 of the Salina Code is amended to read as follows:

> **Sec. 42-506. Classification of signs--Functional types.**
> The following signs are classified by function:
>> (1) *Advertising sign.* A sign displaying a commercial message that directs attention to a business, commodity, service or entertainment conducted, sold, or offered at a location

Consolidated-Salina  EPN111155

other than the premises on which the sign is located, or to which it is affixed (off-premise sign).

(2) *Bulletin board sign.* A sign that indicates the name of an institution or organization on whose premises it is located and which contains the name of the institution or organization, the name or names of persons connected with it, and announcements of persons, events or activities appearing or occurring at the institution. Such signs may also present a greeting or similar message.

(3) *Business sign.* A sign displaying a commercial message that directs attention to a business or profession conducted, or to a commodity or service sold, offered or manufactured, or an entertainment offered, on the premises where the sign is located or to which it is affixed.

(4) *Identification sign.* A sign having the name and address of a building, business, development or establishment. Such signs may be wholly or partly devoted to a readily recognized symbol.

(5) *Menu board sign.* An on-site sign designed and used for the display of menu items and pictures and/or prices of menu items.

(6) *Nameplate sign.* A sign giving the name and/or address of the owner or occupant of a building or premises on which it is located, and where applicable, a professional status.

**Section 3.**  **Amendment.**  Section 42-507 of the Salina Code is amended to read as follows:

**Sec. 42-507. Same--Structural types.**

The following signs are classified as types:

(1) *Awning, canopy and marquee sign.* A sign that is mounted or painted on, or attached to, an awning, canopy or marquee that is otherwise permitted by this chapter. No such sign shall project more than twenty-four (24) inches above, below, or twelve (12) inches beyond the physical dimensions of the awning, canopy or marquee, and a minimum of eight (8) feet of clearance shall be provided above grade.

(2) *Banner sign.* A temporary sign composed of cloth, canvas, plastic, fabric, or similar light-weight, non-rigid material that is mounted to a wall, canopy, or solid fence with cord, rope, cable, or a similar method.

(3) *Changeable copy sign.* Any sign on which message copy can be changed through the use of attachable letters and numerals or by electronic switching of lamps, light emitting devices, or illuminated tubes. This includes public message displays or any sign which features automatic switching such as time and temperature signs.

(4) *Electronic changeable copy sign/Computer-operated electronic message signs.* A sign containing a computer or digital software generated message or other automated or remote method of changing copy.

(5) *Feather flag.* A temporary, freestanding, vertical sign, also referred to as a teardrop flag, swooper flag or wind flag, consisting of a loose polyknit or other semi-rigid membrane sign face that flutters in the wind from a pole or staff attached to, anchored or placed into the ground.

(6) *Flashing sign.* A sign which contains an intermittent or flashing, pulsating, blinking or traveling light source which includes signs that give the illusion of intermittent or flashing light by means of animation, or an externally mounted intermittent light source.

3

(7) *Ground sign.* Any sign placed upon or supported by, and permanently affixed to, the ground independently of the principal building or any accessory structure on the property.

(8) *Illuminated sign.* Any sign which is directly lighted by any electrical light source, internal or external, regardless of technology.

(9) *Inflatable sign.* Any sign made of flexible material enlarged, activated or inflated by inserted air or gas, which floats, is tethered in the air, or is located on the ground or on a building.

(10) *Mobile sign.* A sign that is not permanently affixed to the ground or a building and is designed or constructed to be easily moved from one (1) location to another, including signs mounted upon or designed to be mounted on a trailer, even if the sign has had its wheels removed.

(11) *Pole sign.* A sign that is mounted on a freestanding pole, the bottom edge of which sign is six (6) feet or more above ground level.

(12) *Projecting sign.* A sign that is wholly or partly dependent upon a building for support and which projects more than twelve (12) inches from such building.

(13) *Pylon sign.* A freestanding sign, other than a pole sign, permanently fixed to the ground by shafts, posts or other supports wrapped with an aesthetic veneer, but not having the appearance of a solid base.

(14) *Roof sign.* A sign erected, constructed and maintained wholly upon or projecting above any portion of the roof of a building or having the roof as the principal means of support. A mansard shall be considered part of the wall of the building.

(15) *Rotating sign.* Any sign or portion of a sign which moves in a revolving or similar manner.

(16) *Temporary sign.* A sign that is to be displayed for a short period of time and not designed or constructed for permanent display, including but not limited to yard signs, banners, flags, balloons, feather flags, and inflatable signs. Temporary signs shall not include mobile signs.

(17) *Wall sign.* A sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

(18) *Yard sign.* A temporary, freestanding sign made of lightweight or nondurable materials such as paper, cardboard, canvas, fabric, wood, metal, or vinyl that is supported by a frame, pole, or other support structure placed directly in the ground without foundation or other anchor. Yard signs shall not include banner signs.

**Section 4.** **Amendment.** Section 42-508 of the Salina Code is amended to read as follows:

**Sec. 42-508.   Temporary signs, banner signs, and mobile signs.**

(a) The following temporary signs shall be exempt from the zoning certificate (sign permit) requirements of section 42-502, and shall be allowed to display any commercial or noncommercial message on a property with the owner's consent in addition to any other signs allowed under this article and the applicable district regulations:

(1) Two (2) yard signs may be placed and displayed on an individual residential lot in any RS, R, R-1, R-2, R-2.5, R-3 or MH residential zoning district.

(2) Two (2) freestanding temporary signs of any type except feather flags, inflatable signs or banners may be placed and displayed on property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district and on property occupied by multi-family apartments, assisted living facilities and nursing homes.

4

(3) In addition to the temporary signs allowed under subsections (a)(1) and (a)(2), four (4) additional yard signs may be placed and displayed on a property in any zoning district for a period up to forty-five (45) days prior to an election involving candidates for a federal, state or local election that represent the district in which the property is located or involving an issue on the ballot of an election within the district where the property is located. These additional temporary yard signs must be removed within seven (7) days following the election.

(b) On property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district, or on property occupied by multi-family apartments, assisted living facilities and nursing homes, temporary signs allowed under subsection (a) shall not exceed six (6) feet in height or thirty-two (32) square feet of sign area.

(c) On property located in any RS, R, R-1, R-2, R-2.5, R-3 or MH residential zoning district, other than property occupied by multi-family apartments, assisted living facilities and nursing homes, temporary signs allowed under subsection (a) shall not exceed six (6) feet in height or eight (8) square feet of sign area.

(d) In addition to the temporary signs allowed under subsection (a):

(1) Feather flags may be placed and displayed on property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district and on property occupied by multi-family apartments, assisted living facilities or nursing homes. Two (2) feather flags for every fifty (50) feet of street frontage, not exceeding a total of six (6) flags per street frontage, may be displayed on a property for a period not exceeding thirty (30) consecutive days for up to six (6) events in a calendar year. Feather flags shall not exceed thirteen (13) feet in height, shall be set back from any adjoining street a distance equal to its height, shall be securely anchored to the ground, and must be removed by the owner if the flag becomes tattered, torn or damaged.

(2) One (1) inflatable sign may be placed and displayed on property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district and on property occupied by multi-family apartments, assisted living facilities or nursing homes. An inflatable sign may be displayed for a period not exceeding fourteen (14) consecutive days for up to four (4) events in a calendar year. An inflatable sign shall not exceed twenty (20) feet in height, shall be securely anchored to the ground, shall be set back from any adjoining street a distance equal to its height, and must be removed by the owner if the inflatable device becomes tattered, torn or damaged.

(e) Banners placed over an existing sign face, placed at least eight (8) feet above ground level on existing poles or other supports which serve another primary purpose or placed on an existing building, canopy, solid fence, or other structure located behind the front yard setback line shall be exempt from the zoning certificate (sign permit) requirements of section 42-502, but shall comply with all of the requirements of this article and the applicable district regulations.

(f) Mobile signs may be permitted upon issuance of a zoning certificate (sign permit) and when in compliance with all of the other requirements of this article, the applicable district regulations, and the following provisions:

(1) Only one (1) mobile sign shall be allowed on a zoning lot.

(2) Mobile signs shall not exceed thirty-two (32) square feet in area.

(3) Mobile signs shall not be placed within twenty-five (25) feet of an existing pole sign or ground sign, within fifty (50) feet of another mobile sign or within the clear vision triangle of any street or driveway.

(4) Mobile signs shall not be placed on the premises of an establishment which has an existing pole sign or ground sign located in the front yard.

5

(5) Mobile sign permits shall be valid for not more than thirty (30) days. Each establishment may be issued not more than four (4) permits during a calendar year for a combined total of sixty (60) days.

(6) Mobile signs shall be of rigid construction and anchored or weighted to prevent movement or overturning by wind.

(7) Electrical lines shall not lie on the ground where vehicular or pedestrian traffic is permitted. Use of aboveground extension cords is prohibited. All wiring shall comply with the electrical code of the city.

(8) Use of red, yellow, or green external lighting shall be prohibited. Any light shall be constant in intensity or color at all times.

(g) No sign authorized under this section 42-508 shall be placed or displayed within the public right-of-way.

**Section 5.  New Section.**  The Salina Code is amended by adding a section to be numbered 42-511 which section reads as follows:

**Section 42-511. Sign substitution.**
The owner of any sign which is otherwise allowed by this article may substitute noncommercial copy in lieu of any other commercial or noncommercial copy.  This substitution of copy may be made without any additional approval or permitting.  The purpose of this provision is to prevent any inadvertent favoring of any particular commercial or noncommercial message over any other noncommercial message.  This provision prevails over any more specific provision to the contrary.

**Section 6.  Repealer.**  Existing Salina Code Sections 42-506, 42-507, and 42-508 are repealed.

**Section 7.  Effective.**  This ordinance shall be in full force and effect from and after its adoption and publication once in the official city newspaper by the following summary:

Ordinance No. 17-10882 Summary

On July 10, 2017, the City Commission passed Ordinance No. 17-10882.  The Ordinance adds new Sections 42-500 and 42-511 to the Salina Code pertaining to the purpose of the sign regulations and allowing the substitution of noncommercial copy on any permitted sign and amends Salina Code Sections 42-506, 42-507, and 42-508 pertaining to the regulation of signs and repeals the existing sections.  A complete copy of the Ordinance can be found at www.salina-ks.gov or in the office of the City Clerk, 300 W. Ash, free of charge.  This summary is certified by the City's legal counsel.

Introduced:    June 26, 2017
Passed:        July 10, 2017

Kaye J. Crawford, Mayor

[SEAL]
ATTEST:

6

Consolidated-Salina  EPNI11155

Jason A. Gage, City Manager

Certification of Publication Summary:

Greg A. Bengtson, Legal Counsel