.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.
.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.
.

DEPOSITION OF
DUSTIN HERRS,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 1:00 p.m. on the 12th day of September, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.
.

**EXHIBIT 4**

Board of Zoning Appeals for a variance to have exceptional signage.

BY MR. SHAW:

**Q. Okay. All right. Let's kind of do the same thing with a Certificate of Compatibility application. That gets submitted. What happens next for the city?**

A. Yeah. So the Downtown Design Review Board is a board of appointed members, and so there's public hearings involved. We would do a public notification to the surrounding property owners of the nature of the Certificate of Compatibility request. We do a staff report that would then be sent to the members, and we would present that staff report at a DRB meeting and they would review the proposed signage for a Certificate of Compatibility based on the downtown design guidelines.

**Q. It's my understanding the Certificate of Compatibility is not just for signage. Is that correct?**

A. Correct.

**Q. Is it for kind of any external change to property?**

A. Yes.

**exceeded the size allotment?**
A. That is correct.
**Q. Okay. What criteria were used to determine that it was a sign?**
A. There were hamburgers. There was graphic imagery and symbols of hamburgers. There was text telling people not to fear the smell, and there was an arrow with some text inviting people to come inside. So there was clear advertising of their business operations.
**Q. Okay. So the planning team determined that the content of the mural was an advertisement?**
A. Correct.
MS. JOKERST: Object to form.
BY MR. SHAW:
**Q. And because it was an advertisement, that's what classified it as a sign?**
A. Correct.
**Q. Okay. Did anyone ever go to the Cozy Inn and measure the size of the mural?**
A. No. What I did to determine a rough estimate is we have some digital software of imagery that is to scale. And so I can -- from that software, I can measure the height and width

of the building, or in this case the east/west dimension and the height of the building, and do a rough calculation on the size of the exterior wall that was being painted on.

**Q. What is the name of that software?**

A. Pictometry.

**Q. Pictometry?**

A. Um-hum.

**Q. And does that include coverage of the entire City of Salina?**

MS. JOKERST: Object to form.

A. I believe so.

BY MR. SHAW:

**Q. Okay. Is that generally how measurements are made when needed for planning staff?**

MS. JOKERST: Object to form and foundation.

A. Repeat that question.

BY MR. SHAW:

**Q. Is that typically how measurements are taken by planning staff when they're needed for processing a permit application?**

A. I wouldn't say typ --

MS. JOKERST: Object to form.

A. I wouldn't say typically. Because,

typically, we would have drawings and other submittal documents that would have some of the information we'd be looking for. In this case, it was a quick way to get a fairly accurate estimate, not -- it's not survey quality by any means. Just to see what kind of square footage is possibly being proposed.

BY MR. SHAW:

**Q. Okay. In the binder in front of you are some exhibits. If you could open it up to Exhibit 3, please, and you'll see there are little like stamps on them saying Exhibit 1, 2, 3.**

A. Okay. What was the exhibit again, please?

**Q. 3.**

A. Is that like a third of the way through or like --

**Q. It's -- the first two are very big and then --**

THE REPORTER: They stapled together each exhibit. What's stapled is all one.

THE WITNESS: Oh, thank you. That's helpful. Okay.

BY MR. SHAW:

**Q. Do you recognize this document?**

**the Pictometry to measure that?**
A. Correct.
**Q. All right. At the time you sent this, had it been determined that the sign -- well, had it been determined at this point that the mural was a sign?**
MS. JOKERST: Object to form.
A. Yes.
BY MR. SHAW:
**Q. And had it been determined at this point that the mural exceeded the size requirements of the zoning code?**
A. The size --
MS. JOKERST: Object to form.
A. The size limitations of the zoning --
BY MR. SHAW:
**Q. Yes.**
A. Yes.
**Q. And that was a -- I believe you said before that was a collective decision of the planning team. Is that correct?**
MS. JOKERST: Object to form.
A. There seemed to be a consensus. It wasn't really debated.
BY MR. SHAW:

MS. JOKERST: Object to form.

THE REPORTER: Thank you.

THE WITNESS: Do I need to slow down? I'm sorry.

THE REPORTER: Yeah.

THE WITNESS: Okay.

THE REPORTER: She needs to get that in before you answer. And then you said correct?

THE WITNESS: Yes.

THE REPORTER: Thank you.

THE WITNESS: Sorry, Amanda.

THE REPORTER: If you just pause a second --

THE WITNESS: Gotcha. Sure.

THE REPORTER: -- and make sure she's not going to object.

BY MR. SHAW:

**Q. All right. Can you please move to Exhibit 4, please. Do you recognize this exhibit?**

A. Yes.

**Q. And what is this exhibit?**

A. This was an exhibit of some calculations that were run to see if there was a way in which we could potentially permit Mr. Howard's paint sign under the current sign code or under

potentially a modified sign code if a text amendment were created. Specifically, if text amendment were added that not only counted the exterior wall of the building that faced the street but also the wall that faced the parking lot. If a text amendment were made to allow that frontage facing the parking lot which is where the painted mural sign is, if that were to be part of the equation, would it be sufficiently large enough to allow the sign that Mr. Howard was painting.

**Q. As the code is currently written, would it allow using that side lot line in the calculation of frontage?**

A. No.

**Q. Okay. So it's only the, for lack of a better term, the frontage on the front of the building?**

A. Correct.

**Q. Okay.**

A. So this would require a text amendment, but we were trying to look at potential options for Mr. Howard.

**Q. All right. So if I am reading the equation down there correctly, is that saying that**

**if the text amendment were made, there would be 194.4 square feet allowed as opposed to the current 62.4?**

A. Correct.

**Q. Okay. And did Miss Driscoll request you or Mr. Andrew to run that calculation?**

A. I don't remember.

**Q. Okay. So please turn to Exhibit 5. Do you recognize this exhibit?**

A. Yes.

**Q. It is four pages long.**

A. Oh, thank you. That's good.

**Q. Three pages. I'm sorry.**

A. Okay.

**Q. Do you recognize this?**

A. Yes.

**Q. Okay. What is it?**

A. The document is an e-mail from myself to Miss Driscoll that has a Cozy Inn sign analysis attached to it.

**Q. Okay. And what was the purpose of the sign analysis that is attached?**

A. To show and document the existing signage and conditions that the Cozy Inn has in terms of their signage as well as the allowable sign area

form and foundation.
THE REPORTER: Thank you.
BY MR. SHAW:
**Q. So you do not believe it is possible that those are flying saucer hamburgers as Mr. Howard described them?**
MS. JOKERST: Object to form and foundation.
A. I see hamburgers with like bubbles on them.
BY MR. SHAW:
**Q. And if you use imagination, can you see how that might be a hamburger flying saucer?**
A. I see --
MS. JOKERST: Object to form and foundation.
A. I see hamburgers.
BY MR. SHAW:
**Q. Okay. So is there any artist who could ever paint a hamburger flying saucer that would make you see something other than hamburgers?**
MS. JOKERST: Object to form and foundation.
A. I don't know.
BY MR. SHAW:

**Q. Okay. If these are, in fact, hamburger flying saucers, does that change your analysis any?**

MS. JOKERST: Object to form and foundation.

A. No.

BY MR. SHAW:

**Q. You initially included the description of them as flying saucer hamburgers, correct?**

A. I was reiterating what Mr. Howard indicated they were purporting to be.

**Q. Okay. And based on pictures you had seen of the incomplete mural, had you determined that that was an incorrect description?**

MS. JOKERST: Object to form and foundation.

A. When you say that, what are we referring to?

BY MR. SHAW:

**Q. The flying saucer hamburgers, that that was an incorrect description?**

A. Correct.

**Q. But you had not seen at that point the rendition of the -- what they would like the final artwork to look like?**

A. Don't Fear the Smell, The Fun is inside, it's a hamburger joint with hamburgers on it.
BY MR. SHAW:
**Q. Okay. Do you know what that yellow splash of paint we were just discussion is?**
A. A yellow splash of paint.
**Q. What is it supposed to represent in this mural?**
MS. JOKERST: Object to form.
A. With it being a hamburger joint, my presumption is that yellow is mustard and the red colored, gooey rendering is ketchup.
BY MR. SHAW:
**Q. Okay. Is it possible that those are blasts from the flying saucer hamburgers that are attacking the Cozy?**
MS. JOKERST: Object to form and foundation.
A. When you say blasts, what.
BY MR. SHAW:
**Q. Of lasers or plasma bolts. I don't know.**
MS. JOKERST: Object to form and foundation.
A. I don't know how to interpret that.
BY MR. SHAW:

A. Yes.
BY MR. SHAW:
**Q. On the page 319 there, does the article attribute quotes to you?**
A. Yes.
**Q. All right. Does the article attribute a quote to you saying that the purpose of the sign code is to aim to prevent sign wars between businesses?**
MS. JOKERST: Object to form.
A. Yes.
BY MR. SHAW:
**Q. Is that an accurate quote from you?**
MS. JOKERST: Object to form.
A. It's not the only -- the only characteristic or purpose of sign regulations.
BY MR. SHAW:
**Q. Okay.**
A. But it is --
**Q. It's --**
A. -- one factor.
**Q. I'm sorry for talking over you. Did you say it's a factor?**
A. Yes.
**Q. Okay. What is a sign war?**

MS. JOKERST: Object to form.

A. A sign war could be a scenario where you have a number of businesses along a corridor. And in order to become more prominent, they erect signs that are larger than the signs around them and so then -- or larger than the businesses around them. And the businesses around them in turn erect signs that are taller or larger than the original sign. And then more people have larger, bigger signs and additional signage, and it goes on to the point where the signage loses its effectiveness. You lose the trees for the forest, becomes confusing, becomes cluttered and there's so much signage that none of it is really effective any longer.

BY MR. SHAW:

**Q. I see. And is that a term used in the city code?**

MS. JOKERST: Object to form.

BY MR. SHAW:

**Q. Is sign wars a term used in the city code?**

A. No. It was a term I use in an allegory form.

**Q. Okay. So you did use the term sign wars**

**when speaking to the reporter for this article, correct?**

A. Correct.

**Q. That is a correct quotation?**

A. Correct.

**Q. And you said you were using it as -- did you say it was an allegory or...**

A. In the example of the scenario I gave you, a description of the scenario I gave you.

**Q. All right. And so one of the aims of the sign code is to prevent these sign wars?**

MS. JOKERST: Object to form.

A. One of the aims is to protect both the aesthetic feel and quality of life of the community through it's aesthetics as well as making sure that you don't create any safety hazards which a lot of sign clutter and large amounts of signage could potentially result in.

BY MR. SHAW:

**Q. Do you think a mural can potentially result in safety hazards?**

MS. JOKERST: Object to form and foundation.

A. Which kind of mural?

BY MR. SHAW:

**Q. Okay. All right. There's another quote attributed to you in that next paragraph. Can you please review that?**
A. Yes.
**Q. Is that an accurate quotation?**
A. Yes.
**Q. And the sign wars quotation is also accurate?**
A. Yes.
**Q. Okay. Can you go to Exhibit 14, please. Are you familiar with what this document is?**
A. This looks like a sign permit in LAMA.
**Q. When it says at the top the date of 2/5/2024, do you know is that the date that LAMA says the permit was submitted or is that the just the date this was generated?**
MS. JOKERST: Object to form.
A. I have no idea.
BY MR. SHAW:
**Q. Okay. So when you look at this, does it have any field in there somewhere saying like assigned to, you know, Dustin Herrs, for instance?**
A. When I receive a sign permit for review in our LAMA database, it looks nothing like this from my seat. The window I see is nothing like

**Q. Do you know if a Certificate of Compatibility was ever applied for this mural?**
MS. JOKERST: Object to form.
A. No.
BY MR. SHAW:
**Q. Do you know if a violation was ever -- or a citation was ever given to The Yard over this mural?**
MS. JOKERST: Object to form.
A. This sign is not in violation, because it is a sign oriented toward the inside of building B.
BY MR. SHAW:
**Q. Does the sign code use orientation at all in the regulation of signs?**
MS. JOKERST: Object to form.
A. That specific word?
BY MR. SHAW:
**Q. Yes.**
A. I don't know.
**Q. Does it use that concept?**
A. Yes.
**Q. Do you know where?**
A. Possibly. I'd have to have the code to review it.

**Q. All right. Exhibit 1, so right at the front of your book.**

A. Okay. So under this sign definition, one of the characteristics of a sign would be not located inside a building.

**Q. Okay.**

A. So we exempted this from the sign code because of that.

**Q. All right. But that doesn't speak to the orientation of a sign, does it?**

MS. JOKERST: Object to form.

BY MR. SHAW:

**Q. And I may actually just clarify, first. Are you looking at Section 42-764 (3)?**

A. I am.

**Q. Okay. And does that refer to the orientation of the sign?**

A. It refers to its location.

**Q. But the location is whether it's inside of a building?**

A. Um-hum. And in this case, it was interpreted that building B was sandwiched between buildings A and C.

**Q. So is it the staff's opinion that buildings A, B and C are all one building?**

A. No, they are adjacent buildings.
**Q. So they're adjacent buildings. Which building is the mural in Exhibit 32 located inside of?**
A. The north wall of building B.
**Q. I see. So the north wall of building B is this brick wall several feet away from building B?**
A. They are --
MS. JOKERST: Object to form.
A. They are adjacent and connected.
BY MR. SHAW:
**Q. Do you know if the structure of building B actually touches building A?**
A. There are elements of B that touch building A, yes.
**Q. Is that element just netting?**
MS. JOKERST: Object to form.
A. I don't know.
BY MR. SHAW:
**Q. Can you turn to Exhibit 25 and specifically page 183 of Exhibit 25?**
MS. JOKERST: Did you say 183?
MR. SHAW: Yes, 183.
MS. JOKERST: Thank you.

BY MR. SHAW:
**Q. Are you there?**
A. I have it, yes.
**Q. Is this rendering depicting a gap between buildings A and B?**
MS. JOKERST: Object to form and foundation.
A. Building B appears to be adjacent to building A.
BY MR. SHAW:
**Q. When you say adjacent, what does that mean?**
A. Directly next to.
**Q. Okay. Does it mean touching?**
A. Like overlapping. They do touch.
**Q. Do the physical buildings touch?**
MS. JOKERST: Object to form.
BY MR. SHAW:
**Q. Or I'll ask it this way. Do you see building B, does it depict where the pillars are?**
A. Yes.
**Q. Are any of those pillars touching building A?**
A. No. The vestibule appears to protrude into building B.

**Q. But when you say into building B, there's no wall there. Is that correct?**

A. There's a wall.

**Q. Of building B.**

A. The north wall of building B and the south wall of building A are the same wall.

**Q. Okay. But what I'm saying is building B is a roof structure supported by pillars, correct?**

A. Correct.

MS. JOKERST: Object to form.

BY MR. SHAW:

**Q. It has no walls. Is that correct?**

MS. JOKERST: Object to form.

A. Building B shares a wall with building

A. It isn't supported --

BY MR. SHAW:

**Q. Why --**

A. By the same wall.

**Q. Why does staff described these as two different buildings then?**

MS. JOKERST: Object to form and foundation.

A. It's an independent structure.

BY MR. SHAW:

**Q. I agree it is an independent structure.**

**How is it inside a building then?**
MS. JOKERST: Object to form and foundation.
A. The south wall of building A has a sign that faces into building B.
BY MR. SHAW:
**Q. Well, I understand it faces towards building B.**
A. Yes.
**Q. But are they different buildings?**
MS. JOKERST: Object to form.
A. They are different buildings that share a common wall.
BY MR. SHAW:
**Q. Even though that wall is several feet away from building B, is open to the air, is open to rain, it is still the same wall?**
MS. JOKERST: Object to form and foundation and asked and answered. I think we need to move on. He's already answered all these questions multiple times.
MR. SHAW: I'm not seeing how this is inside of a building, and I'm not just not understanding it.
MS. JOKERST: Okay. My objection

**Q. What's there today, yeah. Are those little bubbles on the hamburgers outlined on that sign as it sits there today?**

A. No.

**Q. You attended the meeting with Mr. Howard at Smoky Hill Museum, right?**

A. Yes.

**Q. After that meeting, was it your understanding that Mr. Howard wanted to pursue a potential code amendment to see if that would alleviate any of his issues with getting a sign permit?**

A. That was my understanding.

**Q. And was the city willing to try to work with Mr. Howard in that regard?**

A. We had contacted a sign regulations specialist to engage in conversations with the community about potential text amendments to our sign code.

**Q. And can you flip back to Exhibit 12 page 3, I'm sorry. Hopefully you're still there.**

A. Yeah, I'm still there.

**Q. Okay. I want you to look at the large like burger in between the Don't Fear the Smell and The Fun is inside with the arrow. Do you see**

A. Okay. So as I recall, this property is zoned I-2 which doesn't --

THE REPORTER: I-2?

THE WITNESS: I-2.

THE REPORTER: Thank you.

A. Which is our light industrial zoning district and has different sign allowances and requirements and regulations than Mr. Howard's, for example. And one of the differences is there's not a limitation that I recall on the number of signs you can have. And so what was done is a rectangular box around the various elements and those were all added together into an aggregate.

BY MR. SHAW:

**Q. So you didn't do the entire mural, just the elements of the mural individually?**

A. Correct.

MS. JOKERST: Object to form and foundation.

BY MR. SHAW:

**Q. Did you perform a similar analysis at the Cozy' mural where you took the different elements and calculated them individually?**

MS. JOKERST: Object to form and

MR. SHAW: Okay. All right. I have no further questions for you.
MS. JOKERST: I have a couple follow-ups.
CROSS-EXAMINATION
BY MS. JOKERST:
**Q. Mr. Herrs, did you provide the Cozy Inn sign analysis to Mr. Howard?**
A. Yes, when we met at the Smoky Hill Museum. I believe I did if I remember correctly.
**Q. Did Mr. Howard ever propose an alternative measurement for his sign?**
A. I don't believe so.
**Q. And I want to turn your attention to Exhibit 3 if you can pull that up. Just let me know when you're there.**
A. I am there.
**Q. Okay. If you look about halfway down where it says I informed Steve that as it is currently written, do you see that?**
A. Yes.
**Q. Okay. And do you see the date there is November 6 of 2023?**
A. Yes.
**Q. So on November 6, 2023, did you tell Mr. Howard that the sign on the side of the Cozy would**

**not qualify for a sign permit as it was proposed?**

A. Yes.

**Q. If you can skip back to Exhibit 12 and that last photo, the rendering?**

A. Yes, I'm there.

**Q. Okay. As you sit here today and you look at this rendering, does that change your determination that this is a sign?**

A. No.

**Q. And earlier you talked about there were maybe some -- like I think you used the term bubbles in this rendering, like there was a little bubble on some of the hamburger depictions. Do you recall saying that?**

A. Yes.

**Q. Let me see. Actually, do we have a photo? Let me try to find an exhibit with a photo of this for you really quickly so I can refer you there. I thought I saw one in here. Well, do you recall what the outline on the Cozy looks like that you saw?**

A. Yes.

**Q. Okay.**

A. Are you talking about the existing -- what's there today?

**that?**

A. I do.

**Q. Do you see any other traditional burger condiments depicted in that area of the sign?**

A. Pickles, onions, ketchup, mustard.

**Q. And what about the sign as a whole? I guess look towards the right, just scan the whole thing. Do you see condiments throughout the sign?**

A. Yeah. I see ketchup and mustard and other pickles floating around.

**Q. And those little like white things, that big burger in the middle, you can kind of -- or, I'm sorry, towards the left in the middle, Don't Fear the Smell and The Fun is inside, and then you can kind of see it like on the one to the top right, those little white -- I don't know how to describe them, little white --**

A. Looks like team.

**Q. -- morsels?**

THE REPORTER: What did you say, Amanda?

MS. JOKERST: Morsels.

THE REPORTER: Thank you.

BY MR. SHAW:

**Q. Do you know what those are?**

A. No.

**Q. Okay. Don't Fear the Smell, do you know what smell the Cozy is infamous for?**
A. Primarily the onion odor.
**Q. Okay. Could those be -- I guess when you look at that, do you think that those could be onions?**
A. I mean I think the little white flakes, if you want to call them that, around the burger with the -- next to the pickles are probably onions.
**Q. And take a look again at that big burger in the middle in between Don't Fear the Smell and The Fun is inside, can you describe to me I guess what the condiments look like in that patty specifically?**
A. The yellow looks like mustard. The red looks like ketchup with pickles and onions in a patty there.
**Q. Does it look like the ketchup is like running off of the burger, so to speak?**
A. Yeah.
**Q. The if you could turn to Exhibit 8, the sign analysis, and specifically go to that last page, page 4, where it talks about existing conditions.**

A. Okay. I'm there.
**Q. Okay. Under that it says current allowable sign area, 63 square feet. Do you see that?**
A. I do.
**Q. Is that the allowable sign area in total for the Cozy?**
A. That is correct.
**Q. Okay. And then down on the proposed hamburger sign analysis, do you see there where it says the Cozy Inn is approximately -- or, I'm sorry, the proposed hamburger sign on the north wall of the Cozy Inn is approximately 528 square feet?**
A. Yes.
**Q. And is that the measurement that you took to determine how large that painted wall sign is?**
A. Yes.
**Q. And if you look at the current signage, it says total sign area, 52.88 square feet. Do you see that?**
A. I do.
**Q. Okay. Is that the total signage that the Cozy currently had not including this wall sign?**
A. That is correct.

same sign allowances as other people in downtown central business zoning district, which is our C-4 zoning district. People in the C-5 zoning district are allowed the same sign allowances as other people in the C-5 district. People in residential zoning districts are allowed to have the same sign allowances as other people in residential zoning districts of that same district.

**Q. And I want to speak specifically to sign clutter. How does regulating signs in the aggregate advance -- prevent sign clutter?**

MR. SHAW: Objection.

A. If signs are not regulated in the aggregate, you could have one sign that's larger than others. Then other people get larger signs. And if you get a whole bunch of signage, an excessive amount of signage both in terms of number of signs and size of signs, it can lose its effect and become distracting and potentially cause safety problems. It could also damage the aesthetic of the community, the quality of life of the community. And so the goal of the sign regulations is to permit and allow ample amount of signage for each property while still establishing

a balance that makes that signage effective and attractive without becoming a safety concern.

BY MS. JOKERST:

**Q. And I want to direct your attention to Exhibit 31, and specifically page 2, item 8?**

A. Okay. I'm on page -- or Exhibit 31.

**Q. Yep, Exhibit 31, page 2, item 8. It's on the top of that page.**

A. Okay. Sure.

**Q. The wall sign helps make the JRI Hospitality Field at The Yard more recognizable from 4th Street. Do you see that?**

A. Yes.

**Q. Okay. So earlier Mr. Shaw was asking you questions about this and the application, and you said you thought that the application was related to a JRI sign that was in on the vestibule portion inside of The Yard. Do you recall that?**

A. I do.

**Q. Okay. Now, I want you to read No. 8.**

A. Um-hum.

**Q. Okay. So you're going to read that, the wall sign helps make the JRI Hospitality Field at The Yard more recognizable from 4th Street. Now, I want you to turn to Exhibit 32 and go to that**

**Q. Okay. And I want you to look at the top of this photo that's Bates marked 91 on Exhibit 32. Can you describe the structure that's at the top of that photo?**
A. When you say the top, are you talking about the roof structure of the field.
**Q. Yes. Yep. So is that a roof?**
A. Yes.
**Q. So is this infield area covered?**
A. Yes.
**Q. Is this infield area enclosed?**
A. It's covered. It's not enclosed because there's not walls all the way around it.
**Q. Okay. Well, let me ask you -- let's look at -- I want you to look at the top page, that 95. Do you see that page, that photo?**
A. Yes.
**Q. Is there a pubic entrance from the street? Can you just walk off the street into that infield building?**
A. In that sense, no.
**Q. Okay. So is there a structure that is enclosing the infield?**
A. Yes.
**Q. Okay. What is that structure?**

A. There's fencing and netting and a rooftop that encloses the structure, surrounds the structure.

**Q. And looking at the structure on 95, is that permanently affixed to the ground there?**

A. Yes.

**Q. Okay. And is this enclosure here on 95, is that intended to enclose people who are in that infield area?**

A. Yes, people and balls, baseballs, softballs.

**Q. All right. And let's go back down to that last page, I think it's 301, the last page, page 5 on Exhibit 32. And earlier you mentioned if you kind of look down like if you're looking straight down, it looks like there's a wall right there. Do you see that?**

A. I do.

**Q. Okay. And is that the vestibule?**

A. Vestibule, yes.

**Q. Vestibule. I hate that word.**

A. That's how you -- that's how you transition from building A to building B.

**Q. Got it. Okay. So is that touching building B?**

A. Yes.
**Q. Is that connected to building B?**
A. Yes.
**Q. And I want you to look at the grass, the turf there?**
A. Um-hum.
**Q. Do you see that turf on the infield?**
A. I do.
**Q. Okay. Is that touching that brick wall?**
A. Yes.
**Q. Okay. And I want you to look at this fence in the foreground. Do you see that fencing?**
A. I do.
**Q. Okay. Is this the fence that encloses the infield building?**
A. Yes.
**Q. Okay. Is that fence connected to the brick building?**
A. It is.
MS. JOKERST: All right. I don't have -- I don't have any other questions.
MR. SHAW: I have a few follow-up.
REDIRECT-EXAMINATION
BY MR. SHAW:
**Q. Do you know if there is, in fact, a sign**