.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.
.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.
.

DEPOSITION OF
CORPORATE REPRESENTATIVE
DUSTIN HERRS,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 9:27 a.m. on the 30th day of October, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

**EXHIBIT 15**

avenues for both commercial and non-commercial messages. So the City of Salina has what we would call a content neutral sign code where we have a substitution clause where if you have a commercial sign or a non-commercial sign, commercial message or non-commercial message, it doesn't matter. Like you can literally just swap them out because we don't -- we don't really concern ourselves with the content of those signs.

Now, the objectives and the balance, when we're talking about balance the public and the private objectives, some of the public objectives are making sure that we don't have signs that create a lot of clutter that might be distracting or a lot of clutter where it's difficult to discern messages of the signage because there's so much of it or clutter in the way that it blocks or impairs visibility for motorists or pedestrians along the street front. We also want to make sure that we don't have distractive signs, signs that are flashing or blinking or maybe are so large that they draw our attention longer than they should or they're illegible, you can't read them and so it draws our attention longer than it should and, therefore, creating potential traffic

hazards or safety hazards. We want to make sure that the public interest of having signs that are fully secured where they're not falling off of walls or falling off of poles and damaging persons or vehicles or property that that's really important. So there's certainly some public objectives that we want to protect, but we also want to balance that with the ability for property owners to share a message, to share either their ideas or their thoughts or their commercial business endeavors for signage. So having signage that is adequate and abundant in a way that they can reasonably share their messages while not becoming a hindrance to the public safety of the community. Because we're very concerned about the public health, safety and welfare of the community. And that's the reason behind a lot of these purposes that we have listed here 1 through 8.

**Q. Okay. Why does this section here or this subsection differentiate between commercial and non-commercial messages?**

A. Well, it doesn't. It notes that there are potential commercial and non-commercial messages. But in our view, in our mind in this

question on that one.
A. So the statement of this particular provision is unsecured clutter distracting and/or illegal -- or illegible signage. And so clutter typically is not a single sign. Clutter is having multiple signs and having many of them to the point where it becomes distracting or blocks vision.
BY MR. SHAW:
**Q. Is the city aware of any facts that cluttered signs are a danger to motorist s, pedestrians or property?**
A. I'm aware that traffic safety is a concern when it comes to regulating signage and that clutter can play into that because signs are specifically by their nature and what they are designed to pull your eye or attract your eye. They wouldn't function if they didn't. And by having -- the more signs you have, the more your eye is pulled away from either driving or walking and potentially creating a safety hazard.
**Q. Is the city aware of any traffic accidents that have been caused in the City of Salina by cluttered signage?**
MS. JOKERST: Object to scope.

A. I don't know.

BY MR. SHAW:

**Q. How does the city determine the number of signs that constitute clutter?**

A. So each zoning district has a requirement on number of signs, how big the signs can be and where they can be located. And those requirements are designed to limit clutter so we don't have accidents.

**Q. Is the city aware of any published studies on traffic safety that support the numbers that are in the code of what constitutes clutter?**

MS. JOKERST: Object to scope.

A. I don't know. Sorry. I was prepared to answer the questions that were in the topics.

BY MR. SHAW:

**Q. Okay. I'm just trying to understand what the city's purpose as laid out in the code is.**

**Does the -- how does the city determine what constitutes a distracting sign?**

A. So what we do is we apply the code from each zoning district. So each zoning district has a number of signs that are allowed, the size of signs that are allowed, the location of any freestanding signs, what limitation there might be

on location as well as height. And those district regulations are designed to reduce any kind of distraction that there might be. There's also prohibitions on flashing signs or blinking signs or strobing, things of that nature, that might be distracting. So the code itself is designed to reduce distraction as much as possible.

**Q. Does the city have -- is the city aware of any facts showing that distracting signs are a danger to motorist, pedestrians or property?**

MS. JOKERST: Object to scope.

A. I don't know.

BY MR. SHAW:

**Q. Is the city aware of any accidents that have been caused by distracting signs in the City of Salina?**

MS. JOKERST: Object to scope.

A. I don't know.

BY MR. SHAW:

**Q. How does the city determine what is an illegible sign?**

A. So if a sign is faded where it requires additional staring at it, looking at it to discern the sign or if it's like ripped or tattered or if it's -- if it's written in a way where -- it's

A. What do you mean by harm?
**Q. I mean does the city have -- is it aware of any facts showing that the painting on the side of The Cozy Inn has had a detrimental impact on the aesthetics of Salina?**
A. I think what I could say to that is that the downtown district specifically, since you asked about The Cozy Inn, has district regulations that are specifically designed to protect the character and bring forth a certain visual aesthetic in the downtown area that when the proper process is followed where a sign permit is submitted and reviewed and taken to the DRB and is reviewed by the DRB and meets all the policies within the downtown design guidelines and meets all the zoning requirements that those signs enhance the appearance of the aesthetic of the designed character of the downtown area. And that by going outside of those processes and having signage that doesn't meet the downtown requirement and doesn't -- hasn't gone and been reviewed by the downtown review board, it puts at risk intent of the C-4 district regulations that are intended to protect the aesthetic and the character of the downtown area, and it puts at risk the requirement

for downtown review board. Because if Cozy Inn doesn't have to follow those rules, why does anybody else? And then if everybody has signs that don't fit within those character of -- design character of the C-4 district and the downtown review board, then those requirements become null and void.

**Q. All right. What --**

A. And it changes the character of the downtown aesthetic.

**Q. What I'm trying to get at here is apart from the city's determination that the painting on the side of The Cozy Inn is not in compliance with the code, is there any additional facts that the city's aware of that would show that the painting at The Cozy Inn has harmed the aesthetics of the city?**

A. And what I'm saying is this isn't just about The Cozy Inn from our seat. This is about the community as a whole.

**Q. I understand that. But what I'm asking is, is there any factual reason to believe that this particular painting on the side of The Cozy Inn harms the aesthetics of the community apart from its non-compliance in the city's view with**

BY MR. SHAW:
**Q. Attract attention?**
A. Attract attention? I can't tell you the intention of each individual artist and what they intend.
**Q. Can the city determine the intention of any business that wants to put up a sign?**
MS. JOKERST: Object to scope.
A. We can determine that a sign is a sign by its character and elements.
BY MR. SHAW:
**Q. What do you mean by its character and elements?**
A. Does it have writings or pictorial images, representations, emblems, symbols that announce, direct attention to or advertise.
**Q. So by reviewing the potential sign for those elements being contained within it, that is how the city can determine if it is a sign?**
A. Yes.
MS. JOKERST: Object to form. Sorry. I'm trying to follow your question and I'm not trying to interrupt.
BY MR. SHAW:
**Q. All right. I'll try to rephrase this.**

**Does the city determine that a sign or a potential sign is, in fact, a sign by reviewing its content for elements that announce, direct attention to or advertise?**

MS. JOKERST: Object to form.

A. We determine whether or not a display is a sign by looking at the writings, the pictorial representations, the emblem, symbols and whether or not those work together to announce anything or make any proclamations, if they are identifying anything, if they're pointing towards anything or directing to anything or if they're advertising any products or services or highlight any brands or encouraging commerce of some kind.

BY MR. SHAW:

**Q. Okay. So in subsection 5 here, apart from the potential for distraction or for setting a city-wide precedent, is there any other way that a painted wall sign can cause property damage?**

A. Well, I think it could impact the aesthetic appearance. So if you had -- for instance, if you're in a residential district and you had somebody that wanted to put up a giant billboard that's a painted sign in between House A and House B, it could impact the aesthetic and the

character of that neighborhood. It could also impact property values. So there are examples of painted signs that could have negative impacts.

**Q. Okay. But so section 5 here, subsection 5 here, does the property damage that is discussed include aesthetic harms?**

A. Okay. Okay. I understand your question better now. You could also have multiple signs, I guess, that could create litter and clutter if you had a lot of painted signs. So I think -- I think it's -- I don't know that whether it's a painted sign or a non-painted sign it makes much of a difference according to our sign code. It's about the time, place and manner, where the signs, how many signs are there, how large are the signs, how tall are the signs.

**Q. Okay. But subsection 5 here, is that dealing with the aesthetics of signs?**

A. No. This is property damage, personal injury.

**Q. Okay. I guess at least I'll explain what I'm thinking when I read this.**

A. Okay.

**Q. When I think, okay, an improperly constructed sign that could cause property damage**

MS. JOKERST: Yep, that works.
MR. SHAW: So back at 10:30?
MS. JOKERST: Yes. 10:31?
MR. SHAW: Sure.
(THEREUPON, a recess was taken.)
BY MR. SHAW:
**Q. Is the city aware of any facts showing that the painting on the side of The Cozy Inn was improperly constructed?**
A. No.
**Q. Is the city aware of any facts that the -- that would show the painting on the side of The Cozy Inn is poorly maintained?**
A. No.
**Q. Okay. So in subsection 6, you see where it says protect property values, the local economy and quality of life by preserving and enhancing the appearance of the streetscape?**
A. Yes.
**Q. Is the city aware of any facts that the sign code has enhanced property values?**
A. I think it protects property values. And an example of that would be one I've already kind of presented where if you had a residential neighborhood and there was a empty lot between two

houses and somebody came in and put a giant billboard might impact the property values or the desire for people to want to live in that neighborhood.

In the downtown district where we have specific design guidelines for signs, there is a higher standard of development. And there has been in the last ten years transformative investment that's taken place in the millions if not hundreds of millions, kind of transformative investment. And part of those improvements, certainly anything that's on the exterior, front facade or signage gets reviewed by the DRB to make sure that the design fits within the design guidelines of the DRB and is of a certain character and quality that ensures that the property values in the downtown are kept up and that the economy in the downtown is strong because it becomes a desirable area with a perceived quality of life that people enjoy and it has an attractive streetscape appearance because of that.

**Q. Has the city done any sort of studies of property values within the city and how the sign code has impacted those property values?**

MS. JOKERST: Object to scope.

A. Yes.
**Q. All right. So is the -- does this Interrogatory read please identify every government interest served by regulating plaintiff's mural?**
A. Yes.
**Q. And do you see that last sentence there saying the government interests are served by regulating signs like The Cozy sign include aesthetics, pedestrian and traffic safety and property values?**
A. Yes.
**Q. Are there any other interests apart from those list right there that are served by regulating painted wall signs?**
A. I think that's a pretty good summary in that quality of life is kind of encompassed by those ideas. Like it's in there. If you have these things, you're improving quality of life.
**Q. Okay. So is quality of life then, I guess, an overarching interest in the city's view?**
A. Yes.
**Q. Okay.**
A. I mean if you look at these, I think public health, safety and welfare come to mind as

A. So we regulate signs in the aggregate across the entire community. And if we didn't, there would be a potential that you could have a lot more signs producing sign clutter which could enhance the aesthetic of the community. You can have signs that are very large and possibly distracting which could impact the aesthetics of the community.

**Q. Sorry. Let me stop you. I'm not asking about the sign code as a whole right now --**

A. Sure.

**Q. -- and how that may or may not enhances aesthetics. What I'm getting at is this. Interrogatory 4 here --**

A. Yes.

**Q. -- specifically claims that the interests served by regulating the specific types of signs like The Cozy sign include aesthetics. And so I'm asking what facts support that contention that regulating signs like The Cozy sign enhances aesthetics?**

A. Well, it says the sign code regulates all signs, and so that's what I was answering to. I guess I'm still not -- I'm sorry.

**Q. Right now, I'm focusing here on the last**

**district, is there any reason to believe that that change would be factually incorrect?**

MS. JOKERST: Object to form and scope.

A. That's very similar to earlier when you asked me if I think what is -- well, I don't remember the exact question. But I think it's -- yeah, that's something I couldn't answer.

BY MR. SHAW:

**Q. Okay. What facts does the government contend show that regulating signs like The Cozy sign enhances pedestrian safety?**

A. So if you have -- the idea is that the sign regulations are designed to, again, for each district limit the size of signs, the number of signs, the height of signs, the location of signs in order to reduce clutter. We don't want a lot of sign clutter because that can become distracting. It could impair the visual sight lines for motor vehicles as well as pedestrians. Sign sizes, we want to limit them so they don't become a distraction. We don't want signs that hold the eye longer than they should. We want to make sure that signs are effective. Again, that comes down to clutter where if you have too many signs, it becomes --

**Q. I don't want to interrupt you, but is the city aware of any factual data showing its regulating the specific type of signs that The Cozy Inn has enhances pedestrian safety?**

MS. JOKERST: Object to scope.

A. You're asking if The Cozy Inn enhances traffic safety? Is that what you said?

BY MR. SHAW:

**Q. No. I'm asking is the city aware of any like factual data showing that regulating this type of sign enhances pedestrian safety?**

MS. JOKERST: Object to scope.

A. I don't know.

BY MR. SHAW:

**Q. Is the city aware of any -- let me rephrase. What facts does the city contend support the allegation that regulating signs like The Cozy sign enhances traffic safety?**

A. So our regulations, again, are designed to limit the number of signs, the location of signs, the size of signs so that businesses have opportunities or property owners, if they are not even businesses, have opportunities to have signs that give them opportunities to display and post those while at the same time limiting the number

of signs so that you don't have sign clutter that can become distracting. It doesn't make it hard to read the signs because the more signs you have, the more information there is, sometimes the harder it is to really soak in information that you're trying to and it can become distracting when you're focusing on signs rather than driving or walking. And by limiting the number of signs, you reduce clutter. By limiting the size of signs, you limit signs that might be a distraction. By limiting or prohibiting, rather, like blinking, flashing, strobing kind of signs --

**Q. Hold on. Let me stop you. Is the city aware of any facts showing that the sign code, in fact, enhances traffic safety, has succeeded in its objective?**

MS. JOKERST: Object to scope.

A. I don't know how you would even do a study like that if you have these design standards, because you wouldn't have a before and after picture to evaluate.

BY MR. SHAW:

**Q. Is the city aware of any other municipality that has conducted any sort of before and after of its sign code to show if it has, in**

**fact, enhanced traffic safety?**

MS. JOKERST: Object to scope.

A. Yeah, I don't -- I don't know.

BY MR. SHAW:

**Q. Okay. And in a similar vein, is the government aware of any facts that would show that the sign code has, in fact, succeeded in enhancing pedestrian safety?**

MS. JOKERST: Object to scope.

A. I think just like with the traffic safety question, you'd have to have a before and after. So you'd have to have -- and since we have the sign code that we've consistently administered, you don't really have a before and after picture. You just have what we have.

BY MR. SHAW:

**Q. Okay. And does the government or is the government aware of any facts showing that the sign code has succeeded in promoting property values?**

MS. JOKERST: Object to scope.

A. Since the sign code regulations have been administered consistently since their inception which has been a very long time, I don't -- again, you won't -- there's no way to have a before and

**show that painted wall signs are more detrimental to pedestrian safety than painted murals?**

MS. JOKERST: Object to scope.

A. Any specific studies or like...

BY MR. SHAW:

**Q. Any facts that would show that a painted wall sign is more detrimental to traffic -- to pedestrian safety than painted murals?**

MS. JOKERST: Object to scope.

A. No.

BY MR. SHAW:

**Q. Is the government aware of any facts that would show that painted wall signs are more detrimental to traffic safety than painted murals?**

MS. JOKERST: Object to scope.

A. I think the fact that signs by their definition attract your eye in a way to announce, direct attention to or advertise does change the character of a sign in relationship to or contrasted to a mural, a painted mural and that that could have impacts on traffic safety.

BY MR. SHAW:

**Q. So you say it could have impacts on traffic safety. Is the city aware of any facts showing that it, in fact, does have impacts on**

after picture, like this is what the property values used to be. Here's what they are. I can tell you in the downtown area where we have had a lot of redevelopment that property values have gone up. We can certainly -- we could do a study as to what property values were five, ten years ago and what they are now. That exercise has not been completed but we could do that.

BY MR. SHAW:

**Q. Okay.**

A. And I'm sure it would show property values have gone up.

**Q. But the sign code in the business -- or in the downtown area, that was in effect before this increase in property value, correct?**

MS. JOKERST: Object to scope.

A. So the sign code in the downtown business -- or downtown Business Improvement District, you're asking if they predate the downtown or --

BY MR. SHAW:

**Q. You mentioned how in the past I think you said ten years or so the downtown has seen a lot of development, correct?**

A. Yes. Absolutely, yes.

**Q. And so what I'm asking is the sign code,**

**though, long predates that boom in development. Is that correct?**

MS. JOKERST: Object to scope.

A. It does. And it predate -- the BID is not as old as the sign code, but it also predates the recent reinvestment, but I do think it contributes to it.

BY MR. SHAW:

**Q. Okay. Section 42-500, when was that enacted?**

MS. JOKERST: Object to scope.

A. 2017.

BY MR. SHAW:

**Q. Was there a different purpose section in effect before 2017?**

MS. JOKERST: Object to scope.

A. I don't know. I didn't research that.

BY MR. SHAW:

**Q. Okay. Is the city aware of any facts showing that painted wall signs are more harmful to aesthetics than painted murals?**

MS. JOKERST: Object to scope.

A. No.

BY MR. SHAW:

**Q. Is the city aware of any facts that would**

**Q. When was that determination made?**

A. On the 6th of November.

**Q. And who made that determination?**

A. It was -- I assign it to a collective decision. We pulled up a photograph of it and --

**Q. Can I stop you real quick. When you say we pulled up, who is we?**

A. Sure. It would have been the planning staff that was in that meeting at the time which would have been Miss Driscoll, it would have been myself, it would have been Mr. Andrew and Mr. Michelson.

**Q. Okay. So go on. That group of people you just mentioned and you were at a meeting. You pulled up a picture of the kind of the mural. Then what happened?**

A. And we viewed it and it had met the definition of a sign. And we were all like we need to get ahold of Mr. Howard right away, make sure he's aware of this in case he wasn't aware of this, like we didn't want him to get the whole sign up and then that be a problem, so we wanted him to be aware of it as soon as possible since he was in the process of having the sign painted. So we contacted him right away just so that he

**mural at the Cozy Inn announces something?**
A. Yes.
**Q. What did the city determine that it announced?**
A. It proclaims or declares to not fear the smell.
**Q. Okay. Was any other part of the mural determined to be an announcement?**
A. I mean The Fun is inside is making a proclamation of a sort, so that would be an announcement. It's announcing that there's burgers here because there's burgers on -- on the pictorials, representations of the sign.
**Q. Were any other elements of the mural considered an announcement by the city?**
A. I think those are the main ones that jump out at you anyway.
**Q. All right. Did the city determine that The Cozy mural directs attention to something?**
A. Yes. There's an arrow that points towards the pickup window and the entry door into the restaurant.
**Q. Okay. Did the city determine any element of the mural other than the arrow directed attention?**

A. Well, The Fun is inside directs you to inside, invites you inside and to go inside.

**Q. Okay. And did any other elements of the mural direct attention to something?**

A. Those would be the main ones I could think of.

**Q. Okay. And did the city determine that The Cozy mural advertises something?**

A. Yeah. So one of the products that they sell is burgers, and it has pictorial representations of burgers on the outside of the building.

**Q. Okay. Is any other element of the mural an advertisement in the city's estimation?**

MS. JOKERST: I'll object to form.

A. I mean the whole thing kind of works together as a cohesive composition for the sign -- for the sign as an advertisement, because there's a lot of burgers and there's a lot of ketchup and mustard.

BY MR. SHAW:

**Q. Okay. So then is it the city's position the entire mural is an advertisement?**

A. The city's position is the entire painting is a sign that has advertisement in it.

**Q. Fun?**
A. Yeah.
**Q. Okay. And at any point, has the city reevaluated it's determination that the mural is a sign based on Mr. Howard's input?**
A. No.
**Q. Okay. So that determination that had been made even before speaking to Mr. Howard that it was a sign, that has never been reconsidered by the city. Is that correct?**
A. Correct.
**Q. Okay. Was Mr. Schrage involved in that determination?**
A. The determination, no.
**Q. Okay. When the city first contacted Mr. Howard, had a determination already been made that the mural was too large for the C-4 zoning district?**
MS. JOKERST: Object to form.
A. Yes. We had already -- when I talked -- when I spoke with him, I had already did an estimate, if you will, of the size of the sign, an approximation.
BY MR. SHAW:
**Q. Okay. How did that -- how do you**

**calculate that approximation?**

A. The building has kind of -- well, what I would call -- what we would call a broken facade where it's got a flat roof and a facia that has different elevations to it because there's a parapet in the middle. What I did is I measured the height of the wall using Pictometry software which can get pretty close, at least for an estimation, it's good for that, where I can get the height of the wall of the lower parapet and the taller parapet. I think the lower parapet was like 11 feet and the top of the taller parapet was 13. So I took an average of like 12 feet, multiplied it by the length of the wall. And that gave me an estimate of how large that wall sign was.

**Q. Okay. Did you save that Pictometry analysis or file?**

A. No.

**Q. I don't know exactly how Pictometry works.**

A. No, I don't know if you can save but I didn't save.

**Q. All right. So there's no document showing that measurement?**

A. No.

**Q. Okay. At any point since then, has the city reevaluated whether the sign at The Cozy Inn or the painting at The Cozy Inn that we're fighting over here about whether or is or isn't a sign --**

A. Sure.

**Q. -- at any point has the city reevaluated whether or not that painting was too large for the C-4 zoning district?**

A. Well, we ran some -- a mental exercise to see if a text amendment could be approved to -- let me back up. The C-4 district allows for 3 square feet of sign area per lineal foot of building frontage. And The Cozy Inn is 20.8, nominally 21 feet of building frontage. So that comes out to nominally 63 total square foot of sign area that's allowed. We ran a scenario where if we were to propose a text amendment to allow a side wall to also be incorporated and function as a frontage of a building, even though it's not facing a street, would that provide sufficient square footage to allow the proposed Cozy Inn sign, and it was insufficient. That idea, that proposed text amendment would be insufficient for

**in this e-mail, you got those from the Pictometry software. Is that also correct?**

A. The height, the 12 feet is an estimate based on an average of the building. And the 20.8 is from the legal description. So, basically, the deed that shows the lot depth since the building is -- the building takes up the entire lot.

**Q. And that 44.4 feet measurement, how was that one taken?**

A. Yeah, I apologize. I said lot depth. The 20.8 is lot width and the 44.4 is the lot depth. And that's from the deed as well, from the legal description.

**Q. The 20.8 and the 44.4, those are both from the deed description?**

A. Um-hum. From the legal description of the property.

**Q. And 12 feet, you said that's from Pictometry?**

A. Yeah. It's an average estimate because it's got a broken facade or that has multiple heights to it.

**Q. Okay. Was any other measurement ever taken of The Cozy Inn?**

A. I think later on when we did a more

thorough analysis, I think rather than taking average height, I measured the height and width using Pictometry of like three -- there's three different sections. I have three different heights of the building. So I measured more accurately the area of the wall. So I think in my later analysis, it's a similar approximation but it's more accurate.

**Q. All right. Discussing your analysis, I believe what you're talking about will be Exhibit 7, so a few pages down.**

A. I have Exhibit 7.

**Q. Is this the analysis you were just referring to?**

A. Yes.

MR. SHAW: Okay. We'll go ahead and admit Exhibit 7.

BY MR. SHAW:

**Q. So I'm trying to find here is there -- you said somewhere in here you did a different calculation than the one that was in the previous exhibit?**

A. Yeah. So the previous exhibit, the e-mail that we were just discussing which was -- I forgot the exhibit number already, 3 maybe.

**Q. Yes, 3.**
A. Had 540 square feet. This analysis says 528. I wanted to make clear that I measured it differently and that I believe this is more accurate --
**Q. Okay.**
A. -- than the other one. The previous one was more estimated. This one, I was measuring the height of the portion, the east portion that's lower. And there's a central portion that's taller, measured that separate. And then there's a west portion that's lower again, I measured that and then added them together.
**Q. All right. Did this analysis subtract any wall area for the existing signs on that facade of The Cozy Inn?**
A. It did not subtract the area of the existing signs on that side.
**Q. Okay. Did it subtract any area for the service window or door on that facade of The Cozy Inn?**
A. It did not.
**Q. Did it subtract for any of the other architectural features on that facade of The Cozy Inn?**

reviewed if those writings and pictorial representations announced anything, directed your attention towards anything or advertised anything.

BY MR. SHAW:

**Q. And could the city have determined that this painting was a sign without reviewing the content of the painting?**

MS. JOKERST: Object to form and scope.

A. The code that the City of Salina has is indifferent to speech in terms of non-commercial or commercial signage. So I don't know that it's a matter of what the content is but rather does it announce, does it direct attention to or does it advertise, any of those three. In this case, we have all three.

BY MR. SHAW:

**Q. If the content of the mural at the Cozy was just a painting of a pepperoni pizza and that is it, would that be considered a sign by the City of Salina?**

MS. JOKERST: Object to form and scope.

A. I'd have to see the sign. I'd have to see the proposal.

BY MR. SHAW:

**Q. Okay. So for the city to determine if a**

**would enable a code amendment to incorporate that vision? Is that what you're saying?**

A. Potentially. Yes. I mean that was going to be a public conversation. It wasn't going to be a decision by staff, but it was going to be a public conversation that we would have with a consultant that we had engaged in to go through this exercise to see if this is something that the city and the community wanted for the community in the downtown area or just anywhere in the community.

**Q. You just mentioned a consultant. Is that Wendy Moeller that you're referring to?**

A. Yes, that is correct.

**Q. Had she been retained on the date that that meeting at the Smoky Hill Museum took place?**

MS. JOKERST: Object to form and scope.

A. I do not believe so.

BY MR. SHAW:

**Q. Okay.**

A. She was hired at a later date with the understanding that Mr. Howard wanted to work through a public process of potentially looking at a sign code amendment that could allow his sign.

**Q. When was this application placed on hold?**

A. Well, when it came in, it was essentially put on hold because we couldn't approve it.

**Q. Okay. So the city placed it on hold immediately?**

A. Yes, because we could not approve it and we were looking at other solutions, potential solutions. City staff did not have the authority under the current sign code to permit the sign. And in order to permit the sign, it would require an amendment to the sign code.

**Q. So if you could turn to Exhibit -- give me one moment, Exhibit 9. Is Exhibit 9 a Certificate of Compatibility Application filed by The Cozy Inn?**

A. Yes.

**Q. And is it for a Certificate of Compatibility for the mural at the Cozy Inn?**

A. Yes.

MR. SHAW: We'll admit Exhibit 9.

BY MR. SHAW:

**Q. Was this submitted by Mr. Howard at the same time as the Sign Permit Application?**

A. It appears so. It has the same November 13th, 2023 date on it.

**Q. Okay. Was a -- I'm going to say DRB, but**

A. Yes.

**Q. Was The Cozy Inn ever provided with a written statement of the reasons of denial?**

MS. JOKERST: Object to form and scope.

A. The Cozy Inn was informed before the application was even applied for and the sign permit was applied for that the sign was -- did not conform to the C-4 regulations and is not something the staff had the authority to permit.

BY MR. SHAW:

**Q. Was that a written statement?**

A. It was not a written statement. It was a verbal statement in a meeting that I had with Mr. Howard on November 6th and then also at a later meeting that took place at the Smoky Hill Museum.

**Q. Was The Cozy Inn provided with any recommendations about potential changes to the project that might allow it to be approved?**

A. I did mention to Mr. Howard that he could reduce the signage -- the size of the signage to an area that would fit within the 63 total square feet that he had, that he could either reduce the proposed sign down to the remaining nominally 10 square feet that he has or he could remove some existing signs as well but reduce his total

signage down to the 63 square feet that he's allowed.

**Q. Was that -- you said that to him orally?**

A. Correct.

**Q. Okay. Was there any written --**

A. No.

**Q. -- statement of that to Mr. Howard?**

A. No. We did not record that. That was in our initial meeting.

**Q. All right. All right. Can we go back to Exhibit 11 which was Mr. Michelson's letter.**

A. I have Exhibit 11.

**Q. And so did this letter inform Mr. Howard that both his Sign Permit Application and Certificate of Compatibility Application had been placed on hold?**

A. Yes.

**Q. And when was this letter sent?**

A. February 8th, 2024.

**Q. Was any other written correspondence sent to Mr. Howard informing him that his applications were on hold?**

A. No. We thought we were of a common understanding from our verbal conversations that we were going through a comprehensive review of

the sign regulations to see if there was any appropriate text amendments that could be made to accommodate The Cozy Inn sign and that we were waiting for that process to come to its full completion before acting on his sign permit or his Certificate of Compatibility Application.

**Q. I can't remember if asked this already. So if I did, I apologize. Who made the determination to place these applications on hold?**

A. It was -- honestly, it was kind of just an assumption. Like nobody actually said we need to review this, because everyone knew that we couldn't approve it, and we'd already been in conversations about what can we do to accommodate and help Mr. Howard. And so we were of the mind of going down that track of how can we -- how can we possibly help Mr. Howard with his proposal.

**Q. Had the city before this date ever placed an application on hold?**

MS. JOKERST: Object to form and scope.

A. I think due to the nature of the situation where the sign was painted without a sign permit or before going to the DRB that we're in a unique situation where we are very reactionary to the situation, trying to help and