.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.
.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.
.

DEPOSITION OF
MARK WHITE,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 9:07 a.m. on the 31st day of October, 2024, at Kansas Justice Institute, 12980 Metcalf Avenue, Suite 130, in the City of Overland Park, County of Johnson, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

**EXHIBIT 20**

**government entity in a First Amendment free speech case?**

A. Not that I can recall.

**Q. Of those five to ten cases, have you ever represented a governmental entity in a First Amendment free speech case?**

A. Not that I can recall.

**Q. Can you recall, other than this federal case down in Oklahoma, the last case you litigated as an attorney?**

A. Probably it was a case in North Carolina involving an adequate public facilities ordinance.

**Q. I didn't hear you.**

A. It was a case in North Carolina.

**Q. I didn't hear the -- what it was about.**

A. It involved an adequate public facilities ordinance.

**Q. Was that a constitutional challenge?**

A. No.

**Q. Is there a specific type of case of those five to ten cases that you have litigated?**

A. I wouldn't say there's any particular pattern other than they all involve land use and urban planning issues.

**Q. Were any of those five to ten cases**

**Q. What about legal cases? Did you cite legal cases that have the tendency to -- that could have the tendency to undermine your opinions?**

MS. JOKERST: Object to form.

A. Not that I'm aware of, but there could be statements in those cases that somebody could use as an argument against things that are in the report, I suppose.

BY MR. MACROBERTS:

**Q. Did you include any disputed facts or any facts that could undermine your opinion?**

MS. JOKERST: Object --

BY MR. MACROBERTS:

**Q. -- in your report?**

MS. JOKERST: Object to form.

A. Not that I recall.

MR. MACROBERTS: Can we take a five-minute break?

THE WITNESS: Yes. I was going to ask the same thing.

MR. MACROBERTS: Yeah.

(THEREUPON, a recess was taken.)

BY MR. MACROBERTS:

**Q. All right. Mark, do you know whether the**

**City of Salina commissioned or conducted any studies before drafting any version of their sign code?**

MS. JOKERST: Object to form.

A. I am not aware of any.

BY MR. MACROBERTS:

**Q. Do you have any knowledge about why the sign code had been amended at any point?**

MS. JOKERST: Object to form.

A. No.

BY MR. MACROBERTS:

**Q. Are you aware of any peer reviewed studies that have analyzed the efficacy of Salina's sign code in promoting the goals, objectives and policies of the comprehensive plan?**

MS. JOKERST: Object to form.

A. I'm not aware of any peer reviewed studies specifically to -- specific to Salina's own sign code.

BY MR. MACROBERTS:

**Q. So then I was going go through each one. I appreciate you saying that. How about any studies at all. My previous question was peer reviewed studies. Are you aware of any studies that have analyzed the efficacy of Salina's sign**

**Deposition Exhibit 3, the article. What do you call that, an article, a publication? I just want to make sure we're on the same page. What is Exhibit 3?**

A. You can call it a publication.

**Q. That's a good word. All right. Let's go to the publication you authored, the title being Content Neutral Sign Codes After Reed and Austin. Do you have it in front of you?**

A. Yes.

**Q. You -- who was the intended audience for this publication?**

THE REPORTER: What was your objection, Amanda?

MS. JOKERST: To form.

THE REPORTER: Thank you.

A. Urban planners.

BY MR. MACROBERTS:

**Q. Do you stand by the analysis in the publication at Exhibit 3?**

MS. JOKERST: Object to form.

A. Yes.

BY MR. MACROBERTS:

**Q. In the area of content neutrality, it's important to know about the cases of Reed and**

gets into the distinctions between those two and their impacts.

BY MR. MACROBERTS:

**Q. Are you aware of any studies that establish private art is more dangerous than public art?**

MS. JOKERST: Object to form.

A. Not off the top of my head, no.

BY MR. MACROBERTS:

**Q. Are there any cases that establish private art is more dangerous than public art?**

MS. JOKERST: Object to form.

BY MR. MACROBERTS:

**Q. That you're aware of?**

A. Not that I'm aware of.

MR. MACROBERTS: It's 12:10, do you want to take a break.

THE WITNESS: Certainly.

MR. MACROBERTS: All right.

(THEREUPON, a recess was taken.)

BY MR. MACROBERTS:

**Q. All right. Mark, are you -- are you aware of any evidence that establishes that commercial content painted on a wall is more dangerous than non-commercial content painted on a**

**wall?**

MS. JOKERST: Object to form.

A. I'm not aware of anything that specific.

BY MR. MACROBERTS:

**Q. Are you aware of any study or case law that establishes that commercial content painted on a wall is more dangerous than non-commercial content painted on a wall?**

MS. JOKERST: Object to form.

A. Again, I can't think of anything that specific.

BY MR. MACROBERTS:

**Q. Okay. Are you aware of any evidence that would establish that a burger-esque UFO mural is more dangerous than a pizza-esque UFO mural?**

MS. JOKERST: Object to form.

A. Again, I can't think of anything that specific.

BY MR. MACROBERTS:

**Q. Same with studies and case law. There are no studies in cases that would say that?**

A. I --

MS. JOKERST: Object to form.

A. Oh, go ahead.

MS. JOKERST: Just object to form.

BY MR. MACROBERTS:
**Q. I want to go back to Deposition Exhibit 5, the photograph of the Mural at the Mill. Do you agree that the Mural at the Mill is not dangerous?**
MS. JOKERST: Object to form.
A. I don't have any data about the Mural in the Mill and its impacts on traffic safety.
BY MR. MACROBERTS:
**Q. Do you have any reason to believe that the Mural at the Mill display is dangerous?**
A. No.
**Q. Would the exact same mural become dangerous if a daycare business had it painted on their wall?**
MS. JOKERST: Object to form.
A. Not that I know of.
BY MR. MACROBERTS:
**Q. What about if a daycare business started operating inside the mill? Would the mural become dangerous once a daycare started operating inside?**
MS. JOKERST: Object to form.
A. I would have to know more about the business itself to assess its own land use impacts.

were at issue in those cases.

**Q. Are you aware of any complaints made about the display at The Cozy other than from city workers?**

A. No, I'm not aware of any -- any complaints that were filed.

**Q. Are you aware of any academic research that either does or does not support the notion that the public likes painted signs less than other types of painted displays?**

MS. JOKERST: Object to form.

A. I'm not aware of any studies that distinguish painting on a wall versus painting somewhere else.

BY MR. MACROBERTS:

**Q. What about the different types of paintings on a wall? Are you aware of any research that says one type of painting on a wall is more aesthetically pleasing than another type of painting on a wall?**

MS. JOKERST: Object to form.

A. Not that I can recall.

BY MR. MACROBERTS:

**Q. Are you aware of any evidence that would establish that a burger-esque UFO is less**

**aesthetically pleasing than a pizza-esque UFO mural?**

MS. JOKERST: Object to form.

A. Not that I can recall.

BY MR. MACROBERTS:

**Q. Are you aware of any study that would establish that a burger-esque UFO mural is less aesthetically pleasing than a pizza-esque UFO mural?**

MS. JOKERST: Object to form.

A. I can't recall anything that specific.

BY MR. MACROBERTS:

**Q. Are you aware of any evidence, study or case that establishes that commercial content painted on a wall is less aesthetically pleasing than non-commercial content painted on a wall?**

MS. JOKERST: Object to form.

A. In terms of painting on a wall specifically, not specifically, but there are tons of studies on the traffic distraction factor associated with commercial signs.

BY MR. MACROBERTS:

**Q. Well --**

A. So --

**Q. -- I appreciate that.**

A. Okay.

**Q. Do you believe that the Mural at the Mill on Exhibit 5 is aesthetically pleasing?**

MS. JOKERST: Object to form.

A. To me personally, it is.

BY MR. MACROBERTS:

**Q. Does that mural become less aesthetically pleasing if a daycare business were being operated inside the mill?**

MS. JOKERST: Object to form.

A. I don't have a basis for saying that it would.

BY MR. MACROBERTS:

**Q. On page 8 of your report, you wrote neuroscience studies have demonstrated positive amplitude from persons viewing artwork as opposed to negative responses from viewing commercial symbols. Do you see that?**

A. Yes.

**Q. Did you read the Cheng, 2023 study?**

A. Yes.

**Q. Is it your opinion that that is what the Cheng, 2023 study, in fact, said?**

A. There is a statement in the study to that effect that I believe cites another study.

**studies between commercial content painted on a wall versus non-commercial content painted on a wall in the context of travel behavior?**

MS. JOKERST: Object to form.

A. There are studies, and I reference in the report, that talk about public art and how that shifted community behavior and its benefits. And there are studies that talk about the impacts of signs that are commercial on traffic safety. So from that context, yes.

BY MR. MACROBERTS:

**Q. But my question isn't about safety. It's about travel behavior. Because in your report you seem to draw a difference between safety and about behavior.**

MS. JOKERST: If that's a question, I'll object to form again.

A. Okay. I'm not aware of any studies that get into the difference between commercial and non-commercial in terms of travel behavior, especially for individual signs.

BY MR. MACROBERTS:

**Q. In a free speech case involving signs and murals, has any federal court held that urban sprawl is a compelling government interest?**

**Q. Do you see it's like on the left-hand side vertical in green?**
A. Yes.
**Q. And you put some, I guess, pointers here under the heading a community who wants to regulate murals can consider the following options?**
A. Yes.
MR. MACROBERTS: I'm sorry. I did not hear it.
THE REPORTER: She said, "And you put some, I guess, pointers here under the heading a community who wants to regulate murals can consider the following options?"
BY MS. JOKERST:
**Q. Mr. White, are these the -- are the options presented here in your article, do they represent the only way a local government can bring their sign code within constitutional bounds?**
A. No.
**Q. Okay. I want to direct your attention to the report which is that Exhibit 2? Is that what it's marked?**
A. Yes. Yes.